# Exhibit 2

7.  As detailed below, the defendants announced at the beginning of the Class Period that they expected annual income growth of 10% in 2005. In the weeks following the projection, January 25 to February 3, 2005, defendants having insider knowledge of the true undisclosed financial condition of MBNA (that they would be later forced to reveal), sold more than one million shares of their personally-held MBNA stock, including 351,409 shares sold by defendant Bruce L. Hammonds on January 27, 2005 for proceeds in excess of $9 million.

8.  By the time MBNA's fraudulent scheme was finally revealed on April 21, 2005, MBNA revealed that MBNA had to take an almost $207 million write-down of its "IO strip receivable," that its first-quarter income was down 93% percent year-over-year, including the restructuring charge, and that the Company expected full-year earnings to come in "significantly below its 10% growth objective." On this news, shares of MBNA fell to a two-year intraday low of $18.50 before closing at $19.28, down $3.83, or 16.6%, on a day most major bank stocks rose.

9.  As a result of the fraudulent scheme alleged herein, the price of MBNA securities were artificially inflated during the Class Period, Individual Defendants reaped substantial economic proceeds (over $39 51 million) from their insider stock sales, and investors suffered damaged when revelations of the true facts caused a decline in the value of their investments.

10. Defendants knowingly or recklessly directly participated in the fraudulent acts and misconduct for which damages are sought against each of them and/or are

charged with liability as controlling persons. The fact that the financial condition of the Company was materially overstated in its public statements was known

negatively impacted. During the two years that preceded the Class Period, the Individual Defendants sold 2,429,313 shares of MBNA common stock for proceeds of $56,230,935. In comparison, over a mere three months (the Class Period), the Individual Defendants sold ~~1,480,484~~1,937,948 shares of MBNA common stock for proceeds of $ ~~39,364,725.~~51,643,058.50. Defendants' Class Period stock sales both collectively and individually as reflected in Exhibit C incorporated herein by reference were unusual and suspicious in terms of timing and amount because each defendant's stock sales were unusual in scope and timing by virtue of the volume of stock sold during the weeks that immediately followed MBNA's January 2005 guidance of 10% growth for 2005 as follows:

    a.    Defendant Bruce Hammonds sold ~~352,675~~351,409 shares for ~~almost~~more than $9 million in proceeds, representing 6.64% of his total holdings including vested options, this represented a trade of 30.92% of his total open market sales since January 2003:

**Bruce Hammonds: CEO and President**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/27/2005 | 351,409 | 26.51 | ~~9,315,044.35~~ 9,315,852.59 |

    b.    Defendant Kenneth Vecchione's sales of 100,462 shares for $~~2,684,399~~2,684,398.70 in proceeds, representing 8.80% of his total holdings including vested options during the Class Period, is highly unusual because it represents 100% of his open market sales for the two years prior:

**Kenneth Vecchione: CFO**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/25/2005 | 79,829 | 26.7 | 2,131,434.30 |
| 1/25/2005 | 20,633 | 26.8 | 552,964.40 |

37

|            |           |
|-----------:|----------:|
|            | ~~2,684,399~~ 2,6 |
| 100,462    | 84,398.70 |

c.  Defendant John Cochran's sales of 531,159 shares for over $14 million in proceeds, representing 8.96% of his total holdings including vested options during the Class Period, is highly unusual because in one day Cochran sold more shares and profited the highest amount of proceed than any other trading day in the two years prior:

**John Cochran: COO**

| Transaction Date | Shares  | Price | $ Value |
|------------------|---------|-------|---------|
|                  |         |       | ~~10,554,040.76~~ |
| 1/27/2005        | 398,150 | 26.51 | 10,554,956.50 |
| 1/27/2005        | 133,009 | 26.55 | 3,531,388.95 |
|                  |         |       | ~~14,085,429.71~~ |
|                  | 531,159 |       | 14,086,345.45 |

d.  Defendant Charles Krulak's sales of 497,454 shares for over $13 million in proceeds, representing 64.02% of his total holdings including common stock and options exercised as reported with the SEC, is highly unusual because it represents 90.64% of his open market sales for the preceding two years:

**Charles Krulak: Chief Accounting Officer**

| Transaction Date | Shares  | Price | $ Value |
|------------------|---------|-------|---------|
| 2/1/2005         | 224,754 | 26.75 | 6,012,169.50 |
| 2/1/2005         | 50,217  | 27    | 1,355,859.00 |
| 1/31/2005        | 92,483  | 26.5  | 2,450,799.50 |
|                  |         |       | ~~3,459,547.00~~ 3 |
| 1/25/2005        | 130,000 | 26.61 | ,459,300.00 |
|                  |         |       | ~~13,278,375.00~~ |
|                  | 497,454 |       | 13,278,128.00 |

e.  Defendant Richard Struthers sales of 457,464 shares for over $12 million in proceeds, representing 12.53% of his total holdings including vested options during

38

the Class Period, is highly unusual because it represents 55.61% of his open market sales for the preceding two years:

**Richard Struthers: Vice Chairman**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 2/3/2005 | 457,464 | 26.84 | ~~12,278,344.00~~ 12,278,333.76 |

101. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding MBNA and its business practices, their control over and/or receipt of MBNA's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning MBNA, were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

39

102. The Individual Defendants engaged in such a scheme to inflate the price of MBNA securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the