# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE MBNA CORP.<br>SECURITIES LITIGATION | Case No. 05-00272-GMS<br>CONSOLIDATED |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## THEIR MOTION TO DISMISS

Richard H. Morse (No. 531)
rmorse@ycst.com
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

*Attorneys for Defendants*

Of Counsel:

Richard J. Urowsky
Richard C. Pepperman, II
Ryan C. Williams
Christopher F. Nelson
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

February 10, 2006

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING.............................................................1

SUMMARY OF ARGUMENT .............................................................................2

STATEMENT OF FACTS .................................................................................5

    A.    MBNA's January 20, 2005 Press Release Reporting Its
Fourth Quarter 2004 Earnings and Expected Restructuring
Charge ...................................................................................5

    B.    MBNA's January 21, 2005 Webcast and Estimate of FY
2005 Earnings Growth ................................................................6

    C.    MBNA's Fourth Quarter Valuation of Its Interest-Only
Strip Receivable ......................................................................7

    D.    MBNA's April 21, 2005 Press Release Reporting First
Quarter 2005 Earnings .............................................................10

    E.    Plaintiffs' Allegations in the Amended Complaint.....................................10

    F.    The Subsequent Merger with Bank of America Corporation ....................11

ARGUMENT .............................................................................................11

I.    Plaintiffs' Section 10(b) Claim Should Be Dismissed...........................................12

    A.    Plaintiffs Have Not Alleged with Sufficient Particularity
That Each Defendant Acted with Scienter..............................................14

        1.    The Amended Complaint Does Not Contain Sufficiently
Particularized Allegations of "Motive and Opportunity" ................14

            a.    Plaintiffs Have Not Adequately Alleged MBNA's
Motive ........................................................................14

            b.    Plaintiffs' Allegations of Sales of MBNA Stock by
the Individual Defendants During the Class Period
Are Insufficient to Plead Motive........................................15

        2.    The Amended Complaint Does Not Contain Sufficiently
Particularized Allegations of Conscious Misbehavior or
Recklessness .....................................................................23

    B.    Under the PSLRA and Rule 9(b), the Individual Defendants
Cannot Be Liable for Alleged Misstatements They Did Not
Make ..................................................................................25

C.   Two of the Allegedly False and Misleading Statements Fall within the PSLRA's Safe-Harbor Provisions and Are Protected by the "Bespeaks Caution" Doctrine ..........................................28

    1.   MBNA's Statements about the Expected Restructuring Charge Are Protected by Both PSLRA Safe Harbors.......................29

    2.   MBNA's Statements about Expected 2005 Earnings Growth Are Protected by Both PSLRA Safe Harbors.....................31

    3.   The Two Statements Also Are Protected by the "Bespeaks Caution" Doctrine ...........................................................32

D.   The Timing of MBNA's Decision to Write-Down Its Interest-Only Strip Receivable Was a Matter of Business Judgment.....................................................................................................33

II.   Plaintiffs' Section 20(a) Claim Should Be Dismissed...........................................36

CONCLUSION................................................................................................................38

# TABLE OF AUTHORITIES

## CASES

*Page(s)*

*Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995)..............................................21

*Cal. Pub. Employees' Ret. Sys.* v. *Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)......................................................................................12

*Clark* v. *TRO Learning, Inc.*, No. 97 C 8683,
   1998 WL 292382 (N.D. Ill. May 20, 1998)...............................................................29

*Coates* v. *Heartland Wireless Commc'ns, Inc.*,
   26 F. Supp. 2d 910 (N.D. Tex. 1998) .......................................................................26

*Denny* v. *Barber*, 576 F.2d 465 (2d Cir. 1978)..............................................................34

*Deutschman* v. *Beneficial Corp.*, 841 F.2d 502 (3d Cir. 1988) ......................................23

*DiLeo* v. *Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) .............................................4, 34

*Graves* v. *Lowery*, 117 F.3d 723 (3d Cir. 1997)............................................................11

*GSC Partners CDO Fund* v. *Washington*,
   368 F.3d 228 (3d Cir. 2004)................................................................................14, 23

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999)...................................................3, 13, 14, 15, 22, 25, 27

*In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137 (3d Cir. 2004)..................13, 14, 15, 23, 25

*In re American Business Financial Services, Inc. Sec. Litig.*,
   No. 04-0265, 2005 WL 1324880 (E.D. Pa. 2005) ....................................................37

*In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418 (E.D. Pa. 2002)..........................33

*In re Bell Atl. Corp. Sec. Litig.*, Civil Action Nos. 91-0514 *et seq.*,
   1997 WL 205709 (E.D. Pa. Apr. 17, 1997)...............................................................27

*In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574 (D.N.J. 2005)....................26

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997).......................................................11, 12, 13, 15, 20, 21

*In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896,
    2005 WL 2840336 (D.N.J. Oct. 27, 2005)....................................................21

*In re Carter-Wallace, Inc. Sec. Litig*, 150 F.3d 153 (2d Cir. 1998)..........................24, 25

*In re Cigna Corp. Sec. Litig.*, No. Civ. A. 02-8088,
    2005 WL 3536212 (E.D. Pa. Dec. 23, 2005) ..........................................31

*In re Delmarva Sec. Litig.*, 794 F. Supp. 1293 (D. Del. 1992) ........................................12

*In re Digital Island Sec. Litig.*,
    223 F. Supp. 2d 546 (D. Del. 2002)........................................3, 5, 26, 36, 37

*In re Glenayre Techs., Inc. Sec. Litig.*,
    982 F. Supp. 294 (S.D.N.Y. 1997) ............................................................22

*In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865,
    1998 WL 283286 (S.D.N.Y. June 1, 1998) ...............................................21

*In re Merck & Co. Sec. Litig.*, No. 04-3298,
    2005 U.S. App. LEXIS 27412 (3d Cir. Dec. 15, 2005) ...........................12

*In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425 (D.N.J. 2000).......................24

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ........................34

*In re Party City Sec. Litig.*, 147 F. Supp. 2d 282 (D.N.J. 2001).....................................23

*In re PDI Sec. Litig.*, No. Civ. A. 02-CV-0211,
    2005 WL 2009892 (D.N.J. Aug. 17, 2005) .............................................26

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280 (3d Cir. 1999)...................12

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198 (3d Cir. 2002).............13, 36

*In re Royal Dutch/Shell Transport Sec. Litig.*,
    380 F. Supp. 2d 509 (D.N.J. 2005) ..........................................................27

*In re Suprema Specialities, Inc. Sec. Litig.*,
    334 F. Supp. 2d 637 (D.N.J. 2004) ..........................................................15

*In re Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993).......................................32, 33

*Kriendler* v. *Chem. Waste Mgmt., Inc.*,
    877 F. Supp. 1140 (N.D. Ill. 1995) .................................................34, 35, 36

*Malin* v. *IVAX Corp.*, 17 F. Supp. 2d 1345 (S.D. Fla. 1998)...........................................24

*Marra* v. *Tel-Save Holdings, Inc.*, Master File 98-3145,
    1999 WL 317103 (E.D. Pa. May 18, 1999) ........................................27, 28

*MBIA Ins. Corp.* v. *Royal Indem. Co.*, 221 F.R.D. 419 (D. Del. 2004)..........................26

*Morse* v. *Lower Merion School Dist.*, 132 F.3d 902 (3d Cir. 1997)................................12

*Nat'l Distillers & Chem. Corp.* v. *Dep't of Energy*, No. Civil 79-399,
    1980 WL 1057 (D. Del. Oct. 23, 1980) ...................................................12

*Oran* v. *Stafford,* 226 F.3d 275 (3d Cir. 2000) ................................................16

*SEC* v. *Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968).........................................34

*Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272 (3d Cir. 1992)...............................................13

*Smith* v. *Circuit City Stores, Inc.*, 286 F. Supp. 2d 707 (E.D. Va. 2003) ........................30

*Wilson* v. *Bernstock*, 195 F. Supp. 2d 619 (D.N.J. 2002)................................................15

## STATUTES, RULES AND LEGISLATIVE HISTORY

15 U.S.C. § 78j(b)..................................................................................1

15 U.S.C. § 78t(a) ................................................................................2, 36

15 U.S.C. § 78u-4(b)(2) ....................................................................14, 25

15 U.S.C. § 78u-5(c)(1) ..............................................................29, 31, 32

15 U.S.C. § 78u-5(i)(1) ...............................................................28, 29, 31

17 C.F.R. § 240.10b-5............................................................................1

Fed. R. Civ. P. 9(b) .....................................................2, 12, 13, 24, 26, 35

Fed. R. Civ. P. 12(b)(6)..........................................................................2

H.R. Conf. Re. No. 104-369 ...............................................................28

## NATURE AND STAGE OF THE PROCEEDING

Between May 3 and June 8, 2005, nine putative securities class actions were brought against MBNA Corporation ("MBNA" or the "Company") and certain of its officers.[1] These complaints were filed in the wake of MBNA's April 21, 2005 announcement that its earnings for the first quarter of 2005 were lower than previously expected.[2] By Order dated October 13, 2005, this Court consolidated the nine securities cases and appointed Activest Investmentgesellschaft mbH as lead plaintiff. On December 12, plaintiffs filed a consolidated amended class action complaint (the "Amended Complaint"), seeking to represent a putative class of all persons who purchased or otherwise acquired shares of MBNA stock between January 20 and April 20, 2005 (the "Class Period").

