**1**

Westlaw.

Not Reported in F.Supp.                                          Page 1
Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)
**(Cite as: 1998 WL 292382 (N.D.Ill.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
Howard N. CLARK Jr., Plaintiff,
v.
TRO LEARNING, INC., William R. Roach, and Sharon
Fierro, Defendants.
**No. 97 C 8683.**

May 20, 1998.

*MEMORANDUM OPINION AND ORDER*
ZAGEL, J.

I. Background

**\*1** Howard N. Clark, Jr. sues on these allegations. TRO
Learning, Inc. ("TRO") primarily develops PLATO
Learning Systems microcomputer-based instructional and
testing programs. It markets these programs to schools, job
training programs, correctional institutions, and
corporations. A PLATO Learning System typically includes
a library of educational courseware, instruction management
software, a delivery system, and consulting services. This
system is typically installed on a local area network
connected to between 10 and 30 workstations. The cost of
the necessary hardware and software is between $50,000
and $200,000. TRO also produces TRO Aviation Training,
a system that it markets to airlines for use by commercial
pilots, maintenance crews, and cabin personnel.

William R. Roach has been the Chairman of the Board,
President, and Chief Executive Officer of TRO since 1989.
Sharon Fierro was the Senior Vice President, Chief
Financial Officer, Treasurer, and Secretary of the company
during the time relevant to this lawsuit.

Plaintiff Howard Clark apparently claims that TRO, Roach,
and Fierro made a series of public statements between
December 7, 1995 and November 18, 1997 (the class
period) that were misleading and had the effect of
improperly inflating the price of TRO's stock. The general

nature of these statements was that TRO was in line to
achieve or exceed analysts' fiscal year earnings and revenue
projections for 1996 and 1997. Clark alleges that
defendants' statements were false and misleading for several
reasons: (1) earnings estimates were based on revenue that
should not have been recognized under generally accepted
accounting principles ("GAAP"); and (2) technically,
PLATO software was not broadly accepted in the market,
not designed to run on Windows, and not fully adapted to
the Internet. Clark claims that Roach and Fierro profited
from the inflated prices of TRO shares by selling a
substantial number of the shares they owned during the
class period.

Putative class representative Clark filed a class-action
complaint against TRO, Roach and Fierro, on behalf of
himself and all others who purchased shares of TRO,
alleging that they committed fraud in violation of § 10(b) of
the Securities Exchange Act, [FN1] and Rule 10b-5
promulgated thereunder, [FN2] and a violation of § 20(a).
[FN3] Clark seemingly alleges liability based on a
fraud-on-the-market theory. [FN4] Defendants now move to
dismiss the complaint.

>    FN1. 15 U.S.C. § 78j.
>
>    FN2. 17 C.F.R. § 240.10b-5.
>
>    FN3. 15 U.S.C. § 78t(a).
>
>    FN4. The Supreme Court explained this theory as
>    follows:
>    The fraud on the market theory is based on the
>    hypothesis that, in an open and developed
>    securities market, the price of a company's stock is
>    determined by the available material information
>    regarding the company and its business.... 
>    Misleading statements will therefore defraud
>    purchasers of stock even if the purchasers do not
>    directly rely on the misstatements.... The causal
>    connection between the defendants' fraud and the
>    plaintiffs' purchase of stock in such a case is no
>    less significant than in a case of direct reliance on
>    misrepresentations.
>    *Basic Inc. v. Levinson,* 485 U.S. 224, 241-42, 108

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)
**(Cite as: 1998 WL 292382 (N.D.Ill.))**

S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting _Peil v. Speiser_, 806 F.2d 1154, 1160-1161 (3rd Cir.1986)).

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." _Gibson v. Chicago_, 910 F.2d 1510, 1520 (7th Cir.1990) (quoting _Triad Assocs., Inc. v. Chicago Hous. Authority_, 892 F.2d 583, 586 (7th Cir.1989)). A plaintiff fails to state a claim upon which relief may be granted only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Leahy v. Board of Trustees of Community College Dist. No. 508_, 912 F.2d 917, 921 (7th Cir.1990) (quoting _Conley v. Gibson_, 355 U.S. 41, 44-45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

II. Analysis

*2 In their motion to dismiss, defendants argue that Clark failed to allege the elements of a securities fraud claim with sufficient particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure or the recently enacted Private Securities Litigation Reform Act ("PSLRA"). In any complaint alleging fraud a plaintiff must plead "the circumstances constituting fraud ... with particularity" to satisfy the Federal Rules of Civil Procedure. Fed.R.Civ.P. 9(b). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." _In re Healthcare Compare Corp. Securities Litig._, 75 F.3d 276, 281 (7th Cir.1996) (citation omitted). The reasons for these added pleading requirements regarding fraud claims are three-fold: (1) to prevent fishing expeditions, (2) to protect defendants' reputations, and (3) to provide adequate notice to defendants of the claims against them. _Fugman v. Aprogenex, Inc._, 961 F.Supp. 1190, 1194 (N.D.Ill.1997) (citing _Vicom, Inc. v. Harbridge Merchant Servs., Inc._, 20 F.3d 771, 777 (7th Cir.1994)). To state a claim under Section 10(b) or Rule 10b-5 Clark must allege that defendants made a false statement of material fact, with scienter, that caused an injury. [FN5] _Searls v. Glasser_, 64 F.3d 1061, 1065-66 (7th Cir.1995). The first issue is whether Clark sufficiently alleged that defendants made false statements of material fact.

> FN5. Section 10(b) provides in part:
> It shall be unlawful for any person ...

(b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Rule 10b-5 provides in part:
It shall be unlawful for any person ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

A. GAAP Allegations

Clark attempts to establish that defendants violated GAAP in determining TRO's revenues and earnings and made false statements thereupon. GAAP "are the conventions, rules, and procedures that constitute the professional standards of the accounting profession." _Marksman Partners, L.P. v. Chantal Pharmaceutical Corp._, 927 F.Supp. 1297, 1305 (C.D.Cal.1996) (citing _United States v. Arthur Young & Co._, 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984)). A company's overstatement of revenues in violation of GAAP can constitute a false or misleading statement of material fact necessary to establish securities fraud under Section 10(b) and Rule 10b-5 violation. _See Marksman Partners_, 927 F.Supp. at 1305.

Defendants argue that Clark's allegations regarding GAAP-based fraud do not satisfy Rule 9(b) in at least three ways. First, defendants contend that Clark failed to allege the precise rule of GAAP that was violated. Clark states in response that the securities laws do not require a citation to a specific rule when that rule is well-known to defendants, its applicability is undisputed, and the GAAP rules are "elementary and clearly forbid revenue recognition prior to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)
**(Cite as: 1998 WL 292382 (N.D.Ill.))**

a customer's obligation being fixed" under FASB Statement of Concepts No. 5, ¶ 84. In fact, the applicability of FASB No. 5 is disputed by defendants who claim that AICPA Statement of Position ("SOP") 91-1 applies and deny the adequacy of FASB No. 5 as a clear rule because it is outdated. Neither party points to precedent that establishes or negates a rule that a plaintiff must plead the precise principle of GAAP that was violated. In reviewing similar cases, however, I found that this issue never arose because plaintiffs did plead the specific GAAP. See Gross v. Medaphis Corp., 977 F.Supp. 1463, 1466 (N.D.Ga.1997) (complaint alleged violation of Accounting Research Bulletin 43, Ch. 1, § A in complaint); Marksman Partners, 927 F.Supp. at 1305 n. 3 (complaint alleged violation of SFAS 48, 57). These cases and the current ambiguity counsel that Clark should have alleged the precise rule of GAAP at issue. [FN6] Alleging that it was FASB No. 5 in his response brief cannot effect an amendment of the complaint. See Speer v. Rand McNally & Co., 123 F.3d 658, 665 (7th Cir.1997). But there's more.... Defendants also argue that Clark failed to describe what amount of revenue and which transactions and customers were implicated by the alleged GAAP violations. Clark only responds to the revenue issue, and he does so by stating that he alleged in his complaint that "during fiscal 1996, TRO had written off ... $2,458,000 for uncollectible accounts...." Cmplt. at ¶ 101. This response not only fails to impart any specific information about customers and transactions, it also fails to implicate TRO in wrongdoing. That is, corporate write offs are not equivalent to violations of GAAP or improper recognition of revenue. What is missing from the complaint is an allegation that TRO's write offs concerned improperly recognized revenues. Clark merely alleged that "[t]he substantial increase in charge-offs at year-end fiscal 1996 indicates that TRO had recognized revenue in prior periods in violation of GAAP." Cmplt. at ¶ 103. This allegation might best be described as a guess that the write offs were wrongful because they were more than those taken in prior periods. But it is not grounded in facts and it is not enough to satisfy Rule 9(b). See Zeid v. Kimberley, 930 F.Supp. 431, 437 (N.D.Cal.1996) (allegations failed for lack of particularity where plaintiff failed to name a single customer or sale involved in alleged improper revenue recognition). Even if Clark had alleged more specific facts, it probably

would not have been sufficient. When the Seventh Circuit faced similar allegations about corporate write offs and inadequate reserves it found that "[f]or any bad loan the time comes when the debtor's failure is so plain the loan is written off. [ ] If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have recklessness." DiLeo v. Ernst & Young, 901 F.2d 624, 626 (7th Cir.1990).

> FN6. A recent article in the New York Times suggests two relevant points. First, the rules for recognizing revenues on sales of software are unsettled and, as a result, companies have dealt with this issue in different ways. Melody Petersen, *Accounting Rule Hurts Software Companies' Revenues,* N.Y. Times, April 30, 1998, at C1, 7 ("Accounting rule makers have largely left software companies in the Wild West, with few rules to apply and lax ones at that."). The national director for software and services at a major U.S. accounting firm observed that "on a similar transaction some companies could have quite different accounting." *Id.* at C7. Second, a recently created rule might have made the situation here more clear, but this rule did not apply at the time the events that underlie this case occurred. Statement of Position 97-2 applies for fiscal years beginning after December 15, 1997 and "requires companies to postpone revenues on certain software sales if all the promised components and services have not yet been provided." *Id.* at C1.

