**3**

Westlaw.

Not Reported in F.Supp.                                                                                                    Page 1
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
In re: BELL ATLANTIC CORPORATION SECURITIES
LITIGATION.
This Document Relates To All Actions.
**Civil Action Nos. 91-0514, 91-0673, 93-999, 91-0518,
91-0737, 91-0531, 91-7048.**

April 17, 1997.

Lawrence Deutsch, Carole A. Broderick, Berger &
Montague, P.C., Philadelphia, PA, Sherrie R. Savett,
Philadelphia, PA, Arnold Levin, Levin, Fishbein, Sedran &
Berman, Philadelphia, PA, for Neil Jokelson.

Lawrence Deutsch, Berger & Montague, P.C., Philadelphia,
PA, for Nancy Jokelson, Joyce Kane.

Lawrence Deutsch, Berger & Montague, P.C., Philadelphia,
PA, Deborah R. Gross, Law Offices of Bernard M. Gross,
P.C., Philadelphia, PA, for Robert P. Frutkin.

Sherrie R. Savett, Philadelphia, PA, for Adam Weprin.

Lawrence Deutsch, Berger & Montague, P.C., Philadelphia,
PA, Harvey S. Kronfeld, Harvey S. Kronfeld, P.C.,
Philadelphia, PA, for Claire R. Barsky.

Bruce K. Cohen, Meredith, Cohen & Greenfogel, P.C.,
Philadelphia, PA, for Warren Weiner.

*MEMORANDUM OF DECISION*
McGLYNN, Senior District Judge.

**\*1** Presently before this Court is a Motion for Summary
Judgment filed on behalf of defendants, Bell Atlantic
Corporation ("BAC"), BAC's Chief Executive Officer and
Chairman, Raymond W. Smith ("Smith"), and BAC's Chief
Financial Officer and Vice-Chairman, Phillip A. Campbell
("Campbell"), (collectively "defendants" or "BAC") The
plaintiffs in this class action are purchasers of BAC
common stock seeking to hold defendants liable for
violations of section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j (b) (1988); Rule 10b-5, 17 C.F.R. §
240.10b-5(b) (1991) ("Rule 10b-5"); and section 20(a) of
the Act, 15 U.S.C. § 78t(a) ("Count I"). This court has
subject matter jurisdiction over these claims. 28 U.S.C. §
1331. In addition, plaintiffs assert a state common law claim
for negligent misrepresentation, ("Count II"), with
jurisdiction grounded in 28 U.S.C.A. § 1367 (West
Supp.1991), supplemental jurisdiction.

Defendants now move for summary judgment on the
grounds that, 1.) plaintiffs have not established a genuine
issue of material fact with regard to three elements of the
Rule 10b-5 claim: (a) misrepresentation or omission of
material fact, (b) scienter, and (c) loss causation; 2.)
dismissal of the predicate Rule 10b-5 claim requires
dismissal of the § 20 claim; and 3.) this court should decline
pendant jurisdiction over the state law claim for negligent
misrepresentation. For the reasons set forth below,
defendants' Motion will be GRANTED as to both counts.

*I. PROCEDURAL HISTORY*
On January 24, 1991, Neil and Nancy Jokelson and Bernice
Berger filed a complaint in this matter. On January 31,
1991, they filed an amended complaint as of right. On
February 11, 1991 the district court consolidated their case
with five others involving the same subject matter in
accordance with Fed.R.Civ.P. 23, and directs that a
consolidated complaint be filed. On March 14, 1991 a
Consolidated Amended Complaint ("Cons.Am.Compl.")
was filed. The defendants moved to dismiss the
Consolidated Amended Complaint pursuant to Fed. R.Civ.P.
12(b)(6) and the Motion was granted by an order dated
October 30, 1991. *In re Bell Atlantic Securities Lit.*, 1991
WL 2342.36 (E.D.Pa.1991), *rev'd*, 993 F.2d 875 ("Appeal
Opinion"). [FN1] Plaintiffs filed a Motion to Amend the
judgement and for leave to file a Second Consolidated
Amended Complaint ("Compl."). This court denied the
motion on the grounds that 1.) the plaintiffs had previously
amended and 2.) the proffered complaint could not survive a
motion to dismiss. Plaintiffs appealed.

> FN1. The district court dismissed the Consolidated
> Amended Complaint for three reasons: (1) the
> information provided by Bell in the first three
> quarters of 1990 revealed that expenses were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                              Page 2
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

increasing at an increasing rate and revenues were increasing at a decreasing rated and nothing else alleged in the complaint gave rise to a duty to predict a decrease in earnings or return on investment in the fourth quarter; (2) with respect to the affirmative predictions of October 1990, the predictions of a 15-20% increase in return on average common equity for 1990 and of a 6-9% growth in "normalized earnings for 1990" turned out to be not materially different from the actual results and no bad faith was alleged; and (3) the complaint lacked sufficient allegations that the defendants knew at the time of predicting a 10 cents per share write-down that the ultimate write down would be 15 cents per share and, in any event, the difference was not material under accepted accounting principles.

The Court of Appeals reversed and remanded to the district court holding that leave to amend should have been granted pursuant to Fed.R.Civ.P. 15(a) because 1.) the Complaint was the first relevant attempt to amend the Cons.Am. Compl. [FN2] and 2.) the Complaint stated a cause of action under § 10b and Rule 10b-5 by alleging that (a) defendants made a series of misrepresentations in order to give the impression that the trend of increased earnings experienced by BAC prior to fiscal year 1990 would continue throughout that year, (b) defendants made the misrepresentations knowing them to be false or with reckless indifference as to whether they were false, (c) the market considered those misrepresentations significant in evaluating BAC stock, (d) BAC stock is traded on an open market, and (e) as a result of those misrepresentations, plaintiffs purchased BAC stock at an artificially inflated price. *In re Bell Atlantic Sec. Lit., 993 F.2d 875 (3d Cir.1993)* ("Appeal Opinion"). Accordingly, the Court granted defendants leave to amend.

> FN2. The Third Circuit found that the fact that some of the Plaintiffs had earlier amended as a matter of right within days of their original filing was irrelevant and did not prejudice or inconvenience defendants; and the Second Cons.Am Compl., which alleged new facts obtained in discovery between April and October

1991, was aimed at curing deficiencies identified by the district court as lacking in specificity. The Court reasoned that only if the proffered complaint did not succeed in curing identified deficiencies would the district court have been correct in denying the motion to amend.

*2 In its opinion, the Third Circuit stated that it would have affirmed the dismissal of the Consolidated Amended Complaint if there had been no prompt attempt to amend following the district court's dismissal because the complaint lacked sufficient allegations of scienter and the facts alleged therein did not require defendants to disclose more than they did about the expected fourth quarter results. Appeal Opinion at 10.

Further, while not specifically ruling that the Rule 12 proceedings should have been converted into Rule 56 proceedings because the district court relied on material outside the pleadings [FN3], the Court of appeals stated that summary judgement proceedings would have been a "safer course" and added that the parties contentions were more appropriately resolved in a Rule 56 proceeding. Appeal opinion at 11. This Motion for Summary Judgment was filed on March 29, 1996. The Court will now proceed with an analysis of the parties contentions according to the standard set forth in Rule 56. [FN4]

> FN3. In analyzing the complaint, the district court consulted the full text of the documents alleged to be misleading, a transcript of the entire speech to the securities analysts, and Bell's filings with the SEC.

> FN4. The Court of Appeals observed in this regard that the defendants proffered explanations for 1.) an alleged retroactive credit that transformed a third quarter earnings decline into a reported earnings gain, 2.) an alleged misrepresentation concerning the expected amount of the write-off, and 3.) for other allegations of wrongdoing, were "plausible" and suggested that "it may be that the defendants can create a summary judgement record establishing that their reports and pronouncements were not misleading, that any inaccuracies taken

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                            Page 3
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

singly and as a whole, were not material, or that they acted with pure heart and rational basis." Appeal Opinion at 14-15.

## II. Rule 56 Standard of Review

Summary judgment procedure is properly regarded as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The inquiry performed is the threshold inquiry of determining whether there is a need for trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. [FN5]

> FN5. When the question for decision concerns drawing inferences from undisputed evidence, or interpreting and evaluating evidence to derive legal conclusions, a trial may not be necessary. William Schwarzer, Alan Hirsch, David Barrans, *The Analysis and Decision of Summary Judgement Motions: A Monograph on Rule 56 of the Federal Rules of Civil Procedure,* The Federal Judicial Center at p. 39 (1991).

Fed.R.Civ.P. 56(c) provides that a court may grant summary judgement when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The record, and all reasonable inferences drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255-56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita,* 475 U.S. at 587. If there is a "disagreement about material facts or the conflicting inferences to be drawn from them, a trial is required to resolve the conflicting versions." *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982). In determining the motion, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. *McDaniel's v. Flick,* 59 F.3d 446, 453 (3d Cir.1995).

A disputed fact is *material* when it could effect the outcome of the suit under the governing substantive law. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [FN6] A dispute is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.; Anderson,* 477 U.S. at 250. In other words, if proved at trial, the facts proffered by the nonmovant, have to be sufficient to survive a motion for directed verdict or judgment notwithstanding the verdict. *Id;* See also, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN6. When confronted with an asserted factual dispute, therefore, the court must examine the elements of the claims and defenses at issue on the motion and determine whether a resolution of the factual dispute could effect the disposition of any of those claims or defenses.

