Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

representing past due revenues retroactive to the date of the rate case order. The company expects the PUC to rule on this plan by June 1990." (TAB 148)

Furthermore, the second quarter Form 10-Q provides that,
"The quarterly and year to date increases were enhanced by the recognition in May 1990 of $24 million in revenue by Bell of Pennsylvania in connection with the retroactive recoupment of costs incurred to provide discounted employee telephone service" (TAB 6 at MD & A p. 7)

**\*17** On November 9 1990, third quarter Form 10Q was filed with SEC. That document stated,
"The year to date increases were also enhanced by the recognition in May 1990 of § 24.1 million in revenue by Bell of Pennsylvania in connection with the retroactive recoupment of costs incurred to provide discounted employee telephone service. This increase was partially offset by decrease in revenue of $11.4 million related to settlements reached between Bell of Pennsylvania, the Pennsylvania Attorney General and the Office of Consumer Advocate related to past sales and marketing activity". [FN64]

FN64. (DX-TAB 8, BA1000573 at 8)

9.) *NONRECURRING    EVENTS:REVERSALS    OF ACCRUALS & RETROACTIVE CREDITS*

Plaintiffs contend that, in 1989 and 1990, the timing of certain accounting adjustments was intentionally manipulated by BAC in order to create the appearance of growth. In sum, the accounting treatment applied to each of these events complied with GAAP, was accepted by Coopers & Lybrand, and was disclosed to the market. These types of adjustments were a regular part of BAC's accounting processes, as they were for all other RBOCs. [FN65]

FN65. For example, the 1989 annual report stated that "revenue adjustments recorded to reflect estimated rates of return on certain interstate services also contributed to the increase in access revenues in 1989." (TAB 146).

a.) Liability for Access Revenue: "84-800 liability"

In 1990, the FCC regulated the rates local telephone companies could charge long distance carriers for access to the local network. (Beville dep. 12-13). During the 1980's, the FCC regulated these rates by setting the amount of return a telephone company could earn on its capital investment costs. (Beville dep. 11) (the "authorized rate of return"). Regulated companies used the FCC rates to set their rates so that projected revenues were limited to the authorized rate of return on capital costs. (Oliver dep. 10). In practice, actual revenues and expenses were not identical to the projected revenues and expenses that were used to calculate rates and telephone companys would earn more than was allowed under governing regulations. The 84-800 docket dictated how the regulated companies were required to treat revenues earned over and above the FCC's prescribed rates of return. (McGarvey dep. 28; Hanley dep. 177).

b. First Quarter: 84-800

During 1989, BAC and AT & T, BAC's largest long-distance carrier, entered negotiations to settle BAC's liability to refund access charges to AT & T. On October 31, 1989, BAC and AT & T entered into an agreement whereby BAC would pay AT & T approximately $9.9 million on or before January 31, 1990 in settlement of its liability so long as the FCC did not issue new rules which changed the calculation of the refund liability. [FN66] (TAB 140). The rules did not change and BAC made the required payment in the first quarter of 1990. *Id.* BAC reversed any remaining accruals for liability to AT & T.

FN66. at agreement provided, "Pay to AT & T on or before January 31, 1990 that amount provided that the commission does not revise the automatic refund rules invalidated in *AT & T v. FCC*, 836 F.2d 1386 (D.C.Cir.1988)*. (PX 15).

In addition, in March 1990, BAC modified its method for estimating the refund liability based on parameters set out in an order issued by the FCC on January 9, 1990. Once refund liability was resized for any reason, GAAP (APB 20 (changes in estimates), and FAS statement NO. 5 (accounting for contingent liabilities)), required the reversal of any accrual in excess of the newly calculated liability. BAC reversed a total of approximately $37.5 million of

Not Reported in F.Supp.                                                                                      Page 23
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

accruals in the first quarter of 1990. [FN67] Upon reviewing the financial statements for that quarter, Coopers & Lybrand expressly concurred that the accounting treatment was in accordance with APB # 20 and with the decision by BAC not to disclose the adjustments in the financial statements based on immateriality. [FN68] (TAB 147) ("The accruals made were reasonable and disclosures made were adequate"). The first quarter 10-Q, MD & A, disclosed the adjustments and the 1990 impact. That report states, "Adjustments recorded to reflect revised estimates of access revenue liabilities *increased revenues approximately $62 million during the quarter.*" (TAB 4). This figure represents the sum of reversals relating to net 84-800 adjustments and NECA liability, described below.

FN67. (TAB 142, 143)

FN68. (TAB 146, 2) ("An audit included assessing the accounting principles used and significant estimates made by management").

c. First Quarter accrual reversal:NECA
($20 million Mathematical Error)

*18 As part of the 1989 year-end audit process conducted in the beginning of 1990, C & L performed a "detailed review of documentation supporting a $20.8 million NECA contingency accrual." [FN69] (TAB 155). This review revealed that Bell of Pennsylvania had made a mathematical error. *Id.*; (Horn dep. 13). The error occurred when "someone picked up a number when adding the schedule across incorrectly." (Horn dep. at 41.) To correct the error, Coopers and Lybrand concluded that the $20.8 million should be reversed. *Id.* [FN70] However, at the time the error was detected, BAC's financial books were cied for 1989, and adjustments could no longer be made to the financial statements within the computer system. (Horn dep. at 35) ("We would have had to try to reopen the systems, which would have been-which was physically impossible at the time ... once we cleared or closed the books and generated the financial results, the system closes down and starts counting for transactions in the following month.") C & L determined that the error was too immaterial to require the extraordinary and costly step of reopening the financial statements, or even "separate disclosure". (Horn dep. at 32; CL2001506, TAB 156). Therefore, the error was corrected

by reversing the accrual during the first quarter of 1990 with C & L's concurrence. As noted above, the first quarter 10Q for 1990 stated, "Adjustments recorded to reflect revised estimates of access revenue liabilities increased revenues approximately $62 million during the quarter."

FN69. During the first quarter of 1989 Bell of Pennsylvania concluded it owed $9.4 million contingent liability to NECA. TAB 155. In December 1989, Bell of Pennsylvania reviewed the existing accruals and "as a result, increased contingent liability to $20.8 million." *Id.* Von Stetina dep at 233.

FN70. In correcting the error, C & L determined that Bell of Pennsylvania actually should have no NECA contingent liability.

d. Third Quarter reversals

Plaintiffs allege that "approximately $13.5 million of BAC's reported operating revenues for the third quarter of 1990 resulted from the reversal of accruals for 84-600 liabilities." (No 19, TAB 1) The actual amount of access revenue liability reversed in the third quarter was $12.1 million. The impact was disclosed in the MD & A for the third quarter. That document states, "adjustments, recorded to reflect revised estimates of access revenues in both 1989 and 1990 decreased access revenues approximately $13 million during the quarter." [FN71]

FN71. This disclosure compared the effect of such adjustments for the third quarter of 1989 with that of 1990. In 1989, BAC reversed $25.1 million. The difference in the impact on revenues in 3Q89 (increase of 25.1M) and in 3Q90(increase of 12.1m) is approximately 13 million. (TAB 8 at p. 8).

BAC's Third quarter report stated, "Adjustments recorded to reflect revised estimates of access revenue liabilities in both 1989 and 1990 decreased access revenues approximately $13 million during the quarter but *increased* year to date revenues approximately $32 million". (DX TAB 8, BA1000573)

Westlaw.

Not Reported in F.Supp.                                                                                    Page 24
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

e. Fourth Quarter *[1989]*:

Medical Benefits Trust and Pension Benefits $320-million in previously announced special charges against earnings were recorded in 1989. A press release issued on January 23, 1990 (TAB 207) described those charges as follows. "1989 earnings 5.43 per share compared with 6.65 per share in 1988 an 18% decrease ... "our performance would have compared favorably with 1988 except for the approximately $320 in special charges against earnings we recorded at the end of 1989. These charges, *which were of a one time nature* were associated with the revaluation of assets at some of the company's unregulated subsidiaries, the cost of an organizational realignment that included incentives for managers to retire early or voluntarily leave, and debt refinancing at several of the companies telephone subsidiaries"... "*In addition* the company *began* to accrue for and fund a trust to help cover the future cost of medical and dental benefits for nonmanagement retirees. only a portion of the expense in setting up the retirees trust in 1989, referred to in the second sentence, would be nonrecurring. (Campbell dep. 118-120). The funding of the trust, for the most part, was the first installment of a recurring expense. An internal document dated January 24, 1990, from Gary Delson, Director of Financial Reports to his supervisor, Mr. Tomlinson, (B20232242, TAB 207), explains that this press release was "unclear" as to whether the funding of the trust was a recurring or non-recurring charge to earnings and that the final draft omitted the word "primarily" from the sentence "these charges which were (primarily) of one-time nature despite notations on drafts that the trust was a recurring charge. The document acknowledged that the adverse consequences of the error is that financial community could anticipate 1990 EPS to be $7.50. [FN72] The report noted that "in fact, we expect to achieve 7.09 next year 6% growth over "true" normalized 1989 EPS of $6.67". One newspaper article reported the entire $320 million as a non-recurring charges. (TAB 207).

> FN72. This incorrect figure would be derived by analysts calculating "normalized" 1989 EPS in the following way: $320 million is 1.62 EPS. (5.43 + 1.62 = $7.05) $7.50 is 6% growth over $7.05.

