**4**

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
In re CAMBREX CORP. SECURITIES LITIGATION
**No. 03-CV-4896 (WJM).**

Oct. 27, 2005.

Peter S. Pearlman, Barry A. Knopf, Cohn, Liflan, Pearlman, Herrmann & Knopf LLP, Saddle Brook, NJ, for Plaintiffs.

Alan E. Kraus, Latham & Watkins LLP, Newark, NJ, for Defendants.

OPINION

MARTINI, J.

**\*1** This Document Relates To: All Actions

Plaintiffs have filed this consolidated class action complaint against defendants Cambrex Corp., James A. Mack, Douglas H. MacMillan, Claes Glassell, Salvatore J. Guccione, and Luke M. Beshar for violations of Section 10(b) and Rule 10b(5) (hereinafter collectively "Section 10(b)"), and Section 20(a) of the Securities and Exhange Act of 1934. See 15 U.S.C. §§ 78j(b) and 78t(a). Defendants have filed this motion to dismiss arguing plaintiffs have failed to adequately plead securities fraud with the required particularity. For the reasons set forth below, this motion is GRANTED IN PART and DENIED IN PART.

Plaintiffs allege two schemes of fraudulent activity: (1) the overstatement of financial results for the period of 1997 to 2001, and (2) the failure to disclose and account for the loss of Cambrex's largest contract. (Am.Comp.¶¶ 3, 7) (hereinafter "Compl."). Plaintiffs essentially argue that defendants engaged in this fraudulent behavior to artificially inflate the price of Cambrex securities so they could profit from insider trading. (Id. at ¶ 10). Plaintiffs assert that defendants' wrongful behavior harmed purchasers and acquirers of Cambrex securities during the class period. (Id.).

As to the overstatement of financial results, plaintiffs maintain that defendants engaged in a scheme to mislead investors about the company's financial condition by reporting financial results that were overstated by approximately $5 million for the period of 1997 to 2001. (Id. at ¶ 3). The company announced on January 23, 2003 that it had to correct the previous financial results for this period because it had failed to account for expenses paid by one division on behalf of another, which had resulted in the decline of the stock price from $25.73 to $23.89. (Id. at ¶ 6). According to an accountant who worked for Cambrex, there was no system in place to ensure these expenses were accounted for, thus net incomes were improperly inflated. (Id. at ¶ 4). This same accountant claims that Cambrex became aware of this problem as early as 1997 when the company took a write-off to correct the very same problem. He also states that while he was employed by Cambrex he was told that every Chief Financial Officer ("CFO") after 1997 was told of the problem, but chose not to correct it. He further asserts that Cambrex corrected its prior misstatements in January 2003 because its auditor, PricewaterhouseCoopers, LLP, insisted Cambrex restate its prior financials. (Id. at ¶ 5).

Around the same time defendants disclosed the overstatement, defendants were informed that the United States Food and Drug Administration (hereinafter "FDA") rejected the drug application for Replagal, which resulted in the loss of Cambrex's largest contract with Transkaryotic Therapies, Inc. (hereinafter "TKT") for the manufacturing of that drug. (Id. at ¶ 7). Plaintiffs allege that defendants knew about this loss as early as October 2002 and issued forecasts that were materially false and misleading because they failed to adequately or timely account for the loss of the contract. Plaintiffs further allege that on or about January 14, 2003, defendants knew for certain that Cambrex had lost the TKT contract; yet, defendants failed to revise its earnings and revenues to account for the loss of this contract until April 3, 2003. (Id. at ¶ 8).

**\*2** Plaintiffs refer to various statements made in press releases and conference calls where defendants assert an unreasonable earnings growth. In conjunction with the disclosure of the accounting errors, defendants, in the same

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 2
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

press release on January 23, 2003, called for earnings growth in the Biosciences segment of 10-15%. (*Id.* at ¶ 73). Defendants then decreased its earnings forecast on April 3, 2003 to 0-5%. (*Id.* at ¶ 81). The drop in the earnings forecast on April 3, 2003 caused a 37% drop in the stock price. (*Id.* at ¶ 8). In a press release issued on April 24, 2003 and during a conference call held on July 9, 2003, defendants maintained the same growth as stated in the April 3, 2003 press release. (*Id.* at ¶¶ 87, 94). On July 24, 2003, defendants again reduced the earnings forecast in the Biosciences segment to 0-3% and attributed the decline to the loss of the TKT contract. (*Id.* at ¶ 96). The very next day, during a conference call, defendant Beshar conceded that the loss of the TKT contract was known when the earlier forecasts were made, but it has taken longer than expected to replace the contract. (*Id.* at ¶ 99). The market immediately reacted to this statement and the stock price dropped 20% from the previous day's close. (*Id.* at ¶ 9). Plaintiffs maintain that defendants knew it had lost the TKT contract but withheld this information and misstated projected growth in the Biosciences segment in order inflate the stock price so as to allow the individual defendants to engage in insider trading of Cambrex securities and realize a profit of over $16 million. (*Id.* at ¶ 10).

## I. Standard of Review

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must set forth sufficient information to outline the elements of its claims or to permit inferences to be drawn that these elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45-6 (1957). A court may dismiss a complaint for failure to state a claim only if, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted under any set of facts which could prove consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Zynn v. O'Donnell,* 688 F.2d 940, 941 (3d Cir.1982). In deciding such a motion, a court must take as true and view in the light most favorable to a plaintiff all allegations in the complaint. *See* *Warth v. Seldin,* 422 U.S. 490, 501 (1975). A court need not, however, accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual

allegations. *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

## II. Discussion

In order to state a valid Section 10(b) claim, plaintiffs must establish that defendants "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading" in connection with the purchase or sale of a security. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1417 (3d Cir.1997). The plaintiffs must also establish that defendants acted with the required scienter, and that plaintiffs' reliance on the misstatement caused injury. *Id.* Finally, a Section 10(b) claim must satisfy the heightened pleading standards of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 (hereinafter "PSLRA"). *In re Party City Sec. Litig.,* 147 F.Supp.2d 282, 298-99 (D.N.J.2001).

*3 Rule 9(b) requires that all averments of fraud be stated with particularity. Fed.R.Civ.P. 9(b); *see also In re Burlington,* 114 F.3d at 1417. In an attempt "to 'curtail the filing of abusive lawsuits' through the establishment of a 'uniform and stringent pleading requirement," ' *id.* at 299, the PSLRA also imposes a particularity requirement by demanding that the complaint set forth "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires plaintiffs to allege with particularity facts that give rise to a strong inference of scienter with the required state of mind for each act or omission. *See* 15 U.S.C. § 78u-4(b)(2). Although Rule 9(b) allows state of mind to be generally averred, the Third Circuit has concluded that the PSLRA supersedes Rule 9(b) in the event of a conflict. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 531 n. 5 (3d Cir.1999).

Defendants contend that plaintiffs have failed to comply with the requirements of both Rule 9(b) and the PSLRA. Defendants make six arguments in support of their motion to dismiss: (1) lead plaintiff Massachusetts Laborers Annuity Fund (hereinafter "MLAF") lacks standing to assert the TKT allegations; (2) various statements alleged in the complaint are inactionable; (3) plaintiffs fail to plead an actionable omission based on the TKT contract; (4) scienter

Slip Copy                                                                    Page 3
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

was not sufficiently pleaded; (5) individual defendants cannot be liable under Section 10(b) for statements made by others; and (6) the complaint fails to adequately plead a Section 20(a) claim against the individual defendants.

A. MLAF Lacks Standing to Assert TKT Claim

Defendants initially contend that the lead plaintiff MLAF did not purchase stock after July 2002, and thus does not have standing to bring the TKT cause of action because it arises from events spanning from January through April 2003. The Third Circuit requires that named plaintiffs show that they personally have been injured. *Carducci v. Aetna U.S. Healthcare,* 247 F.Supp.2d 596, 623 (D.N .J.2003) (citing *Klein v. Gen'l Nutrition Cos.,* 186 F.3d 338, 345 (3d Cir.1999)). However, "a party named 'lead plaintiff' under the PSLRA need not have standing to sue on each individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 308 F.Supp.2d 249, 257 (S.D.N.Y.2004).

Because MLAF did not purchase stock after July 2002, it is apparent that MLAF was not injured as a result of the alleged TKT fraud, which could not have occurred earlier than October 2002. However, Stephen Dodge, another named plaintiff, purchased 200 shares of Cambrex stock in April 2003. (Compl.¶ 16). Therefore, *a named* plaintiff does have standing to assert this claim, and the TKT claim will not be dismissed for lack of standing.

B. Inactionable Statements

*4 Defendants challenge many of the allegations made by plaintiffs in their complaint on the bases that they are not alleged to be false, are inactionable statements of corporate optimism, or are forward-looking statements that are protected by the safe harbor provision of the PSLRA and the bespeaks caution doctrine. (Defs.' Br. at 29). Defendants also argue that plaintiffs have not stated an actionable claim of omission as to the TKT contract, which will also be addressed in this section. (*Id.* at 34).

1. Statements Not Alleged to be False

Defendants list numerous paragraphs (¶¶ 67, 69, 73-75, 78,

83, 86, 89) containing excerpts from press releases and conference calls which they claim are never alleged to be false and thus do not meet the pleading requirements. (Defs.' Br. at 30; *see also* Defs .' Br., App. A). Defendants also claim that portions of paragraphs 35-63 are not actionable because they are alleged to be false only in "the most conclusory terms" and are unrelated to the alleged fraud. (Defs.' Br. at 30).

As already noted, allegations in the complaint which are not alleged to be misleading with sufficient detail or those not alleged to be misleading at all must be dismissed. *See In re Advanta,* 180 F.3d at 53-31; 15 U.S.C. § 78u-4(b)(3)(A). This section is divided into those disputed paragraphs of the complaint that refer to the accounting fraud, and those that refer to the TKT contract.

a. Statements Based on the Alleged Accounting Fraud

In their complaint, plaintiffs list thirty-eight paragraphs under the heading "Materially False and Misleading Statements Issued During the Class Period," and list twenty-two more paragraphs under the heading "The Truth About Cambrex's Improper Accounting Begins to Emerge." (*See* Compl. ¶¶ 35-94). Defendants correctly point out that "[s]imply referring to a series of public statements and then alleging, in a general and conclusory manner, that those disclosures were false or misleading is insufficient." *In re Party City,* 147 F.Supp.2d at 300 (citations omitted). Although each of the over fifty statements that are alleged to be misleading is not accompanied by a specific explanation, plaintiffs do set forth in their complaint the basis for alleging that the statements are false. (*See* Compl. at ¶¶ 3-6, 64-66).

Plaintiffs allege that Cambrex failed to properly account for certain types of expense accounts that handled payments by one division of the company on behalf of another. (*Id.*). The alleged result of this departure from generally accepted accounting principles ("GAAP") was that net income was improperly reported each quarter from 1997 through 2001, and was overstated by over $5 million for the time period in question. (*Id.*). These errors are confirmed by the fact that Cambrex announced in January 2003 that it was restating $5 million in net income. (*Id.* at ¶ 6). Furthermore, plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

Page 4

allege that Cambrex was aware of the accounting problems by at least 1997. (*Id.* at ¶¶ 5, 65). Although defendants identify excerpts from various paragraphs in the complaint that do not directly address the alleged accounting fraud, these statements serve as context for the sections alleged to be false. Accordingly, this Court finds that paragraphs 35 through 63 are adequately alleged to be false or misleading and, therefore, are actionable.

