**6**

Westlaw.

Not Reported in F.Supp.                                                                                                Page 1
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**

▷

Motions, Pleadings and Filings

United States District Court, S.D. New York.
In re HEALTH MANAGEMENT SYSTEMS, INC.
SECURITIES LITIGATION
No. 97 CIV. 1865(HB).

June 1, 1998.

OPINION AND ORDER
BAER, District J.

\*1 Defendants in this securities fraud class action move to dismiss the Consolidated Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). For the reasons stated below, the defendants' motion is GRANTED, with leave to replead.

I. *Background*
Health Management Systems, Inc. ("HMS"), furnishes proprietary information, management and data processing services and software to hospitals and health care providers. HMS's main function is to benefit its health care clients by enhancing their revenue and accelerating cash flow, for example, by efficiently processing accounts receivable, reducing operating and administrative costs and improving decision-making capabilities. Compl. ¶ 66. In January 1992, HMS entered into a service agreement with HHL Financial Systems, Inc. ("HHL"), pursuant to which HMS was to provide HHL with revenue enhancing and support services. Compl. ¶ 74.

Plaintiff shareholders allege that they purchased HMS shares at artificially inflated prices as a result of materially false and misleading statements made by HMS and the individual defendants [FN1] regarding HMS's existing financial state and business relationships, particularly with certain of its substantial customers, in violation of Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiffs sue on behalf of themselves and a class of other shareholders who purchased HMS stock between February 27, 1996 and February 25, 1997 (the "Class Period").

FN1. The individual defendants are present or former officers and/or directors of HMS and are as follows: Paul J. Kerz, President, Chief Executive Officer and Chairman of the Board of Directors; Donald J. Staffa, Senior Vice President of Operations; Laurence B. Simon, Senior Vice President of Development and Secretary; Phillip Siegel, Vice President and Chief Financial Officer; Russell L. Carson, HMS Director; Richard H. Stowe, HMS Director; Robert M. Holster, HMS Director; and John W. McIntyre, HMS Director. Compl. ¶¶ 38-45.

Specifically, plaintiffs allege that by the beginning of 1996, HMS's business began experiencing financial problems, due to increased competition and the emphasis on cost savings in managed care services. One of HMS's largest customers, HHL, allegedly began failing to make timely payments to HMS, and other customers also began deferring payments. Compl. ¶¶ 75-76. On February 27, 1996, the beginning of the Class Period, HMS announced its first quarter results in a press release, stating that they had a "solid quarter" and looked "forward to a fulfilling year ahead." Plaintiffs allege that these statements were false and misleading in light of HMS's problems with HHL and its other customers. Plaintiffs allege that defendants knew of HMS's financial problems because the individual defendants were officers and/or directors of HMS and especially because defendants Kerz, Carson, Stowe and Holster were also officers and/or directors of HHL. Compl. ¶¶ 77-78, 3.

On May 28, 1996, HMS issued a press release announcing positive second quarter results. Plaintiffs allege that this release was misleading because HMS failed to disclose its financial difficulties with its customers and that HMS and HHL had reached an agreement regarding the offsetting of HHL's receivables. Com pl. ¶¶ 80-83. Shortly thereafter, HMS disclosed the HHL receivables agreement in its Form 10-Q dated June 13, 1996. Plaintiffs allege that HMS nevertheless failed to disclose the full truth of the seriousness of the problem, *i.e.,* that HHL was on the verge of defaulting on its payments owed to HMS. Compl. ¶¶ 85-87.

\*2 On August 21, 1996, HMS disclosed in a press release

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
(Cite as: 1998 WL 283286 (S.D.N.Y.))

that it would take a third quarter charge of $5.51 million (32 cents per share), and that HMS had canceled a contract to manage the information processing business of HHL, after negotiating with HHL for several months. Plaintiffs allege that HMS nevertheless downplayed this by portraying the write-off as a positive, one-time charge that would not affect HMS's future performance. Compl. ¶¶ 89-91. When HMS announced its third quarter results on September 4, 1996 and released its 10-Q report for the period ended July 31, 1996, plaintiffs contend that HMS reinforced this false notion that the HHL situation was behind HMS. Compl. ¶¶ 101-02, 108-09. Plaintiffs also allege that defendants convinced securities analysts that its problems with HHL were in the past and that the write-off signaled a turnaround for HMS and would not negatively impact it. Compl. ¶¶ 93-99.

On November 15, 1996, HMS supposedly "shocked the market" when it announced its fourth quarter earnings were expected to be far less than market projections. HMS reported that these poor results were a result of problems with large clients, as well as the fact that the restructuring of HMS's relationship with HHL had consumed more management resources than anticipated. This news sent HMS's stock plummeting 34% that day. Compl. ¶¶ 112-115. Plaintiffs allege that even these disclosures were misleading and did not disclose the full extent of HMS's problems, *i.e.,* that it was "suffering increased competition, fee erosion and lower margins, all of which were contributing to reduced earnings...." *Id.* ¶ 115. Plaintiffs allege that the full extent of HMS's financial problems were finally revealed on February 25, 1997, the last day of the Class Period, when HMS announced its poor first quarter 1997 results and indicated that net income was down 50% from the prior year. In response to this announcement, HMS stock dropped 15% that day. Com pl. ¶¶ 119-20.

During the Class Period, some of the individual defendants sold their HMS stock, allegedly taking advantage of their concealment of prevailing problems at HMS. Specifically, the individual defendants, officers and/or directors of HMS, sold over $18,000,000 worth of their stock in total during the Class Period. Compl. ¶ 7.

II. *Discussion*

In order to state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, "a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808 (2d Cir.1996).* Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), these elements must be pled with a heightened degree of specificity. That law provides that any complaint alleging a violation of Section 10(b) must "specify each statement alleged to have been misleading, [and] the reasons or reasons why the statement is misleading" and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)(B) and (b)(2). I find that the plaintiffs' complaint fails to meet these stringent pleading requirements.

A. *Pleading on Information and Belief*

*3 All of the allegations in the complaint are prefaced by the phrase "upon information and belief," except those specifically pertaining to the named plaintiffs, their counsel and their own acts. In general, under Rule 9(b) of the Federal Rules of Civil Procedure, pleadings alleging fraud cannot be based on information and belief, except where matters are particularity within the adverse party's knowledge. The plaintiffs may invoke this exception only if they include "a statement of facts upon which [their] pleaded information and belief are founded." *Leslie v. Minson, 679 F.Supp. 280, 282 (S.D.N.Y.1988).* Moreover, the PSLRA provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint here is devoid of any such particularity.

Plaintiffs attempt to satisfy this pleading requirement in a single paragraph preceding paragraph 1 of their complaint, which states:
> Plaintiffs' information and belief is predicated upon, among other things, the investigation made by plaintiffs by and through their attorneys, which investigation included analyses of publicly available new articles, press

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
(Cite as: 1998 WL 283286 (S.D.N.Y.))

Page 3

releases, filings made by defendant Health Management Systems Inc.... with the Securities and Exchange Commission ("SEC") and other matters of public record. The plaintiffs' allegations provide little, if any, specificity about the foundation for their attorneys' allegations. In particular, the above quoted paragraph is insufficient because it does not indicate what publicly available articles, releases and filings the plaintiffs relied on, nor does it indicate what "other matters" of public record plaintiffs reviewed. See Crystal v. Foy, 80 Civ. 446, 1981 WL 1648 (S.D.N.Y. June 30, 1981)(where complaint provided that the basis for plaintiff's information and belief were public filings, news articles, press releases, research reports, and other public sources of information, complaint was deficient, because it failed to delineate the specific documents, articles and reports relied upon by plaintiff); Branch v. Tower Air, Inc., 94 Civ. 649935, 1995 WL 649935 (S.D.N.Y. Nov.3, 1995)(paragraph listing source of plaintiff's information and belief was insufficient where it failed to particularize portions of prospectus relied on, or even the title and author of numerous articles and reports plaintiff alleges it relied on).

