UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| IN RE MBNA CORP. SECURITIES LITIGATION | Case No. 1:05-CV-00272-GMS CONSOLIDATED |
|---|---|

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dated: April 11, 2006

Seth D. Rigrodsky (DSBA No. 3147)
Brian D. Long (DSBA No. 4347)
**MILBERG WEISS BERSHAD**
**& SCHULMAN LLP**
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870 (fax)

- and -

Shannon M. McKenna
**MILBERG WEISS BERSHAD**
**& SCHULMAN LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
(212) 868-1229 (fax)

*Plaintiffs' Lead Counsel*

## Table of Contents

                                                                              Page

TABLE OF AUTHORITIES ..................................................................................iii

NATURE AND STAGE OF THE PROCEEDINGS ...........................................1

SUMMARY OF THE ARGUMENT ....................................................................2

I.  STATEMENT OF FACTS ...........................................................................4

   A.  THE DETERIORATION OF MBNA'S CORE BUSINESS ....................4

   B.  SECURITIZATION AND MBNA'S IO STRIP RECEIVABLES ............6

   C.  THE PACKAGE INFORMED DEFENDANTS.......................................7

   D.  DEFENDANTS' IMPROPER ACCOUNTING
       MANIPULATIONS....................................................................................9

   E.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS
       DURING THE CLASS PERIOD .............................................................10

   F.  THE TRUTH IS REVEALED .................................................................12

II.  ARGUMENT..............................................................................................14

   A.  DEFENDANTS CANNOT MEET THEIR HEAVY BURDEN
       FOR A MOTION TO DISMISS..............................................................14

       1.  The Court Must Accept All Facts And Reasonable
           Inferences In Favor Of Plaintiffs ...................................................14

       2.  Defendants Must Provide Investors With Complete And
           Non-Misleading Information ...........................................................14

       3.  Rule 9(b) And The PSLRA Do Not Require Plaintiffs To
           Plead Evidence Before Discovery Has Begun................................15

   B.  PLAINTIFFS HAVE STATED A SECTION 10(b) CLAIM WITH
       MORE THAN REQUISITE SPECIFICITY .............................................16

   C.  PLAINTIFFS ALLEGE ACTIONABLE
       MISREPRESENTATIONS AND OMISSIONS CONTAINED IN
       CORPORATE DOCUMENTS THAT ARE ATTRIBUTABLE TO
       EACH DEFENDANT................................................................................17

1.  The Sarbanes-Oxley Act And SEC Rules Hold CEOs And CFOs Responsible For Statements In Financial Reports ............... 17

2.  Plaintiffs' Allegations More Than Adequately Attribute Materially False And Misleading Statements To Defendants For Purposes Of A Motion To Dismiss ..................... 18

D.  THE COMPLAINT'S ALLEGATIONS ASSESSED IN THEIR TOTALITY MORE THAN SUFFICIENTLY PLEAD SCIENTER ........ 19

1.  Defendants Are Responsible For Misrepresentations And Omissions In Company Documents ............................................. 20

a.  The Facts Alleged Link Defendants To The Fraud .......... 20

b.  The Red Flags Alleged At MBNA's Credit Card Business Demonstrate How Defendants Knowingly Violated GAAP ................................................................. 25

2.  In The Alternative, The Complaint Also Sufficiently Alleges Motive and Opportunity ................................................. 28

a.  Defendants' Motive To Protect Profitability .................... 28

b.  MBNA Insiders' Massive Stock Sales Establish Their Motive ...................................................................... 29

E.  DEFENDANTS' STATEMENTS RELATING TO "INVESTOR DAY" EARNINGS GUIDANCE ARE ACTIONABLE ........................ 36

F.  THE TIMING OF MBNA'S DECISION TO WRITE-DOWN ITS IO INVESTMENT WAS NOT A MATTER OF BUSINESS JUDGMENT ................................................................................. 37

G.  PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE SUSTAINED ................................................................................ 38

CONCLUSION .............................................................................................. 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990,
   2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005)......................................37

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)................................................................ *passim*

*In re Campbell Soup Co. Sec. Litig.*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ..........................................................15, 21

*In re Cephalon Sec. Litig.*, No. 96-0633,
   1997 U.S. Dist. LEXIS 13840 (E.D. Pa. Aug. 29, 1997)................................16

*Conley v. Gibson*,
   355 U.S. 41 (1957) ...............................................................................................14

*Dura Pharm., Inc. v. Broudo*,
   125 S. Ct. 1627 (2005) .........................................................................................15

*EP Medsystems, Inc. v. Echocath, Inc.*,
   235 F.3d 865 (3d Cir. 2000)................................................................................37

*Epstein v. Itron, Inc.*,
   993 F. Supp. 1314 (E.D. Wash. 1998) .............................................................22

*Fecht v. Price Co.*,
   70 F.3d 1083 (9th Cir. 1995) .......................................................................24, 31

*Fla. State Bd. of Admin. v. Green Tree Finance Corp.*,
   270 F.3d 645 (8th Cir. 2001) .......................................................................20, 23

*In re Honeywell Int'l Inc. Sec. Litig.*,
   182 F. Supp. 2d 414 (D.N.J. 2002) ...................................................................19

*Jones v. Intelli-Check, Inc.*,
   274 F. Supp. 2d 615 (D.N.J. 2003) ..............................................................4, 39

*Kriendler v. Chem. Waste Mgmt., Inc.*,
   877 F. Supp. 1140 (N.D. Ill. 1995) ...................................................................38

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) .............................................................................39

*Marsden v. Select Med. Corp.*, No. 04-4020,
    2006 U.S. Dist. LEXIS 16795 (E.D. Pa. Apr. 6, 2006) ...............................4, 19

*In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, No. 05-1151,
    2006 U.S. Dist. LEXIS 2345 (D.N.J. Jan. 20, 2006) ......................................14

*Montalvo v. Tripos, Inc.*, No. 03-995,
    2005 U.S. Dist. LEXIS 22752 (E.D. Mo. Sept. 30, 2005)................................36

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ..........................................................38

*No. 84 Employer-Teamster Joint Council Pension Trust Fund
v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ......................................................................32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................................20, 23

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002)..........................................................18

*SEC v. Caserta*,
    75 F. Supp. 2d 79 (E.D.N.Y. 1999) .......................................................33, 36

*San Leandro Emergency Med. Group Profit Sharing Plan v.
Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996)..........................................................................34

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..........................................................................23

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)........................................................................14

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)..................................................................16, 39

*In re Smartalk Teleservices, Inc. Sec. Litig.*,
    124 F. Supp. 2d 527 (S.D. Ohio 2000) ........................................................19

*In re Stone & Webster, Inc., Sec. Litig.*,
    424 F.3d 24, 27 (1st Cir. 2005)...................................................................39

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006).................................................................. *passim*

*Swierkiewicz v. Sorema, N.A.*,
    534 U.S. 506 (2002) ...................................................................................14

*In re Tel-Save Sec. Litig.*, No. 98-3145,
    1999 U.S. Dist. LEXIS 16800 (E.D. Pa. Oct. 19, 1999)...................................21

*In re Viropharma, Inc., Sec. Litig.*,
    2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 3, 2003) ...............................23, 36

*Weiner v. The Quaker Oats Co.*,
    129 F.3d 310 (3d Cir. 1997)........................................................................22

## STATUTES AND RULES

Securities Exchange Act of 1934, § 20(a), 15 U.S.C. § 78t(a) ...................... *passim*

Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b)...................... *passim*

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ...............................................1, 14, 39

SEC Rule 13a-14, 17 C.F.R. § 240.13a-14 ...................................................17, 18

SEC Rule 15d-14, 17 C.F.R. § 240.15d-14 ...................................................17, 18

Private Securities Litigation Reform Act of 1995 ("PSLRA"),
15 U.S.C.S. § 78u-4 ...............................................................................15, 19

15 U.S.C.S. § 78u-5(a)...............................................................................37

15 U.S.C.S. §§ 7201-7266 .........................................................................17

15 U.S.C.S. § 7241........................................................................................18

Fed. R. Civ. P. 9(b) ......................................................................... *passim*

Fed. R. Civ. P. 12(b)(6).................................................................................14

## NATURE AND STAGE OF THE PROCEEDING

Lead Plaintiff Activest Investmentgesellschaft mbH for account of the PT-Master Fund, by its counsel and on behalf of all plaintiffs ("Plaintiffs"), respectfully submits this Response in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint. This is a putative securities fraud class action on behalf of all persons, other than Defendants and certain other related parties, who purchased or otherwise acquired the publicly-traded securities of MBNA during the period January 20, 2005 through April 20, 2005, inclusive (the "Class Period"), and who were damaged when the revelation of the true facts regarding MBNA caused a sharp decline in the market price of MBNA securities.[1]

MBNA, one of the world's largest credit card issuers, created "shock and awe" in the marketplace in April 2005 when its top executives disclosed that MBNA was surprised by a payment trend in its core credit card business. (¶¶ 29, 59, 62.)[2] This alleged surprise at MBNA – that customers were "unexpectedly" paying off credit card debt – carried with it severe financial consequences. (¶¶ 5, 59, 60, 73.) MBNA announced it would be forced to take a $206.6 million write-down of its Interest Only ("IO") strip receivable investment and that its profit for 2005 would be "significantly below" the 10% growth guidance provided just three months earlier. (¶¶ 8, 59, 60, 73.) This news, which revealed the true degree of decreases in net interest margins and the true value of the Company's investment in IO strip receivables, caused the shares of

---

[1] The claims asserted arise under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)), including Rule 10b-5 (17 C.F.R. § 240.10b-5).

[2] "¶ __" refers to paragraphs of the Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") filed with this Court on December 12, 2005.

