# TABS 2-3
# to Compendium

# TAB 2
# to Compendium

LEXSEE 1997 U.S. DIST. LEXIS 13840

In re: CEPHALON SECURITIES LITIGATION

CIVIL ACTION No. 96-CV-0633

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*1997 U.S. Dist. LEXIS 13840; Fed. Sec. L. Rep. (CCH) P99,562*

August 29, 1997, Decided
August 29, 1997, Filed

**DISPOSITION:** [*1] Defendants' Motion for Dismissal DENIED.

**COUNSEL:** For DAVID STEINBERG, PLAINTIFF: MARIAN P. ROSNER, WOLF, POPPER, ROSS, WOLF & JONES, NEW YORK, NY USA.

For DAVID STEINBERG, PLAINTIFF: MARK C. RIFKIN, GREENFIELD & RIFKIN, LLP, ARDMORE, PA USA.

For CEPHALON, INC., FRANK BALDINO, JR., BRUCE A. PEACOCK, DEFENDANTS: JOHN G. HARKINS, JR., DAVID J. CREAGAN, ELEANOR MORRIS ILLOWAY, HARKINS CUNNINGHAM, PHILA, PA USA.

For SANDS POINT PARTNERS, L.P., MOVANT: SHERRIE R. SAVETT, PHILADELPHIA, PA USA.

For SANDS POINT PARTNERS, L.P., MOVANT: ROBERT C. FINKEL, WOLF, POPPER, ROSS, WOLF & JONES, NEW YORK, NY USA.

For CEPHALON, INC. SECURITIES LITIGATION: CAROLE A. BRODERICK, BERGER & MONTAGUE, P.C., PHILA, PA USA.

For CEPHALON, INC. SECURITIES LITIGATION: MARIAN P. ROSNER, WOLF, POPPER, ROSS, WOLF & JONES, NEW YORK, NY USA.

For CEPHALON, INC. SECURITIES LITIGATION: MARK C. RIFKIN, GREENFIELD & RIFKIN, LLP, ARDMORE, PA USA.

For MICHAEL F. MURPHY, DR., MOVANT: JOHN G. HARKINS, JR., HARKINS CUNNINGHAM, PHILA, PA USA.

**JUDGES:** CLIFFORD SCOTT GREEN, S.J.

**OPINIONBY:** CLIFFORD SCOTT GREEN

**OPINION:**

### MEMORANDUM and ORDER

Presently pending is Defendant's Motion to Dismiss, Plaintiffs' [*2] Memorandum in Opposition, and the replies thereto. For the reasons set forth below, Defendant's Motion will be denied.

### FACTS

Plaintiffs' consolidated class action complaint alleges violations of the Securities and Exchange Act of 1934 ("the Exchange Act") and also includes a common law claim of negligent misrepresentation. The complaint avers that defendants knowingly or recklessly made false and misleading representations about the data from two clinical studies of defendants' drug Myotrophin. Those misrepresentations allegedly caused a substantial artificial inflation in defendants' stock prices. Plaintiffs claim that they purchased the stock at the inflated prices. Plaintiffs essentially maintain that when the properly analyzed results of the studies were fully and truthfully disclosed, defendants' stock prices fell, causing plaintiffs - all of whom are defendants' shareholders - economic injuries.

Defendants maintain that dismissal of the complaint is warranted pursuant to *Fed.R.Civ.P. 12(b)(6)* as defendants contend plaintiffs' allegations fail to state a claim upon which relief may be granted because they are impermissibly based on hindsight and opinion differences, [*3] not contemporaneous facts supporting a claim of fraud. Defendants essentially assert plaintiffs

Case 1:05-cv-00272-GMS     Document 46-4     Filed 04/11/2006     Page 4 of 22

Page 2
1997 U.S. Dist. LEXIS 13840, *; Fed. Sec. L. Rep. (CCH) P99,562

have not set forth facts sufficient to explain how defendants' statements or omissions were false or misleading at the time they were made. Defendants also assert dismissal is appropriate under *Fed.R.Civ.P. 9(b)* as plaintiffs failed to plead misrepresentation with the requisite specificity and failed to adequately plead scienter. Defendants also maintain Plaintiffs failed to satisfy the heightened pleading requirements for allegations of fraud under the Private Securities Litigation Reform Act of 1995, *15 U.S.C. § 78u-4*. Defendants' final contention is that this court should not, upon dismissal of plaintiffs' Exchange Act claims, exercise supplemental jurisdiction over plaintiffs' state law claims. Defendants maintain plaintiffs' state law claims should be dismissed pursuant to *Fed.R.Civ.P. 12(b)(1)*.

## DISCUSSION

When considering a motion to dismiss under *Fed.R.Civ.P. 12(b)(6)*, the court must take allegations contained in the complaint as true and construe them in the light most favorable to the plaintiff. *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989);* [*4] *Rocks v. City of Phila., 868 F.2d 644, 645 (3d Cir. 1989)*. To state a claim under § 10(b) of the Exchange Act and Rule 10b-5 (of the rules promulgated thereunder), a plaintiff must plead: "1) a false misrepresentation of 2) a material 3) fact, 4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, 5) the plaintiff's reasonable reliance on the representation, and 6) the plaintiff's resulting loss." *Shapiro v. UJB Finan. Corp., 964 F.2d 272, 280 (3d Cir.)*, cert. denied, *506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992)*. Defendants maintain that plaintiffs have not sufficiently pled misrepresentation and scienter. Defendants rely heavily on the pleading requirements of the Reform Act in asserting plaintiffs failed to plead particularly and to plead the requisite state of mind. The Reform Act simply requires, in relevant part,

...the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief [*5] is formed...In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate the chapter,

state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Id., *15 U.S.C. § 78u-4*(b)(2, 3(b)(2)). Clearly, the Reform Act requires some precision in alleging facts, however, it does not require pleading all of the evidence and proof thereunder supporting a plaintiff's claim. Construing plaintiffs' allegations under both *Fed.R.Civ.P. 9(b)* and the Reform Act as true and in the light most favorable to them, I find that Plaintiffs have stated a claim upon which relief may be granted and have sufficiently pled fraud and misrepresentation. Plaintiffs filed a 55 page consolidated class action complaint, containing 109 paragraphs which set forth the time, place and manner in which defendants' allegedly made fraudulent and misleading statements. n1 Plaintiffs have set forth substantial allegations in their complaint which, as alleged, give rise to [*6] a strong inference that defendants may have acted in violation of the Exchange Act. Contrary to defendants' assertions, the complaint sets forth contemporaneous facts supporting plaintiffs' contentions. Defendants urge a narrow reading of *Fed.R.Civ.P. 9(b)* and the Reform Act. The Third Circuit has cautioned against adopting too narrow of a reading of Rule 9(b). See, *Christidis v. First Pa. Mortgage Trust., 717 F.2d 96, 100 (3d Cir. 1983)*. Moreover, as plaintiffs claim defendants made numerous misrepresentations and inconsistent statements regarding the efficacy of Myotrophin and regarding the clinical study results, I must accept those allegations as true. The allegations are sufficiently particular to withstand Defendants' motion for dismissal of plaintiffs' § 10(b) claims.

n1 As defendants urge, I read the complaint as including those portions of documents and matters of public record which can fairly be said to have been relied upon by plaintiffs and incorporated by reference in the complaint. I do not, as defendants suggest, read the complaint as incorporating matters not fairly relied upon by plaintiffs.

[*7]

Because Plaintiffs' § 10(b) claim will not be dismissed, Defendants' argument for dismissal of Plaintiffs' § 20(a) claim lacks merit. To establish liability under § 20(a) of the Exchange Act, a plaintiff must prove that a primary violation occurred, that the defendant had control over the person responsible for the violation, and the defendants acted culpably. See Id. As discussed above, plaintiffs have alleged facts sufficient to support these claims.

1997 U.S. Dist. LEXIS 13840, *; Fed. Sec. L. Rep. (CCH) P99,562

Finally, defendants assert plaintiffs' state law claims should be dismissed because there is no subject matter jurisdiction once plaintiffs' Exchange Act claims are dismissed. Because plaintiff's Exchange Act claims will not be dismissed, I will exercise supplemental jurisdiction over plaintiffs' state law claims.

An appropriate order follows.

**ORDER**

AND NOW, this 29th day of August, 1997, IT IS HEREBY ORDERED that Defendants' Motion for Dismissal is DENIED.

IT IS FURTHER ORDERED that Defendants file an answer to Plaintiffs' Complaint within 20 days of the date of this Order.

BY THE COURT:

CLIFFORD SCOTT GREEN, S.J.

