# TABS 6-7
# to Compendium

# TAB 6
# to Compendium

LEXSEE 1999 U.S. DIST. LEXIS 16800

IN RE: TEL-SAVE SECURITIES LITIGATION; THIS DOCUMENT RELATES TO ALL ACTIONS

MASTER FILE NO. 98-CV-3145 CLASS ACTION

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1999 U.S. Dist. LEXIS 16800; Fed. Sec. L. Rep. (CCH) P90,693*

October 19, 1999, Decided
October 19, 1999, Filed

**DISPOSITION:** [*1] Defendant's Motion to Dismiss denied in its entirety.

**COUNSEL:** For RAYMOND MARRA, MICHAEL GOLDSTEIN, GARY GARTENBERG, ROBERT WOLOSHEN, DEEANNDEVNIE TUREK, PLAINTIFFS: DEBORAH R. GROSS, LAW OFFICES OF BERNARD M. GROSS, P.C., SAMUEL R. SIMON, BARRACK, RODOS & BACINE, ROBERT P. FRUTKIN, STUART H. SAVETT, SAVETT, FRUTKIN, PODELL AND RYAN, P.C., PHILADELPHIA, PA USA.

For TEL-SAVE HOLDINGS, INC., DANIEL BORISLOW, GEORGE P. FARLEY, DEFENDANTS: BARBARA W. MATHER, PEPPER, HAMILTON & SCHEETZ, PHILA, PA USA.

For TEL-SAVE HOLDINGS, INC., DANIEL BORISLOW, GEORGE P. FARLEY, DEFENDANTS: STEPHEN M. SACKS, SCOTT B. SCHREIBER, JOHN A. FREEDMAN, ARNOLD AND PORTER, WASHINGTON, DC USA.

**JUDGES:** RONALD L. BUCKWALTER, J.

**OPINIONBY:** RONALD L. BUCKWALTER

**OPINION:**

### MEMORANDUM AND ORDER

BUCKWALTER, J.

October 19, 1999

Presently before the Court is the Defendant's Motion to Dismiss the Plaintiff's Second Consolidated Amended Class Action Complaint. For the reasons stated more fully below, the Motion is denied.

### I. Procedural History

Plaintiffs filed the first consolidated shareholder action, asserting various securities fraud claims against (1) Tel-Save Holdings, Inc. ("Tel-Save"); (2) Daniel [*2] Borislow, Chairman of the Board of Directors and Chief Executive Officer of Tel-Save ("Borislow"); and four other officers/directors of Tel-Save (the "Individual Defendants"). The Plaintiffs consist of members of a putative class who purchased Tel-Save common stock and/or related call options, and/or sold related put options in Tel-Save common stock between August 14, 1997 through May 22, 1998 (the "Class Period"). By an Order dated May 22, 1999, the Court denied Defendant's Motion to Dismiss with regard to Tel-Save, but granted dismissal in favor of Borislow and the Individual Defendants. Plaintiffs filed the Second Consolidated Amended Class Action Complaint ("Second Complaint") on June 18, 1999. The Second Complaint restated allegations against Tel-Save, but named only Borislow as an individual defendant. Accordingly, the present Motion to Dismiss only seeks dismissal with regard to Borislow.

### II. Background

The facts relevant to this Motion are taken from the Second Complaint. Tel-Save is a Delaware corporation with its principal executive offices in New Hope, Pennsylvania. It provides long distance telephone services purchased from third-party carriers throughout the [*3] United States both to residential and to small and medium-sized commercial customers. Aside from the costs associated with purchasing the long distance services, Tel-Save's primary business costs relate to the marketing of its services and the solicitation of new customers.

Case 1:05-cv-00272-GMS    Document 46-6    Filed 04/11/2006    Page 4 of 18

Page 2
1999 U.S. Dist. LEXIS 16800, *; Fed. Sec. L. Rep. (CCH) P90,693

Recognizing that the expenses incurred in marketing its telephone services far exceeded its initial revenues, Tel-Save began to out source a majority of its direct telemarketing services to companies referred to as "partitions." A partition is an independent long distance provider and marketing company that contracts with Tel-Save to purchase and provide long distance services to customers. Partitions generally receive the difference between the amount received from customers and the amount charged by Tel-Save. Tel-Save has stated publicly that it has a policy of promoting increased marketing activities of certain of its partitions by advancing loans to them.

Plaintiffs contend that, as early as August 14, 1997 and continuing throughout the class period, Defendants embarked on a scheme to artificially inflate the price of Tel-Save common stock by concealing and failing to record properly on its statements millions [*4] of dollars in marketing costs and other expenses, by disguising the expenses as loans to partitions. As a result, according to Plaintiffs, Defendants misrepresented their marketing expenses, income, results of operations, and overall financial condition.

Specifically, Plaintiffs focus on alleged misrepresentations and omissions made by Defendants related to the loans they advanced to two particular partitions, American Business Alliance ("ABA") and Group Long Distance ("GLD"). Plaintiffs contend that Tel-Save falsely proclaimed that loans made to these entities were adequately collateralized by their assets. Plaintiffs allege, however, that both ABA and GLD were insolvent, that the loans were not fully collectible, and that as a result, Tel-Save was required under the Generally Accepted Accounting Principles ("GAAP") to provide for reserves, including a complete write-off (if appropriate) for the probable losses resulting from such advances and a deduction of these amounts from Tel-Save's reported income. Plaintiffs further maintain that ABA and GLD used the proceeds of the loans to pay Tel-Save's marketing expenses, which otherwise should have been reported as an expense on Tel-Save's [*5] own financial statements. Thus, as a result of Tel-Save's accounting practices, Plaintiffs claim that Tel-Save overstated its income, causing an overpricing of its stock during the class period.

In further support of their claims for securities fraud, Plaintiffs contend that Defendants utilized improper methods of accounting to forgive ABA's and GLD's indebtedness to Tel-Save. As a result, Plaintiffs allege that Tel-Save's financial statements and earning reports for the quarterly periods ending June 30, 1997, September 30, 1997, March 31, 1998, and for the calendar year ending December 31, 1997 were false and misleading. Initially, as to Tel-Save's dealings with ABA, Plaintiffs allege that Tel-Save failed to record accurately the loan forgiveness between the two in December of 1996. Specifically, Plaintiffs claim that Tel-Save misled the investing public by recording the transaction as an acquisition of ABA's assets when, in actuality, Tel-Save forgave approximately $ 11 million of ABA's indebtedness. Plaintiffs further maintain that Tel-Save acquired ABA with no reasonable expectation of recovering the assets purchased because ABA's total liabilities exceeded its assets by $ 12 [*6] million. By accounting for the acquisition in this manner, Plaintiffs claim that Tel-Save amortized its marketing expenses through the advances made to ABA, rather than immediately expending such costs as they were incurred.

