1

Westlaw.

Slip Copy                                                                                               Page 1
Slip Copy, 2006 WL 288120 (D.Del.), Fed. Sec. L. Rep. P 93,678
(Cite as: 2006 WL 288120 (D.Del.))

C

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
In re: ASTROPOWER INC. SECURITIES LITIGATION
No. Civ.A. 03-260-JJF.

Feb. 7, 2006.
Norman M. Monhait, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Eric L. Zagar, and Thomas W. Grammar, of Schiffrin & Barroway LLP, Radnor, Pennsylvania, for Plaintiffs, of Counsel.

Edward M. McNally, Lewis H. Lazarus, and Joseph S. Naylor, of Morris James Hitchens & Williams LLP, Wilmington, Delaware, for Defendant Thomas J. Stiner.

*MEMORANDUM OPINION*
FARNAN, J.

*1 Pending before the Court is Defendant Thomas J. Stiner's ("Stiner") Motion To Dismiss The Consolidated Amended Class Action Complaint (D.I.41). By his Motion, Stiner seeks dismissal of both counts of the Consolidated Amended Class Action Complaint (D.I.34) (the "Amended Complaint") under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Stiner seeks dismissal of the amended complaint only with respect to himself; the other Defendant, Allen M. Barnett ("Barnett") has separately filed an Answer (D.I.38). For the reasons discussed below, the Court will grant Stiner's Motion.

BACKGROUND
Lead Plaintiff, Leeb Capital Management, Inc., brought this action on its own behalf and as a class action on behalf of a class of shareholders of AstroPower, Inc. ("AstroPower") who purchased AstroPower stock between May 7, 2001 and April 1, 2003 (the "class period"). AstroPower developed, manufactured, marketed, and sold solar electric power products. Defendant Barnett was AstroPower's President, and Chief Executive Officer. Defendant Stiner was Chief Financial Officer, Senior Vice President, and a director. On February 2, 2004, AstroPower filed a petition for Chapter 11 bankruptcy reorganization. That proceeding has since been converted to a Chapter 7 liquidation.

Count I of Plaintiffs' Amended Complaint alleges that Defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 by fraudulently overstating AstroPower's revenue in a series of press releases and filings with the SEC. Plaintiffs contend that, as a result of Defendants' violations, the market price of AstroPower's stock was artificially inflated during the class period and that Plaintiffs would not have purchased the stock at that price if they had been fully informed. Count II alleges that, under § 20 of the Exchange Act, Defendants qualify as "controlling persons" of AstroPower and are therefore, secondarily liable to Plaintiffs as well as primarily liable under § 10(b) and Rule 10b-5.

By his Motion, Stiner contends that the Court should dismiss the Amended Complaint because, under the heightened pleading requirements of the PSLRA, the Amended Complaint fails to state a claim upon which relief can be granted, and because the Amended Complaint fails to allege sufficient facts from which the Court could conclude that Stiner was a "controlling person" within the meaning of § 20 of the Exchange Act.

DISCUSSION
I. Legal Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993)*. When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff. *Neitzke v. Williams, 490 U.S. 319, 326 (1989); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255 (3d Cir.1994)*. The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost, 1 F.3d at 183*. Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 2
Slip Copy, 2006 WL 288120 (D.Del.), Fed. Sec. L. Rep. P 93,678
**(Cite as: 2006 WL 288120 (D.Del.))**

him to relief." *Conley v. Gibson,* 355 U.S. 41, 45 (1957). The burden of demonstrating that the plaintiff has failed to state a claim upon which relief may be granted rests on the movant. *Young v. West Coast Industrial Relations Assoc., Inc.* 763 F.Supp. 64, 67 (D.Del.1991) (citations omitted).

II. Whether The Amended Complaint States A Claim Against Stiner Under § 10(b) Of The Exchange Act And Rule 10b-5

*2 To state a claim for securities fraud under § 10(b) and Rule 10b-5, a private plaintiff must plead the following elements: "(1) that the defendant made a misrepresentation or omission of (2) a material (3) fact; (4) that the defendant acted with knowledge or recklessness and (5) that the plaintiff reasonably relied on the misrepresentation or omission and (6) consequently suffered damage." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 537 (3d Cir.1999) (quoting *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 710 (3d Cir.1996)). In addition, the PSLRA imposes a heightened standard of factual particularity on allegations of securities fraud, requiring that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "The particularity described in § 78u-4(b)(1) extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockefeller Center Properties, Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir.2002). Finally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2).

Stiner contends that the Amended Complaint fails to state a claim upon which relief can be granted under § 10(b) and Rule 10b-5. He bases this contention on three arguments: (1) the Court should give no weight to Plaintiffs' allegations involving information obtained from unnamed AstroPower employees because the Amended Complaint does not describe them with sufficient particularity or give a reason why it fails to name them (D.I. 42 at 9); (2) the Amended Complaint is not pleaded with the particularity required by the PSLRA (*Id.* at 21); and (3) the Amended Complaint does not raise a strong inference of scienter (*Id.* at 30).

A. *Whether The Court Should Consider Allegations Derived From Confidential Sources*

In interpreting the heightened pleading standards of the PSLRA, the Third Circuit has rejected "any notion that confidential sources must be named as a general matter." *California Public Employees' Retirement System v. Chubb Corp.,* 394 F.3d 126, 146 (3d Cir.2004) ("CALPERS") (quoting *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000)). All that is required is that the confidential source be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* Specifically, in order to satisfy the Court that the confidential sources obtained their information from firsthand knowledge rather than rumor, the Amended Complaint must set forth when the sources were employed by AstroPower, when they acquired the information, and how they had access to the information. *Id.* at 148.

*3 The Court concludes that, with one exception, the Amended Complaint describes its confidential sources with sufficient particularity. [FN1] For each of nine of the ten confidential witnesses, the Amended Complaint specifies the dates of the witness's employment. It also either specifies when the witness acquired the information alleged or provides facts to indicate that the information was acquired on an ongoing basis as a result of the witness's position within AstroPower. With regard to most of the information alleged, the Amended Complaint adequately explains how the witness had access to the information. Although there are some instances in which the Amended Complaint does not fully explain how a confidential witness had access to the information alleged, on the whole, the Court is satisfied, assuming the truth of the allegations in the Amended Complaint, that each confidential witness was in a position to possess the information alleged, and that he obtained the information from firsthand knowledge rather than rumor. Therefore, the Court will consider the allegations derived from confidential sources.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN1. For the confidential witness identified as "Vice President," the Amended Complaint specifies neither when he was employed by AstroPower, when he acquired the information alleged, nor how he acquired the information alleged. Accordingly, the Court will disregard the information attributed to this confidential witness.

