Slip Copy                                                                                                           Page 15
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

duty of inquiry arose; therefore, the dispositive issue is on what date that duty arose. *See, e.g., LC Capital Partners,* 318 F.3d at 154.

FN144. *See supra* note 34.

*11 [The Traders Cry Foul Article] not only trumpets the fact that PI 'is facing harsh criticism from some of [eSpeed's] biggest Wall Street customers,' it serves as a blueprint for the Complaint. Every allegation of fraud in the Complaint is contained in the Traders Cry Foul Article ... it is so comprehensive that plaintiffs *could have drafted all of the allegations of wrongdoing in the Complaint after the publication of the article on November 20, 2002.* [FN145]

FN145. Def. Mem. at 12 (citing Complaint ¶ 50) (emphasis in original, internal citation omitted).

Defendants' argument is not persuasive for two reasons. *First,* the argument that plaintiffs could have drafted the complaint based on an article published in November 2002, before PI was even launched, is absurd, as the Complaint alleges specific misrepresentations made on the following dates: (1) 2/11/03 (conference call); (2) 5/13/03 (conference call); (3) 8/12/03 (press release); (4) 11/13/03 (statement to analysts); (5) 2/10/04 (conference call); and (6) 5/3/04 (press release). Moreover, these early articles give no indication of fraud or misrepresentations--they only convey the message that PI was a controversial new product . [FN146] Cases on which defendants rely involved far more specific warnings of fraud. [FN147]

FN146. *Cf. Fogarazzo v. Lehman Bros.,* 341 F.Supp.2d 274, 300 (S.D.N.Y.2004) (generalized media reports regarding research analyst fraud, not related to specific defendants or even industry-wide fraud, do not suffice to create a duty of inquiry; "[a]t most, those reports should have instilled in plaintiffs a healthy skepticism towards research reports; they did not reveal a 'probability' of fraud").

FN147. For example, *In re Global Crossing Ltd. Sec. Litig.,* 313 F.Supp.2d 189 (S.D.N.Y.2003), involved a newspaper article referenced in the Complaint that unequivocally suggested that "much was amiss" at Global Crossing. The article did not merely indicate general financial difficulties at Global Crossing; rather, "it laid out in detail precisely the transactions at the heart of plaintiffs' allegations of accounting fraud." *Id.* at 199-200. Similarly, the storm warnings available to plaintiffs in *Shah v. Meeker,* 435 F.3d 244 (2d Cir.2006) almost precisely tracked plaintiffs' allegations. In that case, a *Fortune* magazine article triggered inquiry notice because it discussed in great detail all four of defendant's allegedly improper business practices. See *id.* at 250.

*Second,* even assuming *arguendo* that the press articles constituted storm warnings, investors also heard contemporaneous statements from eSpeed management, asserting that the criticisms aired in the articles were merely the doubts normally expressed when confronted with revolutionary products such as PI. These statements went beyond mere expressions of hope but instead were designed to specifically address the concerns raised in the Traders Cry Foul Article and the other articles cited by defendants. [FN148]

FN148. *Cf. LC Capital Partners,* 318 F.3d at 155-56 (in light of storm warnings created by revelations that defendant insurance company was "under-reserving," defendant's statements that it had "paid the bill" and the problem was "now behind us" did not negate inquiry notice....The 'reassuring' statements by management were [unavailing because they were] mere expressions of hope, devoid of any specific steps taken to avoid under-reserving in the future.").

In particular, Lutnick was quoted in the Traders Cry Foul Article as attributing customer unease to simply their lack of understanding of a revolutionary product, saying that, once customers grew to understand PI, "traders will wonder how they ever lived without [it]." [FN149] This message was reinforced in the early days of PI by other defendants. [FN150] As plaintiffs note, "[t]hese positive statements ... were meant to--and did-- temper any warning signs that may have arisen from the media coverage." [FN151] Courts of-



Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 16

ten decline to find that plaintiffs were on inquiry notice in the face of such "reliable words of comfort" designed to counter information that might otherwise give rise to inquiry notice. [FN152]

> FN149. Complaint ¶ 50.
>
> FN150. *See id.* ¶ 55 (Amaitis, on 2/11/03: "[PI] has been out for just over a month and the marketplace is growing accustomed to it"); *id.* ¶ 56 (Chertoff, on 2/11/03: although it is still "early days" of PI, "we think that [PI] will become over time, a natural ... part of the treasury trading business.").
>
> FN151. Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint ("Pl.Mem.") at 10.
>
> FN152. *In re Pronetlink Sec. Litig.*, 403 F.Supp.2d 330, 334-35 (S.D.N.Y.2005) (rejecting defendants' argument that inquiry notice was triggered by defendants' downward revision of its subscriber numbers long before filing of complaint; "these disclosures were contravened by several allegedly false and misleading statements that could have caused a reasonable shareholder to think all was well;" for example, a defendant later stated at a shareholders' meeting that company had "very strong revenue-producing possibilities"). *Accord Sedona Corp. v. Landenburg Thalmann & Co*, No. 03 Civ. 3120, 2005 WL 1902780, at *8 (S.D.N.Y. Aug. 9, 2005) (duty of inquiry not triggered when storm warnings were tempered by defendant's specific denial of wrongdoing).

In fact, defendants even now assert that PI was in the tradition of "eSpeed's past innovations, such as electronic trading itself," where initial customer skepticism quickly melted away. [FN153] Especially given this prior experience, investors in 2002 could have reasonably relied on eSpeed's assurances that customer skepticism of PI would eventually fade, thus precluding a finding as a matter of law that the press articles gave rise to a duty of inquiry. [FN154]

> FN153. Def. Mem. at 1-2.
>
> FN154. *See Newman*, 335 F.3d at 194 (SEC Form 10-K disclosing large writedowns due to start-up and "inefficiency" costs did not trigger inquiry notice when defendant "provided [a] seemingly benign explanation for the writedowns;" "[s]imply because start-up related production and inefficiency costs are identified does not necessarily mean that those costs are the result of fraud."); *see also Teamsters*, 2005 WL 2148919, at *10 (prospectus supplement disclosing high delinquency rates in defendant's loan portfolios did not give rise to inquiry notice, as prospectus supplement disclosed steps to resolve problem; "[t]he suggestion that the problems could be addressed through reorganization of [defendant's] loan servicing operations could lead a reasonable investor to conclude that the problem was related to collection, rather than [the alleged fraud]").

