4

*Westlaw.*

Not Reported in F.Supp.2d                                                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re INTERPUBLIC SECURITIES LITIGATION
No. 02 Civ. 6527(DLC).

May 29, 2003.

Investors sued holding company and principal officers, claiming violations of Securities Act and Securities Exchange Act. Defendants moved to dismiss. The District Court, Cote, J, held that: (1) investors stated claim of registration statement misrepresentation; (2) investors satisfied scienter requirement for § 10(b) suit by alleging that executives had motive and opportunity to commit fraud in order to enhance value of shares for acquisition purposes; and (3) scienter requirement was not otherwise satisfied.

Motion granted in part, denied in part.

West Headnotes

**[1] Securities Regulation ⚷═ 25.18**
349Bk25.18 Most Cited Cases
Investors stated claim of registration statement misrepresentation, under Securities Act, by alleging that holding company overstated net income and earnings per share over four year period. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**[2] Securities Regulation ⚷═ 60.45(1)**
349Bk60.45(1) Most Cited Cases
Investors satisfied scienter requirement for stating claim of securities fraud under § 10(b), by alleging that holding company and executives had motive and opportunity to artificially inflate earnings per share, due to program of growth through acquisition, resulting in dozens of acquisitions, which could be paid for through issuance of fewer shares if value per share remained high. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A.§§ 78j, 78u-4(b)(2).

**[3] Securities Regulation ⚷═ 60.45(1)**
349Bk60.45(1) Most Cited Cases
Investors did not satisfy scienter requirement for stating claim of securities fraud under § 10(b), by alleging that executives of holding company falsely and recklessly represented in annual reports over five year period that it had adequate internal accounting controls, when there was insufficient evidence that executives knew their representations were false. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A.§§ 78j, 78u-4(b)(2).

**[4] Securities Regulation ⚷═ 60.45(1)**
349Bk60.45(1) Most Cited Cases
Investors did not satisfy scienter requirement for stating claim of securities fraud under § 10(b), by alleging that executives of holding company sold stock over critical period in quantities showing motive and opportunity to commit fraud, when volume of sales was not significant in terms of total holdings. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A.§§ 78j, 78u-4(b)(2).

**[5] Securities Regulation ⚷═ 60.45(1)**
349Bk60.45(1) Most Cited Cases
Investors did not satisfy scienter requirement for stating claim of securities fraud under § 10(b), by alleging that principal officers of holding company had roles that gave them intimate knowledge of corporate affairs and imposed duty upon them to be familiar with finances, and that each was in position long enough to become aware of financial misreporting that was going on. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A.§§ 78j, 78u-4(b)(2).
Katharine M. Ryan, Marc I. Willner, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, for the Class of Plaintiffs.

Sandy A. Liebhard, Joseph R. Seidman, Jr., Bernstein Liebhard & Lifshitz, LLP, New York, NY, for the Class of Plaintiffs.

Lewis R. Clayton, Andrew Gordon, Lauren A. McMillen, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendants.

*OPINION AND ORDER*
COTE, J.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                          Page 2
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

*1 This class action, alleging violations of federal securities law, is brought against defendant Interpublic Group of Companies, Inc. ("IPG") and several of its former and current senior executives. The first action making these claims was filed on August 15, 2002. The class actions were consolidated on November 15, and a Consolidated Amended Complaint ("Complaint") was filed on January 10, 2003. The Complaint alleges claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission (the "SEC"). The defendants have moved to dismiss the Complaint. For the reasons that follow, the defendants' motion is granted in part.

*Background*

These facts are as alleged in the Complaint. IPG, which is publicly traded on the New York Stock Exchange, is a holding company composed of hundreds of advertising, specialized marketing, and communication services companies with offices and other affiliations in more than 130 countries. IPG itself has no operating results, and the financial results it reports to the investing public represent the consolidated results of its numerous subsidiaries. IPG provides a full range of traditional advertising and marketing services to its clients, which include General Motors, Unilever, Microsoft, Coca-Cola, and Lucent Technologies. IPG's key international agency brands are McCann-Erickson WorldGroup ("McCann"), Lowe & Partners, and FCB.

*Announcements of Need for a Restatement*

After announcing on August 5, 2002, that it would be delayed in releasing its second quarter results, IPG became engulfed in an accounting scandal when it disclosed in a press release issued on August 13 that it had overstated its financial results from 1997 through the first quarter of 2002, by $68.5 million. It attributed the errors to charges "principally in Europe" that had not been properly expensed. IPG declared that it would have to issue a restatement (the "Restatement") of its earnings. CEO and individual defendant John J. Dooner, Jr. ("Dooner") explained that "[p]rocedures recently put in place by management [had] identified an accounting issue that merited further review."

In an August 13 conference call (the "August 13 Call") hosted by CFO and individual defendant Sean F. Orr ("Orr") and Dooner, Orr explained that $68.5 million was the "total" and "final" charge for these accounting irregularities, that the accounting problems were primarily located in McCann's business units in Europe, and that the amounts involved were not material to any prior period. He explained the problem as follows:

[W]hat we are dealing with here is the effect of not reconciling the intercompany accounts on a timely basis, leading to an accumulation of imbalances that although immaterial to any prior year require a material adjustment to get our accounts caught up.

*2 Orr insisted that these "accounting effects" would "have no impact on cash flow in the present or for that matter in the past, and do not have any implications on future performance." In fact, he asserted that IPG had previously recognized the need to address the issue of intercompany accounts and had, beginning in approximately February 2001, initiated a company wide project to review these accounts and "catch up on the needed reconciliation process to make sure these accounts stay in balance." He acknowledged that as part of this process new accounting procedures had been put in place at McCann in the first quarter 2002, and new management had taken over in McCann Europe.

