# TAB 1

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)
**2004 WL 1753385 (N.D.Cal.)**

**C**Khan v. Park Capital Securities, LLC
N.D.Cal.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
M. Saleem KHAN, Plaintiff,
v.
PARK CAPITAL SECURITIES, LLC, et al.,
Defendants.
**No. C 03 00574 RS.**

Aug. 5, 2004.

Arshad Ahmed, Javed I. Ellahie, The Ellahie Law
Firm, San Jose, CA, for Plaintiff.
Gregory K. Jung, Piper Rudnick LLP, Cara L.
Meredith, Julie A. Kole, Keesal, Young & Logan,
San Francisco, CA, Henry Isaac Bushkin, Huron
Maki & Johnson, William T. Bisset, Hughes Hubbard
& Reed LLP, Los Angeles, CA, Bruce A.
Schoenberg, David Schrader, Schrader &
Schoenberg, Derek J.T. Adler, Hughes Hubbard &
Reed One Battery Park Plaza New York, CA,
Victoria Pauline Lane, Hughes Hubbard & Reed
LLP, New York, NY, for Defendants.

ORDER DENYING DEFENDANT WILDE'S
MOTION FOR SANCTIONS AND GRANTING
MOTION TO ENTER FINAL JUDGMENT

SEEBORG, Magistrate J.

I. INTRODUCTION

*1 Defendant Jason Wilde ("Wilde"), a
broker/account executive employed by Defendant
Park Capital Securities, LLC ("PCS"), filed a motion
for sanctions against Plaintiff Saleem Khan ("Khan")
under the Private Securities Litigation Reform Act of
1995 (15 U.S.C. § 78u-4) and Federal Rule of Civil
Procedure 11 ("Rule 11"). Wilde also requested entry
of final judgment under Federal Rule of Civil
Procedure 54(b). The motion was fully briefed and
heard by the Court on July 14, 2004. At that time, the
Court permitted the parties to submit additional
briefs. Based on all papers filed to date, the oral
argument of counsel, and the subsequent papers filed
by both parties, the Court denies the motion for

sanctions and grants the motion for entry of final
judgment for the reasons set forth below.

II. BACKGROUND

In approximately October 2001, Khan opened a
securities brokerage account at PCS. Khan alleges
that Anthony Johnson ("Johnson"), a broker/account
executive employed by PCS induced and pressured
him into opening his account by making false
promises, such as guaranteeing that Khan would not
lose money and promising to charge commissions
only profitable sales. Khan contends that, after
receiving his first trade confirmation, he noticed
discrepancies between what his broker, Johnson, had
told him and what had actually transpired with
respect to the purchase of a number of Ciena
Corporation stock shares. Despite such discrepancies,
Khan continued to deposit money with PCS for the
purchase of various securities. Again, with respect to
these purchases, Khan alleges that several
discrepancies arose between what his brokers told
him had occurred and what was actually reflected on
his statements. As a result, Khan contends that all of
his stock purchases were secured without his consent
and through fraudulent misrepresentations by
defendants.

In February 2003, Khan filed a complaint against all
defendants whom he believed were involved with his
accounts at Park Capital. At the urging of defense
counsel, Khan agreed to dismiss certain claims that
lacked legal support and to file an amended
complaint. The amended complaint alleged fourteen
(14) claims for relief, twelve (12) of which were
alleged against both Wilde and Johnson premised on
their purported violations of the Securities Act of
1933, as well as § 10(b) of the Securities Exchange
Act of 1934. The amended complaint also pled
several state law claims for relief, including breach of
fiduciary duty, breach of contract, common law
fraud, and conspiracy. Both Wilde and Johnson
moved to dismiss the amended complaint filed
against them. With respect to Johnson, the Court
granted in part and denied in part the motion to
dismiss and granted Khan an opportunity to amend
some of his claims against Johnson.[FN1]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)
**2004 WL 1753385 (N.D.Cal.)**

FN1. Khan subsequently amended his complaint and Johnson again moved to dismiss. That motion was also granted in part and denied in part and this action is proceeding against Johnson, as well as other defendants.

As to Wilde, the Court granted the motion to dismiss Khan's amended complaint without leave to amend. The Court found that the complaint was completely devoid of any factual allegations which connected Wilde to Khan. In fact, Khan admitted that he did not have any dealings with Wilde and that he did not even know Wilde. *See* Lane Declaration at ¶ 4 and Exh. C. Moreover, Wilde submitted a declaration, filed under the penalty of perjury, confirming that he had absolutely no involvement in the handling of Khan's account. *Id.* at ¶ 3 and Exh. B. The only basis upon which Khan premised his complaint against Wilde was the fact that Wilde's name appeared on one of Khan's "Trade Confirmation" activity slips.[FN2] Wilde explained, however, that he did not know how or why his name appeared on that slip and denied any involvement with Khan's account. *Id.* Therefore, he requested that Khan voluntarily withdraw the complaint filed against him. *Id.* at ¶ 6 and Exh. E. Wilde also notified Khan that, if the claims were not withdrawn and the motion to dismiss was granted, Wilde would seek sanctions under Rule 11 against Khan for the filing of claims which lacked any legal or factual foundation. *Id.* Nevertheless, Khan refused to dismiss Wilde.

FN2. In his supplemental brief, Khan submitted copies of documents in which Wilde's name appears on at least eleven (11) trade confirmations, as well as on three separate monthly statements. Khan requests that the Court consider this evidence, pursuant to the holding in *In Re Keegan Management Co., Sec. Litigation,* 78 F.3d 431, 434 (9th Cir.1996) (evidence discovered after filing of complaint rendered complaint nonfrivolous and barred Rule 11 sanctions). Wilde objects to the submission and consideration of this evidence on the basis that it was filed without leave of Court, after the hearing was held in this matter. The Court agrees with Wilde and sustains his objection. Although the Court permitted supplemental briefing in this case, it directed the parties to address solely the issue of the reasonableness of the fees requested by Wilde.

*2 Wilde now seeks sanctions in the amount of the attorneys' fees and costs he was forced to incur to defend himself against Khan's baseless securities fraud allegations. Wilde's motion for sanctions against Khan's counsel, the Ellahie Law Firm ("Ellahie"), is filed pursuant to 15 U.S.C. § 78u-4 and Fed.R.Civ.Pro. 11. In addition, since all claims against Wilde have been dismissed, he requests that the Court enter final judgment in his favor and against Khan, pursuant to Fed.R.Civ.Pro. 54(b). Khan opposes the request for sanctions, but does not object to the entry of final judgment as to Wilde.

### III. STANDARDS

Federal Rule of Civil Procedure 11 governs the filings of pleadings, motions, and other papers with the Court. The purpose of Rule 11 is to deter dilatory pretrial tactics and to streamline litigation by excluding baseless filings. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Golden Eagle Distrib., Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1542 (9th Cir.1986).Rule 11(b) of the Federal Rules of Civil Procedure requires that an attorney who is presenting a pleading or motion to the court certify that to the best of that attorney's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)
**2004 WL 1753385 (N.D.Cal.)**

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed.R.Civ.P. 11(b).

15 U.S.C. § 78u-4(c)(1), enacted as part of the Private Securities Litigation Reform Act ("PSLRA"), requires the district court to make Rule 11 findings upon the termination of a private securities fraud action. Once that occurs and the prevailing party brings a sanctions motion, the PSLRA requires the Court to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion."15 U.S.C. § 78u-4(c)(1). In addition, "[i]f the court makes a finding ... that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11..."15 U.S.C. § 78u-4(c)(2). The presumptive sanction for "substantial failure of any complaint to comply with any requirement of Rule 11(b)... is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action."15 U.S.C. § 78u-4(c)(3)(A)(ii). The presumptive sanction can be rebutted only upon proof that "the award of attorneys' fees and other expenses will impose an unreasonable burden ... and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are imposed."15 U.S.C. § 78u-4(c)(3)(B)(I).

