# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE MBNA CORP. | ) ) ) | Civ. Action No.: 05-CV-00272-GMS |
| SECURITIES LITIGATION | ) ) ) ) | CONSOLIDATED |

## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiffs, by their counsel, make the following allegations upon information and belief based upon all of the facts set forth below which were obtained through an extensive investigation made by and through their attorneys and through discovery.

### NATURE OF THE COMPLAINT

1.      This is a securities class action on behalf of all persons, other than defendants and certain other related parties, who purchased or otherwise acquired the publicly traded securities of MBNA during the period January 20, 2005 through April 20, 2005 inclusive (the "Class Period"), and who were damaged when the revelation of the true facts regarding MBNA caused a decline in MBNA securities' stock price, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and the regulations promulgated thereunder by the SEC, including Rule 10b-5.

2.      In a succession of announcements and public filings in January 2005, defendants deceived the market by reporting purported present facts that the true size of a restructuring charge was unexpected, that MBNA revenues and earnings exceeded analysts' projections, and that MBNA would undergo significant growth

despite a slow growth environment. Defendants thereby created and sustained the false impression, at all relevant times, that the Company was sufficiently adapting to pressure on its interest margins for credit card debt.

3.      Defendants, however, knew or recklessly disregarded that MBNA's fourth quarter and year-ended 2004 reported assets, stockholders' equity, net income and earnings per share were artificially inflated as a result of overly aggressive and improper accounting practices, which violated Generally Accepted Accounting Principles ("GAAP") and other principles of fair reporting, in valuing its interest-only ("IO") strip receivables. In that regard, defendants knowingly or recklessly failed to disclose or to reflect in their public statements that MBNA's critical assumptions used to value its IO strip receivables and related to securitization of its credit card loan pools did not comport with GAAP.

4.      MBNA knowingly or recklessly manipulated its 2004 financial statements in violation of GAAP. These manipulations masked from investors that fourth quarter 2004 EPS (earnings per share), which were reported by Legg Mason on January 20, 2005, to be "a penny ahead of consensus," were artificially inflated. Investors were unaware that MBNA's critical assumptions used to value is IO strip receivables were not truthfully adjusted to reflect known adverse payment rates and other negative trends at MBNA. For this reason, among others, the Company's public statements touting its growth and profitability, at all relevant times, were materially overstated. Defendants knowingly or recklessly manipulated the assumptions on the Company's credit card loan pools, which hid the true extent of the credit card payment rate increase and its adverse effect on MBNA's earnings.

5.      With internal controls in place to closely monitor the impact of MBNA's decisions to virtually eliminate its 0% Balance Transfer Teaser Program and dramatically increase its credit card interest rates in October 2004, defendants could not credibly support their claim made just six months later in April 2005 that MBNA was surprised that its earnings were "impacted by unexpectedly high payment volumes" as reported by TheStreet.com on April 21, 2005. Defendants knew or recklessly disregarded the immediate impact on MBNA's 2004 credit card payment rates of the elimination of the 0% Program starting at least as early as November 2004. To be sure, MBNA's payment rates increased dramatically as credit card customers transferred their balances to competing credit card companies and/or to home equity loans. Despite this known change, MBNA failed to alter the assumptions it used to value its IO receivables, thus overstating its assets, stockholders' equity, net income and earnings per share during the Class Period.

6.      Defendants falsely represented to the investing public that the payment rate assumption used to value the Company's IO strip receivables was regularly adjusted to reflect actual prepayment experience and trends and that the Company had made all adjustments that were necessary for a fair presentation of its financial position. In truth, because the defendants evaluated the accuracy of these receivables monthly, they knew whether MBNA's credit card payment rates required MBNA to take a charge (write- down) to income during each reporting period.

7.      As detailed below, the defendants announced at the beginning of the Class Period that they expected annual income growth of 10% in 2005. In the weeks following the projection, January 25 to February 3, 2005, defendants having

insider knowledge of the true undisclosed financial condition of MBNA (that they would be later forced to reveal), sold more than one million shares of their personally-held MBNA stock, including 351,409 shares sold by defendant Bruce L. Hammonds on January 27, 2005 for proceeds in excess of $9 million.

8.      By the time MBNA's fraudulent scheme was finally revealed on April 21, 2005, MBNA revealed that MBNA had to take an almost $207 million write-down of its "IO strip receivable," that its first-quarter income was down 93% year-over-year, including the restructuring charge, and that the Company expected full-year earnings to come in "significantly below its 10% growth objective." On this news, shares of MBNA fell to a two-year intraday low of $18.50 before closing at $19.28, down $3.83, or 16.6%, on a day most major bank stocks rose.

9.      As a result of the fraudulent scheme alleged herein, the prices of MBNA securities were artificially inflated during the Class Period, Individual Defendants reaped substantial economic proceeds (over $51 million) from their insider stock sales, and investors suffered damage when revelations of the true facts caused a decline in the value of their investments.

10.     Defendants knowingly or recklessly, directly participated in the fraudulent acts and misconduct for which damages are sought against each of them and/or are charged with liability as controlling persons. The fact that the financial condition of the Company was materially overstated in its public statements was known to or recklessly disregarded by all defendants at all relevant times. All defendants culpably participated in the commission of the wrongs alleged herein.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this Action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (28 U.S.C. § 1391(b)). Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in this District. In addition, MBNA maintains its principal executive offices in this District.

13.     In connection with the acts, conduct and other wrongs complained of herein, Defendants used the means and instrumentalities of interstate commerce, including the mails, telephone and the facilities of national securities exchanges.

## PARTIES

14.     Lead Plaintiff Activest Investmentgesellschaft mbH for account of the PT-Master fund ("Activest") purchased MBNA securities at artificially inflated prices during the Class Period as indicated on the papers Activest submitted to the Court in connection with its Motion for Appointment as Lead Plaintiff.

15.     Additional plaintiffs James M. Baker, Rochelle Phillips, Robert Wilkins, Leonard Bronstein, Greg Penn, Clifford W. Jones, Michael D. Blum, Scott Kimball and Virginia McMath purchased MBNA securities at artificially inflated prices

during the Class Period as indicated on the certifications attached to their initial complaints in this consolidated action and suffered damages when revelations of the true facts caused a decline in the value of their investments.

16.    Defendant MBNA is the parent company of MBNA America Bank, N.A. ("MBNA America"), a national bank which, in turn, has two wholly-owned non-United States bank subsidiaries: MBNA Europe Bank Limited (MBNA Europe) and MBNA Canada Bank ("MBNA Canada").  MBNA is an international financial services company providing lending, deposit, and credit insurance products and services to its customers.  Through MBNA America, the Company is an issuer of endorsed credit cards, marketed primarily to members of associations and customers of financial institutions and other organizations; it is the largest card issuer in the United States.  In addition to its credit card lending, MBNA makes other consumer loans (including home equity loans), as well as commercial loans primarily to small businesses.  MBNA's principal place of business is 1100 North King Street, Wilmington, DE 19884.

17.    Defendant Bruce L. Hammonds was at all relevant times MBNA's President, Chief Executive Officer and a MBNA director.

