UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE MBNA CORP.<br>SECURITIES LITIGATION | Case No. 1:05-CV-00272-GMS<br>CONSOLIDATED |

## COMPENDIUM OF UNREPORTED CASES TO REPLY
## IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Dated: August 28, 2008

/s/ Brian D. Long
Seth D. Rigrodsky (#3147)
sdr@rigrodskylong.com
Brian D. Long (#4347)
bdl@rigrodskylong.com
**RIGRODSKY & LONG, P.A.**
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310

*Plaintiffs' Liaison Counsel*

**MOTLEY RICE LLC**
William H. Narwold (admitted *pro hac vice*)
bnarwold@motleyrice.com
Robert T. Haefele (admitted *pro hac vice*)
rhaefele@motleyrice.com
William E. Applegate, IV (admitted *pro hac vice*)
wapplegate@motleyrice.com
Meghan S.B. Oliver (admitted *pro hac vice*)
moliver@motleyrice.com
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000

*Plaintiffs' Lead Counsel*

## **INDEX**                                                                       **TAB**

*Talecris Biotherapeutics, Inc. v. Baxter Intern., Inc.,*
No. 05-349 GMS, 2007 WL 1670387 (D. Del. June 7, 2007)...........................….......….....…. 1

*Thoman v. Philips Med. Sys.,*
No. 04-3698 (GEB), 2007 WL 203943 (D.N.J. Jan. 24, 2007).......................…....…….....…...... 2

*Keene v. Sears Roebuck & Co.,*
No. 05-828 (AET), 2007 WL 77324 (D.N.J. Jan. 8, 2007)..............….......………….......…...… 3

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,*
No. 06-30908, 2008 WL 2894793 (5th Cir. July 29, 2008)..........................…...…................... 4

*Fisher v. Offerman & Co.,*
No. 95 Civ. 2566 (JGK), 1996 WL 563141 (S.D.N.Y. Oct. 2, 1996)................…..…............. 5

*Palladin Partners v. Gaon,*
No. 05-CV-3305 (WJM), 2006 WL 2460650 (D.N.J. Aug. 22, 2006)...............…....…..…..... 6

# TABS 1-4

# TAB 1

Westlaw.

Slip Copy                                                           Page 1
Slip Copy, 2007 WL 1670387 (D.Del.)

**H**Talecris Biotherapeutics, Inc. v. Baxter Intern., Inc.
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TALECRIS BIOTHERAPEUTICS, INC., Plaintiff
v.
BAXTER INTERNATIONAL INC., et al.,
Defendants.
Baxter Healthcare Corp., Counterclaimant
v.
Talecris Biotherapeutics, Inc. and Bayer Healthcare
LLC, Counter-defendants.
**C.A. No. 05-349 GMS.**

June 7, 2007.

Westlaw.

Slip Copy                                                           Page 1
Slip Copy, 2007 WL 1670387 (D.Del.)

**H**Talecris Biotherapeutics, Inc. v. Baxter Intern., Inc.
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TALECRIS BIOTHERAPEUTICS, INC., Plaintiff
v.
BAXTER INTERNATIONAL INC., et al.,
Defendants.
Baxter Healthcare Corp., Counterclaimant
v.
Talecris Biotherapeutics, Inc. and Bayer Healthcare
LLC, Counter-defendants.
**C.A. No. 05-349 GMS.**

June 7, 2007.

Dana Kathryn Hammond, Jeffrey B. Bove, Connolly, Bove, Lodge & Hutz, Wilmington, DE, for Plaintiff/Counter-defendants.
Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE, Susan M. Spaeth, Pro Hac Vice, for Defendants/Counterclaimant.

### MEMORANDUM ORDER

GREGORY M. SLEET, United States District Judge.
*1 At Wilmington this 7th day of June, 2007, having reviewed and duly considered the defendants' motion to amend its Answer, and the plaintiff's motion to strike, and the responses thereto;

IT IS ORDERED that the defendants' motion to amend its Answer (D.I.165) is GRANTED. Although the defendants make the frequent mistake of not distinctly addressing the Rule 16 standard in seeking leave to amend after the date set forth in the Scheduling Order for amendments, courts often evaluate whether a movant has shown good cause by considering the movant's articulated reasons under the Rule 15 standard. *See, e.g., Enzo Life Sciences, Inc. v. Digene Corp.,* 270 F.Supp.2d 484, 490 (D.Del.2003). The court finds that the defendants have met the standards of Rules 15 and 16 of the Federal Rules of Civil Procedure. With respect to the defendants' amendment, however, the court strongly cautions the defendants against pursuing an

inequitable conduct claim at trial that is dependent upon a claim construction theory that the court has rejected.

IT IS FURTHER ORDERED that the plaintiff's motion to strike (D.I.184) is DENIED. The court finds that the defendants did not violate the court's August 17, 2006 Order, and did not improperly raise new argument and authority in their reply brief.

D.Del.,2007.
Talecris Biotherapeutics, Inc. v. Baxter Intern., Inc.
Slip Copy, 2007 WL 1670387 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 2**

Westlaw.

Slip Copy
Slip Copy, 2007 WL 203943 (D.N.J.)

Page 1

**C**Thoman v. Philips Medical Systems
D.N.J.,2007.
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States District Court,D. New Jersey.
Charles **THOMAN**, Plaintiff,
v.
**PHILIPS MEDICAL SYSTEMS**, Defendant.
Civ. No. 04-3698 (GEB).

Jan. 24, 2007.

George Wright Fisher, Jr., Zuckerman & Fisher,
LLC, Princeton, NJ, for Plaintiff.
Jeffrey L. Reiner, Morristown, NJ, for Defendant.

**MEMORANDUM OPINION**

BROWN, Chief Judge.
*1 This matter comes before the Court upon the
motion of defendant Philips Medical Systems
("Defendant") for partial summary judgment of the
Complaint of plaintiff Charles Thoman ("Plaintiff").
The motion for partial summary judgment was filed
on behalf of Defendant on April 21, 2006. This
matter was reassigned to the undersigned on
November 16, 2006. The Court has read and
considered all documents filed and submitted and has
decided the motion based upon the parties'
submissions and without oral argument, pursuant to
Federal Rule of Civil Procedure 78. For the reasons
set forth below, Defendants' motion for summary
judgment is granted as to Counts One, Two, Three
and Four.

**I. BACKGROUND**

Plaintiff was a service sales specialist in the field of
medical equipment and was employed by Picker
Marconi for ten years, voluntarily resigned in 2000
and sought to return there in mid-2001. Thoman
Certif. ¶ 1; Certification of Joseph Graham, ¶ 4;
Thoman Vol. I, T7-13 to 18; T9-18 to 19; T27-15 to
19. During the time Plaintiff wished to return to
Picker Marconi, Defendant Philips was in the process
of acquiring the company. Thoman Vol. I, T8-5 to 8.
On May 10, 2002, Plaintiff received an offer of

employment and commenced working shortly
thereafter. Graham Certif., ¶ 4; Certification of
Eugene Prendergast, Exh. R. Plaintiff was born in
1944 and was fifty-seven years old at the time he was
hired by Defendant. Certification of Charles Thoman,
¶ 1; Certification of Jeffrey L. Reiner, Exh. A, 15:21
to 17:5.

According to Plaintiff, during the acquisition,
Defendant's organization was disorganized as it
integrated additional business, sales methods,
documentation and payments into Defendant's
system. Graham Certif., ¶ 5. Plaintiff claims that with
respect to service sales, the filing, record keeping and
determination and payment of commissions was in a
constant state of disarray. Graham Certif., ¶ 5;
Thoman Vol. I, T50-23 to T51-3; T109-11 to 13.
Around the time Plaintiff was hired, the Senior Vice
President of Service Sales issued a memorandum to
the service sales specialists regarding certain
contracts for which no records existed. Graham
Certif., ¶ 5.

Eugene Prendergast, the Zone Manager for
Defendant, was Plaintiff's supervisor and responsible
for administering his annual performance appraisal.
Defendant's Statement of Facts ("SOF"), ¶ 7. Mr.
Prendergast gave Plaintiff a "very good" rating
during his 2002 review, which encompassed the
period from May 2002 until December 31, 2002. *Id.*
Within forty-five days of being hired, Defendant and
Mr. Prendergast realigned the territories and accounts
of the sales staff. Graham Certif., ¶ 14; Certification
of Dennis O'Toole, ¶ 6; Thoman Vol. II, T210-7 to
T217-22. Plaintiff claims that during that alignment
he acquired some of Mr. O'Toole's accounts,
including one in dispute, the Lenox Hill Hospital.
Graham Certif., ¶ 14; O'Toole Certif., ¶ 6; Thoman
Vol. II, T210-7 to T217-22. Plaintiff claims that he
worked on the Lenox Hill account by establishing
personal relationships and attending meetings
regarding the multi-vendor proposal. O'Toole Certif.,
¶ 9; Thoman Vol. II, T210-7 to T217-22. Mr.
Prendergast maintains that the Lenox Hill account
was not Plaintiff's account. Prendergast Certif., ¶¶ 37-
44.

*2 According to Plaintiff, Mr. Prendergast gave him

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

old copies of Defendant's databases which included whether existing customers would be in need of service contracts for medical equipment. Thoman Vol. I, T53-4 to T54-22. Plaintiff developed prospects to pursue from these lists, including University Radiology, Sparta Imaging, Sussex County Imaging and Greene Medical Imaging. Thoman Vol. I, T-48-4 to 9. Plaintiff claims that according to the documents, these accounts did not have service agreements in place once the warranties ended, and so Plaintiff contacted each customer by telephone to solicit service agreements. Thoman Vol. I, T50-12 to 18; Thoman Vol. II, T222-20 to T225-5. Plaintiff admits that he did not confirm the accuracy of the documents prior to contacting the customers. Thoman Certif., ¶ 8. For all four accounts, Plaintiff secured a signed quotation, and the time between first contact with the customer and securing a signed quotation was less than thirty days. Thoman Vol. I, T73-14 to T78-23; T84-15 to T95-24; T99-14 to T103-18. Plaintiff delivered the signed quotations to Mr. Prendergast for review and then forwarded them to booking. Plaintiff did not retain copies of the signed quotations. Thoman Vol. I, T57-21 to T58-5; T97-21 to 24. A quotation is considered "booked" once it has been reviewed by a contract administrator, approved by a manager and entered into the computer system. Thoman Vol. II, T242-18 to 19.

Between August and December 2002, Plaintiff learned that in each of the four accounts he submitted for booking, a service agreement had already been sold to the customer before Plaintiff was employed by Defendant. Thoman Vol. I, T60-19 to 22. Plaintiff claims that he advised the booking department that the appropriate course of action was to process the pre-existing contracts, not the ones he had recently prepared for those four accounts. Thoman Vol. I, T61-25 to T62-4; T69-19 to 22; T70-2 to 5; T114-1 to 15. Plaintiff contends that he informed Mr. Prendergast about the situation-that Plaintiff had put in a lot of work on these four accounts and secured service agreements only to find out later that the customers already had service agreements-and they discussed the commissions for the accounts. Thoman Vol. I, t63-15 to 22; T72-17 to T73-13; Thoman Vol. II, T236-16 to T240-8. Plaintiff claims that Mr. Prendergast assured him that his receiving a commission was not a problem, and that Plaintiff should enter the old contracts on booking sheets and forward them to the central office. *Id.* Mr. Prendergast denies that such a meeting took place.

Between February and April 2003, these four accounts were addressed by Defendant as part of a validation process which reviewed many of the sales from 2002 and their commissionability. Thoman Certif., ¶ 13. All sales specialists were given an Issues to Resolve list, and were instructed to respond to the items on their list and submit them to an Audit Committee for review, further discussion or final decision. *Id.* Plaintiff's list included the four accounts at issue-University Radiology, Sparta, Sussex and Greene. Thoman Certif., ¶ 14. The committee indicated that the commissions were denied for these accounts because the contracts were sold in 2001, prior to Plaintiff's employment with the company. *Id.* Plaintiff responded to the four rejections as follows:

**\*3** Presented proposals to Customer at Customer's request. After signing and submission it was discovered that this customer had signed a POS agreement. It was buried in some file and forgotten. My inquiry caused the issue to surface. However, the ethical approach was to submit the original document.

Plaintiff claims that with all four accounts he did not know that there were service contracts in place before he started working on the accounts. *Id.* Plaintiff also claims that with all four accounts a POS service contract had been sold to the customer in 2001 when the equipment sale was made, however, those contracts had not been booked. *Id.* According to Plaintiff, until May 2003 there was no activity regarding the four contracts and no one discussed the matter with him or suggested that he withdraw any claim for commissions. Thoman Certif., ¶ 16. In May 2003, he received a response from the Audit Committee regarding the four accounts, which stated: "Rejected need copy of new agreement."Thoman Certif., ¶ 17. The response was issued by Larry Simanek, the Director of Sales Service Administration. Def.'s SOF, ¶ 14.

Plaintiff claims that the company never informed him that they were seeking copies of the newly signed quotations obtained by Plaintiff that past year.*Id.* Plaintiff understood the request for the new agreements to be the 2001 agreements that had been newly booked. *Id.* Plaintiff claims that because the new quotations he received never achieved agreement status and had not been booked, that he

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

believed Defendant was requesting the 2001 signed agreements.*Id.* Plaintiff did not have the more recent, signed quotations in his possession, as he did not retain copies. Defendant contends that after Mr. Simanek's request for more information on the four accounts, Mr. Prendergast sent an email to Plaintiff on May 7, 2003 directing Plaintiff to "[h]ave copies of the signed contracts and PO's that you sold in 02 for items 2 [Greene], 4 [Sparta], 5 [Sussex], 6 [University], 24, 25. We are going to need them faxed."Def.'s SOF ¶ 15.