The Amended Complaint names MBNA as a defendant, as well as five of its officers (collectively, the "Individual Defendants"): Bruce L. Hammonds (MBNA's President and CEO), Kenneth A. Vecchione (MBNA's Chief Financial Officer), John R. Cochran (MBNA's Chief Operating Officer), Richard K. Struthers (MBNA's Chief Lending Officer) and Charles C. Krulak (MBNA's Chief Accounting Officer). Plaintiffs assert one count against all defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (collectively, "Section 10(b)"). Plaintiffs assert a

---

[1] Seven of these complaints were filed in this Court, and two complaints were filed in the Southern District of New York and then transferred to this Court.

[2] In addition to these securities class actions, a putative class action was brought on behalf of participants in MBNA's 401(k) Plus Savings Plan under Section 502 of ERISA. Three derivative actions also were filed by MBNA shareholders and later consolidated. MBNA has moved to dismiss these other actions, which are also pending in this Court.

second count against the Individual Defendants pursuant to Section 20(a) of the
Exchange Act, 15 U.S.C. § 78t(a).

Both counts are based on certain allegedly false or misleading statements
by MBNA during the Class Period. Plaintiffs allege that MBNA "deceived the market"
by stating that (i) the size of a restructuring charge was unexpected (Am. Compl. ¶ 2),
(ii) MBNA would experience 10% earnings growth in 2005 (*id.* ¶¶ 2, 83-86), (iii) one of
the Company's assets, known as the "interest-only strip receivable," was worth more than
it actually was (*id.* ¶¶ 3-4, 82), and (iv) MBNA estimates the value of its interest-only
strip receivable on a "quarterly basis" (*id.* ¶¶ 6, 87-88).

Defendants now move, pursuant to Rules 9(b) and 12(b)(6) of the Federal
Rules of Civil Procedure, to dismiss the Amended Complaint in its entirety for failure to
state a claim upon which relief can be granted, and for failure to plead fraud with the
requisite particularity.

## SUMMARY OF ARGUMENT

The Amended Complaint is a classic example of pleading fraud-by-
hindsight, a practice Congress sought to eliminate with passage of the Private Securities
Litigation Reform Act of 1995 ("PSLRA"). It should be dismissed for the following
reasons.

1.    Plaintiffs have failed adequately to plead a "strong inference" of
scienter by alleging either "motive and opportunity" to commit fraud or "conscious
misbehavior or recklessness." Plaintiffs offer only a very general allegation of MBNA's
supposed "motive," which they fail to support with particularized facts. Although
plaintiffs contend that the Individual Defendants had the requisite motive because they

sold MBNA stock during the Class Period, they do not demonstrate, as they must, that the sales were unusual in scope or timing. To the contrary, as set forth in the Appendix accompanying this brief, the Individual Defendants' sales were consistent with their prior trading history in both scope and timing, and thus do not give rise to a "strong inference" of scienter. Plaintiffs' remaining scienter allegations, which are primarily based on the Individual Defendants' executive and managerial positions, fall far short of the standard for recklessness or conscious misbehavior applicable in the Third Circuit.

        2.     The claims against the Individual Defendants also fail because the Amended Complaint does not allege the fraudulent acts of each defendant separately, instead impermissibly grouping them together for pleading purposes. For example, plaintiffs allege that all of the Individual Defendants "knew or recklessly disregarded" that MBNA had overstated the value of its interest-only strip receivable because "each . . . held a position with MBNA wherein they would have" had access to certain financial information. (Am. Compl. ¶ 92.) Courts in this Circuit, including this Court, have rejected similar attempts to invoke the so-called "group pleading" doctrine. *See, e.g.*, *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 553 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004). Moreover, the Third Circuit has upheld the dismissal of securities complaints based on similarly general "imputations of knowledge" targeted at a group of defendants. *See, e.g*, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company.").

        3.     Two of the alleged misstatements challenged in the Amended Complaint are not actionable because they were forward-looking statements accompanied

by meaningful cautionary language. The statement that MBNA hoped to achieve 10%
earnings growth in 2005 is a classic forward-looking statement, and was accompanied by
the warning that MBNA might not meet its earnings goal because, among other reasons,
it had decided to reduce its reliance on so-called 0% "teaser" credit card rates. Likewise,
MBNA's statement regarding the expected size of a restructuring charge was forward-
looking and accompanied by sufficient cautionary language. These two statements thus
are protected from Section 10(b) liability by the PSLRA's "safe-harbor" provisions, as
well as the judicial "bespeaks caution" doctrine.

    4.  The Amended Complaint's allegations regarding MBNA's
valuation of its interest-only strip receivable are an attack on the exercise of the
Company's business judgment. Plaintiffs claim that MBNA deceived the market by
failing to "timely write-down to fair value" its interest-only strip receivable at the end of
the fourth quarter of 2004. (Am. Compl., ¶ 63.) In advancing this claim, plaintiffs ignore
the fact that MBNA adjusted the value of its interest-only strip receivable downwards by
$95.7 million at the end of the fourth quarter. Plaintiffs also fail to allege with sufficient
particularity that the need to write-down the value of the strip by more than $95.7 million
at that time was "so apparent" that MBNA's failure to do so amounted to fraud. Instead,
plaintiffs plead "fraud-by-hindsight," noting that MBNA took an almost $207 million
write-down of its interest-only strip receivable at the end of the first quarter of 2005. *See
DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("If all that is involved is a
dispute about the timing of the writeoff, . . . we do not have fraud; we may not even have
negligence.").

5.      Plaintiffs' Section 20(a) claim fails because the Amended

Complaint does not sufficiently plead a predicate violation of Section 10(b).  This claim

also fails because plaintiffs have not pled with particularity that Individual Defendants

Cochran, Struthers or Krulak (i) were "controlling persons" within the meaning of

Section 20(a) or (ii) culpably participated in any of the alleged fraud.  Plaintiffs instead

rely on the sort of general allegations that this Court has previously rejected.  *See In re

Digital Island Sec. Litig.*, 223 F. Supp. 2d at 561.

## STATEMENT OF FACTS

**A.      MBNA's January 20, 2005 Press Release Reporting Its Fourth
Quarter 2004 Earnings and Expected Restructuring Charge**

On January 20, 2005, MBNA issued a press release announcing net

income for the fourth quarter ($768.9 million) and fiscal year ($2.68 billion) 2004.  (Am.

Compl. ¶ 80.)  According to the press release, net income for FY 2004 represented an

increase of 15% compared to FY 2003.  (*Id.*)  The press release also disclosed that

MBNA would take a one-time restructuring charge in the first quarter of 2005 in

connection with voluntary early retirement and severance programs.  (January 20, 2005

Press Release, attached as Ex. A to the Affidavit of Richard C. Pepperman, II, sworn to

February 9, 2006 ("Pepperman Aff.").)  The restructuring was expected to cost between

$300 and $350 million.  (*Id.*)

In a report on Form 8-K, filed with the Securities and Exchange

Commission ("SEC") on January 20, 2005 (*see* Am. Compl. ¶ 81), MBNA warned

investors that the restructuring charge was only an estimate and that it was subject to

change if, for example, the number of employees participating in the early retirement and

severance programs turned out to be higher than expected:

This report includes forward-looking statements and estimates concerning the restructuring charge. Such statements and estimates are subject to risks and uncertainties that may cause the Corporation's actual performance to differ materially from that set forth in such forward-looking statements and estimates. For example, *the actual number and identity of people participating in the early retirement and severance programs*, and the overall impact of the restructuring on the Corporation's business, *could affect the amount of the charge and the actual expense reductions in 2005 and 2006.*

(SEC Form 8-K, filed January 20, 2005, attached as Ex. B to Pepperman Aff. (emphasis added).)

**B.    MBNA's January 21, 2005 Webcast and Estimate of FY 2005 Earnings Growth**

On January 21, 2005, MBNA hosted a conference call for analysts. (Am. Compl. ¶ 83.)[3] During this call, MBNA's CEO and President, Bruce Hammonds, predicted that the Company would experience earnings growth of "about 12% over the next several years," but that it would see more modest growth of 10% in 2005, primarily because the Company was "starting the year off at a relatively low level of average growth." (Transcript of January 21, 2005 Conference Call, attached as Ex. C to Pepperman Aff., at 4.)