**\*3** Finally, defendants contend that Clark failed to allege that any of TRO's financial statements were false and misleading as a result of the improper recognition of revenue. In response Clark refers to paragraphs 101, 103, and 115-117 in the complaint and claims that TRO's financial statements for the first three quarters of 1996 were not compiled according to GAAP. I find that none of these paragraphs contain the allegations that Clark purports they do. I also find that plaintiff failed to describe in his complaint any specific false statements that defendants made. Overall, Clark's allegations are conclusory and not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)
(Cite as: 1998 WL 292382 (N.D.Ill.))

grounded in facts. For these reasons (as well as his failure to allege falsity) his GAAP-based fraud claim fails.

B. Historical Statements and Financial Projections

The second issue is whether Clark sufficiently alleged other false statements to move forward with his fraud claim. Defendants offer several reasons as to why Clark's statements do not measure up.

Pre-May 1, 1996 Statements
First, defendants argue that any positive statements made prior to May 1, 1996 are not actionable because Clark only sold shares between the beginning of the class period and that date so he would have benefitted from statements that inflated TRO stock prices during that time. It is true that post-purchase corporate statements cannot form the basis of Rule 10b-5 liability because they cannot have affected the price at which a plaintiff purchased stock. *Roots Partnership v. Lands' End Inc.*, 965 F.2d 1411, 1420 (7th Cir.1992) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 755, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). However, the situation here is different than the one in *Roots*. Although TRO's positive statements before May 1, 1996 may have benefitted Clark when he sold shares prior to that date, these statements may have hurt Clark insofar as the purchases he made subsequent to May 1, 1996 because they became part of the total mix of information in the market. Clark alleges that this mix of information falsely inflated share prices, and TRO has not cited any precedent for the proposition that statements lose their potency at a certain point in time. Therefore, I do not rule out of bounds the issue of validity of the pre-May 1, 1996 statements at this time.

Historical Statements and Financial Projections
Second, defendants argue that the vast bulk of statements attributed to them, as alleged in paragraphs 26-30, 34-38, 40-41, 43-45, 47-52, 59-66, 69-71, 84- 85, 87-88, 90-93, 100, 109, 111, 113-14, 119-20, and 123, are historical facts set forth in TRO's Form 10-Q filings that are not actionable because Clark fails to allege that any of these statements were false when made except, perhaps, summarily in paragraphs 128 and 129. Defendants also contend that some of these statements were too vague or conclusory to be

actionable. Clark's response is that defendants made material misrepresentations concerning TRO's backlog, pipeline, and anticipated revenues and earnings in paragraphs 29-30, 37, 39, 45-6, 48, 54-59, and 62-66.

*4 I find that it is unnecessary to analyze the quality of Clark's specific allegations to reach the conclusion that his complaint is inadequate under the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4 et seq. The PSLRA requires a plaintiff, *inter alia,* to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading...." 15 U.S.C. § 78u-4; *see also Fugman v. Aprogenex, Inc.*, 961 F.Supp. at 1194 (complaint set forth 60 specific fraudulent statements accompanied by a brief explanation of why each statement was false and an allegation that it was material). Here, I cannot discern from the 133 paragraphs in his complaint which ones contain defendants' allegedly material and false statements because Clark does not describe any of his allegations this way. Although Clark supplied a heading above paragraph 26 that reads *SUBSTANTIVE ALLEGATIONS,* he failed to identify which of the subsequent "substantive allegations" constitute defendants' false statements. Even though it is obvious that certain paragraphs contain statements made by defendants, Clark failed to allege that these statements were material or false (mere requirements of Fed.R.Civ.P. 12(b)(6), not the more stringent 9(b)!). He also failed to provide explanations, even brief ones, as to why any particular statement was false. This complaint is justly summarized as a series of quotations from TRO press releases and analyst statements combined with one general explanation regarding falsity which states

> Defendants knew or were reckless in failing to know that the public statements made during the class period concerning demand for TRO's software products were materially false and misleading. Among other things, defendants knew that as a result of the following technical deficiencies [FN7] in the PLATO software, that TRO would be unable to achieve analysts' revenue and earnings projections, which defendants adopted as their own.

> FN7. Clark describes these "technical deficiencies" as the inability to run PLATO software on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)
**(Cite as: 1998 WL 292382 (N.D.Ill.))**

Windows operating system, and the fact that it is not "fully available" on the Internet. Cmplt. at ¶¶ 77-8.

Cmplt. at ¶ 76. But even before Congress enacted the PSLRA courts held that "a plaintiff alleging securities fraud cannot simply quote verbatim from annual reports and press releases and assert that the statements are untrue; he must explain in his complaint what is untrue about each of the challenged statements." *In re First Chicago Corp. Securities Litig.,* 769 F.Supp. 1444, 1453 (N.D.Ill.1991) (citing *Loan v. Fed. Deposit Ins. Corp.,* 717 F.Supp. 964, 967 (D.Mass.1989); *Haft v. Eastland Financial Corp.,* 755 F.Supp. 1123, 1128 (D.R.I.1991); *Akerman v. Bankworcester Corp.,* 751 F.Supp. 11, 12 (D.Mass.1990); *Abrahamson v. Western Savings & Loan Ass'n,* No. 86-1677 (D.Ariz.1989)) (internal quotation omitted). I conclude that Clark's recitation of quotations without any explanation as to which allegations were false or material and why this is so fails to satisfy the requirements of Fed.R.Civ.P. 9(b) and the more stringent standard contained in the PSLRA. This conclusion applies to the complaint as a whole, and thus I find that Clark has failed to sufficiently allege any false statements to state a claim for fraud.

### Anticipated Revenues

*5 Although my conclusion above disposes of this case, the parties both specifically address Clark's allegations regarding false statements of anticipated revenues, and so I will too. Defendants argue that Clark's case boils down to the conclusory allegations regarding projected operating results contained in complaint ¶¶ 76-79 and 121, which are as follows:

Paragraph 76: defendants knew that as a result of the following technical deficiencies ... that TRO would be unable to achieve analysts' ... projections which defendants had adopted as their own;
Paragraph 77: TRO's PLATO software was not designed to run on a Windows-based operating system, which was preferred by TRO's customers.
Paragraph 78: TRO's software was not yet fully available on the Internet.
Paragraph 79: as a result of the foregoing limitations on the PLATO software products, that TRO would be unable

to achieve projected analysts' expectations for fiscal 1996;
Paragraph 121: TRO and Roach knew that TRO's PLATO courseware was not receiving strong acceptance in the marketplace and in light of TRO's adoption of conservative accounting principles, TRO was unlikely to achieve analysts' expectations for the fourth quarter....

Defendants contend that these statements are not actionable because they fall within a statutory safe harbor that protects forward-looking statements when the plaintiff fails to prove defendant made them with actual knowledge that they were false or misleading. Under the safe harbor that defendants refer to, 15 U.S.C. § 78u-5(c), "a person shall not be liable with respect to any forward-looking statement ... to the extent that ... the plaintiff fails to prove that the forward-looking statement ... was made with actual knowledge by that person that the statement was false or misleading...." TRO argues that Clark failed to allege in his complaint that defendants had the requisite actual knowledge of falsity. In response, Clark argues that defendants knew their statements concerning anticipated revenue were materially false because certain of the backlog and anticipated revenues for fiscal 1995 related to orders from consortium partners that did not qualify for revenue recognition; this fact and the fact that TRO's software was "antiquated" constitute the specific facts demonstrating that TRO's earnings projections were unattainable. The problem with Clark's argument is that he fails to allege in the complaint that defendants had "actual knowledge" of falsity. Although he speaks in terms of "actual knowledge" in his response brief, in his complaint he merely alleged that "defendants knew or were reckless in failing to know" of such falsity. By this alternative allegation Clark raised the possibility that defendants were merely reckless in their statements and that they lacked the required knowledge to state a claim. This alone is fatal, even if Clark's allegations regarding the recognition of revenue on sales to consortium partners were enough to state a claim. In fact, it appears that TRO's practice of recognizing revenue after shipping its products to its consortium partners was appropriate under GAAP. A cursory review of the case law suggests it is valid under GAAP and FASB to recognize revenue when a product was shipped. [FN8] *See Rubin v. Trimble,* 1997 WL 227956, at *18 (N.D.Cal.1997) (revenue is recognized upon

Westlaw.

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)
(Cite as: 1998 WL 292382 (N.D.Ill.))

shipment to the customer); *Gross v. Summa Four, Inc.*, 1995 WL 806823, at *4 (D.N.H. Nov. 8, 1995) (same).

> FN8. I also doubt the validity of Clark's more precise concern that TRO wrongfully recognized revenue equivalent to 100% of the value of the products shipped to consortium partners even though they only paid 20% of the value up front. Clark alleges that this was improper because TRO would only receive the remaining 80% of the value after the consortium partners sold TRO's products to members of their consortium group. *Marksman Partners* dealt with a similar situation. It indicated that under Statement of Financial Accounting Standards ("SFAS") No. 48 when a company sells its products with a right of return, a seller may not recognize revenue until either the right of return has expired or the company has become capable of making a reasonable estimate of future returns, unless the buyer acquiring the product for resale has economic substance apart from that provided by the seller. 927 F.Supp. at 1304-05 (citations omitted). Here, the record indicates that the consortium partners had distinct economic substance apart from TRO and that these two parties had sufficient experience dealing with each other that TRO could make a reasonable estimate of future returns. *Cf. id.* at 1305 (plaintiff alleged that defendant corporation had no economic substance apart from its buyer and no historical experience with sales to that buyer).

*6 In addition, I find that Clark's allegations that TRO's software was antiquated and would hinder the company from meeting analysts' projections are conclusory and unsupported by the facts, and I find that some of the facts in the record undermine his conclusions. Most importantly, it was public knowledge that TRO's products did not run on Windows or the Internet. The analysts' projections accounted for this information so it makes little sense to argue that TRO's lack of a Windows product undermined earnings projections. Additionally, Clark did not support his argument that TRO's earnings results were unattainable because its products were "antiquated" with any facts.

"Antiquated" is a relevant concept. While it is true that the version of WordPerfect that runs on the DOS operating system should be considered "antiquated", it is only because of the existence of WordPerfect for Windows and Word for Windows. If these word processing programs did not exist, WordPerfect for DOS would be marketable even if Windows and other types of Windows-based software existed. Similarly, TRO's PLATO education software was the only product of its kind available, then whether it ran on Windows may well have been quite irrelevant to its marketability, and, in turn, TRO's earnings. What Clark's allegations do show is that TRO sold millions of dollars worth of its software, and thus, I find it unreasonable to infer or accept Clark's conclusory allegation, without any supporting facts, that this software was "antiquated."