*3 According to the trilogy of cases decided by the Supreme Court in 1986, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the moving party must first demonstrate the absence of a genuine issue of material fact. That burden may be discharged by pointing out to the court that there is an absence of evidence in the record to support the nonmoving party's case. [FN7] *Celotex,* 477 U.S. at 323. A defendant meets his burden under Rule 56(c) when he "conclusively shows that the facts upon which the plaintiff relied to support his allegation were not susceptible to the interpretation which he sought to give them." [FN8]

> FN7. The movant may either claim that the nonmovant has not offered enough proof to establish a requisite element of its case *or* the movant may attempt to negate an essential element of the nonmovant's case. The Supreme Court in *Celotex,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), rejected the traditional view that the movant must offer affidavits of similar materials *negating* matters on which the nonmovant will bear the burden of proof at trial. Fed.R.Civ.P. 56(e) Advisory committee's notes (amended 1989).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

FN8. In this regard, *Matsushita* demands that the inferences drawn from the non-moving party's evidence be reasonable in order to reach the jury. If the opponents' theory is senseless, no reasonable jury could find in their favor and summary judgment may be granted. *Eastman Kodak Company v. Image Technical Services,* 504 U.S. 451, 469-470, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). On the other hand, if there is evidence in the record from which a reasonable inference in the nonmoving parties favor may be drawn, the moving party cannot obtain summary judgment. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 364 (3d Cir.1987).

Once the moving party has demonstrated the absence of a genuine issue, the nonmovant must go beyond the pleadings and come forward with "specific facts, by affidavits, depositions, answers to interrogatories or admissions on file showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(c)). [FN9]; *Matsushita,* 475 U.S. at 586. ("the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts"). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249-50. Conversely, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, summary judgment must be denied. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). The ultimate burden of persuasion remains with the moving party. There can be no "genuine issue as to any material fact" when, after adequate time for discovery, a party fails to establish the existence of an element essential to the nonmoving party's case on which the party will bear the burden of proof at trial. *Celotex v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265. In a securities fraud case, summary judgment is improper if a plaintiff shows a genuine issue of material fact with regard to one particular statement by the company or its insiders". *In Re World's of Wonder,* 35 F.3d 140, 1412 (9th Cir.1994), cert. denied, 116 S.Ct. 185 (1995) and 116 S.Ct. 277 (1995). *In Re Convergent Technologies,* 948 F.2d 507, 512 (9th Cir.1991).

FN9. This sentence describing the nonmovant's burden in opposing the motion was added in 1963 to overrule a line of cases that had denied summary judgment motions on the strength of well pleaded allegations even though the opponent had produced little or no evidentiary matter to establish that there is a genuine issue for trial. The advisory committee notes explain those cases were incompatible with the "very mission of the summary judgement procedure ... to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56(e) advisory committee's notes (amended 1963).

III. *STATEMENT OF FACTS*
This action was filed on behalf of purchasers of the common stock of BAC between June 14, 1990 and January 22, 1991, ("class period"). According to the complaint, [FN10] BAC artificially inflated the price of its common stock during the class period by issuing false and misleading public statements about the company's financial performance, earnings trends, and anticipated earnings growth in contravention of § 10, Rule 10b-5, § 20, and Pennsylvania common law. By these statements, BAC allegedly intended to give the impression that the trend of increased earnings experienced by BAC prior to fiscal year 1990 would continue throughout that year. Specifically, the statements created or prolonged market misconceptions that BAC would continue to experience 6-9% earnings growth, as forecasted, leading to higher earnings and return on equity, and that BAC's non-communications businesses (particularly the financial services segment) were doing well. To that end, defendants also manipulated the timing of revenues and expenses, and concealed the amount of reported revenues and expenses that were non-recurring or out-of-period. [FN11]

FN10. All subsequent references to plaintiffs' "complaint" in this opinion are to the "Second Consolidated Amended Complaint ".

FN11. Thus, plaintiffs claim is based, in part, on manipulative accounting practices employed by

Westlaw.

Not Reported in F.Supp.                                                                              Page 5
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

defendants.

*4 On January 22, 1991, the end of the class period, the Defendant's issued a press release relating the financial results for the fourth quarter of 1990 and for that fiscal year. That day, BAC common stock declined $4 dollars per share, closing at $50. The market price continued to drop an additional $2.375 per share the next day, closing at $47.625 per share. This lawsuit followed.

The undisputed facts as developed from the depositions, documents and pleadings submitted to the court are as follows. BAC is a regional telecommunication company. It is one of the seven regional Bell operating companies ("RBOC's") created in 1984 as a result of the breakup of AT & T. During the class period, BAC conducted its business through a group of highly-regulated local telephone companies (collectively referred to as the "network services group" or "NSG"), [FN12] a non-regulated cellular telephone business, [FN13] and several non-telecommunications businesses. [FN14] BAC stock is actively traded on the New York, Philadelphia, Boston, Pacific, Midwest, London, Zurich, Geneva, Basil, Frankfurt and Tokyo stock exchanges. [FN15]

> FN12. The NSG consisted of the following seven operating telephone subsidiaries: Bell Telephone Company of Pennsylvania, Diamond State Telephone Company (serving Delaware), New Jersey Bell Telephone Company, and four Chesapeake and Potomac Telephone Companies (serving Washington DC, Maryland, Virginia, and West Virginia). The NSG provided traditional and cellular mobile communications services to the Mid-Atlantic region of the United States and accounted for 88% of Bell's 1990 revenue.

> FN13. BAC's provided cellular telephone service and marketed mobile equipment throughout the MidAtlantic region of the United States.

> FN14. These business segments included: (1) Financial Services (comprehensive equipment leasing, corporate financial services, and real estate investment and development); (2) Business

Systems (computer and computer maintenance services, software support, and disaster recovery services); and (3) International (telecommunications consulting, software development, systems integration services, computer maintenance/repair outside the U.S., and investments in the New Zealand telephone company (Telecom Corporation of New Zealand) and in a Czech. cellular joint venture)).

> FN15. The fraud on the market theory's presumption of reliance is only available if Bell stock was traded on an "open and developed" efficient market. *Basic v. Levinson,* 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Hayes v. Gross,* 982 F.2d 104, 107 n. 1 (3d Cir.1992) (quoting *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J.1989). In this case, it is

In 1990, the year pertinent to this litigation, BAC had assets over 27 billion, total operating revenues (communications services as well as financial and real estate services) of over 12 billion, operating expenses of over 9 billion, and net income of 1.3 billion. Return on average common equity was 14.8%. [DX-Tab 2, BA1000851-910] (1990 Annual Report at 26).

As a publicly traded company, BAC is required to file reports with the Securities Exchange commission. [FN16] Using the calendar year as its fiscal year, BAC files quarterly reports of its financial performance within 45 days after the close of each quarter on Form 10-Q and an annual report within 90 days after the end of the fiscal year on Form 10-K. [FN17] In addition to the requisite SEC undisputed that Defendant Bell's securities are traded on an open market. filings, BAC announces earnings to the public by press release for each quarter and for year end as soon as the results are finalized. [FN18] Management projections are also available to professionals through press conferences and speeches to analyst societies.

> FN16. In its own press releases and quarterly and annual SEC filings, BAC reported all subsidiary financial information, including that for Bell Atlantic Mobile Systems ("BAMS/cellular") and

Westlaw.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

Bell Atlantic Systems Leasing ("BASLI/financial services"), on a consolidated basic in accordance with GAAP. The NSG telephone company subsidiaries also filed their own Forms 10-Q and 10-K, each containing an MD & A. (Tomlinson dep. 24).

FN17. The general requirements for these reports are prescribed by SEC Regulation S-K and in the instructions for each form. The reports include current financial statements, footnotes to those financial statements, and a section entitled Managements Discussion and Analysis of Financial Condition and Results of Operations("MD & A"). Item 303 of Regulation S-K prescribes the format and content of the MD & A. This section contains an analysis of current financial results (including changes in financial condition) and a comparison of the current results to the results of prior periods, usually the comparable period of the prior year. Form 10-K contains more detailed descriptions of various aspects of the company's businesses, and includes or incorporates financial statements also contained in the Annual Report to shareholders. Instructions to Form 10K (D3) request that registrants indicate whether the financial statements in the reports reflect a change from the preceding year in any accounting principles or practices or in the method of applying those accounting principles.

FN18. Press releases are two to three page announcements of key financial results and particularly newsworthy aspects of those results.

BAC's financial accounting methodology is governed by and must comply with Generally Accepted Accounting Principles(GAAP), a set of accounting policies determined by the Financial Accounting Standards Board ("FASB"). The SEC defers to these standards. See, *Accountants SEC Practice Manual,* (CCH) 1523 ("The SEC regards principles, standards and practices promulgated by the [FASB] ... as binding upon registrants filing financial statements with the SEC and upon the certifying accountants").