**\*19** Further, on January 26, 1990, Campbell, addressing a group of New York analysts, stated that the purpose of the meeting is "to walk you through the specifics for each of the nonrecurring initiatives and how each affected our results. He identified each of the charges BAC had included in his "normalized" 1989 results, concluding that "normalized results for the year, adjusting reported EPS for these charges, were $6.67 per share, and that number would be the "benchmark level" for BAC business planning process and from which it would measure its 6% earnings growth. (TAB 209). Campbell also stated that he "deliberately avoided including any mention of the charges we incurred for funding the Post Employment Benefits Trust because I wanted to focus only on *non-recurring* events which effected 1989 results". *Id.* (emphasis in original). He described that the funding of the trust with an annual amount of $137 million, which accounted for and impact of $.38 cents on 1989 EPS. "Since *this item represents an annual expense,* the quarterly results were retroactively restated to recognize the charge. *Id.* On January 25, 1990, an analyst, Mr. Toole issued a report for Merryl Lynch comparing BA reported earnings to the Merryl Lynch estimate and noted, "Exclusive of charges of a nonrecurring variety, EPS would have been $6.67 per share, and exclusive of the recurring trust expenses earnings would have been $7.05. (Toole dep. 66-67). (TAB 71).

f. Third Quarter 1990 Adjustment to Accruals Medical and Pension Benefits

In May 1990, BAC became aware of higher than expected accruals resulting from its funding of medical benefits trust. In September 1990, BAC became aware of overfunding of pension benefits trusts. A task force was formed to determine the reason for this and in August 1990, the task force completed its report documenting the cause of the problem, and prepared instructions for journalizing entries to correct the overfunding of the trusts. The adjustments were booked in the third quarter of 1990. C & L concurred. Third quarter Form 10Q disclosed the adjustments. These adjustments reduced expenses and thereby increased income by 42.1 million. Earnings per share for the third quarter also increased by .10 (EPS would have been .81 compared to . 86 in third quarter of 1989. Reported EPS for the third quarter was $.91). [FN73]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 25
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

FN73. As noted previously, an internal document analyzing the company's 1990 earnings "the company's revenues and income as reported in 1990 were "misleading ".

Plaintiffs note that a Brown Brother's Harriman & Company report dated Oct 26, 1990 remarked that third quarter operating expenses rose only 5.2%, and viewed this as a positive element of the company's financial results. Bear Stearns, commenting on the company's third quarter performance, noted in a report dated Oct 26, 1990, "In terms of operating expenses, we were impressed with the 1% decline in employee costs and other benefits."

Medical Trusts

BAC created VEBA [FN74] trusts for company expenditures for medical, dental, and vision benefits for active management, active nonmanagement, and retired management employees. (B2006882, B2006852, TAB 163,164). Through the close of 1989, the trusts were funded in an amount equal to the bills for medical claims that BAC received from its carriers. The only exception was December when the company would fund the trust for estimated claims incurred but not yet processed for the balance of the calendar year ("the pipeline accrual" or "PA"). The company received a tax deducution in the year of funding the PA. The PA recorded on the company's books was "trued-up" twice a year based on actual claims paid. [FN75] (TAB 166,167,L68,169) (Bardeen dep. at 98)

FN74. VEBA stands for "voluntary employee beneficiary association" a type of trust provided for in section 501(c)(9) of the Internal Revenue Code.

FN75. While adjustments to true-up accruals for medical and pension trusts were routine practice at BAC, they were not previously reported because they were determined to be immaterial. However, adjustments made in 1990 were considered to be more significant because of the overfunding the company experienced in the period January through July 1990 as a result of the implementation of "ghost premiums."

**\*20** In addition, BAC established the Retiree Health Care

Trust in November 1989 to provide benefits to nonmanagment retirees. (TAB 165). In January 1990, BAC changed the method used to fund the VEBA trusts and began to accrue for trust liabilities based on a "ghost premium" developed by BA's insurance carrier Blue Cross/Blue Shield, Aetna, Prudential, and Vision Services.(TAB 167, 172). [FN76] In early 1990, BAC Human Resources Group began to review the claims data and the most recent estimates of the PA to determine whether the "ghost premium" rates were correct. (TAB 174). It became apparent in May 30, 1990, that the company was overfunding for medical and pension benefits relative to actual expenditures. As a result of this finding, Corporate Accounting initiated a study of the accounting for 1990 medical benefits expenses. (B2000026-B20,0031, B2006763, TAb 173, 179). Initial analysis indicated that the overfunding was the result of the premium rates being set too high by the insurance carriers. (B200029, TAB 173). By late June 1990, Aetna provided revised ghost premiums but they were determined, upon review, to be improperly calculated. *Id.* Benefits accounting experts analyzed the problem to determine whether an adjustment was necessary and the study was completed in August of 1990. (Von Stetina dep at 137-38). Results were reported in a comprehensive memorandum prepared by Jane Ludlow describing the problems and the impact on expenses. (B2007132, TAB 182). The review of liability revealed other errors that would further reduce expenses. The one-time adjustment necessary to true-up the medical benefits trust would decrease previously booked expenses by approximately $10.7 million. (B2007132-B2007137, DX-TAB 182). The adjustments were booked during the third quarter. (B2007022, TAB 183).

FN76. Until January 1990, BAC funded the trust based on an interim accrual rate developed by outside actuaries. The accrual rate would be trued-up later in the year based on the claims-paid experience with the trust. (B2006842, B2000015, TAB 167, 170). The new premium was based on prior years claims experience and health care trends.

Pension

Westlaw.

Until September 1990, pension expenses continued accruing at the 1989 annual rates, until September 1990, when BAC received adjusted 1990 pension expense data from Bell Atlantic Trust Administration. (DX TAB 184). Once the new rates were received, a retroactive adjustment was necessary in order to true-up the year-to-date expense accounts as of September 1990. Accordingly, the estimates were booked in the third quarter. [FN77] True-ups are characteristic of the nature of pensions and benefits. (Von Stetina dep. at 220). C & L concurred. (see, CL2010541-42, TAB 186) (The third quarter audit papers state, "C & L has reviewed the company's calculations and allocations among their subsidiaries and agrees that they are reasonable and consistent with prior years. The amounts listed below represent the adjustments which should be recorded in September of 1990."). C & L also concurred with an adjustment of $9.4 million in the third quarter to reverse overaccruals for medical dental and vision benefits. (CL2010456, TAB 187). Furthermore, Form 1OQ for the third quarter disclosed that, "Pension and benefit expenses decreased 20.0% and 8.8% in the third quarter and year-to-date, respectively, as the impact of a September 1990 adjustment to pension accrual rates and the above mentioned early retirement plan at Network Services more than offset business growth-related increases at the subsidiaries." Analysts were aware of the adjustment. (Toole dep. 76-77.)

FN77. For Bell Atlantic Management Pension Plan, the retroactive adjustment was estimated at $15, 115,926 and for the non-management plan the estimate was $11,247,522. Notice was forwarded to the regional telephone companies on september 24, 1990. VonStetina at 220.

10.) *FINANCIAL SERVICES, REAL ESTATE (BAP). INTERNATIONAL*
**\*21** BAC never published detailed financial information about these companies. Rather, as with BAMs cellular, it published on a consolidated basis. Each 10-Q contained a section on revenues of the "Financial Services and Real Estate Services Companies". BAC never published its budgets. BAMs third quarter 100 stated "Revenues of the Financial and Real Estate Services companies increased

11.6% and 14.1% for the three and nine month periods ended September 30, 1990, due principally to the growth of the Company's lease financing subsidiaries." (DX-TAB 8). This statement was accurate. (CL2010597, CL2010598 TAB 193) ($20.5M/$177.4M=11.5558%) ($71.5M/$510M = 14.0784%) [FN78]

FN78. "profitable". Through the third quarter of 1990, TriCon earned $25.3 million (B2037369 TAB 194) and BASLI showed a year to date income of $5.7 million. (B20337370, B2038098, TAB 194, 197). BASLI's growth trends were "softening" and experienced an "ongoing revenue decline" by October, BASLI had a stronger than anticipated fourth quarter and met its budget for the year. (B2038091, B2038098, TAB 199, 197).

BAP lost $13 million by the end of the third quarter. The Defendants note, however, that BAP was budgeted to lose $15 million so that actual loss was less than budgeted loss. (B2037373, TAB 194); (Campbell dep. 261); (TAB 195).

Arguably, these financial services businesses were

An October 25, NYSSA statement described the financial services and real estate subsidiaries and the companies decision to re-value and de-emphasize. (SEE BA1004853, TAB 36).

In support of their contention that BAC withheld information about BASLI, Plaintiffs note that an internal document dated after the October 25, 1990 NYSSA meeting announcing the $.10 writedown, states, " As a hardworking actor myself, I am heartened to know I have a good scriptwriter behind me." The author of this note is an actor.

JANUARY 22, 1990: REPORTED FINANCIAL RESULTS
On January 22, 1991 BAC issued a press release reporting that for the year ending December 31, 1990 earnings per share were $3.38. This is the figure calculated after subtracting a $.15 charge taken in the fourth quarter for the BASLI writedown. The press release stated that "earnings per share growth after eliminating nonrecurring charges in both years was 6%." Thus, factoring out the $.15 charge and

Westlaw.

Not Reported in F.Supp.                                                                   Page 27
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

charges taken in the fourth quarter of 1989, "normalized" 1990 earning per share ($3.53) exceeded 1989 "normalized" earnings per share ($3.33) by 6%. Total net income for the year was $1.31 billion and operating revenues of 12.3 billion had increased 7.4% over the prior year. (BA1000194, DX-TAB 9).