*5 Several paragraphs in the complaint, however, do not allege statements to be false and, therefore, those statements are not actionable. Paragraph 74 is merely an excerpt from a press release correcting a typographical error in the restatement. Plaintiffs have not alleged anywhere in the complaint that this correction is false or misleading. Additionally, paragraphs 83, 86 and 89 concern the SEC inquiry into the accounting misstatements. Paragraphs 83 and 86 are excerpts from defendant Beshar's discussion of Cambrex's cooperation with the SEC's informal investigation into the earnings restatements. Paragraph 89 contains an excerpt where Beshar acknowledges that the investigation had been turned into a formal inquiry. Although the SEC eventually launched a formal investigation, the complaint does not allege that these characterizations of the inquiry were false or misleading at the time they were made. Thus, paragraphs 74, 83, 86 and 89 are not actionable.

b. Statements Based on the Loss of the TKT Contract

In addition to the accounting fraud, plaintiffs also allege that the defendants improperly withheld information regarding the loss of a major contract with TKT. (Compl. at ¶¶ 7-9). Under the contract, Cambrex's Biosciences segment manufactured the active ingredient for Replagal, a TKT drug that was awaiting FDA approval. (*Id.*). Plaintiffs claim that defendants knew it was "more likely than not" that the contract would be cancelled as early as October 2002, but knew for certain on or about January 14, 2003, when the FDA rejected TKT's application for Replagal. (*Id.*). Defendants claim that although they were aware of the FDA rejection and TKT's cancellation, they believed that TKT had started the cancellation process so that it could renegotiate the contract. Because this is a motion to dismiss, and the allegations in the complaint must be taken as true

and viewed in the light most favorable to the plaintiffs, [FN1] the Court finds that defendants knew the TKT contract was lost as of January 14, 2003. Due to the lead time required for new contracts, plaintiffs allege that defendants knew that it would be impossible to replace the loss of the TKT contract for fiscal year 2003. Thus, statements made after January 14, 2003, forecasting continued high growth in the Biosciences segment, are properly alleged to be false and/or misleading.

> FN1. *See Warth v. Seldin,* 422 U.S. 490, 501 (1975).

Given that conclusion, paragraphs 73, 75 and 78 are actionable. Paragraph 73 contains a statement targeting double digit growth for the Biosciences segment. Paragraph 75 contains a statement predicting a continued trend of revenue growth in the Biosciences segment. Both of these statements were made after the cancellation of the TKT contract.

Paragraphs 67, 69 and 78 are distinguishable. Although paragraphs 67 and 69 both forecast strong growth in the Biosciences segment, both were made before defendants allegedly became aware of the cancellation of the TKT contract on January 14, 2003, which is evidenced by TKT's continued optimism about the FDA's approval of Replagal. (*See* Compl. ¶ 68). Further, paragraph 78 includes an excerpt from the March 20, 2003 Form 10-K filed by defendants with the SEC. That excerpt explains why Cambrex restated its results for the previous five years. That excerpt is not alleged to be false. Accordingly, because the statements in paragraphs 67, 69 and 78 are not alleged to be false, they are not actionable.

2. Statements of Corporate Optimism

*6 Defendants next argue that several paragraphs in the complaint (¶¶ 37, 41, 43, 45, 49, 52, 58, 60, 62, 69, 90) are simply statements of corporate optimism and are not actionable. (Defs.' Br. at 30; *see also* Defs.' Br., App. B). Certain vague and general statements of optimism have been considered inactionable as a matter of law because they "constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Burlington,* 114 F.3d

at 1429 n. 14. "Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material." *In re Advanta,* 180 F.3d at 538. However, the Supreme Court has held that statements of opinion by top corporate officials may be actionable if they are made without a reasonable basis. *In re Burlington,* 114 F.3d at 1428 (citing *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1098 (1991)). The reason for this exception is that such statements "can be materially significant to investors because investors know that these top officials have knowledge and expertise far exceeding that of the ordinary investor." *Id.*

A majority of the excerpts alleged by defendants to be inactionable statements of corporate optimism are the reactions of Cambrex's officers to the company's allegedly fraudulent financial results. These statements tend to be vague expressions of optimism, noting that officials are "pleased" or "optimistic." Accordingly, these statements by themselves would not be actionable. However, each paragraph as a whole contains actionable information on the company's financial results, and the puffery is largely irrelevant. Paragraphs 37, 41, 43, 45, 49, 52, 58, 60 and 62 are therefore actionable. To the extent that plaintiffs attempt to rely upon opinions expressed by Cambrex executives, they will not be able to do so successfully. Paragraph 69 has already been found to be inactionable, as it does not allege statements to be false. Further, assertions in paragraph 90 to the effect that "we're adding new business all the time" are mere statements of corporate optimism. (*See* Compl. ¶ 90). In fact, paragraph 90 also contains an accurate assessment of the impact of the loss of the TKT contract, and defendants' hope that the setback would be overcome. Therefore, paragraph 90 is not actionable.

**3. Forward-Looking Statements**

Defendants also claim that many of the allegedly fraudulent statements contained in plaintiffs' complaint (¶¶ 39, 41, 45, 47, 49, 51, 52, 54, 56, 58, 60, 62, 67, 73, 75, 81, 87, 89, 90) [FN2] are protected by both the bespeaks caution doctrine and the safe harbor provision of the PSLRA. (Defs.' Br. at 31-34; *see also* Defs.' Br., App. C). The two concepts are quite similar, but will be considered separately below.

FN2. For the reasons articulated above, the public statements in paragraphs 67, 89 and 90 are not actionable.

**a. Bespeaks Caution Doctrine**

Opinions, predictions, and other forward-looking statements are not *per se* inactionable under the securities laws, but may be actionable misrepresentations if the speaker does not genuinely and reasonably believe them. *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 (3d Cir.1993) (citations omitted). However, under the bespeaks caution doctrine, a securities fraud claim may be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) if there is sufficient cautionary language to negate the materiality of the alleged misrepresentation. *Id.* at 371. " '[B]espeaks caution' is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law." *Id.* at 364. The application of the doctrine depends on the specific language used in the cautionary statements, thus courts must assess the communication in question on a case-by-case basis. *Id.* at 372.

*7 A vague or blanket disclaimer merely warning that the investment has risks usually will not suffice. *Id.* at 371. Rather, the cautionary statements must be "extensive yet specific," in addition to being "substantive and tailored to the specific future projections, estimates or opinions" in the documents in question. *Id.* at 369, 371-72. Moreover, although the Third Circuit has never explicitly held that the cautionary language must accompany the statements in question, it has held that the language must be directly related to the alleged misrepresentations. *EP Medsystems, Inc. v. EchoCath, Inc.,* 235 F.3d 865, 874 (3d Cir.2000).

**b. Safe Harbor of the PSLRA**

The statutory safe harbor of the PSLRA is based on the judicial bespeaks caution doctrine, and similarly restricts certain forward-looking statements from becoming a basis for securities fraud liability. *Helwig v. Vencor, Inc.,* 251 F.3d 540, 547 (6th Cir.2001). The safe harbor provides that there shall be no liability for a forward-looking statement where such statement is "accompanied by meaningful

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                              Page 6
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *In re Party City,* 147 F.Supp.2d at 309 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(I)) (internal quotations omitted). Regarding statements made by natural persons, the PSLRA provides that a forward-looking statement is shielded by the safe harbor unless the plaintiff proves it was made with actual knowledge that the statement was false or misleading. *In re Advanta,* 180 F.3d at 535 (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)). Forward-looking statements made by business entities are protected by the safe harbor unless they were made by or with the approval of an executive officer of that entity who had actual knowledge that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(ii). Under the PSLRA, a statement is forward-looking if it contains, *inter alia,* a statement of the plans or objectives of management for future operations, a statement of future economic performance, or a projection of revenues, income, or other financial items. 15 U.S.C. § 78u-5(c)(1). The PSLRA does not impose a duty on any person to update a forward-looking statement. *In re Advanta,* 180 F.3d at 536; 15 U.S.C. § 78u-5(d) ( "Nothing in this section shall impose upon any person a duty to update a forward-looking statement.").

c. Analysis

It is clear that a statement must actually be forward-looking in order to be protected under either the PSLRA's safe harbor or the bespeaks caution doctrine. Several statements alleged by defendants to be protected are either not forward-looking, or are small, immaterial portions of an otherwise actionable paragraph in the complaint, and therefore protection is not available. *See, e.g., Rosen v. Textron, Inc.,* 321 F.Supp.2d 308, 321 (D.R.I.2004) (stating "the forward-looking statement protection disclosure is not available for a representation of present fact because the statement is misleading when made"). Accordingly, paragraphs 39, 41, 45, 47, 49, 52, 54, 56, 58, 62 and 73 cannot be considered forward-looking and therefore are not protected by either the PSLRA's safe harbor or the bespeaks caution doctrine.

**\*8** Several other statements can be considered

forward-looking, and thus require further analysis to determine whether they are protected by the safe harbor or bespeaks caution doctrine. The threshold issue is whether or not the cautionary statements meet the fairly high standard necessary to protect forward-looking statements under either doctrine. *See, e.g., In re Party City,* 147 F.Supp.2d at 299. Paragraphs 51 and 60 involve Cambrex's revision of earnings forecasts for the second half of 2000 and 2001, respectively. Although it is unclear whether or not the cautionary language directly accompanied the press releases, it is clear that the language is not meaningful and specific enough to prevent liability based on the statements. Previous applications of the doctrines protecting forward-looking statements have required fairly specific and tailored substantive language, and not merely a boilerplate warning that investments have risks. *See, e.g., In re Donald J. Trump Casino,* 7 F.3d at 371-72. The language in question here warns investors of the "risks and uncertainties that exist" which might cause "results to differ materially from the Company's expectations." (Defs.' Br., App. C at 7-8, 10). The language here is simply too vague to protect earnings estimates that were based on allegedly fraudulent accounting practices. Furthermore, plaintiffs allege that the defendants were aware of the accounting problems that inflated earnings as early as 1997. (Compl. at ¶ 3). Even if the warnings were sufficient, the safe harbor is not available when the forward-looking statements are made by or with the approval of an executive officer of that entity who had actual knowledge that the statement was false or misleading, as is alleged to be the case here. *See* 15 U.S.C. § 78u-5(c)(1)(B)(ii). Accordingly, paragraphs 51 and 60 are actionable.

Likewise, that reasoning applies to the very similar cautionary language applicable to paragraphs 75, 81 and 87. Paragraph 75 deals with revenue forecasts for the remainder of 2003 issued days after the FDA rejected Replagal, but before public disclosure of the TKT contract cancellation. Paragraphs 81 and 87 deal with earnings forecast restatements issued three months after the cancellation of the TKT contract. Again, the applicable cautionary language is akin to a boilerplate warning, and is not the kind of meaningful, specific language contemplated by these doctrines. Accordingly, the high standard required for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cautionary language to negate a misrepresentation is not met, and paragraphs 75, 81, and 87 are actionable.