Indeed, a paragraph similar to the one at issue here, was rejected as insufficiently specific in a recent case in this District, Novak v. Kasaks, 997 F.Supp. 425, 1998 WL 107033 (S.D.N.Y. March 10, 1998). In Novak, the plaintiffs based their allegations on an investigation of counsel, which included a "review of [defendant's] SEC filings, securities analysts reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants." Id. at *7. The court held that this paragraph failed to provide the required facts underlying the plaintiffs' allegations. Id. Similarly, here, none of the information specified in plaintiffs' introductory paragraph sufficiently delineates the source of the plaintiffs' allegations.

B. Fraud

*4 Even if plaintiffs had sufficiently identified the source of their allegations, they have failed to plead the elements of fraud with particularity. As discussed above, under the PSLRA, plaintiffs are required to specify each statement alleged to have been misleading, and the reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1)(B). Plaintiffs sufficiently identify the statements alleged to have been misleading. However, I find they have failed to plead with sufficient particularity the reasons why these statements are false or misleading.

The essence of the plaintiffs' complaint is that defendants made statements about the company's financial situation, but failed to disclose the financial difficulties that the company was having, including difficulties with several customers, decreasing margins and slowing or reversing revenue growth. Indeed, the complaint is replete with allegations that certain press releases and public filings were misleading because they failed to reveal that HMS was having problems receiving payments from unspecified customers, including HHL, and that HMS was suffering from "increased competition," lower margins, decreased profitability and "fee erosion." E.g., Compl. ¶¶ 78, 82, 86, 100, 111, 115. These general, conclusory allegations are wholly insufficient under Rule 9(b), let alone the PSLRA. See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir.1982). These allegations do not specify the customers involved, the nature of the customer's supposed payment problems, the nature or genesis of the alleged "increased competition," or the extent of the alleged lower margins or decreased profitability. See, e.g., Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1418-19 (7th Cir.1992)(complaint was insufficient where it failed to particularize alleged operational problems of "slackening demand, obsolete inventory, low-margin liquidations, and declining profit margins"); Tuchman v. DSC Comms. Corp., 818 F.Supp. 971, 977 (N.D.Tex.1993)(dismissing complaint because it referred to problems of increased competition and customer defections but did not specify the nature of the competition or of the customer defections, such as how many and which customers defected), aff'd, 14 F.3d 1601 (5th Cir.1994).

Plaintiffs' attempts to be more specific also fail. For example, plaintiffs point to several statements in press releases on February 27, 1996 and on May 28, 1996, indicating that the company had a solid quarter and looked forward to a fulfilling year. Compl. ¶¶ 77, 80. Plaintiffs allege that these statements were misleading because HMS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
(Cite as: 1998 WL 283286 (S.D.N.Y.))

Page 4

failed to state that it was experiencing requests for contract and contract payment deferrals. HMS also allegedly failed to disclose its problems with HHL, and that HHL "had stopped making payment to [HMS] at least as early as December 1995." Compl. ¶¶ 78, 82. As with the allegations of unnamed customer problems, plaintiffs' allegations regarding requests for contract deferrals are insufficient as they do not specify who requested the deferrals, when they were requested, the amounts at issue or any other facts sufficient to show the purportedly omitted information was material. See, e.g., Tuchman, 818 F.Supp. at 977. The allegation that HHL had stopped making payments in December 1995 is similarly devoid of sufficient factual support.

*5 Plaintiffs also argue that the May 28th press release was misleading because it stated that HMS had consistent operating margins, while HMS was actually experiencing decreased operating margins. However, the conclusory allegation that the opposite of a statement in a press release is true, without further factual elaboration, is insufficient. Leonard v. NetFRAME Sys., Inc., No. C-95-0238, 1995 WL 798923, *6 (N.D.Cal. Aug.8, 1995). Plaintiffs further allege that this release was misleading because it failed to mention an agreement reached between HMS and HHL regarding the offsetting of HHL's receivables. This agreement was subsequently disclosed in HMS's June 13, 1996 form 10-Q. The mere allegation that statements in one report should have been made earlier does not make out a claim of securities fraud. Acito v. IMCERA Group, 47 F.3d 47, 53 (2d Cir.1995); In re Glenayre Technologies, Inc. Securities Litigation, 982 F.Supp. 294, 297 (S.D.N.Y.1997).

Plaintiffs also allege that the earnings results that were stated in the May 28 press release, and in HMS's June 13, 1996 Form 10-Q, materially overstated HMS's earnings because HMS did not write-off receivables from HHL, or at least establish an appropriate reserve. Compl. ¶¶ 84, 87. The conclusory allegation that earnings are overstated or that accounting entries are improper is insufficient. See Decker, 681 F.2d at 116 (allegation that defendant did not write down value of certain facilities was insufficient); Shushany v. Allwaste, Inc. 992 F.2d 517, 522 (5th Cir.1993)(complaint failed to explain how allegedly faulty adjustments affected company's financial statements, or whether they were material).

Plaintiffs also allege that the August 21, 1996 press release was false in its statement that "[w]e do not expect future operating results to suffer as a consequence of this HHL write-off" and that the write-off was a "one-time charge." Compl. ¶ 91. Plaintiffs allege only in a conclusory fashion that defendants "failed to explain that the write-off was not the end of the HHL situation and the Company would sustain additional costs in winding down the HHL business." Compl. ¶ 100. Aside from the fact that HMS did end up spending more on the HMS situation than anticipated, the complaint wholly fails to specify how the statements in the August 21st release were false at the time they were made. Such allegations of fraud by hindsight are not actionable under the securities laws. See Acito, 47 F.3d at 53; Crystal v. Foy, 562 F.Supp. 422, 429 (S.D.N.Y.1983); Grossman v. Texas Commerce Bancshares, Inc., 87 Civ. 6295, 1995 WL 552744 (S.D.N.Y. Sept.15, 1995). Finally, the allegation that HMS's announcement on November 15, 1996 that its earnings were down was misleading because defendants "still failed to disclose that the Company was suffering increased competition, fee erosion and lower margins, all of which were contributing to reduced earnings even below the announced readjusted expectations" (Compl.¶ 115) is wholly insufficient, as discussed above. [FN2]

> FN2. Moreover, plaintiffs have failed to plead facts attributing certain securities analyst's statements to the defendants. Defendants cannot be held liable for reports prepared by analysts unless plaintiffs plead sufficient facts supporting a conclusion that defendants adopted, endorsed, or sufficiently entangled themselves with the analysts statements. See Elkind v. Liggett & Myers Inc., 635 F.2d 156, 163 (2d Cir.1980) To adequately plead "entanglement" plaintiffs must specify what information was supplied to the analyst, who supplied it and how defendants may have controlled the contents of the report. Pilarczyk v. Morrison Knudsen Corp., 965 F.Supp. 311, 320 (N.D.N.Y.1997). The complaint alleges that a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
(Cite as: 1998 WL 283286 (S.D.N.Y.))

Page 5

report published by the firm of Robinson-Humphrey Co. is attributable to defendants because it was written by a former CFO of HMS and because the information is of sufficient detail that it could only have come from defendants. Compl. ¶ 96. I find that these allegations do not sufficiently plead with particularity that defendants so thoroughly "entangled" themselves with such report as to render them liable for such reports. *See, e.g., Leonard,* 1995 WL 798923 at *7.