MBNA to fall to a two-year intraday low on a day most major bank stocks rose.  (¶¶ 8, 60, 62.)

<u>**SUMMARY OF THE ARGUMENT**</u>

The Court should deny Defendants' dismissal motion for the following reasons:

1.    The Complaint describes Defendants' repeated false and misleading statements and omissions (the "Class Period Statements") that kept investors unaware that MBNA was utilizing improper and unreasonable credit card payment rate assumptions to calculate its investment in IO strip receivables.  In accord with controlling law, Plaintiffs attribute each of these statements and omissions to the relevant individual "speaker" and to MBNA's SEC filings, press releases, and "investor day," which reported significant earnings growth for the present and/or future.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 281-82 (3d Cir. 2006).

2.    Plaintiffs more than sufficiently plead a strong inference of *scienter* by alleging facts that constitute circumstantial evidence of either reckless or conscious behavior on the part of Defendants to commit securities fraud.  Despite their representations, Defendants were never surprised by the large amounts of credit card debt payments occurring in 1Q:2005.  By virtue of a detailed internal financial report each Defendant received known as the "Package" and meetings discussing the Package, Defendants knew or recklessly disregarded that the pre-payment rate experienced by MBNA in 1Q:2005 was in fact *expected*.  (¶¶ 33, 51-54, 92.)  Defendants ignored "red flags" surrounding a high pre-payment trend at MBNA in 4Q:2004.  Rather than report this trend and its negative consequences, Defendants implemented overly aggressive and improper accounting manipulations to "get the books redone" in December 2004, which violated the Generally Accepted Accounting Principles ("GAAP") and other principles of

fair reporting, and report positive results. (¶¶ 3, 55-58.) Despite Defendants' public representations to the contrary, the payment rate assumption was not regularly adjusted to reflect actual pre-payment rate experience and trends, which had quickened starting in November 2004. The Complaint specifies the significant degree to which these accounting manipulations artificially extended the life of the IO strip receivables and, therefore, the value of the Company's reported investment income. Thus, MBNA and its executives knowingly or recklessly overstated the Company's assets, stockholders' equity, net income and earnings per share by over $206 million throughout the Class Period. (¶¶ 63, 75.)

3.      Plaintiffs also more than sufficiently plead a strong inference of *scienter* by alleging facts that demonstrate motive and opportunity on the part of Defendants to commit securities fraud. Defendants were motivated to paint a false portrait of success to maintain superior credit ratings, report fourth quarter EPS (earnings per share) "a penny ahead of consensus," secure investors in the open market at an inflated price, and profit by over $51 million after a series of unusually sized and timed insider sales. (¶¶ 4, 100 (revised).) Defendants' argument against *scienter* does not affect the Court's analysis because it improperly argues facts not alleged in the Complaint and relies on securities awarded at little to no cost for reaching 2004 earnings goals as a shield to securities fraud. Moreover, with a proposed Class Period of just three months, Defendants' position that a two-year trading history is an insufficient look-back period to create a strong inference of *scienter* is inconsistent with nearly all securities fraud litigation since the passage of the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

4.      Defendants' Class Period Statements were materially misleading because they failed to communicate what Defendants actually knew about MBNA's financial condition and factor that knowledge into such representations.  It is for that reason that neither the "bespeaks caution" doctrine nor the PSLRA's safe harbor protects Defendants' statements and omissions.  *See Marsden v. Select Med. Corp.*, No. 04-4020, 2006 U.S. Dist. LEXIS 16795, at *19, 24-25, 28-31 (E.D. Pa. Apr. 6, 2006) (rejecting defendants' characterization of claims as speculation).

5.      Plaintiffs' § 20(a) controlling person claim should be sustained because the Complaint more than sufficiently pleads a predicate violation of § 10(b).  This claim also should be sustained because each Defendant was a "controlling" executive of MBNA responsible for the dissemination of the Class Period Statements.  *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 644 (D.N.J. 2003).

# I.      STATEMENT OF FACTS

## A.      THE DETERIORATION OF MBNA'S CORE BUSINESS

MBNA's efforts to diversify through home equity lending was a direct response to the growing challenge that the home equity product posed on MBNA's credit card business.  (¶ 30.)  Defendants knew that customers had increasingly demonstrated an affinity for the home equity line of credit, given its low borrowing costs and tax advantages.  (¶¶ 30, 33.)  Home equity outstandings at MBNA increased from September 2004 to December 2004 by 154.53%.  (¶ 34.)  In contrast, credit card outstandings increased by a mere 4.54% during that same time period.  (*Id.*)  As MBNA offered both products, with credit card loans serving as its largest source of funding, it was able to monitor the gravity of this refinance wave and the pace at which credit card receivable

growth had slackened before the Class Period fueled by home equity refinancings.  (¶¶ 5, 30, 34.)

In fact, this affinity for the home equity line of credit was an industry-wide refinance wave that started in 2002 with above market interest rate reductions.  (¶¶ 33, 68.)  During MBNA's fourth quarter 2004, analysts cautioned credit card companies that a "bounce" in refinance applications in August and September 2004 would be funded in November and December 2004.  (¶ 33.)  As a consequence of this funding, analysts cautioned that credit card payment rates would remain throughout November and December of the fourth quarter 2004.  (*Id.*)  This trend became particularly acute at MBNA in October 2004 when it was the only major competitor in the industry to raise its credit card rates (despite above market interest rate reductions) and nearly eliminate the use of 0% finance charge rates causing it to realize a significant spike in pre-payment rates in November 2004 and thereafter.  (¶¶ 32, 33.)

The significance of the decline in customers and asset growth as a result of, *inter alia*, an increase in competition and customer migration to home equity is also evidenced by the facts that MBNA experienced a 44% decrease in New Accounts for 4Q:2004 compared to 4Q:2003.  (¶ 35.)  Further, New Accounts for the year 2004 dropped 20% compared to the year 2003.  (*Id.*)  As an added strain on profitability, during all relevant times, MBNA's yield had been shrinking.  (¶¶ 31, 36.)  From 1Q:2001 to 4Q:2004, MBNA's net interest margin had shrunk by over 11%, which meant MBNA was earning that much less on every dollar.  (¶ 36.)  Thus, even if MBNA was able to increase its asset growth at a steady pace, its income would have been negatively impacted as a result of the declining net interest margins.  (*Id.*)

### B.     SECURITIZATION AND MBNA'S IO STRIP RECEIVABLES

MBNA's core business is funding credit card loans (¶¶ 32, 37), and securitization is the process by which MBNA is able to fund these loans (¶ 38). At the onset of this securitization process, MBNA accumulates a pool of credit card loan receivables, which is composed of any principal and finance-charge balances owed to MBNA by the card holders of those loans. (¶ 39.) When the pool reaches a certain size, MBNA (as the seller) sells and transfers the credit card receivables to a special-purpose vehicle, a master trust, that then issues securities backed by the receivables. (*Id.*) With 80% of managed loans and 90% of domestic credit card loans securitized, proper accounting is critical as securitization is the lifeline to MBNA's funding. (¶ 38.)

Beyond serving as MBNA's chief source of liquidity, securitization also serves as a major source of investment. (¶ 48.) MBNA retains from each securitized credit card loan pool an IO strip receivable interest as an investment that it must amortize against income on its balance sheet. (¶¶ 39, 40, 43.) Together, this portfolio of retained interests in the IO strip receivables comprises the IO strip receivable investment ("IO investment").

The income that MBNA records in connection with this retained investment is calculated based upon several assumptions. (¶ 41.) The single most important assumption is the pre-payment rate. (¶¶ 45, 47, 65.) The pre-payment rate determines "the estimated life of the securitized loan principal receivables." (¶ 65.) The longer the lifespan, the more income the Company stands to receive by virtue of its IO investment. (¶¶ 41, 42.) However, when a loan is prepaid – meaning that the principal amount is paid back before it is due – any income that MBNA had previously assumed in recording its value is terminated. (*Id.*) Therefore, MBNA's IO investment is an asset that not only

must be amortized against income, but also re-evaluated quarterly for changes in assumptions. (¶ 43.)

Internally, this re-evaluation process occurred on a monthly basis because MBNA recognized that, in accounting for IO strip receivables, the improper use of pre-payment rate assumptions that are even slightly less than actual experience will cause assets, stockholders' equity and earnings to be overstated. (¶¶ 45, 47.) Each month, a comparison of the assumed pre-payment rate with the actual rate revealed whether MBNA must take a charge (write-down) to income during that reporting period. (¶¶ 6, 46.) The timing of this charge was not discretionary. Rather, pursuant to GAAP and SEC Regulations, MBNA was required to write-down an investment's carrying value to fair value and reflect the amount of the write-down in earnings when a decline in the market value of the investment was deemed to be anything other than temporary. (¶ 64, 69-72, 77, 79.) The rise in pre-payment rates at MBNA in November 2004 would have caused such a decline. (¶ 33.)

### C.    THE PACKAGE INFORMED DEFENDANTS

Prior to and throughout the Class Period, MBNA had internal controls in place to closely follow payment trends. (¶¶ 5, 6, 89.) Twice a month, once at mid-month and once at the month's end, MBNA's managers generated reports of their respective business's present and future contribution to the Company's general ledger. (¶¶ 51, 52.) These reports were then compiled into one internal report, referred to within MBNA as the "Package." (¶ 51.) A mid-month Package specifically projected results for the month's end Package. (¶ 52.) Thus, each Package was a "highly detailed" internal report of MBNA's present and projected expenses and revenues of every item appearing on

MBNA's general ledger, including present and projected expenses and revenues regarding credit card loans and home equity loans. (¶ 51.)