# TAB 3
# to Compendium

1 of 2 DOCUMENTS

**CLIFFORD C. MARSDEN and MING XU, Individually and on Behalf of All Others Similarly Situated v. SELECT MEDICAL CORP., MARTIN JACKSON, ROBERT A. ORTENZIO, ROCCO ORTENZIO, and PATRICIA RICE**

CIVIL ACTION 04-4020

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2006 U.S. Dist. LEXIS 16795*

**April 6, 2006, Decided**

**COUNSEL:** [*1] For CLIFFORD C. MARSDEN, Plaintiff: ERIC L. YOUNG, KENNEDY LENNON & EGAN, PLYMOUTH, PA; LORI G. FELDMAN, PETER E. SEIDMAN, SANFORD P. DUMAIN, SHANNON L. HOPKINS, MILBERG WEISS BERSHAD & SCHULMAN LLP, NEW YORK, NY.

For MING XU, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff: ERIC L. YOUNG, KENNEDY LENNON & EGAN, PLYMOUTH, PA; LORI G. FELDMAN, PETER E. SEIDMAN, SANFORD P. DUMAIN, SHANNON L. HOPKINS, MILBERG WEISS BERSHAD & SCHULMAN LLP, NEW YORK, NY: STUART T. STEINBERG, DECHERT PRICE AND RHOADS, PHILA, PA.

For CAPITAL INVEST, DIE KAPITALANLAGEGESELLSCHAFT DER BANK AUSTRIA CREDITANSTALT GRUPPE GMBH, FOR ACCOUNT OF ITS FUNDS C 43 AND GF 5, JAMES SHAVER, FRANK C. BAGATTA, Plaintiffs: ERIC L. YOUNG, KENNEDY LENNON & EGAN, PLYMOUTH, PA; LORI G. FELDMAN, PETER E. SEIDMAN, SANFORD P. DUMAIN, SHANNON L. HOPKINS, MILBERG WEISS BERSHAD & SCHULMAN LLP, NEW YORK, NY.

For SELECT MEDICAL CORP, MARTIN JACKSON, ROBERT A. ORTENZIO, ROCCO ORTENZIO, PATRICIA RICE, Defendants: DAVID M. HOWARD, DECHERT LLP, PHILADELPHIA, PA; MICHAEL L. KICHLINE, STUART T. STEINBERG, DECHERT, PRICE & RHOADS, PHILA, PA;

**JUDGES:** CURTIS JOYNER, J.

**OPINIONBY:** J. CURTIS JOYNER

**OPINION:**

MEMORANDUM [*2] AND ORDER

**JOYNER, J.**

Via the motions now pending before this Court, Defendants, Select Medical Corp., Martin Jackson, Robert A. Ortenzio, Rocco Ortenzio, and Patricia Rice ("Defendants"), move to dismiss Plaintiffs' Amended Complaint pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, and to strike various allegations of the Amended Complaint pursuant to *Federal Rule of Civil Procedure 12(f)*. For the reasons outlined below, the motion to dismiss shall be DENIED in part and GRANTED in part, and the motion to strike shall be DENIED.

**I. Background**

Plaintiffs, on behalf of themselves and a class of similarly situated purchasers of the securities of Defendant Select Medical Corp. ("Select"), brought this suit to recover for alleged violations of the Securities Exchange Act of 1934 (the

Case 1:05-cv-00272-GMS    Document 46-4    Filed 04/11/2006    Page 8 of 22

Page 2
2006 U.S. Dist. LEXIS 16795, *

"Exchange Act"). n1 (Am. Compl. at P1.) During the relevant period, Select was a health care provider specializing in the operation of long-term acute care hospitals ("LTACs" or "LTCHs"). (Am. Compl. at P2.) Select was a publicly-held company whose common stock was traded on the New York Stock [*3] Exchange. (Id. at P18.) Defendant Robert A. Ortenzio ("Robert Ortenzio") is a founder of Select, and served as Chief Executive Officer, President, and a member of the Board of Directors at all relevant times. (Id. at P12.) Defendant Rocco Ortenzio is also a founder of Select, and served as Chairman of the Board of Directors at all relevant times. (Id. at P14.) Defendant Patricia Rice ("Rice") was at all relevant times the Chief Operating Officer of Select. (Id. at P15.) Defendant Martin F. Jackson ("Jackson") served as Chief Financial Officer of Select at all relevant times. (Id. at P16.) Robert Ortenzio, Rocco Ortenzio, Rice, and Jackson (the "Individual Defendants") were all intimately involved with the health care industry, Select's business, and providing information regarding that business to stockholders and the market. (See id. at PP12-16.)

n1 The factual background of Plaintiffs' claims is complex and lengthy. We attempt below to summarize the most pertinent background facts, focusing on the information Plaintiffs allege was wrongfully withheld from the market.

[*4]

LTCHs are designed to treat patients with serious and often complex medical conditions. (Am. Compl. at P30.) LTCHs must have provider agreements with Medicare and must have an average patient stay length of greater than or equal to twenty-five days. (Id.) As of December, 2003, Select operated seventy-nine LTCHs and an additional four non-LTCH-certified specialty hospitals or outpatient rehabilitation clinics. (Id.)

Medicare reimbursements for treatment rendered at Select's hospitals comprised a significant percentage of Select's income. (See id. at P31.) These reimbursements represented 37.3, 40.3 and 46.0 percent of Select's net operating revenues in 2001, 2002, and 2003 respectively. (Id.) Medicare reimbursement constituted approximately sixty-nine percent of all specialty hospital revenues for 2003. (Id.)

As a recipient of Medicare reimbursements, Select was subject to the regulatory oversight of federal agencies. (Am. Compl. at P34.) This oversight included control of and changes to the payment system for receiving reimbursements. (See id. at PP36-43.) Most acute care hospitals are reimbursed under a prospective payment system ("PPS"). (Id. at P36.) [*5] PPS was instituted to prevent overstatement of costs under the previous system by establishing fixed reimbursement rates based on categories of treatment. (Id. at P36, 37.) Each category or diagnostic rate group ("DRG") is based on the national average cost of treatment for the particular medical condition. (Id. at P37.) Reimbursement for general acute care hospitals is limited to six days of care, regardless of whether the actual stay exceeds that limit. (Id.) LTCHs, whose patients generally require more costly care and longer stays, were initially excluded from the PPS system. (Id. at P38.) This exclusion created an economic incentive for acute care hospitals to transfer patients to LTCHs before completing treatment to avoid losing money if the patient stayed more than six days. (Id. at P39.) The exclusion of LTCHs from PPS also meant that there were no DRGs to control costs, leaving the LTCH payment system open to the fraudulent overstatement that had prompted the switch to PPS for other hospitals. (Id. at P38.) This less-restrictive payment system gave a financial incentive to LTCHs to accept early transfers from general acute care hospitals seeking to avoid [*6] losses. (Id. at P40.) The most attractive patients, therefore, were those that could have been treated in a short-term facility, because they likely required the fewest resources and thus yield the greatest profit. (Id. at P40, 42.)

As a result of this structure, health care providers, including Select, expanded their LTCH operations. (Am. Compl. at P41.) Select acquired twenty-six new LTCHs between 2001 and 2003. (Id.) To ensure a supply of profitable patients for the rapidly growing number of LTCH beds, Select instituted a quota system for Medicare referrals from host hospitals to the LTCH. n2 (Id. at P42.) Select pressured employees to accept only Medicare referrals, regardless of the level of care actually appropriate for the patient, and allegedly fired those who did not meet the established quotas. (Id.)

n2 See infra, p.6 for discussion of host hospitals and their relationship to LTCHs.

In August 2002, to eliminate the financial incentives created by the exclusion of LTCHs from [*7] PPS, the Centers for Medicare and Medicaid Services ("CMS") established a PPS system designed specifically for LTCHs ("LTCH-PPS"). (Am. Compl. at P43.) The LTCH-PPS was to be phased in over a five year period. (Id.) The LTCH-PPS system, though based on DRGs, offered higher reimbursement rates than those available for general acute care hospitals. (Id.)

2006 U.S Dist. LEXIS 16795, *

Select's business began to decline beginning in 2003. (Am. Compl. at P44.) Select experienced a decline in patient admissions and an increase in competition from other companies. (Id.) The implementation of LTCH-PPS was expected to cover admissions-related shortfalls, leading to increased pressure to admit patients that did not require long-term care. (Id.) Select's rehabilitation clinics also experienced declines, and Select failed to meet financial goals, resulting in some office closures and staff layoffs. (Id.)

Plaintiffs allege that, in order to conceal these setbacks, Select launched a campaign to acquire LTCHs using the hospital-within-a-hospital ("HIH") model. (Am. Compl. at P47.) Under the HIH model, Select leases space within an existing general acute care hospital that acts as the "host." (Id. at [*8] 48.) By the end of 2003, seventy-five of Select's eighty-three specialty hospitals operated as HIHs. (Id. at P53.)