The focus of Plaintiffs' complaint, however, is on Tel-Save's relationship with its primary partition, GLD. Plaintiffs once again allege that, as the uncollectible receivables from GLD accumulated, Defendants improperly eliminated the loan advances from Tel-Save's books without recognizing a loss from forgiveness of indebtedness. Specifically, Plaintiffs contend that Defendants financed GLD's purchase of all of the assets of two unrelated partitions, Great Lakes Telecommunications, Inc. ("Great Lakes") and Eastern Telecommunications Inc. ("ETI"), both of which possessed conditional warrants to purchase, at significantly below-market prices, Tel-Save common stock. The warrants were allegedly worthless to these unrelated partitions as they were conditioned upon the partitions achieving presumptively unattainable levels of sales of Tel-Save services and required Tel-Save's consent prior to their exercise. At some time later, GLD either sold the warrants directly [*7] to Tel-Save at a substantial premium or exercised the warrants themselves, thereafter selling the underlying Tel-Save common stock and giving the proceeds to Tel-Save. As a result, Plaintiffs maintain that GLD was able to retire approximately $ 20 million of debt owed to Tel-Save without expending any of its own money. Thus, Plaintiffs contend that, through the artifice of acquisitions, Tel-Save was able to convert GLD's uncollectible receivables into cash, ultimately resulting in Tel-Save overstating its income in 1997.

Plaintiffs contend that on May 22, 1998 the improper nature of the relationship between Tel-Save and its partitions was revealed when an on-line financial publication for investors, TheStreet.com, posted a response letter from Defendant Borislow to two minority shareholders of GLD. Previously, on May 7, 1998, the two minority shareholders had written a letter to Defendant Borislow demanding full disclosure of Tel-Save's relationship with GLD, and its use of the warrants held by Great Lakes and ETI to pay off debts owed to it by GLD.

Plaintiffs claim that this disclosure did not immediately affect the price of Tel-Save common stock. How-

1999 U.S. Dist. LEXIS 16800, *; Fed. Sec. L. Rep. (CCH) P90,693

ever, Plaintiffs contend [*8] that, following the release of this letter, the market recognized that Tel-Save's financial statements were not fairly presented and as a result, the price of Tel-Save common stock dropped from its class period high of $ 30.000 per share to a low of $ 4.875 per share on October 7, 1998.

Based on these allegations, Plaintiffs assert that each Defendant knowingly and recklessly violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)-5. Plaintiffs further assert that Defendant Borislow is liable under § 20(a) of the Securities Exchange Act as a control person by virtue of his high-level position, his ownership and contractual rights, and his knowledge of Tel-Save's financial condition and operations. Borislow moves to dismiss for failure to plead fraud with particularity pursuant to *Fed. R. Civ. P. 9(b)* and under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified in relevant part at *15 U.S.C. § 78u-4*, and for failing to state a claim upon which relief can be granted pursuant to *Fed. R. Civ. P. 12(b)(6)*.

## III. Legal Standard

A securities fraud claim is subject to heightened pleading requirements under Fed. R. Civ. [*9] P. 9(b) and the PSLRA. Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Because § 10(b) and Rule 10b-5 are anti-fraud provisions, plaintiffs must plead them with the particularity required by Rule 9(b). See, *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997)*. n1

> n1 In order to have a claim under Rule 10(b)-5, a plaintiff must state the following:
>
>> (1) the defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading;.
>> (2) the defendant acted with scienter;
>> (3) the defendant's misstatement caused him or her injury; and
>> (4) facts sufficient to meet the heightened pleading requirements of *Fed. R. Civ. P. 9(b)* and the PSLRA.
>
> See, *Burlington Coat Factory, 114 F.3d at 1417.*

Moreover, the PSLRA places additional burdens on plaintiffs attempting to plead fraud in securities [*10] cases. Under *15 U.S.C. § 78u-4*(b)(1), plaintiffs alleging that a defendant made a misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." In addition, the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2). A complaint that fails to comply with any of these requirements must be dismissed. See id. § 78u-49(b)(3)(A)..

Additionally, on a motion to dismiss, the court must accept as true all well-pleaded allegations of fact in the plaintiffs' complaint, construe the complaint in the light most favorable to the plaintiffs, and determine whether, "under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief" *Colby v. Upper Darby Township, 838 F.2d 663, 665-666.* (3d Cir. 1988).

## IV. Discussion

1. 10(b)-5 liability:

a. Material [*11] Misstatements/Omissions:

In the previous opinion, the Court found that the Plaintiff had alleged sufficient facts to state a claim under the PSLRA and *Fed. R. Civ. P. 9(b)* with regard to Tel-Save itself. In particular, the Court found the Plaintiffs had alleged misstatements/omissions made with scienter regarding;

> 1. Tel-Save's policy of providing inadequate reserves on loans in order to inflate its income (a violation of GAAP). P 5.
>
> 2. Tel-Save's method of reporting the cost of acquiring American Business Alliance, Inc. (the "ABA Assets").
>
> 3. Tel-Save's failure to disclose its relationship with GLD, including its failure to report transactions with GLD as related party transactions.
>
> 4. Tel-Save's involvement with GLD's purchase of other partitions, including Great Lakes, Adventures in Telecom and ETI.

1999 U.S. Dist. LEXIS 16800, *; Fed. Sec. L. Rep. (CCH) P90,693

5. Tel-Save's reporting of false profits according to GAAP.

The previous Complaint was dismissed with regard to Borislow because the Plaintiffs did not specifically allege what role he played in these misstatements/omissions. To avoid dismissal in the Second Complaint, the Plaintiffs must state Borislow's involvement in the misstatements previously [*12] found to be made by Tel-Save or plead new misstatements attributable to him.

The Plaintiffs have added specificity to their Second Complaint with regard to Borislow' actions. According to Plaintiffs, Borislow signed materially false and misleading Forms 10-Q and 10-K filed during the Class Period. Sec. Compl. P 27. The Defendant also "routinely negotiated and executed entire transactions completely by himself on behalf of the Company" Id. Borislow also participated in the drafting, preparation and approval of the various public filings and shareholder reports and was aware of their false and misleading nature. Sec. Compl. P 31. These allegations alone are enough to link the Defendant Borislow with material misstatements or omissions (the first element of a 10(b)-5 claim). n2 However, whether the Plaintiff has alleged that Borislow acted with the requisite scienter requires a more thorough discussion.

> n2 The Plaintiffs have barely alleged enough of a connection between Tel-Save's misstatements and those of Borislow. They have particularized the misstatements of Tel-Save, and mentioned a few specific instances in which Borislow participated in the drafting, signing and release of disclosure forms and press releases. This is enough to satisfy the first element of a 10(b)-5 claim, and the Plaintiffs allegations of scienter are likewise sufficient. However, even if Plaintiffs failed to allege a primary violation by Borislow, their § 20(a) claim would not be precluded (as discussed below).