B. *Whether The Amended Complaint Satisfies The Heightened Pleading Requirements Of The PSLRA*

The Court concludes that the Amended Complaint does not satisfy the heightened pleading requirements of the PSLRA. Among the elements that a plaintiff must allege to state a claim for violation of § 10(b) of the Exchange Act and Rule 10b-5 is that the defendant made a misrepresentation or omission of a material fact. *Advanta,* 180 F.3d at 537. In alleging, upon information and belief, that Defendants' statements misrepresented or omitted material facts, Plaintiffs "must state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Here, Plaintiffs offer the following reasons for believing that Defendants' statements misrepresented or omitted material facts:

> a. During the relevant time periods, AstroPower was booking revenue when no product had been ordered, shipped, or paid for;
> b. During the relevant time periods, AstroPower was booking receivables as revenue when there was no reasonable expectation of collectability;
> c. During the relevant time periods, AstroPower was booking revenues before shipment had occurred, contrary to its stated revenue recognition policy;

(D.I. 34 at 26, 27, 29 and 34.) and

> d. During the relevant time periods, AstroPower's receivables were not being timely paid because customers were dissatisfied with the quality of AstroPower's products, because AstroPower was deliberately shipping the wrong products so it could declare the shipment as revenue, and/or because AstroPower was deliberately shipping customers underpacked boxes so it could declare the full amount ordered as revenue even though the full amount ordered was not shipped.

(*Id.* at 34.)

These reasons are not supported by sufficiently particularized allegations of fact. In *Greebel v. FTP Software, Inc.,* the First Circuit concluded that the plaintiff had not pleaded allegations of improper revenue recognition with sufficient particularity because:

> *4 The allegations in the Complaint do not include such basic details as the approximate amount by which the revenues and earning were overstated, ... the products involved ... the dates of any of the transactions; or the identities of any of the customers or ... employees involved in the transactions. We do not say that each of these particulars must appear in a complaint, but their complete absence in this case is indicative of the excessive generality of these allegations."

194 F.3d 185, 204 (1st Cir.1999); *see also Klein v. ICT Group, Inc.,* No. 97-6554, 1998 WL 372559, *4 (E.D.Pa. May 19, 1998) (finding insufficient particularity where the plaintiff did "not identify which customers' transactions were misbooked, when the fraudulent accounting entries occurred, or what impact these entries had on the financial information disclosed in the prospectus"). Although here, the Amended Complaint specifically identifies one affected customer, ATERSA, it is lacking in any of the other "basic details" enumerated in *Greebel.* Especially problematic is the complete absence of any allegation with regard to the amount of money involved in the alleged revenue recognition irregularities. Without some properly supported allegation of the amount by which Defendants overstated AstroPower's revenue, the Court cannot conclude that Plaintiffs have alleged, with the particularity required by the PSLRA, that Defendants' alleged misrepresentations or omissions of fact were material. Therefore, the Court concludes that Count I of the Amended Complaint fails to state a claim against Stiner under § 10(b) of the Exchange act and Rule 10b-5. [FN2]

> FN2. Having reached this conclusion the Court need not address Stiner's contention that the Amended Complaint does not state with particularity, facts giving rise to a strong inference of scienter as required by § (b)(2) of the PSLRA.

Leave to amend is ordinarily granted when a complaint is dismissed on particularity grounds alone. *CALPERS,* 394 F.3d at 165. Therefore, the Court will grant Plaintiffs leave

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to amend the Amended Complaint.

III. Whether The Amended Complaint States A Claim Against Stiner Under § 20(a) Of The Exchange Act

Section 20(a) of the Exchange act provides that
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Accordingly, in order to state a claim under § 20(a), Plaintiffs must first adequately plead an independent violation of the Exchange Act by some person controlled by Stiner. *In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 275 (3d Cir.2005)*. Here, the Amended Complaint alleges only that "[a]lthough not named as a defendant herein, AstroPower is liable to Lead Plaintiff and the Class under Section 10(b) of the Exchange Act." (D.I. 34 at 48.) In light of the Court's conclusion that Count I does not state a claim under § 10(b) and Rule 10b-5, this conclusory allegation is insufficient to plead an independent violation by AstroPower. Therefore, the Court concludes that Count II does not state a claim against Stiner.

CONCLUSION

*5 For the reasons discussed, the Court concludes that Count I of the Amended Complaint does not meet the particularity requirements of § (b)(1) of the PSLRA and thus, does not state a claim against Stiner under § 10(b) of the Exchange Act and rule 10b-5. Therefore, under § (b)(3)(A) of the PSLRA, the Court must dismiss Count I with respect to Stiner. The Court further concludes that Count II does not state a claim against Stiner under § 20(a) of the Exchange Act. Therefore, the Court will dismiss the entire Amended Complaint with respect to Stiner, however, the Court will grant Plaintiffs leave to amend.

An appropriate order will be entered.

ORDER

At Wilmington, this 7 day of February, 2006, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that:

1. Defendant Thomas J. Stiner's Motion To Dismiss The Consolidated Amended Class Action Complaint (D.I.41) is *GRANTED;*

2. Plaintiffs shall have thirty (30) days from the date of this Order to file a Second Consolidated Amended Class Action Complaint.

Slip Copy, 2006 WL 288120 (D.Del.), Fed. Sec. L. Rep. P 93,678

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3828425 (Trial Motion, Memorandum and Affidavit) Defendant Thomas J. Stiner's Reply Brief in Support of his Motion to Dismiss the Consolidated Amended Class Action Complaint (Jul. 01, 2005)

• 2005 WL 3828426 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Answering Brief in Opposition to Defendant Thomas J. Stiner's Motion to Dismiss the Consolidated Amended Class Action Complaint (Jun. 20, 2005)

• 2005 WL 3828424 (Trial Motion, Memorandum and Affidavit) Defendant Thomas J. Stiner's Opening Brief in Support of his Motion to Dismiss the Consolidated Amended Class Action Complaint (May. 13, 2005)

• 1:03CV00260 (Docket) (Mar. 07, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2



Slip Copy                                                                                                 Page 1
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re ESPEED, INC. SECURITIES LITIGATION
No. 05 Civ.2091(SAS).

April 3, 2006.

Samuel H. Rudman, David A. Rosenfeld, Mario Alba, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, Laurence Paskowitz, Paskowitz & Associates, New York, NY, for Plaintiffs.

Dennis P. Orr, Joseph De Simone, Matthew D. Ingber, Mayer, Brown, Rowe and Maw LLP, New York, NY, for Defendants.

*OPINION AND ORDER*
SCHEINDLIN, J.

*1 THIS DOCUMENT RELATES TO: ALL ACTIONS

I. INTRODUCTION

This putative class action is brought on behalf of certain purchasers of common stock in eSpeed, Inc. ("eSpeed"), a publicly-traded market leader in electronic bond trading. Plaintiffs allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"). [FN1] All defendants now move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, defendants' motion is granted with leave to replead.

> FN1. 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10(b)(5).

However, I grant leave to replead with some reluctance. After reviewing the pleadings in this case, I harbor grave doubts as to whether plaintiffs can ever allege facts sufficient to survive a motion to dismiss. The fact that eSpeed introduced a new product that ultimately failed, despite cautious optimism from defendants and apparent initial success in raising eSpeed's revenues, does not entitle eSpeed's investors to use the federal securities laws as a "scheme of investor's insurance." [FN2] In light of this, plaintiffs should not file an amended Complaint unless they reasonably believe that the deficiencies identified in this Opinion can be addressed.