B. Materiality

Defendants argue that, for three reasons, any misstatements or omissions made by defendants were immaterial as a matter of law. *First*, defendants contend that statements regarding PI were non-actionable puffery. *Second*, defendants invoke the bespeaks caution doctrine, noting that eSpeed repeatedly warned that (1) PI was new technology that may not catch on with the market; and (2) eSpeed would face stiff competition from a variety of competitors including BrokerTec. *Third*, defendants advance a "truth-on-the-market" defense: "customer criticism of PI--rather than being a 'secret' known only by defendants and kept from potential investors--was instead widely reported and plainly set forth in a series of articles and news releases in reputable media outlets." [FN155] For the following reasons, most (but not all) of the alleged misstatements are immaterial as a matter of law.

> FN155. Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Reply Mem.") at 15.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

1. Puffery

*12 I reject defendants' assertion that *none* of the alleged misstatements were anything more than generalized expressions of corporate optimism. Nonetheless, three of the alleged misstatements constitute mere puffery upon which no investor could have reasonably relied. Liability cannot be based on a vaguely positive statement that "[w]e're excited about [PI's] prospects. So far, so good. Everybody has been anxiously using it and learning how to use the technology." [FN156] Similarly, Amaitis' statement that he was "extremely encouraged" by PI's introduction, and that he "look[s] forward to growing this business as more and more users recognize PI's tremendous benefit" is non-actionable puffery. [FN157] Finally, the 10b-5 claim against Noviello is dismissed on this independent ground, as his non-actionable statements regarding PI's "widespread adoption," and PI as an example of the "innovative solutions [produced by] the collaboration between our product development teams and our software engineering teams," are the only statements plaintiffs ascribe to him. [FN158]

> FN156. Complaint ¶ 55 (Amaitis, 2/11/03).
>
> FN157. *Id.* ¶ 62 (Amaitis, 8/13/03).
>
> FN158. *Id.* ¶ 64 (Noviello, 10/1/03).

2. Bespeaks Caution Doctrine

Defendants are also correct in their assertion that many of the remaining alleged misstatements are protected by the bespeaks caution doctrine, as defendants' expressed optimism regarding PI's performance was adequately tempered by cautionary language. For example, eSpeed's December 1999 prospectus stated that eSpeed "would face competition from a variety of competitors, including a proposed electronic trading network known as BrokerTec." [FN159] Warnings about challenges posed by eSpeed's competitors, including BrokerTec, also appeared in eSpeed's 2002 and 2003 Form 10-Ks. [FN160]

> FN159. *Id.* ¶ 34 (quoting prospectus).
>
> FN160. *See* eSpeed's 2002 Form 10-K at 53, Ex. K to De Simone Aff. ("2002 10-K") (explicitly warning of challenges posed by BrokerTec-ICAP merger); 2003 10-K at 24 (same).

As for PI specifically, while defendants were consistently optimistic about its prospects throughout the putative class period, their statements were tinged with caution. eSpeed's Form 10-Ks from 2001-2003 all noted, inter alia, that "we cannot assure you that we will successfully implement new technologies." [FN161] More concretely, defendants' press releases and oral statements during the class period repeatedly cautioned investors that PI was not a sure thing. [FN162] As late as May 4, 2004, Amaitis noted that "no single [new] product has yet reached traction." [FN163] Thus, investors were adequately warned that PI may not achieve the success envisioned by defendants. [FN164]

> FN161. 2003 10-K at 23. *Accord* 2002 10-K at 56, 58; eSpeed's 2001 Form 10-K, Ex. L to De Simone Aff. at 67, 69.
>
> FN162. *See* Complaint ¶ 55 (Amaitis noting that "PI is new technology" to which the marketplace is still growing accustomed); *id.* ¶ 56 (Chertoff, resisting analyst requests for a more definite statement about PI's prospects: "you know, it is still early days. I can't put more color on it); *id.* ¶ 67 (as of November 2003, eSpeed disclosed that fewer than twenty-five percent of its customers used PI).
>
> FN163. Transcript of May 4, 2004 conference call at 33, Ex. C to De Simone Aff. This transcript may be considered because plaintiffs quote statements from the call in their Complaint. *See* Complaint ¶¶ 73-74.
>
> FN164. *See In re Sun Healthcare Group, Inc. Sec. Litig.,* 181 F.Supp.2d 1283, 1290 (D.N.M.2002) (optimistic statements regarding new business strategy tempered by specific risk disclosures in SEC filings); *Havsy v. Just Toys, Inc.,* No. 93 Civ. 8077, 1994 WL 381447, at *3 (S.D.N.Y. July 20, 1994) (language in prospectus that "there can be no assurance that any new product line will be successful" adequately warned of risk that a product line could later fail).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
Slip Copy, 2006 WL 880045 (S.D.N.Y.)  
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

Page 18

### 3. Truth-on-the-Market

The foregoing analysis does not completely foreclose plaintiffs' claims, as some of defendants' statements are statements of present or historical fact. [FN165] For their "truth-on-the-market" defense, which can apply to statements of present or historical fact, defendants rely on *White v. H.R. Block, Inc.,* where the information supposedly concealed from the market (the pendency of numerous class-action lawsuits against defendant) had already been fully disclosed by court documents, press coverage, and SEC filings. [FN166] Thus, "the truth was all over the market," and any misstatements or omissions concerning the lawsuits made by defendants were immaterial as a matter of law. [FN167]

> FN165. *See* Complaint ¶ 58 (Lutnick stating that "hundreds of traders" are *currently* "enjoying the benefits of PI"); *id.* ¶¶ 60, 66 (Lutnick ascribing eSpeed's *past* performance to success of PI); *id.* ¶ 67 (same); *id.* ¶ 68 (same); *id.* ¶ 73 (Amaitis stating that continued success of PI *"was* illustrated" by solid growth over previous quarter); *id.* ¶ 74 (Lutnick ascribing BrokerTec's increased market share over the *past* quarter to a short-term program which he claimed was ending) (emphasis added).
>
> FN166. *See White v. H.R. Block, Inc.,* No. 02 Civ. 8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004). "Further, the truth [about the pending litigation] was available in the market with more intensity and credibility than was any purported misstatement from defendants." *Id.*
>
> FN167. *Id.*