Despite these assurances that the amount of the Restatement was final, after the market closed on October 16, IPG executives announced that the amount of the Restatement would actually be in the $120 million range. On the following day, IPG's stock price dropped by 30%. [FN1] On November 13, IPG again revised the total, announcing that the final amount of the Restatement would be $181.3 million.

> FN1. The price of IPG shares had dropped by 24% after it announced on August 5 that it would be delaying the announcement of its earnings.

On November 19, IPG identified in a press release three broad categories of charges within the Restatement. (1) $101.1 million was attributed to intercompany charges at McCann, "principally in Europe." The charges "had been in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                           Page 3
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

cluded in accounts receivable and work-in-progress rather than being expensed." (2) $44 million at subsidiaries other than McCann related principally to understated liabilities dating to 1996 and earlier. (3) $36.3 million was related to estimates of insurance proceeds not yet realized, specific write-offs of receivables and other costs that had been capitalized rather than being expensed. According to the final itemization of the Restatement issued by IPG on December 6, during the years 1997 through 2001, IPG overstated its operating income by an average of $22.7 million per year and its net income by an average of $18.7 million per year.

IPG's third quarter Form 10-Q announced that the Restatement included a correction for an overstatement of operating income by $9.6 million and net income by $5.7 million in the second quarter of 2002. This 10-Q also announced that IPG's outside auditor Price WaterhouseCoopers ("PwC") had found "material weaknesses" relating to IPG's processing and monitoring of intercompany accounts. This 10-Q also indicated that "[d]ue to the impact on the [c]ompany's net worth resulting from" lowering of operating profit from previous periods and lower operating profit in the current quarter, IPG had agreed to pay its lenders increased interest rates and commitment fees. IPG further agreed with its lenders to amend by January 5, 2003 its lending agreements to restrict its ability to (1) make acquisitions or investments, (2) make capital expenditures, (3) declare or pay dividends, and (4) to repurchase shares or other debt securities. The SEC has launched an informal inquiry into the accounting practices of IPG.

*Financial Reporting at McCann*

*3 The largest portion of the Restatement is attributed to the processing of intercompany transactions in IPG's largest subsidiary, McCann. McCann accounts for 40% to 50% of IPG's gross revenues, operates in 120 countries, and maintains its worldwide headquarters in New York. At the end of each year, each McCann office was required to pay an annual dividend, representing 80% of that office's net income, to IPG (the "Annual Dividend").

McCann has a multi-tiered management structure. At the worldwide level, McCann has a CEO, CFO, and controller (e.g., "worldwide CEO"). McCann's worldwide operations are divided into four regions: (1) Europe, Middle-East and Africa; (2) Latin America and the Carribean; (3) Asia-Pacific; and (4) North America. Each region has its own CEO, CFO, and controller (e.g., "regional CEO"). Each region is composed of different areas that each have their own CEO and CFO (e.g., "area CEO"). Each area is composed of several countries that each have their own CEO, CFO, and controller (e.g., "country CEO").

The adjustment of $101 million made in 2002 for McCann's failure to account properly for intercompany transactions arose "principally" in McCann Europe. The Complaint provides descriptions from former high-level employees at McCann who worked in other regions--Latin America and North America--of different accounting problems they witnessed within their regions.

*McCann Colombia CFO*

Beginning in 1997, according to a former McCann CFO for Colombia (the "Colombia CFO"), [FN2] McCann executives began pressuring McCann officers in the Latin America region to meet or exceed their budgeted operating profit. If the monthly reported income matched the budget, then it was reported to McCann's worldwide headquarters. If it fell below the budget, the figures were sent to the regional headquarters. Regional executives would then take steps to inflate the figures to bring them in line with the budget. According to the Colombia CFO, from 1997 to 2001, McCann Columbia overstated its operating profit by as much as 500%. For example, in January 1998, the Worldwide Controller ordered the Colombia CFO to understate the cost basis of an office building by $350,000 in order to increase operating profit by that amount. From 1998 to 2001, the Colombia CFO repeatedly advised McCann senior executives of the growing disparity between actual operating results and reported operating results and of the need to revise downward current and past results to offset this disparity.

> FN2. In addition to serving as CFO for Colombia, the person also served as CFO for Ecuador and Peru.

The Latin America CFO ordered the Colombia CFO in 2001, not to file the McCann Colombia annual report for



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

Page 4

2000, which showed a net loss of $250,000. The Latin America CFO explained that McCann Columbia had to report at least $750,000 in net income in order to pay its Annual Dividend. After the Colombia CFO refused to change the numbers, the annual report was filed as it had been drafted and the Colombia CFO was fired.

*Colombia CFO Notifies IPG of Problems*

**\*4** IPG officials were directly informed of the accounting improprieties occurring in McCann Colombia. After he was fired in July 2001, the Colombia CFO sent an email to McCann's worldwide CFO, Orr, and IPG's General Counsel, outlining the accounting manipulations and fraudulent management practices he had witnessed. Following the email, the Colombia CFO met with IPG's general auditor and McCann's worldwide controller to discuss and review the documents evidencing the accounting improprieties. He met at the request of IPG's general auditor with two auditors sent to conduct an audit of McCann Columbia. Finally, the Colombia CFO sent an email in April 2002, to the chairman of the audit and financial committee of IPG's board of directors, detailing the accounting improprieties in McCann Columbia.