## IV. DISCUSSION

A. *Wilde's Motion for Sanctions*

*3 The PSLRA applies to this case since some of Khan's claims are filed under the federal securities laws. As noted, the PSLRA requires the Court to determine whether the four standards imposed by Rule 11(b) have been met by the non-moving party.

1. *Rule 11(b)(1)*

Rule 11(b)(1) states that the pleading must not be

"presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation[.]"Fed.R.Civ.P. 11(b)(1). Defendant Wilde does not contend, nor is there any evidence before the Court, that Khan or Ellahie filed this action for any improper purpose, such as to harass or annoy defendant Wilde, pursuant to Fed.R.Civ.P. 11(b)(1).

2. *Rule 11(b)(2)*

Rule 11(b)(2) states that the claims, defenses, and other legal contentions presented in the pleading must be "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]"Fed.R.Civ.P. 11(b)(2). In order to establish a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5(b)), a plaintiff must allege: 1) a misrepresentation or omission of a material fact; 2) reliance; 3) scienter; and 4) resulting damages. *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996). Similarly, in order to state a claim for common law fraud under California law, the plaintiff must allege facts supporting each of the following elements: 1) that the defendant made a false representation; 2) that the defendant had knowledge of the falsity; 3) that the defendant intended to induce reliance; 4) that the plaintiff actually and reasonably relied; and 5) that the plaintiff suffered actual damages as a result. *Crocker-Citizens Nat'l Bank v. Control Metals Corp.,* 566 F.2d 631, 636 (9th Cir.1977).

In support of his motion for sanctions, Wilde notes that the only reference to him in the entire amended complaint appears on a shared representative account opened on Khan's behalf. Wilde also contends that there is not a single instance in which he is alleged to have made a false misrepresentation. In fact, as conceded by Khan, Wilde made no representations to him whatsoever because there was no direct relationship between the two parties. Wilde also argues that Khan's claims were not warranted by existing law because: 1) he could not have been liable for making a misrepresentation to Khan because he never communicated with him in any form; 2) he could not have been liable for omitting to disclose material information to Khan because he had no

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)
**2004 WL 1753385 (N.D.Cal.)**

relationship with Khan and, therefore, had no duty to disclose; 3) Khan could not have relied on any statement made by Wilde; and, 4) Wilde could not have been secondarily liable to Khan since no secondary or "aiding and abetting liability" is permitted under Section 10(b).*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).*

*\*4 In response, Ellahie argues that where a plaintiff alleges a fraudulent omission, "positive proof of reliance is not a prerequisite to recovery."*Affiliated Ute Citizens v. U.S., 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).* Ellahie also notes that, at the time the complaint was filed, it was unclear whether the PSLRA applied to non-class action lawsuits and to brokers and their employees. With respect to these two points of law, Ellahie is correct. Since the complaint alleges both fraudulent misrepresentations as well as omissions, Khan need not show positive proof of reliance. *Id.* In addition, to date, the Ninth Circuit has not addressed the issue of whether the PSLRA applies to non-class action lawsuits.[FN3]

> FN3. The circuits which have examined the issue have concluded that the PSLRA applies to non-class action suits. *See.e.g.,Simon DeBartolo Group, L.P. v. The Richard E. Jacobs Group, Inc., 985 F.Supp. 427, 430 (S.D.N.Y.1997)* ("[T]he case law which has developed under the PSLRA demonstrates that Section 21D(c) applies in 'any private action' under the 1934 Act, not just class actions"); *Rivera v. Clark Melvin Securities Corp., 59 F.Supp.2d 280 (D.P.R.1999).*

Further, Ellahie contends that a valid argument exists in this case for the application of Second as opposed to Ninth Circuit pleading rules since PCS and the individual defendants all reside in New York. Had that circuit's approach been applied, Ellahie states that it would be permissible to allege facts based on "motive and opportunity," rather than the stringent pleading standard applied in this Circuit in *In Re Silicon Graphics Inc. Securities Litigation, 183 F.3d 970 (9th Cir.1999).*[FN4] Ellahie argues that Wilde had both motive and opportunity to manipulate stock statements and trades as an account executive listed

on Khan's account for his own personal benefit. Ellahie further supports his argument by citing a Ninth Circuit case which states that the Court must consider "whether the total of the plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness."*Broudo v. Dura Pharmaceuticals, Inc., 339 F.3d 933 (9th Cir.2003).* Ellahie contends, based on this case, that the Court must consider the fact that Wilde has been previously accused of fraud while working at PCS with Johnson.

> FN4. For example, the Second Circuit requires that "a plaintiff must either (a) allege facts to show that 'defendants had both motive and opportunity to commit fraud' or (b) allege facts that 'constitute strong circumstantial evidence of conscious misbehavior or recklessness." ' *Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2nd Cir.1999).*

While it is a close question, on balance Ellahie has managed to show that the claims asserted in the amended complaint against Wilde, at the time that they were filed, were either warranted by existing law or by a nonfrivolous argument for the extension of existing law. Although the Court ultimately ruled against Khan on all substantive legal questions presented, Ellahie appears to have had a good faith belief that a claim against Wilde could be advanced consistent with the evolving pleading requirements under the federal securities laws. For example, since the Ninth Circuit has not directly addressed whether the PSLRA applies to non-class action securities fraud lawsuits, Ellahie is correct in stating that the Court could have agreed with it and declined to apply the PSLRA to this case. For these reasons, Khan and Ellahie have met the standard imposed by Rule 11(b)(2).

### 3. *Rule 11(b)(3)*

Rule 11(b)(3) provides that the allegations and other factual contentions must "have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]"Fed.R.Civ.P. 11(b)(3). This portion of Rule 11, frankly, poses the greatest hurdle for Khan and Ellahie to overcome,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)
**2004 WL 1753385 (N.D.Cal.)**

Page 5

especially in light of the fact that Khan conceded he had no direct dealings with Wilde. Nevertheless, Khan and Ellahie correctly note that, where much of the evidence is in the hands of the defendant, some courts performing a Rule 11 analysis have declined to impose sanctions on the plaintiff. See *DeMarco v. Depotech Corp.* 131 F.Supp.2d 1185, 1188 (S.D.Ca.2001) (in a PSLRA case, sanctions were inappropriate where the court found that plaintiff had conducted significant factual research and presented reasonable if not always persuasive legal arguments); *Lebovitz v. Miller,* 856 F.2d 902, 906 (7th Cir.1988) (in a RICO case, the Seventh Circuit found that sanctions were inappropriate against plaintiff who sued a fellow bidder because there was "little doubt that the sequence of events which unfolded during the bidding process would permit a reasonable inference that some wrongdoing was afoot."); *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90 (3rd Cir.1988) (in a conspiracy case, sanctions were not granted because the plaintiff "knew facts that supported a reasonable suspicion of cooperation between defendants and other parties"). Here, information regarding how and by whom Khan's stock transactions were executed and processed remained with the defendants.