18.    Defendant Kenneth A. Vecchione was at all relevant times Vice Chairman and Chief Financial Officer of MBNA and MBNA America.

19.    Defendant Richard Struthers was at all relevant times Vice Chairman and Chief Lending Officer of MBNA.

20.    Defendant John Cochran was at all relevant times Chief Operating Officer of MBNA.

21.     Defendant Charles Krulak was at all relevant times Chief Accounting Officer of MBNA.

22.     Defendants Hammonds, Vecchione, Struthers, Cochran and Krulak are referred to collectively herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who purchased the publicly traded securities of MBNA between January 20, 2005 and April 20, 2005, inclusive. Excluded from the Class are the defendants herein, members of each individual Defendant's immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

24.     MBNA has millions of shares of common stock outstanding, and the Company's common stock was actively traded on the NYSE throughout the Class Period. Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can only be determined by appropriate discovery, plaintiffs believe that Class members number at least in the thousands and that they are geographically dispersed.

25.     Plaintiffs' claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the Class members, and have retained counsel who are experienced and competent in class and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with the other members of the Class Plaintiffs seek to represent.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impossible for the members of the Class individually to redress the wrongs suffered. There will be no difficulty in the management of this action as a class action.

28.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.     whether the Company's publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

c.     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

8

        d.       whether Defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

        e.       whether the market prices of MBNA's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

        f.       whether the members of the Class have sustained damages when revelations of the true facts caused a decline in the value of their investments and, if so, what is the appropriate measure of damages.

## BACKGROUND FACTS

### MBNA: THE WORLD'S LARGEST CREDIT CARD ISSUER

29.      During the Class Period, MBNA was the world's largest independent credit card issuer, ranking third behind multi-national financial conglomerates Chase and Citigroup. The Company had roughly 15% market share as measured by credit card loans outstanding. Since the Company's IPO in 1991, MBNA reported the best record among all financial services companies – nine years of 20% + EPS growth – as well as superior asset quality and solid return on equity.

30.      In addition to issuing credit cards, MBNA also makes home equity loans. MBNA's customers have lower than average credit delinquency rates, are typically "white collar" home owners and carry balances that are almost twice the industry average, which makes them prime candidates for home equity loans. As a result, the Company originates hundreds of millions in home equity loans or lines of credit each year. MBNA's efforts to diversify through home equity lending was a direct response to the growing challenge that the home equity product posed on MBNA's credit card

business. Defendants knew that customers have increasingly demonstrated an affinity for the home equity line of credit, given its low cost and tax advantages. Accordingly, credit card receivable growth of MBNA had slackened before the Class Period fueled by mortgage refinancings.

## MBNA'S CORE CREDIT CARD BUSINESS WAS DETERIORATING PRIOR TO AND THROUGHOUT THE CLASS PERIOD

31.     Throughout the Class Period and prior, MBNA was experiencing a significant downturn in its credit card business due to among other things, a decrease in net interest margin which impacted its profitability. In addition, MBNA's business suffered due to increased competition and customer migration to home equity loans resulting in a loss of credit card customers.

32.     For example, MBNA's core credit card business was becoming increasingly competitive as a result of other banks, such as Citigroup and J.P. Morgan Chase, increasing their emphasis on this market by offering lower rates and better terms than MBNA. As a result, MBNA suffered a decline in asset growth and customers in 2004. As more fully described by Credit Suisse First Boston in its May 31, 2005 analyst report concerning MBNA:

> while MBNA was slowing its 0% [finance charge] usage the rest of the industry did not slow its usage, and in fact became more aggressive. With the continued heavy usage of 0% in the industry the effectiveness of MBNA's [solicitations] declined.

33.     Along with a loss of customers due to increased competition, MBNA also suffered a loss of customers due to the migration to home equity loans and refinancings. Since 2002, consumers have used home equity loans and refinancing as a

sensible alternative to credit cards because they offer lower borrowing costs and tax

deductibility. As Jefferies & Company described in its October 12, 2004 analyst report:

> The refinance wave of the past 2 years has weakened
> growth for card issuers due to mortgage payment savings
> and proceeds from cash-out refinancings.
>
> Recent declines in 5 and 10 year rates caused a bounce in refi
> applications in August and September [2004]. Given the typical
> refinance cycle, we would expect funding of these loans to occur
> over the next 2 months. This will weaken the seasonal surge in
> credit card loan growth as payment rates remain high.

This situation had a particularly strong impact on MBNA in October 2004 when it

raised its credit card rates, causing, according to analysts at Sanford C. Bernstein

& Co., Inc., a spike in prepayment rates in November 2004 and thereafter:



34.     The aforementioned situation continued to be apparent at

MBNA in December 2004 as home equity loan outstandings were increasing at a much

faster rate than credit card outstandings. As reported by the FDIC, home equity

outstandings at MBNA increased from $100.3 million in September 2004 to $255.3

11

million in December 2004, representing a 154.53% increase in outstandings. In contrast, credit card outstandings increased from $19.79 billion (or $1,979 million) in September 2004 to $20.69 billion (or $2,069 million) in December 2004, representing a 4.54% increase in outstandings. Thus, as MBNA offered both products, it should not have been "surprised" that customers were moving their credit card balances at a faster pace to home equity.

35.      The significant decline in MBNA customers as a result of the foregoing factors is evidenced by a January 20, 2005 MBNA "Business Presentation" to investors which shows New Accounts for the fourth quarter of 2004 of 1,005,000, a 780,000 or 44% decrease, compared to the fourth quarter of 2003. Additionally, the presentation shows that New Accounts for the year ended December 31, 2004 were 5,485,000, a drop of approximately 1.3 million or 20% compared to the prior year.

36.      Prior to the start of the Class Period, in the 4Q:2001, MBNA's yield had begun to shrink.  As reported by Jeffries & Company, Inc., dated April 22, 2005 in the first quarter of 2001 the net interest margin was approximately 9.00%. In the fourth quarter of 2004, the net interest margin was down to 8.00%.



Thus, even if MBNA was able to increase its asset growth at a steady pace, its income would still be negatively impacted as a result of its declining net interest margin.

37.     Faced with decreasing net interest margin and steady loss of customers, as a result of the increasing competition in its core credit card business and customer migration to home equity loans and refinancings, defendants had to resort to the below-described accounting manipulations to achieve MBNA's earnings targets for the quarter and year ended December 31, 2004.

## SECURITIZATION & MBNA'S INTEREST-ONLY STRIP RECEIVABLE

38.     Securitization is MBNA's primary funding mechanism for all loans, with 80% of managed loans and 90% of domestic credit card loans securitized as of September 30, 2004.

39.     MBNA's credit card securitization process can be described as follows: Over a given period of time, MBNA accumulates a pool of credit card receivables. The pool of receivables is composed of any principal and finance-charge balances owed to MBNA by the card holders. When the pool reaches a certain size,

MBNA (as the seller) sells and transfers the credit card receivables to a special-purpose

vehicle, a master trust. The trust then issues securities backed by the receivables, which

MBNA retains the right to service.