During discovery, Plaintiff did not produce copies of any of the 2002 contract or purchase orders for the service contracts for the four accounts. Def.'s SOF, ¶¶ 16, 17. The four accounts, Greene, Sparta, Sussex and University, also did not produce any signed service agreements or purchase orders from Defendant during the period of May through December 2002. Def.'s SOF, ¶ 18. While Plaintiff explains that his booking requests for these four accounts brought to the light the fact that the previous contracts were not booked and were lost, Defendant puts forth the testimony of Sharon Lucas, who testified that she entered the 2001 University contract into the computer on July 27, 2001 and it was never lost or misplaced. Def.'s SOF, ¶ 33. Defendant also offers the testimony of Josette Viik that the Sussex and Sparta agreements were not buried in a file, but were entered into the computer system in 2002 and 2003, and that the Greene agreement was not lost or misplaced, rather she performed some necessary computer functions for this account in September 2002. Def.'s SOF, ¶ 34.

*4 During 2002 and 2003, all service sales specialists reporting to Mr. Prendergast submitted monthly forecasts with respect to their sales activity, including information on all of the service agreements booked during that month, current sales activities, transactions the specialist anticipated closing within thirty, sixty and ninety days, and prospects the specialist was pursuing. Def.'s SOF, ¶ 23. Defendant contends that Plaintiff's monthly forecasts do not accurately reflect the claimed activity regarding the four accounts at issue. Def.'s SOF, ¶ 24, 25, 26. Plaintiff explains the discrepancies in his monthly forecasts by stating that he learned about the accounts after he turned in the prior monthly forecast, and obtained signed agreements on the day of his presentations to these companies. Def.'s SOF, ¶ 29.

Defendant contends that Mr. Prendergast brought the problem with the four accounts to the attention of Amy Giustino, Defendant's Human Relations department representative, who directed him to prepare a synopsis of the facts for Paul Murdoch, the Senior Vice President of Customer Services. Def.'s SOF, ¶ 39. Defendant claims that Plaintiff's performance had deteriorated during 2003. Def.'s SOF, ¶ 41. Defendant hired Steve Kellett to replace Mr. Murdoch, and Mr. Kellett was charged with determining what to do about Plaintiff's employment. Def.'s SOF, ¶ 42. On June 17, 2003, Plaintiff was terminated on the basis of unethical conduct regarding the aforementioned four accounts. Thoman Certif., ¶ 18; Def.'s SOF, ¶ 11. Following Plaintiff's termination, his sales territory was covered by an existing employee, Bob Antonishak, age fifty-four, and Marylou Graham, age forty-five. Def.'s SOF, ¶ 51. On December 15, 2003, Mr. Prendergast hired Beth Gilchriest as a service specialist. *Id.* Ms. Gilchriest assumed the majority of Plaintiff's prior job duties. *Id.* At the time of her hire, Ms. Gilchriest was fifty years old. *Id.*

## II. DISCUSSION

### A. *Standard Summary Judgment*

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996); *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219, n. 3 (3d Cir.1988), cert. *denied*,490 U.S. 1098 (1989); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)(noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor). In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir.1987).

**\*5** Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case."*Anderson*, 477 U.S. at 255.

Under the Rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the nonmoving party has provided evidence to show that a question of material fact remains. *See Celotex*, 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented ... by depositions, answers to interrogatories, or further affidavits,"*id.* at 322 n. 3,"its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita*, 475 U.S. at 586 (citations omitted); *see also Anderson*, 477 U.S. at 247-48 (stating that "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

What the nonmoving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing

that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324;*see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)(stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations of an affidavit."); *Anderson*, 477 U.S. at 249;*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied*,507 U.S. 912 (1993)(stating that "[t]o raise a genuine issue of material fact, ... the opponent need not match, item for item, each piece of evidence proffered by the movant," but must "exceed[ ] the 'mere scintilla' threshold and ... offer[ ] a genuine issue of material fact.").

The Local Civil Rules supplement the Federal Rules of Civil Procedure and provide that "each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue."L. Civ. R. 56.1. "Where possible, a single joint Rule 56.1 statement is favored."Allyn Z. Lite, New Jersey Federal Practice Rules 192 (2006 ed.) (citations omitted)."Where a joint statement is not prepared, then, under the rule, 'facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted.' " *Id.* at 193 (citations omitted).[FN1] However, "the parties' statements pursuant to Local Rule 56.1 cannot bind the Court if other evidence establishes that the stipulated facts are in error." *Id.* (citation omitted).

> FN1. The Court notes that while Plaintiff submitted a statement of material facts pursuant to L. Civ. R. 56. 1, the statements were not supported by affidavits, deposition testimony or documents. The Plaintiff also did not properly respond to Defendant's statement of undisputed facts, and therefore this Court was unable to determine what facts Plaintiff disputes. The Court will look to Plaintiff's counter-statement of facts contained in his brief in opposition to the motion for partial summary judgment which provides citations to the record pursuant to L. Civ. R. 56.1.

**B.** *Plaintiff Fails to Satisfy his Burden on his Age Discrimination Claims*

**\*6** Plaintiff's Complaint alleges discrimination on the basis of age pursuant to the New Jersey Law Against

Slip Copy
Slip Copy, 2007 WL 203943 (D.N.J.)

Page 5

Discrimination, N.J. Stat. Ann. § 10:5-1 to -49 ("NJLAD") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"). The Third Circuit has recognized that the New Jersey Supreme Court, "[i]n the absence of divergent language between the NJLAD and federal discrimination laws, ... has applied federal standards in NJLAD cases 'in the interest of achieving a degree of uniformity in the discrimination laws.' " *Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 305 (3d Cir.)* (citations omitted), *cert. denied,543 U .S. 814 (2004).* Consequently, the Court will apply the *McDonnell Douglas* burden shifting analysis to Plaintiff's claims. *See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir.2003)* (citations omitted), *cert. denied sub nom.Sarullo v. Potter, 541 U.S. 1064 (2004).*

Plaintiff must first prove a *prima facie* case of discrimination by a preponderance of evidence. *See Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)*(quoting *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).* To make a prima facie case here, Plaintiff must prove 1) that he belongs to a protected class; 2) that he was qualified for the position; 3) that despite his qualifications he was terminated; and 4) that under circumstances raising an inference of discrimination, the employer continued to seek out individuals with qualifications similar to Plaintiff's to fill the position. *See Sarullo, 352 F .3d at 797* (citing *McDonnell Douglas, 411 U.S. at 802* and *Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 348 n. 1 (3d Cir.1999)); see also Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 281-82 (3d Cir.2001); Warner v. Federal Express Corp., 174 F.Supp.2d 215, 219 (D.N.J.2001)*(stating that the fourth prong is satisfied by presenting evidence "that Plaintiff was replaced by persons sufficiently younger to create the inference of age discrimination").

Once established, Plaintiff's *prima facie* case creates a rebuttable presumption of discriminatory intent. *See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Burdine, 450 U.S. at 254.* While the ultimate burden of proof always remains with Plaintiff, the burden of production now shifts to Defendants, who must articulate a legitimate, nondiscriminatory reason for their actions. *See Hicks, 509 U.S. at 507;Burdine, 450 U.S. at 253.* To satisfy their burden, defendants must come forward with admissible evidence

supporting the nondiscriminatory reason or reasons for their actions. *See Burdine, 450 U.S. at 255.* "The McDonnell Douglas formula is grounded in the presumption that if a rational reason for disparate treatment is not forthcoming, it is more likely than not that illegal discrimination played a role in the [adverse] decision."*Chauhan v. M. Alfieri Co., 897 F.2d 123, 127 (3d Cir.1990)* (citations omitted). Once defendants satisfy their burden, the presumption of discriminatory intent is rebutted and drops from the case. *See id.*

*7 The burden of production then shifts back to plaintiff, who must come forward with admissible evidence showing that the articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *McDonnell Douglas, 411 U.S. at 804;Hicks, 509 U.S. at 507-08;Burdine, 450 U.S. at 253.* "[A] plaintiff does not need direct evidence of pretext in order to survive summary judgment."*Chauhan, 897 F.2d at 127* (citing *Chipollini v. Spencer Gifts, Inc., 814 F.2d 893 (3d Cir.),* cert. dismissed, 483 U.S. 1052 (1987))."Instead, a plaintiff needs to be able to 'point[ ] to evidence which calls into question the defendant's intent.' " *Id .* (quoting *Chipollini, 814 F.2d at 899*). "In sum, the plaintiff cannot rely solely on a potential finding that the defendant's explanation is implausible. The fact that a judge or a jury might disbelieve the defendant's asserted nondiscriminatory reason is not enough, by itself, to preclude summary judgment. Rather, the plaintiff must be able to adduce evidence, whether direct or circumstantial, from which a reasonable jury could conclude that the defendant's explanation is incredible." *Id.* at 128 (citation omitted).

Plaintiff claims that he was terminated from his employment with Defendant based on his age. Plaintiff was fifty-nine years old at the time he was discharged, thus placing him in the protected age group for both the NJLAD and the ADEA. Under *McDonnell Douglas,* Plaintiff must demonstrate that his employer replaced him with a younger individual, giving rise to an inference of age discrimination. Defendant argues that Plaintiff cannot establish a *prima facie* case of age discrimination because he was not replaced by a new hire until six months after he left the company and that initially his position was covered by two existing employees, aged fifty-four

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and forty-five. Further, upon hiring a replacement for Plaintiff, Defendant hired a fifty-year-old woman to cover the bulk of his former territory.

Defendant contends that the age difference-Plaintiff was fifty-eight when terminated and his replacement was fifty-does not constitute an inference of age discrimination. "[I]n order to satisfy the sufficiently younger standard, 'there is no particular age difference that must be shown, but while different courts have held ... that a five year difference can be sufficient, ... a one year difference cannot.' " *Monaco v. American General Assurance Co.*, 359 F.3d 296, 307 (3d Cir.2004) (quoting *Showalter v. Univ. of Pittsburg Med. Ctr.*, 190 F.3d 231, 236 (3d Cir.1999)). Defendant claims that Plaintiff's territory was handled by two existing employees-aged fifty-four and forty-five-until his replacement was hired six months later. The Court follows the standard set forth above and finds that Plaintiff has satisfied the fourth prong by demonstrating that the immediate, temporary replacements and the permanent replacement hired six months after his termination were younger than Plaintiff.

*8 Having found that Plaintiff has presented a *prima facie* case of age discrimination, and with the ultimate burden of proof still remaining with Plaintiff, the burden of production now shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. To that end, Defendant has asserted that Plaintiff was terminated due to "unethical conduct," which involved his claims for commissions on the four accounts in controversy. As documented in detail, Plaintiff was questioned about the four accounts and was given the opportunity to provide his employer with documents to substantiate his claims to these service contracts. Defendant determined that these contracts were actually sold prior to Plaintiff's employment with the company. Plaintiff failed to provide any documents or evidence to validate his contention that he was entitled to the commissions, and Defendant terminated him based on what it found to be unethical conduct. This legitimate, non-discriminatory reason for terminating Plaintiff is supported by Defendant's affidavits, testimony and documents.

Consequently, it is Plaintiff's burden to show that this reason was merely pretext for discrimination.

However, the Court concludes that Plaintiff's claim fails here. Plaintiff has not presented evidence demonstrating that Defendant's stated reason for his termination was merely pretext for discrimination or based upon anything other than his conduct. Plaintiff must point to evidence which calls into question the Defendant's intent. In this case, Plaintiff asserts that the purported unethical conduct is not credible, however, he does not cite to specific evidence to support this claim. Rather, Plaintiff makes broad allegations, for instance, that Mr. Prendergast's credibility is questionable, and since the termination for unethical conduct was initiated by Mr. Prendergast as Plaintiff's supervisor, the credibility of the legitimate reason must also be questioned.

Plaintiff also claims that Mr. Prendergast made a comment to him that a fellow employee, three years younger than Plaintiff, should leave the company because "[h]e's too old for this job."Thoman Vol. II, T283-23 to T284-8. Plaintiff claims that certain service sales specialists were given new assignments, and Plaintiff received a less profitable assignment than a younger specialist. Reiner Certif., Exh. F. In his deposition, Plaintiff claims that the older employees were treated differently than the younger employees by Mr. Prendergast, specifically, that he treated them "[g]enerally rude, not respectful of their feelings ... very aloof."Thoman Vol. II, T285-19 to 25. Plaintiff cited to a specific example where Mr. Prendergast questioned whether he should have been working at a certain office, and Plaintiff claims this demonstrated the way Mr. Prendergast treated Plaintiff differently than younger employees. Thoman Vol II, T283-13 to 24. Plaintiff, however, could not explain a similar situation where one of the younger employees was actually treated differently. Thoman Vol. II, T286-1 to 20.

*9 Even viewing the facts in a light more favorable to Plaintiff, he has failed to put forth evidence that demonstrates the legitimate, non-discriminatory reason for his termination was merely a pretext for age discrimination. Plaintiff makes generalizations regarding the different manner in which his supervisor, Mr. Prendergast, treated the older and younger sales specialists, however, does not cite to any specific examples or conversations that would question the legitimacy of Defendant's reason for terminating him. Plaintiff has not carried his burden to show that Defendant's reason, unethical conduct, is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

not credible. In order to survive a motion for summary judgment, Plaintiff must go beyond mere allegations and point to specific instances and evidence which support his claims. The Court concludes that there are no genuine issues of material fact and that the evidence demonstrates that Defendant terminated Plaintiff based upon his conduct and not in a discriminatory manner prohibited by NJLAD or the ADEA. Consequently, Defendants' motion for summary judgment is granted with respect to Plaintiff's claims under NJLAD and the ADEA (Counts One and Two).