That same day, MBNA filed a report on Form 8-K with the SEC, which repeated that "management's objective is to increase earnings per share by 10% in 2005 . . . , excluding the impact of the previously announced restructuring charge." (Am. Compl. ¶ 84.) The 8-K warned that MBNA expected growth to be slower in the first half of 2005 than in the second half as a result of the "overall slower industry growth rate and the Corporation's decision to reduce its marketing of low introductory rate [credit card]

---

[3]  Plaintiffs erroneously allege (Am. Compl. ¶ 83) that the call occurred on January 20, 2005.

offers in 2004." (SEC Form 8-K, filed January 21, 2005, attached as Ex. D to Pepperman
Aff.)[4]

MBNA's January 21, 2005 Form 8-K also contained significant additional
cautionary language. For example, it noted that the estimate of FY 2005 earnings was
"forward looking" and therefore "subject to risks and uncertainties that may cause the
Corporation's actual performance to differ materially" from its estimate. (*Id.*) This
general cautionary language was followed by specific examples of variables that might
adversely affect future earnings, including competition and the Company's decision to
reduce its reliance on 0% introductory rates:

> Competition from other lenders could affect the Corporation's loans
> outstanding, Customer retention, and the rates and fees charged on the
> Corporation's loans. Competitors may offer lower rates and fees and
> attractive benefits and rewards. As part of its strategy for profitable
> growth, in 2004 the Corporation began offering fewer 0% promotional
> rates, which has the effect of negatively impacting loans outstanding.

(*Id.*) The 8-K also expressly warned that "[c]ustomer spending and *repayment levels* . . .
impact the Corporation's loans outstanding." (*Id.* (emphasis added).)

### C.    MBNA's Fourth Quarter Valuation of Its Interest-Only Strip Receivable

On March 15, 2005, MBNA filed with the SEC its annual report on

Form 10-K for FY 2004. (Am Compl. ¶ 87.) The FY 2004 10-K largely repeated the

results announced by MBNA on January 20, 2005. It also explained to investors how

MBNA "securitize[s]" its credit card loans in order to recognize immediate gains on the

---

[4]  The fact that MBNA had begun in 2004 reducing its reliance on 0% "teaser rates" was public
knowledge before the analyst call. (*See* January 20, 2005 Press Release, Ex. A to Pepperman
Aff., at 1 ("Throughout 2004, MBNA reduced its reliance on 0% promotional offers as a driver of
receivables growth and introduced a number of value-based products centered upon the
WorldPoints rewards platform.").)

debt, but retains certain rights that entitle it to cash flows.  (2004 Annual Report, attached

as Ex. E to Pepperman Aff., at 56.)  One of those rights is known as an "interest-only

strip receivable."

MBNA's interest-only strip receivable represents its contractual right to

receive interest and other revenue from a trust to which MBNA has sold certain credit

card debt.  MBNA calculates the value of its interest-only strip receivable, which is

"based on the present value of expected future net revenue flows," as follows:

> [M]anagement uses certain assumptions and estimates in determining the
> fair value of the interest-only strip receivable.  These assumptions and
> estimates include projections of interest income, certain fees, recoveries
> on charged-off securitized loans, gross credit losses on securitized loans,
> contractual servicing fees, and the interest rate paid to investors in a
> securitization transaction ("excess spread") . . . .  [O]ther assumptions and
> estimates used by the Corporation in estimating the fair value of the
> interest-only strip receivable include projected loan payment rates, which
> are used to determine the estimated life of the securitized loan principal
> receivables, and an appropriate discount rate.

(*Id.* at 23; *see also* Am. Compl. ¶ 65.)

As the Form 10-K explained, MBNA "reviews prior assumptions and

estimates" on a quarterly basis and "compares the results to actual trust performance and

other factors for the prior period that approximates the average life of the securitized loan

receivables." (2004 Annual Report at 23; *see also* Am. Compl. ¶ 87.)  The 10-K further

disclosed the potential volatility of the value of this asset:

> If the assumptions change, or actual results differ from projected results,
> the interest-only strip receivable and securitization income would be
> affected.  If management had made different assumptions for the periods
> covered by this report that raised or lowered the excess spread or projected
> loan payment rates, the Corporation's financial condition and results of
> operations could have differed materially.  For example, a 20% change in
> the excess spread assumption for all securitized loan principal receivables
> could have resulted in a change of approximately $259 million in the value

of the total interest-only strip receivable at December 31, 2004, and a
related change in securitization income.

(2004 Annual Report at 23.)  In fact, the 10-K warned investors that the Company's

estimates and assumptions might turn out to be incorrect for a number of reasons:

> [First,] the rates paid to investors in the Corporation's securitization
> transactions are primarily variable rates subject to change based on
> changes in market interest rates.  [Second,] [c]hanges in market interest
> rates and competitive pressures can also affect the projected interest
> income on securitized loans, as the Corporation could reprice the managed
> loan portfolio.  [Third,] [c]redit loss projections could change in the future
> based on changes in the credit quality of the securitized loans, the
> Corporation's account management and collection practices, and general
> economic conditions.  [Finally,] projected loan payment rates could
> fluctuate based on general economic conditions and competition.

(*Id.*)  The 10-K thus stressed that the "[a]ctual and expected changes in these assumptions

may result in future estimates of the excess spread and projected loan payment rates

being *materially different* from the estimates used in the periods covered by this report."

(*Id.* (emphasis added).)

        In 2004, MBNA adjusted the value of its interest-only strip receivable

downwards by more than $47 million at the end of the first quarter (SEC Form 10-Q,

filed May 10, 2004, attached as Ex. F to Pepperman Aff., at 34), by more than $62

million at the end of the second quarter (SEC Form 10-Q, filed August 9, 2004, attached

as Ex. G to Pepperman Aff., at 44), and by $95.7 million at the end of the fourth quarter.[5]

In total, MBNA wrote-down the value of its interest-only strip receivable by $193.6

---

[5]  The fourth quarter figure can be calculated by subtracting the cumulative write-down during the
first three quarters of 2004 ($97.865 million) (*see* SEC Form 10-Q, filed November 9, 2004,
attached as Ex. H to Pepperman Aff., at 46) from the yearly total ($193.604 million) (*see* 2004
Annual Report at 39).

million in 2004, largely as a result of adverse changes to projected "excess spread[s]" and customer loan repayment rates during the year.  (2004 Annual Report at 39.)

### D.    MBNA's April 21, 2005 Press Release Reporting First Quarter 2005 Earnings

On April 21, 2005, MBNA issued a press release (and filed a report on Form 8-K with the SEC) reporting first quarter 2005 net income of $.02 per common share, including a $767.7 million restructuring charge and an additional $206.6 million downward adjustment of the value of its interest-only strip receivable.  (April 21, 2005 Press Release, attached as Ex. I to Pepperman Aff.)  The restructuring charge was significantly higher than previously predicted, and MBNA informed the public that it would not meet its previously announced goal of increasing its earnings per share by 10% for FY 2005.  (Am. Compl. ¶ 59.)  The press release explained that the Company's results were adversely affected by "unexpectedly high payment volumes from U.S. credit card customers."  (April 21, 2005 Press Release.)

The price of MBNA stock declined significantly on April 21 and 22, 2005.  (Am. Compl. ¶ 60.)  This decline prompted a wave of lawsuits, including the nine securities class actions that were ultimately consolidated into this action.

### E.    Plaintiffs' Allegations in the Amended Complaint

Plaintiffs allege that the Company and the Individual Defendants violated Sections 10(b) and 20(a) of the Exchange Act by making four material misstatements during the Class Period.  These alleged misstatements concern (i) the expected size of the restructuring charge (Am. Compl. ¶ 2), (ii) the actual value of MBNA's interest-only strip receivable at the end of the fourth quarter of 2004 (*id.* ¶¶ 80-82), (iii) the projection of MBNA's 2005 earnings growth (*id.* ¶¶ 83-86), and (iv) the process by which the

Company calculates the value of its interest-only strip receivable (*id.* ¶¶ 87-88).[6]

Plaintiffs seek to assert these claims on behalf of those MBNA shareholders who

purchased or otherwise acquired shares of MBNA stock during the Class Period.  (*Id.*

¶ 23.)

### F.    The Subsequent Merger with Bank of America Corporation

On April 20, 2005—the day before MBNA announced its earnings for the

first quarter of 2005—MBNA stock closed at $23.11 per share.[7]  After the announce-

ment, the price of MBNA stock declined to a low of $18.45 on April 22, 2005, but then

began to recover, rising to well over $21 per share in May and June 2005.  On June 30,

2005, MBNA announced that it had entered into an agreement to be acquired by Bank of

America Corporation.  When announced, the deal valued MBNA at $27.50 per share.