In sum, Clark has failed to sufficiently allege that defendants made actionable, false statements that could serve as the basis of a claim under Section 10(b) and Rule 10b-5. If these word processing is a necessary element of fraud without which the claim cannot go forward. Lacking the requisite false statements, I need not analyze whether Clark has sufficiently pled scienter. This conclusion also disposes of Clark's controlling persons claim under Section 20(a) because the text of this statute plainly requires the plaintiff to prove that a "controlled person" is liable under the Act. 15 U.S.C. § 78t. "If no controlled person is liable, there can be no controlling person liability." *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir.1992) (citation omitted); *see In re Worlds of Wonder Securities Litig.*, 35 F.3d 1407, 1428 n. 9 (9th Cir.1994).

III. Conclusion

For the foregoing reasons, defendants' Motion to Dismiss is granted. This dismissal is with prejudice because of my in-court instruction to Clark when defendants filed their motion that he should either amend his complaint or stand upon it as originally filed and respond to the motion to dismiss.

Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                    Page 7
Not Reported in F.Supp., 1998 WL 292382 (N.D.Ill.)
**(Cite as: 1998 WL 292382 (N.D.Ill.))**

• 1:97cv08683 (Docket) (Dec. 15, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
In re AMERICAN BUSINESS FINANCIAL SERVICES,
INC. SECURITIES LITIGATION
**No. 04-0265.**

June 2, 2005.

Christopher L. Nelson, Schiffrin & Barroway LLP, Radnor,
PA, Katharine M. Ryan, Richard A. Maniskas, Schiffrin &
Barroway, LLP, Bala Cynwyd, PA, for Richard Weisinger
Individually and on behalf of all others Similarly Situated.

Jill Baisinger, Karen Pieslak Pohlmann, Marc J. Sonnenfeld,
Morgan Lewis and Bockius LLP, Philadelphia, PA, for
American Business Financial Services, Inc.

*MEMORANDUM*

ONEILL, J.

## I. INTRODUCTION

*1 These consolidated actions brought against defendants
American Business Financial Services, Inc. (ABFS),
Anthony J. Santilli, Richard Kaufman and Albert W.
Mandia have been filed on behalf of all persons who
purchased or otherwise acquired ABFS' publicly traded
securities during the Class Period. Plaintiffs allege that
defendants made false and misleading statements
concerning ABFS' financial performance and seek to
recover damages for violations of Sections 10(b) and 20(a)
of the Securities Exchange Act of 1934 (Exchange Act) and
Rule 10b-5 promulgated thereunder.

Now before me is the individual defendants' motion to
dismiss plaintiffs' consolidated amended class action
complaint pursuant to Federal Rules of Civil Procedure
12(b)(6) and 9(b) and the Private Securities Litigation
Reform Act of 1995 (PSLRA). [FN1] For the reasons stated
below I will grant defendants' motion.

> FN1. This action is stayed as to defendant ABFS
> because of its January 21, 2005 bankruptcy filing.

## II. BACKGROUND

Defendant ABFS, a diversified financial services
organization that sold and serviced business purpose home
equity loans through its subsidiaries, is the parent holding
company for American Business Credit, Inc. and its primary
subsidiaries, Home American Credit, Inc. (also known as
Upland Mortgage), American Business Mortgage Services,
Inc. and Tiger Relocation Company. ABFS also purchased
home equity loans from financial institutions. Plaintiffs
allege that the typical customers of ABFS and its
subsidiaries were credit-impaired or high-risk borrowers
who could not obtain traditional financing from banks or
savings and loan associations. During the class period,
defendant Santilli served as ABFS' chairman, chief
executive officer, chief operating officer, and director,
defendant Kaufman served as an outside director and
defendant Mandia was ABFS' chief financial officer.

On January 21, 2005, ABFS filed a petition for
reorganization pursuant to Chapter 11 of the Bankruptcy
Code, Title 11 of the United States Code, in the United
States Bankruptcy Court for the District of Delaware in
Wilmington, Delaware. *In re ABFS, Inc., et al.,* (No.
05-10203) (MFW). Pursuant to Section 362 of the
Bankruptcy Code, ABFS' bankruptcy filing automatically
stayed this action against the corporate defendant. On April
1, 2005, the Bankruptcy Court authorized the Creditors'
Committee to retain Special Litigation Counsel to
investigate potential claims on behalf of ABFS noteholders.
Although the noteholders are not members of the putative
class in this case, the conduct that is the subject of the
Special Litigation Counsel's investigation may relate to
some of the conduct at issue in this matter, including ABFS'
accounting practices, internal auditing procedures and
internal financial controls. On April 4, 2005, ABFS
announced that it intended to wind down its operations and
dispose of its assets through a Chapter 11 plan of
liquidation. On May 17, 2005, the company's Chapter 11
bankruptcy proceeding was converted to a Chapter 7
liquidation.

### A. Alleged Fraudulent Scheme
*2 Plaintiffs allege that to raise capital, ABFS used a
financing technique known as a securitization. In its Form

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 2
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

10-K filed with the Securities and Exchange Commission (SEC) on October 10, 2000, ABFS noted that "[t]he ongoing securitization of our loans is a central part of our current business strategy." (Consol.Compl.¶ 5). In each of its securitizations, ABFS transferred a pool of mortgage loans to a trust in exchange for certificates, notes or other securities issued by the trust that were then sold to investors for cash. Plaintiffs allege that ABFS would often retain the rights to service the loans for a fee and would retain an interest in the cash flows generated by the securitized loans (called an "interest-only strip").

Plaintiffs further assert that ABFS' loan delinquency ratio, or the ratio between the company's current and delinquent loans, affected ABFS' ability to securitize its loan pools and consequently its profitability. They allege that investors were less likely to invest in securities secured by loan pools containing a higher number of delinquent loans. Thus, plaintiffs assert that ABFS would be unable to execute its quarterly securitizations if the company's loan delinquency ratios became too high and the company's profitability would suffer. Plaintiffs allege that throughout the class period ABFS consistently reported an extremely low delinquency ratio as compared to industry averages for the sub-prime mortgage industry thus allowing the company to obtain securitizations for increasingly large sums with each successive quarter.

At the core of plaintiffs' claims is their allegation that defendants fraudulently altered their loan delinquency ratio by engaging in improper practices to artificially lower the number of loans that were reported as delinquent. Plaintiffs assert that ABFS employees "knowingly accepted bad checks to satisfy ABF[S'] months delinquency goals...." (Consol.Compl.¶ 42). Plaintiffs also allege that ABFS engaged in "re-aging" techniques such as forbearance and deferment agreements and that ABFS pressured delinquent borrowers to enter into such agreements in order to keep properties from being counted as delinquent. (Consol.Compl.¶¶ 31-41).

Forbearance agreements are agreements negotiated between a borrower and a lender whereby the lender foregoes a given remedy against the borrower for non-payment. Under a forbearance agreement, property held by a non-paying borrower would not be counted as delinquent. A deed in lieu of foreclosure is one type of forbearance device where a delinquent borrower deeds a mortgaged property to a lender in exchange for a release from all obligations under a loan. Under a deferment agreement, a lender will defer a borrower's payment (including past-due payments, plaintiffs allege) and roll the amount due onto the back of the loan to be paid back over time. Plaintiffs assert that the use of these techniques is limited by the guidelines of the Federal Financial Institutions Council (FFIEC) and that ABFS violated the FFIEC requirements.

*3 Absent from plaintiffs complaint are specific allegations as to the frequency with which re-aging techniques were used to avoid delinquent loans or specific allegations as to the amount by which the reported delinquency rate was understated at any point in time. To support their allegations that defendants fraudulently lowered the company's delinquency ratios, plaintiffs rely upon the statements of five confidential witnesses, all purported to be former ABFS employees. (Consol.Compl.¶¶ 31-36, 37-38, 39, 40-43). Confidential witness 1 is alleged to have served as a collections supervisor at ABFS from 1997 to 2003, working to oversee the collections process for delinquent loans. (Consol.Compl.¶ 30-31). He alleges that "individual collectors in his department were expected to, and did, use information they had obtained from borrowers in previous months, such as bank routing numbers, to falsify payments from borrowers who were delinquent...." (Consol. Compl. ¶ 31 (emphasis omitted)). Confidential witness 1 also reported attending a 1999 meeting where ABFS' lawyers discussed forbearance agreements and deeds in lieu of foreclosure. (Consol.Compl.¶ 32). Plaintiff alleges that confidential witness 1 reported that at the meeting the lawyers also emphasized the need to minimize loan delinquency ratios for purposes of obtaining securitizations (Consol.Compl.¶ 32). Plaintiff further alleges that in 2001 confidential witness 1 complained to American Business Mortgage Services' president of operations because he believed that the use of forbearance agreements and deeds in lieu of foreclosure were improper and that he regularly refused requests to negotiate and execute them. (Consol Compl. ¶ 36).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

Confidential witness 2 is alleged to have served as a vice president of sales for American Business Credit, an ABFS subsidiary and is alleged to have been in close communication with ABFS executives during his tenure with the company from 1997 to 2003. Confidential witness 2 is alleged to have stated that the company regularly "roll[ed] the amount past-due onto the back of the loan ..." allowing the borrower to "pay [the loan] current" and preventing the loan from being recorded as delinquent. (Consol.Compl.¶ 37).

During his employment at ABFS from 1996 to 2004 confidential witness 3 is alleged to have served in a number of positions including as underwriter and assistant vice president of loan processing. Plaintiff asserts that confidential witness 3 confirmed that the loan servicing units of ABFS' subsidiaries were closely monitored by ABFS executives. (Consol Compl. ¶ 38 n. 3).

Confidential witness 4 is alleged to have been an asset manager in the REO department [FN2] at ABFS from 1998 through 2002 where he was responsible for overseeing the marketing and selling of properties that the company acquired through foreclosure or deeds in lieu of foreclosure. Plaintiff asserts that confidential witness 4 said that defendant Santilli was very involved in the Collections Department and in "getting the [delinquency ratio] number where they wanted it to be." (Consol.Compl.¶ 39). Plaintiff alleges that confidential witness 4 claims Santilli was present at regular management meetings where the delinquency numbers were discussed and that the numbers appeared to be particularly important to him. (Consol.Compl.¶ 40).

> FN2. REO stands for "Real Estate Owned." REO properties have gone through foreclosure and are owned by a lender.