A. *Financial Reporting Procedure*

During the time period under scrutiny, BAC's internal structure and reporting system was rather complex. Monthly, raw financial data was collected from each of BAC's subsidiaries and consolidated by the Corporate Accounting Department, headed by Assistant Vice President of Finance, William Tomilson. (Tomilson Dep. 15). That department transmitted this data to Financial Analysis, headed by Assistant Vice President, Ronald E. Von Stetina, which added analytical information and disseminated the results to management and those involved in the financial disclosure process in the form of a monthly "Flash Report".Id. In addition to this procedure, Financial Analysis would prepare preliminary monthly and then final Quarterly Analysis Packages which more completely analyzed "flash report" data in preparation for reporting quarterly results. (Tomilson Dep. at 14). These packages, as well as any updates of that information, formed the basis for the quarterly earnings press release and the MD & A. (Ciango Dep. 28). In order to compensate for any lag time in current information created by a delay in printing or circulation of this package, Manager of Corporate Media Relations, Cynthia Ciango, ("Ciango"), would obtain any updates of the package information directly from the departments in verbal or handwritten form before issuing the press release. *Id.*

1. The earnings press release

**\*5** The earnings press release was initially drafted by Ciangio, following a "pre-meeting" with the Director of Investment Relations, Peter D. Crawford ("Crawford"). (Ciangio Dep. 18). This draft was critiqued by Crawford and a second draft was then drawn up by Ciango to be disseminated to a "team" of representatives of various departments. [FN19] That team would then convene in order to discuss the quarterly analysis package and issues raised by the results. (Ciango dep. 18), (Ludlow dep. 138),(Bulliner dep. 40),(Lynch dep. 102); See also (B2006307, TAB 10). The team would continue to comment on subsequent drafts. (Ciangio dep. 21);(Tomlinson dep. 152);(Von Stetina dep. at 41);(Bulliner dep. 25, 38). Eventually, a version incorporating comments from the various departments was submitted to senior members

Westlaw.

Not Reported in F.Supp.                                                              Page 7
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

William Bardeen, Vice President for Finance and Controller, and Carolyn Burger, Vice President Secretary and Treasurer. (Ciango dep. 21-23); (Bardeen dep. 8-9);(Burger dep. 61). Ultimately, the draft was submitted to Campbell and Smith for their approvals. (Ciangio dep. 21-23);(Buliner dep. 34-35). If any changes were made to the draft at any point, the draft was submitted to the legal department "just to make sure that nothing was changed that would create any misunderstanding in terms of public information and accuracy." [FN20] (Ciangio dep. 22-23). Finally, BAC consulted with Coopers & Lybrand, BAC's outside a countaparts, to discuss any "issues that would possibly impact the earnings release." (CL2010328, DX TAB 11). For example, in preparation for the issuance of the press release for the third quarter 1990, Ludlow held a conference call with accounting representatives of each of the subsidiaries. *Id.* The notice of the meeting advised that "your Coopers & Lybrand representative should be present during the calls." (CL2010328, DX TAB 11). The Coopers & Lybrand notes of the October 17, 1990 meeting reflect that, on behalf of the parent, Ludlow and two subordinates attended, as well as Coopers & Lybrand Audit partner, William Walsh and Audit Manager, Mitchell Cohen. (CL2010326, TAB 12). Various issues were discussed by this group with each subsidiary's representative and that subsidiary's C & L counterpart. This procedure was followed for the first quarter press release and the second quarter press release as well. *See also,* (CL2000018-19, TAB 13) (First quarter meeting held April 18, 1990), (CL200974, TAB 14)(Second quarter meeting held July 20, 1990).

> FN19. The team was comprised of the following departments and representatives: Investor Relations (Crawford); Financial Analysis (VonStetina); Corporate Accounting (Tomlinson, Ludlow); and Legal. (Ciangio Dep at 13, 18);(Ludlow Dep 36).

> FN20. BAC required approval of all earnings press releases by the legal department before issuance. (Ludlow dep. 79-81).

    2. The Quarterly and Annual Report
For 1989 and 1990, the Management's Discussion and Analysis (MD & A) section of the 10Q was prepared by the Financial Analysis department following the issuance of the quarterly earnings press release. (Ludlow dep. 40);(Tomlinson dep. 22-23). The initial draft was distributed to "at least twenty people" for review and comment. (Ludlow Dep 76, 138; See also VonStetina dep. 127). Like the press release, the MD & A drafts were reviewed by managers Bardeen, VonStetina, Tomlinson, and Burger, and the legal department, before final review by Campbell, BAC's Chief Financial Officer. (VonStetina dep. 128); (Bulliner dep. 26, 39); (Burger dep. 61);(Lynch dep. 20, 25); (Ludlow dep. 77). Drafts would also be disseminated to Financial Analysis counterparts at the subsidiaries who had provided initial input for their subsidiary to the quarterly analysis package for comment. (Lynch dep. 18-19). This process was designed to identify all disclosure issues. There were no rigid policies as to what should be disclosed and no typical areas were regularly discussed in the MD & A. (Smith dep. 87-88); (Lynch dep. 24,37-38). Decisions about what to include were based on judgment and the perceived materiality of the disclosure. (Burger dep. 36-37); (Lynch dep. 22-23 & 51) (determination turned on whether there was a "significant impact on net income, revenues or expenses");(Crawford Dep 38) ("went from rule of thumb that it represented 10% of corporate earnings to qualitative judgment that the information could result in a change in the. trading value of the security"). Further, the form of disclosure was dictated to some degree by the way information was aggregated in the company's financial statements. (Burger dep. 133). Disclosure issues were reviewed and discussed with Coopers & Lybrand. (Tomlinson dep. 140-41 & 147; Cohen dep. at 6). In addition, the company would answer questions from analysts regarding any disclosure. (Burger dep. 42). The policy was err on the side of more rather than less disclosure. (Von Stetina dep. 125-29) ("we tried to be as open as possible"... "tried to put more in, rather than less" ... "underlying objective in all of this was to disclose as much as possible to the public about what was going on in the business"); (Bulliner dep. at 51) (where uncertain, "we tended to err on the side of disclosing"); (Burger dep. 35-36) ("Our intent was to always be clear to our investment community").

**\*6** Cooper's & Lybrand, after assessing "the accounting

Westlaw.

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

principles used and significant estimates made by management," certified both 1989 and 1990 financial statements as "in conformity with generally accepted accounting principles". (DX-TAB 146, B1000495, (1989)); (DX-TAB 2, BA1000907, (1990)).

B. *Incentive Compensation*

Since 1986 or 1987, BAC had short-term incentive compensation plans by which all management employees could earn annual bonus payments. (Bulliner dep. 128). The amount of the payments or employees' entitlement thereto was tied, in part, to BAC's earnings per share growth. Earnings growth, however, was only one of several criteria by which Company performance was measured for this purpose. (Smith dep. 76); (Aquino dep. 21); (Bulliner dep. 124, 128); (Campbell dep. 54-55). Further, in some years, earnings per share growth was adjusted before determining amount of incentive compensation for that portion of the growth attributed to factors "external to the company" such as a change in accounting principles. (Bulliner at 125-126). A comparable plan existed for union employees. (Von Stetina dep. 304). For 1990, incentive compensation amounted to 30 to 40% of the annual compensation of BAC's senior management. [FN21] (Albertini dep. 108). Without this compensation some BAC employees would have been paid at below market rates for their positions. (Von Stetina dep. 97).

> FN21. Incentive compensation is compensation that is tied in part to the financial performance of a corporation.

C. *The Statements*

Plaintiffs contend that defendants engaged in a grand scheme to falsely portray the true financial condition of BAC in order to inflate the price of the corporation's stock. The primary thrust of plaintiff's case is that BAC reported and predicted earnings growth for the year 1990 as compared to 1989 results while concealing the fact that most or all of this growth derived merely from non-recurring accounting adjustments and other one-time events rather than from operating performance. [FN22] Thus, according to plaintiffs, BAC successfully concealed

the fact that "real" earnings were not growing at the rate reported or predicted. In furtherance of this deceptive scheme, defendants overstated 1990 results and understated 1989 results by manipulating the timing of "reversals of overaccruals" and "retroactive credits" for various liabilities [FN23] and failing to disclose that reported revenues and expenses included non-recurring or out-of-period amounts. [FN24]

> FN22. Plaintiffs do rot allege that the accounting underlying these adjustments violated GAAP and conceded that defendants were entitled to make these adjustments. Instead, they allege that statements reporting and predicting growth, circulated in press releases, speeches to analysts, financial statements, and SEC filings were misleading because such adjustments were not disclosed.

> FN23. As described in detail later in this opinion, these accounting decisions relate to certain liabilities to long distance carriers ("84-800 and NECA") and for certain employee beneifts (ie, pension and medical).

> FN24. For example, as discussed later, BAC allegedly did not disclose that fourth quarter 1990 earnings per share included $.05 cents from an accounting change (ESOP), and did not disclose that a $.10 charge to fourth quarter earnings would be an additional $.05.

In support of their theory, plaintiffs identify the following representations made by the defendant's during the class period as false or misleading. [FN25]

> FN25. The documents containing these statements are located in the record as follows: First quarter April 19 press release (DX-TAB 3) May 16, 1990 Form 10-Q (DX-TAB 4), second quarter July 23, 1990 press release and quarterly report to shareholders (DX-TAB 5), Third Quarter October 18, 1990 press release (DX-TAB 7), October 25, 1990 presentation to NYSSA (DX-TAB 36), October 25, 1990 press release (DX-TAB 107),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                     Page 9
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

November 9, 1990 Form 10Q (DX-TAB 8, BA1000573); January 22, 1990 press release (DX-TAB 9, 123).