For the fourth quarter, the January 22, 1991 press release reported that income had declined to $.65 cents per share, from 91 cents in the third quarter of 1990 and an average of 91 cents per share in the preceding nine months. BAC's return on average common equity for the quarter declined to 10.5% and to 14.8% for the year, lower than the 16.4% represented at the October 25, 1990 meeting with analysts and the 16.4% average return on equity reported in the first nine months of 1990. In the following year, 1991, the companies income declined to 2.61 per share in the first nine months of the year (excluding a gain on the sale of an investment) from 2.73 per share in the same 1990 period and the market price fell further to § 43-$46 per share. (Compl. at 22).

IV. *THE APPLICABLE LAW*
A. *Section 10(b) and Rule 10b-5*

**\*22** The 1934 Act was designed to ensure a fair and honest market for the trading of securities and protect investors against manipulation of stock prices. See S.Rep.O.792, 73d Cong., 2d Sess., 1-5 (1934). The Supreme Court has "repeatedly described the 'fundamental purpose' of the Act as implementing a philosophy of full disclosure". *Santa Fe Industries v. Green,* 430 U.S. 462, 477-78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In order to prove a violation of Rule 10b-5, [FN79] promulgated by the Securities Exchange Commission under § 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), a plaintiff must establish the following by a preponderance of the evidence:

> FN79. Rule 10b-5 provides: It shall be unlawful for any person, directly or indirectly....
> (a) To employ any device, scheme, or artifice to defraud, (b)To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were

made, not misleading, or
(c)To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 CFR § 240.10b-5 (1990)
Neither § 10(b) nor Rule 10b-5 explicitly provides a private right of action, but the courts have inferred one. *Basic,* 485 U.S. at 229. A plaintiff has standing by virtue of being a purchaser or seller of a security who has traded shares between the time the alleged misrepresentations were made and the time the truth was revealed.

(1) that defendants, acting with scienter, an intent to deceive, manipulate or.defraud, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194-214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), either

(2) employed a manipulative or deceptive device, scheme or artifice to defraud. Rule 10b-5(c) or

(3) made a misleading statement or omission, *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476-77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1,7-8, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985);

(3) of material fact, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976);

(4) upon which plaintiff, a purchaser or seller of the security, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731-55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), (5) relied upon in completing a transaction, *Basic v. Levinson,* 485 U.S 224, 243 (1975);

(6) which caused economic loss to the plaintiff. *In re Phillips Petroleum Sec. Lit.,* 881 F.2d 1236, 1244 (3d Cir.1989); *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 683-86 (7th Cir.1990).

The absence of either the scienter or the materiality elements is sufficient to support a motion for summary judgment. *Bryson v. Royal Business Group,* 763 F.2d 491,

Westlaw.

Not Reported in F.Supp.                                                                                                          Page 28
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

493 & n. 3 (1st Cir.1985). The defendants seek summary judgment on the basis of the absence of an actionable misleading statement or omission and/or the absence of scienter, materiality, and loss causation.

### DUTY TO DISCLOSE

It is well established that in the absence of a duty to disclose, there is no liability under these provisions for failing to disclose material information. _Chiarella v. United States,_ 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). Thus, the mere possession and nondisclosure of material facts does not impose liability. However, Rule 10b-5 creates a statutory duty to speak the full truth when defendant undertakes to say anything". [FN80] _First Virginia Bankshares v. Benson,_ 559 F.2d 1307, 1317 (5th Cir.1977), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); _Huddleston,_ 640 F.2d at 543-44. In addition, there is a duty to correct prior statements, if the prior statements were true when made, but will mislead if left unrevised in light of subsequent events. [FN81] _In Re Phillips Petroleum,_ 881 F.2d 1236, 1245 (3d Cir.1989); _Time Warner Inc. Sec. Lit.,_ 9 F.3d 259, 267-68 (2d cir.1993), cert. denied, 114 S.Ct. 1397 (1994). A duty to disclose arises whenever secret information renders prior public statements materially misleading. _Id._ The timing of a correction to an earnings prediction or similar statement involves some discretion. The question of whether a correction is sufficiently prompt must be determined in each case based upon the particular facts and circumstances surrounding the prior disclosure and the material changes which trigger the duty to correct. [FN82] _In re Phillips Petroleum,_ 881 F.2d 1236, 1246 (3d Cir.1989). The correction may have to be made when it can be calculated "with substantial certainty". _Good v. Zenith Electronics Corp.,_ 751 F.Supp. 1320, 3322 (N.D.Ill.1990). A fact question as to when information "solidified" bars summary judgment for defendants. _Id._ [FN83] Generally, there is no duty to make predictions or economic prognostications. While the SEC encourages such disclosures [FN84], it does not mandate management projections or other forward-looking statements either in its filings or in general. [FN85] _Krim v. Banctexas Group, Inc.,_ 989 F.2d 1435, 1446 (5th Cir.1993) (no general duty to volunteer an economic forecast and affirming summary judgment for defendant);

_Arber v. Essex Wire Corp.,_ 490 F.2d 414, 421 (6th Cir.), cert. denied, 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974)(same). There is no duty to disclose general economic conditions because federal securities laws do not compel disclosure of the obvious). _In re Trump Casino,_ 7 F.3d at 377; _Krim,_ 989 F.2d at 1446 (compliance with securities laws requires issuers to disclose material firm-specific information regarding predictions but information concerning general economic facts and conditions is presumed to be known to investors and analysts). There is also no duty to disclose internal forecasts to the public. As the Ninth circuit has explained, 'it is just good business practice ... to generate projections for internal corporate use." _In Re Convergent Technologies Securities Lit.,_ 948 F.2d 507, 516 (9th Cir.1991). Thus, issuers need not reveal all projections. Any firm generates a range of estimates internally or through consultants. It may reveal the projection it thinks best while withholding others, so long as the one revealed rests upon a reasonable basis-a question on which other estimates may reflect without automatically depriving the published one of foundation. _In Re Stac Electronics,_ 89 F.3d 1399, 1411 (9th Cir.1996). _Weiglos v. Commonwealth Edison,_ 892 F.2d 509, 516 (7th Cir.1989) (Corporations need not disclose tentative internal estimates, even though they conflict with published estimates, unless the internal estimates are so certain that they reveal the published figures as materially misleading.) Further, it is well established that mere inquiries, preliminary discussions or communications preparatory to a possible acquisition of one company by another do not require disclosure under § 10b. Disclosure is required only where there are firm offers for acquisition or an acquisition seems reasonably assured at the time. As noted in _Staffin v. Greenburg,_ 1980 WL 1404 (D.C.Pa.), such matters are not material and need not be disclosed because public disclosure of tentative, indefinite, and contingent facts, would itself be misleading. In the corporate world, as elsewhere, the initial ruminations of executives must complete a circuitous course before becoming if ever, actuality.

> FN80. See also _Rand v. M/4-Com, Inc.,_ 824 F.Supp. 242 (D.Mass.1992) (A duty to disclose arises (1) when a corporate insider trades on confidential information; (2) when a corporation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 29
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

has made inaccurate, incomplete or misleading prior disclosures, whether voluntary or required; and (3) when a statute or regulation requires disclosure).

FN81. See also, _Backman v. Polaroid,_ 910 F.2d 10, 17 (1st Cir.1990)"); _Rudolph v. Arthur Anderson & Co.,_ 800 F.2d 1040, 1043 (11th Cir.1986); cert. denied, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed.2d 790 (1987); _Isiquith v. Middle South Utilities,_ 847 F.2d 205 n. 13 (discussing SEC position that issuers must correct predictive statements that no longer have a reasonable basis and the complex inquiry necessary to remove adequacy of disclosure issue from the jury); _First Virginia Bankshares v. Benson,_ 559 F.2d 1307, 1314 (5th Cir.1977) cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) (holding that duty to disclose the whole truth arises when a defendant undertakes to disclose material information).

FN82. In _Flynn v. Bass Bros. Enterprises, Inc.,_ 744 F.2d 978 (3d Cir.1984), the Third Circuit held that ascertaining a duty to disclose soft information should be made by the courts on a case by case basis. The factors to be considered are: 1.) the facts upon which the information is based; 2.) the qualifications of the fact compilers; 3.) the original intended purpose of the information; 4.) relevance to the stockholders and their decisions; 5.) degree of possible subjectivity in the information preparation; 6.) uniqueness of the information; 7.) other, perhaps more reliable, sources of information. _Id._ at 988.

FN83. See also, _Kulicke & Soffa Indus. Inc Sec. Lit.,_ 747 F.Supp. 1136, 1139-42 (E.D.Pa.1990) (correcting an earnings forecast by making a press release 9 days after the company's CEO received data indicating the forecast could not be met was not reckless. Plaintiff's JNOV denied).

FN84. The SEC published a statement encouraging the disclosure of management projections. _See_ Guides for Disclosure of Projections of Future

Economic Performance, Securities Act Release No. 5992, [1978 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 81, 756 (Nov. 7, 1978). The SEC permits certain companies to issue forward-looking statements in the documents they file with the SEC, statements made prior to filing but reaffirmed therein, without being held liable under the antifraud securities laws. _See,_ Safe Harbor Rules for Projections, Securities Act Release No. 6084, [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 82, 117 (July 5, 1979). _See also_ 17 C.F.R. 240.3b-6 (1991).

FN85. Corporations, most likely prefer disclosing only soft information of a high degree of certainty to avoid transgressing Rule 10b-5 and investors would prefer the disclosed information be reliable, since investing in securities entails risks.