4. Omission

Finally, defendants assert plaintiffs' complaint does not state an actionable omission based on the TKT contract cancellation because the potential loss of the contract and the potential impact on the company's forecasts were not sufficiently certain to create an obligation for disclosure. (Defs.' Br. at 35). Defendants claim the possible loss from the contract was not certain since TKT still had a need for Replagal and the companies continued to negotiate the contract. (Id. at 36). Defendants also assert that even with the loss of the contract, a material impact on Cambrex's earlier earnings guidance was not certain since Cambrex could have signed new contracts. (Id. at 37).

*9 In connection with the purchase or sale of any security, under Section 10(b), there is an obligation to disclose any "material fact necessary to make a statement not misleading." Oran v. Stafford, 226 F.3d 275, 282 (3d Cir.2000) (quoting In re Burlington, 114 F.3d at 1417). To state a claim for relief under Section 10(b), "a plaintiff must plead facts demonstrating that (1) the defendant ... omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) the plaintiff's reliance on the defendant's misstatement caused him or her injury." California Pub. Employees' Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir.2004) (citing In re Burlington, 114 F.3d at 1417). Omissions are considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the "total mix" of information available to that investor" ' and would have been important in making his investment decision. Oran, 226 F.3d at 282 (quoting In re Westinghouse Sec. Litig., 90 F.3d 696, 714 (3d Cir.1996)).

Plaintiffs allege a claim for the omission of material facts that would have altered the "total mix" of information made available. (Compl.¶ 80). If the effects of losing the TKT contract were uncertain or only "speculative in nature," as the defendant asserts, it would create doubt as to whether or not the reasonable investor would find the information

material, as required for a claim under Section 10(b). See Klein, 186 F.3d at 343 (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 (3d Cir.1992)). However, at the pleading stage, the Court is required to give credit to plaintiffs' allegations rather than defendants' responses. Plaintiffs allege defendants knew the loss of the contract was definite and this made the earnings guidance impossible to achieve. (Compl.¶¶ 77, 80). Plaintiffs further argue TKT never intended to renegotiate the contract, as evidenced by the Form 10-K filed with the SEC stating the contract was terminated in January of 2003. (Pls.' Br. at 12-13; Compl. ¶ 79). They also contend that defendants' argument that they could maintain expected earnings for 2003 without the TKT contract is meritless. (Pls.' Br. at 13; Compl. ¶¶ 77, 80). Plaintiffs contend there was no possible way to recoup this loss within the year by signing new contracts, and offer to support this conclusion with statements from defendant Mack stating it takes nine months to receive any revenue after a new contract is signed, and would take approximately twelve months to recover from the loss of the TKT contract. (Compl.¶¶ 75, 90). Plaintiffs have alleged facts indicating it was certain Cambrex would not meet their goals. Thus, defendants' motion to dismiss plaintiffs' omission claim is denied.

C. Failure to Plead Scienter With Particularity

The Court must next determine whether plaintiffs adequately pleaded scienter in order to sustain the Section 10(b) claims. The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This must be pleaded as to each act or omission. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir.2004). The strong inference requirement under the PSLRA supercedes the more relaxed scienter standard under Rule 9(b). Id. A plaintiff may establish a strong inference of scienter by alleging both motive and opportunity to commit fraud or alleging conscious misbehavior or recklessness. Oran, 226 F.3d at 288-89.

1. "Must Have Known"

*10 Plaintiffs assert that as a result of their positions, the

Slip Copy                                                                                      Page 8
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

individual defendants were privy to confidential and proprietary information adverse to Cambrex, and thus knew or recklessly disregarded the fact that adverse information was being concealed from the public. (Compl.¶ 24). However, "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." *In re Advanta*, 180 F .3d at 539. Therefore, knowledge cannot be imputed to these individuals merely because they held high positions within the company.

2. Motive and Opportunity

Plaintiffs also allege that individual defendants engaged in an insider selling campaign, [FN3] and thus had motive to artificially inflate the stock price by making misrepresentations. " 'Blanket assertions of motive and opportunity' will not suffice, and 'catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." ' *GSC*. 368 F.3d at 237. In order to satisfy motive and opportunity, plaintiffs must allege a personal benefit to the individual defendants resulting from the fraud. *Id.* Motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosure alleged." *In re Nice Sys.*, 135 F.Supp.2d 551, 583 (D.N.J.2001) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir.2000)).

> FN3. (*See* Compl. ¶¶ 10, 104).

Stock sales may support an inference of scienter if they were "unusual in scope or timing." *In re Party City*, 147 F.Supp.2d 282, 312 (D.N.J.2001). Fraudulent intent is not inferred by the mere sale of stock in large part because many corporate executives are compensated in terms of stock. In other words, these individuals trade securities in the normal course of events. *See In re Burlington*, 114 F.3d at 1424. Plaintiffs "must allege that the trades were suspicious enough to support the necessary strong inference of scienter." *Id.* Further, it has been recognized that "causing temporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial

compensation." *Id.* at 1423 n. 12.

Plaintiffs allege that four of the five individual defendants engaged in the insider selling campaign during the class period. [FN4] This campaign is allegedly supported by the fact that defendants Glassell, MacMillan, Mark and Guccione sold Cambrex securities over several years, earning over $16 million. The securities sold represented "47.22% of all defendants' holdings." (Compl.¶ 104). Plaintiffs allege that these sales provided motive to disseminate materially false and misleading information about the company. (*Id.* at ¶ 10).

> FN4. Beshar is not alleged to have sold stock during that period.

Plaintiffs' allegations, however, fail to establish insider trading with sufficient specificity. The allegations do not demonstrate that the timing of the sales is suspicious. At most, the allegations merely establish that the sales took place within the class period. However, the class period is approximately five years long. Although the defendants sold securities over four of those years, they are not associated with any events that make the timing questionable. Notably, not one of the four defendants sold stock during the four months prior to the January 23, 2003 restatement, with three of the four defendants not selling any stock during the eleven months preceding the restatement. "A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." *In re Party City*. 147 F.Supp.2d at 313 (finding sales of stock three, four and twelve months before the disclosure of negative news to be too attenuated to draw an inference of scienter). Further, it appears many of these transactions came well after the stock had reached its high in 2001. (*See* Compl. ¶ 104). Thus, the timing of these trades raises serious doubt whether the sales were motivated by an intent to capitalize on the disclosure of the restatement and loss of the TKT contract.

**\*11** Moreover, the allegations concerning the scope of the trading are wanting. Although the allegations show that the individual defendants made over $16 million by selling 47.22% of all defendants' holdings, without context, that simply is not sufficient to demonstrate unusual activity. First, there is no "information as to whether the profits made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud." *In re Burlington,* 114 F.3d at 1423. Indeed, plaintiffs have not provided any information regarding the defendants' compensation levels, including the amount of stock or stock options provided to them as part of their compensation. Second, there is no information regarding the defendants' trading history before and after the class period. Thus, the Court has no way to determine whether the defendants' sales were normal and routine. *See id.* at 1424 ("A large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events.") (internal citation omitted). Lastly, the only trades that took place in relative temporal proximity to the negative disclosures were made by Glassell on February 4, 2003. (Compl.¶ 104). These trades accounted for approximately 3.7% of his holdings, and an even smaller percentage of the aggregate holdings at that time. That extremely small percentage of stock sold is insufficient activity from which an inference of scienter can be drawn.

In short, the allegations concerning the individual defendants' stock sales are insufficient and thus unable to support an inference of scienter.

3. Conscious Misbehavior and Recklessness

Plaintiffs also maintain defendants recklessly made misrepresentations regarding Cambrex's financial results and forecasts for the Biosciences segment. "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." ' *In re Advanta,* 180 F.3d at 535. To adequately plead scienter, it is sufficient for plaintiffs to allege that defendants had knowledge of facts or access to information that contradicts their statements. *In re Party City,* 147 F.Supp.2d at 315. It must be pled with particularity that the defendants knew the alleged misrepresentations were false when made or that the issuance of the statements were highly unreasonable. *Id.* at 317. A refusal to acknowledge

the obvious or to investigate the doubtful may also give rise to an inference of scienter. *In re Nice,* 135 F.Supp.2d at 585. A plaintiff, however, cannot rely on factual statements coupled with allegations of fraud in order to plead scienter. *Id.* Finally, reckless behavior should not be defined liberally, otherwise there is a risk of losing the distinction between scienter and negligence. *In re Digital Island Sec. Litig.,* 223 F.Supp.2d 546, 555 (D.Del.2002).

*12 Plaintiffs allege that defendants had knowledge of the accounting misstatements since 1997. Thus, as alleged, defendants knew they were misleading the public during this entire period. Additionally, plaintiffs allege defendants knew of the loss of the TKT contract and failed to disclose and account for it when they rendered their 2003 forecasts.

a. Accounting Fraud

Plaintiffs contend that the defendants system for accounting for expenses did not comply with GAAP. The plaintiffs refer to various press releases and Form 10-K's over a three year period where defendants stated financial results and claim these results were prepared pursuant to GAAP. (Compl.¶¶ 35-63). Notably, "[s]imple computation errors or slight accounting mistakes will not suffice to establish scienter." *In re IKON Office Solutions Inc.,* 277 F.3d 658, 667 (3d Cir.2002). Plaintiffs allege defendants had knowledge of the errors in the financial statements. In support of this assertion, plaintiffs contend that according to an accountant that worked for Cambrex, the company knew of the inaccuracies by 1997 and every CFO had been made aware of the unaccounted for expenses. (Compl.¶ 65). Further, plaintiffs maintain that this accountant personally corrected several inter-company accounts in 2002, where the Biosciences, Profarmco, and Bio Whittaker divisions failed to properly account for expenses. (*Id.* at ¶ 66).

In order to satisfy the particularity requirement when relying on a confidential source, such as the accountant in this case, plaintiffs must aver when the source was employed by the company, the dates the sources acquired the information, and how the source had access to such information. *See California Public Employees' Ret. Sys.,* 394 F.3d at 148. Further, plaintiffs must explicitly state how the source had knowledge of what the individual defendants knew, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

whether this knowledge was firsthand. *Id.* Specifically, the Third Circuit adopted the standard articulated by the Second Circuit, which states in pertinent part:

"[P]laintiffs need only plead with particularity *sufficient* facts to support those beliefs. Accordingly, where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."

*Id.* at 146 (emphasis in original) (quoting *Novak v. Kasaks,* 216 F.3d 300, 313-14 (2d Cir.2000)). While plaintiffs are not required to specifically provide the name of the individual, they need to sufficiently provide facts that support the assertion that said source was in a position to possess such facts. That being said, plaintiffs did explain that their source was an accountant that corrected the expense accounts for three of Cambrex's divisions. The complaint further states that:

*13 According to the accountant, Cambrex was made aware that these accounts were inaccurate at least by 1997. In that year, the Company took a write-off to correct numerous operating operating expenses that had not been recorded due to the exact same failure to reconcile inter-company accounts that caused the Company to restate in 2003.