C. Scienter

*6 Although the above alone requires dismissal of the plaintiffs' complaint, I also find that plaintiffs have failed to plead with sufficient particularity facts that raise a strong inference of scienter. Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA has been interpreted to have strengthened the already stringent pleading requirements under Rule 9(b). *Novak,* 1998 WL 107033 at *5. In order to satisfy this pleading requirement, a plaintiff must now plead specific facts that create a strong inference of either knowing misrepresentation or conscious recklessness. *In re Glenayre Techs.,* 982 F.Supp. at 298. Moreover, under the PSLRA, a showing of motive and opportunity, without more, no longer suffices to raise a strong inference of scienter, although such facts can nevertheless be relevant to the scienter analysis. *In re Glenayre Techs.,* 982 F.Supp. at 298; *In re Baesa Sec. Litig.,* 969 F.Supp. 238, 242 (S.D.N.Y.1997).

Plaintiffs argue that they have plead a strong inference that defendants knew the various press releases and securities filings were materially false and misleading at the time they were made based on membership by four of the individual defendants, Kerz, Carson, Stowe and Holster, on the boards of both HMS and HHL. I find that the fact that four of the individual defendants were on the boards of HMS and HHL is insufficient to establish actual intent or conscious recklessness. Plaintiffs' theory is essentially that these four defendants must have known the true seriousness of the problems at HHL and that they must have communicated this information to the other individual defendants. This allegation fails to explain with sufficient particularity how it is the individual defendants supposedly had knowledge of the true seriousness of HHL's financial condition, or of the other problems HMS was allegedly having with its customers. Indeed, courts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook. *See, e.g., Melder v. Morris,* 27 F.3d 1097, 1103 (5th Cir.1994); *Glickman v. Alexander & Alexander Svcs., Inc.,* 93 Civ. 7594, 1996 WL 88570 at *14 (S.D.N.Y.Febr.29, 1996); *Grossman,* 1995 WL 552744 at *13.

Plaintiffs also argue that they have plead motive and opportunity based on suspicious insider selling activity by the individual defendants. Unusual insider trading activity during the class period may permit an inference of scienter; however, plaintiffs bear the burden of showing that any such sales are in fact unusual. *Acito,* 47 F.3d at 54; *In re Glenayre,* 982 F.Supp. at 299. Plaintiffs argue that since defendants Simon, McIntyre, Krez, Carson, Staffa, Stowe and Holster sold on average in excess of 20% of their holdings during the Class period, this constitutes a strong inference of suspicious trading. [FN3] However, defendant Siegel, the Chief Financial Officer of HMS sold no HMS shares during the Class Period and actually purchased shares during that period and defendant Holster also purchased shares during the Class Period. The fact that these defendants did not sell their shares undermines plaintiff's claim that defendants delayed notifying the public so that they could sell their stock at a huge profit. *Acito,* 57 F.3d at 54; *In re Glenayre,* 982 F.Supp. at 299. Moreover, the timing of the individual defendants' sales is not suspicious. There was no one particular event or events that triggered substantial sales by the individual defendants. Indeed, very few shares were sold after the May 28, 1996 press release, which plaintiffs claim artificially inflated HMS's share price; only defendants Simon and McIntyre sold any shares shortly after May 26. In addition, after the November 15, 1996 announcement which caused HMS's share price to plummet, both Kerz and Staff sold significant amounts of their shares. [FN4] Therefore, I find that plaintiffs have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235
**(Cite as: 1998 WL 283286 (S.D.N.Y.))**

Page 6

failed to meet the PSLRA's pleading requirements regarding scienter. [FN5]

> FN3. Defendants sales during the Class Period were: Kerz, 3.06%, Holster, 5.62%, Carson, 14.02%, Staffa, 22.94%, Simon 23.53%, Stowe 24.92%, and McIntyre 81.9%. While defendant McIntyre's sales were quite high during the Class Period, this was most likely on account of the fact that he resigned as an HMS director prior to January 1997 and was divesting himself of his shares. I note that absent his sales, the average sales of the individual defendants drops significantly, to about 15%.

> FN4. Plaintiffs' argument that HMS's acquisition of Quality Standards in Medicine using supposedly artificially inflated company stock as currency in negotiations also fails to establish motive. Desire to consummate corporate transaction does not constitute a motive for securities fraud. *See e.g., San Leandro, 75 F.3d at 814; Melder, 27 F.3d at 1102.*

> FN5. Plaintiffs allege that the individual defendants are liable as control persons under Section 20(a) of the Exchange Act. Since plaintiffs have failed to sufficiently plead their 10(b) claim, this claim must also be dismissed. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 704 (2d Cir.1994).*

*D. Individual Defendants*

*7 Outside director defendants Carson, Stowe, and Holster argue that the complaint should be dismissed against them because it fails to specify any false or misleading statements made by them. Defendant Phillip Siegel argues that the complaint should be dismissed against him because the facts alleged in the complaint negate any showing of scienter on his part. In light of the dismissal of the complaint with leave to replead, the court reserves judgment on these aspects of defendants' motions. Plaintiffs are encouraged, however, to address these concerns if they choose to replead.

*IV. Conclusion*

For the foregoing reasons, the motion to dismiss is GRANTED, with leave to replead within 30 days of the date of this opinion.

SO ORDERED.

Not Reported in F.Supp., 1998 WL 283286 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,235

**Motions, Pleadings and Filings (Back to top)**

• 1:97cv01865 (Docket) (Mar. 17, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

LEXSEE 2005 U.S. APP. LEXIS 27412

IN RE: MERCK & CO., INC. SECURITIES LITIGATION UNION INVESTMENTS PRIVATFONDS GMBH, Lead Plaintiff and the Class, Appellants

No. 04-3298

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

432 F.3d 261; 2005 U.S. App. LEXIS 27412; Fed. Sec. L. Rep. (CCH) P93,606

September 29, 2005, Argued
December 15, 2005, Filed

**PRIOR HISTORY:** [*1] Appeal from the United States District Court for the District of New Jersey. (D.C. Civil Action No. 02-cv-03185). District Judge: Honorable Stanley R. Chesler. *In re Merck & Co., Inc. Sec. Litig., 2004 U.S. Dist. LEXIS 28930 (D.N.J., July 6, 2004)*

**COUNSEL:** Sanford P. Dumain, Esquire (Argued), Milberg Weiss Bershad & Schulman, New York, NY; Daniel L. Berger, Esquire, Erik J. Sandstedt, Esquire, Bernstein Litowitz Berger & Grossman LLP, New York, NY, Counsel for Appellant.

Daniel J. Kramer, Esquire (Argued), Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY; Gregory B. Reilly, Esquire, Deborah A. Silodor, Esquire, Lowenstein Sandler, Roseland, NJ, Counsel for Appellees.

**JUDGES:** Before: ALITO, and AMBRO, Circuit Judges RESTANI,* Chief Judge.

* Honorable Jane A. Restani, Chief Judge, United States Court of International Trade, sitting by designation.

**OPINIONBY:** AMBRO

**OPINION:**

OPINION OF THE COURT

AMBRO, Circuit Judge

Merck & Co., Inc. planned an initial public offering of its wholly owned subsidiary—Medco Health Solutions, Inc. Before the IPO was to occur, however, information about Medco's aggressive revenue-recognition [*2] policy came to light. Some details about the policy were disclosed in Merck's registration statements filed with the Securities and Exchange Commission, but a *Wall Street Journal* article reading between the lines of this disclosure precipitated a decline in Merck's stock. After further disclosures and larger declines in Merck's stock price, the Medco IPO was canceled. Union Investments Privatfonds GmbH, as lead plaintiff for a class of Merck stockholders, claims that Merck and Medco committed securities fraud under *section 10(b)* of the Securities Exchange Act of 1934 and that Merck's officers made material misstatements or omissions in the registration statements in violation of *section 11* of the Securities Act of 1933. Union also alleges that the Merck officers and Merck, as Medco's parent company, are jointly and severally liable as controlling persons under *section 20(a)* of the '34 Act. The District Court dismissed all of these claims on a motion under *Federal Rule of Civil Procedure 12(b)(6)*. We affirm.