Within the Package, business areas analyzed and presented their financial data in similar ways. For example, each area's section of the Package set forth comparative results (monthly, quarterly and annually) from prior periods. (¶ 52.) Each section also contained trend analyses. (*Id.*) Further, each area included a "Bullet List" indicating all expenses that varied by $200,000 or more from prior Packages. (*Id.*) Thus, twice a month the Package provided senior management with an understanding of MBNA's present financial condition, how it compared to the past and what it meant for the future.

As the IO investment was a major source of revenue to MBNA's credit card business, facts regarding material fluctuations in this investment were necessarily included in the general ledger and the Package. (¶¶ 3, 51, 52.) In 2004, internal decisions coupled with market conditions caused a significant fluctuation in the pre-payment rate trend of the past, which terminated cash flowing from the securitization process to MBNA's retained IO strip interests. As it was "procedure" to review all securitization assumptions, including the credit card pre-payment rate, at least monthly, this payment trend shift, its comparative results, and the attendant circumstances would have been analyzed in every Package. (¶¶ 48, 51, 52, 56, 66.)

Both the mid-month and month's end Packages were approximately fifty-plus pages in length and, as their function was to inform senior management, were e-mailed to Defendants for review. (¶¶ 51-53.) In order to allow for a meaningful review, each Defendant, among others, received the Package in advance of their attendance at a mid-month and month-end senior management meeting held to discuss the same. (¶¶ 53, 54.)

At these meetings, Vecchione, as MBNA's Chief Financial Officer, arrived well-prepared with detailed notes, actively engaged in discussions and asked questions regarding financial and operational trends and fluctuations contained in the Package. (¶¶ 18, 54.) With this financial disclosure system in place, Defendants maintained a comprehensive understanding of the Company's present and future financial condition.

## D.    DEFENDANTS' IMPROPER ACCOUNTING MANIPULATIONS

During the Class Period, senior management encouraged the systematic manipulation of undesirable financial results in order to better meet expectations. (¶ 50.) Financial results at MBNA were manipulated on a monthly basis, including the improper recordation of journal entries and alteration of the mid-month Package to coincide with the month's end Package. (¶¶ 50, 55.)

Such unlawful accounting manipulations took place in December 2004 when MBNA employees worked significant overtime to "get the books redone" with regard to what the Company termed an "error" in securitization. (¶¶ 56, 57.) Undisclosed to investors, members of the ALCO (Assets & Liability Management Committee) team who were responsible for calculating the value of the Company's IO strip receivables, among others, were required to "start over" and "change all the financial statements" so that this securitization "error" disappeared. (*Id.*) Defendants encouraged these unlawful accounting manipulations because MBNA would have missed analysts' consensus EPS expectations for 4Q:2004 and the benefits therefrom had the Company taken the $206.6 million charge that it was later forced to reveal. (¶¶ 75, 58, 94.) Thus, MBNA's securitization figures for December 2004, which were integrated into its fourth quarter and year-end 2004 public statements and financial filings, were the product of improper accounting tactics. (¶¶ 58, 94.)

### E.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

Unbeknownst to investors, Defendants artificially inflated MBNA's financial condition and the value of its IO investment throughout the Class Period in its SEC filings, press releases and "investor day" statements.  Defendants falsely reported 2004 results by stating that "the fair value of the IO strip receivable [was calculated] based on the *present value* of expected future net revenue flows;" that "the fair value of the IO strip receivable . . . reflect management's judgment as to the . . . projected loan payment rates to be experienced;" that "[o]n a quarterly basis . . . *the Corporation adjusts as appropriate*, the assumptions and estimates [which includes the pre-payment rate]… used in determining the fair value of the IO strip receivable;" that "net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with . . . 2003;" and that year-end 2004 "net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to . . . 2003." (¶¶ 65, 67, 75, 80, 87.)[3]  Defendants further deceived investors on "investor day" by providing artificially inflated earnings guidance for 2005.  (¶¶ 83, 84, 85.)  Specifically, Defendants made statements that they "expect earnings growth to average about 12% over the next several years. . . .  And in fact, in 2005 we expect it to be more like 10%;" and that they expect earnings per share to be $2.26 in 2005 with a 10% growth rate year over year.  (*Id.*)  In making the aforementioned statements, Defendants knowingly or recklessly disregarded facts concerning the true financial state of MBNA.

In November 2004, prior to the Class Period, MBNA experienced a spike in credit card payments of over 18%.  (¶ 33.)  This rise developed into a high pre-payment rate

---

[3] Unless otherwise indicated, emphasis is added throughout.

trend in 2004 that continued through the Class Period and placed the IO investment in serious distress. (¶¶ 33, 48.) This rise was also the steepest monthly payment spike of the year – comparatively spiking at a rate of over 12.5% – and, thus, its impact would have been immediate and dramatic. (¶¶ 33, 45, 66.) Pursuant to GAAP and SEC Regulations, Defendants were required to write-down MBNA's IO investment carrying value to fair value in 2004. (¶¶ 33, 69, 70-72, 79.)

Despite their duty to report in 2004 that the high pre-payment trend existed at MBNA and that the trend had a material unfavorable impact on the carrying value (the income that MBNA expected to receive) of its IO investment, Defendants remained silent. (¶ 77.) As a consequence of this silence, Defendants' statements on January 20, 2005 and March 15, 2005 falsely reported an increase in the Company's net income for the fourth quarter and year-end 2004. (¶¶ 63, 80-82, 87.)[4] It was not until 2005 that Defendants belatedly took a massive charge to adjust for the full impact of 2004's pre-payment activity.

Further, Defendants knowingly or recklessly failed to disclose or to reflect in their 2004 public statements that payment rate assumptions utilized by MBNA during 4Q:2004 and 1Q:2005 – critical to a fair valuation of the income expected to be received by its IO strip receivables – did not comport with GAAP. To the contrary, throughout the Class Period, Defendants positively reported that MBNA's quarterly and year-end financial statements were prepared in accordance with GAAP, that MBNA experienced an increase in net income for the fourth quarter and year-end 2004 and that, based in part on its

---

[4] Demonstrating that the market was deceived by these material false statements, securities analysts credited these reports in issuing positive statements about the Company's successful fourth quarter 2004 EPS, which were reported to be "*a penny ahead of consensus*." (¶ 4.)

quarterly review of actual trust performance, the Company "adjust[ed] as appropriate, the assumptions and estimates used in determining the fair value of the IO strip receivable[s]." (¶¶ 6, 64, 87, 89.) However, as the critical assumptions used to value the IO strip receivables were unreasonable, contradicted by actual experience, and the result of accounting manipulations, MBNA had been artificially inflating its financial results and condition throughout the Class Period. (¶¶ 4, 92.) As a result of these improprieties, MBNA's 8-K and 10-K financial statements, dated January 20, 2005 and March 15, 2005 respectively, were not prepared in accordance with GAAP, SEC Regulations, MBNA's own disclosed policies and other principles of fair reporting. (¶¶ 3, 4, 80-82, 87, 88.)

In addition, as explained earlier, MBNA was experiencing a significant downturn in credit card receivables at its core credit card business due to, among other things, above market interest rate reductions, increased competition, and a decrease in net interest margins. (¶¶ 31, 37, 68.) These conditions caused MBNA's growth to slacken before the Class Period. Despite the known extent of this downturn (yet to be reported) and the industry-wide slow growth environment that made even small growth extremely unlikely, Defendants omitted these facts and deceptively announced on "investor day," January 21, 2005, that they believed MBNA was likely to achieve significant growth (10%) in 2005. (¶¶ 2, 31, 36, 83-85.)

## F.    THE TRUTH IS REVEALED

The truth began to emerge on April 21, 2005 when Defendants created "shock and awe" in the marketplace with their claims that MBNA was surprised by a payment trend in its core credit card business. (¶¶ 59, 62.) On that date, just three months after providing earnings guidance, MBNA stunned investors with its announcement that its profit would be "significantly below" its 10% growth guidance for 2005, and that the

reason for this was purportedly because customers with higher interest rates were "***unexpectedly***" paying off credit card debt in favor of credit instruments with lower interest rates. (¶ 59.) Causing further alarm, the Company announced that first-quarter earnings fell 93%, year-over-year to $0.02 a share, before a restructuring charge, from $0.40 cents a share in the first quarter of 2004, and that earnings were adversely affected by a massive $206.6 million write-down of the Company's IO investment. (*Id.*) Even excluding the one-time restructuring charge, MBNA's reported first-quarter earnings of $0.40 per share failed to meet analysts' expectations of $0.46 per share and resulted in negative analyst reports (addressing MBNA's questionable credibility). (¶¶ 59, 61, 62.) This news, which revealed the true degree of margin compression and the true value of the Company's investment in IO strip receivables, caused the shares of MBNA to plummet to a two-year intraday low of $18.50 before closing at $19.28, down $3.83, or 16.6%, on a day most major bank stocks rose. (¶¶ 8, 60, 62.)

When Defendants were forced to belatedly reveal MBNA's poor 4Q:2004 financial results in 1Q:2005, they disingenuously attributed the downturn to a new development in MBNA's credit card payment rate. In truth, because the Packages reported on actual pre-payment rates and trends, the pre-payment activity in 1Q:2005 would not have come as a surprise. Defendants knowingly or recklessly participated in the fraud that unlawfully delayed disclosure of MBNA's financial condition and used this delay to profit in unlawful insider sales. As evidenced by the material stock price drop following the April 2005 disclosure, had the market known the truth regarding MBNA's business, the Company's stock price would have been negatively impacted. (¶¶ 60, 100 (revised).)