This arrangement provides a significant benefit to the tenant LTCH by eliminating capital costs, and also provides lease income to the host. (Am. Compl. at P48.) HIHs, however, are subject to more stringent criteria for Medicare purposes than free-standing LTCHs to avoid conflicts of interest based on the close proximity of the host to the HIH-LTCH. (Id. at P49, n.8.)

Plaintiffs allege that Select, at the direction of Robert and Rocco Ortenzio, and possibly Rice, exploited this very proximity by paying "kickbacks" to the host hospital in exchange for premature referrals of host patients to the HIH-LTCH. (Am. Compl. at P50-52.) These referral practices created two reimbursable episodes -- one for the host's initial admission and discharge to the LTCH, and a second for the LTCH's admission and eventual discharge. (Id. at P58.)

Reciprocal arrangements also existed whereby HIH-LTCHs referred LTCH patients to the host for tests, rather than using an outside source. (Am. Compl. at P51.) After discharge to the host and completion of the testing or procedures, which [*9] often could have been performed by the LTCH itself, patients are readmitted to the LTCH. (Id. at P61.) This pattern -- referred to by Plaintiffs as "patient churning" -- multiplies the number of reimbursable events for each patient involved, allowing both the host and the HIH-LTCH to collect more from Medicare than if the patient was treated solely by one or the other. (Id.) The benefits of these practices were enhanced by additional manipulation of the Medicare reimbursement system, including shifting DRG classifications or making additional diagnoses to create new reimbursable events and creating new accounts for patients readmitted after testing or procedures at the host. (Id. at PP62, 63.)

These practices were successful in increasing referral and admission rates. (Am. Compl. at P52.) During the relevant period, more than half of Select's referrals came from host hospitals, and Select acknowledged that host hospitals were carefully selected based on referral potential. (Id. at P54.)

The growth in LTCHs and HIH arrangements and concern about Medicare abuses associated with the HIH model prompted increased regulatory scrutiny. (Am. Compl. at P65.) Among the concerned [*10] were CMS and the Medicare Payment Advisory Commission ("MedPAC"), an independent federal body formed to advise Congress on issues affecting Medicare. (Id. at PP66, 67.) In the fall of 2002, MedPAC initiated a study of transfer and referral practices. (Id. at P67.) The Office of the Inspector General of the Department of Health and Human Services ("OIG") indicated the intent to conduct a similar investigation in its Fiscal 2003 Work Plan in September 2002. (Id. at P68.)

MedPAC public reported on its ongoing study of Medicare billing abuses in the HIH model through regular public meetings held at least four times per year. (Am. Compl. at P72.) At such a meeting held April 25, 2003, MedPAC questioned the relationships between HIH-LTCHs and their hosts, particularly the significantly larger percentage of referrals originating from primary referrers in comparison to non-HIH LTCHs, as well as higher profit margins where the host hospital acted as the primary referrer. (Id. at P73, 74.) These concerns were reiterated in MedPAC's June 2003 report to Congress. (Id. at P75.) That report specifically described the reimbursement-multiplying effect of improper transfers and [*11] readmissions. (Id. at P76.)

At its March 18, 2004 meeting, MedPAC presented the results of its study and offered "Draft Recommendations" to Congress. (Am. Compl. at P78.) MedPAC recommended limitations on the types of patients that may be admitted to LTCHs to keep the focus on medically complex patients that cannot be treated in less costly settings. (Id. at P79.) MedPAC also noted that LTCH-PPS created incentives to admit patients with the least costly needs within a DRG. (Id.) MedPAC recommended "strong rules" for HIHs to prevent the discharge of patients purely for financial gain. (Id.)

In addition to this publicly available information, Select had further access to information regarding regulatory investigation of HIH-LTCH practices. Robert Ortenzio acted as a panelist at a Healthcare Summit sponsored by the American Bar Association in November 2003. (Am. Compl. at P81.) Also on the panel were CMS Chief Administrator Thomas Scully and CMS Director, Division of Acute Care, Hospital and Ambulatory Policy Group, Tzvi Hefter. (Id.) The panel discussed proposed Medicare regulations, including a limit on the number of host-to-HIH referrals. (Id.) At

the Healthcare [*12] Summit, Tzvi Hefter clearly expressed his concerns about abuses and the rationale for such a limit. (Id. at P83.)

MedPAC officials visited several of Select's locations in the Fall of 2003 to discuss MedPAC's ongoing investigation. (Am. Compl. at P84.) Robert and Rocco Ortenzio met regularly with MedPAC officials to discuss the study and contribute to MedPAC's recommendations. (Id. at P84.) Robert Ortenzio and Rice met with other Select officials in Fall of 2003 to discuss Select's operations as they related to the OIG's Work Plan, which included investigation of HIH abuses. (Id. at P85.)

Select received additional information and sought to exercise its political influence through Acute Long Term Hospital Association ("ALTHA"). (Am. Compl. at P86.) ALTHA acted as a lobbyist group for LTHCs, and offered exclusive access to information and influence, including legislative and regulatory matters. (Id. at P87.) Robert Ortenzio and Rice both held positions on ALTHA's board. (Id. at P86.) Information regarding the twenty-five percent limit was discussed at Select Company meetings, staff meetings, among concerned employees, and through internal emails. (Id. at P95-97.) [*13]

On January 1, 2004, Select hired Thomas Scully ("Scully"), former Chief Administrator of CMS, to provide government relations and regulatory advice. (Am. Compl. at P99.) Scully was appointed to Select's Board of Directors on February 11, 2004. (Id.)

On May 11, 2004, Select issued a press release announcing regulations proposed by CMS that targeted HIH-LTCHs. (Am. Compl. at P187.) Under the proposed rule, HIH-LTCHs would not be reimbursed for any patients transferred from the host hospital in excess of twenty-five percent of the LTCH's total admissions. (Id.) Select acknowledged that, if adopted, this rule would have disastrous consequences for its business. (Id.)

News of the proposed regulations precipitated a drop in Select's stock prices. (Am. Compl. at P188.) Select's stock dropped by forty percent over May 11 and 12, 2004. (Id.) Downgrades to Select's stock followed. (Id. at P191.)

Plaintiffs allege that Defendants made materially misleading statements and omitted material information regarding the CMS proposal, the means by which revenue was being generated, and the adequacy of internal accounting controls. (Am. Compl. at P115-185.) The statements and [*14] omissions at issue are presented and examined in our discussion below of Defendants' arguments for dismissal.

## II. Defendants' Motion to Dismiss

### A. Standards Governing Rule 12(b)(6) Motions to Dismiss

Generally speaking, in considering motions to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, district courts must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." *Allah v. Seiverling, 229 F.3d 220, 223 (3d Cir. 2000)*(internal quotations omitted); see also *Ford v. Schering-Plough Corp., 145 F.3d 601, 604 (3d Cir. 1998)*. A motion to dismiss may only be granted where the allegations fail to state any claim upon which relief may be granted. See *Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir. 1997)*. The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims. In re *Rockefeller Center Properties, Inc., 311 F.3d 198, 215 (3d Cir. 2002)*. Dismissal [*15] is warranted only "if it is certain that no relief can be granted under any set of facts which could be proved." *Klein v. General Nutrition Companies, Inc., 186 F.3d 338, 342 (3d Cir. 1999)*(internal quotations omitted). It should be noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint and legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. *Rockefeller, 311 F.3d at 216*. A court may, however, look beyond the complaint to extrinsic documents when the plaintiff's claims are based on those documents. *GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004)*; In re Burlington Coat Factory Sec. Litg., 114 F.3d 1410, 1426. See also, *Angstadt v. Midd-West School District, 377 F.3d 338, 342 (3d Cir. 2004)*.

### B. Legal Standard for Securities Fraud Claims

Section 10(b) of the Exchange Act creates a private right of action for individuals injured by false or misleading statements or omissions of material fact. *Burlington, 114 F.3d at 1417* [*16] (internal citations omitted). To state a claim under Section 10(b) and the attendant enforcement provisions of Rule 10b-5, a plaintiff must allege that the defendants (1) made a misstatement or omission of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff reasonably relied, and (5) that such reliance by the plaintiff was the

proximate cause of the injury. GSC *Partners, 368 F.3d at 236* (internal citations omitted). To state a claim under Section 20(a) of the Exchange Act, a plaintiff must be able to maintain a claim for an underlying violation of the Exchange Act by a controlling person or entity, and that the controlling persons were culpable participants in the violation perpetrated by the entity they controlled. *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 (3d Cir. 1992)*, rehearing en banc denied, *1992 U.S. App. LEXIS 15567 (3d Cir. 1992)*.

The Federal Rules of Civil Procedure require that securities fraud plaintiffs must plead the circumstances surrounding the alleged fraud with "particularity." *Fed. R. Civ. P. 9(b)* [*17] . Additionally, claims under the Exchange Act are subject to the heightened pleading requirements established by the Private Securities Litigation Reform Act (the "PSLRA"), *15 U.S.C. § 78u-4*. The PSLRA represents an attempt by Congress to stem the perceived abuse of securities fraud complaints by requiring greater factual particularity when alleging securities fraud. See *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 145 (3d Cir. 2004)*. Under the PSLRA, every securities fraud claim must

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.