[*13]

b. Scienter: Reckless or Conscious

In a 10(b)-5 claim, it remains sufficient for plaintiffs [to] plead scienter by alleging facts that establish a motive or opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior. See, *In re Advanta Corp. Sec. Lit., 180 F.3d 525, 1999 WL 395997 (3d. Cir. 1999).* Recklessness remains a sufficient basis for liability. Retaining recklessness not only is consistent with the Reform Act's expressly procedural language, but also pro-

motes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud. Id. A reckless statement is one "'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *McLean v. Alexander, 599 F.2d 1190, 1197 (3d Cir.1979)* (quoting, *Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir.1977)).* [*14]

Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors. See, *In re Aetna Inc. Sec. Litigation, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999)* (Padova, J.); *Epstein v. Itron, 993 F. Supp. 1314, 1325 (E.D. Wash. 1998)* ("facts critical to a business' core operation or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers"). Contrary to what both Plaintiffs and Defendant argue, the Advanta court left the door open with regard to attributing knowledge to a director/officer. *180 F.3d at 539.* The inquiry focuses on whether the transaction in which the alleged fraud occurred was central to the corporation's core business. The Second Complaint states that Defendant Borislow was CEO and a director throughout the Class Period. It also alleges that he often solely negotiated transactions on behalf of Tel-Save and participated in many of the transactions that the Court has previously decided involved misstatements. These transactions were a significant part of Tel-Save's business. Under these facts, the Court finds [*15] that Defendant either knew or should have known of the misstatements involved. This is especially true with regard to the financial statements that contained materially misleading information during the Class Period, because they are specifically referred to in the Second Complaint. The Plaintiffs do not specifically allege that Borislow had knowledge of the fraudulent transactions with GLD. But they do allege that Tel-Save's method of financing its marketing expenses was central to the business. Therefore, knowledge of the misstatements with regard to the conduct and reporting of these transactions can be attributed to Borislow for purposes of this Motion to Dismiss. These allegations meet the conscious or reckless standard of pleading scienter under the PSLRA.

c. Scienter: Motive and Opportunity.

Motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must now be supported by facts stated "with particularity" and must give rise to a "strong inference" of scienter. *15 U.S.C.A. § 78u-4(b)(2) (West Supp.1999).* These heightened pleading requirements were addressed to the

Case 1:05-cv-00272-GMS    Document 46-6    Filed 04/11/2006    Page 7 of 18

Page 5
1999 U.S. Dist. LEXIS 16800, *; Fed. Sec. L. Rep. (CCH) P90,693

previous ease with which plaintiffs could allege motive [*16] and opportunity on the part of corporate officers to commit securities fraud. Permitting blanket assertions of motive and opportunity to serve as a basis for liability under the Exchange Act would undermine the more rigorous pleading standard Congress has established. See, *Advanta, 180 F.3d at 534.* After the Reform Act, catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter. Therefore, a defendant's motive and opportunity to commit fraud must be clearly stated by the plaintiff.

The Plaintiffs have done that in the Second Complaint. Borislow is alleged to have faced a $ 25 million loss if the price had dropped below $ 16.50 during a 20 day period which occurred during the Class Period. Sec. Compl. PP 21, 29, 129. Borislow also agreed to a lock-up period in which he would not be permitted to dispose of any shares of Tel-Save common stock. The lock up period was set at one year, but would be reduced if the common stock traded above $ 19.80 for a period greater than 20 consecutive [*17] days anytime after March 10, 1997. The Plaintiffs also allege that Borislow had a motive to inflate the stock price because by doing so he was able to secure a $ 30 million loan from Deutsche Bank by using Tel-Save stock as collateral. Sec. Compl. P136. The Defendant argues that an officer/director can not be held to have knowledge of fraud due to his position. As discussed above, knowledge of certain business information can be attributable to a senior officer/director. But even if this were not so, it is certainly not unreasonable that the chief executive officer of a corporation had at least the opportunity to commit fraud by falsely reporting financial information and engaging in suspect transactions. These three allegations, which must be accepted as true for purposes of a motion to dismiss, are more than mere blanket assertions of motive and opportunity to commit fraud, and raise a strong inference of scienter.

The Court has found that Plaintiffs have alleged that Defendant Borislow participated in misstating and omitting material information to the Plaintiffs. The facts suggest he did so intentionally or recklessly. However, the Plaintiffs have certainly alleged enough facts [*18] to suggest that Borislow had the motive and opportunity to commit securities fraud. Therefore, the motion to dismiss for failure to state a primary violation of 10(b)-5 is denied.

2. Control Person Liability under § 20(a)

Section 20(a) of the Securities Exchange Act imposes joint and several liability on any person who controls a "person" liable under any provision of the Act.

See *15 U.S.C. § 78t(a).* Plaintiffs allege that the Defendant Borislow "acted as a controlling person of Tel-Save" under § 20(a). Compl. PP 148-49. Section 20(a) requires proof that "one person controlled another person, but also that the 'controlled person' is liable under the Act." *In re Aetna Inc., 34 F. Supp. 2d at 956.*

The Court has previously decided that Plaintiffs have alleged a primary violation by Defendant Tel-Save of Section 10(b) of the Exchange Act. In other words, the controlled person is potentially liable under the Act. Now the Court decides whether the Plaintiffs have alleged sufficient control by Borislow for the purposes of § 20(a). The heightened pleading requirements of *Fed. R. Civ. P. 9(b)* do not apply to a claim under Section 20(a) [*19] for control person liability. See, *Derensis v. Coopers & Lybrand Chartered Accountants, 930 F. Supp. 1003, 1013 (D.N.J. 1996)* (section 20(a) allegations sufficient on simple pleading of control). Allegations that "support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator" suffice to plead control person liability. *In re Health Management, Inc. Sec. Lit., 970 F. Supp. 192, 205 (E.D.N.Y. 1997).* Allegations that a director signed a fraudulent SEC filing and was in a position to exercise control over the primary violator are sufficient to withstand a motion to dismiss. See, *Jacobs v. Coopers & Lybrand, 1999 U.S. Dist. LEXIS 2102, 1999 WL 101772* at *17-18 (S.D.N.Y.). A defendant may avoid liability under § 20(a), after the Plaintiff has sufficiently stated a claim, by establishing that it acted in good faith and did not culpably participate in the violation. See, *Gould v. American-Hawaiian Steamship Co., 535 F.2d 761, 779 (3d. Cir. 1976).*

The Second Complaint contends that Borislow had almost complete control over and participation in the transactions of Tel-Save that are [*20] central to this action. See, Sec. Compl. § § 28-32. By making these contentions, the Plaintiffs have alleged sufficient control by Borislow over Tel-Save (which may have violated § 10(b)-5) to state a claim under § 20(a). Whether the Defendant can defeat this claim by establishing that he acted in good faith can not be decided at this stage of the proceedings. Therefore, the Defendant's Motion to Dismiss is denied in its entirety.