> FN2. *Basic Inc. v. Levinson,* 485 U.S. 224, 252, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (White, J., concurring in part and dissenting in part). *Accord Dura Pharm. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (*"Dura"*) (Rule 10b-5 actions are not intended to provide investors with a "partial downside insurance policy").

II. BACKGROUND

A. The Parties

Plaintiffs are a group of investors who bought eSpeed stock during the putative class period, which is "purchasers of eSpeed securities from November 20, 2002 through July 1, 2004." [FN3] Defendant eSpeed "operates multiple-buyer, multiple-seller, real-time electronic marketplaces for the global capital markets, including government bond markets and other fixed income and equities marketplaces." [FN4] eSpeed is a subsidiary of the bond trading firm Cantor Fitzgerald Securities, Inc. ("Cantor"), which "has long been a dominant player in the field of government bond trading." [FN5]

> FN3. Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") ¶ 2. I previously appointed the following lead plaintiffs: Michael Weber, Shabbir Adib, Ruby Adib, Hatim Adib and Murtuza Tofafarosh (collectively, the "Adib Group"). *See In re eSpeed Inc. Sec. Litig.,* 232 F.R.D. 95 (S.D.N.Y.2005).

> FN4. Complaint ¶ 18.

> FN5. *Id.* ¶ 2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00272-GMS   Document 48-2   Filed 05/26/2006   Page 8 of 20

Westlaw.

Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 2

Plaintiffs also name four individual defendants. Howard W. Lutnick is eSpeed's Chairman and CEO, and also serves as President and CEO of Cantor. [FN6] Lee M. Amaitis is Vice Chairman, Global Chief Operating Officer and a director of eSpeed. [FN7] Jeffrey M. Chertoff was Senior Vice President and CFO of eSpeed from May 2002 to May 2004. [FN8] Joseph Noviello has been eSpeed's Executive Vice President and Chief Information Officer since September 2001. [FN9]

> FN6. See id. ¶ 19.
>
> FN7. See id. ¶ 20.
>
> FN8. See id. ¶ 21.
>
> FN9. See id. ¶ 22.

B. The Founding of eSpeed

According to plaintiffs, while Cantor trades in other forms of fixed income securities, its "bread and butter has remained U.S. treasury securities." [FN10] Until relatively recently, the modalities of treasury securities trading were quite antiquated, relying largely on voice trades and centralized trading pits. [FN11] Consequently "[i]nformation regarding prices was difficult to obtain, and execution of trades often proved to be a slow process." [FN12] Beginning in the early 1990s, Cantor strove to develop fully automated electronic trading systems which would provide more rapid and less expensive trades. [FN13] The result of this effort was eSpeed, which officially commenced operations in March 1999 and completed an initial public offering ("IPO") in December of that year. [FN14] The IPO prospectus mentioned that among eSpeed's possible competitors was a then-proposed electronic trading network called BrokerTec. [FN15]

> FN10. Id. ¶ 32.
>
> FN11. See id.
>
> FN12. Id.
>
> FN13. See id.
>
> FN14. See id. ¶¶ 33-34. Lutnick and Amaitis were heavily involved in eSpeed's founding. See id. ¶ 33.
>
> FN15. See id. ¶ 34.

*2 eSpeed's first full year as a public company was a success--its $118.9 million of revenue for the year 2000 "far exceeded earlier projections." [FN16] eSpeed's impressive growth continued throughout 2001, even after 658 Cantor employees (including 180 who worked for eSpeed) died in the September 11, 2001 terrorist attacks. [FN17] Despite this catastrophe, eSpeed achieved profitability for the first time in the fourth quarter of 2001. [FN18] Although eSpeed continued to be profitable in 2002, the market began to grow disenchanted with its performance. [FN19] At the same time, BrokerTec emerged as a dangerous competitor for eSpeed's core government securities trading business. After struggling throughout 2000 and 2001, BrokerTec merged in August 2002 with the London-based ICAP. [FN20] The merger gained approval from the U.S. Department of Justice in May 2003, and the two companies' operations were fully integrated by the end of 2003. [FN21]

> FN16. Id. ¶ 36.
>
> FN17. See id. ¶ 50. eSpeed and Cantor shared office space on the top floors of the World Trade Center. See Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Def.Mem.") at 4 (citing Complaint ¶ 37).
>
> FN18. See Complaint ¶¶ 37-38; see also id. ¶ 37 ("[Cantor and eSpeed] were able to continue in business [after September 11] largely due to the electronic trading capabilities that had been developed at eSpeed.").
>
> FN19. See id. ¶ 39.
>
> FN20. See id. ¶¶ 42-46. While the merged company is called ICAP BrokerTec, see id. ¶¶ 48, 50 (referring to BrokerTec's "acquisition" by ICAP); id. ¶ 81 (referring to "competitor ICAP BrokerTec"), the Complaint refers to the merged company as BrokerTec, and for clarity this Opinion adheres to that usage.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN21. *See id.* ¶ 49.

C. The Alleged Scheme

1. Price Improvement

In mid to late 2002, with its stock price languishing, eSpeed sought to "reinvigorate its growth rate." [FN22] To this end, eSpeed developed Price Improvement ("PI"), "a new trading option ... purportedly designed to help bidders get better trade executions in exchange for payment of considerably higher commissions." [FN23] The gravamen of plaintiffs' allegations is that throughout the putative class period, defendants described PI in a falsely positive light, despite their knowledge *first*, that their customers' response to PI was uniformly hostile, and *second*, that PI was a failure that would (and did) cause customers to defect *en masse* to BrokerTec as soon as it became a viable alternative. [FN24]

> FN22. *Id.* ¶ 40.

> FN23. *Id.*

> FN24. *See id.* ¶¶ 6-7.

The putative class period begins on November 20, 2002, soon after "eSpeed began to advise its customers about the general contours of [PI], due to be put in place in early 2003." [FN25] Plaintiffs assert that the impressions of eSpeed's seven hundred customers were accurately portrayed by a November 20, 2002 article in *Dow Jones Capital Markets Report*, entitled "Traders Cry Foul Over eSpeed's New Bond Broking Service" ("Traders Cry Foul Article"). [FN26] This article, based on interviews with some of eSpeed's customers, reported that:

> FN25. *Id.* ¶ 50.

> FN26. *See id.* The full article was submitted as Exhibit G to the 11/16/05 Affidavit of Joseph De Simone, counsel for defendants ("De Simone Aff.").

[eSpeed] is facing harsh criticism from some of its biggest Wall Street customers over a new feature that allows traders to trump the bids and offers of other market participants in return for a higher commission. The controversial feature, named 'Price Improvement,' is part of eSpeed's new software release [which] allows traders to leapfrog--as many as three times-- past competing traders in a lineup of bids and offers. The trader who does so pays an incrementally higher commission with each jump if the trade is completed....Though [PI] promises bigger per-trade commissions for eSpeed on those trades where it is used, the strategy could ultimately backfire.... [FN27]

> FN27. Complaint ¶ 50 (quoting Traders Cry Foul Article).