*13 Although it is difficult to believe that investors could have been blind to the possibility that PI might fail and thereby damage the company, I cannot find the alleged misstatements immaterial as a matter of law. [FN168] In *White,* the allegedly concealed information involved objective facts about pending litigation, readily available to anyone who could access public records. The market's knowledge about the litigation, notwithstanding any representations or omissions by defendants, could not reasonably be disputed. [FN169]

> FN168. *See In re Globestar Sec. Litig.,* No. 01 Civ. 1748, 2003 WL 22953163, at *9-10 (S.D.N.Y. Dec. 15, 2003) (defendants unsuccessfully argued that market had already absorbed concealed information that company's subscription rates would be lower than previously announced; while argument had "intuitive appeal," and court found it "hard to believe" that a reasonable investor could believe alleged misstatements concerning subscription rates, court held that "the question of whether, and when, the market had received enough information to counteract the allegedly misleading statements is best resolved on a summary judgment motion or at trial, not at this stage of the litigation").
>
> FN169. *See White,* 2004 WL 1698628, at *12-13; *see also Starr v. Georgeson Shareholder, Inc.,* 412 F.3d 103, 110 (2d Cir.2005) (alleged omissions immaterial as a matter of law, when prior company disclosures contained the precise information alleged to have been withheld); *In re Vivendi Universal S.A. Sec. Litig.,* No. 02 Civ. 5571, 2004 WL 876050, at *5 (S.D.N.Y. Apr. 22, 2004) (dismissing claim that defendant failed to disclose sales of put options to banks, when "[p]laintiffs' allegation that the put options were not disclosed to them is contradicted by the very documents they rely on in bringing their complaint").

Here, by contrast, plaintiffs point to the same collection of news articles that I addressed earlier in my discussion of inquiry notice. As already noted, the bad publicity surrounding PI during its introduction to the market was counteracted by authoritative statements from defendants, assuring the market that PI would catch on once customers were educated about its benefits. [FN170] Thus, I cannot conclude *at this time* that the corrective information, here the press articles, was "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." [FN171] If defendants eventually discover additional disclosures counteracting defendants' statements regarding PI, summary judgment on this ground might be appro-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy  
Slip Copy, 2006 WL 880045 (S.D.N.Y.)  
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

Page 19

priate.

> FN170. *See* Complaint ¶¶ 50, 55-56; *see also De-Marco v. Lehman Bros., 309 F.Supp.2d 631, 634 (S.D.N.Y.2004)* (allegedly misleading "bullish" reports and high ratings were not rendered immaterial by skeptical language regarding the company because "the very fact that, notwithstanding the skeptical language, the reports gave [the company] the highest possible 'buy' rating is tantamount to a statement that the reader of the reports should discount the skeptical language").

> FN171. *Ganino*, 228 F.3d at 167.

C. Scienter

1. The Alleged Scheme Does Not Defy Economic Reason

Defendants first argue that there can be no possible inference of scienter here because plaintiffs' allegations presume that defendants' behavior was irrational. "Plaintiffs' theory is that defendants repeatedly described PI in a 'falsely positive' light even though they supposedly knew it was detested by customers, provided no benefits and was doomed to fail.... To take such a substantial risk for almost no benefit defies economic sense." [FN172]

> FN172. Def. Mem. at 21.

It is occasionally appropriate for a court to refuse to infer scienter, even on a recklessness theory, when plaintiffs' allegations presume economically irrational behavior from defendants or are otherwise illogical. [FN173] But it should go without saying that, at the motion to dismiss stage, it is rarely proper for a court to decide that a plaintiff's allegations make no sense. And here, plaintiffs' allegations are not completely irrational. [FN174] This is not a case where defendants allegedly attempted to "conceal" information already available to the public; [FN175] or where crediting plaintiffs' allegations would mean believing that defendants went out of their way to lose vast sums of money. [FN176] Rather, the gravamen of plaintiffs' allegations is that eSpeed and its officers misrepresented the true state of PI over a two-year period. Whether plaintiffs have stated a valid *motive* for scienter purposes is a separate question, but they have certainly alleged a campaign of misrepresentation that could, in the abstract, rationally be expected to indefinitely inflate eSpeed's share price.

> FN173. *See, e.g., Hampshire Equity Partners II, L.P. v. Teradyne, Inc.,* No. 04 Civ. 3318, 2005 WL 736217, at *3 (S.D.N.Y. Mar. 30, 2005) (fundamentally illogical and contradictory scienter allegations fail as a matter of law); *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 272 F.Supp.2d 243, 263 (S.D.N.Y.2003) (when plaintiffs' allegations contradicted the assumption that defendants would act in their own economic self-interest, "the allegations in the Complaint affirmatively refute scienter").

> FN174. Defendants wrongly rely on my recent decision in *GeoPharma,* where I dismissed a securities fraud action because no rational defendant could possibly have expected the alleged scheme to succeed. *See In re GeoPharma,* 399 F.Supp.2d at 449-52. In that case, plaintiffs alleged that a pharmaceutical company intended to dramatically inflate its share price for at least five days in order to convert some of its debt and preferred stock into common stock. *See id.* at 439 The stock price would be inflated by an alleged misstatement concerning the precise nature of an FDA approval that the company had just received for one of its products. *See id.* at 438. But as an FDA approval is public information that can be quickly verified by the market, the alleged misstatement could not possibly have inflated the company's share price by the necessary amount for five days, and thus there was no basis for a strong inference that the company intended to deceive anyone by behaving so irrationally. *See id.* at 451-52. I allowed plaintiffs to replead, but dismissed the resulting amended complaint on other grounds. *See generally In re Geo-Pharma, Inc. Sec. Litig.,* 411 F.Supp.2d 434 (S.D.N.Y.2006). The amended complaint was clarified so that I concluded that there was a "marginal" chance to sufficiently inflate the share price, but I also found that the "tenuous plausibility of the al-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00272-GMS   Document 48-3   Filed 05/26/2006   Page 6 of 15

Westlaw.

Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 20

leged scheme substantially weakens the overall strength of plaintiffs' scienter allegations." *Id.* at 446-47 (citation omitted).