*McCann New York Controller*

According to a former controller in McCann's New York office (the "New York Controller"), during 2001, McCann's worldwide controller instructed McCann New York not to book reserves against old receivables. This practice improperly increased McCann New York's operating profit by millions of dollars in 2001. Beginning in November 2001, PwC questioned McCann New York and McCann North America executives about why they had not taken reserves against receivables.

McCann North America also had, according to the New York Controller, lax financial controls. For example, many of the project files, or "job packets", maintained by McCann New York were incomplete. Consequently, McCann New York was forced to estimate revenue and expenses on open projects at the end of each month, frequently booking revenue in the wrong period or double counting revenue.

Finally, the New York Controller reports that McCann North America had serious problems reconciling inter-office accounts. The New York Controller reduced McCann New York expenses by $3 to $5 million to reflect work McCann New York employees had performed for other McCann offices.

*Growth by Acquisition*

During the period when IPG was overstating its earnings results, it had also grown by acquisition. In 1997, IPG issued over 4 million shares of its common stock for acquisitions accounted for under the pooling of interests accounting method and issued an additional 1,200,059 shares of common stock for other acquisitions in which it also paid $80 million in cash. The companies it acquired in 1997 included Complete Medical Group, Integrated Communications Corporation, Advantage International, Ludgate, Marketing Corporation of America, Medialog, The Sponsorship Group, Kaleidoscope and Addis Wechsler.

In 1998, IPG issued almost 7.5 million shares of its common stock for acquisitions under the pooling of interests accounting method and issued an additional 1,359,252 shares of common stock for other acquisitions in which it also paid $140 million in cash. The companies it acquired in 1998 included International Hill, Holiday, Connors, Cosmopoulos, Inc., Public Relations, The Jack Morton Company, Carmichael Lynch, Inc., KBA Marketing, Gillespie, Ryann McGinn, CSI, Flammini, Gingko, Defederico and Herrero Y Ochoa.

**\*5** In 1999, IPG paid a total of $180 million in cash and issued 8,393,893 shares of its stock to acquire 55 companies. In 2000, IPG paid a total of $500 million in cash and issued 26.8 million shares of its common stock to acquire 77 companies, including NFO, which was acquired for 12.6 million shares, and Deutsche, Inc. and its affiliates, which were acquired for 6 million shares. In 2001, IPG acquired 19 companies, including True North Communications, Inc. ("True North").

On March 19, 2001, IPG announced its merger with True North through a stock-for-stock pooling of interests transaction. The merger agreement (the "Merger Agreement") val-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                       Page 5
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

ued True North, one of the world's top ten global advertising and communications holding companies, at $2.1 billion. In connection with the True North acquisition, IPG filed a Form S-4 registration statement on April 19, 2001, and an amended registration statement on May 9, 2001 (collectively the "Registration Statement"). Pursuant to the Registration Statement, IPG registered 67,644,272 shares of its common stock, which represented the equivalent of 59,337,081 shares of True North common stock, the approximate maximum number of shares of True North common stock outstanding, multiplied by 1.14, the exchange ratio contemplated by the Merger Agreement. On June 19, 2001, the shareholders of True North approved the Merger Agreement, making IPG the second largest global advertising holding company.

*The Individual Defendants*

All of the individual defendants (the "Individual Defendants") named in this action--Dooner, Orr, Phillip H. Geier, Jr. ("Geier"), Eugene P. Beard ("Beard"), Frederick Molz ("Molz"), David I.C. Weatherseed ("Weatherseed"), Richard P. Sneeder ("Sneeder"), and Joseph M. Studley ("Studley")--have held or currently hold executive positions within IPG. Geier was, at all relevant times, the Chairman of the Board and CEO of IPG until his resignation from those positions in January of 2001. Dooner has served as IPG's Chairman, President, and CEO since December 15, 2000. Prior to that time, Dooner was President and COO of IPG from April 1, 2000 through December 14, 2000. Dooner was also the Chairman and CEO of McCann from 1995 through March 2000. Beard was, at all relevant times, IPG's Vice Chairman and CFO until February 28, 2000. Orr has served as IPG's Executive Vice President and CFO since June 1999, and has been a director of IPG since February 2000. Studley was, at all relevant times, IPG's Vice President and Controller until January 1, 1999. Molz was IPG's Vice President and Controller from January 1, 1999 until June 2001. Weatherseed replaced Molz as IPG's Vice President and Controller on June 18, 2001, and served in this capacity until December 2001. Sneeder has served as IPG's Vice President and Controller since December 2001. Sneeder had served as True North's Vice President and Controller from January 1999 until June 2001, when he joined IPG.

All of the Individual Defendants signed various 10-K and 10-Q forms during the relevant period. Defendants Dooner, Orr, and Molz also signed the Registration Statement. During the relevant period several of the Individual Defendants sold some of their shares in IPG.

*The Class*

*6 The uncertified class (the "Class") is comprised of two categories. The claims under the Exchange Act are brought on behalf of all persons and entities who purchased or otherwise acquired IPG common stock on the open market between October 28, 1997 and October 16, 2002. The claims under the Securities Act are brought on behalf of all persons and entities who acquired shares of IPG's common stock in exchange for their shares of common stock of True North pursuant to IPG's Registration Statement.

*Discussion*

To dismiss an action pursuant to Rule 12(b)(6), a court must determine that "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) (citations omitted). In construing the complaint, the court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.* "Given the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation omitted).

Although the court's focus should be on the pleadings, it may also consider
> any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                   Page 6
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

*Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991). The court need not credit general conclusory allegations that "are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995).