*5 In addition, in a PSLRA action, "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B). Again, had the Court determined that the PSLRA was not applicable to this case, Khan and Ellahie argue that discovery would have been commenced immediately and all of the facts surrounding Wilde's involvement or lack thereof would have been disclosed. However, since discovery was stayed, Ellahie was forced to rely solely on his pre-filing investigation of Wilde to support the allegations against him. Ellahie had discovered that the NASDAQ was investigating PCS and that such investigation had revealed a pattern in which current PCS employees seemed to move together and operate under the name of "new" brokerage houses. Ellahie also discovered that Johnson was the subject of a disciplinary proceeding. He then noticed that Wilde's name appeared on a stock trade but, when questioned, neither Khan nor Wilde could explain why or how that occurred. In addition, Khan informed Ellahie that many

discrepancies existed between what Johnson had told him had happened and what was reflected on Khan's monthly statements. Moreover, Khan and Ellahie knew that PCS was a small, boutique firm.

The Ninth Circuit has declined to impose sanctions where the complaint is not so lacking in plausibility as to make counsel's decision to certify it subject to sanctions under Fed.R.Civ.P. 11. For instance, in a copyright infringement action brought against Banana Republic, although the Court concluded that The Gap should not have been named as a defendant, plaintiff was not sanctioned because the action was not so "baseless" or "lacking in plausibility" as to warrant sanctions. *Rachel v. Banana Republic Inc.,* 831 F.2d 1503, 1508 (9th Cir.1987). In that case, plaintiff's counsel argued that it was reasonable for him to include The Gap as a defendant because it appeared to him that The Gap was intimately involved in financing and guiding Banana Republic, that the two corporations share common officers and counsel, that the decision to infringe was made by officers of both corporations, and that he received a response on The Gap letterhead when he initially wrote to Banana Republic to allege copyright infringement. *Id.* Based on these facts, the Ninth Circuit reversed the district court's decision to award sanctions. *Id.*

Similarly, the Ninth Circuit declined to award sanctions in a RICO case where it held that plaintiff's claim, though without substantial support, was supported by defendant's sudden closing of its business which the Circuit interpreted as circumstantial evidence of a possible earlier undisclosed plan to shutdown. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466 (9th Cir.1987). In addition, plaintiff provided routine business correspondences and evidence of individual assurances to support its claim, although the Ninth Circuit ultimately agreed that no reasonable trier of fact could infer fraud from such evidence. *Id.* at 1471.

*6 In this instance, Ellahie argues that he was not afforded an opportunity to conduct discovery to find further evidence to support Khan's allegations against Wilde since the PSLRA stays discovery once the opposing party files a motion to dismiss. To support his claim that the allegations were likely to have

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)
**2004 WL 1753385 (N.D.Cal.)**

evidentiary support had further discovery occurred, Ellahie points out that his investigation has revealed a pattern in which Wilde and Johnson seem to move together and operate at different brokerage houses during the same periods of time. Ellahie also claims that Wilde's broker registration was terminated as of July 14, 2003 and that he is currently under investigation by the NASDAQ regulatory authority.

While those facts are less than compelling, their presence does support Ellahie's suspicion that Wilde was involved in the alleged fraud surrounding his PCS account. Ellahie tried to determine why Wilde's name was on a Khan transaction slip by asking Wilde. Counsel also spoke with the SEC and determined that a prior complaint had been filed against Wilde. Accordingly, like the plaintiffs in the *Rachel* and *California Architectural Building Products, Inc.* cases, where the plaintiffs had based their unsuccessful claims on several facts, Khan and Ellahie viewed several circumstantial events in the context of what they knew had occurred with respect to Johnson and inferred that "wrongdoing was afoot." *Lebovitz,* 856 F.2d at 906. Although the more prudent course of action for Ellahie to take would have been to initiate an action against PCS and later amend the claims to include Wilde should evidence be found through discovery that directly implicated him, Ellahie feared that the statute of limitations would expire and that Khan would lose any claim he might have against Wilde.

Rule 11 is not intended to permit sanctions simply because the court decides that the lawyer made the wrong decision. *Golden Eagle Distrib. Corp. v. Burroughs Corp.,* 801 F.2d 1531, 1536 (9th Cir.1986). Although Khan's claims against Wilde lack evidentiary support, they are not so "baseless" or "lacking in plausibility" as to warrant sanctions. *Rachel,* 831 F.2d at 1508. Accordingly, the Court finds that Ellahie and Khan conducted a reasonable, albeit minimal, inquiry into the facts of the case prior to filing the complaint against Wilde and, therefore, meet the Rule 11(b)(3) standard.

### 4. *Rule 11(b)(4)*

Rule 11(b)(4) states that the denials of factual contentions must be "warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief."Fed.R.Civ.P.

11(b)(4).Rule 11(b)(4) does not apply in this case because neither Khan nor Ellahie are denying any factual contentions.

### B. *Wilde's Motion for Entry of Judgment*

Wilde requests that the Court enter final judgment in his favor and against Khan, pursuant to Federal Rule of Civil Procedure 54(b).Rule 54(b) provides that

*7 [w]hen more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Fed.R.Civ.P. 54(b).

The Supreme Court has outlined a two step process to be undertaken in deciding Rule 54(b) motions. First, the district court must determine whether there has been a "final judgment" with respect to the moving party, which the Court defined as "an ultimate disposition of an individual claim entered in the course of a multiple claims action."*Curtiss-Wright Corp. V. General Elec. Co.,* 446 U.S. 1, 7-8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980) (quoting *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 436, 76 S.Ct. 895, 100 L.Ed. 1297 (1956)). Second, the district court must determine whether there is any just reason for delay in entering judgment. *Id.* at 8. In deciding whether there are just reasons for delay, a district court "must take into account judicial administrative interests as well as the equities involved," and can consider "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals."*Id.* at 8. In addition, the Local Rules provide that "[i]n any private action subject to ...15 U.S.C. § 78u-4(c)(1), the findings required thereunder shall be entered by separate order; until entry of such order, the Clerk shall not enter judgment in the action."Civil L.R. 58-1.

Since all claims against Wilde have been dismissed without granting Khan leave to amend his complaint,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)
**2004 WL 1753385 (N.D.Cal.)**

Page 7

the first part of the *Sears* test is satisfied. Taking into account the judicial administrative interests as well as the equities involved, as required by the second portion of the *Sears* test, the Court finds there is no just reason for delay in entering judgment for Wilde since all claims against him have been dismissed. In addition, as noted above, Khan does not oppose the entry of judgment in favor of Wilde at this time.

### V. CONCLUSION

For the reasons set forth herein, the Court denies Wilde's motion for sanctions and grants the motion for entry of final judgment with respect to Wilde. A separate judgment will be entered in favor of Wilde and against Khan.

N.D.Cal.,2004.
Khan v. Park Capital Securities, LLC
Not Reported in F.Supp.2d, 2004 WL 1753385 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2



Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
2000 WL 116082 (N.D.Ill.)

▷Smithkline Beecham Corp. v. Apotex Corp.
N.D.Ill.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
SMITHKLINE BEECHAM CORPORATION and
BEECHAM GROUP, P.L.C., Plaintiffs,
v.
APOTEX CORP., APOTEX, INC., and
TORPHARM, INC., Defendants.
No. 98 C 3952.

Jan. 24, 2000.

MEMORANDUM OPINION

KOCORAS, District J.
*1 Before the Court are the following motions: (1)
Plaintiffs' Motion to Compel Defendant Apotex, Inc.
to Produce Discovery; (2) Defendants' Motion to
Amend their Answer and Affirmative Defenses; and
(3) Defendants' Motion to Compel Plaintiffs to
Testify on Topics 2 and 15-19 of Defendants' Rule
30(b)(6) Notice. For the reasons set forth below, we
rule as follows: (1) Plaintiffs' Motion to Compel is
granted in full; (2) Defendants' Motion to Amend
their Answer and Affirmative Defenses is granted;
and (3) Defendants' Motion to Compel is granted in
part and denied in part.