40.    MBNA also retains an IO strip receivable interest in each pool

of the trust. Thus, by virtue of MBNA's IO strip receivables, MBNA is an investor in the

trust and has the right to the following:

> [MBNA maintains] a right to excess periodic collections:
> collections not allocated to the seller's interest or the investor
> interest or to pay fees owed to the trustee, the servicer, or the
> supplier of credit enhancement. An IO strip does not represent an
> undivided ownership stake in the assets of the trust. This retained,
> or residual, interest is a right to excess cash flows generated by the
> receivable pool owned by the trust. The source of these cash flows
> is excess spread. The IO strip absorbs the excess cash flow that is
> periodically released from the trust.

(The Securitization Markets Handbook p. 217).

41.    According to MBNA's SEC Form 10-K, dated March 15,

2005, the excess spread, which MBNA receives by virtue of its IO strip receivable, is

calculated based upon the Company's estimates of "interest income, certain fees,

recoveries on charged-off securitized loans, gross credit losses on securitized loans,

contractual servicing fees, and the interest rate paid to investors in a securitization

transaction," and by its estimates of "projected loan payment rates, which are used to

determine the estimated life of the securitized loan principal receivables, and an

appropriate discount rate."

42.    In connection with credit card receivable securitization, MBNA

"recognizes a gain on sale and retained beneficial interests, including an IO strip

receivable. The IO strip receivable represents the contractual right to receive interest and

other revenue less certain costs from the trust over the estimated life of the securitized loan." MBNA SEC Form 10-K Mar. 15, 2005.

43.    Therefore, MBNA's IO strip receivable is an asset that "not only must be amortized against income, but also re-evaluated quarterly for changes in assumptions."

44.    When MBNA writes down its IO strip, the amount of the write-down should reflect the net result of new securitization less IO strip amortization market condition adjustments.

45.    In accounting for IO strip receivables, the quality of MBNA's recorded earnings is only as good as the assumptions concerning these factors and if the Company uses prepayment rate assumptions that are even slightly less than actual prepayment experience, assets, stockholders' equity and earnings will be overstated.

46.    According to a former Manager in the Securitization Department who worked for MBNA for almost five years, MBNA re-evaluated its IO strip receivables once a month.

47.    According to a former MBNA employee whose job entailed financial responsibilities for eight years, the assumptions that are involved in calculating the IO strip receivable are reviewed every month, including what percentage of customers are "paying back in full." This former employee explained that the payment trends are not something that "boom, just hits you."

48.    Because MBNA was dependent upon securitizations as its chief source of liquidity, it was in the defendants' interest to delay disclosure of the need to materially increase reserves and alter prepayment assumptions. Such actions would

15

have resulted in lowering the Company's investment ratings and reducing its ability to sell its collateralized loans in the open market, which could have a direct, adverse, and material effect on earnings.

## SUBSTANTIVE ALLEGATIONS

### BEHIND THE SCENES AT MBNA

49.     According to a former MBNA financial analyst with an accounting and MBA degree, employed by MBNA during the Class Period who had responsibilities in preparing expense and revenue reports for senior management, MBNA knowingly materially manipulated its financial results on a monthly basis at many of its business segments. In many instances, management would falsify journal entries in amounts as high as five or six million dollars.

50.     As described by the former MBNA financial analyst, it was well-known at MBNA that senior management encouraged managers to systematically manipulate undesirable results to better meet the Company's expectations. Financial results were manipulated through a monthly process that included, among other things, the improper recording of journal entries. The MBNA Controllers would submit the journal entries to "Team Managers," and the Team Managers would then decide whether to record a journal entry to capitalize an undesirable expense, thus improperly understating expenses and overstating assets. The former financial analyst provided the following example: A Team Manager at MBNA's United States credit card business would take large mailing or marketing campaign expenses and improperly capitalize them as an asset on the balance sheet. Generally, advertising costs are charged as an

expense against income as incurred. See AICPA Statement of Position ("SOP") 93-7, Reporting on Advertising Costs ¶ 12 (Dec. 1993).

51.    According to this former MBNA financial analyst who assisted in the preparation of senior management reports, senior management always received a "highly detailed" internal report of the Company's present and projected expenses and revenues of everything related to items appearing on the Company's general ledger, including present and projected expenses and revenues regarding U.S. and Canada credit card loans and home equity loans. This report was distributed twice a month, once at mid-month and once at the month's end. At MBNA, this Senior Management Mid-Month/Monthly Report was colloquially referred to as "the Package."

52.    According to the former MBNA financial analyst, "the Package" resulted from a process called "Flash" wherein all managers would provide their respective business's expenses, revenues, internal projections, and a "Bullet List" indicating any expenses that varied by $200,000 or more from prior months or prior "Packages." "The Package" was typically over fifty pages in length, provided trend analyses, projected revenues and expenses, and current revenues and expenses with comparative results from prior periods (monthly, quarterly and annually). Necessarily included in the "Package" was information necessary to estimate the fair value of the IO strip receivables including actual loan payment rates and projected loan payment rates. The mid-month "Package" would also project results for the end of the month. The "Package" reported on every MBNA business both inside and out of the United States.

53.    According to the former MBNA financial analyst, "the Package" would be sent via e-mail to a "huge distribution list" that included all managers

17

and their superiors, including defendants Vecchione, Hammonds and Struthers. A former MBNA employee in the capital markets accounting area, which handled securitization of IO strip receivables, stated that defendants Cochran and Krulak also received "the Package." The former financial analyst explained that Meetings were held in Wilmington, Delaware to address the mid-month or monthly report, however, the e-mail containing "the Package" was sent in advance of each mid-month and month-end meeting.

54.    According to the former MBNA financial analyst, only senior management could attend these mid-month and monthly meetings. During these meetings defendant Vecchione was well-prepared with detailed notes. Vecchione would actively discuss and ask questions regarding trends and fluctuations contained in "the Package."

55.    The individual Defendants received frequent "Financial Updates" during the second half of 2004 and through the Class Period, which included a comparison of actual financial results and targets for key benchmarks including loans, loan growth, net income before taxes ("NIBT"), net income growth, EPS and EPS growth. These Financial Updates typically included "Solves," which outlined risks to MBNA's ability to meet key targets and suggestions to solve them. In the fall of 2004, one of the "solves" employed by MBNA to eliminate the gap between its financial targets and actual results was to cut marketing expenses. The marketing expense reductions sacrificed longer term new account growth and loan growth for short term financial performance.

56.    These Financial Updates were discussed at regular "NIBT Meetings," which Cochran and Struthers regularly attended during the second half of

2004. During that time, the Financial Updates that Cochran and Struthers received and discussed at the NIBT meetings outlined declines for the U.S. Credit Card in almost every key business metric, including loans, loan growth, NIBT and net income growth. These negative trends would make it impossible for MBNA to meet its earnings guidance issued in 2005, and were not fully and accurately disclosed at the end of 2004.

57.     Throughout 2004 MBNA experienced increasing payment rates for its U.S. Credit Card, the core of its business.  MBNA executives, including Cochran and Struthers, received periodic reports, such as the Third Quarter 2004 Financial Review, that documented the increasing payment rates.  These increasing payment rates contributed to the devaluation of the I/O strip and the need for a write-down of that asset.