### C. *Plaintiff is not Permitted to Amend his Claim of a Violation of Good Faith and Fair Dealing*

Count Four of the Complaint, "Violation of Covenant of Good Faith and Fair Dealing" alleges that "[t]he termination of Plaintiff by Defendant was so egregious and so contrary to the heart and essence of his employment agreement with Defendant as to violate the covenant of good faith and fair dealing implied in every employment agreement ... [a]s a direct [result] of his unlawful termination, Plaintiff has been caused to sustain serious economic loss and emotion distress and humiliation." Absent an express or implied employment contract, "there is no implied covenant of good faith and fair dealing." *Wade v. Kessler Inst., 172 N.J. 327, 345 (2002); DeJoy v. Comcast Cable Communs., 968 F.Supp. 963, 989 (D.N.J.1997).* Defendant contends that the covenant of good faith and fair dealing does not exist with at-will employment. *Citizens Bank of New Jersey v. Libertelli, 215 N.J.Super. 190, 194 (App.Div.1987); McDermott v. Chilton Co., 938 F.Supp. 240, 246 (D.N.J.1995).* In Plaintiff's opposition, he acknowledges that Count Four is "not well-crafted both in allegations an relief sought and thereby suggests a wrongful termination ... claim." Pl.'s Br. at 41. Plaintiff concedes that as stated, Count Four is subject to dismissal, however, Plaintiff intended this claim to sound in contract, and to pursue recovery for commissions Plaintiff allegedly earned during the first half of 2003 but was not paid due to his termination. *Id.* Regardless of whether employment is "at will," an implied obligation of good faith and fair dealing attaches to any contractual aspect of an employment relationship. *Nolan v. Control Data Corp., 243 N.J.Super. 420, 429 (App.Div.1990).*

**\*10** Plaintiff requests that this Court regard the

Complaint as amended as discussed above or permit Plaintiff to amend the Complaint and consider this motion in light of such an amendment. In this case, the Court entered a Scheduling Order on February 7, 2005, which delineates March 1, 2005 as the deadline for filing a motion to amend the pleadings. Given the untimeliness of Plaintiff's request to amend, Fed.R.Civ.P. 16(b) governs whether Plaintiff will be allowed to file an Amended Complaint. Under Fed.R.Civ.P. 16(b), Plaintiff is required to establish good cause before he will be allowed to amend. The Court has great discretion in determining what kind of showing the moving party must make in order to satisfy the good cause requirement of Fed.R.Civ.P. 16(b).3JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, § 16.14[1][b] (Matthew Bender 3d ed.1997). Whether good cause exists depends upon the diligence of the moving party. Fed.R.Civ.P. 16(b) advisory committee's note; *Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 469 (D.N.J.1990)).* Good cause may be satisfied if the movant shows that his delay in filing the motion to amend stemmed from "any mistake, excusable neglect or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order." *Newton v. Dana Corp. Parish Division, 1995 WL 368172, at \* 1 (E.D.P.A.1995)* (quoting *Gestener Corp. v. Case Equipment Co., 108 F.R.D. 138, 141 (D.Me.1985)).* The good cause requirement must be read in conjunction with the directive of Fed.R.Civ.P. 15(a), that leave to amend be "freely given" such that both standards are met before amendment is allowed. *Reynolds v. Borough of Avalon, 799 F.Supp. 442, 450 (D.N.J.1992).*

Here, Plaintiff merely states that he intended to pursue a breach of the covenant of good faith and fair dealing based on a service contract, however, the claim as stated was not so drafted and instead asserts a breach based on wrongful termination. The Court finds that Plaintiff has not satisfied the good cause standard necessary to amend the Complaint at this late date. Discovery concluded in this case on March 15, 2006. Defendants would be prejudiced if Plaintiff were permitted to revise a claim which was filed in 2004. Plaintiff has not put forth good cause for amending this claim, or explained how mistake or excusable neglect is present. Accordingly, the Court will grant summary judgment as to Count Four, as currently stated and will not permit Plaintiff to amend his Complaint to revise Count Four.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 203943 (D.N.J.)

**D.** *Remaining Counts (Three and Five)*

In Plaintiff's opposition brief, he does not oppose that Count Three, alleging that the termination of Plaintiff was in violation of state whistle blower laws of New Jersey (N.J.S.A. 34:19-1 et seq.), New York, Pennsylvania and Washington, should be dismissed. Therefore, Count Three of the Complaint is dismissed.

Further, in Defendant's reply brief, it withdraws its motion for summary judgment as to Count Five, regarding breach of contract as to the Lenox Hill Hospital account. Therefore, Count Five remains.

**III. CONCLUSION**

*11 For the foregoing reasons, Defendant's motion for partial summary judgment is granted as to Counts One, Two, Three and Four. An appropriate form of order accompanies this Memorandum Opinion.

D.N.J.,2007.
Thoman v. Philips Medical Systems
Slip Copy, 2007 WL 203943 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**TAB 3**

Westlaw.

Slip Copy                                                                                  Page 1
Slip Copy, 2007 WL 77324 (D.N.J.)

**H**Keene v. Sears Roebuck & Co., Inc.
D.N.J.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
Willard KEENE, Plaintiff,
v.
SEARS ROEBUCK & CO., INC., et al.,
Defendants.
Civil Action No. 05-828(AET).

Jan. 8, 2007.

<u>Gregory S. Schaer</u>, Freehold, NJ, for Plaintiff.
<u>Robert James Toy</u>, <u>Rosemarie D. Mercury</u>, Post &
Schell, PC, Philadelphia, PA, for Defendants.

### MEMORANDUM OPINION

HUGHES, U.S.M.J.
*1 This matter is before the Court upon the Motion of
Plaintiff Willard Keene ("Plaintiff") for Leave to File
an Amended Complaint. Defendants Sears Roebuck
& Co., Inc. and Somiya Bhatnagar ("Defendants")
oppose the motion. Plaintiff's complaint initially
alleged violations of the New Jersey Law Against
Discrimination ("NJLAD"), age discrimination,
intentional infliction of emotional distress, breach of
contract, and breach of implied covenant of good
faith and fair dealing. Plaintiff amended his
complaint in March 2005 to include discrimination
based on handicap. Plaintiff's present motion to
amend his complaint to include race and/or national
origin discrimination comes after Defendants'
summary judgment motion has been heard and
decided and a final pretrial order has been entered.
The Court reviewed the written submissions of the
parties and conducted oral argument on January 3,
2007. For the reasons that follow, Plaintiff's Motion
to Amend/Correct Complaint is denied.

### I. BACKGROUND AND PROCEDURAL HISTORY

#### A. Factual Background

Plaintiff was hired by Sears, Roebuck & Company
("Sears") as a Sales Associate at a store in Ocean

Township, New Jersey on July 16, 1991 and served
as an employee of Sears for twelve (12) years. (Pl.'s
Ltr. Br. at 5). During his employment, Plaintiff had
no disciplinary action taken against him for any
reason. *Id.* In 1999, when Plaintiff was 59 years old,
he was transferred to the "Brand Central"
Department, "one of the most lucrative placements
for a Sales Associate."*Id.* at 6, 14.Following his
transfer, Plaintiff continued his employment without
any disciplinary problems. *Id.* at 7.

Around the time of Plaintiff's transfer, Sears changed
its business practices by increasing its emphasis on
customer satisfaction and giving sales associates
authority to implement the changes. *Id.* As part of
this new emphasis on customer enthusiasm, Sears
gave sales associates more autonomy in their
decisions without requiring them to first obtain
management approval before adjusting the price of
merchandise. *Id.* at 10.For example, sales associates
were permitted to extend a discount of up to 10% to
customers for various reasons without first obtaining
management approval. *Id.* at 11.Sears included this
new philosophy in the company's written policies. *Id.*

In October 2002, Somiya Bhatnagar, a 29 year old
male "of foreign descent," <sup>FN1</sup> was hired as Store
Manager in the Ocean Township Sears store where
Plaintiff was employed. *Id.* at 14.Plaintiff contends
that Mr. Bhatnagar treated him with hostility,
frequently ignored him or failed to acknowledge him,
and deliberately failed to speak to Plaintiff by name.
*Id.* As an example, Plaintiff alleged that, in one
instance, Mr. Bhatnagar directed that a refund be
"credited to Mr. Keene's account even though Mr.
Keene was not the original associate who rang the
transaction" which resulted in a reduction of
Plaintiff's revenue figures used to calculate payment
and commissions. *Id.*

> FN1. This description of Mr. Bhatnagar was
> gratuitously included in the original
> Complaint. (Pl.'s Compl. at ¶ 9; *see also* Pl.'s
> First Am. Compl. at ¶ 9). In Plaintiff's
> proposed Second Amended Complaint, he
> described Mr. Bhatnagar as a man of
> "Indian/Asian descent." *(See* Pl.'s Second
> Am. Compl. at ¶ 9).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*2 During the week of December 9, 2002, Plaintiff extended discounts to eight (8) customers within a two day period. *Id.* at 14-15.Some of the discounts extended by Plaintiff during this week were the result of a sale that was scheduled for Saturday of the same week. *Id.* at 16.The discounted prices paid by these customers during the week were no less than the price the customers would have paid if the merchandise had been purchased during the sale on Saturday. *Id.* at 17.

On December 14, 2002, Plaintiff was brought into the office in the presence of Mr. Bhatnagar and told that he had improperly extended discounts to customers during the week of December 9, 2002. *Id.* at 18.During this meeting, Plaintiff was instructed to provide a written statement which required his date of birth and all of the facts and circumstances regarding the discounts Plaintiff extended. *Id.* Plaintiff claims that during this meeting, Mr. Bhatnagar treated Plaintiff with hostility by refusing to address Plaintiff by name and instructing the Asset Production Manager not to provide Plaintiff with a copy of his own statement. *Id.* Following the meeting, Plaintiff was "directed to leave the store and that he was suspended until further notice."*Id.*

On December 16, 2002, Plaintiff was called into the store to discuss with Mr. Bhatnagar the status of his employment. *Id.* at 19.Plaintiff contends that Mr. Bhatnagar was hostile and demeaning during this meeting by demanding that Plaintiff immediately "sit down" and by talking to Plaintiff through Angela Velardi, a witness. *Id.* Mr. Bhatnagar then told Plaintiff that he was being terminated for violating Company policy. *Id.* Plaintiff contends that Mr. Bhatnagar refused to explain what policy Plaintiff had violated and told Plaintiff that there were no avenues of appeal. *Id.* Plaintiff claims that he never received any termination letter or other document explaining the basis for his termination. *Id.* at 20.Internal corporate documentation of Sears indicates that Plaintiff retired and makes no mention of his being terminated.*Id.*

Also on December 16, 2002, Mohammad Moinuddin, a 43 year old male, was hired to fill Plaintiff's position in the Brand Central Department. *Id.* Plaintiff states that Mr. Moinuddin is also of Indian/Asian descent.[FN2]*Id.* Plaintiff further contends

that Mr. Moinuddin extended a 25% discount to Mr. Bhatnagar's cousin. *Id.* at 27.Plaintiff further claims that Mr. Bhatnagar himself extended unauthorized discounts to his cousin and his cousin's relative, which were not viewed as violations of company policy by Sears, in direct contrast to Defendants' treatment of Plaintiff. *Id.* at 26.

> FN2. Plaintiff's original Complaint and First Amended Complaint do not mention Mr. Moinuddin by name, but state that "[a]fter plaintiff's termination, he was replaced with individuals who were younger and did not suffer from medical disabilities."(Pl.'s Compl. at ¶ 14; Pl.'s First Am. Compl. at ¶ 14). Plaintiff's proposed Second Amended Complaint states that "[o]n or about the day that Mr. Keene was terminated by Mr. Bhatnagar, a younger individual, who, like Mr. Bhatnagar, was of Indian/Asian descent, was hired and was specifically assigned to a position in the Brand Central Department where Mr. Keene had worked[;] ... That individual, Mohammad Moinuddin, was a newly hired employee and was 43 years of age, substantially younger than Mr. Keene."(Pl.'s Second Am. Compl. at ¶ 14).

### B. Procedural History

On December 9, 2004, Plaintiff filed a Complaint against Defendants in the Monmouth County New Jersey Superior Court alleging (1) violations of the New Jersey Law Against Discrimination ("NJLAD"), including age discrimination, (2) intentional infliction of emotional distress, (3) breach of contract, and (4) breach of implied covenant of good faith and fair dealing. (*See* Pl.'s Compl.). Paragraph nine (9) of Plaintiff's initial Complaint made reference to Mr. Bhatnagar's national origin although the specific nature of his national origin was not known to Plaintiff at that time. (Pl.'s Reply Ltr. Br. at 2). Defendant Sears, Roebuck and Co. removed the case to federal court on February 14, 2005. (*See* Dkt. no. 05-828, entry no. 1).

*3 Plaintiff filed a First Amended Complaint on March 21, 2005 to include discrimination based on Plaintiff's handicap. (*See* Dkt. no. 05-828, entry no. 8). Defendants filed an answer and affirmative defenses on April 4, 2005, and filed an amended

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

answer to the First Amended Complaint on February 23, 2006. *(See* Dkt. no. 05-828, entry no. 9, 16). This Court entered an Order setting discovery deadlines on March 21, 2006 which required Defendants to file summary judgment motions no later than June 9, 2006. *(See* Dkt. no. 05-828, entry no. 17).

Defendants filed a motion for summary judgment on June 9, 2006 which was granted in part and denied in part on August 2, 2006. *(See*Dkt. no. 05-828, entry no. 18, 31). Specifically, Defendants' summary judgment motion was granted as to counts 4-6 of Plaintiff's amended complaint (violation of NJLAD for handicap and perceived handicap and intentional infliction of emotional distress), denied as to counts 1-3 (violation of NJLAD for age discrimination, failing to take appropriate remedial action and failure to train, supervise and discipline, and wrongful termination), and denied without prejudice as to counts 7-8 (breach of contract and breach of implied covenant of good faith and fair dealing).*(See* Dkt. no. 05-828, entry no. 31). During oral argument on the summary judgment motion on July 31, 2006, Judge Cooper noted, without objection or comment from Plaintiff's counsel, that there was no claim for national origin or race discrimination in Plaintiff's complaint. (Defs.' Opp. Mem. at 5).

The present motion arose, not out of the pleadings themselves, but rather in an evidentiary context. A Final Pretrial Conference was held on October 6, 2006, and a Final Joint Pretrial Order was filed on November 6, 2006. *(See* Dkt. no. 05-828, entry no. 36). Defendants allege that the first time Plaintiff's counsel raised the issue of amending the First Amended Complaint was in his third draft of the proposed Pretrial Order. (Defs.' Opp. Mem. at 5). Specifically, Plaintiff states that it "was only during the final revisions to the Final Pretrial Order that defendants raised an objection by seeking to include a provision in the Order providing that they intended to object to any evidence at trial relating to referencing Mr. Bhatnagar's national origin or race."(Pl.'s Reply Ltr. Br. at 3). Plaintiff further states that it was at the this time "that it first became apparent that an amendment of the Complaint might be necessary in order to preserve plaintiff's ability to introduce such evidence."*Id.* at 3-4.