This transaction closed on January 1, 2006.  On December 30, 2005—the last trading day

for shares of MBNA stock—MBNA stock closed at $27.15 per share.

### ARGUMENT

In deciding a motion to dismiss, a court must accept as true all well-pled

factual allegations of the complaint.  *Graves* v. *Lowery,* 117 F.3d 723, 726 (3d Cir. 1997).

A court is not, however, required to credit bald assertions or legal conclusions.  *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997).  Neither is a

court required to credit "unwarranted factual inferences contradicted by written

documents incorporated and referred to in the complaint."  *Nat'l Distillers & Chem.*

---

[6]  The initial complaints in these securities class actions challenged only MBNA's estimate of its 2005 earnings growth.

[7]  A document setting out the closing price of MBNA common stock for each trading day in 2005 is attached as Exhibit J to the Pepperman Aff.

*Corp.* v. *Dep't of Energy*, No. Civil 79-399, 1980 WL 1057, at *1 (D. Del. Oct. 23,

1980); *see also* Morse v. *Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)

(citing Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357

(2d ed. 1997)).

In ruling on a motion to dismiss, a court may consider documents and

information not included in or attached to a complaint if the material (i) is "integral to or

explicitly relied upon in the complaint," *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184

F.3d 280, 287 (3d Cir. 1999) (emphasis omitted); (ii) is a matter of public record, such as

SEC filings, *In re Delmarva Sec. Litig.*, 794 F. Supp. 1293, 1299 (D. Del. 1992); or

(iii) can be judicially noticed, such as the historical closing prices of a company's stock,

*In re Merck & Co. Sec. Litig.*, No. 04-3298, 2005 U.S. App. LEXIS 27412, at *5 n.3 (3d

Cir. Dec. 15, 2005).

## I.     Plaintiffs' Section 10(b) Claim Should Be Dismissed.

To state a claim under Section 10(b), a plaintiff must allege that "(1) the

defendant made a materially false or misleading statement or omitted to state a material

fact necessary to make a statement not misleading; (2) the defendant acted with scienter;

and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury."

*Cal. Pub. Employees' Ret. Sys.* v. *Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

When pleading fraud claims, Rule 9(b) requires that "the circumstances

constituting [the] fraud . . . be stated with particularity." Fed. R. Civ. P. 9(b). This

"heightened pleading standard gives defendants notice of the claims against them,

provides an increased measure of protection for their reputations, and reduces the number

of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory

Sec. Litig.*, 114 F.3d at 1418.

As the Third Circuit explained, Rule 9(b) "has been rigorously applied in securities fraud cases." *Id.* at 1417. Securities plaintiffs must accompany legal theories with "factual allegations that make their theoretically viable claim plausible." *Id.* at 1418; *see also Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1992). In other words, they must allege the "who, what, when, where and how" of the events at issue. *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004) (internal quotations omitted).

In addition to Rule 9(b), the PSLRA "imposes another layer of factual particularity to allegations of securities fraud," requiring "plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002). Like Rule 9(b), the PSLRA's heightened pleading requirement was intended to "restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." *In re Advanta Corp. Sec. Litig.,* 180 F.3d at 531.

Plaintiffs' Section 10(b) claim should be dismissed for four reasons. First, plaintiffs' scienter allegations fall far short of the heightened requirements of the PSLRA and Rule 9(b). Second, the Amended Complaint fails to allege that each Individual Defendant acted culpably and instead impermissibly groups them together for pleading purposes. Third, two of the alleged misstatements are protected by the PSLRA's safe

- 13 -

harbors and the judicial "bespeaks caution" doctrine.  And fourth, MBNA's decision to

write down the value of its interest-only strip receivable by $95.7 million—and not

more—at the end of the fourth quarter of 2004 was a matter of business judgment.

### A.    Plaintiffs Have Not Alleged with Sufficient Particularity That Each Defendant Acted with Scienter.

The PSLRA provides that "the complaint shall, with respect to *each* act or

omission alleged to violate [Section 10(b)], state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind," *i.e.*, scienter.

15 U.S.C. § 78u-4(b)(2) (emphasis added).  Scienter has been defined as "a mental state

embracing intent to deceive, manipulate, or defraud."  *In re Alpharma Inc. Sec. Litig.*,

372 F.3d at 148 (internal quotations omitted).  Under Third Circuit law, a plaintiff may

plead scienter by alleging either (i) "motive and opportunity" supported by "facts stated

'with particularity'" that "give rise to a 'strong inference' of scienter," *In re Advanta*

*Corp. Sec. Litig.*, 180 F.3d at 535 (quoting 15 U.S.C. § 78u-4(b)(2)); or (ii) facts that

"constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 237 (3d Cir. 2004).  The

Amended Complaint does not adequately allege either.

### 1.    The Amended Complaint Does Not Contain Sufficiently Particularized Allegations of "Motive and Opportunity."

#### a.  Plaintiffs Have Not Adequately Alleged MBNA's Motive.

Plaintiffs allege that "[b]ecause MBNA was dependent on securitizations

as its chief source of liquidity, it was in the defendants' interest to delay disclosure of the

need to materially increase reserves and alter prepayment assumptions."  (Am. Compl.

¶ 48.)  This very general allegation, unaccompanied by "facts stated with particularity"

that give rise to a "strong inference of scienter," is insufficient to establish that MBNA

- 14 -

had the requisite motive. *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535 (internal

quotation marks omitted). Indeed, courts in this Circuit have rejected similarly vague

allegations as insufficient to plead scienter as to a corporate defendant. *See In re*

*Alpharma Inc. Sec. Litig.*, 372 F.3d at 152 (rejecting "motive allegations" that "could be

made against virtually any for-profit entity"); *Wilson* v. *Bernstock*, 195 F. Supp. 2d 619,

636 (D.N.J. 2002) ("desire to maintain a high bond or credit rating or to represent to

creditors that the corporation remains capable of meeting its debt obligations" is

insufficient scienter allegation).

> **b. Plaintiffs' Allegations of Sales of MBNA Stock by the Individual Defendants During the Class Period Are Insufficient to Plead Motive.**

Plaintiffs' allegations (Am. Compl. ¶¶ 99-100) that the Individual

Defendants sold MBNA stock during the Class Period are likewise insufficient to plead

motive. The Third Circuit has held that fraudulent intent cannot be inferred "'from the

mere fact that some officers sold stock.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d at

540 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1424). Rather, stock

sales "may" support an inference of scienter only if plaintiffs allege both that the sales

"were unusual in scope or timing" and that "the trading profits were substantial in

comparison to their overall compensation." *Id.* Plaintiffs thus must allege facts that

enable the court to compare the scope of the sales to the defendant's "total level of

compensation or the size of previous sales" and compare the timing of the sales "to the

timing of past trades." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d at 152.

Although the Amended Complaint mouths the phrases "unusual in scope

and timing" (Am. Compl. ¶ 100), plaintiffs have not satisfied their pleading burden under

either theory. *In re Suprema Specialities, Inc. Sec. Litig.*, 334 F. Supp. 2d 637, 657

(D.N.J. 2004) ("[P]laintiff bears the burden of pleading a factual basis to demonstrate that [trades] were unusual or suspicious."). As demonstrated below (and more fully in the Appendix ("App.") to this brief),[8] the Individual Defendants' sales of MBNA stock during the Class Period were consistent with their prior transactions in both scope and timing. Moreover, every one of the Individual Defendants actually increased his MBNA stock holdings during the Class Period.

**Bruce L. Hammonds (President and CEO).** Plaintiffs allege that Hammonds sold 351,409 shares of MBNA stock during the Class Period, representing approximately 6.6% of his total MBNA stock holdings and 30.92% of his total "open market" sales of MBNA stock since January 2003. (Am. Compl. ¶ 100(a).) Plaintiffs do not provide, however, any information about Hammonds's total compensation. Nor do they provide trading data over any time period prior to January 2003. Such data show that Hammonds's sales during the Class Period were consistent in timing and scope with prior sales.

Since at least 2001, Hammonds has acquired or sold MBNA stock on a quarterly basis. In 2001, for example, Hammonds exercised options or sold large quantities of MBNA stock in January, May and August. (App.) He did the same in January and June of 2002, and exercised options or disposed of shares in every quarter of 2003 and 2004. (*Id.*) The timing of these transactions was consistent with his sales and dispositions during the Class Period, the bulk of which occurred in January 2005.

---

[8] The trading histories set forth in the Appendix are derived from SEC Form 4s filed by the Individual Defendants. This Court can take notice of these transactions in deciding a motion to dismiss. *Oran* v. *Stafford,* 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of information contained in Forms 4 and 5 and Form 14A Proxy statements filed with the SEC).