**\*4** Confidential witness 5 is alleged to have served as Senior Vice-President of Servicing at ABFS from 1999 through 2002. He allegedly stated that ABFS had a recidivism rate among borrowers with forbearance agreements that was higher than the industry standard because of its "aggressive" use of forbearance and deferral agreements. Confidential witness 5 also allegedly said that ABFS ignored the FFIEC

guidelines prohibiting lenders from using forbearance or deferral agreements with an individual borrower more than once in a twelve month period or twice over the lifetime of a loan. (Consol.Compl.¶ 41). Confidential witness 5 further alleged that ABFS employees knowingly accepted bad checks as a result of the company's policy that they should "[k]eep delinquency down. [W]e don't care how you do it." (Consol.Compl.¶ 42). Confidential witness 5 also alleges that the company's collectors were given cash bonuses when they met their monthly delinquency goals and that these bonuses acted as an incentive for collectors to engage in improper practices. (*Id.*). Confidential witness 5 alleges that ABFS executives would have been aware of the aggressive use of forbearance and deferral agreements because they received monthly risk management reports that tracked delinquency rates, recidivism rates and the use of loss mitigation, foreclosure and bounced checks to "pay" loans. (Consol.Compl.¶ 43).

In addition to the allegations of the confidential witnesses, plaintiffs further allege that ABFS received a civil subpoena from the Department of Justice on May 14, 2003 inquiring into the company's use of forbearance agreements. They assert that after ABFS announced it had received the subpoena the company was unable to complete its quarterly securitization because the investors "began to realize that the notes the company had been selling (and was currently attempting to sell) during its securitization were of a much lower quality than represented by the company." (Consol.Compl.¶ 6). ABFS filed a Form 8-K on June 13, 2003 disclosing the company's receipt of the civil subpoena and a second Form 8-K on June 26, 2003 reporting the company's shift away from reliance on quarterly publicly underwritten securitizations in favor of whole loan sales for cash. Plaintiffs allege that both of these filings prompted a strong decline in the value of ABFS stock shares as investors became aware of potential problems with ABFS' delinquency reporting practices.

B. Alleged Materially False and Misleading Statements
Plaintiffs allege that from January 27, 2000 to June 26, 2003 all of ABFS' quarterly press releases or SEC filings that reported financial results or the closing of its securitizations were materially false and misleading. (Consol.Compl.¶¶

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

44-48, 50-55, 57-60, 62-63, 65-67, 69-72, 74-77, 79-80, 82-84, 86-87, 89-90, 92-94, 96-98). As an example, plaintiffs cite to ABFS' Form 10-Q filed on February 14, 2000 which' stated, in part:

> **\*5** Published statistics gathered from a national sample of sub-prime mortgage companies by the Mortgage Information Corporation, have shown that delinquency rates averaged 14.39% as of September 1999 as compared to our current mortgage delinquency rates of 3.47% and September 30, 1999 delinquency rate of 3.53%. .... We believe that our delinquency rate is in part the result of our centralized credit underwriting structure, adherence to written underwriting standards and emphasis on collections.

(Consol Compl. ¶ 46). They argue that this statement and the statements made in the company's other SEC filings and press releases were misleading because they failed to disclose that (1) ABFS was using forbearance agreements and deeds in lieu of foreclosure to improve the company's delinquency ratio; (2) the company was improperly rolling delinquent amounts onto the back end of outstanding loans through the use of deferment agreements; (3) ABFS was knowingly accepting bad checks and falsified payments; (4) the company was not following FFIEC guidelines; and (5) the company was using its scheme to reduce its delinquency rate to securitize its loans, collect interest income from its loans and inflate its financial results. (Consol.Compl.¶¶ 49, 56, 61, 64, 68, 73, 78, 81, 85, 88, 91, 95, 99).

Plaintiffs also allege that ABFS' May 15, 2003 Form 10-Q was materially false and misleading for the reasons noted above and because it failed to disclose or misrepresented the substantial impact of the forbearance and deferment agreements on the company's delinquency ratio and also failed to disclose that these agreements were initiated not solely at the behest of borrowers, but "were actively solicited by the company and its employees." (Consol.Compl.¶ 104). In the Form 10-Q, the company announced that it had engaged in a "significant increase in the usage of deferment and forbearance agreements which impact the aging status of loans for purposes of delinquency reporting." (Consol.Compl.¶ 102).

### C. Scienter Allegations

Plaintiffs allege that ABFS' core business required the manipulation of delinquency rates to allow it to accomplish securitizations and that the alleged fraudulent scheme was therefore central to the company's business and is thus evidence of defendants' scienter. (Consol.Compl.¶ 5). Plaintiffs also allege that defendants' scienter is established by the individual defendants' desire to maintain their compensation standards and by the company's need to complete its debt securitizations. (Consol. Compl. ¶¶ 116 n. 4, 117 n. 5, 119 n. 6).

Plaintiffs further allege that each individual defendant "held a position from which he would have been aware of the true facts and misleading disclosures." (Consol.Compl.¶ 72). As a result of the individual defendants' positions during the class period, plaintiffs argue that they should have known that the company's delinquency rates were being manipulated in order to ensure completion of ABFS' quarterly securitizations.

**\*6** Plaintiffs allege defendants' scienter is also evidenced by the short time period between the company's May 1, 2003 announcement of results for the third quarter of fiscal year 2003 in which the company announced that its delinquency rate "continued to outperform the subprime industry," (Consol.Compl.¶ 100), and the May 15, 2003 filing of a Form 10-Q in which it disclosed that it had undertaken "a significant increase in the usage of deferment and forbearance arrangements, which impact the aging status of loans for purposes of delinquency reporting." (Consol.Compl.¶ 102). Plaintiffs assert that defendants' scienter is further evidenced by the June 26, 2003 filing in which the company stated that it was moving away from its securitization business. (Consol.Compl.¶¶ 6, 107) ("These transactions represent our move toward less reliance on quarterly publicly underwritten securitizations, in favor of whole loan sales for cash which will allow us to streamline operations, offer a broader product line and capture strategic efficiencies.")

In their complaint, plaintiffs also allege that defendants' scienter can be established through their sales of ABFS stock during the class period. (Consol.Compl.¶¶ 115-120). However, in their opposition to defendants' motion to dismiss, plaintiffs concede that the stock transactions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 5
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

referring to shares held by Santilli and Mandia in the complaint "were in fact gifts of or other types of transactions" which cannot be used to establish scienter. (Ps' Opp. at 36 n. 19) Instead, plaintiffs assert that only Kaufman's stock sales can be used to establish his scienter. They allege Kaufman sold a total of 223,846 shares of ABFS common stock worth $2,899,783 during the class period, or 82.96% of his holdings of the company's stock. (P's Opp. at 37. *C.f.* Consol. Compl. ¶ 116 (alleging Kaufman sold 118,548 shares of ABFS common stock worth $1,405,123 during the class period)). Plaintiffs further assert that neither Kaufman nor the other individual defendants had sold shares of ABFS stock in the four years prior to the class period. (Consol.Compl.¶¶ 116-117, 119).

### III. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss examines the sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In determining the sufficiency of the complaint I must accept all the plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences therefrom. *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997).

> The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Id.,* quoting *Conley,* 355 U.S. at 47. I will not inquire as to whether the plaintiff would ultimately prevail, but only whether he is entitled to offer evidence to support his claims. *See Oatway v. Am. Int'l Group, Inc.,* 325 F.3d 184, 187 (3d Cir.2003). "Thus [I will] not grant a motion to dismiss 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' ' *Graves,* 117 F.3d at 726, quoting *Conley,* 355 U.S. at 45-46.

**\*7** Because plaintiffs make claims of securities fraud, Federal Rule of Civil Procedure 9(b) and the PSLRA "impose independent threshold pleading requirements that, if not met, support dismissal apart from Rule 12(b)(6)." *In re Rockefeller Ctr. Props., Inc. Sec. Litg.,* 114 F.3d 1410,

1429 (3d Cir.1997). A securities fraud claim may be dismissed under Rule 9(b) and the PSLRA even if it would survive scrutiny under Rule 12(b)(6). The requirements of Rule 9(b) and the PSLRA are discussed in detail below.

### IV. SECTION 10(B) CLAIMS
#### A. Applicable Law

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated under Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of intestate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim for securities fraud under Section 10(b), plaintiffs must establish that defendants, "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *In re Ikon Office Solutions, Inc. Sec. Litig.,* 277 F.3d 658, 666 (3d Cir.2002).

Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." Although courts must be sensitive to a situation in which the factual information is in the defendant's control, in securities fraud cases, Rule 9(b) is to be "rigorously applied." *In re Burlington Coat Factory Sec.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 6
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

_Litig., 114 F.3d 1410, 1417-18 (3d Cir.1997)._ The PSLRA, 15 U.S.C. § 78u, adds an additional requirement, providing that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). A plaintiff may establish this scienter requirement "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." _Burlington Coat Factory,_ 114 F.3d at 1418. As with the other allegations of fraud, the facts that give rise to a strong inference of scienter must be alleged with particularity, meaning that plaintiffs must plead "the who, what, where, when, and how: the first paragraph of any newspaper story." _In re Advanta Corp. Sec. Litig.,_ 180 F.3d 525, 534 (3d Cir.1999).

**\*8** "Unless Plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations--inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." _In re Rockefeller Center,_ 311 F.3d at 224.

Section 20(a) of the Exchange Act creates liability for "[e]very person who, directly or indirectly, controls any person liable" for an independent violation of the Exchange Act. 15 U.S.C. § 78t. Because claims under Section 20(a) are derivative, "[a] plaintiff cannot maintain a claim under Section 20(a) without meeting the pleading requirements for a primary violation of the Act." _In re The Loewen Group Inc. Secs. Litig.,_ No. 98-6740, 2003 U.S. Dist. LEXIS 15680, at \*57 (E.D.Pa.2003) (Loewen I).

B. Alleged Fraudulent Scheme
Defendants argue that plaintiffs fail to plead the existence of the purported fraudulent scheme to artificially lower the number of delinquent loans with the requisite factual particularity. In _In re The Loewen Group Inc. Sec. Litig.,_ No. 98-6740, 2004 U.S. Dist. LEXIS 16601, at \*34 (E.D.Pa. Jul. 16, 2003) (Loewen II), I held that a plaintiff who alleged that accounts receivable were materially overstated

failed to plead with sufficient particularity:

> because the complaint [did] not include details about when and to what level the accounts receivable should have been written down, when and to what level the allowance should have been changed, why the allowance made by the corporation was unreasonable in light of the cancellations experienced, and how many accounts ultimately were uncollectible.