1.) PREDICTION OF 6-9% EARNINGS GROWTH IN 1990

BAC repeatedly represented that earnings per share would grow 6-9% [FN26] when, in fact, (1) by June 1990, defendants internally estimated growth for 1990 of less than 6% and as low as 4.8%; (2) the NSG was only expected to contribute 3% to 1990 earnings growth (internally referred to as "the business problem") and the non-telecommunications segments were performing poorly (3) access line growth and revenue growth was slowing while expense growth was increasing; (4) growth results for the first three quarters of 1990 were overstated and results for 1989 were understated due to non-recurring events, listed and described in more detail below, so that defendants did not expect the 6% growth to come from "operations".

FN26. For example,
(1) In the first quarter meeting with New York analysts on January 26, 1990, Campbell described charges in the fourth quarter of 1989 which had reduced earnings for that year and then stated, "normalized ongoing results for the 1989 year ... would have been $6.67 ($3.33 after a two for one stock split during the first quarter of 1990) per share on net income of $1.3 billion. This is the benchmark level for our industry planning process and from which we will resume *our 6-9% earnings growth target* and we fully expect to see some acceleration toward the u‚per end of that range in the longer term" (DX TAB 32);
(2) In a third quarter speech for New York analysts on July 25, 1990 Campbell stated that, "with growth of just over 6% we are still near the lower end of *our target range of 6-9 percent* ... we expect to be at the lower end of this growth range until at least next year" (DX TAB 202); and
(3) In a fourth quarter meeting with the NYSSA analysts on October 25, 1990, Campbell stated he expected to achieve the "lower end" of its target for earnings growth of "six to nine percent" in the

1990-92 time frame. He also quantified the expectations for year end:
"Last year we indicated to you that we expected normalized per share earnings of $3.33--excluding some one-time write-downs of inventories and goodwill ... and that's exactly where we ended the year. And we said that earnings would grow from that base to the lower half of our 6-9% objective in the '90-'92 time frame. We're solidly on that path despite some weakening demand due to the economic slowdown in some parts of our region. *We expect normalized earnings for 1990 to be about 6 percent higher than last year without special adjustments.*" (DX TAB 36).

2.) *JULY 23, 1990 GROWTH STATEMENTS*

**\*7** Defendants represented that, as compared to the second quarter of 1989, the second quarter of 1990 showed growth [FN27] when, in fact, the results for the second quarter 1990 included non-recurring accounting adjustments, described below.

FN27. The press release and quarterly report stated that, in the second quarter net income increased 6.2%, total operating revenues increased 6.7%; earnings per share at .92 increased 5.7% as compared to the second quarter of 1989. As compared to the first half of 89, net income grew 6.8%, revenues grew 7.9%, and EPS grew 6.4%. (PX 2004434, DX TAB 5). The report also stated, "Revenues reflected continued growth in volumes in both our telephone and non-telephone businesses and demonstrated the continued strength and resiliency of our regional services based economy."

3.) *THIRD QUARTER STATEMENTS: October 18, 1990*

a. Financial Results
Defendants, in reporting results for the thir quarter of 1990, again represented that the company experienced growth as compared to the third quarter and first six months of 1989, when in fact, results for the first, second, and third quarter of 1990 were overstated by non-recurring accounting adjustments, and the calculation and reporting of "growth"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 10
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

by reference to results for the third quarter of 1989 was misleading because results for the third quarter of 1989 had been negatively impacted by the effects of a strike. [FN28]

> FN28. The press release, in reporting third quarter results, stated, as compared to 3089, "net income increased 4.2%, total operating revenues increased 6.5%, total operating expenses increased 5.2%, earnings per share (EPS) ($.91) increased 5.8%,return on equity was 16.6% (14.6 in 89). For the first nine months of 1990, net income grew 5.9%, revenue grew 7.4%, expenses increased 6.3%, and EPS grew 6.2%. total access lines grew 3.2%, business access lines increased 5.1%. (DX TAB 7) Form 10Q for the third quarter was filed on August 10, 1989 repeated those representations. (DX TAB 6).

### b. Cellular

The Defendants represented that Bell Atlantic Mobile Systems ("BAMs"), BAC's cellular subsidiary, was experiencing "positive results" and "continued growth in volumes" when, in fact, cellular telephoneusage per customer had been weakening, average minutes of use per customer had been declining since October 1989, and BAMs had suffered losses in the first two quarters of 1990. [FN29] (Campanella at 272-83);(PX 167).

> FN29. The press release stated, "Revenues also reflected continued growth in volumes in our non-telephone businesses "... Total usage grew at a "reduced rate" in September 1990. "In September, customer usage and demand for service grew at a reduced rate due to sluggishness in the economy." (TAB 7) ..."We experienced strong business volumes in our local telephone companies, as well as in our wireless communication (cellular) and leasing businesses ... These positive results, at a time when economic weakness exists, are indicative of the underlying strength of our businesses." The October 25, 1990 release stated that "Bell Atlantic Mobile Systems is solidly profitable now, and will be even more so in the future."

### c. Expense Controls

The defendants also represented that revenue growth was due to measures taken to reduce expenses when, in fact, reported growth was not due to expense controls employed by BAC, but to nonrecurring events. [FN30]

> FN30. Regarding expense measures, the release stated, "Tight expense measures contributed to net operating revenue growth of 11.2%" .and we are confident that we have the controls in place to guide our company through this period of economic uncertainty.).. As a prudent measure against future economic uncertainty, all employees are redoubling their efforts to cut expenses." The October 25, 1990 release stated, "our expense controls continue to produce strong operating performance, like the 11.4% growth for the first three quarter of the year ".

### d. Access Lines

Defendants represented that access lines had grown when, in fact, access line growth was slowing. [FN31] (Campanella at 45-50).

> FN31. Regarding access lines the release noted, "Business Access Lines increased 5.1% for the quarter over the third quarter of 1989, while total access lines grew 3.2%, reaching nearly 17.3 million." The October 25 release stated, "Our revenue growth, is driven by a solid information based economy that is producing consistent demand for network services even now, in difficult economic times." "Access line growth has been particularly strong." However, the Court notes that the document also states, "our network usage may be reflecting some economic slowdown, as both interstate minutes of use, at 5.4% for the third quarter and intrastate minutes of use at about 8% are growing but they are growing at a moderate level and slightly slower rate than they were before."

**4.) *THIRD QUARTER STATEMENTS: October 25, 1990***

In an October 25, 1990 presentation to the New York

Westlaw.

Not Reported in F.Supp.                                                                                    Page 11
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

Society of Securities Analysts ("NYSSA") (DX-TAB 36), BAC reported growth in third quarter, when in fact, third quarter results were, again, overstated by nonrecurring accounting adjustments. [FN32]

> FN32. This document also stated that EPS (2.73 for 9 months) is a 6.2% increase over last year. The difference between operating results at 11.4% and EPS at 6.2% is interest expense, ESOP and New Zealand. (PX 181 at A00045).

a. Anticipated Fourth Quarter Results:ESOP

BAC represented its expectations for the fourth quarter as follows: BAC could "sustain [its] strong operating performance as [it] moved towards year end" and "fourth quarter financial results would continue to reflect the strong performance registered by the company for the first nine months." Another statement represented that BAC "continue[d] to have very strong results and expect[ed] a record year from [bits] operating units even during uncertain economic times." In making these representations, however, BAC failed to disclose that $.05 of anticipated earnings per share for the fourth quarter of 1990 would include five cents attributable to a tax benefit for an Employee Stock Ownership Plan (ESOP) rather than from operating earnings; $.04 of the $.05 cents was attributable to the first three quarters of 1990; and expenses related to the ESOP were reclassified on BAC's books. Further, these predictions of fourth quarter results z -led to disclose that a.) Fourth quarter earnings would decline 18-30% from the performance registered for the first three quarters of 1990 and decline significantly from the fourth quarter of 1989 as evidenced by a November 2, 1990 internal document that noted that 1990 EPS would be only 2% higher than adjusted EPS for the fourth quarter of 1989 (3.44). This 2% was due to a change in accounting for BAC's ESOP; b.) that earnings in the fourth quarter would be lower than .81 EPS (10 cents per share less than the company's earnings for the first three quarters of the year. [FN33]; c.) earnings were declining; revenues, while continuing to increase, were increasing at a decreasing rate (1st Q=9%, 2nd Q=6.7%, 3rd Q=6.5%); and expenses were rising at an increasing rate, and based on revenue and expense trends it was reasonable to anticipate that BAC would earn less (less income and less return on

equity) in the fourth quarter than in the first half of 1990. Plaintiffs claim that the drop in the fourth quarter was known by October 1990.

> FN33. The average of the first three quarters = $.91. $.91 minus $.10 charge =.81 EPS in fourth quarter of 1990. Following the October 25, 1990 meeting, the mean of analyst estimates of earnings for the fourth quarter of 1990 was .86 cents per share, as reflected in a December 12, 1990 Zacks investment research report. (Compl. at 566-68).

b. Fourth Quarter Charge of $.10:(Goodwill Writedown)

*8 Regarding a fourth quarter writedown in the goodwill of Bell Atlantic Systems Leasing, ("BASLI"), BAC represented [FN34] that an expected charge to fourth quarter earnings would only be $.10; that there would be "no further bookings of this sort"; and that the motivation for the charge was to reflect the market value of the financial services businesses more conservativly when, in fact, by November 2, 1990, the writedown was estimated to be $.15 ($60 million) rather than $.10 ($40 million); and the motivation for the writedown was not conservativism but, rather, a method to record the expected loss on the potential sale of one of the financial services businesses, Bell Atlantic Systems Leasing, BASLI. [FN35]

> FN34. The release stated that "[We] expect to book a minor goodwill charge of approximately $.10 cents per share in our financial services organization ... as you know we always look very hard at year end to insure that our assets and liabilities are accurately reflected ... we do expect to book a minor adjustment related to goodwill, and that will bring us slightly below some expectations ... I want to make it clear that we do not have an asset exposure ... Financial companies generally are undergoing significant devaluation. As you know we have in the past and we intend in the future to state the value of all of our businesses, including financial services in the most conservative possible way. So we will take a charge against goodwill to fully reflect the conservative market value of this business. *And*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 12
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

*this is the source of approximately $.10 cents charge that we will take to fourth quarter earnings ... We don't anticipate in 1990, 1991 or beyond-any further bookings of this sort."...* "the charge is merely a continuation of our conservative accounting practice to reflect lower market values in the financial services industry".