### False or Misleading Statements

**\*23** A statement is false or misleading if it is factually inaccurate, or additional information is needed to clarify it. An omission can also satisfy this element where silence would make other statements misleading or false. [FN86] Misrepresentations of historical fact clearly satisfy this requirement. In addition, statements of soft informations [FN87] (i.e., forecasts, predictions, or statements of opinion) may be actionable. _Kline v. First Western Government Sec.,_ 24 F.3d 480, 486 (3d Cir.1994). The Third Circuit has squarely held that opinions, predictions, and other forward-looking publications of soft information may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them. [FN88] _In re Donald Trump Casino Sec. Lit.,_ 7 F.3d 357, 368-69 (3d Cir.1993), cert. denied, _Gollomp v. Trump,_ 116 S.Ct 1219 (1994). [FN89] Thus, in order to determine whether a forward looking statement can be deemed untrue, the court must examine whether the speaker, at the time it is made, (1) actually believed the statement to be accurate, or whether (2) there is a factual or historical basis for that belief. _Kline,_ 24 F.3d at 486. Past results are typically the most reasonable basis for predictions. See e.g., _Craftmatic Sec. Lit.,_ 890 F.2d 628, 642 n. 19 (3d Cir.1989) (predictions of increasing revenues, earnings, and market share by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 30
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

telephone company were reasonably based upon MCI's long history of positive earnings including through three of the four quarters in the class period); *Weiglos v. Commonwealth Edison,* 892 F.2d 509, 575 (7th Cir.1989). Small differences between stated earnings goals and internal earnings estimates do not alone deprive statements of a reasonable basis where the company repeatedly emphasized that a certain factor could affect fiscal earnings. *Roots Partnership v. Lands End Inc.,* 965 F.2d 1411, 1418 (7th Cir.1992) (plaintiffs only entitled to an inference that the defendants statements implied that its earnings goals of 10% were within the company's reach. [FN90] Projections of performance not worded as guarantees are generally not actionable under the securities laws. *Raab v. General Physics Corp.,* 4 F.3d 286, 289(4th Cir.1993); *Krim,* 989 F.2d at 1446). Statements relating to long term prospects are not necessarily actionable because of negative short term results. *Apple Computer,* 886 F.2d 1109, 1113 (9th Cir.), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("even if defendants were aware of facts suggesting that Caere's first quarter earnings might be depressed, they easily could have 'genuinely believed' that Caere's long term outlook was good, and there could have been a reasonable basis for that belief"). Finally, failure of the predictions to come true is not proof of fraud or lack of a reasonable basis. *See Santa Fe Indus. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (faulty economic predictions issued in good faith or with a reasonable basis do not give rise to section 10(b) liability); *Eisenberg v. Gagnon,* 766 F.2d 770, 775 (3d Cir.1985) (inaccurate predictions are not generally actionable based solely on inaccuracies contained therein).

> FN86. In sum, a statement is potentially actionable if, when read in light of all the information then available to the market or a failure to disclose particular information, it conveyed a false or misleading impression.

> FN87. Soft information is defined as "statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as earnings projections, estimates, and forecasts." *Craftmatic Sec Litig. v. Kraftsow,* 890 F.2d 628, 642 (3d Cir.1989).

> FN88. See also, *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281- 83 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Herskowitz v. Nutrisystem,* 857 F.2d 179, 184 (3d Cir.1988), cert. denied, 489 U.S. 1054, 109 S.Ct. 1315, 103 L.Ed.2d 584 (1989); *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), cert. denied, *Wasserstrom v. Eisenberg,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985). Other circuits have a more fully articulated standard: [A prediction is actionable] ... (3) if the speaker is aware of undisclosed facts tending to seriously undermine the statement's accuracy. However, if the speaker is aware of such seriously undermining facts, there is no reasonable basis for the belief that the prediction is true. Thus, the requirement that the statement must have a "reasonable basis" encompasses this situation. *In re Apple Computors Sec. Lit.,* 886 F.2d 1109, 1113 (9th Cir.1989), cert. denied, 110 S.Ct. ---- (1990); *Hanon v. Dataproducts,* 976 F.2d 497, 503-04 (9th Cir.1992).cSee also, *Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994); *Rubenstein v. Collins,* 20 F.3d 160,166 (5th Cir.1988), --- U.S. ---- (citing, *Isiquith v. Middle South Utilities,* 847 F.2d 186, 203-4 (5th Cir.), cert. denied, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)).

> FN89. Plaintiffs must put forth sufficient facts to call either the reasonable basis and good faith issues into question. *Roots Partnership v. Lands End Inc.,* 965 F.2d 1411, 1418 (7th Cir.1992)

> FN90. The Court in *Roots* noted that Plaintiffs had not allege that the company could not have met its earnings goals even with reasonable strong Christmas sales, a factor the company repeatedly emphasized could affect its fiscal earnings. The statements made throughout year expressed a goal to earn 10% net pre-tax profits over the next 5 years, including the current year. Some of the statements expressed uncertainty about the current year until the Christmas season results were known. When the statements were made, internal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 31
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

projections for the current year varied from 9.9% to 9.38%.

Presumed Reliance

*24 The Supreme Court recently has endorsed the application of a presumption of reliance in Rule 10b-5 cases. *Basic v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). [FN91] Upon determining that defendants have made a misstatement or omission of material fact, a Rule 10b-5 Plaintiff is entitled to a rebuttable presumption of reliance where the security involved is actively traded in an open and developed market. *Basic v. Levinson,* 485 U.S. 245, 247-250 (1988); *Virginia Bankshares Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). [FN92] An active and open market is one in which there are a large number of traders, a high level of activity and frequency of trades which rapidly reflects new information in the price. The plaintiffs meet the burden of proof on the element of reliance if they demonstrate that the defendants made material misrepresentations or withheld material information. The court will then presume that the misrepresentation occasioned an increase in the stock value that, in turn, induced the plaintiffs to purchase the stock. *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986). [FN93] The presumption is based on the fraud on the market theory, which, in turn, is based on the efficient capital markets hypothesis which assumes that material information about a company is immediately reflected in the price of the stock. Purchasers or sellers rely upon the integrity of this price by assuming it is based on proper information. *Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986); See also, *Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996). Plaintiff need only allege only that he suffered injury in his capacity as a purchaser or seller in the security. *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 261-83 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Defendants do not dispute plaintiffs' allegations of reliance.

FN91. The purpose of requiring a showing of reliance is to establish a connection between plaintiff's harm and defendants conduct. *Rosenberg v. Digilog Inc.,* 648 F.Supp. 40, 43 (E.D.Pa.1985).

FN92. The presumption is supported by the fraud

on the market theory. This theory recognizes that, in an efficient market for stock, the market price of the stock reflects all available, credible information concerning the company and its business. Investors are entitled to rely upon the integrity of the market price as reflecting only true information. *Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986). A plaintiff's who relies on the integrity of the stock price, also relies on statements made to the market, including fraudulent statements that cause the market to misvalue (or overvalue) that stock.

The failure to disclose material negative information about a company or its subsidiaries or the making of false positive statements, will cause a company's stock to sell at a higher price than that at which it would have sold if the true facts had been known. An investor who trades stock at the price set by the market is entitled to rely on the integrity of that price; that is, he relies on that price to reflect only true information about the stock. Because Plaintiff trades in reliance upon the integrity of the market price of the stock, if plaintiff proves that a public misrepresentation or omission is material, it is presumed that the plaintiff relied on it. Such a presumption is consistent with the Acts policy of requiring full and fair disclosure and fostering reliance on market integrity.

FN93. The presumption can be rebutted by showing that either: 1.) the misrepresentations did not affect the market price of the stock (i.e., price was not in fact inflated by misrepresentations, complete and truthful information had credibly entered the market so that the market price of the stock was corrected and did not respond to the misrepresentation or omissions); or 2.) plaintiffs would have purchased the stock even at the price it would have been at but for the misrepresentations. Essentially, defendant must prove there is no link between any alleged misrepresentation and the price plaintiff paid for the stock or the decision to trade at a fair price. The burden of proof is probably merely just shifted to defendant to prove

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                    Page 32
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

no reliance.

In the case at hand, Plaintiffs rely on the fraud on the market theory. It is undisputed that Plaintiffs are purchasers of a security that is traded over national securities exchanges and thus, is actively traded in an open and developed market. Thus, Plaintiffs reliance is not on defendants fraudulent actions directly, but on the marketplaces's reflection of the value of the stock.

An essential corollary to this theory, is the principle of "truth on the market". *Weiglos, 892 F.2d 509 (7th Cir.1989)* ("Prompt incorporation of news into stock price is the foundation for the fraud on the market doctrine and supports a truth on the market doctrine as well"). This doctrine recognizes that, in a fraud on the market case, a defendants' misrepresentations or omission of material information is not material to the reasonable investor's decision to trade if accurate information has been made available to the market by other sources. *Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir.1993)* (citing, *In re Apple Computer Sec. lit., 886 F.2d 1109, 1115 (9th Cir.1989)*, cert. denied, 496 U.S. 953 (1990); *Weiglos v. Commonwealth Edison Co., 892 F.2d 509, 516 (7th Cir.1989)*; *In re Kulicke & Soffa Indus. Sec. Lit., 697 F.Supp. 183, 186 (E.D.Pa.1988)*).