(Compl.¶ 65). The complaint concludes that the accountant was requested to correct expense accounts in the Fall of 2002, at which time the accounting errors were explained to him. (*Id.* at ¶ 64). The complaint goes on to state that "this accountant was told that every CFO at Cambrex after 1997 had been made aware of the unaccounted-for expenses in the inter-company accounts, but none of them had corrected the problem." (*Id.* at ¶ 65). Plaintiffs have sufficiently pleaded defendants' knowledge of the accounting errors through the use of the anonymous source. Thus, the motion to dismiss as to the accounting misrepresentations is denied.

b. TKT Contract

Plaintiffs allege scienter as to the TKT contract by arguing that defendants recklessly issued earnings forecasts that they knew could not be achieved. (Compl.¶ 68). Plaintiffs refer to various forward looking statements made by defendants from January to July 2003, arguing defendants had no reasonable basis to believe these forecasts were accurate since they were informed in January 2003 that Cambrex had lost its largest contract.

Where the alleged misrepresentations are forward-looking statements, plaintiffs must allege defendants had actual knowledge the statements were false or misleading. *See* 15 U.S.C. § 78u-5(c)(1)(B). Thus, a plaintiff must not only allege the statements are false, but must also allege why there is no reasonable basis for the forecasts. *In re The Prudential Ins. Co. of Am. Sales Practices Litig.,* 975 F.Supp. 584, 597 (D.N.J.1997). In satisfying this standard, "plaintiffs bear the burden of 'plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference' that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology." *In re Burlington,* 114 F.3d at 1429.

Defendants made various statements regarding the growth of the Biosciences segment throughout the end of 2002 and the beginning of 2003. While plaintiffs maintain that defendants knew as early as October 2002 that it could not meet these earnings forecasts, this Court has already found these statements inactionable in Section II.B.1.b. Even if this Court were to find them actionable, plaintiffs did not allege scienter for fraud as early as October 2002. Although the FDA postponed the approval of Replagal during that time, defendants were not aware of any disapproval by the FDA as TKT issued in an October 2, 2002 press release that it believed the FDA would approve Replagal. (*Id.* at ¶ 68).

However, plaintiffs have sufficiently pled scienter with regard to the TKT contract for forecasts from January 2003 onward. There are four main communications at issue here: (1) the January 2003 press release projecting earnings growth at 10-15%, (*id.* at ¶ 73), (2) the April 3, 2003 press release dropping earnings growth in the Biosciences segment to 0-5% as a result of a lost contract (*id .* at ¶ 81), (3) the April 24, 2003 press release reiterating 0-5%

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                       Page 11
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

earnings growth in Biosciences segment (*id.* at ¶ 87), and
(4) the July 9, 2003 conference call stating that the expected
earnings growth remained at 0-5% (*id.* at 94). The
complaint alleges that defendants knowingly or recklessly
made false earnings forecasts because defendants knew on
or about January 14, 2003 that the FDA did not approve
Replagal and that TKT was terminating the contract
effective July 2003. (*Id.* at ¶¶ 71, 77, 79). Plaintiffs contend
that defendants' financial guidance was false and misleading
because the TKT contract made up 10% of the revenue
generated by the entire Biosciences division the previous
year and generated $17.5 million in revenue annually. (*Id.* at
¶ 77).

**\*14** In support of these allegations, plaintiffs point to TKT's
March 31, 2003 Form 10-K, which stated that TKT
terminated its contract with the manufacturer of Replagal in
January 2003 to be effective July 2003. (*Id.* at ¶ 79). In
addition, plaintiffs reference defendant Mack's statement
during a conference call on January 24, 2003 that "the
closing cycle [for projects] has been about nine months,
once we validate or certify that it's a worthy project, until
the time we have a master production agreement, it takes
eight to nine months." (*Id.* ¶ 75). Plaintiffs also rely on
defendant Mack's response to a question during an April 25,
2003 conference call where he stated it would take about
twelve months to recover from the TKT loss because that
contract was for the manufacturing of a commercial product
that annualized about $17 million and the new projects tend
to be phase three clinical projects that annualize $2 to $5
million. (*Id.* at ¶ 90). Plaintiffs' allegation that defendants
knew they could not meet these earnings projections is
supported by the July 24, 2003 press release where
defendants attributed the decline in Biosciences sales to the
loss of the TKT contract (*id.* at ¶ 96), and the July 25, 2003
conference call where defendant Beshar conceded that the
loss of the TKT contract was known during earlier forecasts,
but that it just had taken longer than expected to replace the
contract (*id.* at ¶ 99). Taking all of these allegations into
consideration, this Court concludes that plaintiff adequately
pleaded scienter as to the forecasts issued from January
2003 through July 2003 as plaintiffs have alleged facts
sufficient to support a conclusion that these forecasts were
not founded on a reasonable basis.

Plaintiffs also allege defendants failed to disclose the loss of
the TKT contract on its March 20, 2003 Form 10-K, which
resulted in a violation of Section 10(b). Again, plaintiffs
have sufficiently pleaded scienter. (*See id.* ¶¶ 79-80). "[I]n a
non-disclosure situation, any required element of scienter is
satisfied where ... the defendant has actual knowledge of the
material information." *GSC,* 368 F.3d at 239. Plaintiffs have
alleged that defendants had actual knowledge of the loss of
the TKT contract as early as January 14, 2003, which is
supported by TKT's Form 10-K issued on March 31, 2003
stating it had cancelled the contract in January 2003. Thus,
plaintiffs have alleged sufficient scienter with regard to the
TKT omission.

D. Liability of Individual Defendants for Others' Statements

Individual defendants MacMillan, Glassell and Guccione
argue they are not liable under Section 10(b) because
plaintiffs have not alleged that they made materially
misleading statements. Plaintiffs do not dispute that they
have not made any allegations as to these individual
defendants, but contend that pursuant to the
group-publishing doctrine, individual defendants can be
held liable because corporate public statements are
considered the collective effort of all corporate officers. (*See*
Pls.' Br. at 32-4).

**\*15** Before the PSLRA was adopted, the Supreme Court
made it clear that a defendant cannot be liable under Section
10(b) for statements not attributed to that defendant. *Central
Bank of Denver, N.A. v. First Interstate Bank of Denver,
N.A.,* 511 U.S. 164, 177 (1994). Section 78u-4(b)(2) of the
PSLRA comports with this holding by requiring that each
defendant be alleged to have made an intentional
misstatement or omission. *See* 15 U.S.C. 78u-4(b)(2).

While the group-publishing doctrine would relieve plaintiffs
of having to allege a misstatement with regard to every
defendant where the misstatements are contained in
corporate public statements, it is not clear that this doctrine
has survived the adoption of the PSLRA in this circuit.
Although the Third Circuit has yet to speak on this issue,
various districts courts in this circuit have. The majority of
the district courts have held that the PSLRA abrogates the
group-published information doctrine. *See, e.g., Winer*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                 Page 12
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

*Family Trust v. Queen,* No. 03-4318, 2004 U.S. Dist.
LEXIS 19244, *17 (E.D.Pa. Sept. 27, 2004); *see also In re
Am. Bus. Fin. Servs., Inc.,* No. 04-0265, 2005 WL 1324880,
*13 (E.D. Pa. June 2, 2005). Further, the only circuit to have
spoken on this issue, the Fifth Circuit, reached the same
conclusion and found that the PSLRA has abrogated the
group-publishing doctrine. *Southland Sec. Corp. v. Inspire
Ins. Solutions Inc.,* 365 F.3d 353, 364 (5th Cir.2004). These
cases are persuasive. Therefore, this Court concludes that
the group-publishing doctrine has not survived the adoption
of the PSLRA, and dismisses the asserted Section 10(b)
claims asserted against individual defendants MacMillan,
Glassell, and Guccione.

E. Failure to Adequately Plead a Section 20(a) Claim

Lastly, defendants argue that plaintiffs have not adequately
pleaded a violation of Section 20(a). Section 20(a) imposes
liability on individuals who control any person liable under
any provision of the Securities Exchange Act of 1934. *See*
15 U.S.C. § 78t(a). Section 20(a) is a derivative liability
section, requiring evidence of a separate violation under the
Act. *In re Advanta,* 180 F.3d at 541. In order to state a claim
under Section 20(a), plaintiffs must plead with particularity:
"(1) an underlying violation by a controlled person or entity,
(2) that the defendants are controlling persons, and (3) that
they were 'in some meaningful sense culpable participants in
the fraud.' " *In re Cendant Corp. Sec. Litig.,* 76 F.Supp.2d
539, 548 (D.N.J.1999).

Plaintiffs' Section 20(a) claim is based on the underlying
violation of Section 10(b). Defendants initially contend that
plaintiffs' Section 20(a) claim must be dismissed because
plaintiffs' Section 10(b) claim fails. *See id.* at 549
(dismissing a Section 20(a) claim because the necessary
predicate Section 10(b) claim had been dismissed).
Defendants are correct with respect to individual defendants
MacMillan, Glassell and Guccione. Because the Section
10(b) claims asserted against them have been dismissed, the
derivative Section 20(a) claims asserted against them are
dismissed as well. However, the Court did not dismiss
plaintiffs' Section 10(b) claims asserted against individual
defendants Mark and Beshar. Therefore, the Section 20(a)
claims asserted against Mack and Beshar are not dismissed.

*16 Defendants next argue that plaintiffs failed to plead
with particularity culpable participation by any of the
individual defendants. However, there is an "overwhelming
trend" in this Circuit that plaintiffs need only plead simple
control in order to withstand a motion to dismiss for want of
particularity. *Derensis v. Coopers & Lybrand Accountants,*
930 F.Supp. 1003, 1013 (D.N.J.1996); *see also Rocker
Mgmt., LLC v. Lernout & Hauspie Speech Prods.,* No.
00-5965, 2005 U.S. Dist. LEXIS 16854, *42-43 (D.N.J.
June 7, 2005). Further, it has been held that "[the] plaintiff
'need only plead circumstances establishing control because:
(1) the facts establishing culpable participation can only be
expected to emerge after discovery; and (2) virtually all of
the remaining evidence, should it exist, is usually within the
defendants' control .' " *Derensis,* 930 F.Supp. at 1013.
Because plaintiffs have adequately alleged control, their
Section 20(a) claims against the remaining individual
defendants are not dismissed.

III. CONCLUSION
In conclusion, this Court grants in part and denies in part
defendants' motion to dismiss. The claims asserted against
individual defendants MacMillan, Glassell and Guccione
are dismissed. Further, the public statements contained in
paragraphs 67, 69, 74, 78, 83, 86, 89 and 90 are not
actionable.