**I. Factual Background and Procedural History**

Because we review this case at the *Rule 12(b)(6)* stage, we take as true the facts pled in the plaintiff's complaint. Union [*3] is the lead plaintiff for a class of investors owning stock in Merck, a global pharmaceutical company. n1 This suit stems from the actions surrounding Merck's plan to spin off Medco in a 2002 initial public offering. Union alleges that Medco engaged in improper accounting practices, which were not fully disclosed until, after several amendments, Merck filed a registration statement gaining SEC approval. Union further alleges that Merck and Medco made misleading statements about the post-IPO independence of the two entities.

n1 The class period runs from January 26, 2000, to July 9, 2002.

Merck first announced its plans for the Medco IPO in a January 2002 press release, in which Raymond Gilmartin,

Page 2
432 F.3d 261; 2005 U.S. App. LEXIS 27412, *3;
Fed. Sec. L. Rep. (CCH) P93,606

Merck's Chairman and CEO, said that the two companies would pursue independent strategies for success. On April 17, 2002, Merck filed its first Form S-1 with the SEC. The SEC did not approve this S-1, and Merck kept trying, finally securing SEC approval with its fifth S-1, filed on July 9. Market reaction led Merck [*4] to drop Medco's offering price, to postpone indefinitely the IPO, and finally to drop the IPO altogether.

### A. Medco's revenue-recognition policy

Medco is a pharmacy benefits manager (PBM). It saves its clients (plan sponsors) money by negotiating discount rates with pharmacies and influencing doctors to prescribe cheaper, but still therapeutically appropriate, medicines. When a customer buys drugs at a local pharmacy, the pharmacist checks with Medco to ensure that the customer is an approved beneficiary. Then the customer makes a co-payment—usually between $5 and $15—which goes directly to the pharmacy, not to Medco.

Although Medco did not handle these co-payments, it interpreted the accounting standards to allow it to recognize the co-payments as revenue. n2 But it did not disclose this revenue-recognition policy. In fact, Merck's 1999 SEC Form 10-K stated that Medco recognized revenue "for the amount billed to the plan sponsor." After Merck changed auditors, and before it began filings for the Medco IPO, it changed this language in its 2001 Form 10-K to state that revenues were "recognized based on the prescription drug price negotiated with the plan sponsor."

> n2 Merck apparently subtracted out these co-payments later, so its profit numbers were unaffected by this policy.

[*5]

Merck's April 17 Form S-1 disclosed for the first time that Medco had recognized as revenue the co-payments paid by consumers, but it did not disclose the total amount of co-payments recognized. The day this S-1 was filed, Merck's stock price went up $0.03—from $55.02 to $55.05. n3 Merck filed an amendment to its S-1 on May 21 and another on June 13.

> n3 We can take judicial notice of Merck's stock prices even on a motion to dismiss because these facts are "not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned." *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000).

On June 21, 2002, *The Wall Street Journal* reported that Medco had been recognizing co-payments as revenue and estimated that in 2001 $4.6 billion in co-payments had been recognized. Barbara Martinez, *Merck Included Co-Payments Among Revenue*, Wall St. J., June 21, 2002, at C1. Later disclosures would show the actual [*6] number to be $5.54 billion. The market's reaction was immediate; that day Merck's stock lost $2.22—dropping from $52.20 to $49.98. Six days later, Merck announced the postponement of the Medco IPO and indicated that it would drop Medco's offering price.

Merck filed its fourth S-1 on July 5, 2002, finally disclosing the full amount of co-payments it had recognized as revenue. The S-1 showed that Medco had recognized over $12.4 billion dollars in co-payments as revenue, $2.838 billion in 1999, $4.036 billion in 2000, and $5.537 billion in 2001. Four days later, Merck announced that it would postpone the Medco IPO indefinitely, even as it filed its last S-1, which was approved by the SEC.

Merck's stock continued to fall, reaching $45.75 on July 9, the end of the class period, and $43.57 on July 10.

### B. Merck's and Medco's independence

In the January 2002 press release, Gilmartin said, regarding the planned Medco IPO, "We believe the best way to enhance the success of both businesses going forward is to enable each one to pursue independently its unique and focused strategy." The independence of Merck and Medco had been and was to become a subject of some debate. [*7]

The Federal Trade Commission had launched an investigation of Medco in 1996 to determine whether it was giving preferential treatment to Merck's drugs. (The FTC also investigated some of Merck's competitors for similar reasons.) Other drug manufacturers divested their PBMs, but Merck kept Medco. In 1998 Merck entered into an FTC consent decree, which suggested, *inter alia*, that Medco had given favorable treatment to Merck's drugs.

Merck and Medco throughout the class period asserted that the two companies stayed independent. Both companies maintained policies of independence posted on their websites.

But Union produced data suggesting that Merck's market share of drugs sold by Medco was in several instances much higher than Merck's national market share. In its April 2002 S-1, Merck disclosed that post-IPO Medco would be obligated to continue this elevated level of Merck drug sales; the two companies had signed an agreement requiring Medco to sell a higher share of Merck drugs than Merck's national third-party market share. The May and June amendments to the S-1 fleshed out the terms of this agreement, which required Medco to pay

432 F.3d 261; 2005 U.S. App. LEXIS 27412, *7;
Fed. Sec. L. Rep. (CCH) P93,606

Page 3

Merck 50% of its lost revenue if it failed to [*8] hit the sales targets.

### C. The class action is filed

The initial complaint was filed in July 2002. Union was appointed lead plaintiff in November 2002, and it filed its corrected amended complaint in March 2003. At the time, Union's lead counsel was Bernstein Litowitz Berger & Grossman LLP. Defendants filed a motion to dismiss pursuant to *Rule 12(b)(6)*, and the District Court granted it in July 2004. Union appealed that decision in August 2004. Only then did it hire Milberg Weiss Bershad & Schulman LLP as its counsel for this appeal.

### II. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction under *28 U.S.C. § 1331* and under *15 U.S.C. §§ 77v* and *78aa*. It granted a motion to dismiss under *Rule 12(b)(6)*, so we have jurisdiction under *28 U.S.C. § 1291*.

We exercise plenary review of the District Court's grant of a *Rule 12(b)(6)* motion, and "we apply the same test as the district court." *Maio v. Aetna, Inc., 221 F.3d 472, 481 (3d Cir. 2000)*. In reviewing the motion to dismiss, we must accept as true all facts alleged in the complaint and view them in the light most favorable to Union. [*9] *Id. at 482*. Union's claims are also subject to the heightened pleading standards set forth in *Federal Rule of Civil Procedure 9(b)* and under the Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified in scattered sections of 15 U.S.C.), pursuant to *15 U.S.C. § 78u-4(b)(1)*.

### III. Discussion

#### A. May Union retain Milberg Weiss to prosecute this appeal?

Lead plaintiffs in securities class actions must secure court approval of their counsel, but Union retained Milberg Weiss as appellate counsel after the notice of appeal was filed and without any court's approval. We decide that Milberg Weiss may prosecute this appeal but that future lead plaintiffs must obtain court approval for any new counsel, including appellate counsel.

Congress passed the PSLRA in part to reduce abusive class action litigation. S. Rep. No. 104-98, at 10-11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 689-90. To this end, the PSLRA requires courts to appoint as lead plaintiff the "most adequate plaintiff"—the plaintiff with the most money at stake. *15 U.S.C. § 78u-4(a)(3)*. The theory behind this requirement is that plaintiffs with the largest financial [*10] interests, typically institutional investors, will best represent the plaintiff class's interests and will choose the best counsel. Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale. L.J. 2053, 2105 (1995); see also S. Rep. No. 104-98, at 11 nn.32, 34, *reprinted in* 1995 U.S.C.C.A.N. 679, 690 (citing Weiss & Beckerman, *supra*).