- 13 -

## II.    ARGUMENT

### A.    DEFENDANTS CANNOT MEET THEIR HEAVY BURDEN FOR A MOTION TO DISMISS

#### 1.    The Court Must Accept All Facts And Reasonable Inferences In Favor Of Plaintiffs

The standard for assessing motions filed pursuant to Federal Rule of Civil Procedure 12(b)(6) is well-known.[5]  Notwithstanding these well-established principles, Defendants demand the Court to draw no inferences for Plaintiffs from the Complaint. Several of Defendants' arguments, however, are based on improper inferences and "facts" not alleged in the Complaint, which reflect their likely evidentiary merits-based defenses to this lawsuit.[6]

#### 2.    Defendants Must Provide Investors With Complete And Non-Misleading Information

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, plaintiffs must allege with particularity:  (1) a material

---

[5] A complaint cannot be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  On a motion to dismiss, the Court must "accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 n.1 (2002).  Furthermore, in a Rule 12(b)(6) context, the Court must "resolve all competing allegations and inferences in favor of the Class." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3d Cir. 2000) ("The issue [under 12(b)(6)] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") *Id.* at 173 (citation omitted).  In assessing a motion to dismiss, the Court may not consider matters extraneous to the pleadings with the limited exception of documents "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citations omitted).

[6] Defendants attempt to introduce facts through SEC filings that pre-date both the beginning of the putative class period and the allegations of the Complaint. (*See, e.g.*, Defendants' Opening Brief ("DOB") at 16-20 & Appendix to DOB ("DOB Appx").)  A court may take judicial notice of SEC filings only to the extent that a plaintiff's claims are based on the document. *Burlington*, 114 F.3d at 1426.  Even then, those materials may not be admitted for their truth on a motion to dismiss. *See In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, No. 05-1151, 2006 U.S. Dist. LEXIS 2345, at *19 (D.N.J. Jan. 20, 2006).

misrepresentation (or omission); (2) *scienter*; (3) a connection with the purchase or sale

of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharm., Inc. v.*

*Broudo*, 125 S. Ct. 1627, 1631 (2005).[7]

　　　　The fundamental philosophy underlying the federal securities laws is the

requirement of full and accurate disclosure to the marketplace. *In re Campbell Soup Co.*

*Sec. Litig.*, 145 F. Supp. 2d 574, 583 (D.N.J. 2001) ("[T]he disclosing party has an

obligation to ensure that the representations are accurate."). As discussed below, the

Complaint pleads with more than requisite specificity that Defendants repeatedly violated

the federal securities laws.

### 3.　　Rule 9(b) And The PSLRA Do Not Require Plaintiffs To Plead Evidence Before Discovery Has Begun

　　　　The PSLRA, 15 U.S.C. § 78u-4 (2004), requires plaintiffs to "specify each

statement alleged to have been misleading [and] the reason or reasons why the statement

is misleading." 15 U.S.C. § 78u-4(b)(1)(B). Federal Rule of Civil Procedure 9(b)

provides that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . .

shall be stated with particularity." Fed. R. Civ. P. 9(b). *See also Suprema*, 438 F.3d at

276 ("Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of

securities fraud with all of the essential factual background that would accompany 'the

first paragraph of any newspaper story' – that is, the 'who, what, when, where and how'

of the events at issue.") (citation omitted).

　　　　In determining whether a complaint provides the essential factual background,

courts will weigh the challenges faced by plaintiffs on a pre-discovery motion to dismiss:

---

[7] At this stage, reliance is presumed under the fraud on the market theory. *See Burlington*, 114 F.3d at 1419 n.8.

> [C]ourts should be 'sensitive' to the fact that application of
> the Rule prior to discovery 'may permit sophisticated
> defrauders to successfully conceal the details of their
> fraud.' . . . Accordingly, the normally rigorous particularity
> rule has been relaxed somewhat where the factual
> information is peculiarly within the defendant's knowledge
> or control.

*Burlington*, 114 F.3d at 1418 (citation omitted). Neither the PSLRA nor Rule 9(b)

"require[s] pleading all of the evidence and proof thereunder supporting a plaintiff's

claim." *In re Cephalon Sec. Litig.*, No. 96-0633, 1997 U.S. Dist. LEXIS 13840, at *5

(E.D. Pa. Aug. 29, 1997). Rather, a complaint's factual allegations and all favorable

inferences therefrom need only demonstrate that plaintiffs' "theoretically viable claim [is]

plausible." *See Burlington*, 114 F.3d at 1418 (citations omitted).

### B. PLAINTIFFS HAVE STATED A SECTION 10(b) CLAIM WITH MORE THAN REQUISITE SPECIFICITY

The Complaint details each statement alleged to be false and misleading, when

and where the statement appeared, and exactly how the statement was deceptive. (*See*

*generally* ¶¶ 80-89.) That is all that is required. *See Suprema*, 438 F.3d at 276.

Defendants do not dispute that the issuance of false SEC financial statements, as

alleged in the Complaint, is actionable under the securities laws. Nor could they. *See,*

*e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992). Nor do Defendants

dispute whether Plaintiffs sufficiently articulated the means by which Defendants

artificially inflated MBNA's financial results as the Complaint details the inflation that

began at the close of the fourth quarter and year-end 2004. (*See, e.g.,* ¶¶ 56, 57, 94.) In

that regard, the Complaint pleads with specificity that Defendants' failure to account for

the existence and negative effects of a spike in pre-payment rates, which impaired

MBNA's IO investment by over $206 million, caused 4Q:2004 and 4K:2004 financial

results to be overstated in violation of SEC Regulations and GAAP. (¶¶ 2-5, 33, 63, 68, 69-72, 74-79); *See Burlington*, 114 F.3d at 1422 (discussing satisfaction of the "how" requirement). Instead, Defendants challenge (1) whether Class Period Statements may be attributed to each Defendant; (2) whether Plaintiffs plead *scienter* with particularity with regard to material misstatements in and omissions from Defendants' Class Period Statements; (3) whether material misstatements in or omissions from MBNA's 2005 earnings guidance statements on "investor day" are actionable in light of the PSLRA's "safe harbor" provision and the "bespeaks caution" doctrine; and (4) whether Plaintiffs established control person liability under § 20(a). For the reasons that follow, Defendants' arguments cannot be sustained.

> **C.    PLAINTIFFS ALLEGE ACTIONABLE MISREPRESENTATIONS AND OMISSIONS CONTAINED IN CORPORATE DOCUMENTS THAT ARE ATTRIBUTABLE TO EACH DEFENDANT**
>
> > **1.    The Sarbanes-Oxley Act And SEC Rules Hold CEOs And CFOs Responsible For Statements In Financial Reports**

Defendants' argument that "plaintiffs do not attempt to connect any of the alleged material misstatement with specific defendants" is mistaken. (DOB at 27.) Plaintiffs explicitly plead that Hammonds and Vecchione were signatories to MBNA's 2004 SEC filings, which contained materially misleading statements and omissions, thereby authorizing and adopting the statements therein. (¶¶ 81, 87, 89.) Further, since Defendants' SEC filings were submitted after the effective date of the Sarbanes-Oxley Act of 2002 and SEC Exchange Act Rules 13a-14 and 15d-14, Hammonds and Vecchione, as signatories, cannot escape liability under the securities laws. *See* 15 U.S.C.S. §§ 7201-7266; 17 C.F.R. §§ 240.13a-14 and 240.15d-14.

To assure investors that Defendants had a legitimate basis for making their statements, *and to prevent them from later claiming to be unaware of material information that rendered a financial report false*, the Sarbanes-Oxley Act and the related SEC Rules together required Hammonds as CEO and Vecchione as CFO to, *inter alia*, certify MBNA's year-end 2004 10-K report. (¶ 89); *see generally* 15 U.S.C.S. §§ 7241 and 7261-62; 17 C.F.R. 240.13a-14 and 240.15d-14. Their certifications falsely provided investors with assurances that MBNA's 2004 SEC filings were accurate, and this compels a strong inference of *scienter*.[8]

### 2. Plaintiffs' Allegations More Than Adequately Attribute Materially False And Misleading Statements To Defendants For Purposes Of A Motion To Dismiss

Defendants' refusal to recognize the circumstances in which group allegations coupled with specific allegations can establish a § 10(b) violation is contradicted by the Third Circuit's recent decision in *Suprema*. (*See* DOB at 25-28.) As later discussed, the Third Circuit indicated that *when scienter is adequately alleged*, group allegations can establish that defendants "spoke" through corporate statements. *See Suprema,* 438 F.3d at 281-82 (allegations linking defendants to the reckless conduct are sufficient). Thus, for purposes of this motion to dismiss, MBNA's company publications, including quarterly or annual reports and press releases, are presumed to be the collective work of Defendants so long as they survive the Court's *scienter* analysis.[9]

---

[8] In accord with Sarbanes-Oxley and SEC Rules, Vecchione's signature on Defendants' 8-K quarterly report also compels a strong inference of *scienter*.

[9] *See also In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 510 (W.D. Pa. 2002) ("We see no reason to find that group plead allegations *per se* cannot meet the heightened pleading standards of Rule 9(b) or the PSLRA…").

Even without this presumption, the Complaint more than sufficiently alleges that Hammonds (¶¶ 53, 54, 83, 87, 89, 92), Vecchione (¶¶ 53, 54, 81, 87, 89, 92), Cochran (¶¶ 53, 54), Krulak (¶¶ 53, 54) and Struthers (¶¶ 53, 54, 92) signed SEC filings containing material misrepresentations, actively participated in the preparation of financial statements containing material misstatements and omissions therefrom, or participated in conferences with analysts during which material misstatements and omissions therefrom were made.[10] To the extent any Defendant did not speak at MBNA's "investor day" or did not sign the Class Period SEC filings, each is liable under the securities laws for his material omissions.[11] Thus, as the Third Circuit held in *Suprema*, the Court must review whether Plaintiffs' allegations support a strong inference of *scienter* under the securities laws. *See* 438 F.3d at 281-82.