*15 U.S.C. § 78u-4(b)(1)*. Particular facts must also be plead that give rise to a strong inference of scienter. *15 U.S.C. § 78u-4(b)(2)*.

### C. Discussion

#### 1. Duty

Defendants argue that Plaintiff's claims based on the CMS proposal must be dismissed because Defendants have no legal duty to [*18] predict the actions of a regulatory agency. (Defs.' Mem. in Support of Mot. of Defs.' to Dismiss the Am. Compl. ("Defs.' Br.") at 43-50.) Defendants point to cases in which courts have dismissed shareholder claims that were based on the idea that defendant could and should have predicted the information or events that were allegedly misstated or omitted. (Id. at 43-46 (citing *In re Craftmatic Sec. Litg., 890 F.2d 628 (3d Cir. 1998)*; *In re Viropharma Sec. Litg., Civ. A. No. 02-1627, 2003 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 7, 2003)*; *Helwig v. Vencor Inc., 251 F.3d 540 (6th Cir. 2001)*; *Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605 (7thCir. 1995)*; *Wielgos v. Commonwealth Edison, 892 F.2d 509 (7th Cir. 1989)*.) Courts generally agree that predictions are immaterial where the alleged omitted information would have required speculation and would have minimal value in educating stockholders. See, e.g., *Craftmatic, 890 F.3d at 640*. Here, however, Plaintiffs' allege that Defendants had actual knowledge of the regulations that would be proposed. See infra, III.C. [*19] 3. If, indeed, Defendants possessed such knowledge, their disclosure of that information would not require undue speculation. Plaintiffs confirm that they do not base their claim on the failure of Defendants to predict, but rather on the failure of Defendants to relate what they actually knew and to factor that knowledge into the projections and statements provided to stockholders and the market. (Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Am. Compl. ("Pls.' Br.") at 23-28.) Defendants have not persuaded us otherwise. Thus, we need not determine whether Defendants indeed had a duty to predict. Rather, we reject Defendants characterization of the case and decline to dismiss based on any absence of duty.

#### 2. Materiality

Claims pursuant to 10b-5 must identify a "material representation or omission of fact." (Defs.' Br. at 35 (citing *Dura Pharmaceuticals v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 1631, 161 L. Ed. 2d 577 (2005)*.) Defendants argue that the statements identified by Plaintiffs fail to meet this requirement.

#### a. Statements of past performance

Defendants argue that Plaintiff's claims, to the extent that they are based on statements regarding [*20] Defendants' past performance, must fail because "as a matter of law, these statements about past performance could not have been misleading even if it had been a known fact that the CMS proposal of a future regulatory change was 'imminent and inevitable.'" (Defs.' Br. at 52, 56, 58, 59). Defendants fail to sufficiently establish that the statements regarding past performance identified by Plaintiffs are not, as a matter of law, misleading.

Defendants make no distinctions among the numerous types of statements regarding past performance. Defendants instead ask us to create and apply a bright-line rule that statements regarding past performance can never be misleading

2006 U.S. Dist. LEXIS 16795, *

by virtue of knowledge of future action. Nowhere, however, to Defendants present legal authority in support of this proposed rule. To the contrary, courts seem to distinguish between accurate "reports of previous successes" and those statements made with knowledge of facts rendering that statement inaccurate or misleading at the time it was made. See *In re Cell Pathways Sec. Litg., Civ. A. No. 99-752, 2000 U.S. Dist. LEXIS 8584, *31 n.7 (E.D. Pa. June 21, 2000)* (distinguishing *In re Advanta Sec. Litg., 180 F.3d 525, 538 (3d Cir. 1999)* [*21] on basis that statements were made with actual knowledge of flaws in projects that were part of basis of statement); see also *Shapiro, 964 F.2d at 281-82* (statements of historical fact may be actionable where such statements do not include all information necessary to make statements not misleading). Thus, Plaintiffs' claims based on statements of past performance will not be dismissed based on Defendants' assertion that these claims are not, as a matter of law, misleading.

**b. Statements of Fact or Law**

Defendants claim that certain statements identified by Plaintiffs cannot be actionable because they are merely statements of fact or law. (Defs.' Br. at 58.) Specifically, Defendants point to statements made by Select in its 2003 10-k filing regarding its awareness of anti-kickback provisions, the status of pending litigation, and Select's regulatory monitoring and compliance efforts. (Id.) Defendants offer no legal authority for this conclusion, and we find little to distinguish these statements of fact from the statements of historical fact discussed above that are actionable where they fail to include the information necessary to render them not misleading. [*22] See supra, III.C.2.a.

**c. Forward-looking statements**

**i. July 28, 2003 Press Release**

Defendants assert that the statements identified by Plaintiff from the July 28, 2003 press release are not actionable. (Defs.' Br. at 53.) Plaintiffs' specify that the earnings outlooks for the third and fourth quarters of 2003 presented in this press release were misleading in that they were increased based, in part, on the expectation of gains resulting from implementation of the LTCH-PPS in Select's hospitals. (Am. Compl. at P116.)

Defendants argue that because the proposed rule was not announced until May 11, 2004, projections for the third and fourth quarters of 2003 made in the July 28, 2003 press release could not be misleading on the basis of the proposed rule. We note first that these projections may be misleading on the basis of the alleged Medicare abuses. Furthermore, that the rule was not announced by CMS until May of 2004 does not change the fact that the omission of Defendants' alleged knowledge thereof could be misleading. Defendants argument would entirely undermine the Exchange Act's fraud provisions by exempting defendants from liability for any projections [*23] made for periods that concluded before the revelation of the omitted information.

Next, Defendants argue that this statement, because it identifies LTCH-PPS as a reason for an upgraded outlook, concerns entirely different subject matter than the CMS proposal. (Defs.' Br. at 53.) Defendants, however, cannot defend alleged material omissions by noting that their statements omitted the same information on which Plaintiffs' claims are based.

Last, Defendants assert that this statement is protected by the "bespeaks caution" doctrine and the statutory safe harbor. Under the "bespeaks caution" doctrine, courts have dismissed securities fraud claims where cautionary language rendered the alleged misstatement or omission immaterial as a matter of law. See *In re Donald J. Trump Casino Sec. Litg., 7 F.3d 357, 371 (3d Cir. 1993).* Thus, where projections, forecasts, or opinions "are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors." Id. Although each communication must be assessed on a case-by-case [*24] basis, boilerplate warnings merely are generally inadequate. Id. Rather, to be meaningful, cautionary language must be "substantive and tailored" to the specific forward-looking statements they accompany. *Id. at 371-372.* In examining cautionary language, the question is whether those statements negate the misleading effect of the challenged statements. *Id. at 373* (interpreting and applying *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991)).*

The PSLRA safe harbor protects certain forward-looking statements from Rule 10b-5 liability. See *15 U.S.C. § 78u-5.* The safe harbor applies if the statement or omission is immaterial or accompanied by sufficient cautionary language or if the plaintiff cannot prove that the challenged forward-looking statement was made with "actual knowledge . . . that the statement was false or misleading." Id. at § 78u-5(c)(1).

As this Court has previously stated, the protections of the "bespeaks caution" doctrine and the PSLRA's safe harbor only protect statements that are truly forward-looking. See *Voit v. Wonderware Corp., 977 F. Supp. 363, 369 (E.D. Pa.*

*1999).* [*25] These protections do not apply to statements challenged on the basis that they omitted 'present facts' -- facts known at the time the statement was made. Id.; Cell Pathways, 2000 U.S. Dist. LEXIS at *39-40. Because Plaintiffs challenge these statements on the basis that Defendants withheld present information regarding an imminent CMS proposal and alleged Medicare abuses that were the real source of profits for LTCHs, neither the "bespeaks caution" doctrine nor the statutory safe harbor applies.

### ii. July 29, 2003 Conference Call

Defendants argue that the statement made by Robert Ortenzio during a July 29, 2003 conference call is not actionable because it is mere puffery. (Defs.' Br. at 55.) Courts have found that some statements of optimism, expectation, or opinion are too vague and general to be actionable under Rule 10b-5. Specifically,

> material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism, which "'constitute no more than 'puffery' and are understood by reasonable investors as such.'" [Advanta], *180 F.3d at 538* (quoting [*26] [Burlington], *114 F.3d 1410, 1428 n.14* []). In other words, some statements would not alter the total mix of relevant information available to a reasonable investor. We have recognized that "although questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." [Burlington], *114 F.3d at 1426.*

*EP Medsystems, Inc. v. Echocath, Inc.,* 235 F.3d 865, 872 (3d Cir. 2000).