An appropriate Order follows.

**ORDER**

AND NOW, this 19, day of October, 1999, after careful consideration of the Defendant Daniel Borislow's Motion to Dismiss the Second Consolidated Amended Class Action Complaint for Failure to State a Claim (Docket No. 22), the Plaintiff's response thereto (Docket No. 25), and the Defendant's Reply (Docket No. 29), it is hereby **ORDERED** that the Motion is **DENIED.**

1999 U.S. Dist. LEXIS 16800, *; Fed. Sec. L. Rep. (CCH) P90,693

BY THE COURT:                              RONALD L. BUCKWALTER, J.

# TAB 7
# to Compendium

LEXSEE 2003 U.S. DIST. LEXIS 5623

IN RE VIROPHARMA, INC., SECURITIES LITIGATION

CIVIL ACTION MASTER FILE NO. 02-1627

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2003 U.S. Dist. LEXIS 5623*

April 3, 2003, Decided
April 7, 2003, Filed

**DISPOSITION:** Defendants' motion to dismiss consolidated class action complaint granted in part and denied in part.

**COUNSEL:** [*1] For In Re Viropharma, Inc Securities Litigation, IN RE: Barbara W Mather, Pepper, Hamilton & Scheetz, Philadelphia, PA USA. Gay Barlow Parks Rainville, Pepper Hamilton LLP, Philadelphia, PA USA.

For Ira Gaines, PLAINTIFF: Carole A Broderick, Berger & Montague, PC, Philadelphia, PA USA. Marc Topaz, Schiffrin and Craig, Bala Cynwyd, PA USA. Jacob A Goldberg, Schiffrin & Barroway LLP, Bala Cynwyd, PA USA.

For Viropharma Inc, DEFENDANT: Robert L Hickok, Pepper, Hamilton & Scheetz, Philadelphia, PA USA.

For Claude H Nash, Michel De Rosen, DEFENDANTS: Robert L Hickok, Barbara W Mather, Pepper, Hamilton & Scheetz, Philadelphia, PA USA. Gay Barlow Parks Rainville, Pepper Hamilton LLP, Philadelphia, PA USA.

For George Soros, Frank H Pearl, DEFENDANTS: John G Harkins, Jr, Harkins Cunningham, Philadelphia, PA USA. Richard A Rosen, Paul Weiss Rifkind Wharton & Garrison, New York, NY USA.

For MPM Capital, LP, Gerald Larson, MOVANTS: Andrew L Barroway, Schiffrin and Craig, Ltd, Bala Cynwyd, PA USA. Barbara A Podell, Berger & Montague, PC, Philadelphia, PA USA.

For Terry Wickman, Gary Wickman, Mel Steven Lessley, Kui-Chiu Kwok, Russell E Bingham, MOVANTS: Sherrie F Savett, [*2] Barbara A Podell, Berger & Montague, PC, Philadelphia, PA USA.

For Mark McKinlay, Vincent Milano, MOVANTS: Robert L Hickok, Barbara W Mather, Pepper, Hamilton & Scheetz, Philadelphia, PA USA. Gay Barlow Parks Rainville, Pepper Hamilton LLP, Philadelphia, PA USA.

**JUDGES:** Clarence C. Newcomer, S.J.

**OPINIONBY:** Clarence C. Newcomer

**OPINION:** Newcomer, S.J.

I. Introduction

This is a class action securities fraud case against Viropharma and its officers. n1 Plaintiffs, purchasers of Viropharma Securities, claim that the Defendants made materially misleading statements regarding a drug that was developed by Viropharma called Pleconaril. They allege that these statements misled them as to whether Pleconaril would be approved by the Food and Drug Administration("FDA"). Eventually, the FDA rejected Pleconaril, and the company's stock plummeted. Currently before the Court is the Defendants' Motion to Dismiss the Consolidated Class Action Complaint.

n1 The individuals named include: Claude H. Nash, Viropharma's co-founder, Chairman of the Board, former Chief Executive Officer and former President; Michel de Rosen, Viropharma's current Chief Executive Officer and President; Mark A. McKinlay, Viropharma's co-founder and Vice President of Research and Development; and Vincent Milano, Viropharma's Chief Financial Officer.

[*3]

2003 U.S. Dist. LEXIS 5623, *

II. What a Court may Consider when Deciding a Motion to Dismiss

As a preliminary matter the Court must decide what materials are properly before it on the Defendants' Motion. Both sides have filed no less than four briefs arguing their respective positions. In support of these briefs, the Defendants submitted a total of forty-seven exhibits spread over four volumes and the Plaintiffs submitted several exhibits including the nine-page declaration of a Robert Makuch a biostatistician.

A. The Court Will Consider the Facts Alleged in the Complaint and Extrinsic Documents Either Explicitly Referenced in the Complaint or Integral to the Plaintiffs' Claims

On a motion to dismiss, a court must accept all of the facts pleaded in the Plaintiffs' Complaint as true and take all reasonable inferences in favor of the Plaintiff. *Weston v. Pennsylvania, 251 F.3d 420, 425 (3d Cir. 2001)*. A court is not limited, however, to the four corners of the complaint. A court may consider any document that is explicitly relied upon in the complaint. *In re Burlington Coat Factory Sec. Lit., 114 F.3d 1410, 1426 (3d Cir. 1997)*. A court can also consider the text [*4] of an undisputedly authentic document that is integral to a plaintiff's claim, even if the document is not attached to or named in the complaint. Id. This prevents a plaintiff in a fraud case from pulling isolated statements from a document which may appear fraudulent, but are not so when viewed in context. Id. In such cases, a plaintiff is not able to prevent a court from considering the full text of the document just because the plaintiff chose not to attach it. Id. Accordingly, the Court will consider the Defendants' exhibits that were either referenced in, or integral to, the Plaintiffs' Complaint. n2

n2 These exhibits include the various press releases and other documents, which the Plaintiffs allege contain materially misleading statements. Although the Defendants did not submit all such documents, exhibits 11, 13, 16, 20, 24-28, and 31-33 were either explicitly referenced in the Plaintiffs' allegations or they are integral to the Plaintiffs claims.

B. The Court Will Not Consider Statements [*5] in Public Documents and Newspaper Articles for the Truth of the Matter Asserted Therein

In addition to documents relied on by a plaintiff in the complaint, a court may can consider materials that are public records and that may be judicially noticed under *Federal Rule of Evidence 201. Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000)*. These materials, how-

ever, may only be considered for the limited purpose of showing that a particular statement was made by a particular person. They may not be considered for the truth of the matters stated within them. Id. (quoting *Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)*. If a court adopted the approach of considering such documents for the truth of the matter asserted therein, it would be authorizing a trial by public documents, and thus imprudently expanding the scope of *12(b)(6)* motions.