The article also reported that "traders and managers at several large Wall Street bond desks say the new feature has made them less apt to trade on eSpeed because of the higher cost of accessing the best prices." [FN28] Similarly, a Columbia University professor interviewed for the story asserted that "[a]s an economist, I don't see why the rest of the players should agree to incentive pricing like this, and I guess they don't want to, based on the complaining." [FN29]

> FN28. *Id.* " 'eSpeed is trying to change the rules of trading for their own benefit by forcing people to pay higher commissions to get liquidity. It's not fair, and I have moved almost all my business off eSpeed' said a trader in two-year Treasury notes. Nine traders and fixed income managers at primary dealer banks [who are the biggest players in the interbank market serviced by eSpeed and other inter-dealer brokers] were interviewed for this story.... All of these people spoke critically of the changes to eSpeed." *Id.*

> FN29. *Id.*

\*3 In response, Lutnick (in the words of the article) "attributed [customer] criticism to a natural resistance to change that he believes will pass once traders discover how the new feature improves their access to prices." [FN30] The company also equated complaints about PI to "the initial distaste shown for electronic trading when it emerged in the late 1990s." [FN31] " 'Price [I]mprovement, by its definition, will create better opportunities for traders to get a better price than they initially put into the system," ' said Lutnick. " 'In time, traders will wonder how they ever lived without

this." ' [FN32]

> FN30. *Id.*
>
> FN31. *Id.*
>
> FN32. *Id.*

"In the three trading days after Lutnick's statements were published in *Dow Jones Capital Markets Report* (and [ ] repeated in the *Wall Street Journal* ), eSpeed's stock price rose approximately 15%." [FN33] Several other articles from late 2002 and early 2003 also discuss customer doubts regarding PI, as well as eSpeed's assurances that such doubts would fade once PI's benefits became manifest. [FN34]

> FN33. *Id.*
>
> FN34. Defendants cite several articles expressing customers' skepticism towards PI, including: Steven Vames, *Online Treasury Broking Thrives, As Do Industry Battles,* DOW JONES CAPITAL MARKETS REPORT, Dec. 18, 2002, Ex. E to De Simone Aff. (asserting that PI "has drawn a backlash from eSpeed's customers"); Stephen Vames, *Cantor eSpeed Unit Faces Criticism-- Some Customers of Service Complain About Feature On Trumping of Trades,* WALL ST. J., Nov. 21, 2002, at C14, Ex. H to De Simone Aff. (asserting that "people at several large Wall Street bond desks said [that PI] has made them less apt to trade on eSpeed"); Heather Bandur, *Bond Traders Say eSpeed's Pricing System is Unfair, WSJ Reports,* BLOOMBERG NEWS, Nov. 21, 2002, Ex. I to De Simone Aff. (PI's "pay-to-play" rule has "discouraged" some bond traders from using eSpeed); Stephen Vames, *eSpeed Expands Controversial New Bond Broking Service,* DOW JONES INT'L NEWS, Jan. 9, 2003, Ex. J to De Simone Aff. (quoting a government bond trader as saying "[n]o dealer has asked for [PI] ... the only thing it does is increase the commission we pay on trades"; article also asserts that "[c]riticism aside, [PI] is seen by industry observers as one way the company is trying to add value in an industry that has matured at a swift pace in recent years.").

PI was "formally put into use" in January 2003. [FN35] Plaintiffs assert that after the launch, "defendants [ ] embarked upon a sustained scheme of misrepresentation," the goal of which was to mislead the market into believing that PI was winning over customers and adding value to eSpeed's services. [FN36] Plaintiffs proffer two confidential witnesses to establish that defendants had information to the contrary. The first witness ("CW-1") was employed as a customer account executive throughout the class period. [FN37] His job was to explain PI to approximately forty customers and solicit feedback. [FN38] "CW-1 reports that customer reaction was uniformly negative from the beginning, and that this did not change later on." [FN39]

> FN35. Complaint ¶ 55.
>
> FN36. *Id.* ¶ 51.
>
> FN37. See *id.* ¶ 52.
>
> FN38. See *id.*
>
> FN39. *Id.* ¶ 53.

The complaints heard by CW-1, in sum, revealed that customers "viewed [PI] as a nearly useless system that was merely a subterfuge for raising commissions." [FN40] CW-1 was in a position to report these findings directly to Lutnick, and he did so. [FN41] Nevertheless, Lutnick continued to "misrepresent [ ] the benefits of [PI] and the level of customer acceptance on public conference calls ." [FN42] "Lutnick also misrepresented throughout the Class Period that customers were opting to use [PI] of their own volition, when, in fact, they were often coerced into using it through the threat of disadvantageous [trade] executions." [FN43]

> FN40. *Id.* Specifically, "large customers complained that, under Price Improvement, they often had to pay triple the usual commission merely to stay even with other market players." *Id.* And "[c]ustomers also felt that they often had to use Price Improvement because if they did not do so their orders would receive discriminatory treatment." *Id.*

Westlaw.
Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 5

FN41. See id. ¶¶ 52-53. Plaintiffs do not specify how or where CW-1 informed Lutnick of his findings.

FN42. Id. ¶ 53.

FN43. Id.

Plaintiffs' second confidential witness ("CW-2") was employed throughout the class period in eSpeed's Desktop Support and as a field technician, where he fielded complaints about PI on a daily basis. [FN44] CW-2 asserts that PI was an "unmitigated disaster from day one." [FN45] Specifically, CW-2 relays that he received up to one hundred complaints regarding trade executions "on an average bad day," and that customers believed they were essentially forced to use PI. [FN46] Moreover, eSpeed did not provide CW-2 with the necessary information to adequately explain PI to complaining customers, and this "fueled customer anger." [FN47] Finally, CW-2 asserts that, during client visits, he personally observed clients installing the necessary hardware to use BrokerTec instead of eSpeed. [FN48]

FN44. See id. ¶ 54.

FN45. Id.

FN46. Id.

FN47. Id.

FN48. See id.

*4 Plaintiffs also assert that BrokerTec emerged as a formidable competitor for the first time in late 2003. [FN49] According to plaintiffs, BrokerTec's rise "rendered eSpeed increasingly vulnerable to competitive forces because eSpeed had adopted the odious [PI] system to artificially boost revenues, while BrokerTec simply set reasonable prices for trades." [FN50]

FN49. See id. ¶ 70.

FN50. Id.