FN175. *See In re GeoPharma,* 399 F.Supp.2d at 449-50; *White,* 2004 WL 1698628, at *9-10.

FN176. *See Davidoff v. Farina,* No. 04 Civ. 7617, 2005 WL 2030501, at *11 n. 19 (S.D.N.Y. Aug. 22, 2005) (no scienter when companies alleged to know of fraud that would cause company to fail invested heavily in that company: "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail"); *see also In re JP Morgan Chase Sec. Litig.,* 363 F.Supp.2d 595, 621-22 (S.D.N.Y.2005) (no scienter when "plaintiffs fail to allege facts explaining why, if it was aware of Enron's problems, [defendant] would have continued to lend Enron billions of dollars").

2. Motive and Opportunity

*14 Plaintiffs' motive and opportunity allegations are confined to the stock sales of Amaitis and Noviello during the putative class period. [FN177] But the biggest problem with these allegations is that neither Chertoff nor Lutnick (who owned *thirty million* eSpeed shares during the putative class period) completed any stock sales. "As [C]hairman and CEO of [eSpeed], and as the individual who actually made most of the alleged misstatements during the class period, defendant [Lutnick], if anyone, was surely well-positioned to reap profits from insider knowledge." [FN178] For this reason, the fact that neither Chertoff nor Lutnick sold stock during the putative class period undermines plaintiffs' motive allegations against defendants. [FN179]

FN177. *See* Complaint ¶ 93. Plaintiffs' argument that defendants were motivated to commit fraud because they "could have hoped to maintain the fraud in perpetuity thereby availing themselves of countless later opportunities to sell their eSpeed shares at artificially inflated prices," can be easily dismissed because it flies in the face of this Circuit's well-established law. Pl. Mem. at 17 (citing *Crowell v. Ionics, Inc.,* 343 F.Supp.2d 1, 14-15 (D.Mass.2004)); *but see, e.g., In re Initial Public Offering,* 241 F.Supp.2d at 367 ("mere ownership [of shares] in the absence of profit-taking does not establish a motive").

FN178. *In re Keyspan Corp. Sec. Litig.,* 383 F.Supp.2d 358, 383-84 (E.D.N.Y.2003). Accord *In re Glenayre Techs., Inc. Sec. Litig.,* No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec.30, 1998) (inference of scienter from some defendants' stock sales undermined when CEO and other top officers did not sell stock during class period: "Certainly, one can assume that these high-ranking corporate officers ... would be part of any fraudulent scheme to benefit from insider information through pre-emptive stock sales. The absence of sales from these individuals, then, suggests that ... trading by [other] defendants does not give rise to a strong inference of scienter.").

FN179. *See Acito v. IMCERA Group,* 47 F.3d 47, 54 (2d Cir.1995) ( "The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (quotation and citation omitted); *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1432 (3d Cir.1997) (Alito, J.) (no inference of scienter from some defendant's stock sales when, inter alia, company CEO who owned thirty percent of company did not sell stock).

Moreover, plaintiffs' motive allegations against Amaitis and Noviello are insufficient even when considered separately. It does not suffice to point in isolation to the combined proceeds of defendants (here, $2.8 million) and claim that this "patently significant" dollar amount alone establishes scienter. [FN180] The Complaint also omits necessary information concerning (1) the percentage increase in each defendants' holdings during the class period; and (2) the profit from defendants' sales. [FN181] In particular, plaintiffs plead that Amaitis and Noviello realized "gross proceeds" of $2.8 million, but the Complaint does not disclose whether



Slip Copy                                                                                                  Page 21
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

either made any *profit* from the sales. [FN182]

> FN180. Pl. Mem. at 17; *but see, e.g., In re Scholastic,* 252 F.3d at 75 ("dollar amount[s] cannot be considered in isolation. Rather the percentage of stock holdings sold may be indicative of unusual trading."); *In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 445 (S.D.N.Y.2005) ($60 million did not establish motive); *In re Keyspan Corp.,* 383 F.Supp.2d at 383 ($60 million did not establish motive).
>
> FN181. *See In re Regeneron Pharm.,* 2005 WL 225288, at *22 (citing *In re Scholastic,* 252 F.3d at 75).
>
> FN182. The incomplete information in the Complaint renders particularly curious plaintiffs' assertion that defendants' use of SEC filings to calculate the magnitude of the insider selling amounts to "inappropriate factual argument." Pl. Mem. at 18. Not only am I free to consider such documents on a motion to dismiss, but defendants correctly note that "dozens of cases dismiss[ ] complaints on scienter grounds where ... stock sales were found to be *de minimis* or [where] motive allegations were undermined by increases in total holdings." Reply Mem. at 8 n.2 (citing, inter alia, *Acito,* 47 F.3d at 54, and *Rothman,* 220 F.3d at 94-95).

Whether either defendant sold a significant percentage of his stock holdings is a closer issue. Plaintiffs allege that Amaitis sold 48% percent, and Noviello 88% percent, of their stock holdings during the putative class period. [FN183] These percentages, however, are inaccurate because they do not account for the stock options held by Amaitis and Noviello, which must be considered along with shares actually held in determining whether insider sales are significant. [FN184] When defendants' stock options are included in the calculations, not only are the relevant percentages 8.08% (Amaitis) and 4.98% (Noviello), but in fact "each of the Individual Defendants--Amaitis and Noviello included--actually *increased* their beneficial ownership of eSpeed stock during that time." [FN185]

> FN183. *See* Pl. Mem. at 18 (citing Complaint ¶ 93). While there is no per se rule regarding what percentage of holdings must be sold before a motive is established, certain generalizations can be drawn. *See In re Initial Public Offering,* 241 F.Supp.2d at 367-68 (citing cases) ("insider sales that represent less than ten percent of that insider's total holdings are insufficiently 'unusual' to permit an inference of scienter"); *see also Acito,* 47 F.3d at 54 (defendant's sale of eleven percent of holdings not significant under circumstances of that case).
>
> FN184. *See Acito,* 47 F.3d at 54; *see also Rothman,* 220 F.3d at 94. Plaintiffs rely on *In re Oxford Health Plans Sec. Litig.,* 187 F.R.D. 133 (S.D.N.Y.1999), where the court opined that "vested options are not shares" and should not be considered in determining whether an individual defendant sold a significant percentage of holdings. *Id.* at 140. But *Acito'*s holding directly contradicts this, and plaintiffs are relying on dicta because *Oxford Health Plans* held that, even considering vested options as shares, the percentages sold (ranging from eleven percent to one hundred percent) were "not insignificant." *Id.*
>
> FN185. Def. Mem. 16 (citing 2002 10-K at 59-62; 2004 Form 10-K at 12- 15, Ex. A to De Simone Aff.) (emphasis in original). *See In re Bristol-Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 561 (S.D.N.Y.2004) ("the individual defendants, in almost every instance, *increased* their [ ] holdings during the Class Period--a fact wholly inconsistent with fraudulent intent").