As noted, the defendants have moved to dismiss the entire Complaint. The claims are addressed in the following order: (1) Count I, which alleges a violation of Section 11 of the Securities Act by IPG, Dooner, Orr and Molz; (2) Count II, which alleges a violation of Section 15 of the Securities Act by defendants Dooner, Orr and Molz; (3) Count III, which alleges a violation of Section 10(b) of the Exchange Act by all defendants; and (4) Count IV, which alleges a violation of Section 20(a) of the Exchange Act by the Individual Defendants.

A. Securities Act Claims

1. Section 11

[1] Count I of the Complaint pleads a violation of Section 11 by IPG, Dooner, Orr and Molz based on alleged misrepresentations in the Registration Statement. The Complaint asserts that the three Individual Defendants signed the Registration Statement. These defendants move to dismiss the Section 11 claim on the ground that the element of materiality is not sufficiently pled to meet the pleading standards under either Rule 9(b), Fed.R.Civ.P., or the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

*7 Section 11 states in pertinent part:
> [i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may sue--
> (1) every person who signed the registration statement....

15 U.S.C. § 77k. Section 11
> was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case.

*Herman & MacLean v. Huddleston,* 459 U.S. 375, 381-82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). "[A]ny person acquiring a security issued pursuant to a materially false registration statement" has a cause of action under Section 11 "unless the purchaser knew about the false statement at the time of acquisition." *DeMaria v. Andersen,* 318 F.3d 170, 175 (2d Cir.2003) (citation omitted).

Allegations that "material facts have been omitted" from a registration statement or "presented in such a way as to obscure or distort their significance" are sufficient to state a claim for violation of Section 11. *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 761 (2d Cir.1991) (citation omitted). Material facts may "include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 732 (2d Cir.1987) (citation omitted). The "central inquiry" in determining whether a statement is misleading under Section 11 is "whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment." *I. Meyer Pincus,* 936 F.2d at 761 (citation omitted); *see also DeMaria,* 318 F.3d at 180.

The plaintiffs have adequately alleged that the Registration Statement contained untrue statements of material fact in violation of Section 11. It is alleged that the Registration Statement overstated net income by at least $23.2 million, $19.3 million, $12.4 million, and $16.7 million, and overstated earnings per share (diluted) by at least $0.07, $0.05, $0.03, and $0.05, for the years ended December 31, 2000, 1999, 1998, and 1997, respectively. The Complaint alleges that in the years before the True North acquisition these overstatements had allowed IPG on several occasions to meet and exceed consensus expectations amongst analysts and had influenced investment analysts' ratings of IPG shares. It is alleged that market analysts repeatedly relied on

Westlaw.

Not Reported in F.Supp.2d                                                                                        Page 7
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

IPG's ability to meet and beat expectations when they gave IPG stock a favorable rating.

*8 The defendants make two arguments regarding the pleading standard for a Section 11 claim. They contend that the Complaint must include the "particularized allegations" required by the PSLRA to explain how misstatements would have been material to investors, [FN3] and since the gravamen of the Complaint sounds in fraud, that the Complaint must meet the requirements of Rule 9.

> FN3. The defendants do not cite to any provision of the PSLRA or to any caselaw applying the PSLRA to a Section 11 claim. The defendants' reference to the PSLRA is made in passing and without analysis. It is assumed that the argument refers to the requirements of 15 U.S.C. § 78u-4(b)(1).

Paragraph (b)(1) of the PSLRA requires particularity in pleading when a claim in a "securities fraud" action alleges that an untrue statement has been made. 15 U.S.C. § 78u-4(b). [FN4] Paragraph (b)(1)(B) includes the requirement that a complaint state with particularity all facts supporting an allegation made on information and belief. *Id.* It applies to any "securities fraud" action "arising under this title." *Id.* Paragraph (b)(1) applies to claims brought under the Exchange Act, and not to a Section 11 claim, which is not a securities fraud claim, and is brought under the Securities Act. *See In re Initial Pub. Offering Sec. Litig.,* 241 F.Supp.2d 281, 337-38 (S.D.N.Y.2003).

> FN4. Paragraph (b)(1) of 15 U.S.C. § 78u-4 provides:
> (b) *Requirements for securities fraud actions.*
> (1) Misleading statements and omissions. *In any private action arising under this title* in which the plaintiff alleges that the defendant--
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, *if an al-*
> *legation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.*
> 15 U.S.C. § 78u-4 (emphasis supplied).

Similarly, there is no requirement that a Section 11 claim comply with the requirements of Rule 9(b). [FN5] It is well established that Section 11 is a strict liability statute and does not require proof of fraud. *See, e.g., Herman,* 459 U.S. at 382 ("a § 10(b) plaintiff carries a heavier burden than a § 11 plaintiff. Most significantly, he must prove that the defendant acted with scienter, *i.e.,* with intent to deceive, manipulate, or defraud."). Since fraud is not an element of a Section 11 claim, Rule 9(b)'s requirements for the pleading of fraud do not apply. *See In re Initial Pub. Offering,* 241 F.Supp.2d at 398 n. 61, 399 (collecting cases). While some decisions in this district have imposed a requirement that a Section 11 pleading comply with Rule 9(b) when the complaint alleges a fraud, *see, e.g., In re Am. Bank Note Holographics, Inc. Sec. Litig.,* 93 F.Supp.2d 424, 440 (S.D.N.Y.2000), for the reasons already explained, that requirement is not appropriate when the statute under which the claim is pled does not sound in fraud. *See Swierkiewicz,* 534 U.S. at 513.