BACKGROUND

On June 26, 1998, Plaintiffs SmithKline Beecham
Corporation and Beecham Group, p.l.c. (collectively
"SmithKline") filed a one-count patent infringement
complaint against Defendants Apotex Corp., Apotex,
Inc. and TorPharm, Inc. (collectively "Defendants").
SmithKline seeks an order barring FDA approval of
the Defendants' proposed product until the expiration
of SmithKline's patent, and also barring Defendants
from manufacturing, using or selling their product
until the expiration of SmithKline's patent.

The suit claims that pursuant to 35 U.S.C. §§ 271(b),
271(e) and 281-283, Defendants infringed Patent No.
4,721,723 ("the '723 Patent"), which the United
States Patent and Trademark Office granted Beecham

on January 26, 1988 for an invention called "Anti-
Depressant Crystalline Paroxetine Hydrochloride
Hemihydrate." Beecham eventually assigned the
patent to SmithKline, which markets the paroxetine
as a pharmaceutical drug, Paxil.

Defendant Apotex, Inc. is a corporation organized
under the laws of the Dominion of Canada, with its
principal place of business located in Weston,
Ontario, Canada. Apotex, Inc. manufactures and
markets pharmaceuticals, and it contends that it
conducts its testing and manufacturing work solely
for prescription drugs to be sold in Canada and other
markets outside of the United States.

In 1993, Apotex, Inc. established an operating
division, TorPharm Inc., FN1 a Division of Apotex,
Inc. ("TorPharm Division"), for the express purpose
of "[d]eveloping, testing and manufacturing
prescription drugs in conformance with the detailed
regulatory requirements" of the United States Food
and Drug Administration ("FDA"). Defendants
contend that TorPharm Division operates a "stand
alone" facility in Etobicoke, Ontario, Canada.
Defendants claim that the TorPharm Division facility
in Etobicoke is autonomous and wholly distinct from
Apotex, Inc.'s Weston facility.

> FN1. TorPharm, Inc. is a corporation
> organized under the laws of the Dominion of
> Canada.

The suit arose on May 18, 1998, when SmithKline
received a letter from TorPharm Division, informing
and notifying SmithKline that through its United
States agent, Apotex Corp., TorPharm Division had
previously filed an Abbreviated New Drug
Application ("ANDA") No. 75-356 for "Paroxetine
HCI Tablets" with the FDA. The letter purported to
be a Notification of Certification of noninfringement
under Section 505(j)(2)(B) of the Federal Food, Drug
and Cosmetic Act, 21 U.S.C. § 355(j)(2)(B)(i) and
(ii), and informed SmithKline TorPharm Division
believed that because TorPharm Division's product
contained paroxetine hydrochloride solely in an
anhydrous state, unlike the '723 Patent which is in
hemihydrate form, its "Paroxetine HCI Tablets" did
not infringe upon the '723 Patent. SmithKline

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

disputes TorPharm Division's claim, arguing paroxetine hydrochloride in an anhydrate state will convert into a hemihydrate form. Thus, SmithKline claims ANDA No. 75-356 for "Paroxetine HCI Tablets" infringes on the '723 Patent.

*2 This is our second opinion in this case involving discovery disputes between the parties. Our first opinion concerned SmithKline's motion to compel Defendants, which we granted in part, and denied in part. *See SmithKline Beecham Corp. v. Apotex Corp., 1999 WL 311697 *1 (N.D.Ill. May 13, 1999).* SmithKline renews a portion of its motion to compel, arguing that new information establishes the propriety of an order compelling Apotex, Inc. to produce materials about the role of Apotex, Inc. in the development of TorPharm's paroxetine hydrochloride. In addition to opposing SmithKline's motion, Defendants seek to amend their answer and affirmative defenses to assert that the '723 Patent is invalid or unenforceable. Defendants also move to compel SmithKline to designate and produce witnesses pursuant to Federal Rule of Civil Procedure 30(b)(6). We shall address each motion in turn.

DISCUSSION

I. Plaintiffs' Motion to Compel

SmithKline moves to compel Apotex, Inc. to produce all documents, samples, and things for two categories: (1) Apotex Inc.'s work and efforts to develop the formula, specifications, and process for formulating and producing paroxetine hydrochloride, which Apotex provided on April 15, 1997 to its TorPharm Division to produce a product for the United States market; and (2) Apotex Inc.'s recent work and efforts to test and tablet larger-scale batches [ PAR(108), PAR(109), and PAR (110) ] of bulk paroxetine hydrochloride, produced by Brantford Chemicals, Inc. ("BCI"), allegedly the common supplier for both TorPharm Division and Apotex, Inc. SmithKline argues that these documents fall within the parameters of requests 9, 11, 23-25, 31, and 33 of SmithKline's first set of document requests.

A. Apotex's Initial Development Work

This is not our first review of this issue. Apotex, Inc. had objected to producing these documents and

things when SmithKline initially propounded its production requests. SmithKline then moved to compel their production.

In our prior opinion of May 13, 1999, we noted the Defendants had represented to the Court that the only paroxetine products with any potential to reach the United States market were manufactured in TorPharm Division's facility in Etobicoke, Ontario. *See SmithKline, 1999 WL 311697 at *5.* The Defendants also stated that "Apotex has no intention of marketing paroxetine products in the United States."*Id.* Because SmithKline's production requests sought the production of documents and things that were solely related to Apotex Inc.'s Weston, Ontario facility, Defendants argued that the information was irrelevant. *See id.*

We found the Defendants' logic compelling and ruled that Defendants must only produce samples of paroxetine products manufactured at TorPharm Division's facility because we believed the information sought was solely related to the paroxetine products for non-U.S. Markets. *See id.*However, we explicitly noted that our decision was based on the record before us, and SmithKline was not precluded from bringing this matter before the Court if further developments warranted our attention. *See id.*

*3 SmithKline claims discovery has shown it is entitled to the documents, information and things it seeks from Apotex, Inc.'s Weston, Ontario facility. Specifically, SmithKline claims to have discovered evidence showing TorPharm Division's proposed product was developed as follows: (1) BCI, an Apotex owned entity, developed paroxetine hydrochloride, the active ingredient in the product, which it furnished to Apotex; (2) Apotex developed the specifications, formula, and process to formulate and tablet paroxetine hydrochloride, which it furnished to TorPharm Division; and (3) TorPharm Division incorporated Apotex's formula and specifications and adapted Apotex's process to meet the capabilities of TorPharm's manufacturing equipment.

SmithKline also claims BCI produced three large-scale batches of paroxetine hydrochloride [ (PAR(108), PAR(109), and PAR (110) ] in the early part of 1999, which it delivered to Apotex.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

Page 3

SmithKline contends BCI and TorPharm Division are utilizing these batches with the FDA to assert their capability to increase production to their anticipated commercial-scale level for the United States. SmithKline has only been able to obtain discovery from BCI on the production of these three new batches, but has not been able to obtain discovery from Apotex pertaining to the testing of the batches, actual tablets produced from them, or any other information from Apotex regarding the batches or tablets. In essence, SmithKline claims Defendants are misusing our May 13, 1999 opinion by storing information or items at Apotex that it does not want to produce in discovery.

Defendants admit Apotex provided TorPharm Division with the formula and process for manufacturing paroxetine tablets, but claim this served merely as an insignificant starting point from which TorPharm Division conducted its own development work, which Defendants claim forms the basis of the ANDA submitted to the FDA by TorPharm Division. We disagree with Defendants and rule that they must provide the discovery sought by SmithKline.