58.     The increasing payment rates were caused by a number of factors, including MBNA's deliberate shift to a portfolio that included a larger percentage of rewards cards.  As an internal memorandum dated April 21, 2005 confirms, it had been widely known within the industry that rewards cards experience higher payment rates than nonrewards cards.  MBNA's pullback on cash marketing and 0% promotional offers, as well as its repricings, also contributed to the increasing payment rates that MBNA experienced in 2004 and 2005.

59.     A 2005 Plan Review in late November, 2004 included numbers based on the 2005 Plans submitted by the Business Lines (e.g., U.S. Credit Card, Consumer Finance, Business Card) and a sensitivity run by Corporate & Strategic Planning.  Based on the Plans submitted by the Business Lines, EPS growth for 2005 was forecasted to be negative 5%, and based on the Corporate & Strategic Planning sensitivity, EPS growth for 2005 was expected to be negative 14%.

19

60.     According to the former MBNA financial analyst, MBNA employees also altered the mid-month report to coincide with the monthly "Package," whenever retroactive journal entries or other accounting machinations were used to manipulate financial results.

61.     This former MBNA financial analyst reported that members of the ALCO (Assets and Liability Management Committee) team were responsible for calculating the fair value of the IO strip receivable. This former MBNA analyst explained that it was "procedure" to review all securitization assumptions on a monthly basis. According to this analyst, in December 2004, certain MBNA employees worked significant overtime with regard to what the Company termed an "error" in securitization that involved $80 million. As a result of this securitization error, MBNA had employees, including members of the ALCO team, "start over" and "change all the financial statements."

62.     According to the aforementioned analyst, an MBNA Vice President went so far as to send an e-mail apologizing and thanking those individuals who stayed overtime to help "get the books redone" in December 2004.

63.     MBNA fostered an environment and supported an unwritten Company policy that, in an effort to meet expectations, unlawfully empowered managers to treat actual financial results as mere suggestions. Additionally, defendants encouraged managers to enter into deceptive accounting maneuvers that would soften or eliminate any negative impact on financial results.

**THE TRUTH IS REVEALED**

64.     The truth began to emerge on April 21, 2005, before the market

opened. On that date, MBNA announced that its profit would be "significantly below" its

10% growth target for 2005 purportedly because customers were "unexpectedly" paying

off credit card debt in favor of less-expensive sources of credit such as home-equity

loans. The Company further announced that first-quarter earnings fell 93%, year-over-

year to $0.02 a share, before a restructuring charge, from $0.40 cents a share in the first

quarter of 2004, and that earnings were adversely affected by a $206.6 million write-

down of the Company's IO strip receivable. Reported first-quarter earnings excluding the

one-time restructuring charge were $0.40 per share; the average earnings estimate of 23

analysts surveyed by Thomson Financial had been $0.46 per share.

65.     On this news, shares of MBNA fell to a two-year intraday low

of $18.50 before closing at $19.28, down $3.83, or 16.6 percent, on a day most major

bank stocks rose. The lowered earnings included a $206.6 million write-down of

MBNA's IO strips.

66.     On April 21, 2005, *Bloomberg News* published an article about

the MBNA disclosure that stated, in pertinent part, as follows:

> Executives at MBNA gave 2005 profit growth forecasts in
> January, and didn't indicate the company would fail to reach
> its growth target when it updated its restructuring plans on
> April 6, according to Jason Tyler, who helps oversee $22
> billion at Ariel Capital Management in Chicago.
>
> "Management has lost a lot of credibility," said Tyler,
> whose firm holds 10.8 million shares. "For the first time in
> their history they give earnings guidance, and they can't get
> there. There certainly is a little egg on their face right now.

21

67.     Bruce Harting, an analyst for Lehman Brothers, stated in a note to investors the following: "We find this somewhat disconcerting. The company issued the [10%] guidance just three months ago." On April 21, 2005, Susquehanna Financial Group LLP published an analyst report on MBNA under the headline, "Shock and Awe," and Friedman Billing analyst Scott Valentin stated, "While the restructuring charges and a challenging receivables growth environment was expected, the degree of margin compression, combined with the IO write-down was a negative surprise."

## MBNA'S FALSE FINANCIAL REPORTING

### FAILURE TO TIMELY WRITE-DOWN
### MBNA'S INTEREST-ONLY STRIP RECEIVABLES

68.     In order to overstate the Company's financial results during the Class Period, defendants caused the Company to fail to timely write-down to fair value MBNA's investment in IO strip receivables. Defendants materially overstated MBNA's assets, stockholders' equity and net income by failing to timely recognize the impairment of MBNA's IO strip receivables caused by increased payment volumes on customer accounts with higher interest rates, which adversely impacted the Company's yield on managed loans. As a result of MBNA's failure to timely write-down to fair value its IO strip receivables, MNNA presented materially inflated financial results, in its Form 10-K for the year ended December 31, 2004, in violation of GAAP and its own disclosed policies.

69.     SEC Regulation S-X requires that publicly traded companies present their annual financial statements in accordance with GAAP. [17 C.F.R. § 210.4- 0 1(a) (1)]. In addition, Regulation S-X requires that interim financial statements also

comply with GAAP. Financial statements filed with the SEC that are not prepared in

compliance with GAAP are presumed to be misleading and inaccurate. Management is

responsible for preparing financial statements that conform to GAAP. As noted by

AICPA professional standards:

> financial statements are management's responsibility…
> [M]anagement is responsible for adopting sound
> accounting policies and for establishing and maintaining
> internal control that will, among other things, record,
> process, summarize and report transactions (as well as
> events and conditions) consistent with management's
> assertions embodied in the financial statements. The
> entity's transactions… are within the direct knowledge
> and control of management… Thus, the fair presentation
> of financial statements in conformity with Generally
> Accepted Accounting Principles is an implicit and
> integral part of management's responsibility.

70.     MBNA's 10 -K for the year ended December 31, 2004

disclosed the following with respect to the Company's assumptions related to its IO

receivables:

> The Corporation estimates the fair value of the IO strip
> receivable based on the present value of expected future net
> revenue flows. Since quoted market prices for the IO strip
> receivable are not available, management uses certain
> assumptions and estimates in determining the fair value of
> the IO strip receivable. These assumptions and estimates
> include projections of interest income, certain fees,
> recoveries on charged-off securitized loans, gross credit
> losses on securitized loans, contractual servicing fees, and
> the interest rate paid to investors in a securitization
> transaction ("excess spread"). These projections are used
> to estimate the excess spread to be earned by the
> Corporation over the estimated life of the securitized loan
> principal receivables. The other assumptions and estimates
> used by the Corporation in estimating the fair value of the
> IO strip receivable include projected loan payment rates,
> which are used to determine the estimated life of the
> securitized loan principal receivables, and an appropriate
> discount rate.

MBNA 2004 10-K at 23 (Mar. 15, 2005) (emphasis added).