Plaintiff filed the present motion to amend on November 10, 2006. *(See* Dkt. no. 05-828, entry no.

37) and oral argument was heard on January 3, 2007. In his Proposed Second Amended Complaint Plaintiff seeks to change the reference to Mr. Bhatnagar's national origin in paragraph 9 of the original and first amended complaints from "of foreign descent" to "of Indian/Asian descent." *(See* Pl.'s Compl. at ¶ 9; Pl.'s Second Am. Compl. at ¶ 9). Plaintiff further proposes to alter paragraph 14 of the original and first amended complaints from referencing only Plaintiff's replacement with younger individuals without disabilities to the following:

**\*4** On or about the day that Mr. Keene was terminated by Mr. Bhatnagar, a younger individual, who, like Mr. Bhatnagar, was of Indian/Asian descent, was hired and was specifically assigned to a position in the Brand Central Department where Mr. Keene had worked. That individual, Mohammad Moinuddin, was a newly hired employee and was 43 years of age, substantially younger than Mr. Keene.

*(See* Pl.'s Compl. at ¶ 14; Pl.'s Second Am. Compl. at ¶ 14). Plaintiff seeks to change Count I from a purely age discrimination violation of the NJLAD to one that includes race and/or national origin.

Plaintiff asserts that the proposed amendment is appropriate under <u>Federal Rule of Civil Procedure 15(a)</u>'s liberal standard. (Pl .'s Ltr. Br. at 28-29). Plaintiff further asserts that his proposed amendment would not be untimely, unduly prejudicial to Defendants, or futile. *Id.* at 31, 34-35.Plaintiff also argues that the amendment is appropriate pursuant to <u>Federal Rule of Civil Procedure 15(c)</u> because it relates back to the date of the original pleading. *Id.* at 33.Defendants argue in opposition that Plaintiff's counsel is acting in bad faith in seeking to amend the First Amended Complaint. (Defs.' Opp. Mem. at 5). In addition, Defendants contend that Plaintiff has failed to show good cause for amending the scheduling order pursuant to Rule 16(b).*Id.* at 7. Defendants further contend that Plaintiff's motion should fail under <u>Rule 15(a)</u> because the proposed amendment would be untimely, prejudicial, and futile. *Id.* at 10-14.

## II. *DISCUSSION*

Plaintiff contends that leave to amend should be freely given pursuant to <u>Federal Rule of Civil Procedure 15(a)</u>. (Pl.'s Ltr. Br. at 28-29). Plaintiff

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

further contends that the amendment is not untimely and would not create undue prejudice to Defendants because it is based on the same facts and evidence that have already been addressed by the parties previously in this litigation.*Id.* at 34-35.Plaintiff further contends that his proposed amendment would not be futile because the same evidence which shows pretext on the part of Defendants provides a basis for establishing racial discrimination. *Id.* at 31.Plaintiff argues that the racial discrimination claim relates back to the date of the original pleading and is therefore appropriate. *Id.* at 33.Plaintiff specifically argues that Defendants' alleged racial discrimination arises out of the conduct, transactions, and occurrences set forth in the original pleading. *Id.*

Defendants argue, in opposition, that Plaintiff has failed to show good cause for his delay in amending the complaint to include national origin and racial discrimination as required under Federal Rule of Civil Procedure 16(b). (Defs.' Opp. Mem. at 7). Defendants further argue that Plaintiff's motion should be denied even under the more liberal standard of Rule 15(a).*Id.* at 10.

Specifically, Defendants contend that Plaintiff's motion to amend is (1) in bad faith because he seeks to "highlight Mr. Bhatnagar's place of birth to the jurors," (2) untimely because it was filed two years after the complaint was filed, after discovery has ended, and following decision on a summary judgment motion, (3) prejudicial because it would require further investigation and discovery, and (4) futile because Plaintiff's claims of racial discrimination are based on speculation with no evidence that a similarly situated individual was treated more favorably than Plaintiff. *Id.* at 11-14.

**\*5** Plaintiff replies that issues relating to national origin and race "were raised in the original Complaint as well as during the course of discovery."(Pl.'s Reply Ltr. Br. at 2). Plaintiff argues that it was only during the final revisions of the Final Pretrial Order that Defendants raised an objection regarding Plaintiff's mention of Mr. Bhatnagar's and Mr. Moinuddin's race and/or national origin. *Id.* at 3. Plaintiff further argues that the passage of time alone does not, without more, constitute undue delay. *Id.* at 11.Plaintiff also refutes that the amendment would cause Defendants prejudice because Defendants have access to all relevant documents pertaining to the

individuals at issue. *Id* . Plaintiff argues that the facts and evidence of record are sufficient to establish a *prima facie* case of race or national origin discrimination. *Id.* at 21.

## A. *Federal Rule of Civil Procedure 15(a)*

Federal Rule of Civil Procedure 15 provides that leave to amend a Complaint "shall be freely given when justice so requires."FED. R. CIV. P. 15(a). The decision whether to grant or deny a motion for leave to amend "rests within the sound discretion of the district court."*Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 654 (3d Cir.1998). See *Foman v. Davis,* 371 U.S. 178, 182 (1962). The Court can deny a motion to amend if (1) there has been undue delay, bad faith, or dilatory motive, (2) if the amendment would be futile, or (3) if there would be prejudice to the other party. *Hill v. City of Scranton,* 411 F.3d 118, 134 (3d Cir.2005); *Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 292 (3d Cir.1988).

## 1. Undue Delay, Bad Faith, or Dilatory Motive

The Third Circuit has held that "[t]he passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party."*Adams v. Gould Inc.,* 739 F.2d 858, 868 (3d Cir.1984) (citing *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1163 (5th Cir.1982)). The analysis of undue delay and bad faith require that the Court focus on the plaintiff's motives for not amending the complaint earlier. *Id.* at 868.

In the present case, Plaintiff filed his motion to amend on November 10, 2006, following the ruling on Defendants' summary judgment motion on August 2, 2006 and the entry of the Final Joint Pretrial Order on November 6, 2006. However, as explained in *Adams,* the timing of Plaintiff's motion, alone, is not a basis for finding undue delay or bad faith on the part of Plaintiff. Defendants submit that Plaintiff had notice of his failure to plead race or national origin discrimination on July 31, 2006, during oral argument before Judge Cooper on Defendants' summary judgment motion. Defendants argue that only after they objected to any reference to Mr.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Bhatnagar's national origin at trial did Plaintiff seek to add a claim for race or national origin discrimination in order to reference Mr. Bhatnagar's national origin and the national origin of other sales associates or customers before the jury. (See Defs.' Opp. Mem. at 7). Therefore, Defendants claim that Plaintiff's intent is to improperly influence the jury with reference to Mr. Bhatnagar's race and national origin.

*6 Despite Defendants' assertions that Plaintiff's behavior and timing reach the level of undue delay and bad faith, the Court finds no evidence to indicate Plaintiff's primary purpose in amending his complaint at this time is to improperly reference the national origin of Mr. Bhatnagar and other associates or customers in front of the jury. Plaintiff referenced Mr. Bhatnagar's race and national origin as early as the initial complaint. Although Plaintiff was put on notice by Judge Cooper during oral argument on Defendants' summary judgment motion that his complaint did not contain the claim of race and/or national origin discrimination, he had numerous opportunities to amend his pleadings to include this cause of action. However, timing alone is not sufficient for a finding of undue delay. Therefore, the Court finds no undue delay or bad faith on the part of Plaintiff in filing this motion to amend.

## 2. Prejudice

The Third Circuit Court of Appeals regards the potential of prejudice to the nonmoving party as the "touchstone for the denial of the amendment" pursuant to Federal Rule of Civil Procedure 15(a).Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir.1993) (quoting Cronell & Co., Inc. v. Occupational Safety and Health Review Comm'n, 573 F.2d 820, 823 (3d Cir.1978)). The nonmoving party has the burden of showing unfair disadvantage or deprivation will result if the amendment is allowed. In re Bristol-Myers Squibb Sec. Litig., 228, F.R.D. 221, 228 (D.N.J.2005). A finding of prejudice involves a "serious impairment of the nonmovant's ability to present its case," whereas undue prejudice is found when the nonmoving party shows it "would be disadvantaged or deprived of the opportunity to present facts or evidence that it would have offered."Id. (citing Harrison Beverage Co. v. Dribeck Importers, Inc., 133 F.R.D. 463, 468 (D.N.J.1990)).

In Bristol-Myers, at the time of the motion to amend, discovery had closed with the parties having engaged in "wide-ranging fact discovery." Bristol-Myers, 228, F.R.D. at 223. The Court found that "allowing Plaintiff to amend the Complaint at this point 'deprives [the Defendants] of fair notice, possibly discovery, and the opportunity for motion practice....' " Id. at 229 (citing Wilson v. Muckala, 303 F.3d 1207 at 1215-16 (2002)). The Court based this finding, in part, on the fact that "Defendants would have to examine each new claim and conduct discovery to fairly defend themselves against these new allegations." Id.

In analyzing prejudice, the Court must focus on the effect on the defendants.Adams, 739 F.2d at 868. In Adams, Defendants asserted that they would be prejudiced if Plaintiffs were allowed to amend their complaint because of additional counsel fees and the need for finality in litigation. Id. at 869.The Third Circuit held that Defendants would not be prejudiced by Plaintiffs' proposed amendment in part because further extensive discovery would not be necessary. Id. However, in Berger v. Edgewater Steel Co., 911 F.2d 911 (3d Cir.1990), the Third Circuit upheld a district court's decision to deny plaintiff's motion to amend because the addition of a discrimination claim was a broader claim than violation of ERISA and would require extensive discovery. 911 F.2d at 924.

*7 In the present matter, Plaintiff's claim of race or national origin discrimination is based largely on the same facts as the claims in the original and first amended complaints. However, discovery has been conducted based on Plaintiff's claims of age discrimination, not on a claim of race or national origin discrimination. Unlike the Defendants in Adams, Defendants in the present matter would seek more than counsel fees if Plaintiff's motion were granted. Instead, similar to Berger, Defendants would require significant additional discovery.

Plaintiff argues that no additional discovery would be necessary because the "facts and evidence are the same that plaintiff relies upon in support of his age discrimination claim."(See Pl.'s Ltr. Br. at 35). However, during oral argument, Defendants' counsel stated that if Plaintiff's motion were granted, Defendants' would require additional discovery, including the deposition testimony of Mr. Moinuddin and further research into how Mr. Moinuddin was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

classified racially by Sears and who specifically classified him as such. The Court finds, similar to *Bristol-Myers,* that if Plaintiff were allowed to amend his complaint at this late stage in the litigation, not only would significant additional discovery be required as in *Berger,* but also Defendants would be disadvantaged by losing the opportunity for dispositive motion practice based on Plaintiff's additional claim. Therefore, the Court finds undue prejudice to Defendants if Plaintiff were permitted to amend his complaint to include a claim of race and/or national origin discrimination.

### 3. Futility

" 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."*In re Burlington Coat Factory Securities Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997); *see also Onyiuke v. New Jersey State Supreme Court,* 435 F.Supp.2d 394, 403 (D.N.J.2006) ("An amendment is considered futile 'if the amendment will not cure [any] deficiency in the original complaint or if the amended complaint cannot withstand a motion to dismiss.' "). Therefore, the same standard for legal sufficiency applies in determining futility and in evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).*Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir.2000) ("In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)."); *see also Lesser v. City of Cape May,* 110 F.Supp.2d 303, 331 (D.N.J.2000).

In analyzing whether a complaint fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), "a court must reasonably read the complaint and decide whether the plaintiff has pled a cognizable cause of action entitling it to relief."*Onyiuke,* 435 F.Supp.2d at 404. For the purposes of this analysis, a court "accepts as true all of the well-pleaded factual allegations within the complaint and any reasonable inferences drawn therefrom."*Id.* If the proposed amendment is not clearly futile, then denial of the motion to amend is improper. *Harrison Beverage Co. v. Dribeck Importers, Inc.,* 133 F.R.D. 463, 468 (D.N.J.1990).

*8 In the present matter, Plaintiff alleges that Mr. Bhatnagar, a man of Indian descent, fired Plaintiff, a Caucasian male, in order to hire another sales

associate of Indian/Asian descent. However, Plaintiff can point to no deposition transcript or factual certification in dispositive motion practice that supports an inference of racial discrimination. Plaintiff's counsel conceded at oral argument that he is not presently aware of Mr. Moinuddin's precise national origin, yet he is basing his race and discrimination claim on the racial connection between Mr. Bhatnagar and Mr. Moinuddin. It appears to the Court that Plaintiff's claim of race and/or national origin discrimination is based on mere speculation.

"The McDonnell Douglas framework, as modified by the Supreme Court of New Jersey, requires a plaintiff to satisfy [the following] four elements by a preponderance of the evidence to establish a *prima facie* case of age discrimination": (1) Plaintiff must show that he belongs to a protected class; (2) Plaintiff must demonstrate he was qualified for the position in question; (3) Plaintiff must show that he was terminated despite his adequate qualifications; and (4) Plaintiff must demonstrate that the "employer sought others to perform the same work after he was terminated from his position."*Wright v. L-3 Communications Corp .,* 227 F.Supp.2d 293, 298 (D.N.J.2002). In contrast, the final element in a *prima facie* case of race or national origin discrimination requires Plaintiff to prove that "employees not in the protected class were treated more favorably."*Stokes v. Accounts Receivable Management, Inc.,* No. 05-00437, 2006 WESTLAW 3228025 * 3 (D.N.J. Nov. 2, 2006).