Indeed, as the Appendix demonstrates, Hammonds sold or disposed of large amounts of MBNA stock in January of every year since 2001. There was, in short, nothing "unusual" about his January sales during the Class Period.

Although plaintiffs allege that Hammonds's sales of MBNA stock during the Class Period were "30.92% of his total . . . sales since January 2003" (Am. Compl. ¶ 100(a)), that allegation, by itself, is insufficient to establish that the scope of his sales was unusual. To the contrary, the data collected in the Appendix show that the scope of Hammonds's sales of MBNA stock during the Class Period was normal. On June 17, 2004, Hammonds exercised options on and then sold or disposed of 481,428 shares of MBNA stock, far more shares than he sold or disposed of during the entire Class Period (438,384 shares). (App.) On June 4, 2003, Hammonds exercised options on 315,184 shares of MBNA stock and then sold or disposed of 365,184 shares. (*Id.*) And on September 17, 2003, Hammonds exercised options on and then sold or disposed of 282,000 shares. (*Id.*) In sum, Hammonds's trading history demonstrates that he regularly transacted MBNA stock in large blocks, typically on a quarterly basis, which is exactly what he did during the Class Period.

**Kenneth A. Vecchione (Chief Financial Officer).** Plaintiffs allege that Vecchione sold 100,462 shares of MBNA stock during the Class Period, representing "100% of his open market sales" for the prior two years. (Am. Compl. ¶ 100(b).) Again, plaintiffs' account is incomplete. For one thing, plaintiffs fail to provide any information about Vecchione's total compensation. They also ignore the fact that, with one exception (2003), Vecchione regularly acquired or sold MBNA stock in January or March of each year since 2001. (App.)

During the Class Period, Vecchione acquired or disposed of MBNA stock during January and March, as was his custom, in the following amounts: on January 25, 2005, he sold or disposed of 79,829, 14,236 and 20,633 shares (three separate transactions), but also exercised options for 26,565, 22,500 and 45,000 shares (same). (App.) On January 28, 2005, Vecchione acquired another 23,055 shares pursuant to a Company plan, and on March 1, 2005, he disposed of 4,011 shares (for tax purposes) and acquired 64,156 additional shares (Company plan). (*Id.*) In sum, Vecchione actually acquired 62,567 more shares than he sold or disposed of during the Class Period (as reported on SEC Form 4s). (*Id.*) Similarly, since 2001, Vechionne increased his beneficial ownership of MBNA stock in each year. (*Id.*)

**John R. Cochran (Chief Operating Officer).** Plaintiffs allege that Cochran's sales of MBNA stock during the Class Period—allegedly totaling 531,159 shares—were "highly unusual because in one day Cochran sold more shares and profited the highest amount of proceed than any other trading day in the two years prior." (Am. Compl. ¶ 100(c).) Again, plaintiffs provide no information about Cochran's total compensation, and they provide a selective account of Cochran's trading history.

Since 2001, Cochran has regularly sold or acquired MBNA stock on a quarterly basis, primarily in January, March, May/June and August/September. (App.) Cochran's transactions during the Class Period are consistent with this pattern. On January 27, 2005, Cochran sold or disposed of 398,150, 150,935 and 133,009 shares in three separate transactions. (*Id.*) That same day, he also exercised options to acquire 549,085 shares. (*Id.*) Six weeks later, on March 1, 2005, Cochran disposed of 7,520 shares (for tax purposes) and acquired an additional 118,481 shares through a Company

plan. (*Id.*)  In sum, Cochran acquired 13,563 more shares than he sold during the Class

Period (as reported on SEC Form 4s).  (*Id.*)  Moreover, Cochran sold or disposed of

fewer shares during the Class Period (689,614) than he did in prior years (Cochran sold

or disposed of 1,285,558 shares in 2003 and 855,487 shares in 2002).  (*Id.*)

        Plaintiffs focus on the fact that Cochran sold a large quantity of shares on

one day during the Class Period, January 27, 2005.  (Am. Compl. ¶ 100(c).)  This fact

alone is unremarkable.  For example, Cochran sold or disposed of 501,934 shares on June

17, 2004, and sold or disposed of 615,000 shares on August 26, 2003.  (App.)  Going

back further, this pattern of large transactions on single days continues:  Cochran sold or

disposed of 600,000 shares on May 27, 2003, immediately after exercising the same

number of options.  (*Id.*)  Before that, he sold or disposed of 324,966 shares on

September 10, 2002, again just after exercising the same number of options.  (*Id.*)  In this

context, there was simply nothing unusual about the scope of Cochran's Class Period

transactions.

        **Richard K. Struthers (Chief Lending Officer).**  Plaintiffs allege that

Struthers's sales during the Class Period—allegedly totaling 457,464 shares—were

unusual because they represented "55.61% of his open market sales for the preceding two

years."  (Am. Compl. ¶ 100(e).)  This allegation says nothing about Struthers's total

compensation and, more importantly, is misleading.  During the two-year period

identified by plaintiffs, Struthers sold or disposed of large quantities of MBNA stock on

only three days:  November 7, 2003 (sold 200,000 shares), June 16, 2004 (sold or

disposed of 285,252 shares), and, as plaintiffs allege, February 3, 2005.  (App.)  Given

Struthers's history of transacting large blocks of MBNA shares on isolated days, there

was nothing unusual about his transactions during the Class Period. Moreover, like the other Individual Defendants, Struthers was a net acquiror of MBNA stock, both during the Class Period (103,958 shares, as reported on SEC Form 4s) and during every year since 2001 (shares beneficially owned). (*Id.*)

**Charles C. Krulak (Chief Accounting Officer).** Like Struthers's, plaintiffs allege that Krulak's "open market" sales during the Class Period—totaling 497,454 shares—were unusual because they represented a high percentage of his total open market sales over the prior two years. (Am. Compl. ¶ 100(d).) Again, plaintiffs say nothing about Krulak's total compensation and ignore his longer-term trading history. Although considerably larger than in prior years, Krulak's sales during the Class Period are consistent with his overall trading pattern, which, with the exception of 2003, shows that he transacted MBNA stock on a quarterly basis. (App.) Moreover, during the Class Period, Krulak was a net acquirer of MBNA stock, acquiring nearly 73,000 more shares than he sold or disposed of, as reported to the SEC. (*Id.*)

Taken together, the Individual Defendants' trading histories simply do not support plaintiffs' scienter allegations. In each case, the allegedly "suspicious" sales of MBNA stock were consistent with the Individual Defendants' prior transactions in both scope and timing. Nor is there anything surprising about the sales. As the Third Circuit recognized, "[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1424.

Moreover, plaintiffs fail to provide "information as to whether the profits made were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud." *Id.* at 1423. The court in *In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896, 2005 WL 2840336, at *11 (D.N.J. Oct. 27, 2005), dismissed a similar complaint in part because plaintiffs failed to allege how much stock was "provided to [the insider defendants] as part of their compensation," which made it impossible to determine "whether the defendants' sales were normal and routine." *See id.* ("Although the allegations show that the individual defendants made over $16 million by selling 47.22% of all defendants' holdings, without context, that simply is not sufficient to demonstrate unusual activity.").

In addition, the Individual Defendants' sales during the Class Period represent a small fraction of their total MBNA stock holdings (shares plus vested options). In *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998), the court dismissed a complaint despite allegations that defendants improperly sold over $18 million of company stock during the Class Period, which on average was in excess of 20% of their holdings. In that case, "Defendants' sales during the Class Period were:  Kerz, 3.06%, Holster, 5.62%, Carson, 14.02%, Staffa, 22.94%, Simon, 23.53%, Stowe, 24.92% and McIntyre, 81.9%." *Id.* at *6 n.3. The court held that those sales, without more, were insufficient to satisfy the PSLRA's pleading requirements regarding scienter. *Id.* at *6; *see also Acito* v. *IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (affirming dismissal of securities class action in part because director's sale of 11% of his holdings did not raise strong inference of scienter).

As alleged by plaintiffs, the Individual Defendants' stock sales in this case are of a similar size: Hammonds (6.64%); Vecchione (8.8%); Cochran (8.96%); Struthers (12.53%); Krulak (64.02%). (Am. Compl. ¶ 100.) Such small sales relative to their total holdings are insufficient to give rise to a strong inference of scienter. *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 541 (scienter inference unavailable even though insider defendants sold 5% and 7% of total Advanta shares because they retained enough shares to belie allegation that they "had a motive to capitalize on artificially inflated stock prices").