Here, although plaintiffs have specifically identified a number of statements that they allege are false or misleading, defendants assert that, like the allegations in _Loewen II,_ plaintiffs' complaint is defective because, among other things, it fails to specify (1) the amount by which any delinquency rate was allegedly understated during the class period; (2) the number of accounts where forbearance or deferment agreements were implemented; the total value of the accounts where such agreements were used and why the use of such agreements was improper; (3) the number or identity of the accounts for which ABFS purportedly accepted bad checks, when bad checks were allegedly accepted and who knew the checks were bad; (4) the number or identity of the accounts where ABFS allegedly wrongfully extended additional credit to loan holders, the amount of money allegedly wrongfully extended in additional credit and who knew the company was wrongfully extending additional credit; (5) the number of accounts and amount of money held in the accounts where forbearance or deferment agreements were entered into in violation of the allegedly applicable FFIEC guidelines; (6) the number of accounts and amount of money held in accounts where loan "re-aging" techniques were applied that subsequently became delinquent; or (7) the details regarding the allegedly inflated "interest income" ABFS received from its securitizations. Defendants concede that plaintiffs need not have pled all of these facts in order to survive a motion to dismiss, but argue that plaintiffs' failure to plead any of these facts with particularity is a strong indication that the allegedly fraudulent scheme to improve ABFS' loan delinquency ratios did not exist.

**\*9** Plaintiffs counter that
> "[a]s long as the allegations of fraud reflect precision and some measure of substantiation, the complaint is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

adequate." ... While allegations of time, place and date certainly meet this requirement, ... allegations that set forth the details of the alleged fraud may also meet these requirements, and plaintiffs "are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."

(Ps' Opp. at 15, *quoting Paraschos v. YBM Magnex Int'l, Inc.,* No. 98-6444, 2000 U.S. Dist. LEXIS 3820, at \*25 (E.D.Pa. Mar. 29, 2000) (citations omitted)). They argue that the complaint satisfies the particularity requirements of the PSLRA and Rule 9(b) because it pleads the "who, what, when, where and, how" of the fraud. *In re Advanta,* 180 F.3d at 534.

### 1. Confidential Witnesses

Plaintiffs allege that the accounts of their confidential witnesses illustrate the improper practices defendants used to manipulate the company's delinquency ratios, thus providing the level of detail required to meet the heightened pleading requirements of the PSLRA, Rule 10b-5 and Federal Rule of Civil Procedure 9(b). In *Loewen II* I held that

> [w]e will ... not necessarily disregard averments of fact based on anonymous sources. If the averments are particularized, if they provide circumstantial assurance that "a person in the position occupied by the source would possess the information alleged," we will consider them as part of the constellation of facts alleged for why the defendants' statement is false or misleading.

*Loewen II,* 2004 U.S. Dist. LEXIS 16601, at \*28-29, *quoting In re ATI Technologies, Inc., Sec. Litig.,* 216 F.Supp.2d 418, 432-33 (E.D.Pa.2002). I find that the confidential witnesses' allegations are not sufficiently particularized to meet the pleading requirements of Rule 9(b) and the PSLRA.

Unlike in *Loewen II,* where I found that plaintiffs did not provide sufficient information to establish that its confidential sources were in a position to possess the information alleged, *Loewen II,* 2004 U.S. Dist. LEXIS 16601, at \* 29, 35, here plaintiffs have alleged sufficient information regarding the positions of their confidential witnesses within the company and the time frames for their employment to allow me to consider their averments.

However, the allegations of plaintiffs' confidential witnesses are not sufficiently precise to meet the heightened pleading requirements of Rule 9(b) and the PSLRA. In *California Public Employees' Retirement System v. Chubb Corp.,* 394 F.3d 126, 153 (3d Cir.2004), affirming the District Court's decision granting defendants' motion to dismiss plaintiffs' securities fraud complaint, the Court of Appeals for the Third Circuit held that plaintiffs allegations failed to meet the pleading requirements for claims of securities fraud where the Second Amended Complaint failed to "identify the data, or source of data, used to arrive at its calculations" and where plaintiffs did not "provide any particulars regarding the amount by which reserves were distorted, or how much revenue was improperly recognized."

**\*10** Here, confidential witness 1, a collections supervisor, alleges that collectors at the company were expected to use information obtained from borrowers in previous months such as bank routing numbers in order to falsify payments from delinquent borrowers. He makes no specific allegations however as to when or with what frequency such practices were used and does not allege that he himself ever engaged in such practices. In *Loewen I,* I held that similar detail was necessary for allegations in the complaint to meet the heightened pleading requirements for a securities fraud action. *Loewen I,* 2003 U.S. Dist. LEXIS 15680, at \*30-31, 35 (holding the heightened pleading requirements were not met where "[p]laintiffs have not pleaded the amount by which any acquisition was overvalued, the time and amount by which any asset should have been written down, who knew the assets were overvalued or what information was available to defendants that should have alerted them to the need for a write-down."). The allegations of confidential witness 2 also lack sufficient particularity to meet the requirements of Rule 9(b) and the PSLRA. Although he/she alleges that ABFS avoided loan delinquencies by rolling amounts past due onto the backs of mortgage loans, he/she makes no allegations as to how often past due amounts were rolled onto the backs of loans or what percentage of loans ultimately were saved from delinquency using this technique. Confidential witness 3 makes no specific allegations of wrongdoing at ABFS and only makes allegations regarding the close relationship between senior executives at the company and the loan servicing units of its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
(Cite as: 2005 WL 1324880 (E.D.Pa.))

subsidiaries. Similarly, confidential witness 4 makes no allegations of fraudulent activities by any of the defendants. Instead his/her allegations refer to defendant Santilli's interest in "getting the [delinquency ratio] number where they wanted it to be" and Santilli's attendance at meetings where delinquency numbers were discussed. Plaintiffs do not allege that confidential witness 4 made any statements to support their allegations that the delinquency ratio numbers were attained through the use of fraudulent practices. The averments of confidential witness 5 also lack sufficient particularity to meet the pleading requirements of the PSLRA and Rule 9(b). Although plaintiffs allege that confidential witness 5 stated that ABFS employees knowingly accepted bad checks to satisfy the company's delinquency goals, he/she did not provide any information regarding the frequency with which bad checks were accepted or the number of actually delinquent loans that were made current through the acceptance of bad checks. Confidential witness 5's averment that ABFS ignored the FFIEC guidelines similarly lacks particularity. Although he/she is alleged to have said that the company was aggressive in its use of forbearance and deferral agreements, he/she provided no specific details as to how often the FFIEC guidelines were violated due to the aggressive use of these agreements or how many loans were subjected to aggressive re-aging techniques. Confidential witness 5 also provided no specific details about the correlation between the award of cash bonuses to collectors who met their monthly delinquency goals and their use of improper practices to improve their delinquency numbers. C.f., *Freed v. Universal Health Servs.,* No. 04-1233, 2005 U.S. Dist. LEXIS 7789, at *26-27 (E.D.Pa. May 3, 2005) (holding a complaint failed to plead facts which would support the inference that defendants were engaging in accounting fraud with the particularity demanded by the PSLRA because it did "not state when and to what level bad debt should have been recognized, when and to what level bad debt reserves should have been changed, or how many accounts ultimately were uncollectible"). Accordingly, I find that the statements of the confidential witnesses alleged in the Consolidated Complaint fail to meet the level of particularity required to support the inference that defendants were engaged in a fraudulent scheme to underreport the number of delinquent loans held by the

company.

*11 Plaintiffs argue that, taken as a whole, the accounts of the confidential witnesses corroborate one another, demonstrating their reliability. However, where the accounts of the confidential witnesses taken alone are not sufficiently particularized to meet the requirements of Rule 9(b) and the PSLRA, plaintiffs cannot overcome a lack of particularity by citing to the allegations of the confidential witnesses as a group.

> Citing to a large number of varied sources may in some instances help provide particularity, as when the accounts supplied by the sources corroborate and reinforce one another.... Cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA. Consequently, Plaintiffs' argument that particularity is established by looking to the "accumulated amount of detail" that their unparticular source allegations provide when considered as a whole is unavailing.

*California Public Employees' Retirement System v. Chubb Corp.,* 394 F.3d 126, 155-56 (3d Cir.2004).

### 2. FFIEC Guidelines

In *Burlington Coat Factory,* 114 F.3d at 1417-18, the Court of Appeals held that "[w]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data."

Plaintiffs allege that ABFS' lending practices were covered by the FFIEC guidelines and that defendants violated these guidelines when the company used forbearance and deferment agreements to manipulate its loan delinquency ratios. The FFIEC is responsible for setting standards for certain regulation of "financial institutions ." *See* 12 U.S.C. §§ 3301 et seq. Defendants argue that ABFS did not fall within the statutory definition of a financial institution and that therefore its loan servicing procedures were not covered by the FFIEC guidelines. The statute defines a financial institution as a "commercial bank, a savings bank, a trust company, a savings association, a building and loan association, a homestead association, a cooperative bank or a credit union." 12 U.S.C. § 3302(3).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

I find that even if plaintiffs can prove that the FFIEC guidelines were applicable to the company they have not pled sufficient facts to support their allegations that the company violated the guidelines. Although plaintiffs cite to confidential witness 5's allegation that "ABF[S] ignored these guidelines and was very aggressive in its use of forbearance and deferral agreements," (Consol.Compl.¶ 41), he or she did not support his/her allegation with any facts to show how ABFS actually violated the guidelines. Plaintiffs make no allegations as to the number of times the company used deferral or forbearance agreements for the same borrower within a twelve-month period, how many accounts were affected by the use of multiple deferral or forbearance agreements, or how the company's alleged violations of the FFIEC guidelines affected its overall delinquency results. Plaintiffs' reliance on the FFIEC guidelines is therefore not probative of whether defendants engaged in any improper conduct. *See, e.g., Burlington Coat Factory,* 114 F.3d at 1417-18. *Freed* 2005 U.S. Dist. LEXIS 7789, at \*25-27.

C. Alleged Misleading Statements and Omissions
**\*12** Even if plaintiffs had pled sufficient facts to establish the existence of a fraudulent scheme to manipulate defendants' reported delinquency ratios, they have not established that defendants' allegedly false and misleading statements or omissions were material. Before I can consider the materiality of defendants' statements, however, I must consider whether they can be held liable for statements made after October 16, 2002 and whether the individual defendants can be held liable for statements not personally attributed to them under the group pleading doctrine.