FN35. Plaintiffs also claim that failure to disclose this information in Form 10-Q for the third quarter filed on November 9, 1990 violated Item 303 of Regulation S-K of the Securities Exchange Commission, 17 C.F.R. § 229.303.

c. Return on Equity

The defendants represented that 15-17% return on average common equity was "sustainable" and would be 15-20% in 1990 when, in fact, the target would not be achieved and actual return on equity was 10.5% for the fourth quarter and 14.8% for the year, lower than the 16.4% average return on equity reported in the first nine months of 1990. [FN36]

FN36. With regard to return on equity for the year, BAC stated, "Returns for the nine months show a 16.4% return on equity ... we're comfortable and confident that the higher returns we're now realizing, in that 15-17% range, are sustainable and do create value for our owners. And returns on equity-we believe can yet improve in the 15-20% range.

5.) *FOURTH QUARTER OF 1989 NONRECURRING CHARGES*

In a press release issued January 23, 1990, defendants represented that the funding of an employee benefits that was one-time charge when, in fact, the trust was to be a recurring expense. [FN37]

FN37. The press release described charges taken in the fourth quarter of 1989 as follows. "1989 earnings at $5.43 per share compared with $6.65 per share in 1988, an 18% decrease ... "our performance would have compared favorably with 1988 except for the approximately $320 in special

charges against earnings we recorded at the end of 1989. These charges, *which were of a one-time nature* were associated with the revaluation of assets at some of the company's unregulated subsidiaries, the cost of an organizational realignment that included incentives for managers to retire early or voluntarily leave, and debt ref financing at several of the companies telephone subsidiaries"... "*In addition* the company *began* to accrue for and fund a trust to help cover the future cost of medical and dental benefits for nonmanagement retirees".(TAB 207).

6.) *REAL ESTATE, FINANCIAL SERVICES, AND INTERNATIONAL BUSINESSES*

Defendants represented that each of the non-telephone subsidiaries was doing well when, in fact, those businesses experienced an aggregate loss. Specifically, Bell Atlantic Properties (BAP) lost $13 million; by July, 1990, Bell Atlantic Systems Leasing Inc.'s, ("BASLI"), "growth trend [had] softened"; and by September 1990, BASLI was experiencing an "ongoing revenue decline". [FN38]

FN38. a.) In an April 19, 1990 press release, Campbell stated, "in addition, non-telephone businesses continued to grow at a very satisfactory rate." (DX-TAB 1);, b.) September 20, 1990 in San Franciscs, "I'm now looking forward to equally gratifying results during the next five years. As you know, that's a critical time frame for us, a period in which we expect to grow our international business to about 1.5 million dollars in revenues."; April 23, 1990 speech to Baltimore Institutional Investors, "It may take some time, but we expect international to be a big part of Bell Atlantic's Future."; c.) In an October 25, 1990 release, commenting on financial services business, "our properties business, our real estate business is appraised well above book, and in fact, Bell is the principle tenant. The residual values in our leasing companies are conservative and we have no unusual credit problems."

7. *THE ACCOUNTING ADJUSTMENTS: REVERSALS OF ACCRUALS AND RETROACTIVE CREDITS*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                Page 13
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

Plaintiffs allege that the defendants, when reporting and predicting growth for 1990, failed to disclose that the results for the first three quarters of 1990 were inflated by nonrecurring charges, as follows. In the First Quarter of 1990, 1.) Income was reduced by $11.4 million as a result of a $42 million settlement; 2.) Income was increased by $20 million due to a mathematical error discovered in the fourth quarter of 1989 that was improperly corrected in first quarter of 1990 [FN39]; 3.) Income was also increased by $57 million due to reversals of accruals for various liabilities [FN40]; and 4.) A statement in January 1990 describing non-recurring charges taken in 1989 failed to disclose that the funding of the retirees benefits trust was a recurring charge rather than a non-recurring charge.

> FN39. Plaintiffs also claims that, by delaying the correction of this error, defendants successfully understated results for the fourth quarter of 1989, as well.

> FN40. This claim challenges accruals for certain liabilities that are particular to the communications industry, NECA and 84-800 liability.

In the Second Quarter of 1990, revenues were increased by $24 million as a result of a recoupment of employee benefits.

In the Third Quarter of 1990, reversals of accruals in connection with pension and medical benefits and reclassification of BAC's Employee Stock Option Plan ("ESOP") decreased expenses by $42 million. Net income and earnings were thereby increased by that amount. [FN41]

> FN41. Plaintiffs claim that failure to disclose the fact and amount of the 42.1 million adjustment in expenses in Form 10-Q for the third quarter filed on November 9, 1990 violated Item 303 of Regulation S-K of the Securities Exchange Commission, 17 C.F.R. § 229.303.

**\*9** In sum, Plaintiffs allege that any statements of historical fact quoted above, were 1.) misleading, when made, in that they fail to disclose additional information, or 2.) correct when made, but rendered misleading by after-acquired

knowledge by the defendants of material information. Plaintiffs also allege that, based on the undisclosed information, all predictive statements were issued without a reasonable basis or without a good faith belief in the statements' truth.

D. *A Closer Examination*

A detailed examination of the events leading up to BAC's public statements and any underlying accounting transactions follows.

1.) *6-9% Earnings Growth*

As noted above, throughout 1990, the defendants repeatedly represented that earnings would grow 6-9%. [FN42] Internal reports for 1990, listed below, reflect presentation made to BAC's Board of Directors and to various Board committees, and the contents of financial reports used by senior management:

> FN42. The defendants publicly stated that the source of the earnings growth would be the network services group (basic telephone). For example, in an April 1990 meeting with institutional investors, Crawford stated, "we have major businesses in three different stages of the life cycle, with three different growth patterns, risk profiles, and earnings characteristics. This still robust business supports an ability to earn at the lower end of our earnings objective of six to nine percent." (DX TAB 34); At an October 25, 1990 NYSSA meeting, Cambell stated that the NSG presently contributed "four to six" percent of earnings growth. (DX TAB 36). In deposition, Crawford stated that, "in any single year, results in any single business segment could be more or less than our target ranges". (Crawford dep. 181-82). The network business had the capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% target." *Id.* On July 25, 1990, based on second quarter results, "We expect to be at the lower end of this growth range until at least next year at which time the results from our development activities will begin to make a visible and sustainable contribution". (DX TAB 202).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 14
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

a.) On March 27, 1990 Campbell told the Board of Directors that that "management expected to be on target at 6% growth above normalized 1989 performance." (DX-TAB 41).

b.) On April 3, 1990, William Bardeen, Vice President of Finance and Controller, sent a "pre-flash" analysis of preliminary March results to Smith stating, "Based upon our trend analysis, we anticipate that we will exceed our Commitment View by $7.0 million and post net income of $1,404 million ($3.57 EPS) for the year." (DX-TAB 42).

c.) On May 11, 1990, Bardeen circulated the April flash report, commenting that net income for April was "over budget" by $36 million, and that net income of the first four months of the year was $6.2 million over budget and 7.3% higher than the corresponding 1989 period. "Earnings to share for the year to date were $1.20, a 6.2% increase over the same period last year." (DX-TAB 43).

On June 26 1999, Campbell reviewed financial results for the period ending May 31, 1990 with BAC's executive committee. He stated that, "the Corporation's financial performance was on target for both the month of May and year to date 1990" and that cumulative earnings per share of $1.53 were above the targeted level. (DX-TAB 44).

e.) On July 3, 1990, Bardeen sent Smith a "pre-flash" analysis of expected June and year-to-date results. June net income was below budget but year-to-date earnings were still estimated to be two cents over budget and a 6.4% increase over 1989. Based on current projections, Bardeen predicted that BAC would post net income of $1397 million ($3.55 EPS) for the year, equal to budget and representing a 6.6% EPS growth over normalized 1989. (DX-BA1008542, TAB 45).

f.) On July 24, 1990, Campbell addressed the Board stating, "earning per share for the first six months of the year totalled $1.82-2 cents above targeted EPS and $.11 (6.4%) higher than the same period in 1989 ... we are still striving to achieve our 1990 EPS target of $3.55 which would produce 6.6% growth over normalized 1989 EPS of $3.33". He also noted that the weakening regional economy, as well as investments made in various business development

projects, would make achievement of that target more difficult than in previous years." (DX TAB 46).