Materiality and the "Total Mix"

**\*25** The Supreme Court defined materiality as a substantial likelihood that, under all the circumstances, the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available to him." [FN94] *TSC Industries, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)*; *Basic v. Levinson, 485 U.S. 224, 231-232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)* (Information is material only if its disclosure would have "significantly altered the total mix of facts available to the investor" and if "there is a substantial likelihood that a reasonable investor would have considered the fact important to his investment decision"). That mix of information includes what is already part of the public domain. *Weiglos, 892 F.2d at 516*; *Provenz 102 F.3d 1478)* (citing, *Convergent Technologies, 948 F.2d at 513*) (In a "fraud on the market" case, "an omission is materially misleading only if the information has not already entered the market ... If the market has become aware of the

allegedly concealed information, 'the facts allegedly omitted by the defendant would already be reflected in the stock price the market will not be misled."); *Associated Randall Bank v. Grifin, Kubik, 3 F.3d 208, 213-14 (7th Cir.1993)*. Further, the false or omitted information not involve a material fact because it will not "effect the total mix of information." *United Paperworks Intern. v. International Paper, 985 F.2d 1190, 1199* ("widely reported in readily available media, and shareholders may be deemed to have constructive notice of the facts reported").

> FN94. The Court established a narrow definition of materiality because an unnecessarily low standard for materiality would subject the corporation and its management to liability for insignificant omissions or misstatements and management's fears of exposing itself to liability may cause it simply to bury the shareholders or investors in an avalanche of trivial information-a result that is hardly conducive to informed decision making. *TSC Industries, 426 U.S. at 448, 449*. Although the Court in *Northway* defined materiality in the context of a proxy statement that allegedly violated SEC Rule 14a, the same definition applies equally to determinations of materiality under the antifraud provisions of the federal securities laws. *Healy v. Catalyst Recovery, 616 F.2d 641 (3d Cir.1980)*.

The question of materiality is one of mixed law and fact, involving as it does the application of a legal standard to a particular set of facts. See *TSC Industries inc. c. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)*. Although a determination of materiality "requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him," *Id.,* materiality is appropriately resolved as a matter of law, and summary judgment should be granted when "reasonable minds cannot differ on the question of materiality." *Id.* at 450 (quoting *Johns Hopkins University v. Hutton, 422 F.2d 1124, 1129 (4th Cir.1970)*, cert. denied, 416 U.S. 916 (1974); *Gould v. American Hawaiian SS Co., 535 F.2d 761, 771 (3d Cir.1976)*; *Harnett v. Ryan Homes, 496 F.2d 832 (3d Cir.1974)*) ("To deny a defendant in a securities case

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 33
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

alleging nondisclosure of material facts the benefit of summary judgment procedures would cause a wholly innocent person to incur enormous legal expenses in defending an unmeritorious and frivolous lawsuit at trial. Such a result cannot by countenanced by our judicial system"). The court will examine each of plaintiffs contentions to determine whether there can be a reasonable difference of opinion on materiality.

Pursuant to the "truth on the market doctrine" a statement's potential to mislead and its materiality to the investment decision of reasonable investor can be nullified if the representation is accompanied by cautionary language within the document or the correct information has been revealed by some other disclosure. [FN95]

> FN95. Summary judgement may also be based on the "bespeaks caution doctrine" when "reasonable minds cannot disagree as to whether the mix of information *in the document* is misleading. This doctrine provides a mechanism by which a court can rule as a matter of law that defendants forward looking statements contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. *Provenz* (citing, *WOW*, 35 F.3d at 1413.) It is not new but a reformulation of two fundamental concepts in securities fraud law: reliance and materiality. *Id.* Blanket warnings are insufficient.
>
> The bespeaks caution doctrine was explicitly adopted by third circuit in *In re Trump Casino,* 7 F.3d 357, 364. The court concluded that under the "bespeaks caution" doctrine, "a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law. When the bespeaks caution doctrine is applied to the fraud on the market theory, it is clear that optimistic forecasts in one document are not actionable if the market was sufficiently warned in a *prior or simultaneous* document that those forecasts might not be fulfilled. See *Raab 4 F.3d at 289; Arazie v. Mullane,* 2 F.3d 1456, 1467 (7th cir 1993); *Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996)(citing, *In*

*Re Worlds of Wonder Securities Lit.,* 35 F.3d 1407, 1413-15 (9th Cir.1991)).

**\*26** According to the "truth on the market" doctrine, even if the Court determines that, in isolation, defendants statements or forecasts are actionable as misrepresentations or omissions of material fact, defendants may avoid liability by establishing that the market was aware of the allegedly concealed information. *Weiglos v. Commonwealth Edison,* 892 F.2d 509, 516 (7th Cir.1989). Thus, a defendant can avoid liability for a false statement or one that reveals less than the truth by showing that the market was not affected by the representation because the truth of the matter was known already and had been factored into market prices. John Newman, Basic Truths: "The Implications of the Fraud on the Market Theory for Evaluating the "Misleading' and "Materiality" Elements of the Securities Fraud Claims, 20 J.Corp.L. 571, 576 (1995).

Before the truth on the market defense can be applied, the defendants must prove that the information withheld or misrepresented was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by one-sided representations." *Provenz v. Miller,* 102 F.3d 1478 (9th Cir.1996).

Scienter

Scienter is a necessary element of a Rule 10b-5 action and is an independent basis for granting summary judgment. *O'Connor v. Lafferty,* 965 F.2d 893, 900 (10th Cir.1992). To establish scienter, plaintiffs must show that defendants had a mental state embracing an intent to deceive manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Interpreting the Supreme Courts scienter requirement with regard to predictive statements, the Third Circuit has explained that "an opinion must not be made with reckless disregard for its truth or falsity or with a lack of genuine belief that the information disclosed is accurate and complete in all material respects." *Kline v. First Western,* 24 F.3d 480, 486 (3d Cir.1994). Thus, simply establishing that the predictive statement at issue did not have a reasonable basis, that is, they were negligently made, would not entitle plaintiffs to recover. Rather, it must be proved that defendant knew or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 34
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

was "recklessly indifferent to the fact that the statement did not have a reasonable basis.

Plaintiff can establish scienter by proving either actual knowledge or recklessness. *Software,* 38 F.3d 1088. In this Circuit, reckless conduct is limited to those highly unreasonable omissions involving not merely "simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979); *Eisenburg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), cert. denied, 455 U.S. 938 (1985). The element is satisfied by conduct that presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* Negligent conduct alone, whether gross, grave, or inexcusable does not suffice. *Hochfelder,* 425 U.S. at 194-314.

*27 Scienter may be proved by "facts establishing a motive to commit fraud and an opportunity to do so" or by alleging "facts constituting circumstantial evidence" of recklessness or conscious misbehavior. *Acito v. Imerca Group, Inc.,* 47 F.3d 47 (2d Cir.1995). The mere publication of inaccurate accounting figures, or a failure to follow GAAP without more, does not establish scienter. *Software,* 38 F.3d at 1089. An allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is also insufficient to create a reasonable inference of scienter. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock could be subject to securities fraud. *Acito,* 47 F.3d at 53 (2d Cir.1995); *Tuchman v. DSC Communications,* 14 F.3d 1061, 1068-69 (5th Cir.1994). Further, mismanagement or poor business judgement in coping with a downturn in the economy or in the particular industry does not create liability under Rule 10b-5. Rather there must be the element of deception or scienter. *Serbian v. Amoskeag Bank Shares,* 24 F.3d 357 (1st Cir.1994)

V. *DISCUSSION*
*I. § 10b and Rule 10b-5 Claims*
*1. Earnings Growth Target*

It is undisputed that, throughout 1990, the defendants

predicted that BAC earnings would grow 6-9%. [FN96] Plaintiffs claim that defendants' predictions of 6-9% earnings growth lacked a reasonable basis because 1.) a June 1990 internal report projected earnings per share for the year of 4.8% and because 2.) past reported growth was due merely to non-recurring events, discussed below, rather than to "operating" earnings, 3) an internal estimate revealed that Defendants expected only 4-6% growth from the NSG and only 2-3% from BAC's other businesses which were operating at a loss (PX-6, B2042299.1), and 4.) an internal document revealed that the NSG, BAC's core business could not support 6% growth (referred to therein as the "business problem"). (PX 209, B2051648).

> FN96. The defendants also publicly stated on various occasions that the source of the earnings growth would be the NSG. For example, in April 1990, Crawford stated, "we have major businesses in three different stages of the life cycle, with three different growth patterns, risk profiles, and earnings characteristics. This still robust business supports an ability to earn at the lower end of our earnings objective of six to nine percent." (DX TAB 34); At a meeting with the New York Society of Securities Analysts (N.Y.SSA) on October 25, 1990, Cambell stated that the network services business presently contributed "four to six" percent of earnings growth. (DX TAB 36). In deposition, Crawford explained that "in any single year, results in any single business segment could be more or less than our target ranges". Crawford dep. 181-82. The network business had the capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% target." *Id.* "We expect to be at the lower end of this growth range until at least next year at which time the results from our development activities will begin to make a visible and sustainable contribution". (DX TAB 202).