Slip Copy, 2005 WL 2840336 (D.N.J.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3373826 (Trial Motion, Memorandum and
Affidavit) Reply Memorandum of Law in Further Support
of Defendants' Motion to Dismiss the Consolidated
Amended Class Action Complaint (Sep. 10, 2004)

• 2004 WL 3373821 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Consolidated Amended
Class Action Complaint (Jul. 26, 2004)

• 2004 WL 3373824 (Trial Motion, Memorandum and
Affidavit) Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Consolidated Amended
Class Action Complaint (Jul. 26, 2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2840336 (D.N.J.)
**(Cite as: 2005 WL 2840336 (D.N.J.))**

• 2004 WL 3373818 (Trial Pleading) Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws (Mar. 29, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5**

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
(Cite as: 2005 WL 3536212 (E.D.Pa.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
In re: CIGNA CORP SECURITIES LITIGATION
**No. Civ.A. 02-8088.**

Dec. 23, 2005.

Barbara A. Podell, Sherrie R. Savett, Carole A. Broderick, Berger & Montague, PC, Christopher Reyna, Deborah R. Gross, Law offices Bernard A. Gross PC, Eleanor Morris Illoway, Harkins Cunningham LLP, Philadelphia, PA, Francis P. Karam, Michael S. Bigin, Stephanie M. Beige, Mel E. Lifshitz, Bernstein Liebhard & Lifshitz LLP, Keith M. Fleischman, Milberg Weiss Bershad Hynes & Lerach, New York, NY, Darren J. Check, Schiffrin & Barroway, LLP, Radnor, PA, for Plaintiffs.

Alexander R. Sussman, David M. Morris, Fried Frank Harris Shriver & Jacobson LLP, New York, NY, Sean M. Handler, Schiffrin & Barroway, LLP, Radnor, PA, Ann D. White, Ann D. White Law Offices, P.C., Jenkintown, PA, for Defendants.

Eleanor Morris Illoway, John G. Harkins, Jr., Harkins Cunningham LLP, Barbara A. Podell, Berger & Montague, PC, Philadelphia, PA, for Plaintiffs and Defendants.

*MEMORANDUM*

BAYLSON, J.

*\*1 This is an action alleging securities fraud brought against the CIGNA Corporation ("CIGNA"), pursuant to the securities laws of the United States and Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. Currently before the Court are (1) Plaintiff's Motion to Amend the Complaint (Docket No. 86), and (2) Defendants' Cross-Motion to Dismiss (Docket No. 82). For the reasons discussed *infra,* Plaintiff's Motion to Amend will be granted in part and denied in part, and Defendants' Motion to Dismiss will be denied without prejudice.

I. Background

The original PSLRA complaints in this matter were filed beginning on October 25, 2002, after CIGNA's stock price dropped following its announcement of revised earnings projections on October 24, 2002. The case was originally assigned to Judge Clarence Newcomer, who died earlier this year. By order dated May 15, 2003, Judge Newcomer consolidated the actions, appointed Co-Lead Plaintiffs, and required the filing of a single consolidated amended class action complaint (the "Pending Complaint").

On July 3, 2003, Plaintiff filed the Pending Complaint, which centered around allegations concerning CIGNA's attempt, beginning in 1999, to upgrade the company's technology to improve its competitive position vis a vis rivals who were offering customer-oriented products and processes built on next-generation web-enhanced computer systems. CIGNA's major, billion-dollar technology overhaul was entitled "Transformation," and it was targeted for completion in 2003. The underpinning of Lead Plaintiff Pennsylvania Employee Retirement System's ("SERS") claims is allegations that CIGNA fundamentally mishandled the Transformation project due to deficient planning, scheduling delays, cost overruns, implementation of inadequate and malfunctioning technologies, and poor project management. At the same time that Transformation was causing CIGNA serious difficulties, SERS alleges, CIGNA deliberately misrepresented the progress, timing, success, and cost of Transformation, as well as related earnings estimates, to the public, causing an artificial inflation of CIGNA's stock price. SERS maintains that when CIGNA finally revealed the problems related to Transformation to the public in 2002, CIGNA's share price plummeted, to the detriment of shareholders.

Defendants moved to dismiss the case on August 27, 2003. In Orders dated January 30, 2004 and November 15, 2004, Judge Newcomer dismissed certain claims, including all 2001 claims relating to Transformation, and dismissed defendant Andrea Anania from the case, but denied Defendants' motion with respect to other claims, including 2002 claims relating to Transformation. More specifically, in the January 30, 2004, Order, Judge Newcomer dismissed the following paragraphs for the reasons indicated: § 164

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 2
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

(failure to plead falsity); § 172 (mere puffery); § 181 (mere puffery; failure to plead falsity and scienter); § 196 (mere puffery; failure to plead falsity and scienter); and § 201 (mere puffery; failure to plead falsity and scienter). [FN1] In the November 15, 2004, Order, Judge Newcomer dismissed § 178 for failure to plead scienter, resulting in the dismissal of defendant Anania from the case.

> FN1. In the January 30, 2004 Order, Judge Newcomer also dismissed all claims relating to (1) the use of estimated health care membership numbers, and (2) guaranteed minimum death benefit reserves. Plaintiff has not sought to renew these claims.

**\*2** On June 2, 2005, Co-Lead Plaintiff Peter Szanto filed a motion to withdraw from the case. The Court granted that motion on August 15, 2004. The single Lead Plaintiff is now SERS. Judge Newcomer's Pretrial Scheduling Order, dated May 25, 2005, called for the completion of all fact discovery by January 17, 2006, with the case to be ready for trial by the summer of 2006. As a result of the rulings on the pending motions, a new Pretrial Scheduling Order will be entered after a conference with counsel.

II. The Pending Motions

On July 29, 2005, remaining Lead Plaintiff SERS filed a Motion to Amend, proposing to file an amended consolidated Complaint (the "Proposed Amended Complaint"). On August 12, 2005, Defendants' filed the Cross-Motion to Dismiss all of SERS' remaining claims for lack of economic loss and loss causation, based on the recent United States Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo,* --- U.S. ----, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

The Court held oral argument on the two pending motions on November 16, 2005. At argument, SERS maintained that the proposed amendments are based on the fruits of document discovery, completed in June of 2005, which, SERS urged, provide evidence (1) supporting the expansion of Plaintiff's 2002 claims concerning Transformation; (2) supporting the addition of claims concerning representations of financial estimates; (3) supporting the assertion of facts

concerning falsity and scienter that would cure the defects that led the Court do dismiss the 2001 Transformation-related claims, and thereby revive those claims; and (4) supplement its assertions of economic loss and loss causation. In response, Defendants contended that (1) SERS' motion should be denied due to a continuing failure to adequately plead securities fraud (*i.e.,* alleging new claims and re-alleging dismissed claims regarding non-actionable statements, and failing to plead particularized facts that create the required strong inference of scienter), and (2) pursuant to *Dura Pharmaceuticals,* SERS' remaining claims must be dismissed for failure (and inability) to plead economic loss and loss causation.

Following argument, the Court issued an Order on November 23, 2005 in which the Court: (1) allowed the Pending Complaint to be amended to add paragraphs 247-250, which assert allegations under the category of "loss causation;" (2) agreed to consider the pending Defendants' Motion to Dismiss as constituting a motion under F.R. Civ. P. 12(b)(6) to dismiss paragraphs 247-250; (3) allowed the parties to file additional briefing on the issue of loss causation; and (4) took all other issues under advisement.

The Court now resolves outstanding issues involved in the two pending motions.

III. Relevant Law

1. Amendments and PSLRA Pleading Requirements

The decision to permit an amendment is squarely within the Court's discretion. *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,* 256 F.Supp.2d 329, 332 (E.D.Pa.2003). Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given" by the Court "when justice so requires." F.R. Civ. P. 15(a). Generally speaking, "undue prejudice to the non-moving party is the touchstone for the denial of an amendment." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing, Inc.,* 663 F.2d 419, 425 (3d Cir.1981).

**\*3** However, the PSLRA raises additional concerns regarding proposed amendments. Specifically, in a PSLRA

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 3
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

action, the Third Circuit has instructed that on a motion to amend, the proposed new claims must "satisfy the stringent pleading requirements of the PSLRA;" if they do not, "leave to amend would be futile" and the proposed amended claims should be disallowed. *See In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 154 (3d Cir.2004) (affirming denial of motion to amend a PSLRA consolidated complaint). In so doing, the Third Circuit has stressed "the PSLRA's unique impact of narrowing application of this standard in securities fraud cases." *CALPERS v. Chubb Corp.,* 394 F.3d 126, 164-65 (3d Cir.2004) (quoting *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1332 (3d Cir.2002)); *see also GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 246 (3d Cir.2004) (noting objectives of PSLRA in denying leave to amend).

The stringent pleading requirements of the PSLRA that must be considered when evaluating a proposed amendment are straightforward. As relevant here, the strictures of the PSLRA include:

a. Plaintiff must plead the circumstances constituting the fraud or mistake with particularity. *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 531 (3d Cir.1999). Conclusory allegations are unacceptable. *In re Milestone Scientific Sec. Litig.,* 103 F.Supp.2d 425, 453 (D.N.J.2000).

b. Opinions, predictions, and other forward-looking statements are not actionable unless the speaker does not genuinely and reasonably believe them when they are made (*i.e.,* has actual knowledge of falsity). *In re Advanta,* 180 F.3d at 535-36; *In re Donald J. Trump Sec. Litig.,* 7 F.3d 357, 368 (3d Cir.1993). A statement is forward-looking if it is a statement containing a projection of revenues, income, earnings, per share, capital expenditures, dividends, capital structure, or other financial items; a statement of the plans and objectives of management for future operations; or a statement of future economic performance. 15 U.S.C. § 78u-5(i)(1)(A), (B) and ©. The PSLRA provides a safe harbor for forward-looking statements which are identified as such and are accompanied by a meaningful cautionary statement dealing with important factors which could result in actual results differing materially from those statements presented. *See* 15 U.S.C. § 78u-5(c)(1)(A). However, even in the absence of sufficient cautionary language, the safe harbor can prevent liability for forward

looking statements from attaching if plaintiffs fail to prove individual defendants acted with actual knowledge of the falsity. *See* 15 U.S.C. § 77z-2(c)(1)(B)(I, ii).

Projections of earnings estimates generally fall within the above-described definition of forward-looking statements. *In re Advanta,* 180 F.3d at 536. Although the Third Circuit has not adopted a rule that earnings estimates based on past performance are per se reasonable, *see Weiner v. Quaker Oats Co.,* 129 F.3d 310, 320 (3d Cir.1997), Circuit law generally requires more than a showing that a predicted event did not occur in order to sustain a claim of fraud. *In re Advanta,* 180 F.3d at 536-37. Even as stated in a pre-PSLRA case, this is because "[t]he existing regulatory structure is aimed at encouraging companies to make and disclose internal forecasts by protecting them from liability for disclosing internal forecasts that, although reasonable when made, turn out to be wrong in hindsight.... Companies are not obligated either to produce or disclose internal forecasts, and if they do, they are protected from liability, except to the extent that the forecasts were unreasonable when made." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1432 (3d Cir.1997).