Although Congress was confident that the lead plaintiff would select the best counsel, it relied on the courts' power to "approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class." S. Rep. No. 104-98, at 12, *reprinted in* 1995 U.S.C.C.A.N. 679, 691. Thus, the PSLRA provides that the "most adequate plaintiff shall, *subject to the approval of the court*, select and retain counsel to represent the class." *15 U.S.C. § 78u-4(a)(3)(B)(v)* (emphasis added). This is not an empty requirement; courts have the "power and the duty to supervise counsel selection and counsel retention." [*11] *In re Cendant Corp. Litig., 264 F.3d 201, 273 (3d Cir. 2001)*.

Union was selected lead plaintiff, and the District Court approved Bernstein Litowitz Berger & Grossman LLP as lead counsel. But as noted, after the notice of appeal was filed, Union retained Milberg Weiss as appellate counsel. Bernstein Litowitz consented to Milberg Weiss's retention, but Union neither sought nor obtained the District Court's approval of Milberg Weiss as class counsel.

In its brief, Merck challenges Milberg Weiss's ability to prosecute this appeal without court approval, and Union responds with three arguments. We deal with each in turn.

First, Union argues that Merck does not have standing to protest the choice of lead counsel. We find few cases, from our Court or others, that have addressed this issue. It could be that defendants' ability to challenge lead counsel selection is the same as their ability to challenge lead plaintiff selection. If so, the weight of authority falls against Merck. Compare *King v. Livent, Inc., 36 F. Supp. 2d 187, 190-91 (S.D.N.Y. 1999)* (granting the defendant standing to challenge a motion to appoint a lead plaintiff and lead counsel), with [*12] *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 127 F. Supp. 2d 572, 575 n.2 (D.N.J. 2001)* (stating that the majority of courts have denied defendants the right to challenge "the adequacy of lead plaintiffs and their chosen counsel" and citing cases), *Gluck v. CellStar Corp., 976 F. Supp. 542, 550 (N.D. Tex. 1997)* (deciding that defendants could not challenge the appointment of a lead plaintiff), *and Greebel v. FTP Software, Inc., 939 F. Supp. 57, 60 (D. Mass. 1996)* (same). This makes sense because defendants will rarely have the best interests of the class at heart. *See, e.g., 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)* (allowing only "a

432 F.3d 261; 2005 U.S. App. LEXIS 27412, *12;
Fed. Sec. L. Rep. (CCH) P93,606

member of the purported plaintiff class" to rebut the lead plaintiff presumptions); *Cendant*, 264 F.3d at 268; Weiss & Beckerman, *supra*, at 2106 n.255.

On the other hand, it may be that defendants' ability to challenge lead counsel is separate from their inability to challenge lead plaintiff's appointment. At least one court has allowed a defendant to challenge the selection of lead counsel. See [*13] *In re USEC Secs. Litig.*, 168 F. Supp. 2d 560, 568 (D. Md. 2001) ("The defendants challenge the [plaintiffs'] selection of two separate law firms as lead counsel."). When the challenge is not to adequacy but is, as here, to a lead plaintiff's procedural failure to secure court approval, we hold that defendants do have standing to challenge the retention of lead counsel.

Second, Union claimed that the PSLRA does not prevent it from retaining unapproved appellate counsel, which it characterized as somehow different from lead counsel. Merely stating this argument lays out the span of such a stretch. The PSLRA does not distinguish between lead counsel and appellate counsel; it simply requires court approval of class "counsel." *15 U.S.C. § 78u-4(a)(3)(B)(v)*. The court has a duty to consider the lead plaintiff's choice and whether it should be approved. *Cendant*, 264 F.3d at 275. This inquiry is "limited to whether the lead plaintiff's selection and agreement with counsel are reasonable on their own terms," *id. at 276*, but it is an inquiry that must be made. We hold that all retentions of class counsel by the lead plaintiff—whether lead counsel, trial counsel, or appellate [*14] counsel n4—require court approval under the PSLRA.

> n4 We note in passing that lead plaintiffs may retain multiple firms as co-lead counsel, *cf. Miller v. Ventro Corp.*, 2001 U.S. Dist. LEXIS 26027, No. 01-CV-1287, 2001 WL 34497752, at *13 (N.D. Cal. Nov. 28, 2001) ("If [plaintiffs] believe that more than one law firm is necessary, they must demonstrate to the Court's satisfaction the need for multiple lead counsel."), but court approval is still required, *cf. Martin v. Atchison Casting Corp.*, 200 F.R.D. 453, 458 (D. Kan. 2001) (requiring information about proposed new lead counsel before the court would approve the plaintiff's attempt to switch lead counsel).

Third, Union argues that its retention of Milberg Weiss is valid by virtue of a jurisdictional loophole: the District Court lost jurisdiction after the filing of the notice of appeal, and our Court is not in a position to make the findings required to approve new lead counsel. [*15] While it is generally true that district courts are divested of jurisdiction—and lose the power to act—once the notice of appeal is filed, there are "exceptions to this general rule." *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1314 (3d Cir. 1994). We have identified several, but "limited," instances in which a district court retains its power to act; a court may, for example, review attorney's fees applications, order the filing of bonds, modify or grant injunctions, issue orders regarding the record on appeal, and vacate bail bonds and order arrests. *Venen v. Sweet*, 758 F.2d 117, 120 n.2 (3d Cir. 1985). We limit these exceptions to avoid the "confusion and inefficiency" of having two courts dealing with the same issues. *Id. at 121*.

The power to approve lead plaintiffs' counsel under the PSLRA would not engender this same kind of "confusion and inefficiency"—the approval or disapproval of counsel would lie with the district court, and we typically would not need to second-guess or make this decision ourselves. Therefore, we add this approval power to the short list of actions a district court may take during the pendency of an appeal.

That leaves [*16] this case, in which for the sake of efficiency we eschew a remand and proceed as if Milberg Weiss were approved as appellate counsel. Moreover, because we affirm the District Court's opinion, we do not require Union to secure *ex post* approval for this appeal.

**B. Does Union have a valid claim under section 10(b)?**

Section 10(b) of the Exchange Act makes it "unlawful" to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *15 U.S.C. § 78j(b)*. Rule 10b-5 makes it illegal, as a manipulative or deceptive device, "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R § 240.10b-5.

To make out a securities fraud claim under *section 10(b)*, a plaintiff must show that "(1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) the defendant acted with scienter; and (3) [*17] the plaintiff's reliance on the defendant's misstatement caused him or her injury." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997)). These requirements are heightened by the PSLRA, which requires that the complaint "state with particularity all facts on which [plaintiff's] belief is formed." *15 U.S.C. § 78u-4(b)(1)*. At issue in this case

432 F.3d 261; 2005 U.S. App. LEXIS 27412, *17;
Fed. Sec. L. Rep. (CCH) P93,606

Page 5

is whether Merck's statements were material and whether Union properly alleged "false or misleading" statements by Merck and Medco.

### 1. When Merck disclosed information regarding its revenue calculations, was the disclosure material?

We have said that establishing materiality is the "first step" for a plaintiff with a *section 10(b)* claim. *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)*. The District Court discussed briefly the issue of materiality regarding Union's *§ 10(b)* claim, but it did not reach the issue because it ultimately found that Union had failed sufficiently to show scienter. Union argues that Merck's statements were material, citing the fact that Merck's stock [*18] dropped significantly when *The Wall Street Journal*'s article detailing Medco's accounting practices appeared. Merck claims that because its stock price rose immediately following its initial, minimal disclosure, the disclosure was immaterial as a matter of law.