### D.  THE COMPLAINT'S ALLEGATIONS ASSESSED IN THEIR TOTALITY MORE THAN SUFFICIENTLY PLEAD SCIENTER

The PSLRA requires Plaintiffs to plead facts that, taken together, give rise to a strong inference that Defendants acted with the required state of mind. *See* 15 U.S.C. § 78u-4(b)(2)); *Marsden*, 2006 U.S. Dist. LEXIS 16795, at *32-37; *In re Honeywell Int'l*

---

[10] Defendants do not, because they cannot, dispute that the Complaint satisfies the PSLRA and Rule 9(b)'s pleading requirements as against defendants Hammonds and Vecchione. (*See* DOB at 26 (only challenging the sufficiency of the claims against Cochran, Struthers and Krulak).) Defendants Hammonds and Vecchione personally attached their names to false statements contained in the Company's SEC filings and "investor day" presentations. (¶¶ 81, 83, 87, 89.) As explained, by signing documents pursuant to Sarbanes-Oxley and SEC Rules, Hammonds and Vecchione endorsed the contents therein and thus made statements for §10(b) purposes.

[11] Though improperly annexed to their opening brief, the unauthenticated transcript of MBNA's January 21, 2005 conference demonstrates that every Defendant was in attendance, and thus, cannot escape liability for the statements made therein. (Affidavit of Richard Pepperman, Ex. C, ¶ 2 (stating that the entire Executive Committee is in attendance)); *In re Smartalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000) ("a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements").

*Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 428-29 (D.N.J. 2002) (allegations in their "totality"

sufficiently plead *scienter*).  Obviously, in any one case, there may be some overlap

among the facts alleged to support an inference of *scienter* for similarly-situated

defendants, but if these facts raise an inference of *scienter* for each, the Plaintiffs have

satisfied their burden.  *See, e.g., Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270

F.3d 645, 665-67 (8th Cir. 2001) (using same set of facts to infer *scienter* against several

defendants).  A plaintiff may establish a defendant's *scienter* by alleging facts that (a)

"show that defendants had both motive and opportunity to commit fraud," or (b)

"constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*Suprema,* 438 F.3d at 278 (citation omitted).  The PSLRA does not address the

substantive elements of a § 10(b) claim, only how a claim is pled.  *Id.* at 535.  Under the

PSLRA, "recklessness . . . remains a sufficient basis for liability." *Id.*

### 1.    Defendants Are Responsible For Misrepresentations And Omissions In Company Documents

It is well-established that many different fact-patterns will give rise to a strong

inference that defendants acted with knowledge or recklessness. *Novak v. Kasaks*, 216

F.3d 300, 307 (2d Cir. 2000).  Relevant to this case, the Third Circuit recently highlighted

two fact scenarios in which a complaint should survive a motion to dismiss for

adequately alleging *scienter*.  Under both scenarios, the Court's focus is not on the form

of the pleadings, so long as the content of the pleadings provide an explanation of how

defendants knew or recklessly disregarded the facts at issue.

### a.    The Facts Alleged Link Defendants To The Fraud

First, in *Suprema*, the Third Circuit dismissed claims against a certain group of

non-executive defendants, but articulated that under different facts these defendants'

positions on the company's audit committee would be sufficient to show *scienter* under § 10(b). 438 F.3d at 281-82. The false financial statements were attributed to the audit committee, however, in evaluating *scienter* the Third Circuit found that alleging *the mere ability* to both access and review "unspecified" records, *without more*, failed to "link" each committee member to any fraud. *Id.* at 282. At the root of this limited dismissal were the inescapable facts establishing that Suprema's CEO and CFO controlled "all of the bookkeeping" and "instructed Suprema employees not to be involved in the hard cheese portion of the business," which was the portion that wrongfully recognized revenue. *Id.* at 278-79. Unlike in *Suprema*, Plaintiffs' allegations here more than adequately link each *big cheese* to the "hard cheese portion of the business."

Holding the *big cheese* positions of Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Accounting Officer and Chief Lending Officer, the law *presumes* that Defendants have knowledge of facts critical to MBNA's core operations. *See, e.g., Campbell Soup*, 145 F. Supp. 2d at 599; *In re Tel-Save Sec. Litig.*, No. 98-3145, 1999 U.S. Dist. LEXIS 16800, at *14 (E.D. Pa. Oct. 19, 1999). Here, nothing could be more critical to MBNA's core credit card operations than the speed at which its customers pay off their credit cards. Indeed, the Complaint demonstrates that the pre-payment rate is the single most important assumption MBNA uses to calculate its substantial income received from securitization because payment speeds dictate the life-span of that income.[12] (¶¶ 38, 45, 47, 65.) With 90% of MBNA's domestic credit card

---

[12] This point is emphasized by the Office of the Comptroller of the Currency's (the "OCC") 1999 bulletin specifically addressing that one of the key assumptions in valuing IO strip receivable investments is the *pre-payment speed*, and since accelerated speeds are a critical risk to securitized asset pools, they *"should be analyzed thoroughly and monitored closely for initial valuation and ongoing impairment analyses."* (¶ 66.) The Complaint sufficiently pleads that this analysis was included in a detailed internal report called the "Package." (*see, e.g.*, ¶ 52.)

loans and 100% of its substantial investment in credit card IO strip receivables dependant on the accuracy of this securitization assumption, it is reasonable to infer that Defendants, as MBNA's top executives, knew and disregarded the inaccuracy of MBNA's pre-payment rate assumption each reporting period.  (¶¶ 17-21, 38, 40, 48.)[13]

The Complaint details the reasons why Defendants knew or recklessly disregarded the true facts omitted from their Class Period Statements before such materially false and misleading statements were made.  Prior to any financial disclosure, Defendants participated in a comprehensive process at MBNA that involved senior management's review of a compilation of reports colloquially referred to as the "Package" and meetings to discuss the same twice a month.  (*See supra*, Statement of Facts ("SOF") at C.)  Thus, the materially false and misleading Class Period Statements were the product of decisions made during these meetings.

Each Package was a "highly detailed" internal report that, in part, ***specifically identified trends and variations from former Packages***.  (*Id.*)  From these allegations and/or those concerning the critical nature of securitization to MBNA's core business, among others, a strong inference arises that the Package reported ***on the actual payment rate acceleration and the resulting consequences experienced by MBNA in 4Q:2004***. (*See id.*)  Further, Vecchione's hands-on management style compels a finding that Defendants were aware of MBNA's true financial condition, including credit card pre-payment speeds. *See Suprema*, 438 F.3d at 278.  Vecchione took a hands-on approach by

---

[13] *See Weiner v. The Quaker Oats Co.*, 129 F.3d 310, n.11 (3d Cir. 1997) ("It is not difficult to imagine situations in which the management of a company is well aware of circumstances . . . likely to have a grievous . . . impact on future earnings . . . ."); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) ("facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers").

attending these meeting well-prepared with questions in order to *specifically engage Defendants in discussions that would explain trends and fluctuations*, which by inference would include the high pre-payment trend of 2004. (*See supra*, SOF at C.) The credit card payment rate was an important trend detailed in the Package and it fluctuated significantly in 4Q:2004, which would have resulted in serious discussions between Vecchione and the other Defendants regarding its impact on MBNA's financial condition. (*Id.*; ¶¶ 33, 52, 54.)

Defendants' receipt and review of financial data contrary to their Class Period Statements also compels a finding of *scienter*. *Fla. State Bd. of Admin.*, 270 F.3d at 665 ("One of the classic fact patterns giving rise to a strong inference of *scienter* is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.").[14] During 4Q:2004, internal decisions coupled with market conditions caused the fastest and most significant acceleration in the pre-payment rate trend experienced in the Company's Master Trust, which caused a cessation in cash flowing from the securitization process to MBNA's retained IO strip interests. (*See supra*, SOF at A, B and E, p. 11.) As it was "procedure" to review and compare all securitization assumptions with "actual trust performance," including the credit card pre-payment rate, at least monthly, this payment trend shift, its

---

[14] *See also Novak*, 216 F.3d at 308; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (defendant "had access to internal corporate documents and reports relating to trade sales and return data, conversed with other officers and employees and attended management and committee meetings."); *In re Viropharma, Inc., Sec. Litig.*, 2003 U.S. Dist. LEXIS 5623, at *31 (E.D. Pa. Apr. 3, 2003) (positions in the company provided "access to several documents which contained the facts that allegedly made Defendants' statements materially misleading").

comparative results, and the attendant circumstances were analyzed in every Package. (¶¶ 48, 51, 52, 56, 87.)[15]

The Package and meetings to discuss the Package create the necessary link to find a strong inference that each Defendant maintained *scienter* as to the materially false and misleading nature of their Class Period Statements. *See Suprema*, 438 F.3d at 281-82. Despite their duty to report the unfavorable impact on the carrying value (the income that MBNA expected to receive) of its IO investment due to the fastest acceleration in credit card pre-payments for the year 2004, Defendants remained silent. (*See* ¶¶ 77-79.) As a consequence of this silence, Defendants' public statements on January 20, 2005 and March 15, 2005 falsely reported an increase in MBNA's earnings and net income for the fourth quarter and year-end 2004. (¶¶ 63, 80, 81, 82, 87.) Then in 2005, despite the fact that pre-payment speeds ***dropped below November 2004's actual results***, Defendants belatedly took a massive charge, which (undisclosed to investors) was taken to adjust for the full impact of 2004's pre-payment activity. (*See* SOF at E, p. 11; ¶ 33.)[16]

Plaintiffs sufficiently articulated how each Defendant knew or recklessly disregarded that MBNA inflated its 2004 financial results and provided unreasonable

---

[15] Another favorable inference arises from the fact that because a Package's "Bullet List" identified all expenses that varied by $200,000 or more from prior Packages, this 4Q:2004 payment trend, which impaired the IO investment and created an expense of over $206 million, would have been reported on Bullet Lists in November and December 2004. (¶¶ 52, 75.) Moreover, every employee (and by inference every Defendant) was required to field customer telephone calls for a total of eight hours a month, and in 2004, it was common for every customer telephoning MBNA during a shift to cancel their credit card, thereby giving Defendants first-hand knowledge of the increasing number of customers intent on paying off their credit cards early. (¶¶ 95-97.)