Robert Ortenzio stated that he was "pleased to report that [Select] exceeded earnings expectations . . ." and went on to relate some of the earnings numbers. (Am. Compl. at P118.) He also discussed why Select was optimistic that the LTCH-PPS system would, though "revenue neutral to the industry," benefit Select, citing specific characteristics of Select's business model. (Id. at PP119, 120.) Some of Robert Ortenzio's statement expresses satisfaction with financial results, but his discussion highlights aspects [*27] of Select's business that will allow it to profit from LTCH-PPS where other businesses would not. This type of specific analysis can hardly be said to be so vague that it is obviously immaterial as a matter of law.

Defendants similarly argue that the statement of Jackson during the same conference call was too vague to be anything more than puffery. In response to an analyst's question about Select's long-term LTCH business, Jackson stated that the profit margins for the LTCHs would "probably begin to approach what the margins are in the other acute segments of the business," and expressed that it was "achievable" to make LTCHs as profitable as general acute care hospitals. (Am. Compl. at P121.) While Jackson's statement is more general than Robert Ortenzio's, it nonetheless is more than a mere statement of optimism. Jackson draws a specific comparison to other businesses in the industry, and essentially sets a benchmark for expected results. This is not so vague that any investor would realize it was immaterial.

Defendants also argue that, even if something more than puffery, Jackson's statement was protected by the "bespeaks caution" doctrine and the statutory safe harbor. (Defs. [*28] ' Br. at 55-56.) As discussed above, because Plaintiffs challenge the identified statements on the basis that Defendants omitted present material facts, these protections do not apply. See supra, III.C.2.c.i. Even if Jackson's statement could be said to be truly forward-looking, his statement "we've not updated the data" hardly provides meaningful cautionary language as required for protection under both "bespeaks caution" and the safe harbor. Id.

### iii. October 29, 2003 Press Release

Defendants assert that because Select achieved the projected increase in revenue in the Fourth Quarter of 2003, the statements projecting that increase cannot be misleading. That defendants achieved the projected results (allegedly through use of abusive referral and billing practices also omitted from these statements), does not negate the misleading effect of the omission. We find no authority that renders projections per se inactionable once they have been realized. To the contrary, courts recognize that the key question is not the ultimate truth of the statements, but whether they mislead by virtue of what they omit. See, e.g., *Cell Pathways, 2000 U.S. Dist. LEXIS at 31 n.7* [*29] (noting that "the disclosure required by the securities laws is not measured by literal truth, but instead by the ability of the material to accurately inform rather than mislead prospective buyers") (internal citations omitted).

2006 U.S. Dist. LEXIS 16795, *

Defendants further argue that the "bespeaks caution" doctrine and/or the statutory safe harbor protect the statements of increased financial objectives. (Defs.' Br. at 54-55.) As above, however, the challenge to these statements is one of omission of present facts, making the protections of the "bespeaks caution" and PSLRA safe harbor unavailable. See supra, III.C.2.c.i.

### iv. 2003 10-k Filing

Defendants argue that Select's statement that its "goal is to open approximately eight to ten new long-term acute care hospitals each year using primarily [its] 'hospital within a hospital' model" is not actionable because it is protected by the "bespeaks caution" doctrine and safe harbor provisions. (Defs.' Br. at 57.) Again, the type of challenge here -- that Defendants omitted facts known at the time the statement was made -- makes those protections unavailable. See supra, III.C.2.c.i.

Additionally, Select asserts that because it continues to open [*30] such hospitals, the statement is not misleading. As discussed above, the realization of projections or goals does not negate the misleading nature of statements. Thus, Defendants' argument is unavailing.

### v. April 27, 2004 press release

Plaintiffs identify the upward revision of financial objectives for the remainder of 2004 made in the press release of April 27, 2004 as misleading. (Am. Compl. at P170-171.) Defendants argue that this change in Select's financial outlook is protected by the "bespeaks caution" doctrine and the statutory safe harbor. (Defs.' Br. at 59.) As discussed above, however, Plaintiffs base their claims on omission of facts known to Defendants at the time the statements were made, making these protections inapplicable. See supra, III.C.2.c.i.

Defendants further claim that because these statements were made after any lead plaintiff is alleged to have purchased stock, they cannot form the basis of liability. (Defs.' Br. at 60.) This limitation, however, applies only to the extent that lead plaintiffs fail to set forth any claims based on statements or omissions made prior to the last date on which they purchased stock. Because we have found that Plaintiffs [*31] have identified actionable statements made earlier in the Class Period, we will not dismiss their claims based on post-Class Period statements. n3

n3 Defendants rely on *Klein v. General Nutrition Companies, Inc., 186 F.3d 338, 345 (3d Cir. 1999)* for the proposition that statements made after the last date when a lead plaintiff purchased stock are per se inactionable. (Defs.' Br. at 60.) Their reliance, however, is seriously misplaced. Klein specifically states that "because appellants have failed to allege valid claims based on statements made before they purchased their GNC stock, the post-purchase statements cannot be a basis for liability." *Klein, 186 F.3d at 345* (emphasis added). Other courts have declined to extend this rule to situations where plaintiffs successfully allege claims based on statements made before the last stock purchase. See, e.g., In re Am. Bus. *Fin. Svcs. Sec. Litg., Civ. A. No. 04-265, 2005 U.S. Dist. LEXIS 10853,* *34-35 (E.D. Pa. June 2, 2005).

[*32]

### vi. April 28, 2004 Conference Call

Defendants argue that Robert Ortenzio's statements during an April 28, 2004 conference call was merely an expression of optimism and therefore merely inactionable puffery. (Defs.' Br. at 59-60.) Some statements of opinion, expectation, or optimism are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage. See supra, III.c.2.c.ii. Robert Ortenzio recounted some of the results for the preceding quarter, and noted that Select was "very pleased with the results of [the] first quarter and the prospects for the rest of 2004." (Am. Compl. at P172.) He also discussed the importance of the LTCHs, and noted that the specialty hospitals had exceeded performance expectations. (Id. at P173.) In response to an analyst's questions regarding Select's handling of readmissions of LTCH patients that are transferred to a general acute care hospital for procedures, Robert Ortenzio specifically denied that Select had "those types of patients" moving through their facilities, and stated that readmissions should not create additional reimbursable episodes or change the DRG. (Id. at 174.) Again, although [*33] Robert Ortenzio does express pleasure with the previous quarter's results, he also makes specific statements as to practices carried out at Select's medical facilities, taking his comments far beyond the type of "vague optimism" that is obviously immaterial.

2006 U.S. Dist. LEXIS 16795, *

Defendants further argue that these statements cannot form a basis for any liability because they were made after any lead plaintiff allegedly purchased Select stock. As discussed above, because Plaintiffs have successfully identified actionable statements made before the last stock purchase, they may go forward with their claims based on post-Class Period statements and omissions. See supra, III.C.2.c.v.

### 3. Particularized Facts as to Knowledge

Defendants assert that Plaintiffs fail to allege any particularized facts supporting that Defendants knew or should have known of the CMS Proposal. (Defs.' Br. at 60-74.) In order to satisfy the PSLRA's particularity requirement, Plaintiffs must allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission. *Chubb, 394 F.3d at 146* (quoting *Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000),* [*34] cert. denied, *531 U.S. 1012, 148 L. Ed. 2d 486 (2000)).* Defendants address three categories of information upon which Plaintiffs rely: publicly available information, private activities, and accounts of internal meetings and emails. n4 (Id.) We disagree with this piecemeal approach, and find no authority supporting Defendants implication that each category of information must form a separate set of particularized factual allegations.

> n4 Defendants also suggest in passing that prior knowledge of CMS's proposed rule is an impossibility because government regulations prohibit the disclosure of non-public information. (Defs.' Br. at 60, n.23.) The compliance of government employees with government regulations is not the question before us, and we find Defendants' reliance thereon on such compliance unpersuasive and irrelevant.

Considering all of the facts alleged and inferences drawn, we find that Plaintiffs meet their burden under the PSLRA. In support of their claim that Defendants knew or [*35] should have known of the CMS proposal, Plaintiffs offer factual allegations that Defendants had access to and were provided with information concerning both the general and specific nature of the forthcoming proposal. Information of a more general nature was provided by MedPAC's publications, studies, and meetings and OIG's work plans and studies, meetings with MedPAC and OIG personnel, and ALTHA. Plaintiffs specifically allege that these sources provided Defendants with information that a significant change in LTCH reimbursements was imminent. (Am. Compl. at P65-98.) More specific information was provided at the Healthcare Summit, where CMS officials reportedly discussed some details of the proposal and the rationale therefor. n5 (Id. at P81.) The addition of Scully to Select's Board of Directors may also have provided more specific information, given his previous employment as head of CMS. (Id. at P99-104.) Regardless of whether these allegations can, taken separately, support Plaintiffs claims, they are described with sufficient particularity.