Generally, this Court will not consider the public documents and newspaper articles submitted by the parties for the truth of the matter asserted in the documents. n3 Specifically, the Court will not accept as true the statements made by Viropharma in its SEC and FDA filings. It would be improper to [*6] accept these statements as true because the crux of the Plaintiffs' Complaint is that statements made by Viropharma were not truthful. In addition, the parties have submitted several public documents from the FDA which merely provide background on the process for testing and approving new drugs. n4 Unlike the statements of Viropharma, the authenticity and accuracy of these documents cannot reasonably be questioned. *Fed. R. Evid. 201(b)(2)*. In forming its opinion, the Court has relied on these documents only to this extent that they educate the Court in the FDA approval process, but has not made any specific factual conclusions about this case based on them.

n3 These include Defendants' exhibits 6, 14, 18, 19, 22, 23, 29, and 34-37 and Plaintiffs' exhibits B to their Supplemental Submission in Opposition to Defendants Motion to Dismiss.

n4 These include Defendants exhibits 1-5 ,7-10, 39, 40, 42-46, exhibits A and C to the Plaintiffs' Motion to Strike, and Plaintiffs exhibits C-G to the Plaintiffs' Supplemental Submission in Opposition to the Defendants' Motion to Dismiss.

[*7]

C. Other Documents Submitted by the Parties

The parties have also submitted several other documents that are not proper on a motion to dismiss. The Plaintiffs' submission of an expert report at this stage is entirely improper. *DeMarco v. DepoTech Corp., 149 F. Supp. 2d 1212, 1219-22 (S.D. Cal. 2001)*; See Visconti by Visconti v. United States Healthcare, 1998 U.S. Dist. LEXIS 15691 at *12 (E.D.Pa. Sept. 28, 1998)(expert report is not a pleading). Besides being wholly outside of the pleadings, this expert report attempts to circumvent the usual procedures for allowing expert testimony. See *DeMarco, 149 F. Supp. 2d at 1221*. The Defendants have

not had the opportunity to examine Mr. Makuch or to challenge his qualifications and the methodology of his opinions. The Defendants have also submitted several documents that are neither suitable for judicial notice, nor integral to the Plaintiffs' Complaint. These documents will not be considered.

II. Factual Background

A. Background on the FDA Approval Process

Every drug sold in the United States must first be approved by the FDA. Approval by the FDA requires preclinical [*8] trials usually done on animals, then at least three phases of clinical trials on humans (these trials are referred to as phases I, II, and III). Phase I trials are mainly aimed at determining if the metabolic and pharmacologic actions of the drug in humans are safe enough to proceed to Phase II studies. Phase II studies are controlled clinical studies that involve a limited population infected with the disease the drug proposes to treat. Phase III studies usually involve many more people than Phase II studies and are intended to gather additional information on the drug's efficacy and safety that will be used in evaluating its overall risks and benefits.

After the completion of Phase III clinical trials, the drug company files a New Drug Application(NDA) with the FDA. A NDA should present information regarding the sub-groups that will eventually comprise the drug's market. If the application is not sufficient, the FDA will refuse to file it. If the NDA is accepted, the FDA may refer the application to an advisory committee of outside experts. The recommendations of these committees are not binding, but are almost universally followed. After making its decision, the FDA sends one of [*9] three letters: an approval letter, a not approvable letter, or an approvable letter.

B. History of Pleconaril

Pleconaril is a drug aimed at treating picornaviruses. Picornaviruses are the cause of over one-half of all common colds. Pleconaril was the first drug that was ever submitted to the FDA for the treatment of these viruses. The predicted affect of the drug was to shorten the duration of colds in adults.

Viropharma ran clinical trials on Pleconaril from the early 1990s until the rejection of the drug by the FDA in 2002. On July 13, 1999, Viropharma announced the results of one of its Phase II studies. Contrary to the statements made by Viropharma, the Plaintiffs allege that this study and all other Phase II trials showed no statistically significant effect. On April 11, 2000, Viropharma announced that a Phase III study had failed to show any significant treatment benefit. Despite these studies, how-

ever, Viropharma announced on March 15, 2001, that a later Phase III study had proven successful.

The Plaintiff alleges that this later Phase III study was lacking in several respects. First, the study showed that the drug had a negative impact on smokers. This negative effect [*10] was confirmed in three different trials. Also, those suffering from heart problems and other co-morbid conditions were wholly excluded from the study. Third, because minorities and the elderly were underrepresented no conclusions could be made about the drug's efficacy and safety in these groups. The Plaintiffs also allege that Pleconaril did not show a significant treatment effect in the male population. Because of these deficiencies, the Plaintiffs allege that the therapeutic profile for Pleconaril was extremely narrow, and therefore Defendants could not claim that it was marketable to all adults.

In the fall of 2001, after Viropharma submitted the NDA for Pleconaril, Viropharma did a six-week prophylaxis study to confirm the drug's efficacy and test the safety of the drug when interacting with other medications. This was the first time Viropharma had tested Pleconaril's interaction with other drugs. In this trial, several women who were taking oral contraceptives experienced menstrual difficulties. Although the preliminary results of the study were available to Viropharma by mid-February 2002, they were not released to the public until March 18, 2002. This study spurred Viropharma [*11] to undertake other studies to explore the side effects of Pleconaril, but before these studies were completed the FDA's Advisory committee rejected Pleconaril. The FDA sent a non-approval letter to Viropharma on May 30, 2002.

C. Allegedly Misleading Statements

The Plaintiffs allege that several public statements made during the course of the clinical trial and approval process were material misrepresentations. These were statements made both by the Defendants directly and by analysts on behalf of the company. The crux of the Plaintiffs' Complaint is that these statements represented to the investing public that Pleconaril was effective at reducing the common cold, and that it was effective over the whole spectrum of adults. The statements are:

1) A July 13, 1999, press release stating that the Phase II trials were a success. In this release Viropharma stated that "Pleconaril-treated patients experienced a clinically and statistically significant reduction in time to complete resolution of all disease symptoms, as well as a reduc-

2003 U.S. Dist. LEXIS 5623, *

tion in the patient-reported time to return to feeling normal." n5

2) A February 24, 2000 report in the Dow Jones Newswire repeated the statements [*12] of Defendant Milano that "Pleconaril is a very exciting product. . . . We have received a lot of interest from pharmaceutical companies."

3) A February 28, 2001, issue of Bioworld published an interview with a Viropharma spokeswoman who stated that after reviewing previous clinical trials, the Company "took several steps to try to increase the likelihood of success."

4) A March 15, 2001, interview with Defendant de Rosen stated that Pleconaril "will probably be good for either everybody or close to everybody" and that it should reach approximately two-thirds of the colds in America. n6

5) A March 15, 2001, report by analysts based on information disseminated by the Defendants stated that the company believed "that Pleconaril's benefit, consistent across endpoints and between studies, puts it on a strong approval track as the first and only drug candidate to effectively treat the cause and symptoms of VRI. VRI results in 34 million U.S. physician visits each year."