2. Materially False Statements

In light of the foregoing, plaintiffs allege that all defendants' statements regarding PI were materially false and misleading for several reasons. *First*, defendants knew that their customers hated PI because it "hiked commissions considerably, provided little or nothing in the way of price improvement, did not work well ... and was tantamount to ... blackmail since those who did not opt for [PI] saw their trades fall behind in priority." [FN51] *Second*, eSpeed aimed to produce short-term unsustainable revenue increases because any increase in revenues attributable to PI was simply the result of forcing customers to use a product they hated. [FN52] *Third*, PI generated a "never-ending barrage" of complaints, fielded by inadequately-trained employees who could not resolve customer concerns. [FN53] *Finally*, defendants concealed from the market the fact "that PI could be imposed on unwilling customers only for so long as no other trading firm had sufficient depth to draw these customers away." [FN54]

FN51. Id. ¶ 57.

FN52. See id.

FN53. Id.

FN54. Id.

Plaintiffs allege that the campaign of misrepresentation began with Lutnick's comments quoted in the Traders Cry Foul Article. According to plaintiffs, he "had no reasonable basis to believe that customers would 'wonder how they lived without' [PI], as it was (i) adverse to their interests; (ii) increased their costs; (iii) did not provide ... 'price improvement' (iv) complicated and slowed trades; and (v) was viewed as an extortionate method of raising commissions without providing a concomitant benefit." [FN55]

FN55. Id. ¶ 51.

During a February 11, 2003 conference call to discuss eSpeed's fiscal year 2002 results, Amaitis stated that PI "is new technology ... out for just over a month, and the marketplace is growing accustomed to it. All the traders are learning ... how to improve their business on using the new software. We're excited about the prospects. So far, so good. Everybody has been anxiously using it and learning how to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
Slip Copy, 2006 WL 880045 (S.D.N.Y.)  
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 6

use the technology." [FN56] Chertoff echoed these comments: "[PI] should not only increase revenue on transactions that are utilized, but should over time be a competitive benefit in that it shows we have better prices on our screen than alternative marketplaces." [FN57] Chertoff also expressed optimism as to PI's future: "It is fair to say the feature is [already] being actively used ... we think that [PI] will become over time, a natural ... part of the treasury trading business, but with only one month under our belt ... so far, so good ." [FN58]

> FN56. *Id.* ¶ 55.
>
> FN57. *Id.* ¶ 56. At the same time, he cautioned that "you know, it is still [the] early days. I can't put more color on it. [PI] is one of the many factors that [factor into eSpeed's earnings and revenue guidance]." *Id.*
>
> FN58. *Id.*

Lutnick was similarly upbeat on a May 13, 2003 conference call: "[w]e have hundreds of traders enjoying the benefits of PI and dozens of traders using PI literally for every single trade they do....We released our PI software in January of 2003 and it continues to gain great traction." [FN59] In an August 12, 2003 company press release, Lutnick boasted that the "tremendous growth in the U.S. Treasury market" and the "success of our [PI] software" combined to produce a fifteen percent increase in both eSpeed's revenues and fully-electronic trading volume from the first quarter 2003 to the second quarter. [FN60] The next day, Lutnick stated on a conference call that PI has become "successful," that it "continues to gain traction," and that "it is obvious that eSpeed [benefitted] from ... successful introduction of our [PI] software." [FN61]

> FN59. *Id.* ¶ 58.
>
> FN60. *Id.* ¶ 60. Lutnick also stated that eSpeed's increased earnings guidance for the third quarter of 2003 was based in part on the expectation that PI would "realize[ ] continued traction." *Id.*
>
> FN61. *Id.* ¶ 62. Lutnick also asserted that eSpeed's "increased profitability" will derive from both "in-

creased market position" and the "increased success of our price improvement power." *Id.* On the same call, Amaitis stated that he was "[e]xtremely encouraged by ... the early stages of PI's introduction into the market ... already many users have opted for system level PI which means that eSpeed's computers maxi[mize] our customer's participation in each trade while minimizing the cost of such participation." *Id.* Novellio similarly extolled PI during an October 1, 2003 conference call, stating that PI has met with "widespread adoption" by customers, and it was an example of the "innovative solution [s]" produced by collaboration of eSpeed's product development and software engineering teams. *Id.* ¶ 64.

*5 On November 13, 2003, Lutnick told analysts that PI was a "growth driver," which in the third quarter of 2003 "continued to gain traction with both the number of users and amount of usage per trader." [FN62] Lutnick also asserted that "PI is already an integral part of the way traders trade." [FN63] He also agreed with an analyst's comment that PI was the sole reason for eSpeed's increasing revenues and market share in the third quarter of 2003. [FN64]

> FN62. *Id.* ¶ 67.
>
> FN63. *Id.*
>
> FN64. *See id.* ¶ 68.

The upbeat statements about PI continued into 2004. Lutnick reiterated on a February 10, 2004 conference call that he expected PI to "continue to grow." [FN65] On May 3, 2004, Amaitis was quoted in a company press release as attributing eSpeed's revenue growth for the first quarter 2004, in part, to the "continued success of our [PI] product enhancement." [FN66] When analysts expressed concern about eSpeed's deteriorating market position on May 4, 2004, Lutnick insisted that BrokerTec was gaining market share merely because of a temporary incentive promotion. [FN67]

> FN65. *Id.* ¶ 71. During the same call, Chertoff soothed analysts' worries about slippage in eS-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                  Page 7
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

peed's market share by asserting that the slippage was a one-quarter event, and claimed that PI would continue to grow. *See id.*

FN66. *Id.* ¶ 73.

FN67. *See id.* ¶ 74. Plaintiffs allege that in fact, Lutnick knew that the real reason for eSpeed's deteriorating position was that its customers were fed up with PI and were consequently defecting to BrokerTec. *See id.* ¶ 75.

3. The End of Price Improvement

On July 1, 2004, the last day of the putative class period, eSpeed shares closed at $17.46 per share. [FN68] After the markets closed that day, eSpeed issued a press release "update" of financial expectations for the second quarter which ended on June 30, 2004. [FN69] This release disclosed that eSpeed expected to report net income from $0.15 to $0.16 per share for the second quarter of 2004, and revenue between $42 and 43 million. [FN70] These results disappointed the market; eSpeed shares plunged twenty-five percent, to $13.01 per share on July 2, 2004, and to $11.39 per share on July 3. [FN71] The July 1 release quoted Lutnick as follows:

FN68. *See id.* ¶ 79.

FN69. *See id.* ¶ 78.

FN70. *See id.*

FN71. *See id.* ¶ 79.

Our weaker than expected performance during the second quarter was due to erosion of our market position from competitive pricing pressure and lower than expected market volumes in Europe. We are proactively addressing our market position, by offering tailored and flexible solutions that have the effect of driving down the marginal costs of trading on eSpeed. We are focusing on a revenue growth strategy that offers our customers the combination of variable and fixed commissions and value-added trading tools. [FN72]

FN72. *Id.* ¶ 78.