At the same time, all stock options are not created equal. Many courts draw a distinction between options that are vested (and thus immediately exercisable) and those that are not. This rationale for this distinction was explained by the Ninth Circuit:
> When evaluating stock sales ... the proportion of shares actually sold by an insider to the volume of shares he *could have sold* is probative of whether the sale was unusual or suspicious.... In this case, we see no reason to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00272-GMS   Document 48-3   Filed 05/26/2006   Page 8 of 15

Westlaw

Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

Page 22

distinguish vested stock options from shares because vested stock options can be converted easily to shares and sold immediately. Actual stock shares plus *exercisable* stock options represent the owner's trading potential more accurately than the stock shares alone. Therefore, a sale involving a significant portion of an insider's actual shares, but only a small portion of his shares and options combined, is less suspicious than were the insider to hold no options. [FN186]

> FN186. *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 986-87 (9th Cir.1999) (emphasis added) (internal citation omitted).

*15 The Second Circuit's view on this issue is not crystal clear. The *Acito* court rejected plaintiffs' contention that defendant's sale of 30,000 shares represented an unusual sale because this sale "represented less than 11% of [defendant's] holdings; after the sale, [defendant] owned approximately 259,000 shares and/or options of IMCERA stock," a figure that included 93,000 *unexercisable* options. [FN187] However, five years later in *Rothman,* the Second Circuit approvingly noted that the lower court opinion it was reviewing only considered exercisable options. [FN188] And district courts in this Circuit, even when relying upon *Acito,* often decline to consider a defendant's unexercisable options. [FN189]

> FN187. *Acito,* 47 F.3d at 54.

> FN188. See *Rothman,* 220 F.3d at 94 (quotation and citation omitted) ("Taking into account [defendant's] vested options, he held more shares at the end of the [putative class period] than at the beginning.").

> FN189. See, e.g., *In re Regeneron Pharm.,* 2005 WL 225288, at *22; *In re Keyspan Corp.,* 383 F.Supp.2d at 383.

When only shares and *exercisable* options are considered, Amaitis sold 17.4% percent of his holdings, [FN190] and Noviello sold 10.9% of his holdings. [FN191] Nevertheless, to the extent that I am not constrained by *Acito* (which would clearly lead to a finding that these sales are de min-

imis), I still find these sales insufficient to establish motive as to Amaitis and Noviello. Again, the dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period. Given this, it is difficult to conclude that sales by two of the four defendants of less than twenty percent of their individual holdings represent such unusual selling activity as to give rise to an inference that either defendant intended to defraud investors. [FN192] Thus, plaintiffs have failed to allege motive and opportunity as to any defendant.

> FN190. Prior to Amaitis' sales, he held 197,262 shares and 340,000 exercisable options, for a total of 537,262 shares he could have sold. *See* 2003 10-K at 27-29.

> FN191. Prior to this sale, Noviello held 27,857 shares and 202,500 exercisable options, for a total of 230,357 shares he could have sold. *See id.*

> FN192. See *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 814 (2d Cir.1996) (failure of some individual defendants to sell stock during class period undermined plaintiffs' allegations that any defendant intended to inflate stock for personal profit).

3. Conscious Misbehavior or Recklessness

In order to plead conscious misbehavior or recklessness, plaintiffs must "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements ." [FN193] When such a contradiction is pled, and when the requirements of Rule 9(b) are otherwise satisfied, "the falsity and scienter [pleading] requirements are essentially combined." [FN194] "That is, if [the Complaint has] sufficiently pled facts to support scienter, [it has] also met the pleading requirements for falsity." [FN195]

> FN193. *Novak,* 216 F.3d at 308 ("Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.").

> FN194. *In re QLT Sec. Litig.,* 312 F.Supp.2d 526, 534 (S.D.N.Y.2004) (quotation and citation omit-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ted). *Accord In re JP Morgan Chase,* 363 F.Supp.2d at 625 (citation omitted).

> FN195. *In re QLT,* 312 F.Supp.2d at 534 (quotation and citation omitted). Thus, for purposes of this section, I assume *arguendo* that defendants' statements are otherwise actionable.

Plaintiffs fail to point to specific reports contradicting defendants' public statements. Such lack of specificity is ordinarily fatal to a plaintiff's effort to plead scienter based on conscious misbehavior or recklessness. [FN196] But here, plaintiffs rely on *first,* the information relayed by CW-1 and CW-2; [FN197] and *second,* an assertion that "the sheer significance of PI as a business model for eSpeed--including market share, trading volume, etc.--substantiate defendants' knowledge, or recklessness in not knowing, of the customer complaints and defections to competing trading companies." [FN198]

> FN196. *See Novak,* 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information"); *see also In re Dynex Capital, Inc. Sec. Litig.,* No. 05 Civ. 1897, 2006 WL 314524, at *8-9 (S.D.N.Y. Feb. 10, 2006) (plaintiffs failed to plead scienter against individual defendants due to absence of allegations pointing to specific information contradicting public statements: "In broad terms, senior officers will always have 'access' to information indicative of malfeasance (if such information exists)"); *In re Loral Space & Commc'ns Ltd. Sec. Litig.,* No. 01 Civ. 4388, 2004 WL 376442, at *10 (S.D.N.Y. Feb.27, 2004) (no inference of scienter when, inter alia, "plaintiffs have not adequately identified the reports and memoranda that ostensibly contained facts contradicting the defendants' statements").

> FN197. *See* Pl. Mem. at 14-15

> FN198. *Id.* at 15 n. 11.