> FN5. Rule 9(b), Fed.R.Civ.P., provides in part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Defendants also argue that the Complaint's allegations are insufficient to plead materiality because (1) as investors were informed in the August 13 Call, the accounting errors had no impact on cash flow or any implications for future performance; and (2) since the exchange rate between IPG and True North was fixed and unaffected by stock price movements, a "slight" change in IPG's historical financial results could not have been material to shareholders voting on the proposed merger. A complaint fails to state a claim where no reasonable investor could have been misled by the misstatement. It cannot be said, taking the allegations of the Complaint as true, that no reasonable shareholder would have considered it important when voting on the True North acquisition to know of these prior errors in the reporting of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                  Page 8
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

IPG's financial results or to know the correct net income and earnings per share figures for the four years preceding the acquisition.

*9 The cases on which the defendants rely do not require a different conclusion. Several relate to the pleading of Section 10(b) claims. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 161-62 (2d Cir.2000); In re Westinghouse Sec. Litig., 90 F.3d 696, 715 (3d Cir.1996); Ferber v. Travelers Corp., 802 F.Supp. 698, 705, 708 (D.Conn.1992). Another addresses a motion for summary judgment. See Greenapple v. Detroit Edison Co., 468 F.Supp. 702 (S.D.N.Y.1979). Even under Section 10(b), however, a "complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question." Ganino, 228 F.3d at 162 (citation omitted); see also Halperin v. eBanker USA.COM, Inc., 295 F.3d 352, 359 (2d Cir.2002). As already noted, the motion to dismiss must be denied even under this standard.

2. Section 15

The Complaint pleads that defendants Dooner, Orr and Molz violated Section 15 by acting as control persons over those who are alleged to have violated Section 11. Section 15 of the Securities Act attaches liability to "[e]very person who, by or through stock ownership, agency, or otherwise, ... controls any person liable" under Section 11 of the Securities Act. 15 U.S.C. § 77o. To state a violation of Section 15, a plaintiff must plead (1) an underlying primary violation of Section 11 by the controlled person; and (2) the defendant's control over the primary violator. In re WorldCom, Inc. Secs. Litig., No. 02 Civ. 3288(DLC), 2003 U.S. Dist. LEXIS 8245, at *41 (S.D.N.Y. May 19, 2003).

The defendants move to dismiss the Section 15 claim on the ground that the plaintiffs have failed to plead an underlying Section 11 violation. Since the plaintiffs have adequately pleaded a claim under Section 11, the defendants' motion is denied.

B. Exchange Act Claims

1. Section 10(b) and Rule 10b-5

[2] The Complaint pleads that IPG and the Individual Defendants violated Section 10(b). The defendants contend that the Complaint does not adequately allege that they each acted with the scienter required by law.

Section 10(b) of the Exchange Act [FN6] is designed to protect investors by serving as a "catchall provision" which creates a cause of action for manipulative practices by defendants acting in bad faith. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Rule 10b-5, the parallel regulation, describes what constitutes a manipulative or deceptive device. 17 C.F.R. § 240.10b-5; see also Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir.1999). Plaintiffs' claims arise under Section 10(b) and Rule 10b-5.

> FN6. Section 10(b) provides that:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--...
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
> 15 U.S.C. § 78j(b).

To state a cause of action under Section 10(b) and Rule 10b-5 a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir.2003) (quoting Ganino, 228 F.3d at 161); see also Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir.2001) (citation omitted). Section 10(b) claims sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the PSLRA. See In re Scholastic Corp., 252 F.3d 63, 69-70 (2d Cir.2001).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

**\*10** "The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b-5, that the plaintiff must allege is an intent to deceive, manipulate or defraud." *Kalnit,* 264 F.3d at 138 (citation omitted). In the Second Circuit, plaintiffs alleging securities fraud have long been required to state with particularity "facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 812 (2d Cir.1996). When Congress passed the PSLRA it required that
> [i]n any private action arising under this chapter in which the plaintiff may recover money damages *only on proof that the defendant acted with a particular state of mind,* the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u-4(b)(2) (emphasis supplied). The PSLRA raised the nationwide pleading standard for securities fraud but did not alter the level of pleading previously required by the Second Circuit. *Kalnit,* 264 F.3d at 138; *Ganino,* 228 F.3d at 170; *Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000).

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito,* 47 F.3d at 52 (citation omitted); *see also Kalnit,* 264 F.3d at 138; *Rothman,* 220 F.3d at 90. The Second Circuit has identified four types of allegations that may support a strong inference of scienter:
> [W]here the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Novak,* 216 F.3d at 311 (citation omitted).

a. Motive and opportunity

"Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Novak,* 216 F.3d at 307 (citation omitted). General allegations that identify the same motives "possessed by virtually all corporate insiders" are not sufficient to create a strong inference of fraudulent intent. *Id.* Similarly, a company's desire to maintain a high bond or credit rating is not a sufficient motive for fraud since virtually every company desires to have a good rating. *Rothman,* 220 F.3d at 93. A desire to acquire other companies through the use of stock as consideration, however, may be a sufficient allegation of scienter in connection with misrepresentations or omissions that are alleged to have inflated the company's stock price. *Rothman,* 220 F.3d at 93; *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 573 & n. 2 (2d Cir.1982).