In determining what matters are discoverable in this case we bear in mind "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action."Fed. R. Civ. Proc. 26(b)(1)."The information need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."*Id.* We broadly construe relevancy at the discovery stage. *See In re Aircrash Disaster Near Roselawn, Indiana October 31, 1994,* 172 F.R.D. 295, 303 (N.D.Ill.1997).

In its briefs pertaining to SmithKline's initial motion to compel Defendants claimed Apotex, Inc.'s Weston facility had no connection whatsoever to the development of any products for marketing in the United States. *See SmithKline,* 1999 WL 311697 at *5. Despite this representation to the Court, the Defendants now claim the only connection the Weston facility has with the ANDA is providing a starting point for TorPharm's development work. This contradiction of Defendants' earlier representations to the Court indicate it is far from settled what role Apotex, Inc.'s Weston facility played, and continues to play, in the development of its TorPharm

Division's paroxetine.

*4 In addition, SmithKline has presented newly obtained information to the Court that the development process of the paroxetine intended to be marketed by TorPharm Division was not as segregated as Defendants initially claimed. Instead, SmithKline alleges Apotex Inc.'s Weston facility played a role, which it continues to play, in the development of TorPharm's paroxetine.

Defendants admit TorPharm Division based its development work upon the formula and process developed by Apotex, Inc. at its Weston facility. Indeed, Gaetan Marcoux, the former formulation development manager for TorPharm Division stated on page 99 of his deposition that the formula and process provided to TorPharm Division from Apotex, Inc. were the building blocks for TorPharm Division's process. The evidence also shows TorPharm Division received the "building blocks" for its development work no later than April 15, 1997, when Dr. Sherman, Apotex's president, faxed the formula and process package for paroxetine to Dr. Coffin-Beach, TorPharm's president.[FN2]Plainly, whatever work, assumptions, calculations, and processes went into developing Apotex's formula and process is necessarily relevant to TorPharm's ANDA, because they were an essential component of the development process. This is in accord with our prior opinion permitting SmithKline to review and analyze representative samples from each stage in the development of paroxetine products at TorPharm's Division facility. *See SmithKline,* 1999 WL 311697 at *6.

> FN2. Marcoux testified that he had already received the formula and process package prior to Coffin-Beach's receipt.

Defendants argue Apotex supplies product only to non-U.S. markets.[FN3]Thus, permitting SmithKline discovery from Apotex's Weston facility would improperly expand the scope of discovery to include information regarding paroxetine products that will not be sold in the United States.

> FN3. Defendants also argue that allowing the requested discovery will delay the litigation. Had Defendants advised the Court of the true nature of Apotex's role prior to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

our initial determination of this matter, we would not be facing a second motion at this late date. Also, Defendants are seeking leave to amend their answer and affirmative defenses. If granted such leave, they seek corresponding discovery responses from SmithKline. Granting Defendants their sought remedies will certainly delay the proceedings, undercutting Defendants argument.

Defendants miss the point. SmithKline has presented the Court with compelling, uncontroverted, newly-obtained evidence that the starting point for TorPharm Division's development process of paroxetine was the product produced by Apotex to be marketed in countries other than the United States. Based on this information, compelling Apotex to produce documents and samples from its Weston facility is no longer related to their non-U.S. paroxetine products, but bears directly on Apotex's role in developing the "building blocks" for the paroxetine product produced by TorPharm Division, which TorPharm Division intends to market in the United States. Merely because that product is also sold outside of the United States is entirely irrelevant. SmithKline is entitled to discovery of each stage of the development of TorPharm's paroxetine product, See *SmithKline*, 1999 WL 311697 at *6. Apotex, Inc. must produce documents and samples reflecting Apotex Inc.'s work and efforts to develop the formula, specifications, and process for formulating and tableting paroxetine hydrochloride.

B. Apotex's Recent Large-Scale Work

SmithKline next moves to compel Defendants to produce discovery related to Apotex's efforts to test and tablet three larger scale batches of paroxetine hydrochloride recently produced by BCI. SmithKline claims BCI recently produced three batches, designated PAR(108)3-99, PAR (109)3-99, and PAR (119) 3-99. All three batches were significantly larger than any previous quantities produced by BCI for TorPharm, Division and are being stored at Apotex, Inc.'s Weston facility.

**\*5** SmithKline argues that the larger size of the batches, relative to the size of any batches previously produced, evidences TorPharm Division intends to rely upon them to assert to the FDA their anticipated

capability of producing paroxetine hydrochloride at a commercial production level. Thus, SmithKline claims that even though the batches are stored at Apotex's Weston facility, TorPharm Division will utilize the batches to further its efforts to market the product in the United States. Consequently, SmithKline accuses TorPharm Division of improperly using this Court's prior order as a shield to prevent SmithKline from conducting appropriate discovery of any documents and things about the larger batches, even though the batches are actually earmarked for use by TorPharm in its efforts geared towards the United States market.

Defendants claim their actions are warranted and proper. They claim BCI produces bulk paroxetine hydrochloride for both Apotex and TorPharm Division. In contrast to TorPharm Division, Apotex uses the paroxetine to produce products for non-U.S. markets. Defendants *imply* the paroxetine batches are solely for the use of Apotex. Thus, Defendants argue that their failure to produce any documentation on these batches is warranted.

The parties have framed the issue in such a way that it lends itself to easy resolution. If TorPharm is going to rely upon the batches for its application process to the USFDA, SmithKline is entitled to discovery about them. If indeed the batches are intended *exclusively* for use by Apotex in markets outside of the United States, information concerning them is irrelevant to the controversy before the Court.

Defendants argue "there is absolutely no evidence which even suggests that Apotex will use these three batches (or any batches of bulk material) to supply paroxetine to the United States, or that anyone other than TorPharm will be the supplier to the United States ."This not a flat denial of SmithKline's claim. Rather, their "denial" is couched in terms of there being no evidence.

Defendants next argue TorPharm Division will be the sole supplier to the United States market. While evidently true, SmithKline has not argued that Apotex is producing paroxetine products for the United States market. Rather, the dispute centers on whether Apotex is warehousing paroxetine to shield it from discovery by SmithKline, when TorPharm Division intends to use the paroxetine in its efforts to obtain FDA approval to market its product in the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

United States. Defendants make no argument on this point, much less a flat denial.

Finally, Defendants argue Apotex will not use the three batches to supply paroxetine to markets in the United States. Again, this is not the issue. SmithKline has not made this argument, but instead claims that TorPharm Division will use the three batches in its efforts to market a paroxetine product in the United States. Defendants have not argued this point either, and again have not made an outright denial of SmithKline's allegations.

*6 Given that Defendants have not stated that TorPharm Division will not use the three larger batches that are currently located at Apotex's Weston facility in its efforts to obtain FDA approval allowing it to produce paroxetine products to be sold in the United States market, we believe that the batches may be used by TorPharm and thus are relevant to this action. SmithKline is entitled to the discovery they seek regarding the paroxetine hydrochloride contained in batches PAR(108)3-99, PAR (109)3-99, and PAR (119) 3-99 and its motion to compel is granted.

## II. Defendants' Motion to Amend Their Answer and Affirmative Defenses

Next, Defendants move to amend their answer and affirmative defenses to assert that the '723 patent is invalid or unenforceable. Federal Rule of Civil Procedure 15(a) provides that a party must obtain leave of court or written consent of the opposing party to amend a pleading. See *Garner v. Kinnear Mfg. Co.*, 37 F.3d 263, 269 (7th Cir.1994) (citing *Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir.1992)). Under Rule 15(a) of the Federal Rules of Civil Procedure, district courts may grant leave to amend pleadings and such leave "shall be freely given when justice so requires," so long as there is no harm to the other party. Leave to amend is "inappropriate where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment."*Perrian*, 958 F.2d at 194;see also *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir.1997) (citing inter alia *Foman v. Davis*, 371 U.S.