> 71.    Similarly, the Office of the Comptroller of the Currency ("OCC") Bulletin 99-15, notes that the key assumptions in valuing IO strips include prepayment rates, credit loss rates, discount rates, and servicing rates. Regarding prepayment rates, the OCC noted that:

> > Prepayment speeds are a critical risk to securitized asset pools and should be analyzed thoroughly and monitored closely for initial valuation and ongoing impairment analyses. Prepayment speeds can vary greatly by product, credit grade, loan-to-value, geographic area, and other demographic or economic factors. For example, voluntary prepayments commonly accelerate with market interest rate reductions, driving down the estimated life of the pool of underlying assets and therefore, the value of IO strips and servicing assets.

OCC Bulletin 99-15, Subprime Lending Risks and Rewards (Apr. 5, 1999) (emphasis added).

> 72.    Additionally defendants disclosed in MBNA's 2004 10-K that:

> > The assumptions and estimates used to estimate the fair value of the IO strip receivable at December 31, 2004, reflect management's judgment as to the expected excess spread to be earned and projected loan payment rates to be experienced on the securitized loans.

> 73.    Defendants did not comply with their purported internal policies and applicable regulations because they knew or recklessly disregarded that above market interest rate reductions existing before and during the Class Period would cause an acceleration in voluntary prepayments, thereby impairing the value of the IO strip receivables during the Class Period. For example, the attached Exhibit A incorporated herein by reference demonstrates that MBNA should have known that the

payment rates of its credit card users would spike when it raised its already high interest rates in October 2004. The chart in Exhibit A compares the interest spread between the Prime Rate (which drives home equity loan interest rates) and the average credit card annual percentage rates ("APR") for three of the top major credit card issuers, and also identifies the corresponding average APR for MBNA's non-affinity credit cards. While the interest spread between the Prime Rate and typical credit card APRs are directly correlated and remained steady, MBNA set itself apart by dramatically raising its APR to 20.70% — representing a 15% increase for October 2004. As the attached Exhibit B incorporated herein by reference demonstrates (using data collected by Sanford Bernstein in a report dated April 21, 2005), MBNA credit card users immediately responded by paying off their MBNA balances at faster rates in November 2004 — opting to take advantage of lower debt carrying costs at other credit card issuers (with balance pay-down offers) or with home equity loans and lines of credit.

74.    MBNA's failure to timely write down its investment in its IO strip receivables is a violation of GAAP, which requires that for individual securities classified as either available-for-sale or held-to-maturity, a company shall determine whether a decline in fair value below the amortized cost basis is other than temporary. FASB Statement of Financial Accounting Standards ("SFAS") No. 115, Accounting for Certain Investments in Debt and Equity Securities, ¶16 (May 1993). Pursuant to SFAS No. 115, MBNA was required to write-down a security's carrying value to fair value and to reflect the amount of the write-down in earnings when the occurrence of a decline in the market value of the security was deemed to be anything other than temporary. Id.[1]

---

[1] According to SFAS No. 140 Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities ¶ 14 (September 2000):

Accordingly, because it was probable that MBNA would be unable to collect all amounts due according to the contractual terms of the IO strip receivables not impaired at inception, an other-than-temporary impairment occurred, requiring a charge to earnings.

75.     Additionally, GAAP provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated. SFAS No. 5, Accounting for Contingencies ¶ 8 (March 1975).  SFAS No. 5 also requires that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made.

76.     The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred." 17 C.F.R. § 210.10-01.

---

IO strips, retained interests in securitizations, loans, other receivables or other financial assets that can contractually be prepaid or otherwise settled in such a way that the holder would not recover substantially all of its recorded investment…shall be subsequently measured like investments in debt securities classified as available-for-sale or trading under Statement 115, as amended (par. 362).

77.     Also, GAAP states that:

> An expense or loss is recognized if it becomes evident that
> previously recognized future economic benefits of an asset
> have been reduced or eliminated, or that a liability has been
> incurred or increased, without associated economic
> benefits.

FASB Statement of Concepts No. 5 ¶ 87.

78.     In MBNA's press release dated April 21, 2005, defendants

belatedly admitted the impropriety of the Company's prior statements by taking a $206.6

million charge on its IO strip receivables. In this regard, the Company disclosed:

> the Corporation's results were further impacted by
> <u>unexpectedly high payment volumes from U.S. credit card
> customers</u>. The higher payments reduced managed loans in
> the quarter more than in prior years. Additionally, the
> payment volumes were particularly higher on accounts with
> higher interest rates, which adversely impacted the
> Corporation's yield on managed loans.
>
> As a result of these recent trends, in the revaluation of its
> IO strip receivable, the Corporation projected lower excess
> spreads and higher payments. This reduced the IO strip
> receivable and resulted in a net loss from securitization
> activity of $206.6 million. The net loss from securitization
> activity is included in other operating income and caused
> the Corporation's first quarter 2005 other operating income
> to be lower than its first quarter 2004 other operating
> income. (emphasis added).

79.     Accordingly, defendants violated GAAP by failing to timely

write down the Company's investments in its IO strip receivables when there was a

significant change in payment trends, adversely impacting said investments, thus

overstating MBNA's reported net income, assets, and stockholders' equity during the

Class Period. At that time, the defendants knew or recklessly disregarded that the IO strip

receivables were experiencing deteriorating financial conditions, due to the increased

27

payment volumes on customer accounts with higher interest rates, starting in November 2004.

80.    Additionally, MBNA's failure to timely write down the Company's investments in its IO strip receivables was material. The materiality is evidenced by the fact that, if not for the failure to take the charge of $206.6 million, MBNA would have missed analysts' consensus EPS estimates of $0.58 for 4Q:2004. See SAB No. 99 (stating that in assessing the materiality of a misstatement the auditor must consider "whether the misstatement masks a change in earnings or other trends [and] whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise"). Additionally, MBNA touted that "net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth quarter of 2003." To be sure, defendants' failure to take the $206.6 million charge in the fourth quarter of 2004 allowed MBNA to show solid growth, rather than a loss.

**ADDITIONAL GAAP VIOLATIONS**

81.    In addition to the accounting improprieties stated above, MBNA presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

a.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

b.      The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

c.      The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

d.      The concept that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

e.      The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

f.      The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79); and

g.      The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business

situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

## VIOLATIONS OF SEC REGULATIONS

82.    Item 7 of Form 10-K and item 2 of Form 10-Q, Management Discussions and Analysis of Financial Condition and Results of Operations ("MD&A") require the issuer to furnish information required by Item 303 of Regulation S-K [17.C.F.R.229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

83.    In addition, the SEC in its May 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K.

84.    A disclosure duty exists where a trend, demand, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

## FALSE AND MISLEADING STATEMENTS AND OMISSIONS

85.    On January 20, 2005, the first day of the Class Period, the Company issued a press release reporting 4Q:2004 results. The press release reported that "net income for the fourth quarter of 2004 was $768.9 million or $.59 per common share, an increase of 9%, compared with $703.5 million or $.54 per common share for the fourth

quarter of 2003." Additionally, MBNA disclosed that for the full year, net income rose to $2.68 billion or $2.05 per common share, an increase of 15% compared to $2.34 billion or $1.79 per common share for 2003."

86.    That same day, MBNA filed with the SEC a Form 8-K for the quarter ended December 31, 2004. The 8-K repeated the financial results reported in the Company's press release. The Form 8-K was signed by defendant Vecchione.