Plaintiff in the present case has made no claim in the proposed Second Amended Complaint that employees outside the protected class were treated more favorably than Plaintiff and provides the Court no factual or evidentiary basis for a finding of race or national origin discrimination. Plaintiff's proposed amendment to paragraph 14 of his First Amended Complaint provides only that Plaintiff was replaced by Mohammad Moinuddin who "was 43 years of age, substantially younger than Mr. Keene."*(See* Pl.'s Second Am. Compl. at ¶ 14). Other than the basic fact of Mr. Bhatnagar's and Mr. Moinuddin's ethnicity, of which Plaintiff is unsure for Mr. Moinuddin, Plaintiff's claim of discrimination based on race or national origin invites pure speculation. Therefore, based on a Rule 12(b)(6) standard, which demands the Court accept Plaintiff's allegations as

Slip Copy
Slip Copy, 2007 WL 77324 (D.N.J.)

true and view them in a light most favorable to Plaintiff, the Court finds that Plaintiff's motion to amend his complaint to include race and/or national origin discrimination would be futile. The Court notes, however, that it is not ruling on the admissibility of the connection between Mr. Bhatnagar and Plaintiff's replacement at trial.

### B. *Federal Rule of Civil Procedure 16(b)*

Federal Rule of Civil Procedure 16(b) provides that once a scheduling order has been entered by the Court, it "shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge."[FN3]FED.R.CIV.P. 16(b).

> FN3.Federal Rule of Civil Procedure 16(e) provides that "[t]he order following a final pretrial conference shall be modified only to prevent manifest injustice."FED.R.CIV.P. 16(e). In the present matter, a Final Pretrial Conference was held on October 6, 2006, and a Final Joint Pretrial Order was entered on November 6, 2006. However, because the Court finds that Plaintiff failed to show good cause under Rule 16(b), it will not reach the issue of manifest injustice under Rule 16(e).

*9 Courts "must consider F.R.Civ.P 16(b)'s requirements that scheduling orders only be modified for 'good cause' in conjunction with Rule 15(a)'s directive that leave to amend a complaint be 'freely given.' " Reynolds v. Borough of Avalon, 799 F.Supp. 442, 450 (D.N.J.1992).

Defendants argue that Plaintiff offers no good cause as to why he did not seek to amend his complaint, which was filed two years ago, to include race or national origin discrimination previously, especially following Judge Cooper's statements regarding the lack of this claim during oral argument on July 31, 2006. Plaintiff contends that Defendants were aware of the race issue prior to this motion because Plaintiff made reference to Mr. Bhatnagar's national origin in his initial Complaint. (See Pl.'s Reply Ltr. Br. at 2). Plaintiff further argues that issues relating to race and national origin were raised in discovery and included in the Statement of Material Facts submitted in connection with Defendants' Motion for Summary

Judgment. *Id.*

During final revisions to the Final Pretrial Order, Defendants raised an objection to any evidence at trial relating to Mr. Bhatnagar's national origin. *Id.* at 3. Plaintiff argues that it was at this point that he sought to amend the Complaint to "preserve plaintiff's ability to introduce such evidence."*Id.* at 3-4.Plaintiff's counsel submitted a letter to the Court in advance of the Final Pretrial Conference to make the Court aware of the race/national origin issue to be discussed at the conference. Although the Court's initial inclination was to deny Plaintiff's application without prejudice, the Court instructed Plaintiff to raise the issue by formal motion if he wanted to pursue it further. Plaintiff subsequently filed the present motion to amend his complaint.

On March 21, 2005, Plaintiff filed a motion and was permitted to amend his complaint to include discrimination based on handicap. The Pretrial Scheduling Order, entered on May 17, 2005, directed that fact discovery would end by November 30, 2005. Plaintiff was put on notice of his failure to plead race and/or national origin discrimination on July 31, 2006, during oral argument before Judge Cooper. However, Plaintiff did not file the present motion to amend the complaint to include this count until November 10, 2006. Plaintiff has provided no satisfactory explanation for his delay in seeking to include the race and/or national origin discrimination claim. Therefore, the Court finds, as an alternative basis for denying the Motion, that Plaintiff has not shown good cause to modify the Court's scheduling order and amend his complaint.

### III. *CONCLUSION*

For the reasons expressed here, the Court finds no undue delay or bad faith on the part of Plaintiff in seeking to amend his Complaint pursuant to Federal Rule of Civil Procedure 15(a). However, the Court finds undue prejudice to Defendants if Plaintiff's motion is granted, in part, because of the need for significant additional discovery. The Court further finds that Plaintiff's claim of race and/or national origin discrimination would be futile under a Rule 12(b)(6) standard. The Court further finds, in considering Federal Rule of Civil Procedure 16(b) in conjunction with Rule 15(a), that Plaintiff has failed to show good cause for modifying the Court's May

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 8
Slip Copy, 2007 WL 77324 (D.N.J.)


17, 2005 scheduling order. Therefore, Plaintiff's
Motion to Amend/Correct Complaint is denied.

*10 An appropriate Order accompanies this
Memorandum Opinion.

D.N.J.,2007.
Keene v. Sears Roebuck & Co., Inc.
Slip Copy, 2007 WL 77324 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 4



--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

Page 1

Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.
C.A.5 (La.),2008.

United States Court of Appeals,Fifth Circuit.
INDIANA ELECTRICAL WORKERS' PENSION TRUST FUND IBEW; Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund; Carpenters Pension Fund, of Baltimore, Maryland; Hawaii Laborers Pension Plan, Plaintiffs-Appellees,
v.
SHAW GROUP, INC.; Tim Barfield, Jr.; J.M. Bernhard, Jr.; Richard F. Gill; Robert Belk, Defendants-Appellants.
No. 06-30908.

July 29, 2008.

**Background:** Purchasers of company's stock brought action against company and its corporate officers alleging they engaged in scheme to misrepresent true nature of company's financial condition to inflate stock price. The United States District Court for the Eastern District of Louisiana, Helen Ginger Berrigan, J., denied defendants' motion to dismiss. Defendants' appealed.

**Holdings:** The Court of Appeals, Edith H. Jones, Chief Judge, held that:
(1) chief executive officer's (CEO) management style did not support inference of scienter;
(2) comments did not support inference of scienter;
(3) allegation that company failed to timely disclose concerns affecting viability of contract did not support inference of scienter; and
(4) officers' sale of their stock did not indicate a motive to engage in securities fraud.

Reversed and remanded.

**[1] Securities Regulation 349B ☞60.18**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive

or Fraudulent Conduct
                349Bk60.18 k. In General. Most
Cited Cases
Under the Private Securities Litigation Reform Act (PSLRA) the elements of a fraud claim have stayed the same: a material misrepresentation or omission; a defendant with scienter concerning the fraud; reliance; damages; and loss causation. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4(b)(1)(B), (b)(2).

**[2] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
The Court of Appeals reviews the sufficiency of a complaint *de novo* on appeal.

**[3] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
A three step approach is used when reviewing scienter allegations on a motion to dismiss a federal securities fraud case pursuant to the Private Securities Litigation Reform Act (PSLRA): (1) the allegations must, as in federal pleadings generally, be taken as true; (2) courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice and the facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled; and (3) a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                                   Page 2
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

[4] Securities Regulation 349B ☞60.45(1)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses
to Liability
                349Bk60.45    Scienter,    Intent,
Knowledge, Negligence or Recklessness
                349Bk60.45(1) k. In General.
Most Cited Cases
In a federal securities fraud case, the required state of
mind is an intent to deceive, manipulate, or defraud
or severe recklessness; severe recklessness is limited
to those highly unreasonable omissions or
misrepresentations that involve not merely simple or
even inexcusable negligence, but an extreme
departure from the standards of ordinary care, and
that present a danger of misleading buyers or sellers
which is either known to the defendant or is so
obvious that the defendant must have been aware of
it. Securities Exchange Act of 1934, § 10(b), 15
U.S.C.A. § 78j(b).

[5] Securities Regulation 349B ☞60.51(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
Although circumstantial evidence can support a
strong inference of scienter in a federal securities
fraud case, allegations of motive and opportunity
standing alone will not suffice; appropriate motive
and opportunity allegations may, however,
meaningfully enhance the strength of the inference of
scienter. Securities Exchange Act of 1934, § 10(b),
15 U.S.C.A. § 78j(b).

[6] Securities Regulation 349B ☞60.45(1)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses

to Liability
                349Bk60.45    Scienter,    Intent,
Knowledge, Negligence or Recklessness
                349Bk60.45(1) k. In General.
Most Cited Cases
In determining scienter in a federal securities fraud
case, the court looks to the state of mind of the
individual corporate official or officials who make or
issue the statement (or order or approve it or its
making or issuance, or who furnish information or
language for inclusion therein, or the like) rather than
generally to the collective knowledge of all the
corporation's officers and employees acquired in the
course of their employment. Securities Exchange Act
of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

[7] Securities Regulation 349B ☞60.45(1)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses
to Liability
                349Bk60.45    Scienter,    Intent,
Knowledge, Negligence or Recklessness
                349Bk60.45(1) k. In General.

Most Cited Cases
Mere publication of inaccurate accounting figures, or
a failure to follow generally accepted accounting
principles (GAAP), without more, does not establish
scienter in a securities fraud case. Securities
Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

[8] Securities Regulation 349B ☞60.51(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
To plead scienter adequately in a securities fraud
case, plaintiffs must state with particularity facts
giving rise to a strong inference that the party knew
that it was publishing materially false information, or
the party was severely reckless in publishing such
information. Securities Exchange Act of 1934, §
10(b), 15 U.S.C.A. § 78j(b).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

**[9] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
Pleadings of scienter in a securities fraud case may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[10] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
Hands-on management style of company's chief executive officer (CEO), coupled with his alleged boast that there was nothing in company that he did not know, were insufficient to support inference of scienter, as required to support stockholders' securities fraud claim; allegations lacked specificity about what CEO may have known, or was reckless not to have known, about details of company's accounting practices. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[11] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
Allegation that company's corporate officers must have known of alleged accounting irregularities because they were so massive was insufficient to support inference of scienter, as required to support stockholders' securities fraud claim against officers and company; company never acknowledged wrongdoing or restated financial reports, there was no single event that officers were alleged to have known and concealed from public, and no attempt was made to estimate by how much earnings were inflated. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[12] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
Chief executive officer's (CEO) alleged comment to executives during dinner conversation that "we have got to show more progress" and comment to company's financial analyst that revenue numbers were too low and that he "needed to do something to fix that" were insufficient to support an inference of scienter, as required to support stockholders' securities fraud claim against CEO based on company's accounting practices; source for comments was not identified and comments could have been regarding need to improve company's business performance or pointing out an error that needed to be corrected. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[13] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
Corporate officers' alleged knowledge that company's project tracking software program had malfunctioned did not support inference of scienter, as required to support stockholders' securities fraud claim based on company's accounting practices, where sources for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

allegations were not identified and nothing indicated that officers knew reports contained false information. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[14] Securities Regulation 349B** 🔑60.51(2)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 In General
                  349Bk60.51(2) k. Scienter. Most Cited Cases
Allegation that company failed to timely or fully disclose material concerns affecting viability of major construction contract did not support inference of scienter, as required to support stockholders' securities fraud claim against corporate officers; officers were not specifically connected to company's disclosures, nothing tied officers to ongoing knowledge about project's status, and company's announcement neither stated nor implied anything about contract. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[15] Securities Regulation 349B** 🔑60.28(10.1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
             349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
               349Bk60.28 Nondisclosure; Insider Trading
                  349Bk60.28(10) Matters to Be Disclosed
                    349Bk60.28(10.1) k. In General. Most Cited Cases
A corporation does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[16] Securities Regulation 349B** 🔑60.28(2.1)

349B Securities Regulation
   349BI Federal Regulation

349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
      349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
         349Bk60.28 Nondisclosure; Insider Trading
            349Bk60.28(2) Duty to Disclose or Refrain from Trading
               349Bk60.28(2.1) k. In General.
Most Cited Cases
Liability under Rule 10b-5 of the Securities Exchange Act for nondisclosure arises if there is a duty to speak. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[17] Securities Regulation 349B** 🔑60.51(2)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
              349Bk60.51 In General
                 349Bk60.51(2) k. Scienter. Most Cited Cases
In a securities fraud case, to demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged; merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[18] Securities Regulation 349B** 🔑60.45(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses to Liability
              349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
                349Bk60.45(1) k. In General.
Most Cited Cases
Corporate officers' sale of their stock did not indicate a motive to engage in securities fraud; first officer sold his stock a few days after expiration of his "lock-up" agreement during which company's stock split two-for-one and stock could have been sold so

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

that officer could take profit on newly acquired shares, first officer's second sale missed immediate price spike following positive earnings announcement, and second officer's sale was not out of line with his past sales and allowed second officer to capitalize on expiration of his "lock-up" period and stock split. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[19] Securities Regulation 349B** ☞60.45(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses
to Liability
         349Bk60.45   Scienter,   Intent,
Knowledge, Negligence or Recklessness
         349Bk60.45(1) k. In General.
Most Cited Cases
Because corporate executives are often paid in stock and stock options, they will naturally trade those securities in the normal course of events, and courts will not infer fraudulent intent in a securities fraud case from the mere fact that some officers sold stock. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[20] Securities Regulation 349B** ☞60.45(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses
to Liability
         349Bk60.45   Scienter,   Intent,
Knowledge, Negligence or Recklessness
         349Bk60.45(1) k. In General.
Most Cited Cases
Insider stock sales may be probative of scienter in a securities fraud case if they occur in suspicious amounts or at suspicious times; suspicion may be generated if the sales are out of line with prior trading practices or made at times calculated to maximize personal profit. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[21] Securities Regulation 349B** ☞60.45(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses
to Liability
         349Bk60.45   Scienter,   Intent,
Knowledge, Negligence or Recklessness
         349Bk60.45(1) k. In General.
Most Cited Cases
Scienter in a particular securities fraud case may not be footed solely on motives universal to corporate executives. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[22] Securities Regulation 349B** ☞60.45(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses
to Liability
         349Bk60.45   Scienter,   Intent,
Knowledge, Negligence or Recklessness
         349Bk60.45(1) k. In General.
Most Cited Cases
The desire to maintain a high credit rating is universally held among corporations and their executives and consequently does not contribute significantly to an inference of scienter in a securities fraud case. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[23] Securities Regulation 349B** ☞60.45(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.43 Grounds of and Defenses
to Liability
         349Bk60.45   Scienter,   Intent,
Knowledge, Negligence or Recklessness
         349Bk60.45(1) k. In General.
Most Cited Cases
A Sarbanes-Oxley certification, standing alone, is not indicative of scienter in a securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Sarbanes-Oxley Act of 2002, §