All of the Individual Defendants also retained substantial holdings of MBNA stock and vested options during and after the Class Period—in fact, all were net acquirers of MBNA stock during the Class Period (as reported to the SEC). *See In re Glenayre Techs., Inc. Sec. Litig.*, 982 F. Supp. 294, 299 (S.D.N.Y. 1997) (no inference of scienter in part because "defendants still owned over 3 million shares of Glenayre stock" after alleged illegal insider trading). As explained above, Hammonds's SEC filings show that he acquired 56,180 more shares during the Class Period than he sold or disposed of (App.); Vecchione 62,657 more shares (*id.*); Cochran 13,563 more shares (*id.*); Struthers 103,958 more shares (*id.*); and Krulak 72,753 more shares (*id.*). These facts are inconsistent with plaintiffs' assertion that the Individual Defendants had "motive" to defraud by taking advantage of an artificially inflated stock price.

Finally, there is nothing unusual about the fact that the Individual Defendants sold stock in January 2005, shortly after MBNA announced its FY 2004 results. As the Third Circuit has noted, because insiders are permitted to trade only in a "window" after a public announcement is made, it is not unusual for insiders to sell stock

after earnings announcements. *Deutschman* v. *Beneficial Corp.*, 841 F.2d 502, 506 (3d Cir. 1988) ("The 'disclose or abstain from trading' rule laid down in the insider trading cases imposes on insiders a duty to disclose information which need not otherwise be disclosed before they act on that information in any uninformed marketplace."); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001) ("Trading following public announcements simply evidences compliance with the securities laws."). That is exactly what happened in this case. *See also In re Alpharma Inc. Sec. Litig.*, 372 F.3d at 152 n.9.

### 2. The Amended Complaint Does Not Contain Sufficiently Particularized Allegations of Conscious Misbehavior or Recklessness.

To plead scienter based on conscious misbehavior or recklessness, "it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false." *GSC Partners*, 368 F.3d at 239. Neither can recklessness simply be equated with negligence. Rather, "[a] reckless statement is a material misrepresentation or omission 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535).

Here, plaintiffs offer the following allegations of reckless or conscious misbehavior, none of which rises to the level of specificity required by the PSLRA or suggests an "extreme departure" from the standards of ordinary care:

(1)     MBNA failed to write down the value of its interest-only strip receivable by a sufficient amount at the end of the fourth quarter of 2004 in violation of GAAP. (Am. Compl. ¶¶ 69-76.)

- 23 -

(2)    Senior MBNA management "always received a 'highly detailed' internal report" known as "the Package," that included "present and projected expenses and revenues of everything relating to items appearing on the Company's general ledger" (*id.* ¶ 51) and that "would have" included information necessary to estimate the value of the interest-only strip receivable (*id.* ¶ 92).

(3)    It was "well-known" that unspecified "senior management" encouraged others "to systematically manipulate undesirable results" by, for example, changing "journal entries." (*Id.* ¶ 50.)[9]

(4)    The Individual Defendants "knew" of or participated in the fraudulent conduct based on their positions within the Company and their access to information. (*See id.* ¶¶ 10, 54, 64, 97-98.)

As an initial matter, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 472 (D.N.J. 2000). "Such a violation, on its own, does not represent the extreme departure from the standards of ordinary care that the recklessness standard requires." *Malin* v. *IVAX Corp.*, 17 F. Supp. 2d 1345, 1361 (S.D. Fla. 1998) ("Plaintiffs' allegations of a GAAP violation do not give rise to a strong inference that the Defendants acted know-ingly or recklessly."); *see also In re Carter-Wallace, Inc. Sec. Litig*, 150 F.3d 153, 157 (2d Cir. 1998) (affirming dismissal of complaint in part because "one cannot state a claim

---

[9]  This vague allegation (Am. Compl. ¶¶ 50, 94) is a red herring.  The Amended Complaint contains no claim based on the allegation that the Individual Defendants improperly "record[ed]" journal entries."  (*Id.* ¶ 50.)  Even if the allegation were relevant to plaintiffs' claims, it does not satisfy the particularity requirements of the PSLRA and Rule 9(b).

for securities fraud merely by alleging a GAAP violation"). Nowhere do plaintiffs allege that the Individual Defendants were involved in or perpetrated the alleged GAAP violations and thus possessed the requisite scienter. (Am. Compl. ¶¶ 66-76.)

At most, the Amended Complaint alleges in conclusory fashion that all of the "defendants . . . knew or recklessly disregarded" that the assumptions used to value MBNA's interest-only strip receivable were overly optimistic. (*Id.* ¶ 68.) The only basis for this alleged knowledge or recklessness—aside from the vague allegation that each Individual Defendant was a "senior manager"—is that they had access to "the Package." (*Id.* ¶¶ 51-54.) This is not enough to meet the PSLRA's "strong inference" requirement. The Third Circuit has consistently held that the "mere fact that the information was sent" to a defendant "and therefore was available for [their] review" is "insufficient to 'give rise to a strong inference that [defendants] acted with the required state of mind.'" *In re Alpharma, Inc. Sec. Litig.*, 372 F.3d at 151 (quoting 15 U.S.C. § 78u-4(b)(2)). Nor can plaintiffs' allegations of scienter "rest primarily upon the premise that the individual defendants are liable simply by virtue of the positions they held within the company." *Id.* at 149. "Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." *In re Advanta Corp. Sec. Litig.,* 180 F.3d at 539.

### B.    Under the PSLRA and Rule 9(b), the Individual Defendants Cannot Be Liable for Alleged Misstatements They Did Not Make.

Plaintiffs seek to hold every Individual Defendant liable for every alleged false or misleading statement. In doing so, they ignore the most basic of the PSLRA's pleading requirements, namely, that the complaint must allege that each defendant is culpable. 15 U.S.C. § 78u-4(b)(2). Plaintiffs take the position that the Individual Defendants should be treated as a group "[b]ecause of their board membership and/or

executive and managerial position with MBNA" (Am. Compl. ¶ 91) and because "each defendant held a position with MBNA wherein they would have . . . received a copy of 'the Package'" (*id.* ¶ 92). The Court should reject this argument.

To start, the "PSLRA codifies a ban against group pleading" by requiring plaintiffs to plead particularized facts concerning *each* alleged misstatement or omission with respect to *each* individual defendant. *Coates* v. *Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 916 (N.D. Tex. 1998). Indeed, this Court, along with others in this Circuit, has "reject[ed] the viability of group pleading under the PSLRA" on the ground that "under the PSLRA . . . scienter [must] be pled with particularity as to each defend-ant." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 553; *see also In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 584 (D.N.J. 2005) ("[T]he prevailing authority within this District counsels that group pleading has been abolished."); *In re PDI Sec. Litig.*, No. Civ. A. 02-CV-0211, 2005 WL 2009892, at *24 (D.N.J. Aug. 17, 2005) (refusing to recognize group pleading doctrine subsequent to passage of PSLRA).

"[W]hen alleging fraudulent behavior against a group of defendants, a plaintiff is required to separately plead the fraudulent acts of each defendant to satisfy Rule 9(b)." *MBIA Ins. Corp.* v. *Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004). "Collective allegations of fraud against a group of defendants" do not suffice. *Id.* Here, plaintiffs have alleged no factual basis for establishing that defendants John Cochran, Richard Struthers and Charles Krulak possessed any control over MBNA's financial disclosures or had any involvement in the statements at issue in this lawsuit. (*See* Section II, *infra*.)

Plaintiffs' general allegation that all of the Individual Defendants "received 'the Package'" (*id.* ¶¶ 53-54) is insufficient to state a fraud claim against each defendant under the PSLRA and Rule 9(b). *See In re Advanta Corp. Sec. Litig.,* 180 F.3d at 539. Even accepting this allegation as true, plaintiffs do not allege that "the Package" included all of the information required to calculate the value of the interest-only strip receivable. Nor do they allege that any of the Individual Defendants, based on the information in "the Package," (i) actually calculated the value of the strip (or even knew how to do so) or (ii) actually knew that the value of the strip had to be adjusted downward by more than it was ($95.7 million) at the end of the fourth quarter of 2004.[10]

In addition, with one exception, plaintiffs do not attempt to connect any of the alleged material misstatements with specific defendants. (Although plaintiffs attribute the statement concerning MBNA's expected 2005 earnings to Hammonds, as explained in Section I.C.2, *infra,* that forward-looking statement is protected by the PSLRA's safe harbors and the bespeaks caution doctrine.) To survive a motion to dismiss, the PSLRA requires that plaintiffs "attribute at least one statement to each of the Individual Defendants to whom a violation of Rule 10(b) is alleged." *In re Royal Dutch/Shell Transp. Sec. Litig.*, 380 F. Supp. 2d 509, 558 (D.N.J. 2005). For example, in *Marra* v. *Tel-Save Holdings, Inc.*, Master File 98-3145, 1999 WL 317103, at *6 (E.D. Pa. May 18, 1999), the court dismissed the claims against the individual defendants because