1. Liability for Material Statements or Omissions Made
After October 16, 2002
Defendants argue that because no named plaintiff traded shares of ABFS stock after October 16, 2002 all claims based on representations made after that date must be dismissed. Prior to class certification, "the action is one between the [named plaintiffs] and the defendants." *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 659 (3d Cir.1998). "Named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members

of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (internal quotations and citations omitted). In *Klein v. General Nutrition Companies, Inc.,* 186 F.3d 388, 345 (3d Cir.1999), the Court of Appeals for the Third Circuit held that where the plaintiffs failed to allege valid claims for securities fraud based on statements made before they purchased their GNC stock, they could not rely on statements made after their stock purchases as a basis for liability. However, the named plaintiffs assert that they should be allowed to show reliance on statements issued after they made the last of their ABFS stock purchases because the statements made after they had purchased their shares were made in furtherance of defendants' common scheme to defraud. *See Nicholas v. Poughkeepsie Sav. Bank/FSB,* No. 90-1607(RWS), 1990 U.S. Dist. LEXIS 12677, at \*15-16 (S.D.N.Y. Sept. 27, 1990) (holding on a motion to dismiss that named plaintiff could rely on statements made by defendants following her purchase as a basis for her claims because the statements were part of a "common scheme to defraud"). Plaintiffs further assert that the Court's holding in *Klein* does not apply in this instance because plaintiffs have alleged valid claims based on statements made by defendants in advance of their own ABFS stock purchases.

I agree with defendants that plaintiffs must allege that they personally have been injured by defendants' allegedly false and misleading statements. In this instance, plaintiffs must therefore allege valid claims for securities fraud based on statements made by defendants before they themselves purchased their ABFS stock and cannot rely solely on statements made by defendants after October 16, 2002 to establish their claims. However, if plaintiffs do allege valid claims based on statements made before they purchased their ABFS stock, an issue I will consider in detail below, I will not dismiss their allegations regarding defendants' post-purchase statements provided that they are evidence of a common scheme to defraud.

2. Group Pleading Doctrine and Liability of Individual
Defendants for Allegedly
False and Misleading Statements
**\*13** In attributing the allegedly misleading statements and

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

omissions in the company's quarterly press releases and SEC filings to the individual defendants, plaintiffs seek the benefit of the "group pleading" doctrine. Under the group pleading doctrine,

> the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as annual reports, prospectuses, registration statements, press releases, or other 'group published information' that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation.

*Winer Family Trust v. Queen,* No. 03-4318, 2004 U.S. Dist. LEXIS 19244, at *17 (E.D.Pa. Sept. 27, 2004) (citations omitted). Defendants argue that all claims against the individual defendants based on statements attributed to "ABFS" or to another individual should be dismissed because the "group pleading" doctrine was abrogated by the enactment of the PSLRA. Plaintiffs assert that the individual defendants should be held liable for all of the allegedly false and misleading statements because the group pleading doctrine survived the enactment of the PSLRA and because the individual defendants directly participated in the alleged fraudulent scheme by permitting ABFS to issue the statements.

The Court of Appeals for the Third Circuit has not ruled on whether the group pleading doctrine survived the enactment of the PSLRA and district courts in this Circuit are divided on the issue. In *Winer,* the most recent district court decision in this Circuit to address the issue of the group pleading doctrine, the Court held that "[t]he majority of district courts in this Circuit have held that the group pleading doctrine did not survive the enactment of the PSLRA." *Id.* Courts that have held the group pleading doctrine was abrogated by the PSLRA have followed the reasoning of the District Court for the Southern District of California in *Allison v. Brooktree Corp.,* 999 F.Supp. 1342, 1350 (S.D.Cal.1998), quoted in *Marra v. Tel-Save Holdings, Inc.,* No. 98- 3145, 1999 U.S. Dist. LEXIS 7303, at *14 (E.D.Pa. May 19, 1999) which explained that "to permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant." *See also*

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,* 142 F.Supp.2d 589, 619-20 (D.N.J.2001) (noting that if the group pleading doctrine is viable after enactment of the PSLRA, "the requirement to plead scienter with particularity as to each defendant is meaningless"). I agree with this reasoning and find that, without allegations connecting individuals to allegedly misleading statements or omissions made in group published documents, this doctrine can no longer be used to create liability for individuals under Section 10(b) and Rule 10b-5. [FN3] *See In re Home Health Corp. of Am. Sec. Litig.,* No. 98-834, 1999 U.S. Dist. LEXIS 1230, at *65 (E.D.Pa. Jan. 29, 1999) ("The court agrees that the group published information doctrine is inconsistent with the PSLRA's pleading requirements, and thus, that specific allegations as to the actions and scienter of each defendant are necessary.).

> FN3. Defendants note that the Court of Appeals for the Fifth Circuit, the only Circuit Court of Appeals to have examined whether group pleading was abrogated by the PSLRA concluded that it was. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364 (5th Cir.2004).

**\*14** Plaintiffs may therefore still allege upon information and belief that an individual defendant is liable for a misleading statement made in a group published document if the complaint states with particularity all facts on which the belief that the statement was made by the individual defendant is based. *See* 15 U.S.C. § 78u-4(b)(1).

> For instance, if the alleged misleading statement appears in a press release issued by a company discussing financial performance, a plaintiff could plead on information and belief that the chief financial officer is responsible for making the statement if the plaintiff can plead with specificity why the officer's position directly involves such duties or why a specific corporate policy requires that the chief financial officer make such releases.

*Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 916 n. 2 (N.D.Tex.1998), quoted in *Winer,* 2004 U.S. Dist. LEXIS 19244, at *18. I will therefore consider whether plaintiffs have sufficiently pled a connection between each individual defendant and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                   Page 11
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

allegedly misleading statements made in ABFS' press releases and quarterly filings

### i. Kauffman

Plaintiffs have alleged a direct connection between defendant Kaufmann and three of the alleged false and misleading statements or omissions cited by plaintiffs in the complaint, the company's October 10, 2000 Form 10-K, the company's September 28, 2001 Form 10-K and the company's September 20, 2002, all of which are alleged to have been "signed by the Individual Defendants." (Consol.Compl.¶¶ 59, 76, 90). In *In re Aetna Securities Litigation,* 34 F.Supp.2d 935, 949 (E.D.Pa.1999), the Court dismissed claims against an outside director because plaintiffs' allegations concerning his involvement with the company's operational affairs were "merely conclusory" and therefore "insufficient." [FN4] Although plaintiffs allege that Kaufmann, along with the other individual defendants, was

> FN4. The Court in *In re Aetna* assumed that the group pleading doctrine remained viable, but held that
> [a]s a prerequisite for group pleading that involves an outside director, operational involvement on the part of the outside director must be pled.... Allegations that the outside director merely held a position on a committee that is responsible for overseeing the corporation's financial or disclosure activities are insufficient under the group pleading doctrine.
> *In re Aetna,* 34 F.Supp.2d at 949, *citing In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995).

privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to [him] in connection therewith, (Consol.Compl.¶ 18), these allegations are not sufficiently specific to meet the heightened pleading requirement of the

PSLRA. *See In re Advanta,* 1998 U.S. Dist. LEXIS 10189, at *24-25 (citations omitted) ("A director, officer, or even the president of a corporation often has superior knowledge and information, but neither the knowledge nor the information invariably attaches to those positions, ... and plaintiffs have not pointed to specific reports, circulated among defendants, which contained the adverse information defendants are charged with knowing."). Plaintiffs have made no allegations as to whether Kaufman had positions on audit, executive or other committees responsible for overseeing the corporation's financial and disclosure activities which would provide a direct connection between him and the allegedly misleading statements. I will therefore grant defendants' motion to dismiss with respect to the claims against Kaufman under Count One of the Consolidated Complaint.

### ii. Mandia

**\*15** Like Kaufman, defendant Mandia is alleged to have possessed non-public information regarding the company's business, finances, products, markets and business prospects as a result of his position with ABFS. Unlike Kaufman, however, Mandia was the company's Chief Financial Officer. In addition to the company's October 10, 2000 Form 10-K, the company's September 28, 2001 Form 10- K and the company's September 20, 2002 Form 10-K, all of which are alleged to have been "signed by the Individual Defendants," Mandia is also alleged to have signed the company's quarterly Form 10-Qs between February 2000 and May 2003, [FN5] all of which are alleged by plaintiffs to contain materially false and misleading statements and omissions. (Consol Compl. ¶¶ 46, 52, 63, 66, 71, 80, 84, 87, 94, 98, 102). In an announcement of the company's fourth quarter and fiscal year financial results, on October 10, 2000, Mandia is also alleged to have stated that "our well-below average delinquency rate of 2.91% continues to distinguish our Company. Down 27 basis points from the rate at March 31, 2000, our delinquency rate remains one of the lowest in the industry." (Consol.Compl.¶ 58).

> FN5. As noted above, I must first consider whether plaintiffs state a valid claim against Mandia based on the statements he signed before October 16, 2002. Only then may I consider the statements filed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

with the SEC after that date.

Although plaintiffs do not allege that Mandia's position as CFO required him to do more than sign the company's Form 10-Ks and 10-Qs, viewing the facts in the light most favorable to plaintiffs, it is reasonable to find that Mandia was responsible for the information contained in the SEC filings because of the nature of his position. *See, e.g. In re Home Health Corp,* 1999 U.S. Dist. LEXIS 1230, at *61--62 (holding plaintiffs stated a claim against defendant CFO where CFO was listed as a contact person on allegedly misleading press releases, and was a signatory to the allegedly misleading Form 10-K). The group pleading doctrine

> is valid where it is almost certain that given the high level position of the officer within the company and the nature of the published writing that he or she would have been involved directly with writing the document or approving its content and that the officer was privy to information concerning the accuracy of the statements within the document.

*In re U.S. Interactive, Inc. Sec. Litig.,* No. 01-522, 2002 U.S. Dist. LEXIS 16009, at *15 (E.D.Pa. Aug. 23, 2002). Indeed, for SEC filings made after July 30, 2002 Mandia was required to sign the company's SEC filings and certify that the statements made therein were not misleading under the Sarbanes-Oxley Act. *See* 18 U.S.C. § 1350 ("Each periodic report containing financial statements filed by an issuer with the Securities Exchange Commission ... shall be accompanied by a written statement by the chief executive officer and chief financial officer (or equivalent thereof) of the issuer.").