**\*10** g.) On July 25, 1990, Bardeen sent Smith a Key Financial Information Report updated for June 1990. The report states that the "Network companies" operating results continue to exceed the budget due principally to higher access revenues." Bardeen noted' that the weakening regional economy was becoming evident in those companies' volumes and concluded, "our current best view of the year indicates that 1990 earnings per share will total $3.54 or a 6.3% increase over 1989, as opposed to targeted EPS and EPS growth of $3.55 and 6.6%." (DX-TAB 47).

h.) On August 24, 1990, Bardeen sent Smith a Key Financial Information Report updated for July 1990. The letter stated that "the Network companies' operating results continue to exceed the budget due principally to higher access revenues," although volumes were beginning to fall below budgeted levels due to the weakening regional economy. Bardeen again repeated that "our last best view for the year indicated that 1990 earnings per share will total $3.54, or a 6.3% increase over 1989." (DX TAB 49).

i.) On October 3, 1990, Bardeen sent Smith a Projected Earnings Report. This showed that income for the month of September would probably be less than budgeted, although revenues were still higher than anticipated at the NSG. Bardeen also noted that third quarter net income would probably be $13 million below budget. He estimated year-to-date net income as $5 million below budget but still 5.5% ahead of 1989, and year to date earnings as $2.74, a 6.6% increase over 1989 and still one cent over budget. He concluded that total EPS for the year would be reported at $3.55 or a 6.6% growth over 1989. (DX-TAB 50).

j.) On October 18, BAC announced third quarter earnings by press release of $.91 per share, a 5.8% increase over the third quarter of 1989. Year to date earnings were § 2.73 per share, an increase of 6.2% over 1989.(DX-TAB 7).

k.) An "Earnings Update," dated October 23, 1990, predicted year-end normalized earnings per share growth of 6.3%. (TAB 51).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 15
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

l.) On November 14, 1990, Bardeen circulated the flash report for October 1990. The report indicated that net income was $10.8 million below budget for that month, but Network Services was still overrunning its budget due to higher-than-budgeted network access volumes and rates. (DX-TAB 52).

m.) On November 14, 1990, Bardeen separately summarized for Smith what he considered the "earnings per share that should be expected by the investment community based on your recent presentations to Wall Street analysts versus where our best view of EPS for the year currently stands." That summary reflected a "market expectation" of $3.43 ($3.53 minus a $.10 cent charge) compared to a best estimate as of that date of $3.42. Bardeen stated that "we will work to bring results in at the market expectation of $3.43." (DX-TAB 39).

n.) On December 13, 1990, Bardeen circulated the flash report for November 1990. The report indicated that net income for November was $17.1 million below budget, but that December results needed to exceed the budget by only $4 million to achieve 6% normalized growth. (DX-TAB 53).

*11 o.) On December 18, 1990), management informed BAC's Executive Committee that the Company was "on track" to meet its growth target of 6% growth in earnings, excluding the special charge. (DX-TAB 54).

p.) On January 4, 1991, Bardeen sent Smith a Projected Earnings Report stating that his best estimate was that December's net income, before deduction of the special charge, would be $5.6 million over budget, and that projected EPS without the charge would be $3.53 and even possibly $3.54. (DX-TAB 55).

q.) On January 14, 1991, Bardeen circulated the flash report for December 1990. The report stated that, excluding the special charge taken for that month, full year EPS totaled $3.53, representing 6.0% growth over normalized 1989 results. The report also noted that Network Services overran its budget by $6.1 million. (DX-TAB 56).

Plaintiffs submit, however, a June 1990 internal report that projected earnings per share growth of 4.8% for the year, (BA10008563, DX-TAB 60) [FN43] ; an internal report estimating "4-6% growth in the NSG for 1990 and 2-3% growth potential" from the nontelecommunications companies (cellular and business systems); and an internal report reflecting BAC's concern, referred to as "the business problem", that NSG growth at only 3% per year would not support the achievement of 6% overall growth.

> FN43. The document that allegedly reveals that defendants had knowledge in June 1990 that BAC would not achieve the 6-9% EPS forecast, is dated June 25, 1990. It is entitled "Bell Atlantic Corporation 1990 Short Term Compensation" and is part of a multi-page draft entitled "Projected Earnings Report". (DX BA1008563, TAB 60). Two columns each of net income and earnings estimates are aligned under-the heading "Entity Estimates". "Book" EPS growth under "Entity Estimates" is 4.8%. The document shows that an aggregation of subsidiary estimates, (i.e. "entity's" expected final booked net income as translated into earnings per share), produced EPS growth of 4.8%. (VonStetina dep. 140-41) ("entity view" represents consolidation of estimates given by each of the entities. It's simply "adding them up"); (Von Stetina dep. 147) ("snap shot in time of what total years earnings could look like, based on knowledge as of that day.").

### 2.) *FOURTH QUARTER: ESOP*
#### a.) $.05 TAX BENEFIT INCLUDED IN FOURTH QUARTER EARNINGS
In 1989, BAC established two leveraged Employee Stock Ownership Plans ("ESOP's"). [Def's B2006140, TAB 92] The ESOP's took a loan to purchase BAC common stock. [FN44] The stock was to be used over a ten year period, beginning on January 1, 1990, as BAC's matching contribution to its employee savings plans. [Def's B2006080, TAB 79]. For each quarter of 1990, BAC paid dividends on the stock held by the ESOP's. [FN45] These dividends were tax deductible by BAC pursuant to section 404(k) of the Internal Revenue Code. [FN46] BAC included the tax deduction attributable to the entire year in reported

Not Reported in F.Supp.                                                                            Page 16
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

earnings per share for fourth quarter of 1990 rather than restating the first three quarters to reflect a tax deduction of $.02 for the first quarter, $.01 for the second quarter, and $.01 for the third quarter. As a result of the accounting treatment applied by BAC to the deduction, reported fourth quarter earnings per share were increased by $.05 per share.

> FN44. Specifically, the ESOP's borrowed $790 million which was used to purchase 8.2 million shares of BAC common stock from the company's treasury and 8.8 million shares on the open market.

> FN45. [CL100081, TAB 80]

> FN46. Pursuant to <u>section 404(k) of the Internal Revenue Code</u> in effect in 1990, dividends paid on common shares held by an ESOP were tax deductible if the dividends were used to make payments on a loan, the proceeds of which had been used to acquire the employer's stock for the ESOP. Tax deductions confer a benefit on shareholders by reducing the company's overall tax liability.

In 1990, when the company first began accounting for the tax benefit generated by the payment of dividends, the accounting treatment was governed by APB Opinion No. 11 (Accounting for Income Taxes) and FASB EITF 86-4. These standards provided for the credit of the tax deduction directly to retained earnings without running the benefit through the income statement to reduce expense and increase income. [FN47] In December 1987, FASB issued Statement 96 (Accounting for Income Taxes) ("SFAS 96") superseding APB Opinion 11 and Issue 86-4, [DXB2007886-2007887, TAB 83] and scheduled to become effective beginning December 15, 1988, allowing the inclusion of the tax benefit in the calculation of net income, and thereby into the computation of earnings per share. However, in the fall of 1988, and again in December 1989, the effective date of SFAS 96 was deferred until December 1991 by the--FASB due to considerable debate on the issue [FN48] and the FASB decided to modify certain provisions of SFAS 96. *Id.* Beginning in 1990, a question arose as to whether companies still reporting under APB Opinion 11 could calculate their net income and then add the amount of

the tax deduction to that figure solely for the purposes of computing earnings per share. (DX-B2000281, B2006150, B2006080-B2006084, B2007884-B2007890, TABS 86, 87, 8b, 89). See also Ludlow Dep. 91-92. Deliberations of the EITF concerning the calculation of EPS under APB Opinion No. 11 continued but a consensus was not reached by June 1990. In August 1990, Louis Miller, a specialist in BAC-, Corporate Accounting department, concluded that there was authoritative support for including the tax deduction in the calculation of EPS and that the APB Opinion 11 permitted, and the EITF sanctioned, diversity in accounting treatment of the tax benefit as long as there was disclosure. [DX B2006174-B2006176, TAB 93]. On September 11, 1990 Miller advised Jane Ludlow that Bell Walsh, C & L audit partner, did not object to inclusion of the tax in the earnings per share calculation. [Def's B2006137, TAB 100]. In early October, BAC decided to postpone the inclusion of the tax benefit in the calculation of EPS for the third quarter of 1990. [DX TAB 101, B2006125]. On December 14, 1990, the EITF issued a statement acknowledging that diversity in practice on the issue was permissible under GAAP. (Ludlow dep 69). In addition, the AICPA terminated its discussion of the issue. (Ludlow dep. at 94 Tomlinson dep 90- 91). Accordingly, BAC included the benefit when calculating earnings per share, but not in the calculation of net income. The accounting treatment complied with GAAP. Further, after determining that the amount attributable to the first three quarters was immaterial, and gaining the approval of Coopers & Lybrand, BAC included the deduction for the entire year fourth quarter earnings. (CL2001516, TAB 102) ("We also concur that the effect on EPS is immaterial and restatement of quarterly earnings per share computation is not necessary"). Because the benefit was not included in income, the accounting treatment applied to the deduction for contibutions complied with GAAP. The fact that BAC's accounting treatment had changed was not disclosed until February 15, 1991 in BAC's 1990 Annual Report [FN49] (DX-TAB 2 at 29, 54). However, on January 23, 1991, Dean Witter reported that fourth quarter earnings included a one time charge and "a positive $.05 per share benefit from ESOP accounting." (DX-TAB 103); Lehman Brothers similarly reported on the same day that the company's fourth quarter results included the benefit derived from the ESOP. (TAB 104). In sum, GAAP permitted BAC to include this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                Page 17
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

tax benefit in earnings per share and C & L accepted that accounting treatment. [FN50]

FN47. Pursuant to APB Opinion No. 11 and EITF 86-4, "the resulting tax benefit from ESOP dividends distributed to employees should be credited directly to retained earnings." without running the tax benefit through the Income Statement. [B2006167, TAB 81]. *See also* Accountants SEC Practice Manual (Financial Statements) 4543 at 4457 (June 1990) ("ESOP" sponser reports the tax benefit from dividends paid to the ESOP as a credit directly to retained earnings in accordance with APB No. 11"). [DX TAB 82, B2006172-2006173). In December 1987, FASB issued Statement 96 (Accounting for Income Taxes)(("SFAS 96"), superseding APB Opinion 11 and Issue 86-4, and proposing that tax deduction be recognized as a reduction of income tax expense rather than credited directly to retained earnings. [Def's B2007886-2007887, TAB 83].