Arguably, this is not a failed forecast. The defendants publically indicated that the base from which one should measure the 6-9% growth is "normalized" earnings of $3.33 for 1989. [FN97] Simple calculations show that, by these statements, defendants were predicting earnings per share

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                      Page 35
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

for 1990 of approximately 106% of $3.33, or $3.53, before subtracting special charges. Actual results for the fourth quarter and for the year were disclosed by press release on January 22, 1991. In that release, BAC reported a special charge of fifteen cents and reported earnings per share of $3.38 and stated that "earnings per share growth after eliminating non-recurring charges in both years was 6%" [FN98] BAC's outside auditor. Coopers & Lybrand verified this press release as accurate. (DX-CL2001595, TAB 40). Thus, ostensibly, the forecast of at least six percent growth in 1990 was met. Furthermore, there is evidence in the record that BAC achieved 6% growth even after eliminating the effect of non-recurring and one-time adjustments, discussed below. [FN99]

> FN97. In October, BAC stated, "Last year we indicated to you that we expected normalized per share earnings of $3.33-excluding some one-time write-downs of inventories and goodwill ... and that's exactly where we ended the year. And we said that earnings would grow from that base to the lower half of our 6-9% objective in the '90-'92 time frame ... We expect normalized earnings for 1990 to be about 6 percent higher than last year without special adjustments." At the same meeting, Cambell announced a charge of approximately ten cents to 1990 fourth quarter earnings. This statement is challenged by the plaintiffs but will be considered by the court later in this opinion under the heading "goodwill writedown". (DX TAB 36).

> FN98. Factoring out the $.15 cents charge, reported earnings per share of $3.38 would be $3.53.

> FN99. The document, dated January 23, 1991, reflects that one-time items that increased earnings were subtracted and those that decreased expenses were added back in to the figuresfor 1989 and 1990 so that only "operating" earnings remain for comparison. The resulting figure, a percentage representing earnings growth for 1990 over 1989 attributible only to operations, is 6.1%. (BA100082). Plaintiff does not contest anything in this document. Instead, Plaintiff has submitted a document that purportedly contradicts the growth

percentage. However, this submission does not permit a reasonable inference that 6% growth for 1990 was not achieved and, therefore, does not create a genuine issue of fact. That document reports "normalized 1990 net income as $1,318.5 ($3.34 EPS according to Plaintiff's calculations compared to $3.33 EPS for 1989), a figure markedly lower than the $1,375.1 figure that produced 6.1% growth according to the January 23 document, referred to above. However, this document compares 1990 to 1991 rather than to 1989. Because "normalizing" is a process by which years are equalized for comparison purposes and different years are characterized by different accounting events, normalizing 1990 results for adjustments taken in a year other than 1989 will produce different normalized base figure for 1990. We note that, because these documents were generated after the end of the class period, they do not provide a reasonable basis for defendants predictions nor do they negate the existence of a reasonable basis therefor. The January 23 document merely demonstrates that BAC, in fact, experienced 6% growth without the challenged one-time adjustments, contradicting Plaintiff's claim that defendants were aware that growth for 1990 would come only from the challenged adjustments rather than from operations.

**\*28** The forecast of 6-9% was issued with a reasonable basis. Historical performance itself can provide a reasonable basis for future growth. *In re Craftmatic,* 890 F.2d at 642 n. 19 (Management projections of profit and growth can have a reasonable basis if there is a history of profitable operations.) BAC's Annual Report for 1990 issued on February 15, 1991 reported 6% earnings growth in 1990 and that "the total value of your investment in Bell grew for the seventh consecutive year." (DX-TAB 2). In addition, an analyst report issued by Nomura securities on BAC stated "our confidence in BAC management is very high ... Management has delivered at least its targeted 6-9% earnings growth on a normalized basis every year since divestiture."(DX BA1000133, TAB 25).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 36
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

Throughout 1990, BAC generated internal estimates of earnings growth for the year. The prediction of 6-9% for the year was consistent with all reliable estimates. Plaintiffs claim that several internal estimates were inconsistent with the prediction and deprive it of a reasonable basis. Plaintiffs first quote an internal document predicting 4.8% growth for 1990, but fail to point to record evidence that this estimate is reliable, certain, or that it represents an inescapable fate. [FN100] Defendants, on the other hand, have provided ample evidence that this estimate was not considered to be reliable or certain by BAC. [FN101] Because this estimate was not considered reliable by management, this document did not represent the company's view. Such evidence can not undermine the reasonable basis or good faith belief for the defendants projections of 6-9% earnings growth provided by other internal estimates. Another internal estimate cited by the Plaintiffs, estimates 4-6% growth from the NSG. Again, as long as the attainment of 6% growth is within reach, it has not been foreclosed, and the prediction is not deprived of a reasonable basis.

> FN100. As noted above. (See, type print p. 35).

> FN101. These "Entity Estimates" were not considered by management to be reliable projections of the company's actual performance because they do not take into account decisions made at the corporate headquarters level or acceptable expense levels. See (DX-BA 1008542, TAB 62) (July 3, 1990 "pre flash" analysis by Bardeen, concluding that net income for the year would equal budget and 6.6% EPS growth: In so concluding, Bardeen noted that "estimates provided by the companies result in a lower projected net income. Their lower forecast can be attributed to expense estimates which exceed those of my staff. We have also recognized anticipated medical expense accrual reversals which have not been communicated to the companies.") The "Administrative View", an estimate that takes into account these corporate factors, is a more accurate reflection of the Company view. This estimate projected EPS growth of 6.6%. (DX-BA1008557, TAB 60); (Von Stetina dep. 142) (administrative

view "based on what entities provided plus information that we were cognizant of that they might not have been aware of at that point in time").

Moreover, defendants' awareness of what is referred to internally as the "business problem," does not undermine a reasonable basis or good faith belief in the prediction of 6-9% growth for 1990. Undisputed deposition testimony reveals that the "business problem" was a long term concern that the earnings growth from the NSG would not be sufficient, in itself, to achvieve the 6-9% growth forecasted each year. (Bardeen dep. 76) ("limited long term growth from the basic core businesess"); (VonStetina dep. 242) ("The long term business problem was that the [NSG] growth rates in earnings would not be sufficient in and of themselves to achieve 6-9% each year. and ... growth would have to come from the nonregulated businesses"). Plaintiffs put forth no evidence showing that this was not a long term problem or that the estimate of only 3% growth applies to 1990. Documents reflecting that BAC anticipated that growth in the NSG would be insufficient to meet yearly predictions in the future, does not erode the Defendants' reasonable basis or good faith belief in the achievement of this target in the short term. Indeed, the record reveals that the NSG had the capacity to account for the lower end of the 6-9% range for several more years. (Crawford dep. 181-82) (NSG has capacity over the several years following 1990 to account entirely for "the lower end" of the 6-9% range); (TAB 34) ("this still robust business supports an ability to earn at the lower end of our earnings objective of 6-9%").

*29 Plaintiffs contend that certain nonregulated business segments were performing poorly (i.e., BAP, the real estate subsidiary lost $1.3 million in 1990 and the growth trend in BASLI, the Financial Services subsidiary, was "softening" throughout that year). However, in light of the fact that the defendants expected 6% of the earnings growth to derive from the NSG, some negative information about the other subsidiaries would not deprive the predictions of 6-9% growth of a reasonable basis or defendants of a good faith belief in the truth of their statements.

Finally, other events, discussed below, allegedly deprived the prediction of 6% growth from having a reasonable basis

Not Reported in F.Supp.                                                                 Page 37
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

and also rendered any quarterly statements reporting attained growth misleading. However, those nonrecurring events were sufficiently disclosed, were not material, or defendants had no duty to disclose the information.

### 2. Reversals of Accruals and Retroactive Credits

Plaintiffs complain that any growth expected for the year would come, not from operating performance, but from accounting manipulations that allowed defendants to overstate earnings for 1990 and understate 1989 earnings. Plaintiffs do not challenge the underlying accounting and concede that Defendants were entitled to make these accounting adjustments under GAAP. Instead, they claim only that defendants intentionally manipulated the timing of the adjustments in order to show at least 6% growth in 1990 over the results reported for 1989. This can be translated into a claim that statements made regarding growth in 1990 as compared to 1989 were misleading in that they failed to disclose the amount of growth attributable to non-recurring and out-of-period transactions, and that predictions of 6-9% growth for 1990 lacked a reasonable basis because defendants knew that growth would not be from operations. However, the record reveals that the timing of the adjustments was reasonable. There is no evidence that BAC delayed making a reversal, despite discovering that an overaccrual existed and sizing the amount of the overaccrual. Regardless of when it occurs, reversing an over-accrual, as required under GAAP, will always have a "ballooning" effect on financial res lts.

Furthermore, even if these adjustments were intentionally timed by defendant to show earnings growth, the adjustments were disclosed to the market so that no reasonable investor would be' misled about the effect of these adjustments on reported earnings. In other words, no reasonable investor would be misled into thinking that.the improvement in the reported financial results of the company was caused only by improved operating revenues.

#### a. Second and Third Quarter

The first group of challenged adjustments, involves the reversal of an accrual, an estimation made by management of future expenses or liabilities that must be "reversed", i.e. added back in to revenues, if eventually proved to be

inaccurate by the actual expenses or liabilities, or by subsequent changes in rates used to calculate the accrual.

**\*30** Nothing in the record indicates that the overaccruals were anything more than poor business judgement. "Mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable." *Serbian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357 (1st Cir.1994) (citing, *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 (3d Cir.1993). The accounting, explicitly approved by independent outside auditors, was in compliance with GAAP.

This court agrees that information about the source of a company's reported growth may be material in some cases. Certainly, if the amount of growth derived from accounting adjustments rather than an improvement in the business is material, that information must be disclosed if it will render statements misleading. *See e.g. Weeks Dredging & Contracting v. American Dredging,* 451 F.Supp. 468, 479 (E.D.Pa.1978). In this case, however, the challenged adjustments were disclosed to the market. While the drafting of some of the documents that disclosed these transactions may have been inartful at times, there was sufficient disclosure from which the market could deduce the amount and effect of one-time events.