\*4 Judge Dalzell recently detailed this analytical framework concerning forward-looking financial performance forecasts in *In re ATI Technologies, Inc. Securities Litigation,* 216 F.Supp.2d 418, 440-43 (E.D.Pa.2002). In *ATI Technologies,* the Court noted that Plaintiff may be able to set forth "particularized facts about circumstances existing at the time Defendants gave optimistic projections that threatened to have a negative impact on profit margins and sales," and that such facts may indicate that Defendants' "forecasts about revenue, sales, and profit margins remaining on track were unreasonable when made." *Id.* at 441. However, the Court recognized that, because they are nonetheless forward-looking, such "unreasonable statements" are successfully neutralized by either (1) Defendants' showing that the projections were accompanied by appropriate cautionary language (triggering the "bespeaks caution" doctrine), or (2) Plaintiff's failure to "show that those who made them or approved of them had 'actual knowledge' of their falsity." *Id.* at 442-32 (citing *EP Medsystems, Inc. v. Echocath, Inc.,* 235 F.3d 865, 872-875 (3d Cir.2000); 15

Westlaw.

Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

U.S.C. § 78u-5(c)(1)(B)).

Existing law assumes that the market knows that companies have neither a specific obligation to disclose internal forecasts nor a general obligation to disclose all material information; as a result, the Third Circuit presumes that ordinary, run-of-the-mill forecasts contain no more than the implicit representation that the forecasts were made reasonably and in good faith. *Id.* In keeping with this, the law does not impose a duty to update forward-looking statements such as earnings estimates with all relevant material information and/or upon changes in business strategy. *See* 15 U.S.C. § 78u-5(d) ("Nothing in the section shall impose upon any person a duty to update a forward looking statement."); *In re Burlington Coat Factory,* 114 F.3d at 1433 ("The voluntary disclosure of an ordinary earnings forecast does not trigger any duty to update.").

c. Vague and general statements of optimism constitute no more than non-actionable puffery and are understood by reasonable investors as such. *In re Advanta,* 180 F.3d at 538.

d. The PSLRA's heightened requirements for pleading scienter requires that Plaintiff allege facts that establish a strong inference of the requisite state of mind. 15 U.S.C. § 78u-4(b)(2). Plaintiff may accomplish this by alleging either "facts establishing a motive to commit fraud and an opportunity to do so" or "facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Advanta,* 180 F.3d at 530. These facts must be alleged with particularity and with respect to each alleged act or omission. *Id.* at 535 (holding that permitting blanket assertions of motive and opportunity to serve as the basis of liability would undermine the more rigorous pleading standard Congress has established in the PSLRA); *see also EP Medsystems,* 235 F.3d at 881 (holding that it is not enough for a plaintiff to state that defendants had no reasonable basis for making the representation).

2. Pleading Economic Loss and Loss Causation

**\*5** The United States Supreme Court recently issued an opinion in *Dura Pharmaceuticals, Inc. v. Broudo,* --- U.S. ----, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) in which the Court discussed the basic required elements of a PSLRA

action. In *Dura,* the Court specifically held that those fundamental requirements include pleading *"economic loss,* 15 U.S.C. § 78u-4(b)(4); and *' loss causation,' i.e.,* a causal connection between the material misrepresentation and the loss." 125 S.Ct. at 1631 (emphasis in original).

In so holding, the Court rejected the Ninth Circuit's ruling that, in a PSLRA fraud-on-the-market case (such as the case *sub judice* ), plaintiffs need only establish that "the price *on the date of the purchase* was inflated because of the misrepresentation." *Id.* at 1631 (quoting *Broudo v. Dura Pharmaceuticals, Inc.,* 339 F.3d 933, 938 (9th Cir.2003)) (emphasis added by the Supreme Court). The Court held that an inflated purchase price "will not itself constitute or proximately cause the relevant economic loss," and explained that "any logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id.* at 1631.

Few Courts of Appeals have had time to incorporate the recent *Dura Pharmaceuticals* ruling into the laws of the Circuits. Indeed, the Third Circuit only very recently acknowledged the ruling in passing in *In re Merck & Co. Securities Litigation,* 2005 U.S.App. LEXIS 27412, \*39 (3d Cir. Dec. 15, 2005).

Prior to *Dura Pharmaceuticals,* the Third Circuit's standard for evaluating the pleading of economic loss and loss causation was enunciated in *Semerenko v. Cendant Corp.,* 223 F.3d 165, 185 (3d Cir.2000). In *Semerenko,* our Court of Appeals held that:

[W]here the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement ... We note, however, that those decisions assume that the artificial inflation was actually "lost" due to the alleged fraud. Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
(Cite as: 2005 WL 3536212 (E.D.Pa.))

the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price ... Because a plaintiff in an action under § 10(b) and Rule 10b-5 must prove that he or she suffered an actual economic loss, we are persuaded that an investor must also establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation.

*6 This Court concurs with Judge Pisano's recent conclusion, set forth in *In re Royal Dutch/Shell Transport Securities Litigation,* 2005 U.S. Dist. LEXIS 32190 (Dec. 12, 2005), that *Dura Pharmaceuticals* is consistent with the Third Circuit's existing precedent for pleading economic loss and loss causation:

As recognized by *Dura,* the Third Circuit had not used the "Ninth Circuit's 'inflated purchase price' approach to proving causation and loss." *Id.* at 1630, 1632 n5. In *Semerenko,* the Third Circuit recognized that prior Third Circuit precedent held that "where the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement." *Semerenko v. Cendant Corp.,* 223 F.3d 165, 185 (3d Cir.2000). However, the Third Circuit emphasized that:

The "artificial inflation [must] actually [be] 'lost' due to the alleged fraud. Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price.

Because a plaintiff in an action under § 10(b) and Rule 10b-5 must prove that he or she suffered an actual economic loss, we are persuaded that an investor must also establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation. *Semerenko,* 223 F.3d at 185 (citations omitted) (emphasis added). In requiring a plaintiff to plead and prove that the alleged

misrepresentations (1) "proximately caused" (2) "the decline in the security's value," *Semerenko* is entirely consistent with *Dura's* holding that "the Ninth Circuit's approach [was] inconsistent with the law's requirement that a plaintiff prove that defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura,* 125 S.Ct. at 1633; *Semerenko,* 223 F.3d at 185. The standard for pleading economic loss and loss causation in the Third Circuit thus was not undermined by *Dura.*

IV. Discussion Regarding the Proposed Amended Complaint

1. Alleged Misrepresentations on May 2, 2001

As noted above, Judge Newcomer disallowed an allegation in the Pending Complaint concerning alleged misrepresentations in May 2001. Plaintiff has attempted to remedy this with more detailed claims based on its discovery and investigation to date. In the Proposed Amended Complaint, beginning at paragraph 160, Plaintiff alleges that CIGNA announced its results for the first quarter of 2001:

In a publicly accessible conference call with analysts on May 2, Defendant Hanway made false representations concerning the company's transformation initiative, asserting that it was on schedule and that CIGNA's total 2001 systems research and development costs, the preponderance of which was for transformation, would be $250 to $300 million, whereas in fact there were reports within the company from internal CIGNA documents that the transformation costs in the 2001 Operating Plan were $341 million.

*7 The Proposed Amended Complaint attempts to include allegations of scienter that Judge Newcomer found were missing from the Pending Complaint. The Court will review these allegations in some detail.

Initially, the Proposed Amended Complaint is vague as to what portion of the total 2001 systems research and development costs were actually for Transformation, and the allegation that these costs were "expected to be approximately $250 to $300 million" is the type of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                              Page 6
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

forward-looking statement as to which there is a safe harbor under the PSLRA. *See* 15 U.S.C. § 78u-5(i)(1)(A), (B) and © (discussed above). As the Court of Appeals stated in *In Re Burlington Coat Factory*:

> The forward looking portion of the statement here is a general, non-specific statement of optimism or hope that a trend will continue. Claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts.

114 F.3d at 1427 (citations omitted).

The allegations concerning the May 2001 disclosures continue with claims that the publicly available statements of CIGNA were materially false and misleading, as demonstrated by "various internal CIGNA documents authored by or sent to Defendant Stewart or the Chief Financial Officer of CIGNA Health Care" (Proposed Amended Complaint ¶ 162). These claims, set forth in the disjunctive, without stating facts showing a knowledge of falsity on the part of any named Defendant, are insufficient.

Judge Newcomer did find that there were allegations in the Pending Complaint sufficient to allege that there were undisclosed delays in the progress and status of the Transformation project, but Plaintiff is now intent on alleging that CIGNA misrepresented the *costs* of Transformation in addition to the problems with delays. Paragraphs 162-171 of the Proposed Amended Complaint contain allegations about increased costs, but also assert that the *delay* in Transformation was increasing the cost of Transformation.

In its attempt to sufficiently allege scienter, [FN2] Plaintiff alleges that Defendant Hanway's May 2, 2001, representation that CIGNA was "right on our internal tracking, our internal time frame" was false and misleading because he knew there were many delays due to, *inter alia,* a variety of circumstances including the "critical eligibility application," which would result in increased costs and delay in the development of other applications, and that these delays "were highly material because they impaired the company's ability to adequately test applications." The Proposed Amended Complaint further asserts in Paragraph 164 that these delays, which Defendant Hanway knew about

but recklessly disregarded when he made his May 2, 2001 representation, included a number of issues which Plaintiff's allege were crucial to the Transformation project. *See* Proposed Amended Complaint at § 164(a)-(h). Plaintiff further suggests in Paragraph 166 of the Proposed Amended Complaint that when CIGNA announced on October 24, 2002, that its earnings for 2002 and for the third quarter of 2002 were sharply lower than Hanway's prior estimates, and the price of CIGNA stock declined sharply, Defendants cited "Transformation related increased technical and service costs" as causes of the company's markedly reduced earnings.

> FN2. Plaintiff's allegations concerning scienter are spread throughout the Proposed Amended Complaint. The Court has reviewed them, both in the specific places where facts are pleaded, and also at the end of the pleading, under the heading of "Scienter Allegations" beginning at Paragraph 242. However, this approach to pleading made it difficult to "match up" allegations to specific events. Although these allegations show that Defendants Hanway and Stewart were at various meetings, and may have reviewed certain documents, the Court is still not satisfied that the requirements of scienter have been met by the allegations made against Hanway and Stewart. Plaintiff's allegations that Stewart and Hanway had motive to misrepresent the facts about earnings because of their own compensation arrangements have been held insufficient as a matter of law. *GSC Partners, supra.*

Defendants' brief asserts that Plaintiff misrepresents financial reports about different CIGNA operational units. At oral argument, defense counsel presented facts and contentions that the discrepancies between the estimates and the other facts presented by Plaintiff are explained by the Plaintiff's failure to understand CIGNA's accounting for Goodwill in various statements. The Court cannot resolve this issue on the Motion to Amend, nor do the Defendants' contentions themselves necessarily negate the allegations of scienter. Rather, the Court rules on the sufficiency

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 7
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

of the allegations themselves.