Our Court, as compared to the other courts of appeals, has one of the "clearest commitments" to the efficient market hypothesis. n5 Nathaniel Carden, Comment, *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency*, 65 U. Chi. L. Rev. 879, 886 (1998). Our 1997 *Burlington* opinion created a standard for measuring the materiality of statements in an efficient market. n6 *See 114 F.3d at 1425*. In 2000, we ratified the *Burlington* standard post-PSLRA in *Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000)* (citing *Burlington*). The *Oran - Burlington* standard holds that "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." *Id.*

> n5 We have defined an efficient market as that in which "information important to reasonable investors (in effect, the market) is immediately incorporated into stock prices." *Burlington, 114 F.3d at 1425* (citation omitted).

[*19]

> n6 Union has alleged that Merck's stock traded on an efficient market. Compl. P212(c).

In *Oran*, information was disclosed on July 8, and the stock price rose for four days afterward. We held that the failure to disclose the information earlier was immaterial. *Id. at 283*. Similarly, in *In re NAHC, Inc. Securities Litigation*, we discerned "no negative effect" on a company's stock price "immediately following" the date of disclosure. *306 F.3d 1314, 1330 (3d Cir. 2002)*. Again, we held the disclosed information immaterial as a matter of law. *Id.*

In this case, the disclosure occurred on April 17, and there was no negative effect on Merck's stock. *The Wall Street Journal*'s article, accompanied by a significant decline in Merck's stock, appeared two months later. Union claims that this June stock decline demonstrates the materiality of the information Merck disclosed. But the situation we faced in *NAHC* was similar: the company's stock price plunged 75% just three weeks after the disclosure was made. [*20] *Id. at 1321*. That disclosure was made on November 2, with no negative effect on the stock price, but the stock plummeted on November 26, after another disclosure. *Id. at 1321, 1330*. We held the first disclosure not material. Merck's stock did not drop after the first disclosure, and that is generally when we measure the materiality of the disclosure, not two months later.

In *Basic Inc. v. Levinson*, the Supreme Court declined to resolve "how quickly and completely publicly available information is reflected in market price." *485 U.S. 224, 248 n.28, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*. Union tells us that we cannot therefore apply the *Oran - Burlington* standard. But it overlooks that our Court has resolved how "quickly and completely" public information is absorbed into a firm's stock price. We have decided that this absorption occurs "in the period immediately following disclosure." *Oran, 226 F.3d at 282*.

This does not mean instantaneously, of course, but in this case there was no adverse effect to Merck's stock price from the disclosure "in the period immediately following disclosure." In fact, Merck's stock continued to rise from its baseline of $55.02, [*21] including the April 17 S-1 filing date, for five trading days after the disclosure. The five-trading-day rise was followed by a five-trading-day decline, which reached a low of $54.34. Then, starting on May 1, 2002, Merck's stock remained above $55.02 until June 4. But Union expects us to ignore this one-month increase in Merck's stock price in favor of a five-day decline of little over 1%. This we will not do.

Union also argues that the April 17 disclosure was so opaque that it should not have counted as a disclosure. Although Merck disclosed that it had recognized co-payments as revenue in April, it did not disclose the sum total of those co-payments until July. This is why, Union claims, the stock price did not drop until *The Wall Street Journal*'s reporter made public the estimated magnitude of the co-payment recognition. In effect, Union is arguing that investors and analysts stood in uncomprehending suspension for over two months until the *Journal* brought light to the market's darkness.

432 F.3d 261; 2005 U.S. App. LEXIS 27412, *21;
Fed. Sec. L. Rep. (CCH) P93,606

The *Journal* reporter arrived at an estimate of $4.6 billion of co-payments recognized in 2001 by using one assumption and performing one subtraction and one multiplication on the [*22] information contained in the April S-1. She determined the number of retail prescriptions filled (462 million) by subtracting home-delivery prescriptions filled (75 million) from total prescriptions filled (537 million). She then assumed an average $10 co-payment and multiplied that average co-payment by the number of retail prescriptions filled to get $4.6 billion. n7

> n7 Union makes much of the difference between the estimated $4.6 billion and the actual $5.54 billion, but had the *Journal* reporter used a slightly higher average co-payment, this difference would have been smaller. She noted that "$ 10 to $15 is typical in the industry." *Martinez, supra.* Had she used $12.50, the average of $10 and $15, she would have come up with $5.78 billion.

The issue is whether needing this amount of mathematical proficiency to make sense of the disclosure negates the disclosure itself. We scrutinized a disclosure requiring calculation in [*23] *Ash v. LFE Corp., 525 F.2d 215 (3d Cir. 1975).* A proxy statement disclosed directors' current pension amounts and, in another section, their newly proposed pension amounts, but it did not disclose the increase. *Id. at 218.* We held that requiring readers to perform the subtraction themselves was immaterial because the "facts were disclosed prominently and candidly." *Id. at 219* ("We decline to hold that those responsible for the preparation of proxy solicitations must assume that stockholders cannot perform simple subtraction."). The calculation from Merck's S-1 was somewhat more complex—it required some close reading and an assumption as to the amount of the co-payment. But the added, albeit minimal, arithmetic complexity of the calculation hardly undermines faith in an efficient market.

Union points out nonetheless that Merck was followed by many analysts, including J.P. Morgan, Morgan Stanley, and Salomon Smith Barney, who "closely examine a company's revenue and revenue growth when valuing a company's stock" in Merck's industry. Compl. P9. The logical corollary of Union's argument then is the following rhetorical question: If these analysts—all focused on revenue—were [*24] unable for two months to make a handful of calculations, how can we presume an efficient market at all? Union is trying to have it both ways: the market understood all the good things that Merck said about its revenue but was not smart enough to understand the co-payment disclosure. n8 An efficient market for good news is an efficient market for bad news. The *Journal* reporter simply did the math on June 21; the efficient market hypothesis suggests that the market made these basic calculations months earlier.

> n8 Union needs the market to be efficient. With an efficient market it can use the fraud-on-the-market theory, which allows it to meet its *section 10(b)* reliance requirement. *See Burlington, 114 F.3d at 1415 n.1, 1419 n.8.* The fraud-on-the-market theory supposes that "'the price of a company's stock is determined by the available material information regarding the company and its business.'" *Basic Inc., 485 U.S. at 241, 108 S. Ct. 978, 99 L. Ed. 2d 194* (quoting *Peil v. Speiser, 806 F.2d 1154, 1160 (3d Cir. 1986)).*

[*25]

But we do not wish to reward opaqueness. We decline to decide how many mathematical calculations are too many or how strained assumptions must be, but Merck was clearly treading a fine line with this delayed, piecemeal disclosure. It should have disclosed the amount of co-payments recognized as revenue in the April S-1; it should have disclosed this revenue-recognition policy as soon as it was adopted. Sunshine is a fine disinfectant, and Merck tried for too long to stay in the shade. The facts were disclosed, though, and it is simply too much for us to say that every analyst following Merck, one of the largest companies in the world, was in the dark.

**2. Did Union properly allege that "false or misleading" statements were made by Merck and Medco?** n9

> n9 Scienter and reliance typically would come next in our analysis after materiality. *See Burlington, 114 F.3d at 1417.* But because we have decided that the initial S-1 disclosure was not materially false or misleading and did not omit sufficient facts, we do not discuss scienter here.