[16] This further compels a inference of *scienter*. *See Fecht v. Price Co.*, 70 F.3d 1083 (9th Cir. 1995) (A plaintiff may "draw on contemporaneous statements or conditions" to demonstrate why statements were false when made). At any rate, this presents a question of fact that is not appropriate for consideration on a motion to dismiss.

earnings guidance when Defendants failed to account for the spike in pre-payment rates that caused a $206.6 million impairment to its IO strip receivables. (¶¶ 33, 63, 69, 72, 75, 79.) By participating in the Package's disclosure control process at the senior management level, each Defendant knew, understood and had the power to prevent the dissemination of the Class Period Statements. (*See* ¶¶ 17-21, 51-54, 81, 87, 89, 92.) Thus, consistent with Third Circuit law, the Complaint demonstrates how each Defendant *– by virtue of their position and actual preparation, review and approval of the materially false and misleading Class Period statements –* knew or recklessly disregarded particular unlawful behavior.

> **b.     The Red Flags Alleged At MBNA's Credit Card Business Demonstrate How Defendants Knowingly Violated GAAP**

Second, even if the above culmination of events is not enough, the Third Circuit recognizes that a complaint should survive a motion to dismiss where it alleges "red flags" of improper accounting measures in support of the inference that the defendants knowingly or recklessly violated GAAP. *Suprema*, 438 F.3d at 279-80.

Here, Defendants knowingly or recklessly failed to disclose or reflect in their Class Period Statements that payment rate assumptions utilized by MBNA during 4Q:2004 and 1Q:2005 – critical to a fair valuation of the income expected to be received by its IO strip receivables – did not comport with GAAP. (*See* ¶¶ 41, 43, 65, 66, 70, 77, 92.) To the contrary, throughout the Class Period, Defendants positively reported that MBNA's quarterly and year-end financial statements were prepared in accordance with GAAP, that the Company experienced an increase in net income for the fourth quarter and year-end 2004 and that, based in part on its quarterly review of actual trust

performance, the Company "adjusts as appropriate, the assumptions and estimates used in determining the fair value of the IO strip receivable[s]." (*See supra*, SOF at E.)

With this backdrop, Defendants were also able to deceive investors that 10% guidance for 2005 was reasonable by withholding their knowledge that several credit card business-related impairments coupled with the failure to write-down MBNA's IO investment made 2005 growth highly unlikely. (*See* ¶¶ 31-37, 74.) Because the critical assumptions used to value the IO strip receivables were unreasonable, contradicted by actual experience and the result of accounting manipulations, MBNA had been artificially inflating its financial results and condition throughout the Class Period. (¶¶ 4, 33, 92.) MBNA further failed to report that it was reasonably possible, probable, likely or evident when *it was, in fact, apparent that MBNA's IO strip investment was impaired by over $206 million.*[17] (¶¶ 3, 4, 63, 68, 72, 76-79, 87, 89, 110.) As a result of these improprieties, MBNA's Class Period Statements (8-K and 10-K financial statements, dated January 20, 2005 and March 15, 2005 respectively, and "investor day" earnings guidance statements) were not prepared in accordance with GAAP, SEC Regulations, MBNA's own disclosed policies and other principles of fair reporting. (¶¶ 3, 4, 80-82, 87, 88.)

Other significant "red flags" occurred during 4Q:2004 that should have put Defendants on notice in 2004 that unlawful accounting manipulations took place with regard to MBNA's IO strip investment, including: (1) MBNA employees worked

---

[17] Defendants improperly bring in extraneous documents that show MBNA wrote-down the value of its IO strip receivable investment by $193.6 million over the course of 2004 as compared to the massive $206.6 million write-down it recorded in just the first quarter of 2005. (DOB at 9-10.) Introduction of this fact only raises further inferences in Plaintiffs' favor and emphasizes that because MBNA's sharpest spike in pre-payment rates occurred in November 2004, the largest write-down should have occurred in 4Q:2004, not 1Q:2005.

*significant overtime in December 2004 to "get the books redone;"* (2) undisclosed to investors during this December overtime, individuals responsible for calculating the value of the Company's IO strip receivables were required to "start over" and "change all the financial statements" so that this securitization "error" disappeared; (3) November 2004 represented a major fluctuation and shift in credit card payment trends that would have led Defendants to discuss and decide at Package meetings to unlawfully manipulate the value of the IO investment; (4) the actual November payment rate at the Master Trust for securitizations rose above 18%, representing the steepest rise of the year; (5) analysts predicted, and the OCC warned, payment rates would remain high; (6) payment rates remained high; (7) credit card outstandings experienced a slow-growth of only 4.54%, which was especially troubling because for every dollar generated in revenue, MBNA was receiving less profit than the four years prior due to its shrinking net interest margin; (8) new accounts decreased by 44%; (9) customers were leaving as nearly all of MBNA's teaser rates were expiring, further hurting the present value of the IO investment (a significant investment for MBNA); (10) customers were rapidly switching to home equity lines of credit in response to above market interest rate reductions, which also hurt the present value of the IO investment; and (11) as early as November 2004, customer payment rates accelerated in response to MBNA alone increasing its non-affinity credit card interest rates, once again negatively impacting the present value of the IO investment. (¶¶ 22, 33-37, 56, 57, 86, 88, 95, 96.)[18] Thus, the occurrence of these

---

[18] In addition to the above red flags, Plaintiffs have alleged with particularity other facts, which, when viewed collectively, give rise to a strong inference of *scienter*. These additional facts include:

  •  Defendants represented that *before* each reporting period the Company regularly adjusts the payment rate assumption used to value its IO investment to reflect *"actual trust performance,"* and that an increase in the payment rate would affect the life of and discount rate

additional red flags more than adequately demonstrates that Defendants concealed that they knew or should have known that the Company could not legitimately provide 10% earnings guidance for 2005, nor could it report fourth quarter EPS "a penny ahead of consensus" with a 9% increase in net income for 4Q:2004 in the face of these devastating statistics and events at its core credit card business without raising Defendants' concerns about compliance with GAAP. (*See* ¶¶ 4, 75, 80, 83-85, 98.)

### 2. In The Alternative, The Complaint Also Sufficiently Alleges Motive and Opportunity

In addition to the foregoing, which establishes sufficient circumstantial evidence of Defendants' *scienter*, the Complaint also makes clear that Defendants had concrete and strong financial motives to commit fraud.[19]

### a. Defendants' Motive To Protect Profitability

Beyond serving as MBNA's chief source of liquidity, securitization also served as a major source of investment. (¶ 48.) MBNA retained from each securitized credit card

---

on income from this investment. (¶¶ 41, 65, 87.) Meanwhile, the actual performance of MBNA's Master Trust revealed that between the quarters of 1Q:2004 and 1Q:2005 inclusive, the highest and sharpest rise in payment rates occurred in 4Q:2004. (¶¶ 6, 33, 42, 65, 87.) Despite these facts, it was not until 1Q:2005 that MBNA's SEC filings reported that an "unexpected" payment rate would cause the Company to take the largest write-down to its IO strip receivable investment. (¶¶ 5, 59, 73.);

• The actual performance of MBNA's Master Trust revealed that a high pre-payment trend started in November of 4Q:2004 and continued through 2005. (¶¶ 33, 59, 73, 75.);

• With Defendants' approval, MBNA knowingly materially manipulated its financial results, including the improper recordation of journal entries, every month to better meet the Company's expectations – at times in amounts as large as five or six million dollars. (¶¶ 49, 50.);

• According to former employees, payment trends at MBNA are not something that "boom, just hits you" because Defendants monitored and re-evaluated variations in its securitization assumptions, including pre-payment rate assumptions, each month. (¶¶ 46, 47.) Yet, Defendants characterized the catalyst for the $206.6 million write-down of the IO investment as an "unexpected" payment rate experience. (¶¶ 5, 59, 73.); and

• The fear of layoffs and a company buyout permeated the Company at all relevant times because MBNA was rapidly losing customers. (¶ 97.)

[19] Defendants do not dispute that they each had the opportunity to commit securities fraud.

loan pool an IO strip receivable interest as an investment that must be amortized against income. (¶¶ 39, 40, 43.) The longer the lifespan of these pools, the more income the Company stood to receive by virtue of its IO investment. (¶¶ 41, 42.) However, when a loan is prepaid – meaning that the principal amount is paid back before it is due – any income that MBNA had previously assumed in recording its value is terminated. (¶¶ 41, 42.) Thus, when pre-payment rates accelerated in 2004, the Complaint alleges that it was in each Defendant's interest to delay disclosure of the need to materially increase reserves and alter pre-payment assumptions because such actions would have resulted in lowering the Company's investment ratings and reducing its ability to sell its collateralized loans in the open market, which could have a direct, adverse, and material effect on earnings. (*See* ¶¶ 39-43, 48.)