> n5 Defendants classify the Healthcare Summit as publicly available information such that the market should have responded. (Defs.' Br. at 61.) We are not persuaded, however, that information discussed at the Healthcare Summit can be considered publicly available in the same sense as published agency reports. Although the agenda was publicly available, it does not appear that the contents of the presentations and discussions themselves were available to the public. In the absence of dissemination of the contents of the discussions themselves to the public, Defendants' reliance on the lack of market reaction is misplaced.

[*36]

In addition to the allegations as to how Defendants obtained or could have obtained the information, Plaintiffs make specific allegations that Defendants actually knew of and discussed the twenty-five percent rule before its announcement. Defendants attack the accounts of internal emails, meetings, and discussions on the basis that the confidential witnesses do not meet the standard set out in Chubb.

In Chubb, the court examined the sufficiency of a complaint that relied upon a single internal memorandum and a number of confidential witnesses to allege facts supporting their securities fraud claims. *Chubb, 394 F.3d at 147.* In analyzing the lone piece of documentary evidence, the Third Circuit found that, where relying on "internal reports," a plaintiff must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Id. at 147* (quoting *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72-73 (2d Cir. 2001),* cert. denied sub nom., *Scholastic Corp. v. Truncellito, 534 U.S. 1071, 151 L. Ed. 2d 590 (2001)).*

2006 U.S. Dist. LEXIS 16795, *

With regard to the confidential [*37] witnesses, the court adopted and applied the analysis used by the Second Circuit to determine whether the sources had been described with sufficient particularity. *Chubb, 394 F.3d at 146-47* (adopting standard set out in Novak, supra). Under Novak, confidential sources need not be named where either (1) "plaintiffs rely on confidential personal sources but also on other facts" that provide an "adequate basis for believing the defendants' statements were false" or (2) sources are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id. at 146* (quoting *Novak, 216 F.3d at 314).* The court found that because the lone document was insufficient, the confidential sources took on a "heightened importance" and were thus subject to the closer scrutiny required by Novak because the allegations rested solely on confidential sources. See id. at 146-48.

The documents relied on here are distinguishable from the documents in Chubb and Scholastic. The documents found to be inadequately described in Chubb and [*38] Scholastic were internal reports detailing the defendants' own company-generated statistics. See *Chubb, 394 F.3d at 147-48.* The documents here are internal emails providing information to employees about upcoming regulatory changes. We see no reason that such documents would require the type of review or mathematical analysis that courts have found necessary for company-generated statistical reporting. Furthermore, Plaintiffs allege that the key document -- the email that actually described efforts as to improved implementation of the twenty-five percent rule -- was distributed by top executives of Select. (Am. Compl. at P97.) This is more detail than provided by the Chubb plaintiffs' statement that "a memo went out" without reference to where it came from. See *Chubb, 394 F.3d at 147.* Thus, we find that the documents are, given their disparity from the type of documents relied upon in the cases offered by Defendants, described with sufficient particularity and can support an inference that the statements and omissions were materially false or misleading.

Defendants suggest that the confidential witnesses proffered as recipients of the email [*39] must undergo further scrutiny. (Defs.' Br. at 66-67.) We find no authority mandating this cumulative analysis, and note the conspicuous absence of such an inquiry in Chubb. Thus, we conclude that Plaintiffs have supplied sufficiently particularized facts, as required under the PSLRA, in support of their contention that Defendants knew or should have known of the CMS proposal.

**4. Loss Causation for Improper Revenue and Inadequate Control Claims**

Defendants argue that Plaintiffs, in setting forth their claims for securities fraud based on improper revenue and inadequate controls, fail to adequately plead loss causation. (Defs.' Br. at 74.) To maintain a securities fraud action, Plaintiffs must allege that the alleged misstatements or omissions caused Plaintiffs' loss. *Dura, 125 S. Ct. at 1634.* Mere allegations of an inflated purchase price are insufficient to show loss causation. Id. at 1631. Under the Court's decision in Dura, plaintiffs proceeding, as here, under a fraud-on-the-market theory, must allege not only that they paid artificially inflated prices, but also that the value of the shares fell significantly after the truth became known. [*40] Id.

Here, Plaintiffs allege both that Defendants artificially boosted stock prices by omitting or misstating material information and that the revelation of the "truth" -- that Select's outlook was far from rosy because many of its most profitable practices would be forbidden -- caused a dramatic drop in stock prices. (Am. Compl. at PP73-78.) Defendants argue that Plaintiffs do not sufficiently connect the allegations of improper revenue and inadequate controls with the resulting drop in stock prices. Dura, Defendants argue, held that merely alleging that a particular act or omission "touches upon" a later loss is insufficient. (Defs.' Reply at 26.) With regards to this matter, the Court stated

given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation . . . "touches upon" a later economic loss. But, even if that is so, it is insufficient. To "touch upon" a loss is not to cause a loss, [*41] and it is the latter that the law requires.

*Dura, 125 S. Ct. at 1632* (emphasis in original). Defendants suggest that Plaintiffs have not articulated a sufficient connection between the alleged inadequate controls and insider trading and either the losses allegedly suffered or the discovery of the truth concerning the CMS proposal. That other factors may contribute to a price drop should not, however, preclude plaintiffs from pursuing claims based on those other factors. Rather, allegations that the other factors contributing to the loss are themselves actionable seem to be the missing link in cases addressing loss causation. Thus, we find

that Plaintiffs claims of inadequate controls and improper revenue should not be dismissed on the basis of failure to plead loss causation.

**5. Improper Revenue**

Defendants argue that Plaintiffs fail to allege particularized facts to support a claim that Defendants improperly generated revenues through kickbacks, premature patient transfers, and patient churning. (Defs.' Br. at 77-82.) Defendants' attack hinges on their contention that the confidential witnesses relied upon by Plaintiffs fail to meet the Chubb standard [*42] discussed above. See supra, III.C.3.

Plaintiffs do not challenge the appropriateness of the Chubb standard as applied to their confidential witnesses, apparently acknowledging that their claims rely heavily on those confidential sources. n6 (Pls.' Br. at 46-50.) Rather, Plaintiffs assert that the confidential sources are described with sufficient particularity to support that the individuals cited plausibly had access to the facts alleged. (Id.) In Chubb, the court focused on the absence of information regarding when confidential sources were employed and whether someone in that position might reasonably have access to the information attributed to the unnamed individual. See *Chubb, 394 F.3d at 148-56.*

> n6 We note that Plaintiffs also rely on some documentary evidence as discussed above, making the heightened scrutiny of Chubb less appropriate for confidential witnesses. See supra, III.C.3. Given Plaintiffs' approach in responding, and the large number of confidential witnesses relied upon in the complaint, we nonetheless consider Defendants' Chubb arguments.

[*43]

Defendants' attack focuses on the second portion of the Chubb analysis -- whether the confidential source had access to the information. Defendants present two arguments that Plaintiffs' confidential witnesses lacked access to the information alleged.

First, Defendants argue that various confidential witnesses lacked personal knowledge of any alleged wrongdoing, and can, at most, repeat "hearsay" in support of Plaintiffs' claims. Defendants, however, present no legal authority for the categorical exclusion of second-hand knowledge. Although the Chubb court admonished the plaintiffs in that case for failing to describe whether alleged knowledge was first- or second-hand, the court did not establish that all testimony of the latter sort was inherently insufficient. Chubb, 394 at 150. Rather, the type of "rumors and speculation" deemed categorically insufficient under Chubb consisted of statements "attributed to no source. . . ." *Id.* at 155 (emphasis added). Because the confidential witness information at issue here is attributed to specific sources and does not leave to speculation whether the information was first- or second-hand, it cannot [*44] be categorically rejected as insufficiently plead.

Defendants also argue that Plaintiffs fail to explain how the confidential witnesses, some of whom were employed at individual hospitals, had access to information on a "national scale." Defendants rely heavily on the Chubb court's rejection of the plaintiffs' attempt to "attribute specific nationwide information and statistics . . . to former employees who worked in local branch offices." *Chubb, 394 F.3d at 155.* Unlike Chubb, however, where nearly all of the confidential sources were former employees of local branch offices, Plaintiffs here rely on confidential witnesses who worked at corporate headquarters or on a regional level, in addition to those who worked in individual hospitals. Also in contrast to Chubb, the information at issue here centers on policies and practices, rather than statistics. See *id. at 150-151.*

While we agree with the observation in Chubb that the connection between local employees and national statistics regarding a department separate from that in which those employees worked is tenuous, the allegations here are significantly less speculative. See *id. at 148.* [*45] For example, while regional billing specialists might not have national statistics regarding customer retention, it is plausible that they were privy -- and likely subject -- to billing policies, and aware of billing trends. (See, e.g., Am. Compl. at PP60.) Another example of the disparity between the witnesses in Chubb and those proffered by plaintiffs is in the corroborative nature of the statements by witnesses at different locations. CW1, a former Regional Director for Select's Middle Atlantic Region, reported that Select instituted quotas for Medicare referrals from host hospitals, and pressured employees to only accept the most profitable referrals. (Id. at P42.) CW3, a Patient Services Specialist who worked in Arizona reported similar bullying to increase the admissions statistics by accepting patients that did not really require long-term care. (Id. at P44.) These corroborating statements seem to be precisely the type of additional link that the Chubb court sought.