6) Defendant de Rosen stated in March of 2001 that the completion of clinical studies was a "truly momentous event in our history." He also claimed that the achievement was all that more remarkable because [*13] Viropharma had been forced to completely reshape its clinical program after three successive studies had produced negative results. n7

7) On August 24, 2001, Defendants represented that non-smokers simply "experienced greater reduction in duration." Smokers who were treated with the drug actually had the duration of their colds extended.

8) On October 19, 2001 Form 8-K filed with the SEC stated that Viropharma had submitted a NDA requesting permission

to market Picovir for the treatment of VRI in adults.

n5 Viropharma made several similar statements touting the efficacy of Pleconaril. An August 14, 2000, statement in the Wall Street Journal claimed that: "In clinical studies to date, Pleconaril - treated patients have experienced a shortening in their disease duration and a decrease in the severity of their disease." A March 15, 2001, press release stated that results from clinical studies "demonstrated that patients with a VRI caused by picornavirus who were treated with Pleconaril experienced a statistically significant decrease in disease duration and in cold symptom severity." Defendant McKinlay was quoted in April 9, 2001, as saying that certain clinical studies showed that patients experienced a reduction in the severity and duration of their illness. Similar statements were also included in an allegedly misleading analyst report dated August 24, 2001 and an October 8, 2001, Morgan Stanley Dean Witter report based on a Viropharma presentation.

[*14]

n6 Similarly, Defendant de Rosen allegedly exaggerated the scope of Pleconaril in an April 30, 2001, letter to stockholders by stating that every person is a potential patient and that millions of patients need the drug. In a Barron's article on May 7, 2001, he stated that "we need to market this as a scientific revolution because this is a disease that anyone can catch. Potentially every family in America could use it." On September 10, 2001, in discussing the collaboration between Viropharma and Aventis Pharmaceutical, the Company stated that the agreement "clearly represents a tremendous opportunity to potentially reach patients and physicians. The common cold is the number one reason for physician visits in the Unities States today."

n7 Defendant de Rosen also referred to the success of certain trials as a momentous event in an April 30, 2001, letter to stockholders. Similarly, Defendant Milano was quoted as saying that "we believe this is going to be successful, and we're very passionate about making it happen."

D. Viropharma's Securities

2003 U.S. Dist. LEXIS 5623, *

Viropharma's stock price rose and fell [*15] on the hopes for FDA approval for Pleconaril. When Viropharma announced that its July 13, 1999, Phase II study was a success, the company's stock rose from $ 9.25 to $ 19.13 per share. Two months later, the company announced a sale of three million shares of stock priced at nineteen dollars a share. In February of 2000, the Defendants announced the intent to issue one-hundred-and-fifty million dollars in convertible subordinated notes.

When the prospects for the success of Pleconaril deteriorated, so did the stock price of Viropharma. When the disappointing Phase III study results were announced on April 11, 2000, the share price of Viropharma dropped from $ 71.75 to $ 23.25 per share. When the Advisory Committee recommended that the drug not be approved, the share price dropped from $ 5.50 to $ 1.41. After Viropharma received the non-approval letter for Pleconaril, the stock dropped to a few pennies per shares.

III. Discussion

A. Securities Fraud Claims under Section 10(b) of The Securities Exchange Act and Rule 10b-5

The Complaint sets forth allegations against the Defendants under *Section 10(b) of the Securities Exchange Act of 1934* and *Rule 10b-5* promulgated thereunder [*16] by the S.E.C. To state a claim under *Rule 10b-5*, the plaintiff needs to plead that: 1) the defendant made a materially false or misleading statement or omitted a material fact necessary to make a statement not misleading; 2) the statement was made in connection with the sale of securities; 3) the statement was made with scienter; 4) the plaintiff reasonably relied on the statement; and, 5) the misstatement proximately caused the plaintiff's injury. n8 *Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000).*

n8 Although the Defendants state that the complaint does not meet any of these elements, they only offer argument on elements one and three. After evaluating the Plaintiff's Complaint, the Court concludes that it pleads sufficient facts to satisfy elements two, four, and five.

B. While the Defendants' have Correctly Stated that They had no Duty to Predict the Advisory Committee's Decision, They did have a Duty not to Make Material Misstatements of Fact

The Defendants claim that the Plaintiffs [*17] are seeking to impose a duty to predict the outcome of the FDA's decision. They further argue that they had no such duty under the securities laws. The Court soundly agrees that 10b-5 does not place an obligation to predict the

FDA's decision. The thrust of the Plaintiffs' Complaint, however, is not seeking to impose such a duty. n9

n9 One paragraph of the Plaintiffs' Complaint does allege that Viropharma materially misled investors by saying the Pleconaril was on the track to FDA approval. The Court finds this statement to be immaterial. See Section IV(D), infra.

The Plaintiff is alleging that the Defendants breached their duty to not make material misstatements. Whether the Defendants had to predict the FDA's decision is irrelevant. They are liable under 10b-5 if they made statements that a reasonable investor would consider in deciding whether to buy stock. All investing is based on investors' perceptions about the future. The Plaintiffs in this case bought Viropharma securities based on their perception [*18] of whether Pleconaril would be approved by the FDA. Viropharma would not be responsible if its investors' perceptions were based solely on the company's predictions about the prospects for FDA approval. That is not the case, however. Rather the allegations in this case are that Viropharma made misstatements of fact which formed the basis for its investors' perceptions. See In Re NAHC, Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 16754 at *35 (E.D. Pa. Oct. 17, 2001)(stating that while corporate officials do not need to be clairvoyant, they are responsible for revealing material facts known to them). Accuracy in these types of factual statements lies at the heart of what the securities laws are trying to protect.

C. The Defendants did have a Duty to not Materially Mislead the Market when Making Statements About Pleconaril's Efficacy

The Defendants argue that the failure to disclose efficacy data that was not considered fatal by the FDA does not render alleged statements materially misleading. In making this argument, the Defendants are asking the Court to make a determination as to the basis of the FDA's decision to deny the NDA for Pleconaril. At this stage in the [*19] litigation, it is simply not within the Court's purview to make such a determination. In re Cell Pathways Inc. Sec. Litig., 2000 U.S. Dist. LEXIS 8584 at *28 (E.D.Pa. June 21, 2000)(holding that on a motion to dismiss it is inappropriate to dismiss a complaint based merely on a defendant's "insistence on their version of the contested issues in the case").

D. The Defendants may have had a Duty to Disclose Drug Interaction Data

The Defendants claim that they had no duty to disclose drug interaction data from the six-week prophy-

2003 U.S. Dist. LEXIS 5623, *

laxis study conducted in late 2001. The Defendants argue that this information was preliminary and could not have altered the total mix of information in the market. Drug interaction data that is not statistically significant need not be disclosed in order to prevent prior statements about a drug's safety from becoming materially misleading. *Oran v. Stafford, 226 F.3d 275, 284 (3d Cir. 2000)*. At this stage in the litigation, however, the Court is unable to determine whether the data from the six-week study was statistically significant, and therefore, the Court must reject this argument.