During a July 2, 2004 conference call, Lutnick denied an analyst's suggestion that eSpeed's loss of market share was caused by customer "animosity" towards PI. [FN73] According to *CBS Marketwatch,* "Lutnick frustrated some analysts in [the July 2 conference call], saying he failed to lay out a feasible plan to aggressively compete with [BrokerTec] on pricing and product offerings." [FN74] On August 6, 2004, eSpeed announced that it was "revamping its pricing structure to a mostly fixed pricing model, from the prior structure consisting of a low fixed price component and a higher variable pricing component." [FN75]

FN73. *See id.* ¶ 80. Plaintiffs assert that after eSpeed's disappointing quarterly results, "the market now understood the truth: eSpeed's slavish adherence to a system detested by its customers might have produced artificial short-term gains, but had finally resulted in a material decline in eSpeed's financial performance. Indeed, the 'competitive pricing pressure' referred to by defendant Lutnick was actually the reality of customers stating their preference for BrokerTec's user-friendly pricing system versus the unworkable and unpopular Price Improvement system." *Id.*

FN74. *Id.* ¶ 81.

FN75. *Id.* ¶ 83.

eSpeed announced the end of PI on January 4, 2005. Paul Saltzman, eSpeed's Chief Operating Officer, stated that the elimination of PI was "a result of extensive discussions and feedback from our clients." [FN76] A January 17, 2005 article in *Securities Industry News* noted that "users have complained that the system, initiated in 2002, was expensive, provided little benefit, and slowed down execution." [FN77] According to Saltzman, "By making the system simpler and faster, it will draw liquidity to the system.... Over time, we expect our market share to increase." [FN78] eSpeed's new CFO Jay Ryan stated on March 1, 2005, "[r]emoval of [PI] has been very well-received by customers." [FN79] And eSpeed President Kevin Foley stated on May 10, 2005 that eSpeed's trading volume "grew because of our new customer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
Slip Copy, 2006 WL 880045 (S.D.N.Y.)  
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

Page 8

pricing and the removal of [PI]." [FN80]

>   FN76. *Id.* ¶ 85. Saltzman was hired in June 2004. *See id.* ¶ 89.
>
>   FN77. *Id.* ¶ 86.
>
>   FN78. *Id.*
>
>   FN79. *Id.* ¶ 87.
>
>   FN80. *Id.* ¶ 88.

*6 A "detailed analysis of eSpeed's business" in the August 15, 2005 edition of *Forbes* magazine asserted that "[c]lients hated [PI]. In the 18 months after introducing the gimmick, eSpeed lost an estimated 20 percentage points of market share.... Traders credit Saltzman with persuading Lutnick (after seven months of pleading) to drop [PI]. 'When we had the time and the resources to listen to our customers, we removed it,' Saltzman says." [FN81]

>   FN81. *Id.* ¶ 89.

4. Scienter Allegations

Plaintiffs assert that "[t]he ongoing fraudulent scheme described in this Complaint could not have been perpetrated ... without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants." [FN82] Plaintiffs also allege that defendants Amaitis and Noviello completed three "unusual" stock sales between them during the class period. Amaitis sold a total of 93,750 shares of eSpeed stock on December 12 and December 15 of 2003, for gross proceeds of $2,207,000. [FN83] After selling these shares, Amaitis still held 103,512 shares. [FN84] Noviello received $593,000 from a sale of 25,000 shares of eSpeed stock on December 20, 2003, leaving him with only 2,331 shares. [FN85] Neither defendant had bought or sold any eSpeed stock during the prior two years. [FN86]

>   FN82. *Id.* ¶ 92.
>
>   FN83. *See id.* ¶ 93.
>
>   FN84. *See id.* At this time, Amaitis also held 962,500 stock options, of which 340,000 were immediately exercisable. *See* eSpeed's 2003 Form 10-K, filed with the SEC on 3/15/04 at 27 ("2003 10-K"), Ex. B to De Simone Aff.
>
>   FN85. *See* Complaint ¶ 93. At this time, Noviello held 475,000 stock options, of which 202,500 were immediately exercisable. *See* 2003 10-K at 27.
>
>   FN86. *See* Complaint ¶ 93.

III. LEGAL STANDARD

A. Standard of Review

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " [FN87] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiffs' favor. [FN88] Courts generally do not consider matters outside the pleadings but may consider documents attached to, referenced in, or integral to the pleadings. [FN89] Courts may also take judicial notice of stock prices, and press articles (for the fact of their publication). [FN90]

>   FN87. *Nechis v. Oxford Health Plans, Inc.,* 421 F.3d 96, 100 (2d Cir.2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York,* 375 F.3d 168, 176 (2d Cir.2004) (quotation and citation omitted).
>
>   FN88. *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27, 30 (2d Cir.2004) (citation omitted).
>
>   FN89. *See Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 122 (2d Cir.2005); *see also In re Initial Public Offering Sec. Litig.,* 241

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 9

F.Supp.2d 281, 331 (S.D.N.Y.2003). A court at the motion to dismiss stage can also consider "public disclosure documents ... that have been [ ] filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *In re Interpublic Sec. Litig.,* No. 02 Civ. 6527, 2003 WL 21250682, at \* 6 (S.D.N.Y. May 29, 2003) (citation omitted).

FN90. *See In re AOL Time Warner, Inc. Sec. and ERISA Litig.,* 381 F.Supp.2d 192, 246 n. 61 (S.D.N.Y.2004) (stock prices); *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 289 F.Supp.2d 416, 425 n. 15 (S.D.N.Y.2003) (citation omitted) (press articles).

B. Section 10 and Rule 10b-5

1. Prima Facie Case

To state a prima facie case for securities fraud under section 10(b) and Rule 10b-5, a plaintiff must allege that " 'the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." ' [FN91] The requisite state of mind, or scienter, in a securities fraud action is " 'an intent to deceive, manipulate or defraud." ' [FN92]

FN91. *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000)). Accord *Dura,* 125 S.Ct. at 1631 (internal citation omitted) (basic elements of 10b-5 action are "a material misstatement or omission, scienter ..., a connection with the purchase or sale of a security, reliance ..., economic loss; and 'loss causation' ").

FN92. *Ganino,* 228 F.3d at 168 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

Securities fraud actions are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), [FN93] and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). [FN94] To plead a material misrepresentation or omission under the PSLRA "the complaint [must] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." [FN95] Rule 9(b) requires, among other things, "that the pleading 'explain why the statements were fraudulent." ' [FN96]

FN93. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances concerning fraud and mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally." *See also Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (applying Rule 9(b) standard to securities fraud claims).

FN94. Pub.L. No. 104-67, 109 Stat. 737 (1995). *See Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000).

FN95. 15 U.S.C. § 78u-4(b)(1)(B).

FN96. *Rombach,* 355 F.3d at 172 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). Statements of opinion may be actionable if plaintiff shows that defendant did not actually believe the opinion she expressed. *See, e.g., In re IBM Corp. Sec. Litig.,* 163 F.3d 102, 107 (2d Cir.1998).

2. Statute of Limitations

\*7 Section 804(a) of the Sarbanes-Oxley Act of 2002 provides that a securities fraud action "may be brought not later than the earlier of (1) two years after the discovery of the facts constituting the violation; or (2) five years after such violation." [FN97] For statute of limitations purposes, discovery of the relevant facts includes inquiry notice as well as actual notice: [FN98]

FN97. 28 U.S.C. § 1658(b).