Even assuming that their statements are otherwise reliable, plaintiffs' confidential witnesses can establish scienter only as to Lutnick and eSpeed itself. CW-1 only reported his findings to Lutnick, and CW-2 did not (as far as the Complaint alleges) report his findings to anyone. [FN199] Moreover, the information relayed by CW-1 is simply insufficient to establish that eSpeed or Lutnick made knowingly false statements about PI. Defendants' points are well taken that *first,* plaintiffs fail to allege *when,* or by direct quote *what,* CW-1 actually told Lutnick;" and *second,* that the negative feedback CW-1 received was from only forty customers, "a tiny fraction (6%) of eSpeed's customer base (alleged to be 700)." [FN200] The fact that six percent of customers disliked PI does not necessarily mean that Lutnick lacked a reasonable basis for expressing optimism about PI's prospects. [FN201] Finally, it is unclear whether CW-1 ever spoke to a customer who actually used PI; his information was gathered "in late 2002 or early 2003," [FN202] but PI was not introduced to the marketplace until January 2003. [FN203]

> FN199. *See In re Gilat Satellite Networks,* 2005 WL 2277476, at * 18 (with respect to an individual defendant's statement that company's product is "fulfilling its vision of offering high-speed internet," allegation that beta testers discovered problems with product touted by defendant did not raise scienter inference because "[t]he complaint does not allege to what extent beta testers criticized [the product], or to whom. Nor does the complaint allege the existence of any internal reports or memoranda produced by these unidentified beta testers that would indicate [the product's alleged problems].").

> FN200. Def. Mem. at 19.

> FN201. Similarly, as defendants also note, "there are no particularized facts concerning how these customers are selected, whether they represented a random sample of customers, or whether they were eSpeed's largest or smallest customers--information that clearly would be relevant to an analysis of customer satisfaction." *Id.* (citation omitted).

> FN202. Complaint ¶ 52.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

>   FN203. *See id.* ¶ 55.

*16 Plaintiffs' alternative argument that defendants should be charged with knowledge of an allegedly "vital portion" of eSpeed's business such as PI is potentially meritorious. In *Cosmas v. Hassett,* plaintiffs alleged that defendant directors falsely claimed that "[s]ales to the People's Republic of China ... are also an important new source of revenue" for [defendant] Inflight." [FN204] To plead conscious misbehavior or recklessness, plaintiffs alleged that, at the time this statement was made, defendants were aware that China had recently adopted new import restrictions that would essentially preclude new sales to China. [FN205]

>   FN204. 886 F.2d 8, 10 (2d Cir.1989).

>   FN205. *See id.* at 10-11.

The Second Circuit held that plaintiffs had successfully pled scienter, because:
>   [T]he [ ] complaint alleges facts from which one can reasonably infer that sales to [China] were to represent a significant part of Inflight's business. These facts [in turn] give rise to a strong inference that the defendants, who [were allegedly] directors of Inflight, had knowledge of [China's] import restrictions, since the restrictions apparently eliminated a potentially significant source of income for the company. [FN206]

>   FN206. *Id.* at 13.

Thus, if the subject-matter of the alleged misstatements is sufficiently "significant" to a defendant company, it may be possible for knowledge of contradictory information (and thus, scienter) to be imputed to individual defendants even in the absence of specific information contradicting their public statements. [FN207]

>   FN207. *See also In re JP Morgan Chase,* 363 F.Supp.2d at 628 (citation omitted) ("When information is at the core of a company's business, it may be properly ascribable to senior officers"); *In re Xerox Corp. Sec. Litig.,* 165 F.Supp.2d 208, 223 (D.Conn.2001) (scienter adequately alleged because, inter alia, "[t]he problems Xerox was having, the plaintiffs allege, affected the company's 'core operations' and jeopardized the success of the company's most significant initiative at that time"); *Epstein v. Itron, Inc.,* 993 F.Supp. 1314, 1326 (E.D.Wash.1998), *abrogated on other grounds by In re Silicon Graphics Sec. Litig.,* 183 F.3d at 974 ("facts critical to a business's core operations or an important transaction are generally so apparent that their knowledge may be attributed to the company and its key officers").

Nonetheless, the Complaint is inadequate in this respect because it does not allege that PI was so vital to eSpeed that its top officers must have known of the extent of PI's failure. [FN208] To the extent that this "core operations" method of pleading conscious misbehavior or recklessness is viable after the PSLRA, [FN209] plaintiffs must provide more facts to support a strong inference that any misstatements by defendants regarding PI must have been made with scienter. [FN210]

>   FN208. In fact, some allegations cut in the opposite direction. *See* Complaint ¶ 56 (Chertoff stating that PI is "one of many factors" affecting projections of eSpeed's future performance, and also indicating that PI is merely an *option* for eSpeed's customers); *id.* ¶ 62 (Lutnick explaining that PI is merely "an example" of various "core products" or "product enhancements").

>   FN209. *Cosmas* precedes the PSLRA by six years, and post-PSLRA decisions in other Circuits have cast doubt on whether scienter can be pleaded in this manner. *See Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 867 (5th Cir.2003) (rejecting allegation that failure of company's core business evidences defendant's knowledge that they were misrepresenting company's prospects for success); *In re Read-Rite Corp. Sec. Litig.,* 335 F.3d 843, 848 (9th Cir.2003) (rejecting "core operations" method of pleading scienter in light of PSLRA).

>   FN210. *See, e.g., In re JP Morgan Chase,* 363 F.Supp.2d at 628 (declining to apply "core operations" doctrine when plaintiffs allege no facts suggesting that alleged fraudulent accounting "was at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the core of JPM Chase's business"); *In re Federated Dep't Stores Sec. Litig.*, No. 00 Civ. 6362, 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004) (holding that because misrepresentations concerned "a financial factor of a subsidiary representing approximately 10% of [subsidiary's] total assets," and this factor was "not essential to the survival" of the company, knowledge of fraud could not be imputed to defendants.); *cf. In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 496 (S.D.N.Y.2004) (because subject of alleged fraud was earnings restatement revealing a loss so large that company declared bankruptcy, key officers could be charged with scienter based on concealing this loss); *In re Cell Pathways Sec. Litig.*, No. 99-725, 2000 WL 805221, at *1, 7 (E.D.Pa. June 20, 2000) (misrepresentations concerned company's only drug product); *Epstein*, 993 F.Supp. at 1317 (misrepresentations involved matters "essential to the survival of the company").