**\*11** Insider sales may serve as evidence of motive, but the plaintiff must allege that any such sales were unusual in some way. For example, the insider trading may be extensive. *See Novak,* 216 F.3d at 308. If one director engaged in insider sales, the court may consider whether other directors also sold or held their shares during the relevant period. *Acito,* 47 F.3d at 54. The amount of profit and the percentage of the defendant's holdings that were sold are also relevant. *In re Scholastic Corp.,* 252 F.3d at 74-75; *Rothman,* 220 F.3d at 94-95; *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 85 (2d Cir.1999).

b. Conscious misbehavior or recklessness

The pleading standard also will be satisfied if plaintiffs allege facts showing that the defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman,* 220 F.3d at 90 (citation omitted); *Kalnit,* 264 F.3d at 142. Pleadings have been found sufficient when they have "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kalnit,* 264 F.3d at 142 (citation omit-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00272-GMS    Document 48-5    Filed 05/26/2006    Page 11 of 16

Westlaw.

Not Reported in F.Supp.2d                                                                                                        Page 10
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
(Cite as: 2003 WL 21250682 (S.D.N.Y.))

ted). If plaintiffs rely on allegations that the defendants had access to facts contradicting their public statements, plaintiffs must "specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309 (citation omitted). Allegations of recklessness have also been sufficient where the allegations demonstrate that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Id. at 308. A violation of GAAP, however, standing alone, is insufficient. Id. at 309.

2. IPG

The plaintiffs contend that IPG's scienter is adequately alleged in two ways. First, they argue that there are adequate allegations of motive and opportunity based on IPG's campaign to acquire other companies, and the incentives that program gave IPG to inflate the price of its stock. Second, they contend that there are adequate allegations of conscious misbehavior and recklessness in connection with IPG's statements that it had adequate internal accounting controls in place.

a. Acquisition Campaign: Motive and Opportunity

The Complaint contains detailed allegations of IPG's multi-year program of growth through acquisition. Many of these acquisitions relied on IPG issuing its own shares and stock-for-stock transactions. While the simple purchase of one company by another may not ordinarily provide a sufficient allegation of a motive to commit fraud, a sustained and extensive plan to grow by acquisition, particularly through scores of acquisitions paid for with a company's stock, as alleged here, may.

*12 IPG argues that the Complaint does not adequately allege that the acquisition strategy was dependent on the price of its stock. The Complaint's allegations, which must be taken as true, describe the repeated use of IPG's own stock to make acquisitions. This is sufficient to allege the connection between the price of IPG's stock and the acquisitions.

IPG also contends that the Complaint does not describe any "coherent nexus" between the acquisitions and any fraudulent statement. What is alleged is a sustained multi-year program of acquisition and misstatements of financial results over the course of those same years. This had at least three identified benefits. Because of the inflated stock price, fewer shares of IPG stock had to be issued in connection with stock-for-stock acquisitions. Because fewer shares were issued, IPG suffered less stock dilution. Finally, the inflated earnings per share led to positive analyst reports. In these circumstances, there is no need to link each or any particular acquisition with a particular false financial report. The Complaint sufficiently alleges that the decision to grow by acquisition motivated IPG to inflate its reported earnings over that same period in order to have a higher stock price than it would otherwise have had.

The cases upon which IPG relies to support its argument that the plaintiffs have not sufficiently alleged a motive are inapposite. In Kalnit, 264 F.3d 131, the defendant was a company being acquired and the alleged motive was the desire to achieve the most lucrative proposal. Id. at 141. Salinger v. Projectavision, Inc., 972 F.Supp. 222 (S.D.N.Y.1997), involved private placements and not acquisitions. Id. at 232-33. In Glickman v. Alexander & Alexander Servs., Inc., No. 93 Civ. 7594(LAP), 1996 WL 88570 (S.D.N.Y. Feb.29, 1996), the defendant engaged in one acquisition that was paid for by cash. Id. at *9.

b. Representation Regarding Controls: Conscious Misbehavior or Recklessness

[3] The plaintiffs contend that they have adequately alleged IPG's scienter through allegations that it falsely and recklessly represented in its annual reports from 1997 to 2001, that it had adequate internal accounting controls. The plaintiffs rely on the following passage from those reports:
> Management maintains a system of *internal accounting controls* which provides reasonable assurance that, in all material respects, assets are maintained and accounted for in accordance with management's authorization, and transactions are recorded accurately in the books and records. To assure the effectiveness of the internal control system, the organizational structure provides for defined lines of responsibility and delegation of authority.

(emphasis supplied). The plaintiffs contend that this representation was false since IPG admitted on August 13, 2002, that it did not have procedures in place to reconcile inter-



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
(Cite as: 2003 WL 21250682 (S.D.N.Y.))

Page 11

company balances properly until early 2002, and PwC found in 2002 that IPG had a material weakness in those internal accounting controls that relate to the processing and monitoring of intercompany transactions.

*13 While it is true that PwC found a material weakness in IPG's processing and monitoring of intercompany accounts, it is not true that the Complaint alleges that IPG admitted that it did not have procedures in place to reconcile such accounts or to do it properly. What the Complaint reports is a statement by IPG that it had put in place new accounting procedures in early 2002, after having recognized the need to address the issue of intercompany accounts.

The Complaint does not contain sufficient allegations that IPG knew with respect to any of its annual reports between 1997 and 2001, that its description of its internal accounting controls was false, or that it was reckless with respect to those representations. There is, therefore, no strong inference of scienter based on the representation about accounting controls.

3. The Individual Defendants

The plaintiffs rely on two arguments regarding allegations of scienter for the Individual Defendants. For four of the defendants, they argue that their sales of stock over the course of several years is a sufficient allegation of motive and opportunity. With respect to each Individual Defendant they rely on a generalized assertion that their role in corporate affairs must have given them knowledge that the financial results of IPG were incorrectly reported in each quarter.

a. Stock Sales

[4] The plaintiffs have not pleaded that the sales of IPG stock by any of the four Individual Defendants was sufficiently unusual to provide a strong inference of scienter. For three of the four defendants, this conclusion is quickly explained. Dooner sold 50,000 shares in 1998. Even with that sale, his holdings more than doubled between 1997 and 1998, and continued to grow in every year that followed. Beard sold 25,000 shares in 1998, but still held roughly twice as many shares as the year before, and by 2000, held over 500,000 more shares than he held in 1998. Studley sold 2,214 shares in 1997 and 1998. His net holdings for 1997, 1998, and 1999, however, remained constant at about 9,000 shares.