178, 182, 83 S.Ct. 227 (1962)); *Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 480 (7th Cir.1997) (citing *Ferguson v. Roberts*, 11 F.3d 696, 706 (7th Cir.1993)). Delay is an insufficient justification by itself for denying a motion to amend, unless the delay causes undue prejudice to the opposing party. See *Tragarz v. Keene Corp.*, 980 F.2d 411, 432 (7th Cir.1992).

SmithKline argues Defendants have unduly delayed seeking to amend for improper reasons, prejudicing SmithKline's ability to swiftly prosecute their case. Defendants dispute Plaintiffs characterization of the delay as undue. They contend they could not previously plead the '723 patent was invalid or unenforceable because they did not have a good faith basis for doing so. Defendants claim SmithKline delayed producing their discovery responses, and turned over a prodigious amount of documents (in excess of 375,000 pages). As a result, Defendants only recently were able to determine a good faith basis existed for pleading that the '723 patent is invalid or unenforceable. Defendants further contend SmithKline will not be prejudiced if the Court permits them to amend their answers and affirmative defenses. We conclude Defendants may amend their affirmative defenses and answer because Defendants did not unduly delay seeking to file their amendments.[FN4]

> FN4. Because we find that no undue delay exists we need not examine whether SmithKline is prejudiced by the delay. As for SmithKline's prejudice argument regarding the Philadelphia case concerning the '723 patent, we note that SmithKline is the Plaintiff in both cases and opposed their consolidation. The resolution of any prejudice to SmithKline arising from duplicative depositions is within their control and it may not claim prejudice on this basis.

*7 This case has been in litigation since June 26, 1998. Defendants filed their original answer and affirmative defenses on August 31, 1998, and moved to amend their answer and counterclaim on December 22, 1999, nearly sixteen months later. Contrary to SmithKline's implication, however, the record does not show Defendants were inactive during this period. Defendants promptly served their

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

first requests for production of documents on SmithKline in September of 1998. They followed these initial requests with a second set of production requests on March 10, 1999. SmithKline admits it did not fully comply with these production requests until September 21, 1999, and the last batch of documents concerned Ferrosan, a company with whom SmithKline has a licensing deal.

Defendants claim the '723 patent is invalid and unenforceable based upon Ferrosan's role in the development of the paroxetine hydrochloride marketed by SmithKline. Specifically, Defendants claim they recently obtained evidence indicating in the early 1980's SmithKline received paroxetine hydrochloride material and specifications from Ferrosan. Because SmithKline did not list any Ferrosan employees as named inventors in the '723 patent, Defendants argue the '723 patent is invalid under 35 U.S.C. § 102(f). Based on this recently discovered information, Defendants seek to amend their answer and affirmative defenses to plead the '723 patent is invalid and unenforceable.

SmithKline challenges this version of events, pointing to Defendants' own statement that SmithKline has been producing Ferrosan documents for over one year. SmithKline also claims Defendants are actually the party slowing the progress of discovery to better align this action with a similar case in Pennsylvania.

We find SmithKline's arguments unpersuasive. Contrary to SmithKline's assertion, the pertinent factor is when they completed their document production. Only then could Defendants fully synthesize the documents and compose their theory of the case. Defendants received the final documents from SmithKline in September 1999. They subsequently filed Rule 30(b)(6) deposition notices seeking information relevant to the invalidity and unenforceability issues. After SmithKline balked at designating witnesses, claiming irrelevance to the issues before the Court, Defendants moved to amend their answers and affirmative defenses. We do not believe this qualifies as foot-dragging by Defendants.

Moreover, the record shows SmithKline's production tardiness was not an insignificant factor in the timing of Defendants seeking to assert the invalidity and unenforceability defenses. SmithKline contributed to

any delay by taking over six months to finish producing the documents sought by Defendants in March of 1999, and taking one year to fully comply with Defendants' September 1998 requests. Allowing SmithKline to assert delay as a basis for prohibiting Defendants from amending their answer and affirmative defenses would be inequitable inasmuch as SmithKline has been less than diligent in fulfilling its production obligations. Based on the relatively brief period between the completion of production and Defendants seeking leave to amend in tandem with SmithKline's contributing role, we conclude Defendants did not unduly delay seeking to amend their answer and affirmative defenses.

*8 SmithKline next argues Defendants are barred from raising these issues because they failed to assert them in their notice letter to SmithKline, thus precluding Defendants from raising them in any subsequent litigation. SmithKline essentially analogizes this situation to cases barring a discrimination complainant from raising any basis for discrimination in her complaint that she did not plead with EEOC. In support of this original proposition, SmithKline cites *Bristol-Myers Squibb Co. v. Royce Labs, Inc.*, 69 F.3d 1130 (Fed.Cir.1995), wherein the court stated that in an infringement action, "depending upon the nature of the certification that has been filed, the district court determines the validity of the patent at issue and/or whether the drug sought to be marketed infringes the claims of the patent."*Bristol-Myers Squibb*, 69 F.3d at 1135.

*Bristol-Myers* does not support SmithKline's argument. The cited language merely discusses what the court should look to in its determination of the validity of the patent. *Bristol-Myers* does not say notification letters to patent-holders must assert all potential basis for noninfringement, at risk of being precluded from asserting them in a subsequent suit. Because SmithKline does not assert any other authority for barring Defendants from asserting in litigation a theory not presented in its notice letter, we conclude Defendants may amend their answer and affirmative defenses.

III. Defendants' Motions to Compel

The final matter before the Court is Defendants' motion to compel SmithKline to testify on Topics 2,3 and 15-19 of Apotex's Rule 30(b)(6) notice. Rule

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

30(b)(6) authorizes litigants to name a business entity as a deponent. See Fed. R. Civ. Proc. 30(b)(6). Doing so triggers a duty upon the business to designate an individual to testify on its behalf, while setting forth the matter upon which the individual will testify. See id. The designated witness "must testify as to matters known or reasonably available to the organization." Id.

Defendants originally filed a motion to compel SmithKline to testify on topics 1-20 of defendants' Rule 30(b)(6) notice. Following receipt of the motion, SmithKline forwarded Defendants a letter naming individuals to testify on topics 1, 4-14, and 20. SmithKline declined to designate witnesses for topics 2, and 15-19. SmithKline promised to shortly name a witness for topic 3, but as of this writing, has failed to do so. We will examine the propriety of a Rule 30(b)(6) deposition for each these topics in sequence.