87.    The above-described statements appearing in MBNA's fourth quarter 2004 press release and Form 8-K touting the Company's financial results were materially false and misleading when made because MBNA knew or recklessly disregarded that it had manipulated its financial results in the fourth quarter and year-end of 2004, that customers were not converting to market rate balances after teaser rates expired; and that the dramatic increase in credit card payment rates starting in November 2004 had impaired the value of MBNA's investment in its IO strip receivables.

88.    On January 21, 2005, MBNA hosted its first ever "Investor Day". During that call, defendant Hammonds stated, in pertinent part, as follows:

> We expect earnings growth to average about 12% over the next several years. There will be years when it's more than 12% and years when it's less than 12%. And in fact, in 2005 we expect it to be more like 10%.

As Hammonds noted at the outset of the call, the entire Executive Committee was present on the call, including Vecchione, Krulak, Cochran and Struthers. Those individuals remained silent, failing to correct Hammonds's false and misleading statements.

89.    On January 21, 2005, MBNA filed with the SEC a Form 8-K that reaffirmed its earnings guidance stating, in pertinent part, as follows:

MBNA Corporation announced today that management's objective is to increase earnings per share by 10% in 2005 and by an average of 12% per year over the next several years, excluding the impact of a previously announced restructuring charge of approximately $300 million to $350 million pre-tax that the Corporation will take in the first quarter of 2005.

90.    The above-described statements providing earnings guidance in a conference call, in MBNA's form 8-K and on "Investor Day" were materially false and misleading when made because MBNA knew or recklessly disregarded that:

a.    credit card growth would be adversely impacted due to continued mortgage refinance activity which was not as profitable for MBNA as its credit card business;

b.    customers were not converting to market rate balances after MBNA's teaser rates expired;

c.    MBNA faced intense competitive pressures from other major card issuers;

d.    MBNA alone increased its interest rates at least as early as October 2004;

e.    MBNA was experiencing a steady decline in its net interest margin, starting in the fourth quarter of 2001;

f.    January's mid-month "Package" provided a detailed report showing current and projected increased credit card pre-payment rates;

g.    monthly revaluations of its quarterly model for IO strip receivable assumptions showed that the receivables were artificially inflated;

h.    MBNA had manipulated its financial results for the fourth quarter and year-end of 2004; and

i.    MBNA monitored the dramatic increase in credit card payment rates starting in November of 2004, which had a negative effect on the fair value of the IO strip receivables.

91.    On March 15, 2005, defendants filed the Company's Form 10-K with the SEC, essentially repeating the results announced in January 2005. With respect to IO strips, in the section of the Form 10-K captioned "Off-Balance Sheet Asset Securitization," the Company stated, in pertinent part:

> The Corporation estimates the fair value of the IO strip receivable based on the present value of expected future net revenue flows.
>
> ****
>
> The assumptions and estimates used to estimate the fair value of the IO strip receivable at December 31, 2004, reflect management's judgment as to the expected excess spread to be earned and projected loan payment rates to be experienced on the securitized loans.
>
> ****
>
> On a quarterly basis, the Corporation reviews prior assumptions and estimates and compares the results to actual trust performance and other factors for the prior period that approximates the average life of the securitized loan receivables. Based on this review and the Corporation's current assumptions and estimates for future periods, the Corporation adjusts as appropriate, the assumptions and estimates used in determining the fair value of the IO strip receivable.

The Form 10-K was signed by defendants Hammonds and Vecchione.

92.    The above-described statements appearing in MBNA's Form 10-K were materially false and misleading when made because MBNA knew or recklessly disregarded that:

33

a.    its true expectations were more accurately reflected on a monthly basis in "the Package;"

b.    credit card growth would be adversely impacted due to continued mortgage refinance activity which was not as profitable for MBNA as its credit card business;

c.    customers were not converting to market rate balances after MBNA teaser rates expired;

d.    MBNA faced intense competitive pressures from other major card issuers resulting in a loss of customers;

e.    MBNA alone increased its interest rates at least as early as October 2004;

f.    MBNA was experiencing a steady decline in its net interest margin starting in the 4Q:2001; and

g.    monthly revaluations of its quarterly model for IO strip receivable assumptions showed that the receivables were artificially inflated.

h.    MBNA had manipulated its financial results for the fourth quarter and year-end of 2004; and

i.    MBNA monitored the dramatic increase in credit card payment rates starting in November of 2004, which had a negative effect on the fair value of the IO strip receivables.

93.    In addition to the foregoing, the Company's 2004 Form 10-K also contained the following certifications signed by defendants Hammonds and Vecchione:

34

1. I have reviewed this annual report on Form 10-K of MBNA Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a- 15(e) and 15d- 15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

I . . . certify that MBNA Corporation's Form 10-K for the period ended December 31, 2004, fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of MBNA Corporation.

## ADDITIONAL SCIENTER ALLEGATIONS

94.      The Individual Defendants, by reason of their stock ownership, management position, and/or membership on MBNA's board of directors, were controlling persons of MBNA and had the power and influence, and exercised the same, to cause MBNA to engage in the illegal practices complained of herein.

95.      As discussed above, Defendants deceived the investing public in the drafting and preparation of the public documents and communications complained of herein, and knew of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and knew or recklessly disregarded, their materially misleading nature. Because of their board membership and/or executive and managerial position with MBNA, the defendants had access to the adverse non-public information about MBNA's business prospects and financial condition.

36

96.     As alleged herein, throughout the Class Period, defendants knew or recklessly disregarded that MBNA's revenue, income and earnings per share were materially overstated and that critical assumptions used to value the IO strip receivables were unreasonable and contradicted by actual experience. For example, each defendant held a position with MBNA wherein they would have been included on the "huge distribution list" that received a copy of "the Package" as described in herein. "The Package" reported trends and projections as to all revenues and expenses twice a month. With securitization serving as MBNA's primary source of funding, a projection and calculation of actual prepayment rates would have been included in every "Package." Not only were defendants Hammonds, Vecchione and Struthers included on this distribution list, but twice a month Vecchione, among others, would attend these meetings well-prepared and with questions about "the Package." By virtue of their receipt of this information reflecting the true facts regarding the Company and its financial condition, all defendants directly participated in and knew of the fraudulent scheme alleged herein.

97.     The undisclosed problems alleged in this Complaint regarding MBNA's accounting practices and financial condition were continuous, material, and of a nature that evidences they were known of and in existence during the Class Period and were therefore known to or within the purview of all defendants at all relevant times. The undisclosed problems would have been a matter of utmost concern for senior management especially in light of the potential acquisition of MBNA by another banking institution.

98.     MBNA's senior management intentionally or recklessly fostered an environment and supported an unwritten company policy that unlawfully

empowered managers to treat reported financial figures failing to meet expectations as mere suggestions should they determine that deceptive accounting maneuvers could soften or eliminate any negative reaction by the investing public. Managers overrode financial journal entries monthly, and as described herein, this policy was implemented when a Vice President of the ALCO team had MBNA employees work overtime to change MBNA's books in December 2004.