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
                                                                                                    Page 6
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

302(a), 15 U.S.C.A. § 7241(a).                          BACKGROUND

[24] Securities Regulation 349B ⚖══35.15         Shaw, which is headquartered in Baton Rouge,
                                                 Louisiana, provides engineering, design and
349B Securities Regulation                       construction services to the energy, chemical and
     349BI Federal Regulation                    environmental industries, as well as federal, state and
          349BI(C) Trading and Markets           local governments. On June 10, 2004, Shaw issued a
               349BI(C)1 In General              press release announcing that the Securities and
                    349Bk35.15 k. Controlling Persons.   Exchange Commission ("SEC") was conducting an
Most Cited Cases                                 informal inquiry concerning the company, which
Control person liability under the Securities    appeared to relate to the company's use of the
Exchange Act is secondary only and cannot exist in   purchase method of accounting for acquisitions.
the absence of a primary violation. Securities   When the stock price fell on this notice, several class
Exchange Act of 1934, § 20(a), 15 U.S.C.A. § 78t(a).   action suits were filed. Union pension funds have
                                                 become the lead plaintiffs in the consolidated class
David J. George, Douglas Wilens (argued), Paul J.   action against defendants Shaw and its CEO J.M.
Geller, Coughlin, Stoia, Geller, Rudman & Robbins,   Bernhard, Jr., CFO Robert Belk, COO Tim Barfield
LLP, Boca Raton, FL, Joel R. Waltzer, Waltzer &   and former COO Richard Gill.[FN1]The class period
Associates, Harvey, LA, for Plaintiffs-Appellees.   runs from October 19, 2000, to June 10, 2004.
Clifford Thau, Hilary Lovett Preston, Steven Robert
Paradise, Vinson & Elkins, New York City, Arthur   Pleading violations of Section 10(b) of the Securities
Gregory Grimsal, Gordon, Arata, McCollam,        Exchange Act of 1934, Rule 10b-5 securities fraud,
Duplantis & Eagan, New Orleans, LA, Thomas S.    and Section 20(a) control person liability, the lengthy
Leatherbury, Vinson, & Elkins, Dallas, TX, Marie   complaint alleges that Shaw knowingly or with
Roach Yeates (argued), Vinson & Elkins, Hounston,   severe recklessness misled the public in five ways.
TX, for Defendants-Appellants.                   See15 U.S.C. § 78j(b); 17 C.F.R § 240.10b-5; 15
                                                 U.S.C. § 78t(a). First, Shaw artificially inflated its
Appeal from the United States District Court for the   earnings by manipulating the purchase method of
Eastern District of Louisiana.                   accounting in connection with two acquisitions.
                                                 Second, Shaw prematurely recognized revenue on
Before JONES, Chief Judge, and STEWART and       long-term engineering, procurement and construction
CLEMENT, Circuit Judges.                         contracts by exploiting the percentage of completion
                                                 method of accounting in violation of generally
EDITH H. JONES, Chief Judge:                     accepted accounting principles ("GAAP"). Third,
*1 A putative class of purchasers of Shaw Group,   Shaw failed to disclose material issues affecting the
Inc. ("Shaw") common stock sued Shaw and four of   viability of a major construction project. Fourth, the
its corporate officers alleging that Shaw engaged in a   company overstated its backlog of contracts to give a
scheme to misrepresent the true nature of the    false impression that demand for its services was
company's financial condition to the public and   higher than it actually was. Fifth, Shaw delayed
inflate its stock price. Shaw moved to dismiss for   paying vendors or did not pay them at all as a device
failure to satisfy the Private Securities Litigation   to improve its reported cash flow.
Reform Act's ("PSLRA") heightened pleading
requirements for securities fraud cases, but the   Plaintiffs allege that the true nature of Shaw's
district court denied the motion without a written   financial condition leaked to the stock market in a
opinion. On this interlocutory appeal, we hold that   series of four disclosures beginning with the August
the complaint failed to allege facts from which a   2002 announcement that a customer had failed to
"strong inference of scienter" may be drawn against   make a $32 million milestone payment for work
the defendants. We reverse and remand with       performed on a construction project, and continuing
instructions to dismiss the case.                with negative disclosures about the company's
                                                 earnings and operational performance.[FN2]The stock
                                                 price dropped allegedly in response to each of these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

events and to the final straw, the announcement of the SEC inquiry.

**\*2** Curiously, given the dramatic nature of the allegations and the claims that the company overstated assets by "hundreds of millions of dollars," the company never restated its earnings or financial reports based on the matters alleged by plaintiffs; has not received a qualified audit report; has not reported that it was the victim of any accounting irregularities; and has endured no liquidity crisis, as might have been expected if massive accounting fraud had occurred. Finally, we take judicial notice that the SEC terminated its inquiry against Shaw on December 28, 2007, with no enforcement recommendation.

The district court denied Shaw's motion to dismiss for failure to satisfy Federal Rule of Civil Procedure 12(b)(6) in light of the PSLRA's heightened securities fraud pleading requirements. The court heard oral argument and ruled from the bench with no written or orally stated opinion. This court granted an interlocutory appeal. Shaw challenges the sufficiency of plaintiffs' pleading of falsity, scienter and loss causation.

### DISCUSSION

[1] The PSLRA set high standards for pursuing federal securities fraud suits in order to check "frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims."*Tellabs, Inc. v. Makor Issues & Rights, Ltd., -- U.S. ----, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007).* To be sure, the elements of a fraud claim have stayed the same: a material misrepresentation or omission; a defendant with scienter concerning the fraud; reliance; damages; and loss causation. *See Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 264 n. 5 (5th Cir.2007)* (citing *Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).* But the PSLRA enhanced the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ...."15 U.S.C. § 78u-4(b)(1)(B). Second, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind."15 U.S.C. § 78u-4(b)(2).

[2] In this case, we pretermit testing the sufficiency of the allegations of falsity and loss causation because the complaint insufficiently alleges that the defendants acted with scienter. We review the sufficiency of the complaint *de novo* on appeal. *See Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 550 (5th Cir.2007)* [hereinafter *Central Laborers*].

[3]*Tellabs* affirmed a three step approach to reviewing scienter allegations on a motion to dismiss a federal securities fraud case pursuant to the PSLRA. *Tellabs, 127 S.Ct. at 2509-10.*First, the allegations must, as in federal pleadings generally, be taken as true. *Id. at 2509.*Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. *Id.* The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled. Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Id.* The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible." *Id. at 2510.*

**\*3** [4][5][6] Before *Tellabs,* this court had elaborated on the basis for scienter allegations. The required state of mind is an "intent to deceive, manipulate, or defraud" or "severe recklessness." *Rosenzweig v. Azurix Corp., 332 F.3d 854, 866 (5th Cir.2003)* (internal quotation marks omitted). Severe recklessness is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id. at 866* (quoting *Nathenson v. Zonagen Inc., 267 F.3d 400, 408 (5th Cir.2001)).* Although circumstantial evidence can support a strong inference of scienter, *Abrams v. Baker Hughes Inc.,*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                                                    Page 8
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

292 F.3d 424, 430 (5th Cir.2002), allegations of motive and opportunity standing alone will not suffice.*Rosenzweig, 332 F.3d at 867.*Appropriate motive and opportunity allegations may, however, "meaningfully enhance the strength of the inference of scienter."*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 368 (5th Cir.2004) (quoting *Nathenson, 267 F.3d at 412).* Finally, this court has rejected the group pleading approach to scienter and instead looks to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."*Id.* at 366.Consequently, "it is only necessary for us to address the allegations claimed to adequately show [scienter] on the part of the [named officers]" to determine whether the complaint sufficiently pleads scienter. *Id.* at 367.

With this landscape in mind, we turn to examine the scienter allegations pertinent to each category of alleged misstatements and then to the attempted motive and opportunity bolstering allegations against Bernhard and Belk.

### A. Accounting Irregularities

*4 [7] The vast bulk of allegations in a very bulky complaint relate to Shaw's alleged abuse of or failure to follow GAAP. The accounting irregularities are of two types: those relating to the way in which Shaw treated its acquisition of two large companies from bankruptcy proceedings; and those relating to the percentage of completion method of recognizing revenue from Shaw's performance of long-term contracts. Plaintiffs' bottom line assertion is that these irregularities allowed Shaw artificially to inflate its earnings by "hundreds of millions" of dollars during the class period. This court follows the general rule[FN3] and has stated repeatedly that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."*Barrie v. Intervoice-Brite, Inc.,* 397 F.3d 249, 264 (5th Cir.), modified and reh'g denied,409 F.3d 653 (5th Cir.2005) (quoting *Fine v. Am. Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990)); *see also Fin. Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 290 (5th Cir.2006)

("[F]ailure to follow accounting standards, without more, does not establish scienter.").

[8] To plead scienter adequately, plaintiffs must state with particularity facts giving rise to a strong inference that the "party [knew] that it [was] publishing materially false information, or the party [was] severely reckless in publishing such information."*Barrie,* 397 F.3d at 264 (quoting *Fine, 919 F.2d at 297).*

### 1. Acquisition Accounting

Plaintiffs allege that Shaw misused the purchase method of accounting for the acquisitions of the assets of two large companies, Stone & Webster and the IT Group, out of their respective bankruptcy proceedings in July 2000 and May 2002. Shaw portrayed the acquisitions as critical to consolidating the company's market position and to its diversification efforts. Shaw fully disclosed its application of the relevant accounting principles. The plaintiffs assert, however, that Shaw artificially inflated the recorded reserves and goodwill associated with the purchase method and thereafter used such accounts to "pad" Shaw's earnings. Shaw also established reserves for pending contracts acquired from these companies that, according to the plaintiffs, "bore no reasonable relationship to the fair market value of the acquired assets," and were used as "cookie jar" reserves to inflate its reported earnings. Plaintiffs finally allege irregularities in Shaw's accounting for adjustments to the fair value of the acquired assets; its failure to disclose the basis for pre-acquisition contingencies bearing on such adjustments; and its failure to write off impaired goodwill. (Plaintiffs' Consolidated Amended Complaint ("Compl.") 98.) All of these allegations are tied to the statements in Shaw's periodic financial reports during the class period, and voluminous citations to accounting rules are included.

[9][10] No direct allegations of fraudulent conduct or intent on the part of Bernhard or Belk are alleged. Instead, plaintiffs rely, as they are permitted to do, on circumstantial allegations. They assert that the individual defendants must have known of the irregularities because of their executive positions in the company, and they emphasize Bernhard's "hands-on management style," and the magnitude and extent of the accounting standards violations. None of these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ---                                                          Page 9
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

assertions withstands analysis. First, this court's caselaw makes clear that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company."*Abrams,* 292 F.3d at 432.[FN4]Second, Bernhard's management style, coupled with his alleged boast that "there is nothing in this company that I don't know," are insufficient to support a strong inference of scienter. See *Goldstein v. MCI WorldCom,* 340 F.3d 238, 251 (5th Cir.2003). Such statements lack specificity about what Bernhard may have known or, for that matter, was reckless not to have known, about the details of the company's accounting practices. That these allegations derive from confidential sources further detracts from their weight in the scienter analysis. Following *Tellabs,* courts must discount allegations from confidential sources.*Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 756-57 (7th Cir.2007). Such sources afford no basis for drawing the plausible competing inferences required by *Tellabs.Id.* at 757 ("*Tellabs* requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences; anonymity frustrates that process."). At the very least, such sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source ... would possess the information pleaded ...."*ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 353 (5th Cir.2002); *see also Central Laborers',* 497 F.3d at 552 (same).

**\*5** [11] The final assertion, that Bernhard, Belk and through them, Shaw must have known of the alleged accounting irregularities because they are so massive, disproves itself. This case is quite unlike most securities fraud cases, which are precipitated when the company announces such revelations as a restatement in earnings due to accounting mistakes or the discovery and correction of material errors or misdeeds in a subsidiary. Here, there was no mea culpa from the company in the form of acknowledged wrongdoing or restated financial reports, nor was there any auditor qualification to those aspects of the reports made the basis of this complaint, nor any publicly expressed reservations by the auditors to the financials. There is no single event or fact that the executives can be alleged to have known and concealed from the public. In *Central Laborers,* by contrast, the company disclosed material weaknesses in its internal controls that eventually required restatement of two and a half fiscal years of financial

results. 497 F.3d at 549.This court concluded that the defendant's "public statements and subsequent restatement due to GAAP violations provide[d] some basis to infer scienter."*Id.* at 552.But that is lacking here.

Moreover, while plaintiffs strenuously argue that the "cookie jar" reserves and other devices enabled Shaw to pad its earnings massively, they make no attempt to estimate by how much the earnings were inflated. There is no standard of comparison to what the correct numbers would have been. Valuations of assets, especially contracts and assets acquired from bankrupt companies, as well as the application of sophisticated accounting standards like "fair value," leave broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 205 (1st Cir.1999) (" 'Generally accepted accounting principles' ... tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."(quoting *Thor Power Tool Co. v. Comm'r of Internal Revenue,* 439 U.S. 522, 544, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979))). Plaintiffs cannot transform inherently nuanced conclusions into fraudulent misstatements or omissions simply by saying that there were abuses or misuses of the GAAP rules. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. 'Must be' is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition."). Likewise, plaintiffs cannot make allegations that strongly support the defendants' guilty knowledge of securities fraud, on the issues of acquisition accounting here raised, by throwing out large numbers with no factual basis for ascertaining what the "truth" was. *See In re Stone & Webster, Inc., Sec. Litig.,* 414 F.3d 187, 199 (1st Cir.2005) (holding that alleged overstatement of financial results did not contribute to an inference of scienter because complaint gave "no indication whatsoever what the size of the alleged overstatement of current profits was").