---

[10] Plaintiffs also claim that MBNA's statement that it revalues its interest-only strip receivable on a "quarterly basis" was false or misleading because defendants received "the Package" on a monthly basis. (Am. Compl. ¶¶ 6, 87.) That defendants supposedly received "the Package" monthly does not mean that MBNA valued its interest-only strip receivable more frequently than quarterly. In any event, "[t]here is . . . no duty to disclose internal forecasts to the public." *In re Bell Atl. Corp. Sec. Litig.*, Civil Action Nos. 91-0514 *et seq.*, 1997 WL 205709, at *22 (E.D. Pa. Apr. 17, 1997).

plaintiffs "failed to plead with particularity the allegations against each of the individual

defendants." The court explained:

> Plaintiffs fail to identify which defendant was responsible for making the
> challenged statements or omissions. Plaintiffs simply assert conclusory
> allegations that the individual defendants "had access to the adverse
> undisclosed information . . . from internal corporate documents" and were
> "involved in the drafting, producing, reviewing, and/or disseminating" the
> false and misleading statements. The only mention of the individual
> defendants' involvement with the communication of the allegedly fraudu-
> lent statements are three averments that the individual defendants signed
> various annual reports. Asserting such facts alone will not prevent
> dismissal. Plaintiffs must properly plead wrongdoing as to each individual
> defendant and cannot merely rely on the individuals' positions or
> committee memberships [in so doing].

*Id.* (citations omitted). As the *Marra* court did, this Court should dismiss the

Section 10(b) claim asserted against the Individual Defendants for failure to plead fraud

with the required particularity as to each defendant.

C.   **Two of the Allegedly False and Misleading Statements Fall
within the PSLRA's Safe-Harbor Provisions and Are Protected
by the "Bespeaks Caution" Doctrine.**

To encourage public companies to make projections and estimates without

fear of litigation, the PSLRA created two statutory safe harbors for forward-looking state-

ments. *See* H.R. Conf. Re. No. 104-369 at 42-45. A statement is "forward-looking"

under the PSLRA if it: (i) "contain[s] a projection of revenues, income (including

income loss), earnings (including earnings loss) per share, capital expenditures,

dividends, capital structure, or other financial items;" (ii) is "a statement of the plans and

objectives of management for future operations, including plans or objectives relating to

the products or services of the issuer;" (iii) is "a statement of future economic

performance, including any such statement contained in a discussion and analysis of

financial condition by the management or in the results of operations included pursuant to

the rules and regulations of the Commission;" or (iv) is a "statement of the assumptions underlying or relating to any statement described" above. 15 U.S.C. § 78u-5(i)(1).

The first PSLRA safe harbor provides that a defendant "shall not be liable with respect to any forward-looking statement" if the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).  This safe harbor protects forward-looking statements regardless of a defendant's actual knowledge.

The second safe harbor protects forward-looking statements, regardless of accompanying cautionary language, unless plaintiff can "prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i).  To avoid this safe harbor, a plaintiff cannot merely allege (as plaintiffs do here (*e.g.*, Am. Compl. ¶ 3)) that defendants knew *or* were reckless in failing to know that a statement was false or misleading. *See* 15 U.S.C.§ 78u-5(c)(1)(B)(i).  Because such an allegation raises the possibility that defendants were merely reckless in their statements, it is insufficient to plead that defendants had the required "actual knowledge." *See Clark* v. *TRO Learning, Inc.*, No. 97 C 8683, 1998 WL 292382, at *5 (N.D. Ill. May 20, 1998).

### 1.    MBNA's Statements about the Expected Restructuring Charge Are Protected by Both PSLRA Safe Harbors.

Plaintiffs allege that "defendants deceived the market by reporting purported present facts that the true size of a restructuring charge was unexpected." (Am.

Compl. ¶ 2.)[11]  Even if plaintiffs had pled supporting facts—which they did not—this

claim would fail as a matter of law because MBNA's initial estimate of the restructuring

charge clearly falls within the PSLRA safe harbors for forward-looking statements.

MBNA's January 20, 2005 Form 8-K stated that "[t]he restructuring

charge is expected to total approximately $300 million to $350 million pre-tax . . . ."

(January 20, 2005 Press Release, Pepperman Aff. Ex. A.)  This statement is followed by

cautionary language, which plainly identifies the restructuring estimate as "forward

looking:"

> This release includes forward-looking statements and estimates
> concerning the restructuring charge.  Such statements and estimates are
> subject to risks and uncertainties that may cause the Corporation's actual
> performance to differ materially from that set forth in such forward-
> looking statements and estimates.  For example, the *actual number and
> identity of people participating* in the early retirement and severance
> programs, and the overall impact of the restructuring on the Corporation's
> business, *could affect the amount of the charge* and the actual expense
> reductions in 2005 and 2006.

(*Id.* (emphasis added).)

MBNA's statements about the expected restructuring charge contained

management's projections of anticipated costs.  As such, the statements are forward-

looking within the meaning of the PSLRA.  *See, e.g., Smith* v. *Circuit City Stores, Inc.*,

286 F. Supp. 2d 707, 722 (E.D. Va. 2003) ("Circuit City's lease statements were for

future costs.  The accuracy of those statement could only be verified after they were

made.  Thus, the lease statements were forward-looking.").  The statements also were

accompanied by meaningful cautionary language that specifically warned of the risk that

---

[11]  Plaintiffs fail to include this statement in the later section of the Amended Complaint entitled
"False and Misleading Statements and Omissions."  (Am. Compl. ¶¶ 80-89.)

more employees than expected might elect to participate in the early retirement and severance programs.

Moreover, plaintiffs have not alleged that any of the defendants actually knew, as required by the PSLRA, that the statements were false or misleading. *See* 15 U.S.C. § 78u-5(c)(1). Accordingly, these statements fall within both PSLRA safe harbors.

### 2. MBNA's Statements about Expected 2005 Earnings Growth Are Protected by Both PSLRA Safe Harbors.

Plaintiffs also challenge MBNA's statement that its "'objective is to increase earnings per share by 10% in 2005.'" (Am. Compl. ¶ 84 (quoting MBNA's January 21, 2005 Form 8-K).) This statement is unquestionably a forward-looking statement, and it was identified as such. *In re Cigna Corp. Sec. Litig.*, No. Civ. A. 02-8088, 2005 WL 3536212, at *3 (E.D. Pa. Dec. 23, 2005) ("A statement is forward-looking if it is a statement containing a projection of . . . earnings . . . per share."). The remaining statements in MBNA's January 21, 2005 Form 8-K are assumptions underlying MBNA's plan or projection, and therefore are considered forward-looking under the PSLRA. 15 U.S.C. § 78u-5(i)(1).

MBNA's January 21, 2005 Form 8-K, which was issued immediately following the conference call announcing the Company's expected earnings growth, contained meaningful cautionary statements:

> This release includes forward-looking statements and estimates concerning MBNA Corporation's financial performance. Such statements and estimates are subject to risks and uncertainties that may cause the Corporation's actual performance to differ materially from that set forth in such forward-looking statements and estimates.

(January 21, 2005 Form 8-K, Pepperman Aff. Ex. D.)  MBNA then identified specific factors that could cause actual results to "differ materially" from MBNA's estimates, including:  (i) "competition from other lenders," which might take the form of "lower rates and fees" and "attractive benefits and rewards;" (ii) MBNA's decision to offer "fewer 0% promotional rates, which has the effect of negatively impacting loans outstanding;" and (iii) "[c]ustomer spending and repayment levels and [c]ustomer use of the Corporation's lending products over competing lending products, such as mortgage and home equity products." (*Id.*)  Given these cautionary statements, MBNA's forward-looking statements regarding projected 2005 growth clearly fall within the PSLRA's first safe harbor.

The PSLRA's second safe harbor also protects these statements because plaintiffs once again have not alleged that any of the defendants had actual knowledge that the statements were false or misleading. *See* 15 U.S.C. § 78u-5(c)(1).

### 3.   The Two Statements Also Are Protected by the "Bespeaks Caution" Doctrine.

Under the "bespeaks caution" doctrine, when a document's "forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors." *In re Trump Casino Sec. Litig.,* 7 F.3d 357, 371 (3d Cir. 1993).  "In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." *Id.*  To be "meaningful," a cautionary statement must be more than "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks." *Id.*  Rather, the statement must be "substantive and

tailored to the specific future projections, estimates or opinions" challenged by plaintiffs. *Id.* at 371-72.