A more difficult question is whether Mandia can be also be held liable for allegedly misleading statements or omissions in ABFS' announcements of financial results. (Consol.Compl.¶¶ 44, 62, 65, 69, 74, 79, 82, 86, 89, 92, 96, 100). Plaintiffs do not allege that Mandia was required to prepare the announcements as a function of his position or that Mandia was otherwise connected to these announcements. However, plaintiffs do allege that each announcement was "reaffirmed" by the Form 10-Qs filed with the SEC. Because I have already found that it may be reasonable to hold Mandia liable for the information

contained in the Form 10-Qs, by extension it is also reasonable to hold him liable for the same information contained in the company's announcements of financial results. *See In re Reliance Sec. Litig.,* 91 F.Supp.2d 706 (D.Del.2000) ("Although the complaint does not attribute any specific misstatement to these defendants, the wrong complained of ... is the kind of matter that these defendants may have been personally responsible for overseeing.").

**\*16** For the purposes of a motion to dismiss, I must therefore consider each alleged misstatement or omission in the company's announcements of financial results, the statements in the company's October 10, 2000, September 28, 2001 and September 20, 2002 Form 10-Ks, ABFS' quarterly Form 10-Qs filed between February 2000 and May 2003, and the statement Mandia made on October 10, 2000 in connection with the company's fourth quarter financial results to determine whether plaintiffs have stated a claim against Mandia under Rule 10b-5. However, I will dismiss the claims against Mandia related to the company's press releases cited in paragraphs 47, 55, 67 and 72 of the Consolidated Complaint because plaintiffs have not made sufficient allegations to connect Mandia to the allegedly misleading statements contained therein.

### iii. Santilli

As with Kaufman and Mandia, defendant Santilli is alleged to have possessed non-public information regarding the company's business, finances, products, markets and business prospects as a result of his position with ABFS. As the company's Chairman, CEO, President, COO and Director, plaintiffs allege Santilli possessed non-public information regarding the company's business, finances, products, markets and business prospects. Santilli's position alone is not sufficient to establish his liability for allegedly misleading statements attributed to the company. *See Marra,* 1999 U.S. Dist. LEXIS 7303, at *15-16 ("Plaintiffs must properly plead wrongdoing as to each individual defendant and cannot merely rely on the individuals' positions or committee memberships within the Tel-Save organization."). However, plaintiffs' Consolidated Complaint contains numerous allegations that directly attribute misstatements and omissions of material fact to Santilli. As with the other individual defendants, Santilli is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                 Page 13
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

alleged to have signed the company's October 10, 2000 Form 10-K, the company's September 28, 2001 Form 10-K and the company's September 20, 2002 Form 10-K. In accordance with the requirements of the Sarbanes-Oxley Act, Santilli also signed and certified ABFS' November 14, 2002, February 14, 2003 and May 15, 2003 Form 10-Qs. Plaintiffs also cite to many comments directly attributed to Santilli in the company's announcements of financial results and press releases. (¶¶ 45, 48, 51, 54, 70, 71, 72, 75, 83, 86, 93, 97, 100). Because plaintiffs have established a significant connection between Santilli and the allegedly misleading statements in the company's SEC filings, announcements of financial results and press releases, I must analyze each alleged misstatement or omission to determine whether plaintiffs have stated a claim against Santilli for securities fraud under Rule 10b-5. *See Winer,* 2004 U.S. Dist. LEXIS 19244, at *19-20 (holding plaintiff's allegations directly attributing statements in company's press releases to an individual defendant required the court to analyze those alleged misstatements under Rule 10b-5.)

### 3. Materiality

*17 Plaintiffs have not established that there is a substantial likelihood that the statements or omissions in defendants' SEC filings and press releases "would have been viewed by the reasonable investor as having significantly altered the total mix of information available to the investor." *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1330 (3d Cir.2002), citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231-232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). "The materiality question asks of each statement: is the allegedly false statement, in the context in which it was publicized, 'information that would be important to a reasonable investor in making his or her investment decision." ' *Loewen I.,* 2003 U.S. Dist. LEXIS 15680, at *44 (citation omitted). Materiality is a mixed question of law and fact and "[o]nly if the alleged misrepresentation or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Weiner v. Quaker Oats Co.,* 129 F.3d 301, 317 (3d Cir.1997) (quotation omitted).

"Obviously there can be no securities fraud liability for a

true statement." *Loewen I,* 2003 U.S. Dist. LEXIS 15680, at *41. Defendants argue that plaintiffs have not produced evidence to establish that ABFS' reported financial results were false. As an example, defendants cite paragraph 47 of plaintiffs' Consolidated Complaint which challenges the information contained in a press release reporting the value of ABFS' loan originations for its fiscal quarter ending March 31, 2000 and the closing of a \$235 million mortgage loan securitization. Plaintiffs do not allege facts to demonstrate that the company did not, in fact, close a \$235 million loan securitization or that ABFS failed to originate loans in the amount reported.

Plaintiffs counter that their allegation is not that defendants' statements were false on their face, but that the information they contained was misleading because defendants were only able to achieve their reported financial results by manipulating their delinquency ratios. Plaintiffs further argue that "failures to disclose sufficient information to render statements actually made not misleading" are actionable under Rule 10b-5. *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 200 n. 19 (3d Cir.1990). They assert that "whenever defendants mentioned their securitizations and/or delinquency rates, they had an affirmative duty to disclose the fact that they attained low delinquency rates by employing [ ] improper practices...." (P's Opp. at 21). However, as noted above, plaintiffs have not pled sufficient facts to establish that defendants' use of forbearance and deferment agreements was improper. Defendants' alleged failure to disclose how their lower than industry average delinquency ratios were attained is therefore not actionable under Rule 10b-5.

Further, many of the allegedly misleading statements cited by plaintiffs in their complaint explicitly refer to the company's work with borrowers to "cure" their loan delinquencies prior to foreclosure, undercutting plaintiffs' allegation that ABFS' SEC filings and press releases were misleading because they failed to disclose that ABFS was using forbearance agreements and deeds in lieu of foreclosure to improve its delinquency ratio. In the January 27, 2000 press release cited by plaintiffs as starting the class period, the Company announced record results for its second fiscal quarter and six months ended December 31,

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

1999. The press release also cited a statement by defendant Mandia, who said, "[b]ased on our proactive efforts working with borrowers who are delinquent, more than half of the delinquent loans 'cure' without ever going into foreclosure." (Ds' Mot. to Dis. Ex. G at 3). [FN6] While not referencing the techniques used to "cure" the delinquent loans, Mandia's statement at least alerted investors that ABFS' initial delinquency rate may have been significantly higher than that reported after the company undertook its "proactive efforts" to work with delinquent borrowers.

> FN6. On a motion to dismiss filed pursuant to Rule 12(b)(6) the materials at which I may look are limited. *Burlington Coat Factory,* 114 F.3d at 1424-25. I may consider a document not cited in or attached to the complaint only if it is "integral to or explicitly relied upon in the complaint." *Id. at 1426, quoting Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996).

**\*18** Even more strongly weighing against plaintiffs' allegations that defendants' statements were materially misleading, the Forms 10-K filed on October 10, 2000, and September 28, 2001 explicitly disclosed ABFS' use of "work-out arrangements" with delinquent borrowers, explaining:

In addition, after a loan or lease becomes 61 days delinquent, our loss mitigation unit becomes involved. Our loss mitigation unit tries to reinstate a delinquent loan or lease, seek a payoff, or occasionally enter into a modification agreement with the borrower to avoid foreclosure. All proposed work-out arrangements are evaluated on a case-by-case basis, based upon the borrower's past credit history, current financial status, cooperativeness, future prospects and the reasons for the delinquency.

(Consol.Compl.¶¶ 59, 76). The September 20, 2002 Form 10-K similarly explained:

When a loan becomes 45 to 60 days delinquent for a home equity loan or 90 days delinquent for a business purpose loan, it is transferred to a specialist in the collections department. The specialist tries to reinstate a delinquent loan, seek a payoff, or enter into a forbearance or other agreement with the borrower to avoid

foreclosure. All proposed arrangements are evaluated on a case-by-case basis, based on, among other things, the borrower's past credit history, current financial status, cooperativeness, future prospects and the reasons for the delinquency.

(Consol.Compl.¶ 90). Investors thus had some notice of defendants' use of re-aging techniques to improve the company's reported delinquency ratio.

Defendants further argue that many of the alleged misstatements plaintiffs challenge in the Consolidated Complaint are immaterial puffery. "Vague and general statements of optimism that constitute no more than 'puffery' and are understood by reasonable investors as such" will not support a claim of securities fraud. *In re Advanta,* 180 F.3d at 538. Statements are immaterial when they are so exaggerated or so vague that reasonable investors would not rely on them in considering the total mix of available information. *Hoxworth,* 903 F.2d at 200, citing *TSC Industries Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). "The theory behind not holding defendants liable for puffery is that reasonable investors would consider the source of such optimism and consequently not allow it to affect unduly their opinion of the stock." *Loewen I,* 2003 U.S. Dist. LEXIS 15680, at \* 42. Statements that plaintiffs allege to be misleading and which defendants assert are mere puffery include the following:

In April 2000, defendant Santilli said,

I am very proud of the way this organization has focused its energies on answering the needs of our target markets. This achievement demonstrates that, even during a period of interest rate tightening by the Federal Reserve our needs-based, retail origination strategy is not only working, but thriving. Our business lending and consumer mortgage divisions deserve credit of an outstanding month and quarter.

**\*19** (Consol Compl. ¶ 48). In June 2000, defendant Santilli said,

I am very proud that we have been able to maintain our pace of securitizations for ten straight quarters, and now have more than \$2 billion in securitized loans.... These accomplishments demonstrate our continued focus on

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

credit quality, the application of uniform underwriting standards, and our retail origination strategy. These practices are critical to our ongoing success, and central to our strategy of managed growth.

(Consol.Compl.¶ 54). In June 2001, defendant Santilli said, "We are particularly pleased with the demand shown for the certificates in this securitization, and the quality of purchasers that we were able to attract." (Consol.Compl.¶ 72). Three months later, in September 2001, he explained, "We firmly believe our accomplishments come from combining the demand for our products with significant investments in training, new technology and the ongoing development of one of the most sophisticated portfolio management tools in the industry." (Consol.Compl.¶ 75). In January 2002, Santilli said,

We believe the fact that we were able to maintain our earnings momentum during a period of declining interest rates and economic conditions, including increased prepayment activity, demonstrates our commitment to doing business the right way every day, from the origination process through to the careful servicing of our portfolio.