FN48. In March of 1988, the FASB convened a series of meetings to consider requests to amend SFAS 96.

FN49. The disclosure occurred in the section headed "Significant Accounting Policies" and in Note 15 to the consolidated financial statements. The report stated that "effective in 1990, for purposes of computing EPS, net income is increased by the tax benefit related to dividends paid on shares held by the Company's ESOP". The footnote stated "EPS for the fourth quarter included 5 cents ... the first three quarters were not restated because the change would not be material". (Annual Report at 29,54 TAB 2).

FN50. Plaintiffs also submit an internal company document, purportedly revealing that BAC knew that numbers reported throughout 1990 were misleading. That document states, "during 1990, the company reported $95 million in *revenues* which were non-recurring, or reported out-of-period" and "strong yr/yr growth somewhat

misleading". However, this statement, referring only to revenues and not earnings for 1990, is irrelevant to Plaintiff's claim regarding the treatment of BAC's ESOP.

b.) EXPENSE RECLASSIFICATION: ESOP
*12 During 1990, BAC re-classified the expense incurred for matching employee contributions to BAC's savings plan. The background of this change is as follows. BAC offers employees a 401(k) savings plan in which BAC matched employee contributions to the plan up to a set maximum figure. During 1989, BAC matched employees contributions, with cash so that the expense of those contributions was booked as "Employee Expense". The two ESOP's Instituted by BAC in 1989, described above, obtained a loan to purchase shares of DAC stock. (TAB 92). This loan was evidenced by a note guaranteed by BAC so that the debt is accounted for as a liability on BAC's consolidated financial statements and interest payments on the loan are recorded as "Interest Expense". (TAB 2 at 36). In 1990, BAC changed its method of matching employee contributions to the savings plan from cash to the BAC shares that were purchased by the ESOP's for this purpose. The ESOP's paid interest on the debt they incurred to buy those shares with funds from BAC's contributions to the ESOP trusts. *Id.* at-48-9. As required by ESOP accounting rules, these contributions were classified as "Interest". *Id.* at 35. As a result employee expense figures decreased. "Employee Expense" is a category of "Operating Expense" and "Interest Expense" is not. Operating Income is the difference between "Operating Revenues" and "Operating Expenses". Plaintiffs complain that this change led the market to believe that BAC's "Operating Inc me" was growing faster than it actually was.

Plaintiffs also claim that, until BAC issued the 1990 Annual Report 10-K, the changed treatment of BAC's matching contributions and the substantial increase to operating income and interest expense remained undisclosed. [FN51] BAC's Form 10-Q for the second quarter of 1989 described the establishment of the ESOP's "for two BAC savings plans" in Note 6 to the Consolidated Financial Statements. The footnote explains the purchase of the stock with debt and states that "the shares of common stock acquired by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                   Page 18
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

ESOP trusts will be used over a ten year period, beginning January 1, 1990, *to provide the company's matching contributions to such employee savings plans* and concluded that because the notes evidencing the debt are guaranteed by the company, they would be included in the financial statements as *long term debt.* (TAB 159 at 6); (TAB 160 at 6). In addition, the first quarter 1990 Form 10Q, noted that interest expense grew by 10.5% over the first quarter of 1989 because "interest recognized on debt associated with the leveraged employee stock ownership plans established by the company in 1989". (TAB 4 at p. 8); See also (10Q10Q), TAB 8 at p. 9) 3Q10Q TAB 8 at p. 10); TAB 161 (Crawford speech 9/19-9/21 1990, "interest expense is higher due to our leveraged ESOP"). The expense continued to be fully accounted for, albeit in a different account, and the ultimate earnings per share was not affected.

> FN51. That report states, "employee costs decreased approximately $41. million 'during 1990 as a net result of the effects of accounting for the Company's leveraged employee stock ownership plans (ESOP's) which became effective January 1, 1990, and an increase in the Companys' matching contributions percentages to the savings plans in 1990. *Under ESOP accounting rules, the portion of the Company's contributions representing accrued interest on the ESOP debt, which totaled $64 million in 1990, is classified as interest expense.* This decrease in employee costs was partially offset by a $23 million increase in the companys' contributions to the savings plan." (TAB 2 p. 35, and Note 8). C & L determined that this disclosure fully complied with the recommendations for ESOP accounting made by FASB's Emerging Issues Task Force, in Issue 89-8. (DX TAB 162).

### 3.) PREDICTED GOODWILL [FN52] WRITEDOWN (BASLI)

> FN52. Goodwill is the excess of cost of an acquired enterprise over the sum of identifiable net assets. Accounting for an intangible asset involves determining an initial carrying amount, accounting for that amount after acquisition under normal business conditions, and accounting for that

amount if the value declines substantially and permanently. FASB Accounting Standards Current Text § 160.401, 1991).

**\*13** At an New York Society of Securities Analysts meeting on October 25, 1990; in a press release issued that day; and in BAC's third quarter Form 10Q, issued on November 9, 1990, [FN53] the defendants announced their intention to take an "approximately $.10 cents" charge against fourth quarter earnings ... and that they expected "no additional writedowns". Also, the 10Q for the third quarter stated, "In the fourth quarter, the company announced that it would revalue the amount of goodwill in its Financial Services Group. This revaluation is expected to reduce 1990 net income by approximately $40 million ($.10 EPS)." The charge ultimately taken in the fourth quarter 1990 was $.15 cents ($60 million).

> FN53. MD & A at p. 11.

This charge was related to the valuation of one of BAC's financial services businesses, Bell Atlantic Systems Leasing ("BASLI"). By October of 1990, BAC was engaged in non-public negotiations with General Electric Capital Corporation to sell BASLI. These negotiations were still ongoing in January 1991. A sale at BASLI's book value would have produced a loss of *approximately* $40 million (.10 per share). (Bardeen dep. 83-84). The sale of BASLI was not consummated during 1990 and was not sold until several years later because the company could not obtain an acceptable price. (TAB 110); (Albertinini dep. 39-41); (Von Stetina dep. 169) ("We turned them [GE] down because we didn't feel like their offering price was fair"); (Bulliner dep 59- 60); (Campbell dep. 155-56). The record reveals that, by late October, it appeared that a sale was likely to be consummated but an agreement as to price had not been reached. Despite this fact, Campbell decided to make an announcement so that analysts would be aware that the asset was likely to be revalued. (Campbell dep. 156); (Crawford dep. 118) ("description of charge intended to convey financial information without going into actual negotiations"). In January 1991, the company determined that it would accept less than book price. Some of that loss would be due to uncollectible loans to BAC officers. The charge ultimately taken to earnings in connection with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 19
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

revaluation of BASLI was $.15 per share, a five cent difference between the projected and actual writedown (1.5% of 1990 earnings)

During an October 23, 1990 presentation to the Finance Committee of the Board, Bardeen discussed a "negative impact on earnings in the $40 million dollar range" arising out of the sale of BASLI. He also recommended $.10 to Campbell as the best estimate for the announcement, (Campbell dep. 156), an estimate based on the company's "test assessment of the market value of this entity and any related tax settlements." (TAB 114).

That day, November 2, 1990, Bardeen wrote to William Walsh, the Coopers & Lybrand partner in charge of auditing BAC. That letter confirms that the decision to disclose the "probable fourth quarter 1990 charge related to Financial Services" was triggered by continuing discussions for the sale of BASLI and stated that "we are beginning to recognize that disposition at or near current book value ($105 million) would still produce a tax charge of $40 million ($.10 EPS) ... even if negotiations breakdown, we will want to consider a valuation adjustment prior to year end" (Nov. 2, 1990, DX TAB 108).

*14 Plaintiffs submit that the Defendants knew that the charge would be an additional five cents by November 14, 1990. A document dated that day, lists the BASLI writedown as $.10 and the current best view of earnings per share at $3.42. It states, "we will work to bring results in at the market expectation of $3.43"... "Please remember, if we decide to consummate the sale of BASLI at the current proposed purchase price, earnings per share would be reduced by an additional $.05". [FN54] (DX-TAB 115). Deposition testimony reveals that the company did not consider public disclosure of a figure higher than $.10 in November because a decision as to sale price had not yet been made." (Campbell dep. 152-53); (Crawford dep. 112) (company had expectations of bettering price).

> FN54. Plaintiffs claim that this document allows a reasonable inference that the Company's estimates of the expected loss were $60 million, equal to 15 cents per share.