#### b. First Quarter Reversal of Accruals [FN102]: $20 Million Mistake

> FN102. The plaintiffs challenge another one-time charge in the first quarter, the AT & T settlement. However, the information is immaterial because the amount and effect of the AT & T settlement was disclosed prior to the class period.

Plaintiffs claim that a mathematical error that resulted in an overaccrual for NECA liability should have been corrected in the fourth quarter of 1989 rather than the first quarter of 1990. The error was detected in January 1990 during the routine year-end audit by Coopers & Lybrand. Plaintiffs claim that Defendants were able to boost first quarter earnings by reversing the accrual in 1990 despite knowing that the reversal was necessary before the financials were issued for the fourth quarter of 1989. By overstating 1990

Not Reported in F.Supp.                                                                      Page 38
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

revenues and understating 1989 revenues, BAC was able to show revenue growth in the 1990 compared to the 1989. The reversal of this error and of additional overaccruals detected while investigating the error, caused $20.8 million in revenues to be added to 1990 financial results.

However, nothing indicates that this decision as to the timing of the reversal represents anything more than the difference between two permissible judgments. By the time BAC and Coopers & Lybrand knew that a reversal was necessary and quantified the amount, the "books were already closed for 1989" and there was testimony that it would have been physically impossible to change the financial, statements in the computer system. Cooper's and Lybrand determined that the error was immaterial so that reversal in the 1989 financial statements was unnecessary.

Furthermore, apart from the timing of the reversal, there can be no liability imposed for the mathematical error because the mere publication of inaccurate accounting figures (or failure to follow GAAP) without more, does not establish scienter. *Provenz v. Miller,* 102 F.3d 1478, 1489 (9th Cir.1996). Further, as noted above regarding the second and third quarter, there is also no liability for the overaccrual itself. *Serbian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357 (1st Cir.1994) (citing, *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 (3d Cir.1993)* ("Mere failure to provide adequate reserves does not implicate the concerns of the federal securities laws and is not normally actionable").

**\*31** Moreover, as discussed in connection with the other reversals during 1990, this adjustment was disclosed before the end of the class period. The first quarter 10-Q for 1990 contained the statement, "Adjustments recorded to reflect revised estimates of access revenue liabilities increased revenues approximately $62 million during the quarter."

### 3. *Access Line, Revenues, Expenses*

Plaintiffs contend that the Defendants made positive statements regarding access line growth during the class period, but failed to disclose that access line growth was slowing so consistently that it was perceived as a "trend" by October 1990.

Defendants' statements regarding access line growth are not material. The historical figures were accurately disclosed from which a reasonable investor could deduce that access lines were growing at a reduced rate. Each quarter, BAC's 10-Q reported actual access line growth, both in percentage rates and raw operating statistics. (DX-TAB 4, 5, 7, 8) Because the defendants never predicted or forecasted future access line growth, there was no duty to provide interim figures. [FN103] *Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) ("A duty to disclose does not arise from the mere possession of non-public information").

> FN103. Neither the statements quoted by Plaintiff's, nor the reporting of quarterly figures amounted to a partial disclosure or a prediction of future growth. Thus, Plaintiff's have not provided evidence demonstrating that defendant's had a duty to disclose additional information.

In addition, Plaintiffs contend that various statements and reports failed to disclose that revenues were increasing but at a decreasing rate, and expenses were increasing, at an increasing rate. However, as with access line growth, BAC disclosed the actual figures necessary to make this simple calculation. (TABs 3, 5, 7).

As a matter of law, there is no genuine issue of material fact as to any statement regarding the rate of growth in access lines, revenues, or expenses. Accordingly, summary judgment may be granted as to these claims.

### 4. *Third Quarter 1989 Strike*

Plaintiffs complain that the Defendants, when reporting results for the third quarter of 1990, failed to disclose the quantifiable adverse impact a 1989 strike had on 3Q89 net income. This omission allegedly made the reporting of growth for the third quarter of 1990 as compared to the same quarter of 1989 misleading. However, there was no duty to disclose this information and it is immaterial.

BAC disclosed the fact of a strike in Form 10-Q for the third quarter of 1989. (TAB 146 at 8). Once disclosed, there was no duty to re-report this fact or to disclose BAC's internal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 39
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

estimate of the strikes' impact. (DX-TAB 204). There is no evidence that BAC considered the estimate to be reliable or certain. The defendants have offered testimonial evidence to the contrary. (Smith dep. 143, 144-46) (final impact "impossible" to determine with all the "gives and takes that go on in our business "... revenues lost due to "pent up" demand would be quickly replaced at the strikes end and thus, it will have little overall impact); (Lynch dep. at 57) (DX-TAB 205, 206) (Both BAC and C & L determined that the impact was immaterial). Furthermore, the fact that a strike will have a negative impact on business is commonly known. This is not the industry-specific information that the securities laws require be disclosed. Finally, because BAC disclosed actual income, revenue, and expense figures both in third quarter, 1989 and in third quarter, 1990, the figures for a reasonable investors analysis and comparison were available.

5. *Goodwill Writedown*

*32 Plaintiffs contend that, at the time of announcing a $.10 writedown or sometime thereafter, BAC knew but failed to disclose that the writedown would actually be $.15. There is no evidence in the record that defendants knew that the writedown would be $.15 at the time it was announced. Thus, this prediction did not lack a reasonable basis. However, because BAC predicted that there would be "no further writedowns in 1990, 1991, or beyond," the defendants made a prediction which must be corrected if it becomes materially misleading.

Plaintiffs point to an internal document that purportedly creates a factual issue as to when BAC decided to writedown goodwill an additional $.05 cents. (DX-TAB 115). [FN104] However, the wording of that document, and internal documents drafted later in the year, belies any reasonable inference BAC had decided, with such certainty that a duty to disclose was triggered. The document states "*If* we decide to sell BASLI at the current proposed purchase price, earnings per share *would* be reduced by an additional $.05." (DX-TAB 115). Even assuming that the internal documents create a factual issue as to when the decision was made, the difference between the projected and the actual writedown, 1.5% of 1990 earnings, was not material and would not likely influence the decision-making

of a reasonable investor. (DX 39, 108). Furthermore, another internal memo quoted by the Plaintiffs, does not give rise to a reasonable inference of scienter. The typewritten portion of the memo, drafted by Crawford, dated October 29, 1990, states that, "$.10 did not nave significant impact on our stock price" and attached analyst reports. One of those receiving the reports hand-wrote back, to Crawford in the margin: "Good Reviews! Thanks for all your hard work in the engineering process. As a hardworking actor myself, I am heartened to know that I have a good script writer behind me". (DX-TAB 122). Plaintiffs claim that the notation on the memo proves that defendants had consciously "fooled" the analysts as to the amount of the charge announced at the October 25, 1990 meeting. However, even reading the evidence in light most favorable to the plaintiffs, this notation cannot give rise to a reasonable inference of scienter. The allusion to "acting" does not refer to conscious deception but to the author's hobby. The author, in fact, appears frequently in dramatic performances. (DX-213) The Supreme Court has made clear that strained or inconclusive inferences alone should not defeat summary judgment. *Anderson v. Liberty Lobby*, 47 U.S. 242, 252-57 (1986); See also, *Vaughn v. Teledyne*, 628 F.2d 1214, 1218-22 (9th Cir.1990).

> FN104. The Court notes that the use of the qualifier, "approximately," in the original announcement of a .10 cents writedown on October 25, 1990, discloses at least some uncertainty as to the amount of the writedown.

Plaintiffs also contend that Defendant's statements regarding the writedown were misleading because they failed to disclose that the writedown only related to BASLI, rather than to the Financial Services segment as a whole. A variation on this claim is that Defendants failed to disclose that the writedown related to a sale of BASLI and a potential loss realized therefrom. However, this information is clearly not material. As long as the amount, purpose, and effect of the charge was disclosed, no reasonable investor would have considered the basis for the charge significant. *Vosgerichian v. Commodore Int'l, Inc., 832 F.Supp. 909, 911-912 (E.D.Pa.1993)*, *vacated on other grounds*, 662 F.Supp. 1371 (E.D.Pa.1994). Further, there is no general

Westlaw.

Not Reported in F.Supp.                                                                Page 40
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
(Cite as: 1997 WL 205709 (E.D.Pa.))

duty to disclose any information about negotiations regarding a potential acquisition or other extraordinary corporate transaction. _Basic v. Levison, 485 U.S. 224, 234, 238-41, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)_; See e.g., _In re General Motors Class E. Stock Buyout Sec. Lit., 694 F.Supp. 1119, 1128-29 (D.Del.1988)_ (corporation did not have a duty to disclose negotiations concerning sale of subsidiary). The statements made regarding the writedown did not constitute a public denial of the fact that negotiations were pending. See e.g., _Basic,_ 485 U.S. at 239 n. 17.Further, there is no information in the record that the parties to the negotiation had come to an agreement. Accordingly, BAC did not have a duty to disclose the fact that non-public negotiations for the sale of BASLI were being conducted.

6.) _Expense Measures_

**\*33** Defendants complain that Plaintiffs' statements regarding the effect of expense measures taken in 1990 failed to disclose that reported growth was due to nonrecurring items rather than to expense measures. This is not an actionable omission. Rather, statements about expense measures were literally true. Expense controls were merely one of a number of factors "contributing to net operating revenue growth". No reasonable investor would understand defendants' statements to mean that "expense measures" were the only reason for the net operating revenue growth and nothing in the record demonstrates that the defendants' knew, at the time of making the announcement, that expense measures had been completely ineffective.