*8 However, the Court concludes that Plaintiff has failed to show that the statements of Defendant Hanway on May 2, 2001 were anything other than forward-looking statements. The fact that Defendant Hanway may have had knowledge of operational difficulties in the Transformation project as early as May 2001 does not, under the allegations of the Proposed Amended Complaint, meet the requirements of the PSLRA for causing a dramatic reduction in stock price in October 2002. This span of almost 18 months is simply too long to allow a new theory of liability, to allow discovery to proceed to find a cause-and-effect relationship for a multi-billion dollar corporation such as CIGNA, between an announcement in May 2001 and a stock decline in October 2002. Stated differently, the Court cannot find sufficient reason to allow, at this time, these particular allegations of the Proposed Amended Complaint, even assuming, *arguendo,* that there was a "domino effect" from misrepresentations made in May 2001. The Court finds that Plaintiff has already alleged that delays in Transformation were known to CIGNA officers and misrepresented in statements made during calendar year 2002--and the case will proceed as to these misrepresentations.

Plaintiff is obviously attempting to have the start of the alleged fraud run from May of 2001, as this will increase the alleged damage period dramatically from the class period which exists under Judge Newcomer's current Orders, which will start as of February 8, 2002.

Plaintiff has also attempted to show that because of the delays, Transformation costs were increasing. Common sense suggests that delays usually increase costs. However, the Proposed Amended Complaint is deficient in sufficient facts to show scienter as to costs. There is no specific allegation that any defendant or high-ranking officer of CIGNA had specific knowledge, aside from whatever they may have known about delays, that the costs of Transformation were being misrepresented.

In Paragraph 161 of the Proposed Amended Complaint, Plaintiff points to Defendant Stewart's response to a question from an analyst who queried:

Just to the nearest $50 million, I recall the range being

something like 250- 300 million in total systems R & D which, you know, a preponderance of it was for transformation. Is that consistent with your thoughts on '01?

Defendant Stewart allegedly answered in the affirmative and continued:

We haven't changed our view of that particularly those include a variety of things including e-commerce activities and things like that. So, it's meant to be sort of broadly developmental, not just the transformation numbers.

Plaintiff's attempt to allege that this generalized answer, clearly forward-looking by its terms and intent, constitutes a misrepresentation as to costs because the 2001 operating plan for Transformation costs was $341 million, is unsuccessful. Proposed Paragraphs 162, 164(a)-(h), and 165 are a jumbled stream of alleged facts that appear to "cherry pick" from CIGNA documents--but Plaintiff fails to establish scienter concerning the above-quoted remarks. The best that could be said for this aspect of Plaintiff's Proposed Amended Complaint, notwithstanding that Plaintiff failed to show any scienter as to Defendant Stewart's answer quoted above (or the other statements allegedly made by Defendant Hanway), is that the Proposed Amended Complaint is alleging the truism that delays result in an increase in costs.

*9 Although the Court has, in some detail, related the allegations of the Proposed Amended Complaint and found that scienter is lacking now (just as Judge Newcomer found it lacking in prior, more generalized allegations), the Court also takes into account, in denying this portion of the Proposed Amended Complaint, the factors of prejudice and delay in completion of the litigation. CIGNA has been defending this case, which includes the gathering of documents and interviews of knowledgeable witnesses, based on the original claims about the delays and problems concerning completion of Transformation. To allow introduction of a new theory of liability concerning misstatements of costs and earnings would likely require an entirely new round of document gathering and witness interviewing with a burden and expense that the Court finds prejudicial, particularly so long after the events in question. Balancing this burden and expense against the relatively

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                           Page 8
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
(Cite as: 2005 WL 3536212 (E.D.Pa.))

weak allegations, which the Court has reviewed above, the Court concludes that the these proposed amendments concerning earnings and costs estimates should not be allowed.

This case was started on October 25, 2002 and focused on misrepresentations about the completion of "Transformation." The terminal illness and untimely death of Judge Newcomer undoubtedly accounted for some delay. Nonetheless, the fact of the matter remains that after three years, although there has been extensive document production, few depositions have been taken and completion of merits discovery is months away; there has been no ruling on the class action issue; and there is a need to bring this case to closure by placing some reasonable fence around new allegations and further discovery.

For all of these reasons, the Court declines to allow Paragraphs 160 through 168 of the Proposed Amended Complaint concerning the statements made as of May 2, 2001.

2. Alleged Misrepresentations on August 1, 2001

The Pending Complaint's allegations concerning the August 1, 2001, conference call alleged misrepresentations made by Defendant Hanway about customer reaction to Transformation (*i.e.,* Hanway's statement that "So I would say progress to date has been good. The customer reaction to this, Charles, has been very positive"), which Judge Newcomer dismissed as non-actionable puffery. *See* Pending Complaint ¶ 172.

However, the paragraphs of the Proposed Amended Complaint concerning the August 1, 2001, conference call instead focus on representations made about estimated operating earnings. Paragraph 170 asserts that when CIGNA issued a press release announcing its results for the second quarter of 2001, on August 1, 2001, it reported operating income of $262 million or $1.73 per share. Plaintiff further asserts that, in connection with this report, Defendant Stewart made a substantially reduced estimate of the 2001 operating earnings of CIGNA's healthcare business and CIGNA's 2001 consolidated operating earnings, as a result of which the Proposed Amended Complaint alleges that

there was an "immediate and dramatic decline in the market price of CIGNA stock from its close on July 31, 2001 to a closing price of the following day." The Proposed Amended Complaint asserts that the representations as to earnings were false because CIGNA, in fact, expected operating earnings of much less than what was actually announced. In Paragraph 171, the Proposed Amended Complaint further asserts that Stewart falsely represented that "the decline [in estimated earnings] is solely related to the medical cost pressure on HMO operations offset in part by stronger indemnity."

*10 The only claim which could possibly come close to alleging scienter concerning the allegedly false August 1, 2001, statements is the proposed new Paragraph 172, which reads in its entirety as follows:

> 172. Defendant Stewart's representation in the preceding paragraph as materially misleading because the reduced estimate was caused in part by the fact that defendant Stewart had previously misrepresented Transformation costs on May 2, 2001, and, the acceleration of Transformation spending, as stated in the official quarterly financial report of CIGNA HealthCare, which was received by defendant Stewart, was a significant cause of reduced HMO operating earnings and margins.

The Court ascertains several reasons against allowing this new theory of liability to proceed. Initially, the statements allegedly made by Stewart were clearly forward-looking statements about earnings estimates in the future, and for this reason alone, are not actionable under *In Re Burlington Coat Factory* and the PSLRA. Secondly, Paragraph 172, quoted above, is lacking in facts showing scienter. The Court has already found that the alleged statements made on May 2, 2001 should not become part of this case, and thus, the fact that the reduced earnings estimate allegedly made on August 1, 2001, was "caused in part," (itself very vague), "by the fact that defendant Stewart had previously misrepresented Transformation costs on May 2, 2001," only asserts that one non-actionable statement caused a subsequent statement--and thus, by definition, the later statement can not itself be actionable. Plaintiff does not explain how a reduced earnings estimate can be "caused" by a prior misrepresentation rather than by actual facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                            Page 9
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

occurring within the company. Perhaps Plaintiff intended to allege a "cover-up" in a continuation of the fraud allegedly started in May 2001, but did not say so. Furthermore, the last clause of Paragraph 172 is murky. Plaintiffs do not allege how a statement concerning acceleration of Transformation spending, as set forth in the official quarterly financial report of CIGNA HealthCare, could be actionable even if it were a significant cause of reduced HMO operating earnings and margin. There is nothing contained in these Paragraphs concerning the August 1, 2001, press release that indicates that Stewart personally knew facts which he intentionally misrepresented in these statements.

Last, the theories expressed about the August 1, 2001, statement contained in Paragraphs 169-172 of the Proposed Amended Complaint have no relationship to customer reaction, a theory set forth in the Pending Complaint and rejected by Judge Newcomer, but, rather, inject a new theory of liability into the case. This will not be permitted because, as stated above, doing so (1) will unduly complicate discovery, (2) is prejudicial to the Defendants, and (3) is likely to unduly delay trial of a case already over three years old.

For all of these reasons, the Court declines to allow the paragraphs of the Proposed Amended Complaint concerning the statements made as of August 1, 2001.

3. Alleged Misrepresentations on November 2, 2001

**\*11** The Pending Complaint, as well as the Proposed Amended Complaint, asserts that CIGNA's press release announcing its financial results for the third quarter of 2001, released on November 2, 2001, contained false statements actionable under the PSLRA. Judge Newcomer had dismissed the November 2001 claims for failure to plead scienter and found that they were non-actionable puffery. In Paragraphs 176-184 of the Proposed Amended Complaint, the Plaintiffs have divided their assertions into two general parts. Plaintiff first alleges that the Defendants made misrepresentations concerning the status of the Transformation project, and, second, alleges that Defendants misrepresented costs and earnings in material amounts.

a. Alleged Misrepresentations Concerning the Status of the Transformation Project

In Paragraph 176 of the Proposed Amended Complaint, Plaintiffs assert that shortly after the issuance of the November 2, 2001, press release, Defendants Hanway and Stewart, during a telephone conference, once again commented on Transformation by stating "first of all, we are on track with our own schedule," which itself was false because CIGNA knew there were serious technological flaws and significant delays in putting millions of its customers on new computer platforms as of January 1, 2002, as had been planned under Transformation. The Proposed Amended Complaint cites internal memoranda, either authored by Defendant Hanway or reviewed by him, which raised numerous problems, including an assertion in one memorandum that unresolved Transformation problems would result in "a financial and customer relations nightmare."

In contrast to the allegations in the Proposed Amended Complaint which the Court found lacking in the discussion above and below, the Court finds that the allegations concerning the November 2001 representations are specific; made with abundant citations of knowledge by Hanway and/or Stewart that they were making false statements to the public as compared to what they themselves knew from internal CIGNA memoranda which they either wrote or received; and material because they cast significant doubt on CIGNA's ability to meet the Transformation schedule benchmark of January 1, 2002, as had been previously represented to the public.

The Court will therefore allow the amendment of the Pending Complaint to add Paragraphs 175 through 181 of the Proposed Amended Complaint, because these Paragraphs contain specific allegations showing scienter, that statements made to the public and the analysts about the Transformation project shortly before the beginning of calendar year 2002 failed to disclose the Defendants' actual knowledge that significant problems existed. Plaintiff is entitled to attempt to prove that if the true facts had been disclosed, this might have made a difference in CIGNA's shareholders' knowledge and appreciation of the company's prospects/problems for the year 2002. The Proposed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 10
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

Amended Complaint specifically alleges that the delays, which CIGNA had known about since the spring of 2001, had continued to occur "with the result that it was impossible for CIGNA to deliver properly functioning systems to customers and the company planned to migrate to the new system on January 1, 2002 ..." *See* Proposed Paragraph 179. Moreover, Proposed Paragraph 180 quotes an internal audit report for May-August 2001, delivered to CIGNA's audit committee, which states:

>    *12 Processes around the management of a sales and underwriting system development project continue to need substantial improvement because of inadequate design and architecture to insure required functionality.