[*26]

i) *Were the Merck and Medco statements regarding their independence false or misleading?*

Union's complaint alleges that Medco made false statements about Merck's and Medco's independence. The District Court held that these statements were not actionable because Union's supporting evidence came mostly from dates outside the class period. Medco's website contained statements about Medco's independence policy. The website stated, among other things, that Medco would "make decisions on the therapeutic aspects of its programs without substantive influence from Merck" and would "treat Merck products no differently from those of any other manufacturer, observing the same procedures

432 F.3d 261; 2005 U.S. App. LEXIS 27412, *26;
Fed. Sec. L. Rep. (CCH) P93,606

for independent clinical review as it does for drugs of any other manufacturer." Compl. P126. Union produced data showing the extent to which Merck's market share among Medco beneficiaries was significantly higher than its nationwide market share.

The District Court discarded this market-share evidence, holding it unusable because most of it arose from outside the class period. To support its holding, the Court cited only a case from the Northern District of California, *Clearly Canadian*, which held "statements [*27] made or insider trading" done outside the class period "irrelevant to [the] plaintiffs' fraud claims." *In re Clearly Canadian Sec. Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995). The *Clearly Canadian* Court, though, had just denied the defendants' motion to dismiss and was striking from the plaintiffs' complaint nearly 20 pages of allegations of statements and insider trading from outside the class period. *Id.* The Court was removing out-of-period claims because the defendants were not liable for them; it was not addressing their relevance as evidence.

Two Second Circuit cases have, however, addressed out-of-period information for the purposes of allowing inferences to be drawn. In *Novak v. Kasaks* the plaintiffs' complaint provided facts about inventory write-offs from after the expiration of the class period, and the Court held that those facts supported the plaintiffs' allegations that inventory issues existed during the class period. *216 F.3d 300, 312-13 (2d Cir. 2000)*. It further held that a report showing inventory information "six months after the Class Period . . . supports the inference that inventory during the Class Period was similar." [*28] *Id. at 313*. In a 2001 case the Second Circuit reversed the District Court, holding that pre-class data was relevant to show defendants' knowledge at the start of the class period. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). The Court made clear that both post-class-period data and pre-class data could be used to "confirm what a defendant should have known during the class period," noting that "any information that sheds light on whether class period statements were false or materially misleading is relevant." *Id.*

The District Court in our case found that Union could not "rely on statistical data collected prior to the commencement of the class period . . . to buttress [its] contention that the statements on Medco's website were misleading." *In re Merck & Co., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 28930, No. 02-CV-3185 (SRC), slip op. at 34 (D.N.J. July 6, 2004). This finding directly conflicts with the Second Circuit's holding in *Scholastic*, and the *Clearly Canadian* case is meager support. We shall follow the Second Circuit here and hold the pre-class data regarding Merck's market share relevant to showing Medco's statements [*29] to be misleading. The District Court therefore incorrectly disregarded the evidence of Medco's favoritism toward Merck products. n10

> n10 We of course do not remand this case, because we held against Union on materiality.

ii) *Did Gilmartin's January 2002 statement fall within the "forward-looking statement" safe harbor?*

Union alleged that Gilmartin's statement in a January 2002 press release was false and misleading. As we noted, Gilmartin, discussing the planned Medco IPO, said, "We believe the best way to enhance the success of both businesses going forward is to enable each one to pursue independently its unique and focused strategy." The District Court held that this statement fell within the "forward-looking statement" safe harbor, thereby foreclosing liability for the statement. Union argues that this statement cannot meet the safe harbor's requirements because it was about a planned initial public offering.

Concerned about the effect of litigation's specter on corporate disclosure, Congress created [*30] in the PSLRA a safe harbor for forward-looking statements. S. Rep. No. 104-98, at 16, *reprinted in* 1995 U.S.C.C.A.N. 679, 695. This safe harbor is designed to shield statements like those regarding revenue projections and future business plans from leading to liability. *Id.* at 17, *reprinted in* 1995 U.S.C.C.A.N. 679, 696.

But the safe harbor does not apply to statements "made in connection with an initial public offering." *15 U.S.C. § 78u-5(b)(2)(D)*. It can be assumed that statements made in a registration statement and prospectus filed for an IPO are made "in connection with" that IPO. *See, e.g., In re Ravisent Techs., Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 13255, No. Civ.A. 00-CV-1014, 2004 WL 1563024, at *11 n.27 (E.D. Pa. July 13, 2004) (registration statement); *In re Musicmaker.com Sec. Litig.*, 2001 U.S. Dist. LEXIS 25118, No. CV00-2018 CAS(MANX), 2001 WL 34062431, at *13 n.7 (C.D. Cal. June 4, 2001) (registration statement and prospectus). One case has suggested that statements made at pre-IPO presentations are "in connection with" an IPO. *See* [*31] *In re Ins. Mgmt. Solutions Group, Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 9962, No. 8:00CV2013T26MAP, 2001 WL 34106903, at *1, *9 (M.D. Fla. July 11, 2001).

We hold today only that a statement made in a press release several months before a planned IPO that never subsequently happened is not "in connection with" an IPO. We do not address, however, whether statements made in registration statements and prospectuses may lead to liability if an IPO does not occur. n11

n11 We find unpersuasive Union's arguments that the cautionary language was insufficient, that Gilmartin had actual knowledge, and that the statement was not mere puffery; therefore, we do not address them in detail. The cautionary language was sufficient because the press release incorporated by reference the cautionary statements in Merck's 2000 Form 10-K, as well as those in its periodic reports. Cautionary statements do not have to be in the same document as the forward-looking statements. Cf. *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 875 (3d Cir. 2000). Union could not establish Gilmartin's actual knowledge of the alleged falsity of his statement based on his position alone. See *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999). And his statement could also have been mere puffery, because it was a "vague and general statement of optimism," *id. at 538*.

[*32]

### C. Was the April 17 registration statement disclosure material under section 11?

*Section 11* of the 1933 Securities Act provides a private right of action to individuals who have suffered harm from misstatements in an issuer's registration statement. *15 U.S.C. § 77k(a)*. Because the S-1 is a registration statement, the April 2002 disclosure regarding Medco's revenue-recognition policy can be subject to a *section 11* claim as well as a *section 10(b)* claim. We have already decided that this disclosure was not material under *section 10(b)*. The question we must now decide is whether it was material under *section 11*.

The District Court dismissed Union's *section 11* claims as by law immaterial. Union claims that the market's failure to react to a disclosure is an invalid basis for dismissing a *section 11* claim, and it cites a 2004 case from our Circuit, *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267 (3d Cir. 2004), for the proposition that the *Oran–Burlington 10(b)* materiality standard does not apply to *section 11* claims.

A *section 11* claim looks to whether a registration statement "contains an untrue statement of a material fact or omits to state a material fact required [*33] to be stated therein or necessary to make the statements therein not misleading." *15 U.S.C. § 77k(a)*. We have made it clear that claims under both *section 11* and *section 10(b)* require a showing of a "material" misrepresentation or omission.

We first noted that *section 11(a)* and Rule 10b-5 shared the materiality element in our *Craftmatic* opinion, where we adopted the Supreme Court's *TSC* materiality definition (substantial likelihood of importance to a reasonable shareholder) for both. *In re Craftmatic Sec. Litig., 890 F.2d 628, 641 & n.18 (3d Cir. amended 1990)* (citing *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976))*. In *Trump* we said that the "materiality requirement" was "common to" *section 11* and *section 10(b)* claims. *In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig., 7 F.3d 357, 368 n.10 (3d Cir. 1993)*. We also reiterated that the Supreme Court's *TSC* materiality definition applied to *section 10* and *section 11* actions. *Id. at 369*. In *Westinghouse* we again noted that *sections 10(b)* and *11* both required "that plaintiffs allege a *material* misstatement or omission." [*34] *In re Westinghouse Sec. Litig., 90 F.3d 696, 707 (3d Cir. 1996)* (emphasis in original).