### b.    MBNA Insiders' Massive Stock Sales Establish Their Motive

Courts universally recognized that insider trading can support an inference of *scienter*. *See Suprema*, 438 F.3d at 277; *Suprema*, 438 F.3d at 277 (sales of company stock by insiders that are "unusual in scope or timing . . . may support an inference of *scienter*") (citation omitted). "Whether a sale is 'unusual in scope' depends on factors such as 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.'" *Supreme*, 438 F.3d at 277 (citation omitted). Here, the following gives rise to a strong inference of *scienter*: (1) the atypical volume of sales of MBNA stock by Company insiders from their personal holdings – ***nearly 2 million shares of MBNA stock for almost $52 million in proceeds*** (¶ 100 (revised)), (2) the fact that the sales represented significant percentages of those insiders' respective MBNA holdings, (3) the unusual scope of the insiders' sales

compared to a two-year trading history, and (4) the timing and almost synchronous series of trades by *every* insider Defendant.

With regard to each Defendant, Plaintiffs have shown that the timing and scope of their open market trades were unusual when compared to both their individual and collective trading practices:

- Hammonds', Vecchione's, and Cochran's January 2005 sales were the ***only*** open market sales in the first quarter of ***any year since 2003***;

- Struthers' February 2005 sale was the ***only*** open market sale in the first quarter of ***any year since 2003***;

- Krulak's January and February sales were the ***only*** open market sales in the first quarter of ***any year since 2003***;

- On January 27, 2005, Hammonds sold 351,409 shares for more than $9 million in proceeds, representing 6.64% of his total holdings including vested options, this represented a trade of ***30.92% of his total open market sales since January 2003***;

- Vecchione's sales on January 25, 2005 of 100,462 shares for $2,684,398.70 in proceeds, represented 8.80% of his total holdings including vested options during the Class Period and ***100% of his open market sales for the two years prior***;

- Similarly, on January 27, 2005, Cochran's sales of 531,159 shares for over $14 million in proceeds, represented 8.96% of his total holdings including vested options during the Class Period and ***the most shares and highest profit of any other trading day in the two years prior***;

- On January 25th and 31st and February 1st of 2005, Krulak's sales of 497,454 shares for over $13 million in proceeds, represented 64.02% of his total holdings including common stock and options exercised as reported with the SEC and ***90.64% of his open market sales for the preceding two years***; and

- Struthers's sales of 457,464 shares on February 3, 2005 for over $12 million in proceeds, represented 12.53% of his total holdings including vested options during the Class Period and ***55.61 % of his open market sales for the preceding two years***.  (¶ 100 (revised).)[20]

---

[20] Defendants' piecemeal argument questioning the size of these trades is misplaced.  (DOB at 21.)  Defendants rely on cases where the only inference of *scienter* arose from one defendant's insider trading or where the CFO did not sell and no other facts supported an inference of *scienter* as compared to this case where all five Defendants improperly traded and the Complaint does not rest its *scienter* pleading solely upon allegations of insider trading.  (*See id.*)

Despite their confusing assertions, *no Defendant made any open market purchase of MBNA stock* during the Class Period. To the contrary, within the same two week period that followed Defendants' false announcement that MBNA had exceeded analysts' expectations for the fourth quarter and year-end 2004 and was expected to achieve of 10% earnings growth, every Defendant abandoned their duty to the investing public not to sell with insider information, or to disclose insider information prior to selling MBNA stock. (¶ 99.) Defendants collectively profited by selling over $51 million in MBNA stock in just ten days, as compared to approximately $56 million over the course of the previous two years. (¶¶ 100 (revised), 102.) Defendants cannot ignore the highly suspicious and unusual circumstances in which *all Defendants stock sold their MBNA stock less than three months before the truth was revealed. See Fecht*, 70 F.3d at 1083-84 (concluding that without an intervening event, the shortness of time – there two and one-half months – between when the optimistic statements were made and the negative results were revealed supports an inference of *scienter*). Given the large number and percentages of stocks traded, the timing of the sales, and the prior trading history (or lack thereof) of each Defendant, the stock sales that occurred were unusual and suspicious and, together, give rise to a strong inference of *scienter*.

In making its determination as to whether the Complaint sufficiently sets forth facts that create a strong inference of *scienter*, however, the following three categories of information are not presently before the Court: (1) information regarding Defendants' compensation for 2005; (2) information regarding Defendants' trading history prior to 2003; and (3) information regarding Defendants' incentive-based stock awards. Defendants argue that this information is vital to the Court's determination, and without

- 31 -

this information, Plaintiffs fail to meet the pleading requirements of *scienter*. As set forth below, Defendants' argument must be rejected as it is misleading and contrary to Third Circuit law.

First, in misconstruing Third Circuit law, Defendants argue that Plaintiffs ***must*** set forth each Defendant's overall compensation because only then can the Court determine whether the profits realized from insider sales create an inference of fraud. (DOB at 21.)  This argument seeks to mislead the Court into believing that information concerning Defendants' 2005 compensation was available at the time of filing this Complaint in December 2005.  In fact, Defendants know this information was not available because publicly-traded companies, like MBNA, only publish this information once a year in their company's proxy statement, which is filed with the SEC within 120 days after the end of the fiscal year.  Defendants also know this information will never become publicly available because, by merging with Bank of America Corporation in 2005, MBNA was not and will never be required to file a proxy statement for that year. It is in these very situations – where information is peculiarly within Defendants' control – that the Third Circuit has instructed courts to relax Rule 9(b)'s particularity requirement.  *See, e.g., Burlington*, 114 F.3d at 1418 (citations omitted).  For purposes of this Motion to Dismiss, the Court can look to several other factors and find Plaintiffs have sufficiently pled *scienter* based on Defendants' unusual trading activity.

Second, inconsistent with nearly all securities fraud litigation since the passage of the PSLRA, Defendants expect the Court to consider a trading history beyond the scope of the ample trading history provided by Plaintiffs. *See, e.g., No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 941 (9th Cir.

2003) (finding that for purposes of *scienter* the court should compare the class period sales to a trading history of equal length because *"only"* sales within this time period are relevant), *cert. denied*, 540 U.S. 966 (2003).[21] The proposed class period for this matter is just three months. While a three month trading history would be sufficient, Plaintiffs generously provide trading data and comparisons that look back *two full years* (2003 - 2004) to demonstrate that Defendants' sales, which all transpired over the course of ten days, were unusual. (¶¶ 100 (revised), 102.)[22] Plaintiffs respectfully submit that the Court should not entertain a trading history beyond the bounds of the Complaint, but recognize that it is ultimately for the finder of fact to determine whether the propitious timing by Company insiders was coincidental or by design. *See SEC v. Caserta*, 75 F. Supp. 2d 79, 96 (E.D.N.Y. 1999).

Third, Plaintiffs caution the Court not to be misled by Defendants' befuddled misuse of certain words and phrases, including "sold or disposed of," "acquired or sold," and "acquired . . . more shares than he disposed of," throughout their brief. Every acquisition and disposal of stock has different implications based on how it is coded on each respective SEC Form 4.[23] Thus, putting these improper comparisons and incomplete calculations aside, Defendants' retention of stock acquired through the exercise of stock options or receipt of stock is inconsequential to the Court's *scienter*

---

[21] While the Court may judicially notice SEC filings directly relied upon by the Complaint, Defendants improperly annex documents that are either not attributable to an indisputable source or go far beyond the bounds of the Complaint. In particular, Defendants' SEC filings that address fiscal years 2001-2002 are not properly before the Court on a motion to dismiss.

[22] In contrast, Defendants have to go back *five years* to support their factual arguments regarding the Individual Defendants' unlawful insider sales. (DOB at 16-20.)

[23] The Complaint, like nearly all complaints filed under the securities laws, only focuses on the Class Period sales that are coded "S" because these sales represent cash transactions as opposed to other transactions, i.e., stock awards and options, that are essentially cashless.

determination, especially in light of other unusual circumstances surrounding their trades.
*See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,*
75 F.3d 801, 814-15 (2d Cir. 1996) (holding that at the pleading stage the fact that the
defendant acquired stock does not negate allegations of motive based upon the unusual
temporal proximity of defendant's insider sale of stock to an adverse announcement).  By
exercising these options, each Defendant was able to acquire MBNA shares either ***at no
cost or at prices well below the then-current market price*** for the Company's stock and
immediately sell back most of those shares at the higher price, thereby reaping substantial
returns.[24]  That each Defendant exercised options and quickly turned large profits on
them evidences their motive to artificially inflate the price of MBNA stock so that they
could reap the largest possible gains from these transactions.  Similarly providing motive,
Plaintiffs have detailed herein how Defendants knew that missing analysts' 2004
consensus, timely disclosing the impairment to the IO investment and reporting the
inability to grow earnings would cause the Company's stock price to plummet below

---

[24] For example, Defendant Hammonds acquired 337,918 shares through the exercise of options or awards at below-market prices of $0.00-$8.78 per share in January 2005, but sold all of these shares (plus 13,491 others) in the open market to unsuspecting investors at the price of $26.51 per share.  Similarly, Defendant Vecchione acquired, through the exercise of options, 94,065 MBNA shares at the below-market prices of $13.92-$15.06 per share in January 2005, but sold 100,462 of these shares in the open market to unsuspecting investors at prices of $26.70-$26.80 per share.  Likewise, Defendant Cochran acquired 584,696 MBNA shares through the exercise of options or awards at below-market prices of $0.00-$4.89 per share in January 2005, but sold 531,159 of these shares in the open market to unsuspecting investors at prices of $26.51-$26.55 per share.  In addition, Defendant Struthers acquired 619,420 MBNA shares through the exercise of options or awards at below-market prices of $0.00-$8.78 per share between January and February of 2005, but sold 457,464 of these shares in the open market to unsuspecting investors at the price of $26.84 per share.  Moreover, Defendant Krulak acquired 562,007 MBNA shares through the exercise of options or awards at below-market prices of $0.00-$21.70 per share between January and February of 2005, but sold 497,454 of these shares in the open market to unsuspecting investors at prices of $26.50-$27.00 per share.  (*See* DOB Appx.)

their stock option exercise price and, thus, failed to disclose the same. (*See supra,* SOF at B.)