We will not examine each confidential source in detail. As demonstrated above, Defendants' argument ignores significant distinctions between the Chubb scenario and the information now before [*46] us. We are not persuaded by Defendants' conclusory arguments that the confidential witnesses fail the Chubb test, and will not dismiss Plaintiffs' improper revenue claim on that basis.

**6. Inadequate Controls**

Defendants argue that Plaintiffs have not set forth a viable claim based on the alleged inadequacy of Select's internal controls. Defendants correctly point out that "it is not a violation of the securities laws to simply fail to . . . provide sufficient internal controls." *Shapiro, 964 F.2d at 283.* Plaintiffs do not directly respond to this attack on the viability of their claims for liability based on inadequate controls, but focus instead on the value of allegations of inadequate controls in establishing scienter. (Pls.' Br. at 54-58.) Plaintiffs cannot successfully establish an independent basis for liability based on Defendants failure to provide adequate internal controls. Thus, to the extent that Plaintiffs do attempt to set forth such a claim, it must be dismissed. This does not, however, affect Plaintiffs' ability to pursue their claim that Defendants made false or misleading statements regarding the adequacy of their internal controls. [*47] See id. (noting that statements regarding internal controls may be actionable).

Although it is not entirely clear from their motion, Defendants appear to attack all "allegations of improper controls," which could arguably include claims based on misleading statements or omissions with regard to the same. (Defs.' Br. at 82-83.) Defendants argue that these allegations are merely based on the previously discussed claims of kickbacks. (Id.) Defendants assert that Plaintiffs fail to allege facts regarding what the controls were and why they were deficient, and instead rely on the assertion that kickbacks occurred as a result of insufficient controls. (Id.) Plaintiffs' allegations based on inadequate internal controls are indeed conclusory. n7 Even if we considered all the alleged wrongdoing, rather than just the kickbacks, to be a result of inadequate controls, Plaintiffs still merely recite the alleged results of deficient controls. We agree that these facts, even though plead with sufficient particularity as discussed above, are not sufficient to support a claim based on misstatements as to the adequacy of internal controls.

n7 Plaintiffs' allegations regarding internal controls and GAAP read as follows:

Select did not have effective internal controls in place needed for accurate financial reporting. Because the Company lacked such controls, defendants were able to execute their scheme to defraud Medicare, as discussed above, by inducing the host hospitals to refer a significant number of patients in exchange for kickbacks. As a result of the substantial referrals, Select overstated revenue and earnings throughout the Class Period. Accordingly, Select's lack of adequate internal controls rendered Select's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP. Moreover, as discussed in PP109-111 [describing alleged cash-skimming scheme through NovaCare billing system], Select's lack of controls at the Company's NovaCare facilities resulted in egregious errors in the accounting records because cash receipts were not properly posted to patient accounts, prior to and during the Class Period. (Pls.' Compl. at P131.)

The Company violated Section 13(b)(2)(B) of the Exchange Act by misrepresenting that select maintained adequate internal controls, when, in fact, Select's internal controls were severely deficient, allowing defendants to engage a [sic] scheme whereby they paid the host illegal kickbacks in exchange for patient referrals, resulting in overstatement of Select's revenues and earnings. (Pls.' Compl. PP132(m), 150(m), 169(m).)

For the reasons stated in P131, defendants violated Section 13(b)(2) of the Exchange Act by failing to maintain adequate internal controls and procedures, which allowed them to engage in the fraudulent Medicare billing and referral schemes . . ." (Id. at P183.)

[*48]

2006 U.S. Dist. LEXIS 16795, *

Plaintiffs fail to connect the litany of alleged wrongdoings to any control or type of control that, if properly established, would have prevented the same. Plaintiffs do not allege that the "necessary information [regarding internal controls] lies within defendants' control . . ." such that their failure to identify any deficient controls may be excused. Cf. *Bogart v. Nat'l Comm. Banks, Inc., Civ. A. No. 90-5032, 1992 U.S. Dist. LEXIS 14958, *25-26 (D.N.J. Apr. 28, 1992)* (rejecting defendants' argument that, to be plead with sufficient particularity, plaintiff must identify specific internal controls where plaintiff specifically alleged that necessary information was within defendants' exclusive control) (quoting *Craftmatic, 890 F.2d at 645-46).*

The only internal control deficiency Plaintiffs attempt to describe with any particularity is the alleged NovaCare billing scheme. See *supra*, n.7. Plaintiffs do not attempt to create any connection between this alleged cash-skimming scheme and the kickbacks upon which the internal control allegations rely. Furthermore, courts have rejected attempts to rely on allegations that corporate defendants [*49] "must have known" when they signed a disclosure that internal controls and procedures were inadequate. See, e.g., *In re Interpool, Inc. Sec. Litg., Civ. A. No. 04-321, 2005 U.S. Dist. LEXIS 18112, *47-48 (D.N.J. Aug. 17, 2005)* (internal citations omitted). Thus, in the absence of particularized facts, Plaintiffs have not sufficiently stated a claim based on misstatements regarding the internal controls of the company.

Defendants further argue that Plaintiffs cannot establish liability for GAAP violations. Defendants assert that, to state a claim for liability based on violations of GAAP, Plaintiffs must allege that "the responsible parties new or should have known that [the financial statements] were derived in a manner inconsistent with reasonable accounting practices." *Christidis v. First Pennsylvania Mortg. Trust, 717 F.2d 96, 100 (3d Cir. 1983).* Plaintiffs GAAP allegations are premised entirely on the lack of internal controls. See *supra*, n.7. Because Plaintiffs have failed to support their internal controls claim with sufficiently particularized factual assertions, we do not see how any claim relying thereon can survive. Thus, as [*50] currently plead, Plaintiffs claim that the certifications of GAAP compliance were false and misleading must fail.

**7. Scienter**

Defendants argue that Plaintiffs failed to sufficiently plead facts giving rise to a strong inference of scienter, and that their Section 10(b) claims should, therefore, be dismissed. Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668 (1976).* Plaintiffs may successfully plead scienter either (1) by showing that Defendants had both the motive and the opportunity to commit fraud, or (2) by presenting strong circumstantial evidence of "conscious misbehavior or recklessness." *GSC Partners, 368 F.3d at 237* (internal citations omitted). The PSLRA requires that Plaintiffs set forth particular facts giving rise to a strong inference that Defendants acted with scienter. *15 U.S.C. § 78u-4(b)(2).* Defendants argue that Plaintiffs have failed to meet the PSLRA's pleading requirements for either method of establishing scienter.

**a. Conscious misbehavior or recklessness**

Defendants attack Plaintiffs' [*51] showing of scienter for its CMS proposal claims on the basis that Plaintiffs fail to present circumstantial evidence giving rise to a strong inference of conscious misbehavior or recklessness. To be reckless, a statement must be material and involve an "extreme departure from the standards of ordinary care . . . ." *GSC Partners, 368 F.3d at 239* (internal citations omitted). The danger that the statement will mislead must either be actually known to the defendant or so obvious that the defendant must have been aware of it. *Id.*

Defendants argue that Plaintiffs' circumstantial support for scienter depends upon the claim that Defendants should have known of the proposed rule before the proposal was released. Because Defendants believe these claims to be meritless, they assert that those claims also cannot support scienter. This argument is predicated on our rejection of all of Plaintiffs' claims based on the CMS proposal. In light of our decision above that dismissal of those claims is inappropriate, Defendants' argument is not persuasive. As discussed above, Plaintiffs plead an array of facts supporting that Defendants knew or should have known of the impending regulatory [*52] action. These facts, as plead, also support a strong inference of scienter. If, indeed, Defendants did know, or should reasonably have known, of upcoming regulatory changes with a significant negative impact on their business, omission of that information, particularly when taken together with the other, positive statements made regarding the business, carries an obvious danger of misleading. Thus, Plaintiffs have met the pleading requirements for scienter for their CMS proposal claims, and we need not analyze whether they have also shown motive and opportunity for those claims.