E) Materiality of the Alleged [*20] Misrepresentations

Only misrepresentations that are material are actionable. The test for determining the materiality of a statement is whether a reasonable investor would believe that it "significantly alters the 'total mix' of information' available to that investor." *Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000)*(citing *In re Westinghouse Sec. Litig., 90 F.3d 696, 714 (3d Cir. 1996)*). Certain types of "soft information" such as statements of subjective opinions and intentions are immaterial as a matter of law. *In re Craftmatic Sec. Litig., 890 F.2d 628, 642 (3d Cir. 1989)*. Similarly, the law considers vague and general statements of optimism as mere immaterial puffery. *In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)*. To determine whether a statement is puffery, a court must examine the context in which the statement was made. *In re Lucent Technologies, Inc. Sec. Litig., 2002 U.S. LEXIS 11556 at *77 (D.N.J. June 26, 2002)*. Classic examples of puff include a broker calling a bond "marvelous," or saying a stock is so "red hot" that the investor "could not lose." *Newman v. L.F. Rothschild, 651 F. Supp. 160, 163 (S.D.N.Y. 1986)*. [*21]

Several of the Defendants' allegedly actionable statements are not material under the above legal analysis. The statements concerning the potential scope of Pleconaril, cited in Section 2(C)(4) above, like "everybody is potential patient" and referring to Pleconaril as "a scientific revolution," are simply not the type of factual statements upon which reasonable investors base their decisions. Similarly, the statements referring to successful clinical trials as a momentous event in Viropharma's history (Sec. II(C)(6) supra) and the February 24, 2000, quote from the Dow Jones Newswire describing Pleconaril as a "very exciting product" (Sec. II(C)(2) supra) must be dismissed as mere puffing. The March 15, 2001, report that merely stated the company's belief that Pleconaril was on a strong track to approval (Sec. II(C)(5) supra) is also immaterial because investors should not rely on a company's prediction about the future actions of independent government agencies. n10 See *Epstein v. Washington Energy Co., 83 F.3d 1136, 1142 (9th Cir. 1996)*(finding no duty to predict action of public utility

commission); *Fanni v. Northrop Grumman Corp., 2000 Dist. LEXIS 21626, [*22] at *32-37 (C.D. Cal. April 10, 2000)*(finding no duty to predict whether Department of Justice would approve merger).

n10 The Court also notes that the allegedly misleading statement made in the February 28, 2001, issue of Bioworld (Sec. II (C)(3) above) is also not actionable. The statement only conveys the fact that Viropharma redesigned its clinical trials in an attempt to increase the likelihood of success. The Plaintiffs, however, have not pleaded that Viropharma did not redesign its clinical trials. Accordingly, the Complaint does not state sufficient facts to impose 10-b5 liability on the basis of this statement.

The remainder of the alleged statements cannot be disregarded as puffery or subjective opinions. Statements regarding the overall efficacy of the drug, the claim that smokers received a decreased benefit when in fact the data showed the drug extended the duration of their colds, and statements that the NDA for Pleconaril was aimed at seeking approval for all adults, cannot be simply dismissed [*23] as immaterial as the Defendants claim. Indeed, it would be sad day when court could determine that misstatements about a whether a company's primary product worked did not alter the 'total mix' of information available in the market. This is not a case where the Plaintiffs claim that the absence of information about a product renders a statement materially misleading. See *In re PLC Sys., Inc. Sec. Litig., 41 F. Supp. 2d 106, 115-16 (D.Mass. 1999)* (finding that merely disclosing one fact about a product does not require the disclosure of all facts that may be of interest to the market). Rather, the Plaintiffs have pleaded that the statements made by Defendants were contrary to the then existing state of facts, for example, that Pleconaril was effective for all adults when it was not.

F) The Safe Harbor for Forward-Looking Statements

The Private Securities Litigation Reform Act of 1995 (hereinafter "PSLRA") provides a safe harbor for forward-looking statements. A forward looking statement is one whose truth or falsity cannot be determined until after the statement has been made. *Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir. 1999)*. Forward [*24] looking statements include: (1) "a statement containing a projection of revenues" or other financial items; (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;" (3) "a statement of future economic performance;" and (4) "any statement of the assumptions underlying or relating" to

2003 U.S. Dist. LEXIS 5623, *

the aforementioned statements. *15 U.S.C. § 78u-5(i)(1)*. Additionally, A forward-looking statement only qualifies for the safe harbor to the extent that it is:

> (1) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" (*15 U.S.C. § 78u-5(c)(1)(A)(i)*);
>
> or
>
> (2) the plaintiff fails to prove the forward-looking statement was made, or approved by an executive officer of the company, with actual knowledge that the statement was false or misleading. (*15 U.S.C. § 78u-5(c)(1)(B)*).

1) The Statements found by the Court to be Material Misrepresentations [*25] are not Forward-Looking n11

n11 Because the Court has determined that the other four statements alleged by the Defendants to be forward-looking are not actionable because they are not material, the Court will not discuss whether they qualify for the safe harbor.

The Court finds that the material misrepresentations in the July 13, 1999, press release n12 and in the October 19, 2001 8-K Filing under the heading "Have you submitted an NDA for Picovir(TM)?" are not forward-looking. n13 They do not fall into any of the categories of forward-looking statements listed above. Rather, these statements when read in the context are statements conveying to the market the current status of clinical trials and the NDA for Pleconaril. The truth or falsity of both of these statements was determinable at the time they were made.

n12 The challenged sections of this press release are as follows:

> Trial results indicate that Pleconaril-treated patients experienced a clinically and statistically significant reduction in time to complete resolution of all disease symptoms, as well as a reduction in the patient-reported time to returning

to feeling normal, as measured by a global assessment score. . . . We've seen excellent results with Pleconaril in patients with viral respiratory infection, a disease for which there are no available anti-viral treatments. Our plan is to continue the path towards regulatory approval of this important new therapy.

[*26]

n13 In the 2001 8-K Filing, the Plaintiffs challenge the same statement-- "we submitted an NDA to the FDA requesting permission to market Picovir for the treatment of VRI in adults-- which appears under two different headings. The first heading-- "What will be the primary indication for Picovir(TM)?"-- could render the first resuscitation of the above quote forward-looking. The heading asking specifically about whether the Defendants had submitted a NDA, however, is clearly a statement of fact, and therefore, does not qualify for protection under the safe harbor. Accordingly, whether the first statement does or does not qualify for the safe harbor is irrelevant.