FN98. *See Rothman v. Gregor,* 220 F.3d 81, 96 (2d Cir.2000) (quotation and citation omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.
Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 10

A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.... Moreover, when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry. [FN99]

>   FN99. *Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 350 (2d Cir.1993) (citation omitted). Accord *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 154 (2d Cir.2003) ("If the investor makes no inquiry once the duty arises, knowledge [of the alleged fraud] will be imputed as of the date the duty arose.").

To be placed on such a duty of inquiry, or "inquiry notice," plaintiffs "need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them." [FN100] That said, available information must establish "a probability, not a possibility" of fraud to trigger inquiry notice. [FN101] Moreover, on a motion to dismiss, "[u]nless Defendants can produce 'uncontroverted evidence [that] irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law." [FN102] The Second Circuit is "decidedly reluctant to foreclose [ ] claims as untimely absent a manifest indication that plaintiffs could have learned the facts underpinning their allegations" prior to the statutory limitations period. [FN103]

>   FN100. *Salinger v. Projectavision, Inc.,* 972 F.Supp. 222, 229 (S.D.N.Y.1997). Accord *Newman v. Warnaco Group, Inc.,* 335 F.3d 187, 193 (2d Cir.2003) (quoting *Dodds,* 12 F.3d at 351-52) (" 'An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.' ").

>   FN101. *Newman,* 335 F.3d at 194.

>   FN102. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* No. 05 Civ. 1898, 2005 WL 2148919, at *4 (S.D.N.Y. Sept. 6, 2005) (*"Teamsters"*) (quotation and citation omitted).

>   FN103. *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 169 (2d Cir.2005) (emphasis omitted).

Facts triggering a duty to inquire are frequently termed "storm warnings." [FN104] Once sufficient storm warnings appear, "plaintiffs must exhibit 'reasonable diligence' in investigating the possibility that they have been defrauded. If they fail to meet this obligation, plaintiffs will be held to have had 'constructive knowledge' of the fraud against them." [FN105] A plaintiff's duty of inquiry is mitigated when "the warning signs are accompanied by reliable words of comfort from management." ' [FN106] "However, reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." [FN107] "Whether reassuring statements justify reasonable reliance that apparent storm warnings have dissipated will depend in large part on [1] how significant the company's disclosed problems are, [2] how likely they are of a recurring nature, and [3] how substantial are the 'reassuring' steps announced to avoid their recurrence." [FN108]

>   FN104. *Dodds,* 12 F.3d at 350 (citation omitted).

>   FN105. *Addeo v. Braver,* 956 F.Supp. 443, 449 (S.D.N.Y.1997) (quotation and citation omitted).

>   FN106. *In re Alston SA,* 406 F.Supp.2d 402, 421 (S.D.N.Y.2005) (quoting *LC Capital Partners,* 318 F.3d at 155).

>   FN107. *LC Capital Partners,* 318 F.3d at 155.

>   FN108. *Id.*

3. Materiality

An alleged misstatement must be material--"[i]t is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." [FN109] A fact is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00272-GMS    Document 48-2    Filed 05/26/2006    Page 17 of 20

Westlaw.

Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 11

considered material if there is a "substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares" of the stock. [FN110] Similarly, a plaintiff must show that there was a "substantial likelihood that the disclosure of [an] omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available," [FN111] and that at the time of the investment, a reasonable investor would have considered the omitted information as significant. [FN112]

>FN109. *Basic,* 485 U.S. at 238 (emphasis in original). *Accord Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).
>
>FN110. *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 518 (2d Cir.1994). *Accord Basic,* 485 U.S. at 231 (applying the materiality standard established in *TSC Indus., Inc. v. Northway Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) to Rule 10b-5 actions).
>
>FN111. *TSC Indus., Inc.,* 426 U.S. at 449.
>
>FN112. *See Glazer,* 964 F.2d at 154-55.

*8 Although the materiality question is not often amenable to disposition as a matter of law, [FN113] there are a few situations where it might be appropriate to dismiss a complaint on such grounds. *First,* "courts have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation ... numbingly familiar to the marketplace--loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." [FN114]

>FN113. *See, e.g., Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002).
>
>FN114. *Gavish v. Revlon, Inc.,* No. 00 Civ. 7291, 2004 WL 2210269, at *20 (S.D.N.Y. Sept.30, 2004). *Accord Novak,* 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); *Rombach,* 355 F.3d at 174 (unfocused "[e]xpressions of puffery and corporate optimism do not give rise to securities violations").

*Second,* optimistic company statements can also be rendered immaterial by the "bespeaks caution" doctrine. This doctrine provides that "certain alleged misrepresentations made in connection with the purchase or sale of a security are deemed immaterial as a matter of law because it cannot be said that a reasonable investor would consider them important in light of adequate cautionary language that is set forth in the applicable disclosure documents." [FN115] When, as here:

>FN115. *In re Regeneron Pharm., Inc. Sec. Litig.,* No. 05 Civ. 3111, 2005 WL 225288, at *14 (S.D.N.Y. Feb.1, 2005) (citing *Halperin,* 295 F.3d at 357).

[P]laintiffs proceed on a fraud-on-the-market theory ... the defendants' cautionary statements must be treated as if attached to every one of its oral and written statements. Under this reasoning, the Court must consider whether any cautionary language provided by the defendants at any time sufficiently warned of the risk of which plaintiffs complain. [FN116]

>FN116. *In re Gilat Satellite Networks, Ltd.,* No. CV-02-1510, 2005 WL 2277476, at *13 (E.D.N.Y. Sept. 19, 2005) (internal quotation and citation omitted).

But the scope of the doctrine is limited to "prospective representations," as opposed to representations concerning "present or historical facts," which "cannot be cured by cautionary language." [FN117] "Additionally, the cautionary language must be examined in the context of the representations to determine whether the language warns of the specific contingency that lies at the heart of the alleged misrepresentation." [FN118]

>FN117. *P. Stolz Family P'ship v. Daum,* 355 F.3d 92, 96-97 (2d Cir.2004).
>
>FN118. *Id.* at 97.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                              Page 12
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

*Finally,* a corollary to the fraud on the market presumption, known as the "truth-on-the-market" doctrine, provides that an alleged misstatement cannot defraud the market, and is thus immaterial, when the truth of the matter is already known to the market. [FN119] "However, the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." [FN120]

> FN119. *See Ganino,* 228 F.3d at 167; *but see id.* ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").
>
> FN120. *Id.*

4. Scienter

The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." [FN121] "Although speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.' " [FN122] Facts giving rise to a strong inference of scienter can be alleged by one of two methods: the plaintiff may plead "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." [FN123]

> FN121. 15 U.S.C. § 78u-4(b)(2).
>
> FN122. *Ganino,* 228 F.3d at 169 (quoting *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999)).
>
> FN123. *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (quotation and citation omitted). *Accord Novak,* 216 F.3d at 311.

i. Motive and Opportunity

\*9 "Motive [entails] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," while "[o]pportunity [entails] the ... likely prospect of achieving concrete benefits by the means alleged." [FN124] "Motives ... generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." [FN125] The desire "to inflate stock prices while [defendants] sold their own shares" may support a viable claim, [FN126] if a plaintiff can allege that any such sales were in some way "unusual." [FN127] Extensive sales can be unusual, and the amount of profit and the percentage of a defendant's holdings that were sold are also relevant. [FN128]

> FN124. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994).
>
> FN125. *Kalnit,* 264 F.3d at 139.
>
> FN126. *Id. Accord Novak,* 216 F.3d at 307.
>
> FN127. *See In re Interpublic,* 2003 WL 21250682, at \*11 (citation omitted).
>
> FN128. *See In re Scholastic Sec. Litig.,* 252 F.3d 62, 74-75 (2d Cir.2001) (courts must consider "the amount of profits from the [insider stock] sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling").