Moreover, even if PI was sufficiently significant that knowledge of its true prospects can be imputed to the individual defendants, plaintiffs must still adequately allege that defendants lacked a reasonable basis for optimism about PI. Such optimism was seemingly justified for at least part of the putative class period. For example, Lutnick announced on August 12, 2003 that "the success of our [PI] software in the second quarter" contributed to a fifteen percent increase in eSpeed's revenues and electronic trading volume, and that he expected PI to contribute to higher earnings in succeeding quarters. [FN211]

FN211. Complaint ¶ 60.

Plaintiffs allege that this and similar statements were actionable because, inter alia, the revenue growth generated by PI was merely "artificial[ ] and temporary[ ]" and achieved at the cost of "alienating eSpeed's customers." [FN212] But even so, many of plaintiffs' allegations boil down to the proposition that defendants should have *anticipated* that PI would eventually damage the company, even at a time that the company was enjoying growing revenues. Such "fraud by hindsight" allegations have long been rejected. [FN213]

FN212. *Id.* ¶ 61.

FN213. *See, e.g., Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.).

D. Loss Causation [FN214]

FN214. Plaintiffs invoke the fraud-on-the-market presumption to establish transaction causation. *See* Complaint ¶¶ 94-95. Defendants do not contest this presumption's applicability here.

*17 The parties dispute whether the pleading of loss causation is governed by Rule 8(a) or Rule 9(b) of the Federal Rules of Civil Procedure. This is an issue left open by *Dura* and not squarely addressed by the Second Circuit. In light of the other deficiencies of the Complaint, I need not resolve this dispute now. Instead, like the Supreme Court in *Dura*, I assume *arguendo* that Rule 8(a) applies. [FN215] Under that standard, plaintiffs' loss causation allegations just barely suffice. [FN216]

FN215. Plaintiffs incorrectly assert that *Dura* adopted a liberal notice pleading standard for loss causation. *See* Pl. Mem. at 27; *but see Dura*, 125 S.Ct. at 1634 (emphasis added) ("we assume, *at least for argument's sake,* that neither the [Federal] Rules nor the securities statutes impose any special further requirement [beyond Rule 8(a) ] in respect to [pleading loss causation].").

FN216. Should the Second Circuit eventually hold that Rule 9 governs the pleading of loss causation, plaintiffs' loss causation allegations would *not* suffice. Plaintiffs should take this into account should they file an amended Complaint.

Defendants contend that plaintiffs' loss causation allegations are inadequate because the twenty-five percent stock drop on July 2, 2004 was a full six months *before* the January 4, 2005 announcement that eSpeed would discontinue PI. [FN217] Accordingly, defendants assert that plaintiffs' allegations here are "strikingly similar" to the allegations deemed insufficient in *Dura*. [FN218]

FN217. *See* Def. Mem. at 24-27.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN218. *Id.* at 26.

In *Dura,* defendant allegedly made two distinct false statements: (1) defendant falsely represented the extent of its profits from drug sales; and (2) it also claimed that it expected the Food and Drug Administration ("FDA") to approve its new spray device to treat asthma. [FN219] On the last day of the putative class period, defendant announced disappointing earnings, which it specifically attributed to low drug sales. [FN220] The next day, defendant's shares plummeted. [FN221] Eight months *after* that loss, defendant announced that the FDA would not approve defendant's spray device after all. [FN222]

FN219. See *Dura,* 125 S.Ct. at 1630.

FN220. *See id.*

FN221. *See id.*

FN222. *See id.* After the disclosure regarding the spray device, "Dura's share price temporarily fell but almost fully recovered within one week." *Id.*

Because there was no corrective disclosure *regarding the spray device* before the economic loss occurred, the alleged deception *regarding the spray device* could not possibly have caused the economic loss:

> [T]he plaintiffs' lengthy complaint contains only one statement that we can fairly read as describing the loss caused by the defendants' 'spray device' misrepresentations. That statement says that the plaintiffs 'paid artificially inflated prices for Dura's securities' and suffered 'damage' ... however, the 'artificially inflated purchase price' is not itself a relevant economic loss. And the complaint nowhere else provides the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation concerning Dura's 'spray device.' [FN223]

FN223. *Id.* at 1634.

As *Dura* reaffirms, it is axiomatic that "[a] concealed fact cannot cause a decrease in the value of a stock before the concealment is made public." [FN224] But the Complaint gives rise to an inference, albeit a weak one, that by the end of the class period, investors connected eSpeed's loss of market share and financial decline to the rejection of PI by eSpeed's customers.

FN224. *In re WorldCom, Inc.,* 2005 WL 375314, at *6 (citing *Lentell,* 396 F.3d at 175 n. 4).

Under the heading "The Truth Is Disclosed," plaintiffs allege that on July 1, 2004, eSpeed "issued a press release in which it finally disclosed that [its] business was not progressing as previously anticipated." [FN225] Specifically, this press release disclosed disappointing results for the second quarter of 2004. [FN226] eSpeed's stated reasons for these results were competitive pricing pressure and lower than expected market volumes in Europe. [FN227] A twenty-five percent drop in eSpeed's stock price ensued on July 2. [FN228]

FN225. Complaint ¶ 78.

FN226. *See id.*

FN227. *See id.*

FN228. *See id.* ¶ 79.

*18 To plead loss causation based on these facts, plaintiffs first quote an analyst's query to Lutnick on the July 2 conference call, regarding "whether 'on the market share issue,' the losses were due to 'animosity' customers had toward Price Improvement." [FN229] But plaintiffs then state that "[w]hile Lutnick denied this, the market now understood the truth: eSpeed's slavish adherence to a system detested by its customers might have produced artificial short-term gains, but had finally resulted in a material decline in eSpeed's financial performance." [FN230]

FN229. *Id.* ¶ 80 (quotation omitted).

FN230. *Id.* Plaintiffs further assert that "Indeed, the 'competitive pricing pressure' referred to by defendant Lutnick was actually the reality of customers stating their preference for BrokerTec's user-friendly pricing system versus the unpopular and unworkable Price Improvement system." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
(Cite as: 2006 WL 880045 (S.D.N.Y.))