The fourth defendant, Geier, sold over 500,000 shares between 1998 and 2000. His largest sale was of approximately 250,000 shares in 1999, a sale that represented almost 20% of his holdings. Even with that sale, his 1999 holdings were only slightly smaller than his net 1998 holdings and were substantially smaller than his net holdings in 2000. By 2000, Geier owned approximately 700,000 shares more than he had in 1999. Given the plaintiffs' theory of the fraud, which alleges a multi-year program of deceit and stock price inflation, Geier's sales are not sufficiently unusual when placed in the context of his entire trading history in IPG stock.

b. Knowledge of Corporate Affairs

[5] The plaintiffs argue that the roles of the Individual Defendants in IPG's affairs gave them an intimate knowledge of corporate affairs, and imposed on each of them the duty to be familiar with IPG's finances. When coupled with the length of time over which IPG's financial results were misstated, and the extent of corruption within McCann, they argue that they have sufficiently alleged that each of the Individual Defendants knew of the financial misreporting by IPG or was at least reckless regarding it.

*14 These allegations do not meet the heightened pleading requirements imposed by the PSLRA. The plaintiffs have not pointed to any document, study, or inquiry that any of the Individual Defendants was required to review or make as an IPG officer that would have put the defendant on notice of the specific failings within the subsidiaries' accounting procedures that led to the IPG Restatement. Generalized allegations about their role in the corporation or the length of time that the accounting problems lasted are not a substitute for the particularized pleading required by the law.

The plaintiffs place special emphasis on two of the Individual Defendants, Dooner and Orr, and the dramatic revelations by the McCann Colombia CFO and the McCann New York Controller recited in the Complaint. The plaintiffs argue that the culture of pressure, falsification and misrepres-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00272-GMS    Document 48-5    Filed 05/26/2006    Page 13 of 16

Westlaw.

Not Reported in F.Supp.2d                                                                                                Page 12
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

entation within McCann that these two witnesses describe could not have gone unnoticed by IPG officers, and that two of them were directly connected to it. Dooner was the McCann CEO between 1995 and March 2000, before becoming an IPG officer. The McCann Colombia CFO provided direct notice to Orr of fraud, when he sent him an email describing the problems at McCann Colombia.

The recitations regarding McCann New York and Colombia are very serious. They provide a basis for finding that there was strong pressure from corporate management, at least within McCann, to falsify financial reports where it was necessary in order to achieve budget targets. It is fair to infer that the primary beneficiaries of the practice would have been those executives whose careers were enhanced by meeting their budgets, and IPG, the entity that was reporting the financial results on a consolidated basis.

The bulk of the Restatement, however, is unrelated to the problems described by the two informants. The Restatement is for $181.3 million. $101.1 million is attributed to intercompany charges "principally" in McCann Europe. [FN7] $44 million relates to an understatement of liabilities from 1996 and earlier at subsidiaries other than McCann. The remaining category, therefore, is the only category that could provide the link between the informants' allegations and the necessary scienter. This category, amounting to $36.3 million, is composed of insurance proceeds, and write-offs of receivables and other costs that had been capitalized rather than expensed. The Complaint does not contain allegations that would fairly support an inference that these errors were intentional, much less ordered by or known to any of the Individual Defendants.

> FN7. The only description that either of the informants gives of the intercompany reconciliation problem is the one given by the McCann New York Controller, who made an adjustment to account for the difficulty of doing the reconciliation accurately.

The cases on which the plaintiffs rely do not lead to a different conclusion. In fact, *Stevelman, 174 F.3d 79,* warns against allegations of "fraud by hindsight" and cautions that repeated misrepresentations may reflect mismanagement, not fraud. *Id. at 85.* In *Novak, 216 F.3d 300,* the defendant was alleged to have actual knowledge of the facts when giving false explanations to the public. *Id. at 311-12.* In *Kelley v. CINAR Corp., 186 F.Supp.2d 279 (E.D.N.Y.2002),* the CFO's job required him to be familiar with the company's tax liability which, along with other evidence, supported the inference that he knew of the alleged tax fraud scheme. *Id. at 317.* In *Holographics, 93 F.Supp.2d 424,* the court found the Section 10(b) claim adequately pleaded against a controller and CFO when they were uniquely situated to control the revenue recognition procedures of the company and these revenues were "radically" inflated for two years. *Id.* at 448. Here, the accounting errors that led to the Restatement are not alleged to have been within IPG itself, but instead to have occurred within various subsidiaries and to be due to diverse failures. In these circumstances, the plaintiffs have failed to allege sufficient facts from which to draw an inference that any of the Individual Defendants was aware of or reckless with respect to the misstatements of financial results contained in IPG's quarterly or annual reports.

4. Section 20(a)

*15 The plaintiffs' final claim is for a violation of Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a). Section 20(a) creates a cause of action against defendants alleged to have been "control persons" of those engaged in the primary securities fraud. The section provides:

> *Every person who, directly or indirectly, controls any person liable under any provision of this chapter* or of any rule or regulation thereunder *shall also be liable jointly and severally* with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person acted in good faith* and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). A plaintiff must plead only the existence of a primary violation by a controlled person and the direct or indirect control of the primary violator by the defendant in order to state a claim under Section 20(a). *In re WorldCom, Inc. Secs. Litig.,* 2003 U.S. Dist. LEXIS 8245, at *59.