A. Rule 30(b)(6)

Rule 30(b)(6) is a vehicle for streamlining the discovery process. See *Resolution Trust Corp. v. Southern Union Co., Inc.,* 985 F.2d 196, 197 (5th Cir.1993). The effect of the rule is to place upon the business entity the burden of identifying witnesses who have knowledge responsive to subjects requested in the Rule 30(b)(6) requests of its opponent. See id. Rule 30(b)(6) is also designed to prevent business entities from "bandying," the practice of presenting employees for their deposition who disclaim knowledge of facts known by other individuals within the entity. See *Alexander v. F.B.I.,* 186 F.R.D. 148, 152 (D.D.C.1999). Consequently, Rule 30(b)(6) imposes a duty upon the named business entity to prepare its selected deponent to adequately testify not only on matters known by the deponent, but also on subjects that the entity should reasonably know. See *Alexander,* 186 F.R.D. at 152; *United States v. Taylor,* 166 F.R.D. 356, 361 (M.D.N.C.1996); *Media Svcs. Group, Inc. v. Lesso, Inc.,* 45 F.Supp.2d 1237, 1253 (D.Kan.1999). If a deponent is unable to testify about certain relevant areas of inquiry the business entity must designate additional parties to satisfy a Rule 30(b)(6) notice. See *Alexander,* 186 F.R.D. at 152; *Taylor,* 166 F.R.D. at 360; *Starlight Intl. Inc. v. Herlihy,* 186 F.R.D. 626, 639 (D.Kan.1999); *Dravo Corp. v. Liberty Mut. Ins. Co.,* 164 F.R.D. 70, 75 (D.Neb.1995)(corporation

must provide a substitute for a deponent with insufficient knowledge). Failure to adequately prepare the deponent may subject the entity to sanctions. See *Bank of New York v. Meridien Biao Bank Tanzania Ltd.,* 171 F.R.D. 135, 151 (S.D.N.Y.1997); *Taylor,* 166 F.R.D. at 363; *Starlight,* 186 F.R.D. at 640.

**\*9** A Rule 30(b)(6) deponent's testimony does not represent the knowledge or opinions of the deponent, but that of the business entity. See *Taylor,* 166 F.R.D. at 361. In effect, the deponent is "speaking for the corporation," giving the corporation's position on the topic. See id. The deponent must testify to both the facts within the knowledge of the business entity and the entity's opinions and subjective beliefs. See id. This includes the entity's interpretation of events and documents. See id.

B. Topic 2

On October 22, 1999, Defendants served their Notice of Deposition Pursuant to Rule 30(b)(6) ("the Rule 30(b)(6)") upon SmithKline. Topic 2 of the Rule 30(b)(6) requested SmithKline designate a witness to testify regarding "SmithKline's responses to Defendants' Interrogatories and requests for production, along with the subjects identified therein." SmithKline objected to this Interrogatory, claiming that complying with it would be unduly burdensome because it would require having a witness study the vast amount of discovery pertaining to the case.

While the liberal discovery allowances of the Federal Rules do not permit a recipient of discovery requests to fulfill its discovery obligations by failing to conduct a search for answers and then stating it does not know the answer, See *In re Independent Svc. Org. Antitrust Litig.,* 168 F.R.D. 651, 653-54 (D.Kan.1996), the Rules also preclude proponents of discovery from wielding the discovery process as a club by propounding requests compelling the recipient to assume an excessive burden. See *United States v. District Council of New York City,* 1992 WL 208284 at \*15 (S.D.N.Y. Aug. 19, 1992). Consequently, the recipient of a Rule 30(b)(6) request is not required to have its counsel muster all of its factual evidence to prepare a witness to be able to testify regarding a defense or claim. See *In re Independent Svc. Org. Antitrust Litig.,* 168 F.R.D. at

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

654. This rule holds especially true when the information sought is likely discoverable from other sources. See _E.E.O.C. v. HBE Corp., 157 F.R.D. 465, 466-67 (E.D.Mo.1994)._

Defendants assert that compelling SmithKline to prepare such a witness would not be an undue burden, but would serve to narrow and focus the issues of the case. As Defendants are aware, answering requests for production and interrogatories customarily is performed with the assistance of counsel. Thus, the proposed area of inquiry improperly trespasses into areas of work product and attorney-client privilege. See _In re Independent Svc. Org. Antitrust Litig., 168 F.R.D. at 654._ In such cases, courts will not permit discovery implicating privilege concerns absent a showing that the information sought is not discoverable by other means. See _HBE Corp., 157 F.R.D. at 466-67._

Defendants could readily have obtained the same information in a more efficient manner by propounding "standard" interrogatories upon its opponent. By doing so, Defendants could obtain the same information with infinitely less intrusion upon privilege concerns, in a more workable form, and from the individuals who have actual knowledge of the matters at issue.

**\*10** In its present form, we find Defendants' Rule 30(b)(6) deposition notice overbroad, unduly burdensome, and an inefficient means through which to obtain otherwise discoverable information. Defendants have also failed to convince us that the factual information they seek has not already been produced, or that it cannot be discovered through a less ·invasive method. Accordingly, we deny Defendants' motion to compel on Topic 2.

C. Topic 3

Topic 3 of the Rule 30(b)(6) requests SmithKline designate a witness to testify on the content of SmithKline's patent. While SmithKline has not explicitly objected to this Topic, it also has failed to designate a testifying witness. Because SmithKline also has not tendered to the Court any basis for not designating and producing a witness knowledgeable on Topic 3, we hold that it must do so without delay.

D. Topics 15-17

In Topics 15-17, Defendants requested SmithKline designate and produce a Rule 30(b)(6) witness who will testify on prior art bearing on the validity and enforceability of the '723 patent. SmithKline argues topics 15-17 are irrelevant to the interpretation of the patent claim and whether Apotex's proposed drug will infringe any claims of the patent. The determination of this issue hinges on the outcome of Defendants' motion to amend their answer and affirmative defenses, which would make the information sought quite relevant. Because we granted Defendants' motion to amend _supra,_ topics 15-17 are relevant to the case and SmithKline must designate witnesses to testify on these matters.

E. Topic 18

In Topic 18, Defendants seek information on the factual basis of SmithKline's claim that Defendants infringed the '723 patent. The issue here is duplication. SmithKline argues it need not designate a 30(b)(6) witness because Defendants have also served Interrogatory Number 12 upon SmithKline seeking the same information. SmithKline is currently preparing its answer to this interrogatory, and argues it should· not have to prepare a representative witness to testify to matters it is already providing to Defendants.

We agree. As with Topic 2, Topic 18 improperly infringes upon matters of attorney-client privilege, work product, imposes an undue burden, and is needlessly duplicative because Defendants will already be receiving the information. See _HBE Corp., 157 F.R.D. at 466-67:In Re Independent Svc. Org. Antitrust Litig., 168 F.R .D. at 654._ Inasmuch as complying with producing a witness to testify on Topic 18 would require SmithKline to brief its designee on SmithKline's response to Interrogatory Number 12, compelling SmithKline to undergo this duplicate process is unnecessary and overly burdensome. See _Dist. Council of New York City, 1992 WL 208284 at * 15._ Consequently, we deny Defendants' motion to compel on Topic 18.

F. Topic 19

Along a similar vein, Topic 19· is better suited to alternative means of discovery than a Rule 30(b)(6) deposition. Topic 19 concerns SmithKline's

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)
**2000 WL 116082 (N.D.Ill.)**

investigation and testing activities which led to the conclusion that Defendants were infringing the '723 patent. Similar to Topic 2, we believe a Rule 30(b)(6) deposition is an inefficient means of ascertaining the information sought. Instead, standard interrogatories would be a better method of discovering the particulars of SmithKline's investigation because SmithKline could synthesize the information from all of the necessary sources, which would then be presented to Defendants in a comprehensible manner. In addition, SmithKline claims any testing was conducted by individuals who are knowledgeable in the field, who it will tender as expert witnesses. Again, this is an area better suited for an alternate means of discovery; in this case interrogatories identifying all individuals involved in testing, expert interrogatories and depositions. Consequently, we deny Defendants' motion to compel SmithKline to designate a witness to answer Topic 19.

## CONCLUSION

*11 For the foregoing reasons, (1) Plaintiffs' Motion to Compel is granted in full; (2) Defendants' Motion to Amend their Answer and Affirmative Defenses is granted; and (3) Defendants' Motion to Compel is granted in part and denied in part. The parties have fourteen (14) days to comply with this Order.