99.     According to the former MBNA financial analyst described in paragraph 49, every employee was required to field customer telephone calls for a total of eight hours a month. This analyst explained that by having all employees field customer telephone calls, which included inquiring about the reasons for paying off and closing credit card accounts, MBNA heard for itself that its customers were switching to home equity loans instead of credit card debt.

100.     According to a former MBNA internet architect with over ten years of service at MBNA who fielded calls, telephone calls to MBNA often involved customers advising MBNA that unless it extended their zero percent credit card rates, they would close their accounts. This former employee also recalled employees in MBNA's customer service unit indicating that every person they spoke with during a four or eight hour shift would be canceling their credit card.

101.     According to the former MBNA internet architect, the "constant talk" at MBNA was the loss of customers and in October 2004 everyone was predicting layoffs or a buyout. According to this MBNA former employee, the trends of internet credit card applicants were reported to the Senior MBNA executives.

102.    As detailed above, the Individual Defendants, as officers and directors of the Company, were privy to confidential financial information concerning the Company's business, financial condition and future business prospects and outlook. In this capacity, the Individual Defendants had access to material, nonpublic information concerning the Company's true financial condition and how MBNA would not be able to meet its 10% guidance for 2005. Defendants knew that they would be forced to reveal the extent to which known high credit card payment rates were affecting its IO strip receivable, which would affect MBNA's business and earnings.

103.    Defendants engaged in accounting and balance sheet manipulations in order to put off the inevitable until another fiscal year, enabling them to meet financial benchmarks set by the Compensation Committee of the Board and earn sizeable bonuses at the end of 2004. If MBNA's net income growth for 2004 had been a mere two percent lower, the MBNA Executive Committee, including Defendants Hammonds, Vecchione, Krulak, Cochran and Struthers would have earned no bonus in 2004.

104.    Notwithstanding the duty not to sell MBNA common stock when they possessed this sort of material, non-public information regarding MBNA's true financial condition, or to disclose the insider information prior to selling the stock, each of the Individual Defendants and several other directors of the Company, sold MBNA stock at prices that were artificially inflated by defendants' material false and misleading statements and omissions.

105.    As discussed above, the defendants deceived the investing public for their personal financial advantage, artificially inflating the price of MBNA stock so that they could engage in unlawful insider sales transactions. As is evidenced by the material

stock price drop following the April 21, 2005 disclosure, had the market known the truth regarding MBNA's business, the Company's stock price would have been negatively impacted. During the two years that preceded the Class Period, the Individual Defendants sold 2,429,313 shares of MBNA common stock for proceeds of $56,230,935. In comparison, over a mere three months (the Class Period), the Individual Defendants sold 1,937,948 shares of MBNA common stock for proceeds of $51,643,058.50. Defendants' Class Period stock sales both collectively and individually, as reflected in Exhibit C incorporated herein by reference, were unusual and suspicious in terms of timing and amount by virtue of the volume of stock sold during the weeks that immediately followed MBNA's January 2005 guidance of 10% growth for 2005 as follows:

   a. Defendant Bruce Hammonds sold 351,409 shares for more than $9 million in proceeds, representing 6.64% of his total holdings including vested options, this represented a trade of 30.92% of his total open market sales since January 2003:

**Bruce Hammonds: CEO and President**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/27/2005 | 351,409 | 26.51 | 9,315,852.59 |

   b. Defendant Kenneth Vecchione's sales of 100,462 shares for $2,684,398.70 in proceeds, representing 8.80% of his total holdings including vested options during the Class Period, is highly unusual because it represents 100% of his open market sales for the two years prior:

**Kenneth Vecchione: CFO**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/25/2005 | 79,829 | 26.7 | 2,131,434.30 |
| 1/25/2005 | 20,633 | 26.8 | 552,964.40 |
| | **100,462** | | **2,684,398.70** |

      c.      Defendant John Cochran's sales of 531,159 shares for

over $14 million in proceeds, representing 8.96% of his total holdings including vested

options during the Class Period, is highly unusual because in one day Cochran sold more

shares and profited more than any other trading day in the two years prior:

**John Cochran: COO**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 1/27/2005 | 398,150 | 26.51 | 10,554,956.50 |
| 1/27/2005 | 133,009 | 26.55 | 3,531,388.95 |
| | **531,159** | | **14,086,345.45** |

      d.      Defendant Charles Krulak's sales of 497,454 shares for

over $13 million in proceeds, representing 64.02% of his total holdings including

common stock and options exercised as reported with the SEC, is highly unusual because

it represents 90.64% of his open market sales for the preceding two years:

**Charles Krulak: Chief Accounting Officer**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 2/1/2005 | 224,754 | 26.75 | 6,012,169.50 |
| 2/1/2005 | 50,217 | 27 | 1,355,859.00 |
| 1/31/2005 | 92,483 | 26.5 | 2,450,799.50 |
| 1/25/2005 | 130,000 | 26.61 | 3,459,300.00 |
| | **497,454** | | **13,278,128.00** |

e.    Defendant Richard Struthers's sales of 457,464 shares for

over $12 million in proceeds, representing 12.53% of his total holdings including vested

options during the Class Period, is highly unusual because it represents 55.6 1% of his

open market sales for the preceding two years:

**Richard Struthers: Vice Chairman**

| Transaction Date | Shares | Price | $ Value |
|---|---|---|---|
| 2/3/2005 | 457,464 | 26.84 | 12,278,333.76 |

106.    As alleged herein, Defendants acted with scienter in that

Defendants knew that the public documents and statements issued or disseminated by or

in the name of the Company were materially false and misleading; knew or recklessly

disregarded that such statements or documents would be issued or disseminated to the

investing public; and knowingly and substantially participated or acquiesced in the

issuance or dissemination of such statements or documents as primary violators of the

federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of

their receipt of information reflecting the true facts regarding MBNA and its business

practices, their control over and/or receipt of MBNA's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to

confidential proprietary information concerning MBNA, were active and culpable

participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly

disregarded the falsity and misleading nature of the information which they caused to be

disseminated to the investing public. The ongoing fraudulent scheme described in this

complaint could not have been perpetrated over a substantial period of time, as has

42

occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

107.    The Individual Defendants engaged in such a scheme to inflate the price of MBNA securities in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of MBNA securities; and (iii) reap enormous profits from the exercise of their stock options and the sale of MBNA securities.

## STATUTORY SAFE HARBOR

108.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Further, none of the statements pleaded herein which were forward-looking statements were identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward looking statement was authorized and/or approved by an executive officer of MBNA who knew that those statements were false when made. Further, the clear language of the Private Securities Litigation Reform Act expressly excludes from the safe harbor protection statements that are "included in a financial statement prepared in accordance with generally accepted accounting principles." In re Sunbeam Sec. Litig., 89 F. Supp. 2d 1326, 1339 (S.D. Fla. 1999); 15 U.S.C. § 78u-5(b)(2)(A).