**\*6** For all these reasons, we cannot derive a strong inference of scienter against Bernhard, Belk and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

Shaw. Plaintiffs have failed to allege a sufficient basis for defendants' knowledge or severe recklessness as to the accuracy of the accounting standards for the Stone & Webster and IT Group acquisitions.

*2. Percentage of Completion Accounting*

Plaintiffs allege that Shaw inflated its earnings by prematurely recognizing revenue on long-term contracts. A substantial portion of the company's business derives from the performance of long-term engineering, procurement and construction contracts, each of which is, by plaintiffs' admission, unique and complicated. The preferred accounting standard for such contracts is the "percentage of completion" method, used and disclosed by Shaw in its financial reports, whereby a company records revenue as it performs work on a contract. The company first estimates the total cost of contract performance and then compares the estimate with actual costs over the life of the contract. As work proceeds, the company records the corresponding percent of the revenue that should be recorded on the company's books. When, however, reasonably dependable estimates cannot be made or "inherent hazards" relating to contract conditions make profit predictions unreliable, the "completed-contract" method becomes preferable; it recognizes revenue and expenses incurred on a contract only in the year of completion. *In re Stone & Webster,* 414 F.3d at 196-97.

Shaw allegedly prematurely recognized revenue on long-term contracts in violation of GAAP. Shaw's management pressured, coerced and if necessary, forced employees to inflate the percentage of completion of their projects and accelerate earnings recognition. (Compl.98.) Second, Shaw lacked the internal controls necessary to estimate the percentage of completion accurately because its proprietary software program for project tracking, Shaw-Trac, did not work.[FN5] Because Shaw could not make reasonably dependable estimates, the plaintiffs contend that it should have used the completed contract method and deferred recognizing revenue until the contracts were completed.

*7 Overriding the specific allegations, which will be discussed below, are systematic deficiencies and an inherent contradiction in the pleadings. The plaintiffs rely heavily on confidential sources for their allegations. But they generally fail to provide sufficient details about their sources to credit their statements and fail to tie those statements to the large scale accounting fraud that allegedly took place. Further, the fact that the company's internal accounting controls did not work properly does not necessarily lead to the conclusion that revenues were consistently overstated on the company's financial reports. Because errors could bias the figures down as well as up, the inference that such errors demonstrate an intent to defraud is weak. Finally, as with the company's acquisition accounting, Shaw has never corrected, repudiated or recalculated its use of the percentage of completion method on its long-term contracts.

To support the allegations of scienter on the part of Bernhard and Belk, plaintiffs contend that Shaw pressured employees to inflate the percentage of completion numbers; that Bernhard and Belk knew about Shaw-Trac's deficiencies; that they had access to allegedly incriminating internal reports; and that they must have known about the alleged overstatement of contract revenues. Each of these subjects requires discussion.

The only pleadings that connect either of these defendants to pressuring of employees are two statements attributed to Bernhard. It is asserted that Bernhard told several Shaw executives during a dinner conversation that, "We have got to show more progress," on Shaw's construction projects. (Compl.8.) Plaintiffs would draw the inference that he was advising the others to report higher completion rates on the construction projects than had actually been achieved. Second, in or about June 2002, a "former confidential insider" heard Bernhard scream at a company financial analyst named Scott Roussell because Shaw's revenue numbers were too low and he "needed to do something to fix that."(Compl.280.) After this incident, the confidential source claims to have "heard Roussell call various operations centers in order to get them to increase their percentages of completion on Shaw's projects to 'help with the numbers.'" (Compl.280.)

[12] The dinner table remark is insufficient to support an inference of scienter on Bernhard's part. Initially, plaintiffs offer no source, documentary or personal, for this comment. *See ABC Arbitrage,* 291 F.3d at 358. Plaintiffs fail to allege with particularity when

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

this comment was made. See *Southland,* 365 F.3d at 376-77. But even if Bernhard made the statement, a more likely, nonculpable inference, absent any other details, is that Bernhard was commenting on the need to improve the company's business performance.

*8 Bernhard's "do something to fix that" statement suffers from similar deficiencies. The confidential source is not identified sufficiently by his title, work location, or dates of employment to reassure the reader that he heard and understood the meaning of the remark. See *Central Laborers,* 497 F.3d at 552. Further, the statement cannot contribute to a strong inference of scienter because it is "susceptible to many interpretations, including innocent ones." *In re Integrated Elec. Servs., Inc.,* No. 4:04-CV-3342, 2006 WL 54021, at *4 (S.D.Tex. Jan. 10, 2006) (unpublished) (holding that comment by corporate manager to employee was too ambiguous to support strong inference of scienter), *aff'd, Central Laborers,* 497 F.3d 546 (5th Cir.2007). Bernhard may have simply been pointing out an error that needed to be corrected.

[13] Bernhard and Belk allegedly knew about Shaw-Trac's malfunction in several ways. The complaint alleges that in May 2002, a letter detailing problems with Shaw-Trac was sent to "senior Shaw insiders responsible for Shaw-Trac's development."(Compl.71.) Whether Bernhard and Belk were among the recipients or how they may have learned of its contents, however, is not stated, nor does the complaint allege who wrote the letter or just what it said. This allegation is too vague to allow an inference of scienter.

More pointedly, plaintiffs allege that "Bernhard knew that Shaw-Trac was not functional" when Shaw began using the program in mid-2001. They claim that Bernhard insisted on rolling out Shaw-Trac because he wanted to use it as a marketing tool with potential customers. By 2003, it is alleged, Shaw began to move away from the program because it did not work, and Bernhard then directed the company IT department to develop Shaw-Trac Lite, a simplified new program that also failed to work. (Compl.74.) Plaintiffs do not, however, supply documentary or personal sources for the majority of these allegations.[FN6] This court has explained that "general allegations and conclusory statements, such as stating [defendants] knew ... adverse material" do not

contribute to a strong inference of scienter. See *Blackwell,* 440 F.3d at 289-90. Because there is no factual support for the allegation that Bernhard knew that Shaw-Trac was dysfunctional when it was rolled out, the allegation fails to support a strong inference of scienter.[FN7] Compare *In re Stone & Webster,* 414 F.3d at 205 (holding allegations of communications from customer to defendant were "too vague to support a strong inference" that defendants "were aware of them or, if so, were reckless in failing to take them seriously"). Further, the allegation of Shaw-Trac's problems may indicate corporate mismanagement, but the securities laws do not protect investors against negligence. See *Tuchman v. DSC Commc'ns Corp.,* 14 F.3d 1061, 1070 (5th Cir.1994) ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim ...."); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995) (same).[FN8] Plaintiffs do not state facts that support an inference that Bernhard rolled out Shaw-Trac with intent to deceive or with severe disregard of its potential to mislead investors.

Belk is alleged to have been "informed, in great detail, by a former Baton Rouge project controls manager, of all the problems associated with the use of Shaw-Trac."(Compl.73.) In *Southland,* this court found wanting a similar scienter allegation. 365 F.3d at 375-76. There, securities fraud plaintiffs alleged that corporate insiders, including named individual defendants, were repeatedly told by programmers and developers that one of the company's technology products would not work as represented. *Id.* The court held this allegation "insufficient because it fail[ed] to state when, where or on what occasion or occasions this occurred, fail[ed] to in any way identify the [company's] programmers and developers involved, and [did] not indicate whether their statements were oral or written or give[ ] any meaningful particulars as to what was stated." *Id.* at 376. In this case, plaintiffs' allegation also lacks particularity concerning when, how and what the confidential source told Belk, and it lacks sufficient detail to support the probability that the source was in a position to know about "all of the problems" related to Shaw-Trac or that these problems pervaded the company. See *ABC Arbitrage,* 291 F.3d at 353; see also *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 155 (3d Cir.2004) (rejecting use of statements from local branch office employees to substantiate allegations about nationwide company practices).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                                                      Page 12
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

*9 Finally, plaintiffs allege that the defendants knew or were severely reckless in not knowing about Shaw-Trac's problems because, according to numerous confidential sources, the problems were widely known throughout the company. (Compl.26, 72.) The "defendants must have known" allegation was rejected by this court in *Abrams, 292 F.3d at 432,* as too vague to support a strong inference of scienter.

Turning to more general allegations that the executive defendants knew or should have known that Shaw was prematurely recognizing revenue from its long-term contracts, plaintiffs first point to their receipt of monthly reports on the progress of contracts, which were discussed at meetings. (Compl.24-29.) The complaint does not, however, allege that the reports or the meetings included information at odds with Shaw's public statements. *See Abrams, 292 F.3d at 433.*[FN9]In fact, the complaint alleges that the reports were already inaccurate when prepared because they contained allegedly unreliable data derived from Shaw-Trac.[FN10]Thus, these allegations do not substantiate an inference that Bernhard and Belk knew they contained false information, nor does the mere fact that they received the reports imply that they knew of any inaccuracy.

Plaintiffs also assert that the magnitude and egregiousness of Shaw's premature revenue recognition create an inference of scienter by Bernhard and Belk. According to their brief, Shaw "improperly recognized millions of dollars of revenue on every single one of its EPC contracts," and because of their size, "even minimal percentage increases caused material overstatement[s] of Shaw's income."Such bold statements cannot substitute for factual assertions connecting the corporate executives to specific contracts or accounting or management practices that led to the alleged overstatements. Yet particularized assertions are lacking here.[FN11]Moreover, a single confidential source identified as a "former independent contractor for [Stone & Webster] and then Shaw" contributed these allegations, but the complaint does not state how long the contractor worked for Shaw, when he learned the information alleged, or how he was in a position to know the practices of every superintendent on every Shaw project. *See ABC Arbitrage, 291 F.3d at 353.*Without such details, we cannot credit these

allegations as a basis for a strong inference of scienter. The only specific observation by this source is that he saw a construction superintendent incorrectly record that 200 feet of pipe had been installed when, in fact, only 120 feet had been. (Compl.277.) And even the location and date of this allegation are not pinpointed.

After considering plaintiffs' scienter allegations together, we conclude they do not state with particularity facts giving rise to a strong inference that the defendants knew or were severely reckless in not knowing that Shaw was prematurely recognizing revenue on its long-term contracts.

*B. Viability of the LSP-Pike Project*

*10 [14] Plaintiffs allege that Shaw failed to timely or fully disclose material concerns affecting the viability of a major construction project. In September 2001, Shaw announced that it had signed an agreement with NRG Energy, Inc. to construct two power plants, one of which was known as the LSP-Pike project. On August 5, 2002, however, Shaw announced that NRG had experienced liquidity problems and would not make its next scheduled $32 million milestone payment on the project. *See Shaw Group Inc., Press Release (Form 8-K) (Aug. 5, 2002).* Shaw also announced that it had reached an agreement with NRG to acquire substantially all of the assets of Pike in exchange for forgiveness of current sums owed to Shaw and a payment of $43 million to NRG by Shaw. *Id.* Shaw noted that if the companies could not implement the agreement and NRG failed ultimately to complete its scheduled payment, there could be a material adverse effect on Shaw's ability to meet its earnings expectations. *Id.* Shaw's stock price immediately dropped.

Whether viewed from the perspective of substantive liability standards, the complaint's use of a confidential source, or the gap between plaintiffs' pleading and their misleading characterizations of the complaint on appeal, these allegations fail to support a strong inference of scienter against Bernhard, Belk or Shaw. As with the preceding claims, Bernhard and Belk are not specifically connected in any way to Shaw's August 2002 disclosure or its nondisclosures or the timing of disclosures concerning this project, nor does the confidential source tie the defendants to ongoing knowledge about the project's status.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                                                    Page 13
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

[15][16] First, plaintiffs' underlying theories of securities fraud are that Shaw (a) should have disclosed earlier its knowledge that the project was in financial jeopardy or (b) did not disclose enough about the project's difficulties. They cite no caselaw or SEC rules to support these claims. In general, a corporation "does not commit securities fraud merely by failing to disclose all nonpublic material information in its possession."*Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996), *superseded by statute on other grounds as recognized in Greebel v. FTP Software, Inc.,* 194 F.3d 185, 197 (1st Cir.1999). This court has affirmed that "[l]iability under Rule 10b-5 for nondisclosure arises if there is a duty to speak."*Kaplan v. Utilicorp United, Inc.,* 9 F.3d 405, 407 (5th Cir.1993). Plaintiffs do not explain why Shaw had an affirmative duty to disclose NRG's missed payments or other problems concerning this one construction project before August 5, 2002.

Similarly, their claim of incomplete disclosure is actionable only if what they said is misleading. "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."*Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002); *see also McDonald v. Kinder-Morgan, Inc.,* 287 F.3d 992, 998 (10th Cir.2002) ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.") (internal quotation marks omitted). Plaintiffs' allegations do not meet this standard. Even assuming arguendo that the omitted information was material, Shaw's announcement neither stated nor implied anything about the history of Shaw's relationship with NRG. Shaw's omission of information about its alleged problems with NRG before August 2002 did not make its announcement untrue or misleading.[FN12]

*11 Second, plaintiffs make no attempt to state with particularity facts giving rise to a strong inference that either Bernhard or Belk knew or was severely reckless in not knowing about the LSP-Pike project difficulties long before NRG missed a payment in August 2002. We indulge the assumption that the confidential source occupied a position that enabled him to know about NRG's internal financial problems that ultimately caused it to miss a milestone payment.

*See ABC Arbitrage,* 291 F.3d at 353.Nonetheless, the complaint does not indicate how or when the officers became aware of what the confidential source allegedly knew. *Cf. Kushner v. Beverly Enters., Inc.,* 317 F.3d 820, 828 (8th Cir.2003) (holding that an allegation that someone involved in a fraudulent scheme reported to one of the named defendants was "not specific enough to support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring").