The statements discussed in the previous two sections are protected by the bespeaks caution doctrine, and were therefore "immaterial as a matter of law." *Id*. at 371. The warnings accompanying MBNA's estimate of the restructuring charge were tailored to the projection by clearly identifying risks specific to the estimate, such as the risk that more employees would participate in the early retirement and severance programs than anticipated. (January 20, 2005 Press Release, Pepperman Aff. Ex. A.) MBNA's statement about expected earnings growth in 2005 also was accompanied by a tailored warning: the January 21, 2005 Form 8-K identifies specific risks that might affect MBNA's ability to achieve the projected growth, such as MBNA's decision to discontinue teaser rates or changes to customer prepayment rates. (January 21, 2005 Form 8-K, Pepperman Aff. Ex. D.) These are the very risks that plaintiffs now claim came to pass. *See, e.g.*, *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 441-42 (E.D. Pa. 2002) (ATI's projection of 25% revenue growth was "not misleading in a material sense" because ATI identified "specific risk factors," many of which were "the very ones plaintiffs identify in the complaint as actually coming to pass").

### D.    The Timing of MBNA's Decision to Write-Down Its Interest-Only Strip Receivable Was a Matter of Business Judgment.

Plaintiffs allege that MBNA "fail[ed] to timely write down" the value of its interest-only strip receivable, causing the Company to overstate its fourth quarter 2004 earnings. (*See* Am. Compl. ¶¶ 3-4, 6, 69, 74-75.) Although the value of the interest-only strip receivable is determined based on a variety of different factors, plaintiffs rely almost exclusively on one factor—credit card payment rates. (*See, e.g., id.* ¶ 6.) At bottom,

- 33 -

plaintiffs claim that, based on negative prepayment trends, MBNA should have adjusted the value of its interest-only strip receivable downwards in the fourth quarter of 2004 by more than $95.7 million, presumably by as much as it did in the first quarter of 2005 ($206.6 million). (*See, e.g.*, *id.* ¶ 74.)

"Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito*, 47 F.3d at 53. This is because "'the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC.'" *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) (quoting *SEC* v. *Texas Gulf Sulphur Co.*, 401 F.2d 833, 850 n.12 (2d Cir. 1968) (*en banc*)); *see also DiLeo*, 901 F.2d at 627 ("If all that is involved is a dispute about the timing of the writeoff, . . . we do not have fraud; we may not even have negligence."); *Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978) ("For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones. . . . [F]ailure to [act with greater clairvoyance] does not constitute fraud.").

The decision in *Kriendler* v. *Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140 (N.D. Ill. 1995), is directly on point. As in this case, plaintiffs alleged that "[a]t year-end 1992, defendants should have reported material write-downs in the carrying value of CHW's property, plant and equipment, principally its incinerators, in order to comply with [Generally Accepted Accounting Principles] GAAP." *Id.* at 1152 (alterations in original and internal quotation omitted). In support of their fraud claim, plaintiffs

"quote[d] at length from various accounting standards in an attempt to establish that GAAP required CHW to write-down the value of [its assets] once [their] impairment was known." *Id.* at 1153. In holding that plaintiffs' allegations did not satisfy Rule 9(b), the court explained:

> Plaintiffs have failed to allege facts which would provide a basis for this Court to infer that CHW actually concealed a decision to write-down its assets before July 1993. In addition, even if CHW contemplated a write-down before its public announcements in July and September of 1993, "[f]irms are not required to make public in-house estimates of their future performance," and "internal projections still in the process of consideration and revision cannot serve as the basis for [10b-5] liability." Thus, any discussions regarding a write-down which CHW might have had prior to its announcement (but chose not to disclose to the public) are not actionable as fraud, unless those discussions moved from the consideration and projection phase into an actual write-down phase. Without factual allegations to support this conclusion, the Court must dismiss the Complaint.

*Id.* (alterations in original and citation omitted). The court also rejected plaintiffs' challenge to the timing of the write-down as an improper attempt to plead fraud by hindsight. The court stressed that "[t]he standard is whether the need to write-down the Facility was 'so apparent' to CHW before the announcement, that a failure to take an earlier write-down amounts to fraud." *Id.* at 1154.

As in *Kriendler*, plaintiffs here have not pled sufficient facts to establish that the need to write-down the value of the interest-only strip receivable by more than $95.7 million was "so apparent," prior to MBNA's April 21, 2005 earnings release, that the failure to do so amounts to fraud. Nowhere do they allege that "the Package"—the only document plaintiffs identify in support of their claim that defendants "knew" that the value of the strip was inaccurate before April 2005—*actually* contains data that make it readily apparent that a write-down is necessary. At most, plaintiffs allege that the Package "would have" prepayment rates. (Am. Compl. ¶ 92.) By the same token,

- 35 -

plaintiffs do not allege that the prepayment data included in the Package were so adverse that the need to adjust the strip downwards (by more than MBNA actually did) was "so apparent" to the defendants, even considering all of the other factors that go into the valuation, that they committed securities fraud. *Kriendler,* 877 F. Supp. at 1152-544; *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 553. Accordingly, plaintiffs' challenge to the timeliness of MBNA's write-down under Section 10(b) should be dismissed.

## II.    Plaintiffs' Section 20(a) Claim Should Be Dismissed.

Section 20(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person. . . ." 15 U.S.C. § 78t(a). To plead a claim for control person liability under Section 20(a), plaintiff must allege: "(1) an underlying violation by a controll[ed] person or entity; (2) that the defendants are 'controlling persons;' and (3) that the defend-ants were in some meaningful sense culpable participants in the fraud." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 560. "[T]he heightened standard of the PSLRA requires that a claim under Section 20(a) state with particularity the circumstances of both the defendants' control of the primary violator, as well as of the defendants' culpability as controlling persons." *Id.* at 561. Plaintiffs' Section 20(a) claim does not meet any of these three requirements.

As set forth above, plaintiffs have not adequately alleged a violation of Section 10(b), as they must to bring a Section 20(a) claim. *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 211-12 ("[D]erivative claims under Section 20(a) depend on proof of a separate underlying violation of the Exchange Act.") (internal quotation omitted). Plaintiffs' Section 20(a) claim should be dismissed for this reason alone.

- 36 -

Plaintiffs also fail adequately to allege that all of the Individual Defendants were "controlling persons" within the meaning of Section 20(a). To qualify as a controlling person, "a defendant must possess actual control over the transactions in question." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 561 (internal quotation omitted). Here, plaintiffs allege that the Individual Defendants were controlling by reason of "their stock ownership, management position, and/or membership on MBNA's board of directors." (Am. Compl. ¶ 90; *see also id.* ¶ 91.) Without more, this conclusory allegation is insufficient to establish that defendants Cochran, Struthers and Krulak were "controlling persons" for purposes of the alleged fraud. *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 561 ("unsupported allegations regarding management responsibilities fail to allege [control] with the requisite specificity").

Plaintiffs similarly fail to allege that defendants Cochran, Struthers and Krulak were culpable participants in the alleged fraud. None of the three is alleged to have sat on MBNA's Assets and Liability Management Committee, the group within MBNA responsible for calculating the value of the interest-only strip receivable. (*See* Am. Compl. ¶ 56.) And the Amended Complaint contains no other allegation—again, aside from conclusory references to "management positions"—that these three participated in the challenged valuation. Nor do plaintiffs allege that any of these three defendants made or in any way participated in the making of the alleged misstatements concerning MBNA's estimated restructuring charge or its expected 2005 earnings. *See In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, No. 04-0265, 2005 WL 1324880, at *14 (E.D. Pa. June 2, 2005) (dismissing Section 20(a) claim against individual defendant).

## CONCLUSION

The Amended Complaint should be dismissed in its entirety for failure to state a claim upon which relief can be granted, and for failure to plead fraud with the requisite particularity.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Richard H. Morse*

Richard H. Morse (No. 531)
rmorse@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Defendants*

Of Counsel:

Richard J. Urowsky
Richard C. Pepperman, II
Ryan C. Williams
Christopher Nelson
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

February 10, 2006

- 38 -

## CERTIFICATE OF SERVICE

I, Richard H. Morse, hereby certify that on February 10, 2006, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jeffrey S. Goddess, Esquire
> Rosenthal Monhait Gross & Goddess, P.A.
> Mellon Bank Center
> 919 Market Street, Suite 1401
> P. O. Box 1070
> Wilmington, DE 19899
>
> Ralph Nicholas Sianni, Esquire
> Seth D. Rigrodsky, Esquire
> Milberg Weiss Bershad & Schulman LLP
> 919 North Market Street, Suite 411
> Wilmington, DE 19801

I further certify that on February 10, 2006, I also caused copies of the foregoing document to be served by hand on the above-listed counsel of record

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Richard H. Morse*

Richard H. Morse (I.D. No. 531)
17th Floor, Brandywine Building
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6651
rmorse@ycst.com

Attorneys for Defendants