(Consol.Compl.¶ 83). Santilli further noted the importance of its loan servicing techniques in April 2002, explaining "Our historical record supports our core belief that collections are every bit as important as originations to deliver success in this business. We believe it's really what sets us apart."

Santilli's optimistic statements are typical of those which have been held by the courts to constitute nothing more than puffery. In *In re U.S. Interactive,* 2002 U.S. Dist. LEXIS 16009, at *45-46 (emphasis in original), the Court held that a statement by the chairman of the board that "As we evaluate ourselves and prepare ourselves for this next phase, we realize and celebrate that we are the leader *right now* in the telecom industry in enabling the customer value chain.... We think that right now our ability to leverage that with a change in the market place gives us an edge, and that's what we want" was no more than puffery.

All public companies praise their products and their objectives. Courts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate

managers and numbingly familiar to the marketplace--loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*In re Ford Motor Co. Sec. Litig.,* 381 F.3d 563, 570-71 (6th Cir.2004), *quoting Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996). Read in context with all of the information available to investors, defendants' alleged misleading statements are immaterial. Beyond Santilli's optimistic statements, the company's publications also alerted investors to the fact that the company faced challenges in maintaining its low delinquency rates due to changes in economic conditions. For example, the company's February 14, 2002 Form 10-Q stated that "[t]he increase in delinquencies and delinquency percentages was mainly due to the continued decline in economic conditions and the seasoning of the managed portfolio. As the managed portfolio continues to season we expect the delinquency rate to continue to increase."

**\*20** Plaintiffs argue that even statements of puffery such as the opinions and predictions made by Santilli may be actionable under the securities laws "if the speaker does not genuinely and reasonably believe them." *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 378 (3d Cir.1993). They assert that the statements at issue here are actionable because defendants knew that Santilli's statements and the other statements released about the company's delinquency ratios, securitizations and financial results were untrue because they knew that the company's delinquency rates were being improperly manipulated. However, as already noted, plaintiffs have not pled sufficient information in the Consolidated Complaint to establish that there was a fraudulent scheme to improve the company's delinquency ratios. Plaintiffs therefore have not established that defendants could not have reasonably believed in the truthfulness of their statements at the time they were made. "[L]iability does not attach merely because 'at one time the firm bathes itself in a favorable light' but later the firm discloses that things are less rosy." ' *In re Advanta,* 180 F.3d at 538, *quoting DiLeo,* 901 F.2d at 627. Plaintiffs have not established that the statements or omissions in defendants'

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 16
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

SEC filings and press releases were false or materially misleading.

### D. Scienter

Even if plaintiffs had established that defendants' statements or omissions were false or materially misleading, they have not met the PSLRA's requirements for pleading scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the Third Circuit, a plaintiff may establish this strong inference "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Burlington Coat Factory,* 114 F.3d at 1418. Plaintiffs' Consolidated Complaint alleges that defendants' scienter is evidenced by their stock sales during the class period and also by the individual defendants' positions within the company.

Insider stock sales that are unusual or suspicious in timing or amount may create an inference of scienter. *In re Advanta* 180 F.3d at 540. As noted above, although the Consolidated Complaint alleges suspicious stock sales by defendants Santilli and Mandia, plaintiffs have now withdrawn their allegations regarding Santilli and Mandia's alleged sales. Plaintiffs continue to assert that defendant Kaufman's sales were unusual and suspicious in timing and amount and that they are therefore indicative of scienter. Defendants argue that the Consolidated Complaint fails to establish Kaufman's opportunity to commit fraud. In order to satisfy the opportunity prong of the motive and opportunity test, plaintiffs must allege that Kaufman had the opportunity to cause the defendants to make the allegedly materially misleading statements and omissions in the company's press releases and SEC filings. As noted above, plaintiffs have not pled sufficient information to support their allegations that defendant Kaufman, an outside director, was an active participant in the alleged fraudulent scheme. As such, the allegations regarding his stock sales are insufficient to meet the pleading requirements for scienter under the PSLRA. *See, e.g., In re Aetna,* 34 F.Supp.2d. at 956 (dismissing claims against outside director for failure to allege opportunity).

*21 While insider sales are one way to prove scienter, they are not required. However, plaintiffs' other allegations of scienter are also inadequate. "[B]lanket assertions of motive and opportunity ... [and] catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *In re Advanta,* 180 F.3d at 535. Plaintiffs must allege "a concrete and personal benefit to the individual defendants resulting from [the alleged fraudulent scheme]." *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir.2004), *quoting Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001). Plaintiffs have not cited any authority from this Circuit to support their assertion that their allegations that defendants engaged in fraud to maintain their compensation packages and other benefits derived from the company's success are sufficient to demonstrate defendants' motive. Plaintiffs' allegations of generalized motives such as the company's need to complete its debt securitizations, incentive compensation and defendants' desire to protect their executive positions are insufficient to meet the pleading requirements for scienter. *See GSC Partners,* 368 F.3d at 238 (holding allegation that corporation would have been unable to acquire a company without the successful issuance of notes and would have been unable to sell the notes at or near the price sought had the company's true financial condition been revealed was insufficient to establish motive); *In re Alpharma Sec. Litig.,* 372 F.3d 137, 152-53 (3d Cir.2004) (holding allegations of a desire to increase stock prices, were insufficient to establish scienter); *In re Digital Island Sec. Litig.,* 357 F.3d 322, 331 (3d Cir.2004), *quoting Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 622-23 (4th Cir.1999)("Assertions that a corporate officer or director committed fraud in order to retain an executive position ... simply do not, in themselves, adequately plead motive"). *Loewen II,* 2004 U.S. Dist. LEXIS 16601, at *62 ("the desire to maintain a high credit rating is not sufficient, however, to satisfy the requirement for pleading motive").

Plaintiffs also appear to plead scienter by including allegations of recklessness or conscious behavior by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

defendants.

A reckless statement is one involving not merely simply or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. We also note that scienter can be alleged by stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior

*In re Advanta,* 180 F.3d at 535 (citations and internal quotations omitted). The Consolidated Complaint fails to plead conscious wrongdoing by any of the defendants with the required level of specificity. Plaintiffs allege that the individual defendants had knowledge of the alleged fraudulent scheme because it was essential to the company's "core operations." However, plaintiffs have not met their burden of alleging facts that the individual defendants' positions were such that they were consciously involved in a scheme to defraud investors.

*22 There are no allegations in the Consolidated Complaint to support the alleged conscious or reckless wrongdoing by defendant Kaufman as his alleged stock sales do not represent "an extreme departure from the standards of ordinary care" in the absence of additional allegations showing that he had knowledge of the alleged fraudulent scheme. The Consolidated Complaint similarly lacks allegations that defendant Mandia was aware of a scheme to fraudulently use loan re-aging techniques in order to improve the company's loan delinquency ratio. While plaintiffs have included more specific allegations pertaining to defendant Santilli's role in the alleged fraudulent scheme, none of the allegations are sufficient to establish the required "strong inference" that he acted with the required state of mind. Although Santilli is alleged to have attended meetings where delinquency numbers were discussed and he is alleged to have taken an interest in getting the delinquency ratio numbers to a desired level, there are no allegations to connect him to the use of fraudulent practices in order to manipulate the company's delinquency ratios. Plaintiffs may not establish scienter by pleading "a bare inference that a defendant 'must have had' knowledge of the facts." *In re Advanta,* 180 F.3d at 539. The facts pled to

support plaintiffs' scienter allegations are therefore insufficient to support a claim of securities fraud and the Consolidated Complaint will be dismissed.

### V. CLAIMS UNDER SECTION 20(A)
Section 20(a) of the Exchange Act creates liability for "[e]very person who, directly or indirectly, controls any person liable" for an independent violation of the Exchange Act. 15 U.S.C. § 78t. Because claims under Section 20(a) are derivative, "[a] plaintiff cannot maintain a claim under Section 20(a) without meeting the pleading requirements for a primary violation of the Act." *Loewen I.,* 2003 U.S. Dist. LEXIS 15680. Because the Consolidated Complaint fails to plead the alleged fraudulent scheme with the requisite level of particularity, fails to establish that there is a substantial likelihood that defendants' allegedly false statements would have been material to a reasonable investor and fails to plead that the individual defendants acted with the requisite strong inference of scienter, I will also dismiss Plaintiffs' claims under Section 20(a).

### ORDER
AND NOW, this 2nd day of June, 2005, after considering defendants' motion to dismiss, lead plaintiffs' opposition thereto, defendants' reply brief and for the reasons set forth in the accompanying memorandum, it is ORDERED that defendants' motion is GRANTED and the Consolidated Complaint is DISMISSED as to defendants Anthony J. Santilli, Richard Kaufman and Albert W. Mandia with leave to amend pursuant to Rule 9(b) of the Federal Rules of Civil Procedure and the Reform Act. Any amended complaint must be filed within twenty (20) days from the date of this Order.

Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270

### Motions, Pleadings and Filings (Back to top)

• 2004 WL 2695359 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of Motion of the Engler Group to Consolidate Actions, to be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel, and in Opposition to Competing Motion (Apr. 09, 2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1324880 (E.D.Pa.), Fed. Sec. L. Rep. P 93,270
**(Cite as: 2005 WL 1324880 (E.D.Pa.))**

• 2004 WL 2696833 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of Motion of the Engler Group to Consolidate Actions, to Be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel, and in Opposition to Competing Motion (Apr. 09, 2004)

• 2004 WL 2696944 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of Motion of the Engler Group to Consolidate Actions, to be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel, and in Opposition to Competing Motion (Apr. 09, 2004)

• 2004 WL 2695307 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Motions Seeking Appointment of Lead Plaintiff and Approval of Selection of Counsel (Apr. 05, 2004)

• 2004 WL 2696820 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Motions Seeking Appointment of Lead Plaintiff and Approval of Selection of Counsel (Apr. 05, 2004)

• 2004 WL 2696938 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Motions Seeking Appointment of Lead Plaintiff and Approval of Selection of Counsel (Apr. 05, 2004)

• 2:04cv00265 (Docket) (Jan. 21, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.