On November 27, 1990, Campbell informed the Board that discussions as of that date had yielded a proposed price below the expectations held at the time the 5.10 charge had been announced [FN55] but also confirmed that management was working to bring the price back up toward the initial target. (BA1000334- 41, TAB 117). A November 30, 1990 internal document revealed that the charge was estimated as a range running between $40 million ($.10) and $60 million ($.15). (TAB 118). The record reveals that uncertainty continued into January 1990, when Ciango was directed to prepare two drafts of the fourth quarter release, one announcing the $.10 charge, and one announcing the .15 charge. (TAB 119, 120). The final decision was made "shortly" before the earnings announcement on January 21, 1990 when management determined that the Company could no longer expect to get its originally anticipated price for BASLI. (Crawford dep. 108).

> FN55. GE quotes this price in a letter dated December 19, 1990, summarizing its understanding of the status of the discussions for the sale of BASLI. (TAB 121).

Coopers & Lybrand audited the treatment of the charge and "concurred with Management's disclosure of this matter in the financial statements and the MD & A. (TAB 111).

On January 22, 1991, the Finance Committee of the Board recommended a sale at a maximum loss of $60 million. (TAB 116). The sale did not take place until several years later.

### 4.) THIRD QUARTER 1989 STRIKE
In the third quarter of 1989, BAC experienced a strike/work stoppage by its unionized employees. Plaintiffs claim that reporting growth for third quarter 1990 as compared to third quarter 1989 was misleading because defendant's failed to disclose the quantifiable adverse impact of the 1989 strike on 1989 net income. Regarding the overall increase in employee costs as compared to the third quarter 1988, the Form 10Q for the third quarter 1989 reported that, "these increases were partially offset *by* a net reduction in employee costs resulting from a month-long strike by nonmanagment employees of the Network Services companies. However, strike-related increases in other

Westlaw.

Not Reported in F.Supp.                                                                                    Page 20
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

operating expenses offset this reduction in employee costs."
(TAB 146 at 8). [FN56] In addition, newspapers reported
the strike. (DX TAB 203) (New York Times, August 7,
1989).

> FN56. The NSG, also disclosed the fact of a strike
> in their own forms. For example, Bell of
> Pennsylvania's Form 10Q states, "A reduction in
> non-management wage expense as a result of the
> August 1989 work stoppage was more than offset
> by additional overtime pay to management
> employees during the work stoppage and an
> increase in post-strike non management overtime
> to relieve the backlog of work orders."

*15 Although plaintiffs claim that the strike reduced 3Q89
reported income by $20.6 million (14 million lost revenues
and $6.6 million increased expenses) (TAB 1) [FN57] an
internal document, (DX-TAB 204, Exhibit 112, PX-91),
reveals that BAC estimated lost revenues at $14 million, and
a net expense impact, after offsetting management overtime
and wage savings, of only $1.3 million.

> FN57. If accepted as accurate estimates, $14
> million in revenues is 1.2% of BAC's local service
> operating revenues for the quarter and $6.6 million
> represents .03% of operating expenses for that
> period. (Def.'s Mot.Sum.Judgement. at 115).

BAC considered the calculation of the effect of the strike
extremely speculative due to numerous offsetting factors.
(Smith dep. 143) (final impact "impossible" to determine
"with all the gives and takes that go on in our business");
(Smith dep. 144, 146) (The revenues lost during the strike as
a result of "pent-up" demand would be quickly replayed
after the strike's end and thus the strike will have little
overall impact). BAC determined that the impact was
immaterial so that further discussion of the strike in 1990
was unnecessary. (Lynch dep. at 57), (DX--TAB 205). In
evaluating the 1989 disclosure documents, Coopers &
Lybrand also found the effect to be immaterial. (TAB 206,
CL4001123) ("and the immaterial impact of the work
stoppage on the financial statements"); See also, (Smith dep.
143) ("strike impact minimal"); (Campanella dep. 25, 56)
(did not effect net income or revenue "very much"... "did

not have any significant impact").

### 5.) CELLULAR
The average cellular minutes of use per customer declined
over the course of 1990. [FN58] The fact that average
cellular minutes of use declines as the customer base grows
is a well known phenomena in the cellular telephone
industry in every region and in all cellular businesses.
[FN59] (Smith dep. at 135). BAC disclosed the decrease in
monthly minutes of use per customer. At the October 25,
1990 NYSSA conference, in response to question about the
decline in cellular growth in the third quarter, Smith stated,

> FN58. Average usage minutes per customer during
> 1990 were: January-166; February-150;
> March-162;April-151;
> May-157;June-148;July-134; August-136;
> September-128; October-140; November-124;
> December-116.

> FN59. The first customers to sign on are those with
> the greatest need. As the price of the service and
> equipment goes down, additional customers
> subscribe but use the service less. (Burger dep. at
> 25; Campbell dep. at 269; VonStetina dep. at
> 155-56).

When you compare year over year were about the same
that we've been in the past and we don't see any
substantial turndown. *We see some weakening in the
minutes of use, but that is very predictable according to
the charts we've been looking at all along, in terms of the
maturation of the customer base.* We expect that if we do
get into a more significant recession than we've seen, then
we'll see things slow down a bit further ... basically it has
been statistical at this point ... "We're looking at this time
to see whether we'll be disclosing more information, we
haven't made that decision yet") (DX-TAB 36).

Market analyst reports acknowledged awareness of
declining cellular minutes of use. For example, John Baur,
an analyst for Kidder Peabody, released a report on August
3, 1990, noting "*a marked deterioration in the average
monthly bill paid by the industries' customers.*" [FN60] The
fourth quarter decline was more pronounced than that of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                       Page 21
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

first three quarters. [FN61]

> FN60. (KP 000605-06, TAB 190); (DX-TAB 9)
> (October 30, 1990 report-"revenue per subscriber
> continues to fall"); (TAB 192) (November 13, 1990
> Report noting "This drop is probably due to the
> continuing evolution in customer mix-as cellular
> penetration increases, more lower revenue users are
> added which tends to bring the average revenue per
> subscriber down").

> FN61. The January 22 release noted "a fourth
> quarter economy driven downturn in demand"
> (TAB 9)

At no time did BAC disclose profit margins, expense, or net
income figures for BAMS alone. [FN62] BAC reported its
revenues each quarter from "Other Communications and
Related Services" and "Other Operating Expenses" which
included certain BAMS revenues and costs and explained
any significant components of those results.

> FN62. Smith, Barney 1/4/91, p. 6 TAB 72 ("BEL
> does not release financial results for its cellular
> operation; however, the company does disclose
> operating statistics.")

### 6.) REVENUE DECLINE, EXPENSE INCREASE
**\*16** Throughout the year, while not explicitly stating that
revenues were continuing to increase but increasing at a
decreasing rate and that expenses were rising at an
increasing rate, BAC disclosed the historical figures. For
example, BAC disclosed revenues for the first quarter of
$3.02 billion a 9% growth, (TAB 3), for the second quarter,
$3.08 billion, a 6.7% growth, (TAB 5), and for the third
quarter, a growth of 6.5%. In addition, BAC disclosed
figures showing that expenses were rising at an increasing
rate. In 1990, BAC reported that, first quarter expenses were
$2.36 billion, an 8.2% growth; second quarter expenses
were 2.39 billion, a 5.6% growth; and third quarter expenses
were 2.42 billion.(tab 7).

### 7.) ACCESS LINES
BAC never forecasted or predicted future access line
growth. While access line growth was slowing, there was a

significantly sharper downturn in access line growth and
other demand indicators in the fourth quarter. [FN63] In the
10-Q for each quarter, BAC accurately reported actual
access line growth, both in percentage rates and raw
operating statistics, throughout 1990. (TAB 4, TAB 5, TAB
7, TAB 8). This data shows that for the first three quarters
that the rate of growth was slowing slightly. The net overall
growth was 3% and a 5-6% growth in business lines.

> FN63. A fourth quarter, economy driven downturn
> in demand was evidence by lower growth in access
> lines and toll volumes and lower cellular usage per
> customer. (TAB 123).

### 8.) NONRECURRING EVENTS:
### FIRST QUARTER: REVENUE DECREASE $11 MILLION
### SETTLEMENT SECOND QUARTER:
### REVENUE INCREASE $24 MILLION EMPLOYEE
### BENEFITS
In the first quarter of 1990, revenues were decreased by $11
million and in the second quarter, revenues were increased
by $24 million as a result of certain one-time events.
Plaintiffs claim that failing to disclose these one-time events
was misleading.

However, first quarter 1990 press release disclosed that,
> "the first quarter results include accounting for a proposed
> settlement with the Pennsylvania Office of consumer
> advocate and Attorney Generals Office relating to an
> inquiry into Bell of Pennsylvania's past sales and
> marketing activity." (TAB 3).

Form 10-Q for that quarter further stated that,
> "these increases [in revenues] were partially offset by an
> additional accrual of $11.4 million recorded for a
> tentative settlement reached between Bell of
> Pennsylvania, the Pennsylvania Attorney General's
> Office, and the Office of Consumer Advocate related to
> past sales and marketing activities."(tab 4).

In addition, the possibility of a recoupment of $24 million in
the first quarter was disclosed in Form 10Q for that quarter:
> "On April 2, 1990 the company filed an employee
> discount revenue recovery plan with the PUC. The plan
> requests a one time recoupment of $24 million

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.