7. _Bell Atlantic Employee Stock Ownership Plan ("ESOP")_

Five cents of fourth quarter EPS was attributable to the ESOP tax benefit and .04 of that was attributable to the first three quarters of 1990. Plaintiffs contend that BAC violated GAAP by including the tax benefit from dividends paid to the ESOP in the company's reported income. However, consistent with GAAP, the $.05 benefit was only included in the calculation of earnings per share for the year, not in the calculation of net income. While, this increase in EPS was not disclosed until after the class period, nothing in the record suggests that this inclusion was unreasonable.

Plaintiffs, thus, challenge the timing of the change in the fourth quarter and the decision to include the entire years tax benefit in the fourth quarter. However, Coopers & Lybrand concurred with the inclusion of the $.04 from the first three quarters of 1990 in the fourth quarter and determined that the amount was immaterial so that the first three quarters need not be restated. While the inclusion was not explicitly disclosed by BAC until the issuance of the Annual Report 10-K in February 1991, analyst reports issued on January 23, 1990, the day after the class period, shows awareness that $.05 was added to fourth quarter earnings as result of ESOP accounting. (DX TAB 103, 104). Furthermore, even if the timing of the disclosure was unreasonable, the amount of the tax benefit is immaterial.

The second claim regarding BAC's ESOP accounting finds fault with a change in the account in which ESOP expenses are listed. Plaintiffs argue that because "Employee Expense" is a category of "Operating Expense" and "Interest Expense" is not, the market was led to believe that BAC's "Operating Income" (the difference between "Operating Revenues" and "Operating Expenses"), was growing faster than it actually was. GAAP mandates that this expense must be listed in the interest expense account and the change was disclosed to the market. In the first quarter MD & A for 1990, BAC noted that interest expense grew by 10.5% over the first quarter of 1989 because of "interest recognized on the debt associated with the leveraged employee stock ownership plans established by the company in 1989."(TAB 4), (TAB 8 at 9, second quarter);(tab 8 at 10, third quarter).

8.) _Cellular (BAMs)_

**\*34** Plaintiffs claim that defendant's positive statements regarding "non-telephone companies" failed to disclose that cellular minutes of use per customer was declining at BANs, BAC's cellular subsidiary. However, the fact that cellular minutes of use was declining was disclosed at the October 25, 1990 NYSSA conference in response to questions from analysts, and is, therefore, immaterial. (DX-TAB 36)

Furthermore, the statements are not misleading. The statements that total cellular usage grew at a "reduced rate" in September 1990 and that "revenues grew approximately $10 million and $45 million respectively" are not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 41
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

misleading. (TAB 8). Because the decline in minutes of use was disclosed, the growth in revenues would be understood to be the result of growth in total customer usage rather than minutes of use. Plaintiffs also claim that the defendants failed to disclose materially lower profit margins, or expense or net income figures for BAMs in 1990. However, BAC never disclosed this information on BAMs. Rather, it reported only noteworthy results from subsidiaries and their general results on a consolidated basis. There is no duty to disclose even the most material information absent undertaking to speak on the particular subject.

### 9.) Return on Equity

Plaintiffs claim that Defendants' prediction that they could sustain a return on equity of 15-17% was fraudulent.--Actual return on equity was 14.8% for the year. There is nothing in the record to show that the defendants knew that the 15-17% figure would not be achieved or that the prediction lacked a reasonable basis. The difference between actual and predicted results is immaterial as a matter of law.

### 10) Funding of the Medical Benefits Trust

Plaintiffs claim that defendant's press release statements regarding the funding of the trust in 1989 was misleading because it implied that the trust was a one-time charge instead of the first installment of a recurring expense. Defendants argue that the press release clearly separates the indisputably non-recurring charges relating to asset writedowns and restructuring from the trust funding. [FN105] However, even if this press release was unclear as to the amount of charges that would continue through 1990, there would be no misunderstanding as to the normalized basis upon which BAC assessed its 1990 earnings growth. On January 26, 1990, Campbell stated that normalized results for the year, adjusting reported EPS for these [nonrecurring] charges, were $6.67 [3.33 after stock split] per share, and that number would be the benchmark level from which BAC would measure its 6% earnings growth (TAB 209). [FN106]

> FN105. They argue that charges expressly identified as of a one-time nature are itemized in

the first sentence while, the second sentence, beginning "*in addition,*" notes that the company "*began* " to accrue for and fund the trust."

> FN106. Plaintiffs have submitted the affidavit of Harris Devor, and the affidavit of John Torkelson, in opposition to defendants Motion for Summary Judgment. As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving parties case. However, where the record is clear, the court is not required to defer to the contrary declarations of plaintiffs' experts. *In Re Apple Computer Sec. Lit.. 886 F.2d 1109, 116 (9th Cir.1989); Provenz, 102 F.3d 1478 (1996); In Re Adobe Systems, 787 F.Supp. 912 (N.D.Cal.1992).*

### 11.) BASLI and BAP

Plaintiffs contend that statements failed to disclose that Bell Atlantic Properties ("BAP"), the real estate subsidiary, lost $13 million in the third quarter and that BASLI's growth trends were softening and was experiencing an ongoing revenue decline. This cannot form the basis for a claim of fraud. The defendants never disclosed detailed financial information for the subsidiaries. Rather, it disclosed only noteworthy information on a consolidated basis. Furthermore, some of the alleged undisclosed information was actually positive news that would not undermine a positive statement. For example, with respect to BAP, while it did lose $13 million, it was budgeted to lose $15. Finally, there is no evidence of scienter with respect to statements about these subsidiaries aside from the motive provided by the existance of incentive compensation. As noted previously, evidence of incentive compesation, without more, is insufficient to defeat summary judgment.

**\*35** Based on the foregoing analysis, the Defendant's Motion for Summary Judgment must be granted.

### II. Control-Person Liability under Section 20(a)

Plaintiffs allege in Count I that the individual defendants, Raymond W. Smith and Phillip A. Campbell are liable as controlling persons of BAC by virtue of their corporate positions pursuant to Section 20(a) of the 1934 Act. That

Westlaw.

Not Reported in F.Supp.                                                      Page 42
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**

section provides that "(a) every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and *to the same extent as such controlled person* to any person to whom such controlled person is liable." Section 20(a) broadly defines control as any indirect means of discipline or influence short of actual direction: or "ability to exert influence, directly or indirectly over the decision making process of another person." Culpable participation in the violation is required for control person liability, and the plaintiff must prove (in the case of inaction) that inaction was deliberate and done intentionally to further the fraud. § 20(a) expressly provides a defense if the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Liability under section 20 is predicated on an independent violation of the Securities laws. The individual defendants can be held liable under § 20 only if an independent Rule 10b-5 violation by Bell has been proven.

Because I have granted summary judgement in defendants favor on the § 10 and Rule 10b-5 claim, section 20(a) liability is precluded and summary judgment will be granted as to that claim as well.

### III. *Count II Negligent Misrepresentation*
The plaintiffs also contend that this court has the power to exercise supplemental jurisdiction over Plaintiffs' state common law claim of negligent misrepresentation. This court has power to exercise pendant jurisdiction over state claims that are "so related" to the federal claims that they form part of the same case or controversy. State claims are part of the same constitutional case if they "derive from a common nucleus of operative fact" and "are such that [the plaintiff] would ordinarily be expected to try them in one judicial proceeding". *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The power to exercise supplemental jurisdiction exists when a Plaintiff makes a § 10b and Rule 10b-5 claim and state law claims based on the same allegedly fraudulent conduct (case). The court however, has broad discretionary powers to decline pendant jurisdiction pursuant to § 1367(c). Under the statute, district courts are expressly authorized to decline to

exercise supplemental jurisdiction over a claim under subsection (a) if (c) the district court has dismissed all claims over which this court has original jurisdiction. Because I have dismissed the federal claims in the action, I will exercise my discretion to decline supplemental jurisdiction. Accordingly, Count II negligent misrepresentation claim is dismissed without prejudice.

### VI. *Conclusion*
*36 For the reasons stated above, I conclude that plaintiffs have not established a genuine issue of material fact regarding essential elements of their Rule 10b-5 claim (Count I) and defendants are entitled to judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgement will be GRANTED as to Count I of the Second Consolidated Amended Complaint. Because the Rule 10b-5 claim has been dismissed, Plaintiff's derivative claim pursuant to § 20(a) against Defendants Campbell and Smith (Count I) must fail as well. Finally, pursuant to § 1367(c)(3) I decline to exercise supplemental jurisdiction over the state common law claim for negligent misrepresentation and Count II will be dismissed without prejudice.

### ORDER
AND NOW, this 16th day of April, 1997, upon consideration of the Motion for Summary Judgment submitted on behalf of Defendants Bell Atlantic Corporation, Raymond W. Smith, and Phillip A. Campbell; Plaintiff's Memorandum in Opposition to Defendants' Motion; Defendants Reply Memorandum in Support of their Motion; and Plaintiffs Supplemental Memorandum in Opposition to Defendants' Motion, for the reasons stated in the attached memorandum, it is ORDERED that Defendant's Motion for Summary Judgment is GRANTED. Judgment is hereby entered in favor of the Defendants and against the Plaintiffs in Count I. Count II is dismissed without prejudice.

Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467

### Motions, Pleadings and Filings (Back to top)

• 2:91cv00514 (Docket) (Jan. 24, 1991)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                  Page 43
Not Reported in F.Supp., 1997 WL 205709 (E.D.Pa.), Fed. Sec. L. Rep. P 99,467
**(Cite as: 1997 WL 205709 (E.D.Pa.))**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.