Although the Court does not necessarily know whether these are the determinative documents within CIGNA, or that they necessarily contain the entire picture of CIGNA's progress with its Transformation project, given that this case has from the start been primarily about alleged misrepresentations which CIGNA made about the Transformation project, the Court finds that the amendments in Paragraphs 175-181 of the Proposed Amended Complaint concerning disclosures as of November 2001(1) do not dramatically change the nature of the case; (2) will not be unduly burdensome or prejudicial on CIGNA, and (3) will allow Plaintiff an opportunity to show that the actionable allegations which, under Judge Newcomer's present ruling, begin as of February 2002, did in fact germinate at an earlier time, in November of 2001.

**b. Claims that Defendants Misrepresented Costs and Earnings**

The second aspect of the Proposed Amended Complaint involving the November 2, 2001, conference call deals with comments by Stewart about the amount of additional spending that the Transformation project would require. Specifically, in response to a question, Stewart stated "we expect to spend like $75 million more in 2001 than it did in 2000." (¶ 182). Plaintiff alleges that this was a false number because the actual increase in Transformation spending in 2001 was more than $150 million. In addition, Plaintiff alleges that Stewart misrepresented CIGNA's operating earnings for its indemnity segment as $396 million, whereas, in fact, the correct estimate as of the third quarter

2001 was $320 million, or $76 million less than Stewart's allegedly false representation.

The Court will decline to allow the amendments in Paragraphs 182-184 of the Proposed Amended Complaint alleging false representations as to costs and/or earnings, for several separate reasons:

1. Because Stewart obviously was speaking before the end of 2001 but was predicting financial results for the entire year of 2001, his statements were, by definition, forward-looking and not actionable under the PSLRA, without scienter.

2. These paragraphs do not cite any facts that Stewart had actual knowledge of specific facts to show scienter, *i.e.,* that he knew his statement was false at the time he made it.

3. Any reasonable listener/reader of his statements would conclude that they were merely expectations (*i.e.,* estimates and not specific representations of actual numbers)--indeed, no one could have had actual knowledge because the year was not yet completed.

The Court also concludes, notwithstanding that some securities fraud cases are brought, and indeed settled for large sums of money, based on allegedly false estimates, that the PSLRA and the case law within the Third Circuit requires district courts to examine securities claims based on costs and earnings estimates with great scrutiny, *see, e.g., In re Advanta,* 180 F.3d at 535-36; *In re Burlington Coat Factory,* 114 F.3d at 1430-36; *Weiner v. Quaker Oats Co.,* 129 F.3d at 320-21, and that the allegations in the Proposed Amended Complaint are not sufficient to overcome the statutory and Third Circuit-endorsed protections for forward-looking statements.

*13 Finally, and repeating what the Court stated above concerning other allegations of improper estimates, the Court finds that allowing the Proposed Amended Complaint to move beyond misrepresentations about the status of Transformation and into CIGNA's estimates of earnings would, in essence, present a new case, require vast amounts of additional and different discovery from what has previously been contemplated, delay the trial and resolution

Westlaw.

Slip Copy                                                                                          Page 11
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

of the case, and would be unduly prejudicial to CIGNA.

4. Alleged Misrepresentations on February 8, 2002

Beginning at Paragraph 187, Plaintiff suggests amendments based upon misrepresentations allegedly made on February 8, 2002, when CIGNA issued a press release announcing its 2001 fourth quarter and year-end financial results. The Court finds that the proposed amended Paragraphs 188-190, 199, and 201 primarily concern operational matters and will be allowed. However, Paragraphs 192 through 197, and 202, concern estimates of earnings and/or costs, and will not be allowed for the reasons stated previously in this Memorandum.

5. Alleged Misrepresentations on May 2, 2002

Judge Newcomer dismissed Paragraph 201 of the Pending Complaint, concerning a press release made on May 2, 2002, announcing the financial results for the first quarter of 2002 and statements made at a press conference on that same date. In the Proposed Amended Complaint, Plaintiff seeks to assert in Paragraphs 204-213 that on May 2, 2002, CIGNA knowingly misrepresented its estimates of earnings for the full year of 2002.

Although, as stated *supra,* the Court will not allow amendment of the Pending Complaint to allow Plaintiff to seek liability for incorrect estimates of earnings and/or costs, in that they are inherently forward-looking and the evidence of scienter is lacking, the Court will allow the amendments set forth in Paragraphs 208-213 of the Proposed Amended Complaint, because these claims primarily involve operational problems and membership growth. The Court finds that these allegations are merely refinements of existing claims that add details to the case that is now pending, and that there is little extra burden placed on CIGNA for the extension of currently-existing claims.

6. Alleged Misrepresentations on August 2, 2002

Beginning at Paragraph 214, Plaintiff seeks to make amendments for allegedly false statements made on August 2, 2002, announcing financial results for the second quarter of 2002. The Court will not allow the proposed Paragraphs

216- 218 because they concern forward-looking statements and there is an absence of sufficient evidence as to scienter.

7. Alleged Misrepresentations on September 3, 2002

Beginning at Paragraph 219, Plaintiff asserts misrepresentations in a press release issued on September 3, 2002, concerning an after-tax charge of $720 million to create reserves for reinsurance contracts. The Court finds that this is a restatement of allegations made in the Pending Complaint; does not propose a new theory of liability based on forward-looking statements; and, thus, will be allowed.

8. Alleged Misrepresentations on or after October 24, 2002

*14 Plaintiff's proposed amendments for acts and omissions taking place after October 24, 2002--beginning at Paragraph 221--merely provide further details and expansion of factual allegations for the events that were pleaded in the Pending Complaint, and will therefore be allowed. Some of these allegations concern events that took place in 2003, after the end of the damage period, and may be evidentiary in nature.

\* \* \*

In all the rulings made above, the Court is not necessarily determining that any specific piece of evidence is either admissible or not admissible in the presentation of dispositive motions or at trial. Rather, the intent has been to be consistent with the PSLRA and Third Circuit law on amendments of complicated securities cases after three years of litigation; to adhere to Judge Newcomer's stewardship of this case during the first three years; and to keep in mind the desirable public policy of not unduly delaying the completion of complex litigation.

V. Economic Loss and Loss Causation Issues

As noted above, Defendants have moved to dismiss paragraphs 247 through 250 for failure to adequately allege economic loss and loss causation, relying heavily on *Dura Pharmaceuticals, supra.* The parties submitted supplemental briefs after discussion on this point during the oral argument held on November 16, 2005.

Defendants acknowledge that, comparing specific trades by SERS, there are some instances in which SERS sold some

Slip Copy                                    Page 12
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

shares at prices lower than the price at which it bought the same shares. Defendants contend, however, that on an overall basis--*i.e.*, for all transactions during the class period--SERS did not have a net loss in its trading in CIGNA stock, and thus, under *Dura Pharmaceuticals*, SERS cannot plead any economic loss or loss causation.

The Court concludes at this time as follows:

1. There are substantial issues of fact raised by the parties. Both sides' briefs on this issue assert that statements made by the other party are false and inaccurate, and the Court cannot resolve these issues without a trial or at least an evidentiary hearing of some type (although it is possible that these factual disputes will disappear once there has been more full discovery and the issues can be presented in a dispositive motion).

2. Defendants' argument can be illustrated by the following simplified hypothetical, which may not necessarily apply to the facts of this case. *See* Figure 1.

----------------------------------------------

```
Figure 1.
Hypothetical Lead Class Plaintiff X
Purchases of ABC Corp. Common Stock

1.   1/1   Buy         1000        at
$10
2.   1/15  Sell        100         at
$15                   + $500
3.   1/30  Sell        100         at
$5                     $500
     2/15  False public statement,
stock goes up [beginning of alleged
damage
            period]
4.   2/20  Sell        200         at
$25                  + $3,000
5.   2/22  Sell        200         at
$30                  + $4,000
     2/24  Truth revealed, stock goes
down
6.   2/25  Sell        100         at
$5                     $500
```

```
    2/25  Hold        300          at
$5        [end of alleged damage
period]

Total Gain for Class Damage Period =
$7,000
Total Loss for Class Damage Period =
$500
Net Gain for Class Damage Period =
$6,500
```

----------------------------------------------

**\*15** The intent of the PSLRA is to require a lead plaintiff to have real economic loss, and Defendants assert as a matter of common sense and realistic economic impact that the Court must look at the Lead Plaintiff's overall economic standing as of the end of the class period, rather than at only particular, isolated individual transactions that occurred during the class period.

3. Although *Dura Pharmaceuticals* contains language that supports the Defendants' interpretation of the requirement of economic loss in the PSLRA, the Defendants' legal position as applied to the facts of this case may require an extension of *Dura Pharmaceuticals* that is not required by either Supreme Court or Third Circuit precedent at the moment (although there are several district court cases discussing this issue).

The Court concludes that, because the issues of economic loss and loss causation are so fundamental to the situation of SERS as the present Lead Plaintiff, the Court should require expedited discovery, and possibly expert reports, on this issue--after which, either or both parties may bring a dispositive motion. At this time, therefore, the Court will deny Defendants' Motion to Dismiss on the grounds of economic loss and loss causation without prejudice.

VI. Conclusion

In accordance with the foregoing discussion, the Plaintiff's Motion to Amend will be granted in part and denied in part. The Defendants' Motion to Dismiss will be denied without

Westlaw.

Slip Copy                                                                                    Page 13
Slip Copy, 2005 WL 3536212 (E.D.Pa.)
**(Cite as: 2005 WL 3536212 (E.D.Pa.))**

prejudice.

An appropriate Order follows.

*ORDER*

AND NOW, this 23rd day of December, 2005, after careful review of arguments presented to the Court by both parties during oral argument and in numerous, detailed pleadings, it is hereby ORDERED as follows:

1. Plaintiff's Motion to Amend (Docket No. 86) is GRANTED in part and DENIED in part, in accordance with the accompanying Memorandum.

2. Defendants' Motion to Dismiss (Docket No. 82), as to paragraphs 247 through 250 of the Proposed Amended Complaint, is DENIED without prejudice. The Court will require expedited discovery and the opportunity for dispositive motions on economic loss and loss causation issues.

3. Plaintiff shall file an Amended Complaint, in accordance with the accompanying Memorandum, by January 9, 2006.

4. The parties shall discuss and submit either a joint or separate proposed Pretrial Scheduling Order to the Court by December 28, 2005 at 12:00 p.m., and, as per the Court's prior agreement with counsel, the Court shall hold a telephone conference with counsel on December 28, 2005 at 4:00 p.m.

Slip Copy, 2005 WL 3536212 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3135663 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Motion for Class Certification by Pennsylvania State Employees' Retirement System (Oct. 24, 2005)

• 2005 WL 3135649 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to sers' Motion for Class Certification (Oct. 06, 2005)

• 2005 WL 3135657 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Memorandum in Opposition to

Defendants' Motion to Quash or Modify Subpoena and for a Protective Order (Oct. 06, 2005)

• 2005 WL 2849070 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Response to Defendants' Notice of Related Case and Request to the Chief Judge for Reassignment (Sep. 07, 2005)

• 2005 WL 2682800 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Lead Plaintiff Sers' Motion to File a Second Amended Class Action Complaint and in Support of Defendants' Cross-Motion for Dismissal of Sers' Claims for Lack of Loss Causation (Aug. 12, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.