We created a test for materiality under *section 10(b)* in *Burlington*. The *TSC* materiality definition "ordinarily" applies, but in efficient markets materiality is defined as "information that alters the price of the firm's stock." *Burlington, 114 F.3d at 1425*. We reached this conclusion in two steps. First, "reasonable investors" are the market. Second, information important to the market will be reflected in the stock's price. Thus, "information important to reasonable investors . . . is immediately incorporated into stock prices." *Id.*

*Sections 11* and *10(b)* share the materiality element and the *TSC* materiality definition. In the context of an efficient market, they also share the stock-price test for materiality. If a company's stock trades on an efficient market, we measure materiality under the *Burlington* (as ratified in *Oran*) standard. Thus, "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." [*35] *Oran, 226 F.3d at 282*.

Our opinion in *Adams Golf*, however, may be read by some to hold that the *Oran – Burlington* materiality inquiry did not apply to actions brought under *section 11*. Adams Golf is a manufacturer of specialty golf equipment, best known for its Tight Lies golf clubs. The company sold its shares in an initial public offering on July 10, 1998. *Id. at 270*. Part of its business strategy was to sell its clubs only through "authorized dealers," but before the IPO it discovered that Costco, the discount warehouse retailer, was selling its clubs. Adams Golf issued a pre-IPO press release on June 9, 1988, disclosing that an unauthorized dealer was selling Tight Lies clubs. *Id. at 271*. This "gray market" distribution of Adams Golf's clubs created a short-term revenue boost around the time of the IPO but cannibalized later sales. *Id. at 271-72*. The company therefore predicted disappointing financial performance and issued a press release to that effect on January 7,

Page 9
432 F.3d 261; 2005 U.S. App. LEXIS 27412, *35;
Fed. Sec. L. Rep. (CCH) P93,606

1999. The stock price dropped 17 percent after this press release with an increase in trading volume from 58,000 to 1.2 million. [*36] *Id. at 277 n.11*.

Under *section 10(b)*, plaintiffs have to plead loss causation—*i.e.*, that the misrepresentation caused the stock price drop. *Id. at 277*. *Section 11* plaintiffs do not have to plead loss causation. *Id*. Instead, it is an affirmative defense in *section 11* cases; defendants can limit damages by showing that the plaintiffs' losses were caused by something other than their misrepresentations. *15 U.S.C. § 77k(e)*. The defendants in *Adams Golf* were contesting materiality under *Burlington* by pointing to the absence of a stock-price decline after the press release (although the stock dropped 17 percent, it only dropped from $4.63 to $3.88, *Adams Golf, 381 F.3d at 277*). The *Adams Golf* Court interpreted the defendants' argument as an attempt to make an affirmative loss-causation defense, and it declined to apply *Burlington*. *Id*. It reasoned that, because *Burlington* was a Rule 10b-5 case with a loss-causation requirement plaintiffs must meet, it did not apply to a *section 11* case with no loss-causation requirement. *Id*.

With that backdrop, we do not read [*37] *Adams Golf* as altering the *Oran - Burlington* materiality standard for *section 11* claims. First, because our Court in *Adams Golf* both knew of and referred to *Westinghouse*, *Trump*, and *Craftmatic*, and inasmuch as precedential cases cannot be overruled unless by the Circuit *en banc*, Third Circuit Internal Operating Procedure 9.1, it is obvious that *Adams Golf* did not intend to conflict with the three earlier decisions equating *section 11*'s materiality element with *section 10(b)*'s.

Second, the *Oran-Burlington* standard applies only to "efficient markets." *Burlington, 114 F.3d at 1425*; *see also Oran, 226 F.3d at 282*, a key ingredient missing in *Adams Golf*. In *Burlington*, the plaintiffs alleged that Burlington's stock traded on an efficient market. *114 F.3d at 1425*. Plaintiffs in *Oran* did likewise. *226 F.3d at 283 n.3*. While the plaintiffs in *Adams Golf* noted that the company's stock traded on the NASDAQ, they did not allege that the stock traded on an efficient market. Consolidated and Amended Class Action Complaint P8, [*38] *In re Adams Golf, Inc. Sec. Litig., 176 F. Supp. 2d 216 (D. Del. 2001)* (No. 99-371-RRM). Indeed, our Court noted that the company's shares did not trade on an efficient market pre-IPO. *Adams Golf, 381 F.3d at 276 n.10*. Without an efficient market, the *Oran - Burlington* standard would not apply. Here, Union has alleged that Merck's stock was traded on an efficient market. Compl. P212(c).

Third, the language in *Adams Golf* at issue likely was *dicta*. The defendants would have lost on appeal even had the Court found *Oran - Burlington* directly applicable. That is, the *Adams Golf* panel held that Costco's unauthorized, out-of-network selling of 5,000 Tight Lies clubs was not "unquestionably immaterial to a reasonable investor." *Adams Golf, 381 F.3d at 276*. We reversed the District Court's conclusion that the disclosure was immaterial as a matter of law because of the nature and magnitude of the unauthorized sales. In addition, the company's stock price did decline following the disclosure; it dropped 17% along with a twentyfold increase in trading volume. [*39] *Id. at 277 n.11*. Under the *Oran - Burlington* standard this decline would have been material. The Court's refusal to apply that standard was irrelevant to its decision, and the language about its refusal was in essence *dicta*.

Fourth, reading materiality and loss causation in *Adams Golf* to be synonymous is incorrect. They are different concepts. In *Burlington* we did not even mention the phrase "loss causation." Rather, our creation of the stock-price rule was explicitly to determine whether information was material. *Burlington, 114 F.3d at 1425* ("In this case, plaintiffs have represented to us that the July 29 release of information had no effect on BCF's stock price. This is, in effect, a representation that the information was not *material*." (emphasis added)). Also, loss causation and materiality are two separate elements of a *section 10(b)* claim. Discussing a *10b-5* claim in 2001, we listed loss causation as an element separate from materiality. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 174 (3d Cir. 2001)*. To leave no doubt, the Supreme Court this year also described loss causation as a separate element in *section 10(b)* [*40] and Rule 10b-5 actions. *Dura Pharm., Inc. v. Broudo, 161 L. Ed. 2d 577, U.S. , 125 S. Ct. 1627, 1631 (2005)*. The bottom line is this: the *Adams Golf* Court did not explicitly claim to change the structure of 10b-5 actions, so we must not read it to do so.

Merck's disclosure was not material under the *Oran - Burlington* standard. This standard is applicable to *section 11* as well as to *section 10(b)*. Thus, because Union must show materiality to succeed on its *section 11* claim, that claim fails as well.

### D. Is there controlling-person liability?

*Section 20(a)* of the Exchange Act provides for liability for "controlling persons." *15 U.S.C. § 78t*. *Section 20(a)* makes controlling persons jointly and severally liable with the controlled person. *Id*. But controlling-person liability is "premised on an independent violation of the federal securities laws." *In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 211 (3d Cir. 2002)*; *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 279 (3d Cir. amended 1992)*.

Because the District Court found that Union had not

sufficiently alleged a securities violation, the Court dismissed its *section 20(a)* claims. n12 Union, [*41] of course, argues that the Court erred in dismissing its *section 10(b)* and *section 11* claims; it therefore claims that its *section 20(a)* claims were also incorrectly dismissed.

n12 The District Court mistakenly cited a case discussing *section 20A*—not *section 20(a)*. *In re Merck*, slip op. at 46 (citing *Advanta, 180 F.3d at 541*). But the standards for the two sections lead to the same result here.

Because the District Court was correct in dismissing Union's other claims, leaving Union with no valid *section 20(a)* claim, we agree as well with the District Court's conclusion as to that claim.

### IV. Conclusion

Union failed to establish a material statement or omission by Merck, so Union did not sufficiently plead a *section 10(b)* violation or a *section 11* violation. Because of [*42] this, Union also fails to make a valid *section 20(a)* claim. We therefore affirm the District Court's decision.