Moreover, MBNA's deteriorating condition made it a prime candidate for a merger with a company like Bank of America and, thus, by retaining MBNA stock Defendants sought to gain substantial proceeds from that corporate negotiation. (¶¶ 31-37, 93, 97.) MBNA – a company that had reported the best records among all financial services companies as well as superior asset quality and solid return on equity – would have substantial motive to report solid earnings growth for 2004 and, for the first time ever, provide earnings growth guidance for 2005 in order to convincingly report (just three months later in April 2005) its own shock as to the Company's true financial condition. Rather than report that MBNA's business could not withstand market conditions and had already felt the effects of its credit card business's deterioration, Defendants would take the opportunity to report one hit to earnings in 2005 that they would label as an anomaly, collect their unlawful insider sales proceeds and simultaneously escape risking a successful merger. Further, a strong inference may be made in this day and age of corporate scandals that sophisticated insiders, like Defendants, understand that there is a delicate balance to be struck in deciding how much stock a person in their respective positions of power can sell, especially in unison, without diluting the market for those particular stock sales or bringing down the value of the stock overall. Under these facts and inferences, which should be viewed in Plaintiffs' favor, Defendants' argument that their retention of MBNA stock during the Class Period gave them more of an incentive to make the Company profitable is a *non sequitur*.

As explained earlier, Plaintiffs' *scienter* allegations must be assessed in their totality. At any rate, having pled a sufficiently unusual occurrence of insider trades that raises strong inferences of motive and thus, *scienter*, this becomes a question of fact for the jury. *See SEC*, 75 F. Supp. 2d at 96.

### E.    DEFENDANTS' STATEMENTS RELATING TO "INVESTOR DAY" EARNINGS GUIDANCE ARE ACTIONABLE

Defendants' characterization of each "investor day" statement, wherein Defendants provided specific earnings guidance for 2005, as "unquestionably" forward-looking improperly ignores that there were non-forward-looking representations associated with these statements. (*See supra,* SOF at E, pp. 10-11, 13; DOB at 31.) Plaintiffs challenge Defendants' representations of (1) good faith - that they believed in the statements when they were made, and (2) fair calculation - that they were unaware of any undisclosed facts that would seriously undermine the statements.[25] As a factual matter, the Complaint sufficiently casts doubt on Defendants' good faith because Defendants knew that serious problems at their core credit card business directly contradicted their overly optimistic earnings guidance for 2005. (*See* ¶¶ 4-6, 33, 46, 47, 49-57, 68, 73, 74, 82, 86, 88, 94.) Moreover, as set forth in more detail above, the Complaint more than sufficiently establishes that Defendants knowingly employed an unfair earnings growth calculation by failing to recognize the IO investment's $206.6 million impairment to income. Where, as here, defendants issue statements while "in possession of material facts which they had a duty to disclose," they are liable for failing to make such statements not misleading. *Montalvo v. Tripos, Inc.*, No. 03-995, 2005 U.S.

---

[25] *See Viropharma,* 2003 U.S. Dist. LEXIS 5623, at *25 (holding that statements were not forward-looking statements because the "truth or falsity . . . of these statements was determinable at the time they were made")

Dist. LEXIS 22752, at *18-19 (E.D. Mo. Sept. 30, 2005) (denying a motion to dismiss despite contention that statements were forward-looking financial projections).[26]

Thus, because Defendants' "investor day" statements were not forward looking, the "bespeaks caution" doctrine and PSLRA safe harbor do not apply and cannot immunize Defendants' materially misleading statements. *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 874 (3d Cir. 2000) ("By its terms, the 'bespeaks caution' doctrine, like the safe harbor . . . is directed only to forward-looking statements."); 15 U.S.C. § 78u-5(a) ("apply only to a *forward-looking* statement . . .").[27]

### F.    THE TIMING OF MBNA'S DECISION TO WRITE-DOWN ITS IO INVESTMENT WAS NOT A MATTER OF BUSINESS JUDGMENT

Defendants wrongly claim that Plaintiffs must *prove* Defendants knowingly violated GAAP by a certain dollar amount, disputing whether the $206.6 write-down was required in 2004.  Plaintiffs, however, need not prove evidence on a motion to dismiss. Further, Defendants' portrayal of the IO investment at MBNA as a loose internal figure unguided by standard industry practices or accounting principles must be rejected. Rather, the timing of an IO investment write-down is governed by GAAP and SEC Regulations that set guidelines for recorded impairments to investments (¶¶ 69-72) and

---

[26] The Complaint sets forth that the market was misled into believing this specific earnings guidance was based on sound reporting principles.  (*See, e.g.*, ¶¶ 60 (share price fell), 61 (reports that "[m]anagement has lost a lot of credibility"), 62 (reported as "Shock and Awe").)

[27] Even if found to be forward-looking, the "bespeaks caution" doctrine and PSLRA safe harbor do not apply because the Complaint adequately pleads Defendants had *actual knowledge* that their "investor day" statements were false when made.  Any warnings provided failed to disclose that Defendants already knew that MBNA would not meet its earnings guidance because *MBNA's financial condition was already impaired by over $206 million* as a result of the higher pre-payment rates at MBNA in 2004. *See In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990, 2005 U.S. Dist. LEXIS 18448, at *105 (D.N.J. Aug. 17, 2005) (holding forward-looking statements made with actual knowledge of their falsity are actionable).

MBNA calculates its fair value monthly "based on the present value of expected future net revenue flows" (¶¶ 46, 47, 51-54, 87). Thus, the value given to MBNA's IO investment is a number of historical fact because the value attributed to this investment every month is based on the *then-present* state of MBNA's financial condition.

As fact, the Complaint pleads MBNA experienced a high pre-payment trend and explains how the sudden and dramatic increase in pre-payments rates cut off a massive amount of income previously attributed to the IO investment from securitization. (*See supra*, SOF at B; ¶¶ 41, 42.) Plaintiffs also need not prove the exact amount that was concealed because numerous facts, by themselves and in combination (i.e., the reasons why Defendants could not have been surprised), support the strong inference that Defendants concealed their decision to belatedly write-down the IO investment. (¶¶ 33, 49-58, 94.)[28]

## G.    PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE SUSTAINED

Defendants challenge whether Cochran, Struthers and Krulak were controlling persons in the fraud. (DOB at 37.) As pled in the Complaint, these Defendants are controlling persons by virtue of their role in the Package review process wherein they determined the contents of MBNA's financial disclosures. (¶¶ 51-54, 89.)[29] Since Plaintiffs have stated actionable claims against all Defendants, including MBNA, as a

---

[28] The cases cited by Defendants are far from "directly on point" and discuss scenarios where, unlike here, there it is a *non-reporting period* or where the court said the "bottom line" for dismissal was that *plaintiff did not plead any facts* from which it could infer a concealed a decision to write-down its assets before it chose to do so. *See, e.g., In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000); *Kriendler v. Chem. Waste Mgmt., Inc.*, 877 F. Supp. 1140 (N.D. Ill. 1995).

[29] As every Defendant attended "investor day," they cannot escape liability for the statements made therein. (*See* n.11 *supra*.)

primary violators of § 10(b) and Rule 10b-5, Plaintiffs' § 20(a) claim should be sustained. *See Shapiro*, 964 F.2d at 280.

Moreover, the Exchange Act imposes liability not only on the person who actually commits the securities law violation, but also on the persons who "directly or indirectly" control the violator. *See* 15 U.S.C. § 78t(a). Plaintiffs have adequately pled control person liability by alleging an underlying violation by MBNA, a "person" the Defendants controlled. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 605 (7th Cir. 2006) (citing *In re Stone & Webster, Inc., Sec. Litig.*, 424 F.3d 24, 27 (1st Cir. 2005)); *Jones*, 274 F. Supp. 2d at 644. Thus, Plaintiffs' claims against the Defendants as MBNA executives actively involved in the financial disclosure process for controlling person liability under § 78t(a) survive. *Id.* "If, in the end, the plaintiffs are able to sustain a charge against [the Company] . . . the other executives will have an opportunity to prove that they acted in good faith." *Makor Issues & Rights,* 437 F.3d at 605.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court sustain

Plaintiffs' Complaint and deny Defendants' Motion to Dismiss in its entirety.[30]

Date: April 11, 2006              Respectfully submitted,

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

<u>/s/ Seth D. Rigrodsky (#3147)</u>
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 984-0597
(302) 984-0870  (fax)

- *and* -

Shannon M. McKenna
**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
(212) 868-1229 (fax)

***Plaintiffs' Lead Counsel***

---

[30] If any deficiencies are found by the Court, Plaintiffs respectfully request leave to amend, which should be freely granted.  *See, e.g., Burlington*, 114 F.3d at 1434.

## CERTIFICATE OF SERVICE

I, Brian D. Long, hereby certify that on this 11th day of April, 2006, I caused a true and correct copy of the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS to be electronically filed with the Clerk of Court using CM/ECF, which will send notification of such filing(s) to the following:

Richard H. Morse
**YOUNG CONAWAY STARGATT & TAYLOR LLP**
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Tel.: (302) 571-6651
E-mail: rmorse@ycst.com
*Counsel for Defendants*


Joseph A. Rosenthal
Jeffrey S. Goddess
**ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A.**
919 Market Street, Suite 1401
Wilmington, DE 19801
Tel.: (302) 656-4433
Email: rmgg@rmgglaw.com


/s/ Brian D. Long
Brian D. Long (#4347)
MILBERG WEISS BERSHAD
    & SCHULMAN LLP
919 N. Market Street, Suite 980
Wilmington, DE 19801
(302) 984-0597
blong@milbergweiss.com