**b. Motive and opportunity**

Defendants argue that Plaintiffs have not sufficiently alleged motive and opportunity to support scienter for Plaintiffs' claims of insider trading. The mere fact that some officers sold stock is not enough to support an inference of

fraudulent intent. *Advanta, 180 F.3d at 525* (quoting *Burlington, 114 F.3d at 1424*). Stock sales may, however, support an inference of scienter where they are "unusual in scope or timing." Id. In examining whether the scope or timing of stock sales is unusual, the Third Circuit has considered how many of the [*53] defendant-officers sold stock, what percentage of total holdings were traded, whether plaintiffs plead facts supporting the conclusion that these trades were not routine, and whether profits from the trades were substantial in comparison to overall compensation for the sellers. Id. This framework appears to apply to the exercise of stock options as well as to the sale of previously purchased shares. Id. Defendants assert that Plaintiffs fail to sufficiently show that trades by individual defendants during the class period were unusual in timing or scope. We disagree.

Plaintiffs allege, and Defendants do not dispute, that each of the named defendants made substantial trades during the class period. This distinguishes Plaintiffs' claims from those in Burlington and Advanta, where only some of the defendant-officers made class-period trades. See *Advanta, 180 F.3d at 540.*

The significant percentage of holdings traded further distances this case from Advanta and Burlington. Plaintiffs allege that Robert Ortenzio sold 48.73%, Rocco Ortenzio sold 46%, Rice sold 94.33%, and Jackson 78.54% of their respective total holdings. (Pls.' Br. at 60.) In contrast, [*54] the sole selling defendant in Burlington traded only 0.5 percent of his holdings, and the selling defendants in Advanta traded five to seven percent of their holdings. Id.

Plaintiffs further allege that these trades were not routine, both because of their size in comparison to previous trading, and because of the proximity of many of the trade dates to dates significant to Defendants' statements and the development of the CMS proposal. (Am. Compl. PP215-227.) Defendants argue that the comparison between class-period and previous trades is not reliable because there was a blackout period for an acquisition leading up to the increased trading activity. (Defs.' Br. at 86-87.) Defendants, at most, establish that an agreement for the acquisition of Kessler Rehabilitation Corporation was announced on June 30, 2003 in a press release. (See id.) Even if such a blackout did occur, Defendants offer no explanation for the remainder of the compared period, which dates back to 2001. (See Pls.' Compl. at P219.) Furthermore, unlike in the case on which Defendants rely, Plaintiff's allegations do not stand on this comparison alone. See In re Alpharma Inc. Sec. *Litg., 372 F.3d 137, 152 n.9 (3d Cir. 2004)* [*55] (noting that "plaintiffs' assertion that these defendants had not sold stock during the preceding fifteen months, standing alone, is insufficient") (emphasis added).

Plaintiffs allege that the profits from the stock sales significantly exceeded the annual compensation of each individual defendant. Robert Ortenzio's profits were approximately 12.4 times his annual compensation for 2003, Rocco Ortenzio's profits were approximately 25.5 times his annual compensation for 2003, Rice's profits were 10.4 time her annual compensation for 2003, and Jackson's profits were 66 times his annual compensation for 2003. (Am. Compl. P227.) As discussed above, we find that Plaintiff sufficiently alleges that these gains were not merely part of the routine exercise of the individual defendants' compensation packages. Thus, considering all of the factors, we find the Plaintiff has sufficiently alleged scienter for its insider trading claims by pleading facts supporting the unusual timing and scope of trades made during the class period.

As to Defendants' assertion that performance bonuses cannot support an inference of scienter, we find that, although alone performance bonuses may be insufficient, [*56] in conjunction with the pleading of other specific sets of facts in support of scienter, the arguable sufficiency of performance bonuses is not decisive.

### 8. "Group" Pleading?

Defendants submit that Plaintiffs' claims against individual defendants cannot survive because they constitute impermissible "group" pleading. n8 Under group pleading doctrine, plaintiffs can link otherwise unattributed corporate statements to individual defendants based solely on their corporate titles and roles. Courts are divided as to whether the heightened pleading standards of the PSLRA preclude group pleading. See, e.g., *Fin. Acquisition Ptnrs. v. Blackwell, No. 04-11300, 440 F.3d 278, 2006 U.S. App. LEXIS 3523*, *10-11 (5th Cir. February 14, 2006) (noting that the Tenth Circuit allows group pleading, while the Fifth Circuit does not). The Third Circuit has not yet addressed this issue, and the district courts in this circuit have differed. See In re *U.S. Interactive, Inc. Sec. Litg., Civ. A. No. 01-522, 2002 U.S. Dist. LEXIS 16009*, *14 (E.D. Pa. Aug. 23, 2002) (comparing *Marra v. Tel-Save Holdings, Inc., 1999 U.S. Dist. LEXIS 7303* (E.D. [*57] Pa. May 18, 1999)(questioning the viability of the group pleading doctrine) with In re *Aetna, Inc. Sec. Litg., 34 F. Supp. 2d 935, 949 (E.D. Pa. 1999)*(applying the group pleading doctrine to determine liability of an outside director)).

n8 Plaintiffs attempt to invoke the group pleading doctrine, asserting that

2006 U.S. Dist. LEXIS 16795, *

it is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.

(Am. Compl. P20.)

This Court, however, need not resolve the question of whether the group pleading doctrine can survive in light of the PSLRA's heightened pleading standards because Plaintiffs have made sufficiently specific claims as to each individual's involvement in the alleged wrongdoing. Plaintiffs' claims rely on documents [*58] personally signed by the Ortenzios and Jackson. (See Pl.'s Br. at 67; Am. Compl. P129, 130, 144.) Plaintiffs' allegations also rely on statements directly attributable to specific individuals, including statements made in press releases and conference calls by Robert Ortenzio and Jackson (See Am. Compl. PP118-121, 135, 140). Plaintiffs also alleged that Rice encouraged illegal kickbacks. (Id. AP50-51.) Thus, although Plaintiffs attempt group pleading, they also base their claims on attributable statements, omissions, and actions.

### 9. Underlying Violation for Section 20(a) Claims

Defendants' argue that Plaintiffs' claims under Section 20(a) must be dismissed as a result of dismissal of the underlying claims for violations of Rule 10b-5. Because we only dismiss a limited portion of Plaintiffs' claims for Rule 10b-5 violations, the Section 20(a) claims survive except to the extent that the Rule 10b-5 claims above have been dismissed.

## IV. Defendants' Motion to Strike

### A. Standards Governing Rule 12(f) Motions to Strike

*Federal Rule of Civil Procedure 12(f)* provides that "upon motion made by a party . . . the court [*59] may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Although the court possesses considerable discretion in addressing a motion to strike under Rule 12(f), such motions are disfavored and will usually be denied unless the allegations have "no possible relation to the controversy and may cause prejudice to one of the parties or if the allegations confuse the issues." *Plaum v. Jefferson Pilot Fin. Ins. Co., Civ. A. No. 04-4597, 2004 U.S. Dist. LEXIS 28968, *5-6* (E.D. Pa. Dec. 22, 2004) (internal citations omitted). n9

n9 Defendants suggest that Rule 12(f) is properly used as an enforcement tool for Rule 8(e)'s requirement of "simple, concise, and direct" pleading. Defendants present no binding authority for this argument. Particularly in light of the deficiencies of Defendants' request for this extreme relief, we find that such an extension of our discretion would be inappropriate.

### B. Discussion

For the most [*60] part, Defendants merely restate their motion to dismiss arguments based on Chubb. We have addressed this issue above, and rejected Defendants' position. See supra, III.C.3, III.C.5. This attempted second bite at the apple has not changed our thinking on this matter.

Furthermore, we are not persuaded that the Chubb standard is in any way an appropriate measure of whether allegations should be stricken under Rule 12(f). Defendants offer no authority for this proposition. Thus, we will not strike allegations of the complaint based on Defendants' Chubb arguments.

In addition to rehashing the Chubb arguments, Defendants ask this Court to strike numerous allegations as irrelevant, impertinent, or scandalous. Defendants, however, merely offer conclusory statements that various allegations will be prejudicial. Because motions of this type are an extreme remedy, we will not strike allegations where the movant has offered no support for claims that prejudice will result.

## V. Conclusion

2006 U.S. Dist. LEXIS 16795, *

For all of the reasons set forth above, Defendants' motion to dismiss is denied in part and granted in part, and Defendants' motion to strike is denied in its entirety pursuant to [*61] the attached order.

**ORDER**

AND NOW, this 6th day of April, 2006, upon consideration of Defendants' Motion to Dismiss (Doc. Nos. 24, 25), and all responses and replies thereto (Doc. Nos. 30, 31, 33, 34), and Defendants' Motion to Strike Allegations of the Amended Complaint (Doc. No. 23), and all responses and replies thereto (Doc. Nos. 32, 35), it is hereby ORDERED as follows:

(a) Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Plaintiffs' claims based on a lack of internal controls and failure to comply with GAAP are DISMISSED.

(b) Defendants' Motion to Strike Allegations of the Amended Complaint is DENIED.

BY THE COURT:

s/ J. Curtis Joyner, J.