In their argument, the Defendants pull isolated forward-looking statements out of the documents at issue in this case. The Defendants do not point out, however, that included in these documents are assertions of then-existing fact. The Plaintiffs are not alleging that the forward-looking portions of the documents are false and misleading, but instead point to the statements of fact. Simply because material misrepresentations appear in [*27] the same document as a forward-looking statement does not make the statements of fact eligible for the safe harbor. In fact, the very case on which the Defendants rely, *Harris v. Ivax Corp., 182 F.3d 799 (11th Cir. 1999)*, stated that if smaller non-forward-looking statements contained within the larger document are challenged as false, it is easily concluded that they fall outside the safe harbor. *Harris, 182 F.3d at 806.* See, also, *In re Penn Treaty American Corp. Sec. Litig., 202 F. Supp. 2d 383, 393 (E.D.Pa. 2002)*(rejecting a defendants' attempt to pull isolated forward-looking portions out of a document while ignoring the statement of fact).

2) The July 13, 1999, Press Release and The October 19, 2001 8-K Filing do Not Include Meaningful Cautionary Language

2003 U.S. Dist. LEXIS 5623, *

Even if the two material misrepresentations discussed above were forward looking, they would not qualify for the safe harbor because they are not accompanied by meaningful cautionary language as required by *15 U.S.C. § 78u-5(c)(1)(A)(i).* n14 Meaningful cautionary language must be substantive and tailored to the specific predictions made in the [*28] allegedly misleading statement. *In re Donald J.Trump Casino Sec. Litig., 7 F.3d 357, 371-372 (3d Cir. 1993).* "A vague or blanket disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.*

n14 The Court also finds that the second part of the safe-harbor, that the Plaintiffs must have failed to allege that the statements were made with actual knowledge of their falsity is not met. As explained in the discussion of scienter Section IV(E), infra., the Plaintiffs did plead that the these statements were made with actual knowledge of their falsity.

The language that the Defendants cite as cautionary is verbose, and more importantly it falls far short of advising investors about any specific risks. This language would not discourage reliance on the statements of fact in the July 13, 2000, press release and the Form 8-k. The "cautionary language" in the July 13 press release only states that future clinical trials may fail, [*29] this does not caution investors that the results of the clinical trial reported in the press release could be interpreted to show that the drug was ineffective. Moreover, a defendant may not use cautionary language to protect himself when he is already aware that the risks he is cautioning against have come to fruition. In re Cell Pathways, Inc. Sec. Litig., 2000 U.S.Dist. LEXIS 8584 (E.D. Pa. June 21, 2000); see, also, *In re World Access, Inc. Sec. Litig., 119 F. Supp. 2d 1348 (N.D.Ga. 2000)*("Neither the safe harbor provision nor the bespeaks caution doctrine are applicable when defendants are aware . . . of the facts that render their statements untrue when made").

E) The Plaintiffs' Pleadings have Created a Reasonable and Strong Inference of Scienter

Scienter is a required element of a cause of action under the *Securities and Exchange Act of 1934* and *Rule 10b-5.* Scienter requires a plaintiff to prove that a defendant possessed a mental state embracing intent to deceive, manipulate or defraud. *Ernst and Ernst v. Hochfelder, 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976).* Since the adoption of the PSLRA, a plaintiff's [*30] scienter allegations must create a reasonable and strong inference that the required intent is present. *In*

*re Advanta Corp. Securities Litigation, 180 F.3d 525, 534-35 (3d Cir. 1999).*

A plaintiff may plead scienter by alleging particular facts that are circumstantial evidence that a defendant acted recklessly or with conscious disregard to the truth of his statement. *Advanta, 180 F.3d at 534-5.* A reckless statement is one made with "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the Defendant or is so obvious that the actor must be aware of it." *Mclean v. Alexander, 599 F.2d 1190, 1197 (3d Cir. 1979)*(quoting *Sudstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir. 1977).*

The Plaintiffs have sufficiently alleged that the Defendants either knew that their statements were false or acted with reckless disregard for the truth of those statements. According to the allegations in the Plaintiffs' Complaint, the Defendants were aware of the lack of efficacy shown [*31] by the Phase II trials, the lack of sufficient data to make any conclusions regarding the efficacy and safety of Pleconaril in significant subgroups, and the negative drug interaction between Pleconaril and oral contraceptives. Knowledge of these facts can be imputed to the Defendants for several reasons. First, because Pleconaril was Viropharma's leading product and Defendants were the highest ranking members of the company, it can be assumed that the Defendants were aware of these facts. See *In re Aetna Sec. Litig., 34 F. Supp. 2d 935, 953 (E.D.Pa. 1999);* In re Tel-Save Sec. Litig., 1999 U.S. Dist. LEXIS 16800 at *14 (E.D. Pa. 1999); *Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D. Wash. 1998).* Second, because of the Defendants' positions in the company they had access to several documents which contained the facts that allegedly made the Defendants' statements materially misleading. See *In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 599 (D.N.J. 2001)*(stating that a claim of recklessness can be based on allegations that defendants had access to information which contradicted their public statements). [*32] Here the Defendants had access to non-public annual reports which contained the results of the clinical trials, the NDA for Pleconaril which contained data from the Phase II and III trials, and the Case Report Forms prepared during the clinical trials. It is even more clear that the Defendants were aware of data that contradicted their statements regarding subgroups because the FDA mandated that data be reported separately based on age and race. Further, the harmful effect on smokers was evident to the Defendants because smokers were stratified in the Phase III trails. Based on these allegations, the Court concludes that there is strong and reasonable inference that the Defendants knew their statements were

misleading or that they acted with an extraordinary lack of care when making the statements.

The Defendants argue that the Complaint lacks sufficient allegations of scienter based on recklessness because the Defendants were not aware of the materiality of their statements. In order to be held liable under 10b-5, the plaintiffs must clearly show that the Defendants either were aware or should have been aware of the materiality of the facts they were misrepresenting. See *City of Phila. V. Fleming Cos., 264 F.3d 1245, 1261 (10th Cir. 2001).* [*33] The Defendants once again attempt to argue that they could not have known their statements were material because the FDA usually considers drug interaction and subgroup limitations as labeling issues and not barriers to approval. Again, the Defendants ignore the reality of Plaintiffs' decision to buy Viropharma stock. In making this decision, the efficacy of the drug in general and in large subgroups is obviously material.

V. Conclusion

For the reasons stated above, the Defendants' Motion to Dismiss the Consolidated Class Action Complaint is granted in part and denied in part. An appropriate Order will follow.

Clarence C. Newcomer, S.J.

Order

AND NOW, this 3rd day of April, 2003, upon consideration of the Defendants' Motion to Dismiss the Consolidated Class Action Complaint (Doc. 14), and responses thereto, it is hereby ORDERED that said Motion is GRANTED in part, and DENIED in part. It is further ORDERED that Paragraphs 45, 46, 57-59, 61, and 62 are hereby STRICKEN from the Plaintiff's Complaint.

AND IT IS SO ORDERED.

/s/

Clarence C. Newcomer, S.J.