Regarding the "opportunity" prong, courts often assume that corporations, corporate officers and corporate directors would have the opportunity to commit fraud if they so desired. [FN129] However, opportunity to commit fraud may not exist if the alleged scheme had no chance of succeeding. [FN130]

> FN129. *See, e.g., In re Time Warner Sec. Litig.,* 9 F.3d 259, 269 (2d Cir.1993) (assuming that defendants had opportunity to manipulate company stock).
>
> FN130. *See Shields,* 25 F.3d at 1120 (complaint "fails to allege a sufficient opportunity to derive a benefit from the [alleged scheme]: [as] the ordinary course of bank business would lead to [discovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 13

of the scheme]"); *see also In re GeoPharma, Inc. Sec. Litig.,* 399 F.Supp.2d 432, 449-50 (S.D.N.Y.2005) (no opportunity to benefit from fraud when, even taking allegations as true, "there was never the slightest chance" that alleged scheme could have come to fruition).

ii. Conscious Misbehavior or Recklessness

When plaintiffs have failed to plead motive and opportunity, "it is still possible to plead scienter by identifying circumstances indicating conscious behavior [or recklessness] by defendant, though the strength of the circumstantial allegations must be correspondingly greater." [FN131] Conscious misconduct is relatively easy to identify, "since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information ... or knowing sale of a company's stock at an unwarranted discount." [FN132]

> FN131. *Kalnit,* 264 F.3d at 142 (quotation and citation omitted).

> FN132. *Novak,* 216 F.3d at 308 (citation omitted).

"Recklessness is harder to identify with ... precision and consistency." [FN133] To allege recklessness, plaintiff must allege facts showing that the defendants' conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." [FN134] Recklessness is adequately alleged when, inter alia, a plaintiff "specifically alleges defendants' knowledge of facts or access to information contradicting their public statements." [FN135]

> FN133. *Id.*

> FN134. *Rothman,* 220 F.3d at 90 (citing *Novak,* 216 F.3d at 308). The Second Circuit has also noted that "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (quotation and citation omitted).

> FN135. *Novak,* 216 F.3d at 308.

5. Causation

A securities fraud plaintiff must also plead both (1) that it relied upon defendant's allegedly fraudulent conduct in purchasing or selling securities, and (2) that defendant's conduct caused plaintiff's loss at least in part. [FN136] These two elements are known, respectively, as "transaction causation" and "loss causation." [FN137] Loss causation refers to the requirement that a plaintiff demonstrate that the fraudulent scheme caused her loss. [FN138] In the case of a 10b-5 action alleging a material misstatement or omission, loss causation generally requires a plaintiff to show that her investments would not have lost value if the facts that defendants misrepresented or omitted had been known. [FN139]

> FN136. *See Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, 179 (2d Cir.2001).

> FN137. "Transaction causation is generally understood as reliance." *Id.* at 186. A rebuttable presumption of transaction causation may be established under the "fraud on the market" theory, even where a plaintiff was unaware of the fraudulent conduct at the time of the purchase or sale:
> 'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.'
> *Basic,* 485 U.S. at 241-42 (alterations in original) (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160-61 (3d Cir.1986)). Pleading that defendants perpetrated a fraud on the market, therefore, fulfills a plaintiff's transaction causation pleading requirement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN138. Congress codified the loss causation requirement in the PSLRA: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

FN139. See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir.2001).

*10 In *Dura,* the Supreme Court rejected the Ninth Circuit's permissive pleading standard for loss causation, which required only that a plaintiff allege that she bought a security at an artificially inflated price. The Court noted that:

> [I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. At the same time, allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid. [FN140]

FN140. *Dura,* 125 S.Ct. at 1634.

Put simply, a plaintiff must allege that "the loss [was] foreseeable and [ ] the loss [was] caused by the materialization of the concealed risk." [FN141] The Second Circuit's loss causation standard was recently summarized by this Court:

FN141. *Lentell,* 396 F.3d at 173 (emphasis omitted).

> Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed--i.e. a corrective disclosure. [FN142]

FN142. *In re Initial Public Offering Sec. Litig. (Liu v. Credit Suisse First Boston Corp.),* 399 F.Supp.2d 298, 307 (S.D.N.Y.2005). *Accord In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288, 2005 WL 375314, at * 6 (S.D.N.Y. Feb. 17, 2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.") (citation omitted).

IV. DISCUSSION

Defendants urge dismissal for a plethora of reasons: (1) this action is time-barred because plaintiffs were on inquiry notice of the alleged fraud by November 2002; (2) plaintiffs have failed to allege loss causation; (3) defendants' alleged misstatements were nothing more than non-actionable puffery; (4) the alleged misstatements were immaterial pursuant to the truth-on-the-market doctrine; (5) the statements were protected by the "bespeaks caution" doctrine; (6) scienter cannot be inferred because the alleged scheme defies economic reason; (7) plaintiffs have failed to allege motive as to any defendant; and (8) plaintiffs have failed to allege conscious misbehavior or recklessness as to any defendant.

Although this action is not time-barred, plaintiffs' allegations are insufficient in at least two respects. *First,* most of the alleged misstatements are immaterial because they are (1) puffery; and/or (2) protected by the bespeaks caution doctrine. *Second,* plaintiffs fail to adequately allege scienter.

A. Plaintiffs Claims Are Not Time-Barred

Defendants argue that plaintiffs were placed on inquiry notice by the press accounts detailing customer dissatisfaction with PI that began appearing on November 20, 2002, the first day of the putative class period and more than two years prior to the filing of the first complaint in this action. As the first Complaint in this consolidated action was filed on February 15, 2005, February 15, 2003 is the key date for statute of limitations purposes--if plaintiffs' duty of inquiry arose before that date, this action is time-barred. [FN143] Although defendants submit several articles published prior to February 15, 2003 that discuss PI, [FN144] they particularly point to the Traders Cry Foul Article featured prominently in the Complaint:

FN143. Plaintiffs do not contend that they actually undertook any inquiry after defendants claim that a