This conclusory assertion, without more, cannot substitute for specific allegations that disclosure regarding PI was a proximate cause of the economic loss. [FN231] But plaintiffs provide some support for the proposition that the market understood the truth about PI by the end of the putative class period, in the form of a *CBS Marketwatch* article discussing the July 2 conference call. [FN232] The article discussed several reasons for the "alarming rate" of decline of eSpeed's market share, which it chiefly ascribed to a "price war" with BrokerTec--a war that, according to the article, eSpeed was losing due to BrokerTec's incentive program, and Lutnick's failure to "lay out a feasible plan to aggressively compete with [BrokerTec] on pricing and product offerings." [FN233] Most importantly, the article also asserts that:

> FN231. *See, e.g., Catton v. Defense Tech Sys., Inc.,* No. 05 Civ. 6954, 2006 WL 27470, at *9 (S.D.N.Y. Jan. 6, 2006) (despite plaintiffs' assertion that they "have alleged a factual link between the decline in the Company's stock and defendants' misconduct," action dismissed when "there is no particular allegation in the Complaint directly supporting the theory that the disclosure or the materialization of the concealed risk led to plaintiffs' loss").
>
> FN232. *See* Complaint ¶ 81 (extensively quoting article).
>
> FN233. *Id.*

eSpeed has initiated new fees in the last year to pay for added value for customers, but its far from clear these are as attractive as the company expected. [BrokerTec's] pricing, with its fee caps, may be attracting high volume customers, while eSpeed's new charges may be hurting the company's volumes. "The magnitude of the market share deterioration was more than expected. There's been more clarity surrounding the issue of fee caps, and [on] the need to address that issue and possibly adopt similar pricing structures," [an analyst] said. [FN234]

> FN234. *Id.*

Drawing all reasonable inferences in plaintiffs' favor at this stage of the proceedings, the *CBS Marketwatch* article could establish that, despite Lutnick's specific denial, the market understood by the end of the putative class period what it did not before--that the "new fees" or "new charges" entailed by PI were damaging eSpeed's market share and financial performance. [FN235] Although the article discusses other possible causes for the stock decline aside from PI, a plaintiff is not required to plead that her economic loss was caused *solely* by the alleged fraudulent scheme. [FN236] Moreover, *Dura* imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion. [FN237] For these reasons, plaintiffs have given "some indication of the ... causal connection [they have] in mind." [FN238]

> FN235. *See In re ICQ Commc'ns, Inc. Sec. Litig.,* No. 1:00 CV 01864, 2006 WL 416622, at *10 (D.Colo. Feb.7, 2006) (although company's explanation for lower earnings did not directly relate to alleged fraud, they "reasonably can be seen as revelation of the negative truth" about defendant's business); *In re Retek Inc. Secs.,* No. Civ. 02-4209, 2005 WL 3059566, at *4 (D.Minn. Oct. 21, 2005) (citing *In re Daou Sys., Inc.,* 411 F.3d 1006, 1026 (9th Cir.2005)) (loss causation allegations survived motion for judgment on pleadings where there was "a possible temporal and subject matter connection between the [alleged corrective disclosure] and the previous alleged misrepresentations ... completely missing in *Dura*"); *cf. Sekuk Global Enters. v. KVH Indus., Inc.,* No. Civ.A. 04- 306ML, 2005 WL 1924202, at *17 (D.R.I. Aug.11, 2005) (loss causation adequately pleaded when defendants' comments accompanying disappointing earnings announcement could be read as attributing poor earnings to subject-matter of alleged scheme).
>
> FN236. *See In re Daou Sys.,* 411 F.3d at 1025; *see also In re GeoPharma,* 399 F.Supp.2d at 453 (plaintiff not required to exclude other possible causes of loss at pleading stage).
>
> FN237. *See In re Winstar Commc'ns,* No. 01 Civ. 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb.27,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                   Page 28
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

2006) ("The Supreme Court [merely] spoke in terms of the 'relevant truth' and the 'truth' making its way into the market place ... [but] did not address the means by which the information is imparted to the public"); see also *In re Enron Corp. Secs., Derivative and ERISA Litig.*, No. MDL-1446, 2005 WL 3504860, at *16 (S.D.Tex. Dec.22, 2005) ("besides a formal corrective disclosure by a defendant ... the market may learn of possible fraud from a number of sources [such as] whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.").

FN238. *Dura*, 125 S.Ct. at 1634.

E. Section 20(a)

Plaintiffs also bring allegations against the individual defendants under section 20(a) of the Exchange Act. [FN239] "However, a primary violation of section 10(b) is a prerequisite to finding control person liability under section 20(a)." [FN240] Thus, these claims must be dismissed as well.

FN239. *See* Complaint ¶¶ 109-11. Section 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78t(a), states, in pertinent part:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly induce the act or acts constituting the violation or cause of action.

FN240. *In re GeoPharma*, 399 F.Supp.2d at 453-54 (citing *Rombach*, 355 F.3d at 177-78).

F. Leave to Amend

*19 Plaintiffs have requested leave to amend the Complaint in the event of dismissal. [FN241] Rule 15(a) provides that leave to amend a complaint "shall be freely granted when justice so requires." Moreover, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." [FN242] Plaintiffs are therefore granted leave to replead within twenty days of this Opinion and Order. [FN243]

FN241. *See* Pl. Mem. at 30 n.20.

FN242. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991).

FN243. *But see supra* Part I.

V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted, without prejudice, with leave to replead within twenty days of this Opinion and Order. The Clerk is directed to close this motion [# 27 on the docket sheet].
SO ORDERED:

Slip Copy, 2006 WL 880045 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 403856 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum of Law in Further Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint (Feb. 10, 2006)

• 2006 WL 738570 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (Feb. 10, 2006)

• 2006 WL 304044 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Jan. 6, 2006)

• 2006 WL 551525 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Jan. 6, 2006)

• 2005 WL 3653989 (Trial Motion, Memorandum and Affi-



Slip Copy
Slip Copy, 2006 WL 880045 (S.D.N.Y.)
**(Cite as: 2006 WL 880045 (S.D.N.Y.))**

Page 29

davit) Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (Nov. 16, 2005)

• 2005 WL 3654021 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (Nov. 16, 2005)

• 2005 WL 3654042 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of law in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (Nov. 16, 2005)

• 1:05cv02091 (Docket) (Feb. 15, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.