The defendants' only challenge to the claim brought under Section 20(a) is that the plaintiffs have not sufficiently alleged an underlying violation of Section 10(b). Since the plaintiffs have sufficiently alleged an underlying violation

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 13
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

of Section 10(b) by IPG, the defendants' argument fails and the motion is denied.

*Conclusion*

The defendants' motion to dismiss is granted in part. The defendants' motion to dismiss Counts I, II and IV of the Complaint is denied. The defendants' motion to dismiss Count III is granted as to all of the Individual Defendants and is denied as to IPG.

SO ORDERED:

Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23474940 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Response to Plaintiffs' Motion for Class Certification (Sep. 26, 2003)

• 2003 WL 23671812 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Response to Plaintiffs' Motion for Class Certification (Sep. 26, 2003)

• 2003 WL 23951482 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (Jul. 11, 2003)

• 2003 WL 23474898 (Trial Pleading) Answer of Defendants to the Consolidated Amended Complaint for Violations of Federal Securities Laws (Jun. 30, 2003)

• 2003 WL 23671810 (Trial Pleading) Answer of Defendants to the Consolidated Amended Complaint for Violations of Federal Securities Laws (Jun. 30, 2003)

• 2003 WL 23474955 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (Feb. 28, 2003)

• 2003 WL 23671808 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (Feb. 28, 2003)

• 2003 WL 23474939 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint (Feb. 07, 2003)

• 2003 WL 23671807 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint (Feb. 07, 2003)

• 2002 WL 32495988 (Trial Motion, Memorandum and Affidavit) Memorandum of the McClung Lead Plaintiffs in Opposition to Competing Motions for Appointment as Lead Plaintiff (Oct. 29, 2002)

• 2002 WL 32595891 (Trial Motion, Memorandum and Affidavit) Memorandum of the McClung Lead Plaintiffs in Opposition to Competing Motions for Appointment as Lead Plaintiff (Oct. 29, 2002)

• 2002 WL 32495972 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of the Motion of Private Asset Management to be Appointed Lead Plaintiff, for Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel and in Opposition to Competing Motions (Oct. 28, 2002)

• 2002 WL 32496077 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Competing Motions and in Further Support of Motion of the Fletcher Plaintiffs to be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel (Oct. 28, 2002)

• 2002 WL 32595896 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Competing Motions and in Further Support of Motion of the Fletcher Plaintiffs to be Appointed Lead Plaintiff and for Approval of Lead Plaintiff's Selection of Lead Counsel (Oct. 28, 2002)

• 2002 WL 32595899 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Further Support of the Motion of Private Asset Management to be Appointed Lead Plaintiff, for Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel and in Opposition to Compet-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

Page 14

ing Motions (Oct. 28, 2002)

• 2002 WL 32768742 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of George Fischer in Opposition to the Motions of (i) International Union of Operating Engineers Management, Inc. (ii) Private Asset Management, Inc. (iii) Southern Michigan Bank & Trust and (iv) Jack Nauheim, for Consolidation, App ointment as Lead Plaintiffs and Approval of Selection of Lead Counsel (Oct. 26, 2002)

• 2002 WL 32595904 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to the Competing Lead Plaintiff Motions and in Further Support of the Motion of International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware for Consolidation, Appointment as Lead Plaint iff and for Approval of Selection of Lead Counsel (Oct. 23, 2002)

• 2002 WL 32496062 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of the Fletcher Group Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiffs and Approval of Selection of Lead Counsel (Oct. 16, 2002)

• 2002 WL 32595889 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of the Fletcher Group Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiffs and Approval of Selection of Lead Counsel (Oct. 16, 2002)

• 2002 WL 32496079 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of the McClung Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel and Liaison Counsel (Oct. 15, 2002)

• 2002 WL 32595884 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of the Motion of International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware for Consolidation, Appointment as Lead Plaintiff and for Approval of Selection of Selection of Lead Counsel (Oct. 15, 2002)

• 2002 WL 32595887 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of the McClung Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel and Liaison Counsel (Oct. 15, 2002)

• 2002 WL 32768738 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion of Private Asset Management to Consolidate Actions, to be Appointed Lead Plaintiff, and for Approval of Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel (Oct. 15, 2002)

• 2002 WL 32768741 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion of the Fletcher Group Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiffs and Approval of Selection of Lead Counsel (Oct. 15, 2002)

• 2002 WL 32496076 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of the Motion of the Proposed Fischer Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiffs and Approval of Selection of Lead Counsel (Oct. 14, 2002)

• 2002 WL 32595894 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of the Motion of the Proposed Fischer Lead Plaintiffs for Consolidation, Appointment as Lead Plaintiffs and Approval of Selection of Lead Counsel (Oct. 14, 2002)

• 2002 WL 32495918 (Trial Pleading) Class Action Complaint for Violations of Federal Securities Laws (Aug. 15, 2002)

• 2002 WL 32595882 (Trial Pleading) Class Action Complaint for Violations of Federal Securities Laws (Aug. 15, 2002)

• 1:02cv06527 (Docket) (Aug. 15, 2002)

• 2002 WL 32496078 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Jack Nauheim's Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (2002)

• 2002 WL 32595885 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Jack Nauheim's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 15
Not Reported in F.Supp.2d, 2003 WL 21250682 (S.D.N.Y.)
**(Cite as: 2003 WL 21250682 (S.D.N.Y.))**

Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.