N.D.Ill.,2000.
Smithkline Beecham Corp. v. Apotex Corp.
Not Reported in F.Supp.2d, 2000 WL 116082 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2002 WL 31667863 (D.Del.)
**2002 WL 31667863 (D.Del.)**

◖In re Digital Island Securities Litigation
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
In re DIGITAL ISLAND SECURITIES
LITIGATION
No. Civ.A.02-57-GMS.

Nov. 25, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

**\*1** This securities class action suit arises from Cable
& Wireless plc's acquisition of Digital Island, Inc.
Individual plaintiffs filed complaints on January 22,
2002, January 31, 2002, and February 22, 2002. The
plaintiffs filed a joint motion for consolidation,
appointment of lead plaintiff, and appointment of
lead counsel on March 25, 2002. The court granted
that motion on April 16, 2002. On May 15, 2002, the
plaintiffs filed their Consolidated Amended Class
Action Complaint. In this complaint, the plaintiffs
contend that the defendants defrauded the Digital
Island shareholders into approving the sale of the
company to Cable & Wireless for less than fair value
.FN1

> FN1. The defendants are Ruann F. Ernst,
> Charlie Bass, Christos Cotsakos, Mary
> Cirillo-Goldberg, G. Bradford Jones, Robert
> Marbut, Shahan Soghikian, Graham
> Wallace, Don Reed, Mike McTighe, Robert
> Drolet, Avery Duff, Marc Lefar, Digital
> Island, Inc. ("Digital Island"), Dali
> Acquisition Corp., and Cable & Wireless plc
> ("Cable & Wireless").

On July 1, 2002, the defendants filed a motion to
dismiss for failure to state a claim under Federal Rule
of Civil Procedure 12(b)(6) and the Private Securities
Litigation Reform Act of 1995, 15 U.S.C. § 78u-4
(the "PSLRA"). On September 10, 2002, the court
issued a Memorandum Opinion dismissing the

plaintiffs' Consolidated Amended Class Action
Complaint in its entirety, with prejudice.

Presently before the court is the plaintiffs' timely
motion to alter the final judgment and for leave to file
an amended complaint.FN2For the following reasons,
the court will deny this motion.

> FN2. On October 21, 2002, the defendants
> filed a motion to strike the plaintiffs' reply
> brief in support of their motion to alter
> judgment. In so moving, the defendants
> reasoned that Local Rule 7.1.5 does not
> permit the filing of reply briefs in motions
> for reargument or reconsideration. However,
> as the plaintiffs' motion to replead is neither
> a motion for reargument, nor a motion for
> reconsideration, the court will deny the
> defendants' motion to strike.

II. DISCUSSION

The decision of whether to grant leave to amend
under Rule 15(a) "rest[s] within the sound discretion
of the trial court under [Federal Rule of Civil
Procedure] 15."*Massarsky v. GM Corp.,* 706 F.2d
111, 125 (3d Cir.1983). In exercising this discretion,
courts do not read Rule 15(a) as providing an
unlimited right to amend complaints. *See e.g. Lorenz
v. CSX, Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993).
Indeed, a motion to amend may be denied for any of
the following reasons: undue delay, bad faith, failure
to cure previous deficiencies, dilatory motive,
prejudice, or futility. *See Foman v. Davis,* 371 U.S.
178, 182 (1962).

In the present case, the court is troubled by the
plaintiffs' decision to file this motion not only after
the motion to dismiss had been filed, but *after* the
court had decided this motion and dismissed their
claims. When faced with the defendants' motion to
dismiss, the plaintiffs would have been well within
their rights to request leave to amend. Instead, they
chose to oppose the motion, in its entirety, without
seeking such relief. Such an approach is highly
suspect as the plaintiffs were aware of the facts which
they now seek to add at the time the original pleading

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667863 (D.Del.)
**2002 WL 31667863 (D.Del.)**

was filed. Thus, there is no excuse for failure to plead them before the case was dismissed.

Additionally, in their briefs on the present motion, the plaintiffs essentially concede that their complaint was deficient, but that they nevertheless did not seek leave to amend it. *See e.g .,* Plaintiff's Motion to Alter Judgment at 5 (recognizing that they had failed to address certain arguments and facts in their complaint, but that they "believe if such arguments had been considered, the [c]omplaint might have survived the motion to dismiss."); Plaintiffs' Reply Brief at 2 (noting that the proposed amendments "alter substantially the particularity of the [c]omplaint's allegations); Plaintiffs' Reply Brief at 6 (stating that "virtually all," but not all, of the required allegations were contained in the original complaint).

*2 The plaintiffs further suggest that "the nature of [their] Opposition Brief [to the Motion to Dismiss] also signaled to this [c]ourt that, in the event it agreed with defendants' argument concerning pleading deficiencies, plaintiffs could adequately and easily replead to cure any such deficiencies."Plaintiffs' Reply Brief at 4. Unfortunately, however, in making this statement, the plaintiffs have apparently forgotten that it is their duty, not the court's, to request leave to amend. Had the plaintiffs been as interested in amending as they claim to have been, the appropriate response would have been a request for leave to amend, *before* the court dismissed their case.[FN3]The court does not, and will not, make its decisions based on covert "signals" from counsel.

> FN3. This is especially true in light of the fact that, in their motion to dismiss, the defendants requested that any dismissal be with prejudice. Thus, the plaintiffs cannot now argue that they were unaware of the possibility of such a dismissal.

Indeed, the only reason the plaintiffs offer for having not sought to amend their complaint earlier amounts to an argument that the case moved too quickly for them to do so.[FN4]*See* Plaintiffs' Reply Brief at 4. To the contrary, however, the plaintiffs filed three individual complaints and then a subsequent consolidated amended complaint. They had time to more carefully craft their complaint at any one of those stages. They chose not to. Moreover, while it is true that the consolidated amended complaint was

only filed approximately two months prior to the defendants' motion to dismiss, that motion to dismiss, regardless of whether it was filed two months or two years after the complaint, was enough to put the plaintiffs on notice of the deficiencies. Additionally, the fast pace of this litigation was dictated by the PSLRA's requirement that a motion to dismiss be decided before a case may proceed. Thus, the court looks with great disfavor on the plaintiffs attempt to use this sensible requirement as a shield to ward off accusations of undue delay.

> FN4. In making this argument, the plaintiffs appear not to understand that they could have fully defended their original consolidated amended complaint, as well as alternatively asked for permission to amend. Rather, the plaintiffs argue that, because they could not be certain an amended pleading would be required, they chose to file their "rapidly coming due" opposition brief. This tactical decision was clearly within their discretion. However, having chosen not to ask for alternative relief, they cannot now be heard to complain about the consequences of their actions.

### III. CONCLUSION

The plaintiffs chose to oppose the defendants' motion to dismiss based upon facts and theories not reflected in their consolidated amended complaint. In so doing, they clearly recognized the complaint's deficiencies. Nevertheless, they did not seek the alternative relief of requesting leave to amend prior to the court's extensive ruling on the motion to dismiss. In this way, they apparently assumed that they would be granted another bite at the apple. Unfortunately, they will not have this opportunity.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Plaintiffs' Motion to Alter Judgment (D.I.71) is DENIED.

2. The Defendants' Motion to Strike the Plaintiffs' Reply Brief (D.I.75) is DENIED.

D.Del.,2002.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31667863 (D.Del.)
**2002 WL 31667863 (D.Del.)**

Page 3

In re Digital Island Securities Litigation
Not Reported in F.Supp.2d, 2002 WL 31667863
(D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.