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## <u>FRAUD ON THE MARKET DOCTRINE</u>

109.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose facts during the Class Period;

b.    The omissions and misrepresentations were material;

c.    MBNA securities traded in an efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.    Plaintiffs and the other members of the Class purchased MBNA securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

110.    At all relevant times, the market for MBNA securities was an efficient market for the following reasons, among others:

a.    Pursuant to the Company's March 31, 2005 SEC Form 10-Q the Company had 1,267,661,327 shares outstanding;

b.    MBNA securities were listed and actively traded during the Class Period on the NYSE, the world's leading and most technologically advanced equities market. During the Class Period, MBNA stock was actively traded on the NYSE with an average daily trading volume of 5,805,527 and a total trading volume of 359,942,700 shares;

c.    As a regulated issuer, MBNA regularly made public filings, including its Forms 10-K, Forms 10-Q and related press releases, with the SEC;

d.    MBNA was followed by analysts from major brokerages. During the Class Period, there were at least 25 research reports written by securities analysts. The reports of these analysts were redistributed to the brokerages' sales force, their customers, and the public at large;

e.    There were more than 949 different institutions of sophisticated investors that owned MBNA common stock during the Class Period; and

f.    MBNA regularly communicated with public investors via established market communication mechanisms, including the Company's website, regular disseminations of press releases on the major news wire services, and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

111.    As a result, the market for MBNA securities digested current information regarding the Company from the publicly available sources described above and reflected such information in the prices of MBNA's securities. As would be expected where a security is traded in an efficient market, material news concerning MBNA's business had an immediate effect on the market price of MBNA's securities, as evidenced by the rapid decline in the market price in the immediate aftermath of MBNA's corrective disclosures as described herein. Under these circumstances, all purchasers of MBNA's securities during the Class Period suffered similar injury due to the fact that the price of MBNA securities was artificially inflated throughout the Class Period. At the times they purchased or otherwise acquired MBNA's securities, Plaintiffs and other

members of the Class were without knowledge of the facts concerning the wrongful

conduct alleged herein and could not reasonably have discovered those facts. As a result,

the presumption of reliance applies. Plaintiffs will also rely, in part, upon the presumption

of reliance established by a material omission.

### COUNT I

### FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

112.     Plaintiffs repeat the allegations set forth above as though fully

set forth herein. This claim is asserted against MBNA and the Individual Defendants.

113.     During the Class Period, Defendants carried out a plan, scheme

and course of conduct which was intended to, and did: (i) deceive the investing public,

including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and

maintain the market price of MBNA common stock; and (iii) cause Plaintiffs and other

members of the Class to purchase MBNA stock at artificially inflated prices during the Class

Period. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took

the actions set forth herein.

114.     Defendants, as set forth above: (a) employed devices, schemes,

and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state

material facts necessary to make the statements not misleading; (c) failed to correct false and

misleading statements made by Defendants; and (d) engaged in acts, practices and a course of

business which operated as a fraud and deceit upon the purchasers of the Company's

common stock in an effort to maintain artificially high market prices for MBNA common

stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued

as primary participants in the wrongful and illegal conduct charged herein, and as controlling

persons of MBNA, as alleged below.

46

115.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

116.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of MBNA as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBNA's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBNA and its business, operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBNA securities during the Class Period.

117.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) Individual Defendants were all high-level executives and/or directors at the Company during the Class Period; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) these Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

118.    Defendants had actual knowledge of the severe misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MBNA's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations

48

and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

119.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBNA's common stock was artificially inflated during the Class Period. Unaware of the fact that the market price of MBNA's shares was artificially inflated, and relying (directly or indirectly) on Defendants' false and misleading statements, or on the integrity of the market in which the securities are traded, and/or on the absence of material, adverse information known to or recklessly disregarded by Defendants (but not disclosed to the public) during the Class Period, Plaintiffs and the other members of the Class acquired MBNA common stock during the Class Period at artificially high prices and suffered damaged when revelation of the true facts caused a decline in the value of their investments.

120.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were unaware of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and true value of MBNA, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have acquired their MBNA securities during the Class Period, or if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

121.    By virtue of the foregoing, Defendants voided Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

122.    As a direct and proximate results of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their acquisition of the MBNA securities during the Class Period.

**COUNT II**

**FOR VIOLATIONS OF SECTION 20(a) OF THE
EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS**

123.    Plaintiffs repeat the allegations set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

124.    Individual Defendants were, and acted as, controlling persons of MBNA within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, these Defendants had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

125.    In addition, Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the

50

power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

126.    As set forth above, Individual Defendants violated Section 10(b) and rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, each on their own behalf and on behalf of the Class, pray for judgment as follows:

a.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c.    Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs;

d.    Ordering an accounting of Defendants' insider trading proceeds;

e.    Awarding preliminary and permanent injunctive relief in favor of Plaintiffs and the Class against Defendants, including an accounting and the

imposition of a constructive trust and/or an asset freeze on Defendants' insider trading proceeds; and

        f.      Such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Date: July 28, 2008        Respectfully submitted,

/s/ *Brian D. Long*
Seth D. Rigrodsky (#3147)
sdr@rigrodskylong.com
Brian D. Long (#4347)
bdl@rigrodskylong.com
**RIGRODSKY & LONG, P.C.**
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310

***Plaintiffs' Liaison Counsel***

**MOTLEY RICE LLC**

William H. Narwold (admitted *pro hac vice*)
Robert T. Haefele (admitted *pro hac vice*)
William E. Applegate, IV (admitted *pro hac vice*)
Meghan S.B. Oliver (admitted *pro hac vice*)
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9450 (fax)

***Plaintiffs' Lead Counsel***

# EXHIBIT A



Credit Card Annual Percentage Rate (APR) v. Home Equity Loans (At Prime)

# EXHIBIT B



# EXHIBIT C



MBNA Corp
Summary of Insider B. Hammonds
Monthly Shares Sold January 1, 2003 - April 20, 2005



MBNA Corp
Summary of Insider K. Vecchione
Monthly Shares Sold January 1, 2003 - April 20, 2005

Summary of Insider Selling
Pre Class Shares Sold: 0
Proceeds from Sales: $0

Class Period Shares Sold: 100,462
Proceeds from Sales: $2,684,399
% of holdings sold: 8.8%

1/25/05
Vecchione sells
100,462 Shares
for Proceeds of
$2,684,399.

Class Period
1/20/05 - 4/20/05



MBNA Corp
Summary of Insider J. Cochran
Monthly Shares Sold January 1, 2003 - April 20, 2005



MBNA Corp
Summary of Insider C. Krulak
Monthly Shares Sold January 1, 2003 - April 20, 2005



MBNA Corp
Summary of Insider R. Struthers
Monthly Shares Sold January 1, 2003 - April 20, 2005

2/3/05
Struthers sells
457,464 Shares
for Proceeds of
$12,278,334.

Class Period
1/20/05 - 4/20/05

6/16/04
Struthers sells
165,170 Shares for
Proceeds of
$4,134,205.

11/7/03
Struthers sells
200,000 Shares for
Proceeds of
$5,010,000.

Summary of Insider Selling
Pre Class Shares Sold: 365,170
Proceeds from Sales: $9,144,205

Class Period Shares Sold: 457,464
Proceeds from Sales: $12,278,334
% of holdings sold: 12.53%