Third, the plaintiffs contend in their appellate brief that their confidential source arranged a special meeting in April 2002 with the defendants and others to discuss the LSP-Pike project problems. But the complaint tells a different story. Although it states that the source organized a meeting, it does not state that these defendants attended or how they allegedly learned what was discussed at the meeting.[FN13]As has been noted, "we review only the well-pleaded facts in the complaint. This new allegation may *not* be considered."*Blackwell,* 440 F.3d at 289.Plaintiffs also allege in their brief but not in their complaint that it is "inconceivable" that the defendants did not know about the status of the LSP-Pike project because "Shaw's financial health was dependent on, in large part, the success of the LSP-Pike project, a $340 million contract."The complaint states neither that Shaw's "financial health" depended on the project nor that it was a $340 million contract. In any event, defendants' status within the company is inadequate for an inference of knowledge about alleged misstatements. *See Abrams,* 292 F.3d at 432.

No viable inferences of guilty knowledge as to these defendants arises from plaintiffs' allegations concerning the LSP-Pike project.

*C. Inflated Backlog and Slow/No Pay of Vendors*

*12 The complaint alleges that Shaw misrepresented its financial condition by including in its backlog figures projects that were "contingent, potential, uncommitted and not documented" and by maintaining a widespread company practice of delaying or not paying vendors toward the end of each fiscal quarter to artificially inflate its cash flow reports. The complaint states no facts with particularity that suggest the inference that Bernhard or Belk knew about or sanctioned or ordered these alleged practices. Moreover, plaintiffs' brief does not

--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

argue how these claims might be salvaged. We deem the un-briefed claims to be abandoned.

### D. Motive and Opportunity Allegations

[17][18] To buttress whatever other inferences of scienter might be drawn from their substantive allegations, the plaintiffs allege that Bernhard and Belk had both motive and opportunity to engage in the charged securities fraud. To demonstrate motive, plaintiffs must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement."*Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir.1999) (internal quotation marks and citation omitted). As high-ranking corporate officers, the defendants had an opportunity to commit fraudulent acts. The question here is whether plaintiffs sufficiently alleged as motives that the defendants sold their stock at "inflated" prices, earned bonuses during the class period, sought to use artificially inflated stock as currency for corporate acquisitions, and aimed to maintain the company's favorable credit rating.

[19][20] Because corporate executives are often paid in stock and stock options, they will naturally "trade those securities in the normal course of events," and courts "will not infer fraudulent intent from the mere fact that some officers sold stock."*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir.1997) (Alito, J.). Insider stock sales may be probative of scienter, however, if they occur in "suspicious amounts or at suspicious times."*Abrams*, 292 F.3d at 435.Suspicion may be generated if the "sales are out of line with prior trading practices or [made] at times calculated to maximize personal profit."*Central Laborers*, 497 F.3d at 553 (quoting *Abrams*, 292 F.3d at 435). Pursuant to *Tellabs*, of course, both culpable and nonculpable explanations for stock sales, as revealed in the pleadings and associated documents, must be considered.

During the first nine months of the class period, Bernhard and Belk sold large blocks of Shaw stock. Bernhard's sales occurred in January and July 2001, while Belk's sole large sale took place in January 2001. Plaintiffs assert that these sales were suspicious because they took place near the market peak for

Shaw stock (if up to $20 below the market high is near the "peak"), and they far exceeded these defendants' previous trades in company stock. Placed in context, the allegations are overstated and innocuous. When Bernhard sold in January 2001, only a few days had passed after the expiration of his "lock-up" agreement not to sell shares for ninety days following Shaw's October 2000 equity offering. During the "lock-up" period, Shaw stock split two-for-one and doubled his holdings. *See* Shaw Group, Inc., Quarterly Report (Form 10-Q), at 7 n. 2 (Jan. 16, 2001). It is quite plausible that Bernhard sold stock in January to take a profit on some of his newly acquired shares. His July sale followed a positive earnings announcement by Shaw, but he missed the immediate price spike following the announcement. *See Southland*, 365 F.3d at 369 (stating that insider's stock sales were not suspicious, in part, because they did not come immediately after an allegedly misleading statement caused spike in share price).

Plaintiffs allege that Belk sold fifty-seven percent of his Shaw stock immediately after the positive earnings announcement in January 2001, marking only his second sale of company shares. But plaintiffs tell only half the story. Shaw's SEC filings, referenced in the complaint, reveal that Belk had actually sold Shaw stock twice before the block sale in question, and a February 2000 sale disposed of approximately sixty-five percent of his holdings at that time. *See* Shaw Group, Inc., Statement of Change in Beneficial Ownership of Securities (Form 4) (Sept. 11, 2000); Shaw Group, Inc., Statement of Change in Beneficial Ownership of Securities (Form 4) (Feb. 25, 2000). Thus, the amount of his January sale was not out of line with his past actions or timing. Further, the sale allowed him to capitalize on the expiration of his own ninety-day lock-up period and the Shaw stock split.

*13 Insofar as their executive compensation packages were tied to company performance, and both men received bonuses during the class period, Bernhard and Belk are in no different position than the vast majority of corporate executives. Consequently, this court has held that incentive compensation "can hardly be the basis on which an allegation of fraud is predicated."*Tuchman*, 14 F.3d at 1068 (internal quotation marks omitted); *see also Abrams*, 292 F.3d at 434.Incentive **compensation** packages may be considered in conjunction with other **scienter**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

allegations, *Barrie,* 397 F.3d at 264, but only in an extraordinary case is it probative. *See MCI WorldCom,* 340 F.3d at 250 (holding that compensation package was probative where MCI WorldCom CEO Bernard Ebbers had a unique pay package and stood to lose millions if WorldCom's stock price dropped significantly). Bernhard's and Belk's packages of bonus and stock options during the class period, while generous, were hardly extraordinary; as a motivation to fraud, they were minor.

[21][22] Plaintiffs wind up their general motive allegations by asserting that Bernhard and Belk wanted to maintain Shaw stock at artificially high prices to increase its value in acquiring companies like IT Group, Scott Sevin & Shaffer, and Technicomp during the class period, and they wanted to maintain its credit ratings. Scienter in a particular case may not be footed solely on motives universal to corporate executives. *See Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000). The outlier to the acquisition proposition, however, is MCI WorldCom, whose need to complete a "crucial" $129 billion merger with Sprint gave the company a motive to inflate its financial results.*MCI WorldCom,* 340 F.3d at 242, 250.Shaw's acquisitions are comparatively modest. Plaintiffs also allege that defendants refused to write off impaired goodwill following the Stone & Webster and IT Group acquisitions because they feared an impact on Shaw's debt covenants and a consequent downgrade of its credit rating. "The desire to maintain a high credit rating is universally held among corporations and their executives and consequently does not contribute significantly to an inference of scienter."*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 664 (8th Cir.2001).

### E. Sarbanes-Oxley Act Certifications

*14 [23] Almost as an afterthought, plaintiffs allege that the Sarbanes-Oxley certifications signed by Bernhard and Belk, which attest to the accuracy of Shaw's SEC filings, contribute to a strong inference of scienter. Under the Sarbanes-Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports. *See*15 U.S.C. § 7241(a). The report must identify the officer's basis for making the certification and each officer must certify that he and other officers are

"responsible for establishing and maintaining internal controls."15 U.S.C. § 7241(a)(4)(A). Moreover, the officers must certify that they have "evaluated the effectiveness of the issuer's internal controls" within the previous ninety days and have "presented in the report their conclusions about the effectiveness of their internal controls."15 U.S.C. § 7241(a)(4)(C), (D). Bernhard and Belk both signed Sarbanes-Oxley certifications from 2002 on, as certifications were attached to the quarterly and annual reports. According to plaintiffs, the certifications were false because the defendants knew that Shaw's internal accounting controls were defective and its financial statements misleading.

In *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir.2006), the court concluded that a Sarbanes-Oxley certification, standing alone, is not indicative of scienter. This court has cited the *Garfield* analysis approvingly. *Central Laborers,* 497 F.3d at 555.To hold otherwise, the Eleventh Circuit reasoned, would mean that "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA."*Garfield,* 466 F.3d at 1266.Instead, the court held that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."*Id.* There must be, in other words, facts establishing that the officer who signed the certification had a "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."*Id.* From the foregoing analysis of all of plaintiffs' allegations, no such facts placed Bernhard or Belk on notice of glaring irregularities or red flags.

### F. Section 20(a) Control Person Liability

[24] Although the plaintiffs alleged that Bernhard and Belk are liable as control persons under Section 20(a) of the Securities Exchange Act of 1934, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation."*Southland,* 365 F.3d at 383.Because we have found the pleadings of Section 10(b) and Rule 10b-5 liability inadequate, and because plaintiffs have furnished no independent

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. L. Rep. P 94,790

briefing on this claim, it must be dismissed.

### CONCLUSION

*15 Whether analyzed as separate claims or in toto, plaintiffs' allegations satisfy neither *Tellabs'* nor this court's standards, construing the PSLRA, for pleading facts that create a strong inference of scienter necessary to pursue further their securities fraud claims. The district court erred in denying the motion to dismiss the complaint. Its judgment is REVERSED, and the case REMANDED WITH INSTRUCTIONS TO DISMISS.

FN1. At oral argument, plaintiffs conceded that Barfield and Gill should be dismissed as defendants. Therefore, we do not examine the allegations against them. The allegations against Barfield and Gill appear to rely on the "group pleading doctrine," a judicial presumption that statements in group-published documents are attributable to those individuals with direct involvement in the everyday business of the company, which this court has rejected. See *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 363-65 (5th Cir.2004).

FN2. Shaw announced (1) negative financials and revised estimates on July 11, 2003, (2) a downturn in earnings on October 16, 2003, and (3) a disappointing operational performance on January 14, 2004.

FN3.*See, e.g., Ferris, Baker Watts, Inc. v. Ernst & Young, LLP,* 395 F.3d 851, 855 (8th Cir.2005) ("Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."); *Piraglia v. Novell, Inc.,* 339 F.3d 1182, 1191 (10th Cir.2003) ("Claims of accounting irregularities or violations of [GAAP] support a claim of scienter only when coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors.") (internal quotation marks omitted); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1208 (11th Cir.2001)

("[A]llegations of violations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)."); *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999) ("The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."); *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996) ( "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.").

FN4.*See also Blackwell,* 440 F.3d at 287 ("Corporate officers are *not* liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded."); *Nathenson,* 267 F.3d at 424-25 ("We recognize that normally an officer's position with a company does not suffice to create an inference of scienter.").

FN5. Shaw described Shaw-Trac in its annual report as follows: "SHAW-TRAC is a web-based, proprietary earned value application that enables the Company to effectively manage and integrate the many phases of a capital project, from estimating to engineering through construction and start-up. Users from around the world consistently access Shaw-Trac through the public networks in order to update and understand the real-time financial position of respective projects."(Compl.56.) (quoting Shaw Group Inc., Annual Report (Form 10-K), at 4 (Nov. 27, 2002)).

FN6. Two of plaintiffs' allegations about Bernhard's involvement with Shaw-Trac have sources: (1) the claim made by an anonymous former Shaw employee that Bernhard rolled out Shaw-Trac because he saw it as a marketing tool, and (2) the claim made by an anonymous former Shaw employee that Shaw-Trac Lite was a stripped-down version of Shaw-Trac. Both confidential sources are insufficiently identified to determine whether someone in their positions would have access to the information alleged. Nonetheless, these

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

claims are innocuous. There is nothing fraudulent about a company marketing its software programs to attract new customers or changing its software programs. *See, e.g., Abrams, 292 F.3d at 433* ("A planned improvement or upgrade [to an internal controls program] does not mean that the prior system was necessarily producing bad data. A perfectly reasonable explanation for implementing [the new program] was to improve efficiency and lower costs.").

FN7. Plaintiffs argue on appeal that their complaint identifies a confidential source, a former project controls manager who assisted in the design and implementation of Shaw-Trac, who stated that Bernhard knew Shaw-Trac did not work. The complaint, however, does not indicate the source of the allegation. (Compl.61.) "Needless to say, in reviewing a *Rule 12(b)(6)* dismissal, we review only the well-pleaded facts in the complaint. This new allegation cannot be considered."*Blackwell, 440 F.3d at 289.*

FN8.*See also Abrams, 292 F.3d at 433* (stating that the nature of accounting problems that lead to restatement could "easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").

FN9.*See Tuchman, 14 F.3d at 1069* (holding that plaintiffs could not satisfy their pleading burden on scienter without "alleg[ing] any facts that show that [any of defendant's alleged] statements were belied by his actual knowledge of contradictory facts").

FN10. The complaint states: "[B]ecause Shaw-Trac did not work, any data obtained from Shaw-Trac and any reports created by Shaw-Trac, including the One-Page Reports, were corrupt and inherently unreliable."(Compl.¶ 26.)

FN11. In *Shushany v. Allwaste, Inc.,* this court held that plaintiffs failed to state a claim for fraud based on accounting irregularities because "the complaint did not

identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position. Although we need not identify which of these deficiencies, standing alone, might render the complaint insufficient under Rule 9(b), we hold that altogether, they do."*992 F.2d 517, 522 (5th Cir.1993).*

FN12. In *Winer Family Trust v. Queen, 503 F.3d 319, 330 (3d Cir.2007),* the court rejected similar allegations that a company's press release was misleading because it omitted information about the history of its relationship with a business partner. There, Pennexx announced that an equity investment made by Smithfield Foods helped facilitate Pennexx's common stock registration. *Id.* Plaintiffs argued that this statement was misleading because Pennexx failed to disclose that a prior venture between Pennexx and Smithfield had been disastrous. *Id.* The court concluded that plaintiffs failed to explain why this omission made the press release misleading or untrue. *Id.Winer* is analogous to the present case.

FN13. The complaint states: "In April 2002, the former controls manager convened a special meeting at [Shaw's] Baton Rouge headquarters to discuss the serious problems with the LSP-Pike project concerning millions of dollars of outstanding invoices and NRG's failure to grant Shaw a full notice to proceed."(Compl.¶ 86.)

C.A.5 (La.),2008.
Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.
--- F.3d ----, 2008 WL 2894793 (C.A.5 (La.)), Fed. Sec. Rep. P 94,790

END OF DOCUMENT