UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| IN RE MBNA CORP. SECURITIES LITIGATION | Case No. 1:05-CV-00272-GMS CONSOLIDATED |
|---|---|

**COMPENDIUM OF UNREPORTED CASES TO REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

Dated: August 28, 2008

*/s/ Brian D. Long*
Seth D. Rigrodsky (#3147)
sdr@rigrodskylong.com
Brian D. Long (#4347)
bdl@rigrodskylong.com
**RIGRODSKY & LONG, P.A.**
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310

*Plaintiffs' Liaison Counsel*

**MOTLEY RICE LLC**
William H. Narwold (admitted *pro hac vice*)
bnarwold@motleyrice.com
Robert T. Haefele (admitted *pro hac vice*)
rhaefele@motleyrice.com
William E. Applegate, IV (admitted *pro hac vice*)
wapplegate@motleyrice.com
Meghan S.B. Oliver (admitted *pro hac vice*)
moliver@motleyrice.com
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000

*Plaintiffs' Lead Counsel*

**INDEX** **TAB**

*Talecris Biotherapeutics, Inc. v. Baxter Intern., Inc.*,
No. 05-349 GMS, 2007 WL 1670387 (D. Del. June 7, 2007)........................................ 1

*Thoman v. Philips Med. Sys.*,
No. 04-3698 (GEB), 2007 WL 203943 (D.N.J. Jan. 24, 2007)........................................ 2

*Keene v. Sears Roebuck & Co.*,
No. 05-828 (AET), 2007 WL 77324 (D.N.J. Jan. 8, 2007)........................................ 3

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
No. 06-30908, 2008 WL 2894793 (5th Cir. July 29, 2008)........................................ 4

*Fisher v. Offerman & Co.*,
No. 95 Civ. 2566 (JGK), 1996 WL 563141 (S.D.N.Y. Oct. 2, 1996)................................ 5

*Palladin Partners v. Gaon*,
No. 05-CV-3305 (WJM), 2006 WL 2460650 (D.N.J. Aug. 22, 2006)................................ 6

# TABS 5-6

# TAB 5





Fisher v. Offerman & Co., Inc.
S.D.N.Y.,1996.

United States District Court, S.D. New York.
Deborah Ann **FISHER**, Individually and on Behalf of Those Similarly Situated, Plaintiff,
v.
**OFFERMAN** & COMPANY, INC. d/b/a **Offerman** & Company, and Scott J. **Offerman**, Defendants.
**No. 95 Civ. 2566 (JGK).**

Oct. 2, 1996.

Lori E. Colangelo, Timothy J. MacFall, Law Offices of Curtis V. Trinko, New York City, for plaintiff.
Phillip C. Essig, Berwin Leighton, New York City, Terrence J. Fleming, Kim Ruckdaschel-Haley, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for defendants.

*OPINION AND ORDER*

KOELTL, District Judge:
*1 This is an action for civil conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961*et seq.*, based on predicate acts of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a). The predicate acts concern primarily a securities offering of debentures of Ilio, Inc. ("Ilio") underwritten by the defendant Offerman & Co., Inc. ("Offerman & Co.") whose president at the time was defendant Scott Offerman. The plaintiff seeks to certify this suit as a class action on behalf of purchasers of Ilio debentures during the Offering Period for those debentures. The defendants now move to dismiss the Second Amended Complaint [FN1] for failure to state a claim on which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6) and for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b). For the reasons that follow the defendants' motion is granted.[FN2]

FN1. The original complaint was filed on April 14, 1995, and asserted a single claim for securities fraud under § 11 of the Securities Act of 1933, 15 U.S.C. § 77k. After the defendants challenged that complaint on statute of limitations grounds, the plaintiff abandoned that claim. The plaintiff moved to file an amended complaint and annexed to her motion a "First Amended Class Action Complaint [Proposed]." The defendants then submitted a Memorandum in Opposition to Plaintiff's Motion to Amend Complaint, arguing that the plaintiff's proposed amended complaint failed to allege essential elements of a RICO claim, namely an enterprise and a pattern of racketeering activity. The plaintiff was ultimately granted leave to file the Second Amended Complaint, which asserted a RICO claim and attempted to cure the defects in the first proposed amended complaint. The amended pleading was entitled "Second Amended Class Action Complaint" and will be referred to in this Opinion as the Second Amended Complaint ("SAC"). It was, in effect, the plaintiff's third complaint, and the second effort to plead a RICO claim.

FN2. The defendants have also moved for sanctions pursuant to Fed.R.Civ.P. 11 based on the plaintiff's filing of the Second Amended Complaint.

I.

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the allegations in the complaint are accepted as true, *see Cohen v. Koenig*, 25 F.3d 1168, 1172-73 (2d Cir.1994), and all reasonable inferences must be drawn in the plaintiff's favor, *see Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, the motion should be granted only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Gibson, 355 U.S. 41, 45-46 (1957); *see also* Goldman, 754 F.2d at 1065.

In her Second Amended Complaint, the plaintiff alleges the following facts. Defendant Offerman & Co. ("Offerman & Co.") underwrote a public offering (the "Offering") of $7.5 million in subordinated debentures issued by Ilio, Inc. ("Ilio") pursuant to a prospectus (the "Prospectus") over a period from January 24, 1992, to April 15, 1992 (the "Offering Period"). Scott Offerman ("Offerman") was the president of Offerman & Co. and in charge of underwriting prospects. Several months after the Offering was complete, Ilio encountered severe financial difficulties, culminating in its filing for bankruptcy in December, 1992. The plaintiff alleges that Offerman & Co. and Offerman personally committed securities fraud, wire fraud, and mail fraud in connection with the sale of the Ilio debentures. Specifically, the plaintiff alleges that the Ilio Prospectus contained certain misrepresentations and omissions relating to the use of the proceeds from the Offering, the financial liquidity of Ilio, and prior bankruptcy litigation involving certain Ilio directors. The plaintiff also alleges that Offerman & Co. engaged in fraudulent trading in Ilio stock during the Offering Period as part of a manipulative scheme to boost sales of the Debentures and encourage new investors to convert the Debentures into common stock.

*2 The plaintiff alleges that the defendants were associated with certain others in an enterprise that conducted numerous fraudulent debenture offerings over a long period of time leading up to and including the Ilio Offering. The plaintiff identifies I. Friedman Equities, Inc. ("Friedman Equities") as the entity that referred potential clients to Offerman & Co. for underwriting. The plaintiff also names a group of banks and transfer agents deemed the "Bond Trustees" that performed various functions, including acting as trustee under the debenture indentures. The group consisted of Norwest Bank, First Trust National Association, Valley National Bank of Arizona, National City Bank, American Stock Transfer, and Builders Finance. (SAC ¶¶ 74-83.)

The plaintiff alleges that the enterprise, which consisted of Offerman & Co., Friedman Equities, and the Bond Trustees, performed three allegedly fraudulent debenture underwritings that eventually soured. The first was a $10 million offering of senior subordinated debentures in Sea Galley Stores Inc. ("Sea Galley") in 1985. (SAC ¶¶ 84-91.) The second was a $30 million offering of guaranteed subordinated debentures in Equipment Renewal Co., Inc. ("ERC") in 1982. (SAC ¶¶ 92-95.) The plaintiff alleges that the defendants committed securities fraud, mail fraud, and wire fraud in connection with the Sea Galley and ERC underwritings in a manner consistent with the violations committed during the Ilio Offering. The plaintiff only claims to have been injured by the predicate acts relating to the Ilio Offering. The plaintiff identifies numerous predicate acts allegedly committed by the defendants during the Ilio Offering Period consisting of securities fraud, as described above, and mail and wire fraud such as mailing allegedly fraudulent SEC disclosure filings and making allegedly fraudulent misrepresentations and omissions to investors over the telephone. The plaintiff asserts that these predicate acts constitute a pattern of racketeering activity as defined in 18 U.S.C. §§ 1961(1) and 1961(5). Based on these allegations the plaintiff asserts a claim against both defendants under 18 U.S.C. § 1962(c).

II.

The defendants move to dismiss the Second Amended Complaint based on certain pleading deficiencies with respect to the RICO claim under § 1962(c) which provides in relevant part:

It shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c). To state a claim under § 1962(c), a plaintiff must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,*465 U.S. 1025 (1984); *see also R.C.M. Executive Gallery Corp. v. Rols Capital Co.,* 901 F.Supp. 630, 639 (S.D.N.Y.1995). The defendants attack the Second Amended Complaint for failing to plead the RICO claim properly in several respects

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

including failure to allege a pattern of racketeering activity and failure to plead a proper predicate act with respect to defendant Scott Offerman.

A.

*3 The defendants argue that the plaintiff has failed to plead the "pattern" element of her RICO claim. To plead properly a pattern of racketeering activity, the plaintiff must "plead at least two predicate acts, see § 1961(5), and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir.1995) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)), *cert. denied*, 116 S.Ct. 2547 (1996); *see also* *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir.1989) (in banc) (purpose of relatedness and continuity requirements is to " 'prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts' " (quoting *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 192 (9th Cir.1987)). The defendants argue that the plaintiff has failed to satisfy the continuity requirement.

" 'Continuity' is both a close- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989). The plaintiff in this case argues that she presents an open-ended pattern of securities fraud, mail fraud, and wire fraud that "has been part of defendants' regular way of conducting the enterprise and their otherwise ongoing legitimate business." (Pl.'s Mem. at 25; SAC ¶ 114, RICO Case Stmt. ¶¶ 5(f, g).) To plead a RICO pattern based on the open-ended concept successfully, the plaintiff must demonstrate "a threat of continuity, for example, by showing that the defendant operates as part of a long-term association that exists for criminal purposes, or that the predicates are a 'regular way of conducting defendant's ongoing legitimate business." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir.1994) (quoting *H.J.*, 492 U.S. at 242-43.)

The plaintiff's allegations of a pattern of racketeering activity are not sufficient. The plaintiff describes the predicate acts relating to the Ilio Offering as "wire fraud, mail fraud and fraud in the sale of the Ilio debentures" taking place "[b]etween June 1991 and continuing to at least July 22, 1992, in furtherance of and for the purpose of executing this one (i.e., the Ilio Offering) of a series of similar schemes...." (RICO Case Stmt. ¶ 5(b, c); SAC ¶ 97.) The pattern of these predicate acts is confined to the period of approximately thirteen months that the plaintiff alleges comprised the Ilio Offering. However, the only predicate acts that the plaintiff has pleaded with any specificity are three alleged mailings that occurred between January 24, 1992, and April 3, 1992. (SAC ¶ 97.) And the Offering Period itself lasted only for approximately three months.

The alleged predicate acts relating to the Ilio Offering do not suffice to plead a pattern of racketeering of sufficient continuity, both in terms of the duration of the alleged pattern and the nature of the acts themselves. The predicate acts are not the type of criminal acts that would suggest repetition.[FN3] With respect to the duration, the period of time of the Ilio Offering is too short to constitute a pattern of racketeering activity under RICO. *See, e.g., Miller v. Gain Fin., Inc.*, 995 F.2d 706, 709 (7th Cir.1993) (Timbers, J.) ("A single scheme which lasts only a short period does not have the requisite continuity, even if there are multiple predicate acts and victims."). In *Aaronson v. Bushell*, No. 88 Civ. 8611, 89 Civ. 6131, 1991 WL 152608 (S.D.N.Y. Aug. 1, 1991), a RICO claim based on an allegedly fraudulent limited partnership offering was dismissed for failure to plead continuity. The Court held that:

> FN3. This is not a case of inherently criminal activity or an enterprise whose business is racketeering, either of which would be circumstances where the nature of the conduct itself may give rise to a threat of continuity. *See* GICC, 67 F.3d at 466; *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir.1995).

> *4 Defendants' alleged fraudulent conduct occurred over a period of only a few months encompassing the offering and sale of the limited partnership units to plaintiffs. In connection with all three partnerships, the [offering memoranda] were issued and the offering of the units terminated within a matter of several months. Under the circumstances of these cases, the time periods involved are too short to create a proper continuity allegation.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Id., 1991 WL 152608, at *4.

In *Antonoff v. Bushell*, No. 90 Civ. 2485, 1991 WL 95433 (S.D.N.Y. May 28, 1991), another case involving allegedly fraudulent securities offerings, the Court held that:

In this case, the fraudulent acts allegedly committed by defendants occurred over a period of a few months during the offering and sale of the limited partnership units, a time period too short, under the circumstances of this case, to satisfy the continuity requirement.

Id., 1991 WL 95433, at *8.

In this case, as in *Aaronson* and *Antonoff*, the duration of the debenture Offering is simply too brief to satisfy the RICO continuity requirement.

Furthermore, there are no allegations that the nature of the defendants' conduct during the Ilio Offering gives rise to a threat of continuity. The Ilio Offering was completed in April, 1992, and no predicate acts are alleged even in the most general way beyond July, 1992. There are no allegations of additional misconduct relating to the Ilio debentures or additional sales of those securities involving the defendants or the enterprise.[FN4]

FN4. The plaintiff also seeks leave to replead to allege additional facts derived from internal Offerman & Co. memoranda relating to the conversion of the Ilio debentures to shares of Ilio stock. (Pl.'s Mem Opp'n at 17 n. 5.) The additional facts relate to the Ilio Offering and remain within the narrow time frame already discussed in the Second Amended Complaint. Additional allegations of this kind will not cure the plaintiff's failure to plead a pattern of racketeering activity, and therefore would not be a basis for repleading.

The plaintiff attempts to demonstrate the threat of continuity by alleging that the predicate acts of securities, mail, and wire fraud were the regular way in which Offerman & Co. conducted its business and by relying on alleged acts involving the ERC and Sea Galley underwritings. The plaintiff argues that the earlier ERC and Sea Galley underwritings establish that the enterprise is in the business of underwriting fraudulent debt offerings and that taking those offerings together with the Ilio Offering, there is a sufficient allegation that the predicate acts were the regular way of conducting that business. (SAC ¶¶ 106-114; RICO Case Stmt. ¶¶ 5(f)-(g), 8.)

These earlier offerings do not suggest a threat of continuity. The ERC offering took place in 1982 and was concluded in a matter of months. The Sea Galley offering took place in 1985 and was also completed in a matter of months. Like the Ilio Offering, each of these earlier securities underwritings were isolated, discrete events that allegedly involved Offerman & Co. and Friedman Equities, although there is no allegation of which, if any, of the Bond Trustees were involved in the ERC or Sea Galley offerings. None of the three offerings are alleged to have continued beyond their completion-indeed, the plaintiff alleges no acts of fraud associated with the offerings beyond the period during which the debentures were sold to investors. *See* GICC, 67 F.3d at 466 (scheme was "inherently terminable" and allegation of continuity was speculative and conclusory because "[i]t defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot"). Moreover, the two earlier offerings occurred about seven and ten years prior to the Ilio Offering. There are no allegations of predicate acts after the acts associated with the Ilio Offering, which was completed in 1992. Absent allegations from which even an inference of a threat of continuity can be drawn, allegations of such isolated and sporadic events are precisely the sort of allegations that the RICO pleading requirements are designed to prevent. *See* Indelicato, 865 F.2d at 1383; *Miller*, 995 F.2d 708-09; *cf.* *Azrielli v. Cohen Law Office*, 21 F.3d 512, 520-21 (2d Cir.1994) (continuity properly pleaded where series of allegedly fraudulent securities sales occurred over one-year period and defendants were allegedly continuing to sell such securities). Under these circumstances, the plaintiffs conclusory and speculative allegations that there is a pattern of racketeering are insufficient to sustain a RICO claim under § 1962(c).[FN5]

FN5. Because the plaintiff has failed to allege a sufficient pattern of racketeering activity, it is unnecessary to reach the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

defendants' additional argument that the plaintiff has also failed to allege a sufficient RICO enterprise. In order to prove a sufficient RICO enterprise, the plaintiff must introduce "evidence of an ongoing organization, formal or informal, and [ ] evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981). The enterprise alleged is an association in fact enterprise consisting of Offerman & Co., Friedman Equities, and the Bond Trustees. The Second Amended Complaint alleges that the defendants Offerman & Co. and Scott Offerman conducted the Offerman enterprise and operated the affairs of the Offerman enterprise through a pattern of racketeering activity. The allegations with respect to Friedman Equities and the Bond Trustees are cursory and conclusory. The addition of Friedman Equities and the Bond Trustees appears to be a transparent effort to circumvent the principles that a RICO "person" must be distinct from the RICO "enterprise" that is conducted, and employees associating with a corporation in the course of their employment cannot form an enterprise distinct from the corporation. *See Discon, Inc. v. NYNEX Corp.,* No. 1126, Docket 95-7673, 1996 WL 479224, at *8 (2d Cir. Aug. 26, 1996); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994). It is unnecessary to reach the alleged deficiencies in the enterprise pleaded in the Second Amended Complaint.

B.

***5** With respect to the claim against defendant Scott Offerman, the defendants argue that the plaintiff has failed to plead that Offerman committed a criminal violation sufficient to comprise a predicate act for liability under § 1962(c). The defendants contend that the plaintiff has alleged only control person liability against Offerman under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and has not pleaded any acts by Offerman that would violate § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), or either the mail fraud or wire fraud statutes. Therefore, the defendants argue, no RICO claim can be stated against Offerman because § 20(a) control person liability is not "racketeering activity" as defined in 18 U.S.C. § 1961(1).

The plaintiff argues that she has alleged Offerman committed securities fraud under both §§ 10(b) and 20(a) of the Exchange Act. Yet the only allegations relating to the alleged § 10(b) violation are that prior to the Ilio Offering, Offerman had been warned, by his wife and others, about misgivings concerning the underwriting. (SAC ¶¶ 38, 65, 72(2).) None of these allegations, however, constitutes the securities fraud pleaded in the Second Amended Complaint which centered on the alleged fraudulent misrepresentations and omissions in the Ilio Prospectus. While the allegation that Offerman was advised that others believed there were problems with the Offering may be relevant to the issue of knowledge or intent, the plaintiff has not identified any allegation in the Second Amended Complaint of some act taken by Offerman that would form the basis for a predicate act of securities fraud under § 10(b) of the Exchange Act. Accordingly, the question is whether a § 20(a) violation is within the meaning of "racketeering activity."

In *Adler v. Berg Harmon Assocs.,* 790 F.Supp. 1222 (S.D.N.Y.1992), the Court explained that:

> [I]n order to connect a controlling person with a RICO claim, a plaintiff must establish facts that show criminal liability on the part of the controlling person for the controlled person's acts, because section 1961 defines acts to be racketeering only if they are among the enumerated felonies punishable under the laws of the United States.... In order for a controlling person to be held criminally liable under [section 20 of the] [Exchange Act], it must be shown that the controlling person knowingly used the controlled person to commit the illegal act.

*Id.* at 1234 (first alteration in original). Section 20(a) of the Exchange Act is not an enumerated felony under the definition of "racketeering activity" in § 1961(a), and merely alleging control person liability without more is an insufficient allegation to sustain a RICO claim. *See Dymm v. Cahill,* 730 F.Supp. 1245, 1260 n. 5 (S.D.N.Y.1990) (claim under § 20(a) "does not alone constitute a predicate act"); *First Nat'l Bank of Chicago v. Shearson Lehman Bros., Inc.,* No. 85 C 4266, 1989 WL 164995, at *3

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(N.D.Ill. Dec. 20, 1989) (controlling person liability insufficient to support RICO claim, improper to "permit[ ] respondeat superior liability to be smuggled into a RICO claim by means of § 20(a)").

*6 Accordingly, the plaintiff has failed to plead a RICO claim against Scott Offerman.

III.

The defendants also move to dismiss the Second Amended Complaint for failure to plead fraud with particularity under Fed.R.Civ.P. 9(b) with respect to the predicate acts of securities fraud, mail fraud, and wire fraud. The defendants contend that the allegations in the Second Amended Complaint are insufficient to raise the strong inference of fraudulent intent required by Rule 9(b) for any of the three predicate acts.

To plead scienter properly, a plaintiff must allege facts giving rise to a strong inference of fraudulent intent. Allegations of securities fraud under § 10(b) and Rule 10b-5 are subject to the requirements of Fed.R.Civ.P. 9(b) regarding scienter. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127-28 (2d Cir.1994). Allegations of mail fraud and wire fraud must also satisfy Rule 9(b). *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). The inference may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128; *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268-69 (2d Cir.1993), *cert. denied sub. nom Ross v. ZVI Trading Corp. Employees' Money Purchase Pension Plan*, 114 S.Ct. 1397 (1994). While Rule 9(b) only requires that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," this somewhat more relaxed pleading requirement "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations[,]" *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir.1990), in light of Rule 9's purpose of providing defendants with fair notice of the plaintiff's claims, safeguarding defendants' reputations from improvident allegations of malfeasance, and protecting defendants against strike suits. *See O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991).

As the Court of Appeals of the Second Circuit has explained:

A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so. *Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.*

*Beck v. Manufacturer's Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987) (emphasis added) (citations omitted), *cert. denied*, 484 U.S. 1005 (1988), *overruled on other grounds, United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (in banc).

With respect to the first method of pleading scienter, the plaintiff alleges that Offerman & Co. and Offerman had a motive to commit the predicate acts of fraud in order to earn their underwriting commissions.[FN6] (SAC ¶¶ 71, 76, 84.)

FN6. The plaintiff also argues that at about the time of the Ilio offering the number of companies in need of small securities offerings, allegedly Offerman & Co.'s specialty, was decreasing and that Offerman & Co. therefore had a motive to commit fraud in order to continue to operate. The plaintiff cites the RICO Case Statement for this allegation. (RICO Case Stmt. ¶ 6(b).) But that section of the RICO Case Statement concerns the roles of the respective members of the RICO enterprise, and that particular allegation refers to Offerman & Co.'s reliance on "finders" such as Friedman Equities given the increasingly competitive nature of its market niche. This allegation does not begin to raise the strong inference of fraudulent intent by the defendants required by Rule 9(b). At most, it is a restatement of the desire for underwriting commissions.

*7 But an underwriter's alleged motive to earn its underwriting fees is not alone sufficient to sustain a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

strong inference of fraudulent intent. If it were, every underwriter, law firm, accountant, and investment advisor whose compensation or commission depended on the completion of an initial public offering would have a motive to commit fraud, which would make Rule 9(b) wholly meaningless. *See* *Melder v. Morris*, 27 F.3d 1097, 1104 (5th Cir.1994) ("Simply put, accepting the plaintiffs' allegation of motive as sufficient would make a mockery of Rule 9(b) by effectively eliminating the scienter requirement as to securities underwriters since all underwriters are, of course, fee seekers."); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.) (accountant's audit fees did not provide motive for purposes of Rule 9(b)), *cert. denied*, 498 U.S. 941 (1990). As Judge Conboy explained:

[Plaintiffs] have alleged no gain other than the fact that the [accounting] firm was compensated for its professional services. It would defy common sense to hold that the motive element of the ... scienter analysis would be satisfied merely by alleging the receipt of normal compensation for professional services rendered, because to do so would effectively abolish the requirement, as against professional defendants in a securities fraud action, of pleading facts which support a strong inference of scienter.

*Friedman v. Arizona World Nurseries Ltd. Partnership*, 730 F.Supp. 521, 532 (S.D.N.Y.1990), *aff'd without opinion*, 927 F.2d 594 (2d Cir.1991); *see also* *Geiger v. The Solomon-Page Group, Ltd.*, No. 95 Civ. 3070, 1996 WL 391981, at *11 (S.D.N.Y. July 10, 1996) ("the mere fact that [the underwriter] stood to earn its fee for performing its customary professional services is not alone sufficient to create a motive from which a strong inference of fraudulent intent may be drawn").

With respect to the second method for pleading scienter, the plaintiff argues that she has alleged numerous instances of conscious misbehavior or recklessness by the defendants. The plaintiff alleges that Offerman & Co. and Offerman conducted shoddy due diligence on the Ilio underwriting, (SAC ¶¶ 6, 22), and made reckless representations in the Prospectus relating to the use of the proceeds of the Offering. The plaintiff alleges that the defendants were aware of Ilio's allegedly precarious liquidity position and knew that the proceeds of the debenture Offering would not be used to finance Ilio's new businesses. Additionally, the plaintiff contends that Offerman & Co. manipulated the price of Ilio common stock by executing fictitious trades during the debenture Offering in order to create an impression that the debentures were a "hot issue," (SAC ¶ 103), and by influencing new debenture holders to convert their holdings to equity. (SAC ¶¶ 72(6).)

The plaintiff's allegations of facts to show conscious behavior are conclusory and speculative and indeed contradicted by the allegations in the Second Amended Complaint. The plaintiff relies on allegations that Offerman & Co. did due diligence and was in contact with Ilio's bankers to conclude that Offerman & Co. must have known about Ilio's precarious financial condition at the time of the Prospectus, but the Second Amended Complaint itself explains that it was only on July 16, 1992, three months after the debenture Offering closed that Ilio reported a net loss for the fiscal year ending April 30, 1992. (SAC ¶ 49.) And the Second Amended Complaint alleges that Ilio's bankruptcy was discussed in September or October, 1992, six months after the Offering Period closed. (SAC ¶ 53.) There are no facts alleged to indicate that Ilio, much less Offerman, was aware of that impending loss at the time of the Prospectus.

*8 Moreover, an allegation of contact with Ilio's bankers is not equivalent to an allegation that Offerman & Co. knew that any statements in the Prospectus were materially false or misleading. Indeed, the Second Amended Complaint discloses that in July, 1992-3 months after the Offering closed-Ilio was able to increase its line of credit by $7 million, by obtaining a $23 million line of credit for Heller Financial, Inc. (SAC ¶ 50.) Hence, rather than indicating conscious misbehavior, the facts alleged in the complaint undercut any inference that Offerman knew that there were material misrepresentations in the Prospectus.[FN7]

FN7. The misgivings allegedly expressed by Carin Offerman would also not support scienter. (SAC ¶ 38.) There is no allegation that she knew that any statements in the Prospectus were materially false or misleading.

The Second Amended Complaint attempts to allege

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

scienter based upon a memo from a former Offerman employee memorializing a conversation with a bank employee. (SAC ¶ 101.) But the only specific allegations about that memo allege that the Offerman & Co. employee falsely stated that the Offering was "progressing satisfactorily." That hardly supports an inference that Offerman & Co. knew or recklessly disregarded the falsity of any statements that actually appeared in the Prospectus. Even if Offerman & Co. was having difficulty selling the Offering, that does not indicate that the Prospectus was false or misleading or that Offerman & Co. knew it to be so.

The allegations of stock manipulation are similarly conclusory and insufficient to allege scienter. The Second Amended Complaint alleges:

Offerman assisted in efforts to manipulate the stock price of Ilio during the Offering to facilitate sales of the Debentures and to create the illusion of a bona fide "hot issue." For example, defendants facilitated a scheme to induce some debentureholders to convert to Ilio common stock at a modest profit during the offering period, to project the illusion of a successful company in the midst of a "hot issue" in order to facilitate the sale of the debentures by its sales agents.

(SAC ¶ 72(6).) There are no factual allegations about what steps Offerman & Co. or Offerman took which "assisted in efforts" to manipulate Ilio stock. There are no details provided whatsoever about the "scheme" to induce conversions of Ilio debentures, namely what actions were taken, how many debentures were converted, at what prices, with what impact on subsequent sales of debentures. These allegations would not be specific enough to satisfy Fed.R.Civ.P. 9(b)'s requirement to prove manipulation with particularity. *See Baxter v. A.R. Baron & Co., Inc.*, No. 94 Civ 3913, 1995 WL 600720, at *6-*7 (S.D.N.Y. Oct. 12, 1995). The conclusory allegations of stock manipulation are similarly inadequate to satisfy the conscious misbehavior or recklessness method for pleading scienter.

Accordingly, the plaintiff has failed to allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.

Therefore, having failed to satisfy Rule 9(b)'s pleading requirements with respect to scienter by either of the two alternate methods with respect to any of the predicate acts of securities fraud, mail fraud, or wire fraud, the defendants' motion to dismiss the Second Amended Complaint for failure to plead fraud with particularity is granted as an independent and alternate basis for dismissal.

IV.

*9 Ordinarily, dismissal based on failure to plead fraud with particularity under Fed.R.Civ.P. 9(b) is without prejudice to plaintiff's filing an amended complaint to cure the deficient pleading. *See Acito,* 47 F.3d at 54-55 ("Leave to amend should be freely granted, especially where dismissal of the complaint [is] based on Rule 9(b)."); *Luce v. Edelstein,* 802 F.2d 49, 56-57 (2d Cir.1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." (citation omitted)).

Nevertheless, it is not appropriate to grant the plaintiff's request in this case because the defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim on which relief may be granted is also granted. The Second Amended Complaint asserts a single RICO claim under § 1962(c). It is the plaintiff's second attempt to state a claim under RICO and the plaintiff's third complaint. The plaintiff turned to pleading RICO only after the first complaint-asserting the more obvious securities claims-was withdrawn as time-barred. The entire effort to plead RICO appears to be an effort to resuscitate a time-barred claim in a new guise. Three bites at the apple is enough. *See In re: Hyperion Secs. Litig.,* No. 93 CIV. 7179, 1995 WL 422480, at *8 (S.D.N.Y. July 14, 1995); *see also In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 402 (2d Cir.1994). Consequently, leave to replead is denied and the Second Amended Complaint is dismissed with prejudice.[FN8]

FN8. Shortly after the Second Amended Complaint was filed, the defendants moved for sanctions and attorneys fees pursuant to Fed.R.Civ.P. 11. The motion is denied. While the Court has dismissed the Complaint, the defendants have not demonstrated the appropriateness of Rule 11 sanctions. Rule 11 sanctions are judged under an objective reasonableness standard

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and are appropriate only when it is patently clear that a pleading has no chance of success. *See International Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 86 (2d Cir.1996); *K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 131 (2d Cir.1995). The plaintiff responded by asking for Rule 11 sanctions against the defendants for having made the Rule 11 motion. That motion is also denied.

CONCLUSION

For all of the foregoing reasons, the defendants' motion to dismiss the Second Amended Complaint is granted and the Second Amended Complaint is dismissed with prejudice. The Clerk of the Court is directed to enter judgment and to close this case.

SO ORDERED.

S.D.N.Y.,1996.
Fisher v. Offerman & Co., Inc.
Not Reported in F.Supp., 1996 WL 563141 (S.D.N.Y.), RICO Bus.Disp.Guide 9139

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# TAB 6





Palladin Partners v. Gaon
D.N.J.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
PALLADIN PARTNERS; Palladin Overseas Fund, Ltd.; Palladin Multi-Strategy Partners, LP; Cheyenne LLC; Palladin Opportunity Fund, LLC; and Palladin Oversees Multi-Strategy Fund, Ltd., Plaintiffs,
v.
Isaac J. GAON, Raymond R. Koch, Mark J. Hirshhorn, William J. Adams, David M. Milch, Robert H. Friedman, Walter Grossman, Mark Berenblut, Oliver Maggard, and Deloitte & Touche LLP, Defendants.
**No. 05-CV-3305 (WJM).**

Aug. 22, 2006.

Jonathan W. Wolfe, Skoloff and Wolfe PC, Livingston, NJ, for Plaintiffs.
David Scott Goldstein, Morrison, Cohen, Singer & Weinstein, New York, NY, for Defendants Gaon and Koch.
Jack M. Kint, Jr., Olshan Grundman, Frome, Rosenzweig and Wolosky, New York, NY, for Defendants Adams, Milch, Friedman, Grossman, Berenblut, and Maggard.
Eric Blumenfeld, Hughes Hubbard & Reed LLP, Jersey City, NJ, for Defendant Deloitte & Touche LLP.

**OPINION**

WILLIAM J. MARTINI, U.S.D.J.

*TABLE OF CONTENTS*


| | | | |
|---|---|---|---|
| I. BACKGROUND | | | 1 |
| | A. Factual Background | | 1 |
| | B. Alleged Fraudulent Schemes | | 3 |
| | | i. Advance Invoicing and Purchasing Schemes | 3 |
| | | ii. Gross Profit Margin Inflating and Failure to Recognize Losses | 4 |
| | | iii. IBM Credit and IBM Global Interrelationship | 6 |
| | C. Alleged Misstatements and Omissions | | 7 |
| | D. Defendants' Liability | | 8 |


© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

II. ANALYSIS 8
A. Standard of Review 8
B. Service of Process 9
C. Section 10(b) Claims 10
i. Confidential Witness 12
ii. Failure to Plead Fraud with Particularity 12
iii. Failure to Plead Misstatements or Omissions 13
a. Executive Defendants 14
1. Impermissible Group Pleading 14
2. Misstatements Not Actionable 15
b. Deloitte & Touche 17
iv. Failure to Plead Reliance 17
v. Failure to Plead Scienter with Particularity 18
a. Executive Defendants 19
b. Director Defendants 20
1. Actual Knowledge of Fraud 21
2. Inference of Scienter 22
c. Deloitte & Touche 26

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

| | | | |
|---|---|---|---|
| | vi. Failure to Plea Loss Causation | | 27 |
| | | a. Executive Defendants | 27 |
| | | b. Deloitte & Touche | 28 |
| D. Section 20(a) Claims | | | 29 |
| E. Common Law Claims | | | 31 |
| | i. Martin Act Does Not Bar Claims | | 31 |
| | ii. Breach of Fiduciary Duty | | 32 |
| | iii. Negligent Misrepresentation | | 34 |
| | iv. Fraudulent Conveyance | | 35 |
| III. CONCLUSION | | | 35 |

*1 This matter comes before the Court on four motions to dismiss the Amended Complaint ("Complaint" or "Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(b), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-(b)(1). These motions have been filed by all Defendants. There was no oral argument. Fed.R.Civ.P. 78. For the reasons set forth below, the motions are GRANTED in part and DENIED in part.

## *I. BACKGROUND*

### A. Factual Background

Plaintiffs are five funds that provided secured financing in the amount of $4.9 million to Datatec Systems, Inc. ("Datatec" or "the Company"), a computer networking company that ultimately went bankrupt. Datatec, a non-party, was a publicly traded Delaware corporation headquartered in New Jersey and provided services installing wiring for and configuring computer networking systems.

Pursuant to a Note Purchase Agreement and related agreements, on July 3, 2003, Plaintiffs collectively lent Datatec $4.9 million in return for Notes in that amount and 875,000 Warrants. On July 28, 2003, Plaintiffs made an additional investment in Datatec, extending Datatec's time to repay the Notes, waiving various rights, and receiving an additional 700,000 Warrants.

Unfortunately, later that year, on December 5, 2003, Datatec retracted its previous earnings estimates for 2004 and announced an expected loss not simply for the second quarter of fiscal 2004 but for the year overall. It further announced that Defendant Gaon, Datatec's CEO, had resigned and that Defendant Director Berenblut had stepped down from his position. The price of Datatec's stock fell 34% following these disclosures.

Next, on December 17, 2003, Datatec quantified an expected second quarter loss of approximately $10 million and announced that it expected to take a restructuring charge of $4.5 million in the next fiscal year.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In addition, it disclosed that it had retained outside counsel to conduct an independent audit of the valuation of its long-term contracts. Datatec additionally disclosed that IBM Credit, through which Datatec had been receiving loans, had refused to issue waivers for Datatec's most recent defaults. Datatec's stock dropped another 15% following these disclosures, and its stock was de-listed by NASDAQ shortly thereafter for failure to file a 10-Q for the quarter ended October 31, 2003.

On August 12, 2004, Datatec announced that in the course of reviewing its revenue recognition policies, it found that it had overstated revenues by up to $18 million over prior periods, that up to $10 million in losses previously thought to occur in 2004 actually required recognition in earlier periods, and that its losses for those earlier periods had been understated by about $10 million. The Company further stated that its previous SEC filings and financial statements for the periods ended 2003, 2002, and 2001-including 2002 and 2003 periodic, quarterly and annual reports-"should not be relied upon by investors."(Form 8-K filed 8/12/04.) In December 2004, Datatec filed for bankruptcy, defaulted on the Notes, and the Warrants Plaintiffs received for their investments were rendered worthless.

*2 On June 30, 2005, Plaintiffs filed this suit under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Act"), 15 U .S.C. §§ 78j(b), 78t(a), 78r, and Rule 10b-5, 17 C.F.R. § 240. 10b-5, promulgated thereunder. Defendants are Isaac J. Gaon ("Gaon"), Datatec's Chairman and CEO during the period in question; Raymond R. Koch ("Koch"), Datatec's Chief Operating Officer during the period in question; Datatec's outside directors William J. Adams, Jr. ("Adams"), David M. Milch ("Milch"), Robert H. Friedman ("Friedman"), Walter Grossman ("Grossman"), Mark L. Berenblut ("Berenblut"), and J. Oliver Maggard ("Maggard"); and the Company's independent accountant Deloitte and Touche LLP ("D & T"). Hereinafter, Gaon and Koch are collectively referred to as "the Executive Defendants," and Adams, Milch, Friedman, Grossman, Berenblut, and Maggard are collectively referred to as "the Director Defendants."

**B. Alleged Fraudulent Schemes**

Plaintiffs generally allege three fraudulent schemes Defendants employed to portray the Company as financially healthier than it in fact was. All, Plaintiffs allege, contributed to the false statements at issue in this case.

*i. Advance Invoicing and Purchasing Schemes*

First, Plaintiffs allege advance purchasing and invoicing schemes whereby Datatec inflated its revenue and accounts receivable figures by posting receivables for work that had not yet been performed or for materials not used. With regard to the advance purchasing scheme, Plaintiffs allege Defendants conducted the scheme with specific regard to its contract with Lowe's. Plaintiffs allege that Datatec would regularly make advance materials purchases, ostensibly for future work to be performed for Lowe's, but would recognize the revenue from this future work in the present. At times, Datatec allegedly purchased more than one and one-half years worth of materials pursuant to this scheme. At the same time, Plaintiffs claim Datatec never had an agreement with Lowe's for longer than a three-month period at any point in time. Thus, there was no business justification for these advance purchases. Plaintiffs allege Gaon and Koch expressly ordered these purchases to "make revenues," and that these purchases were often ordered at the end of the month or quarter, when the Company's lower-than-desired results started to come in. (Compl.¶ 209.)

Plaintiffs further allege that Defendants engaged in an advance invoicing scheme whereby Datatec would issue invoices to its clients for work not yet done solely to inflate artificially the accounts receivable ledger provided to IBM Credit, through which the Company had been obtaining loans. Defendants engaged in this scheme with respect to its long-term contracts. It did so allegedly to obtain even more borrowings from IBM Credit., since Datatec's credit line was based on its accounts receivable balances. Thus, Plaintiffs allege, the accounts receivable invoices upon which the loans were based were inflated such that the loans obtained were in excess of the amount entitled to on the actual receivables.

*ii. Gross Profit Margin Inflation and Failure to Recognize Losses*

*3 Second, Plaintiffs allege Defendants deliberately neglected to account for cost overruns and losses in one of its major contracts, the "Home Depot Project," so that it could maintain a high profit margin for the project, and therefore a rosier financial picture overall. According to the Complaint, Home Depot awarded a $250 million-plus multi-year contract to IBM Global Services ("IBM Global") to rewire the computer networking systems in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

approximately one thousand Home Depot stores. Datatec was one of two subcontractors on the Home Depot job under IBM Global. Each subcontractor would receive $15 million in return for servicing five hundred stores, regardless of the costs incurred. According to Plaintiffs, Koch was responsible for Datatec's estimates and business modeling leading up to the bid submitted to IBM Global. Koch projected the gross profit margin on the Home Depot work to be 25-30%.

In or about August 2002, IBM Global asked Datatec to take over for the other subcontractor, so that Datatec would be the sole subcontractor for the wiring work on all one thousand Home Depot stores. Datatec accepted, but according to Plaintiffs, the Company was unequipped to handle the new scale of the project. Plaintiffs allege that, due to the massive amount of unanticipated and unbudgeted work the Home Depot Project ultimately required, Datatec's costs skyrocketed far beyond those originally estimated by Koch.

Allegedly, Datatec also encountered many unforeseen difficulties in installing the wiring and generally performing under its obligations. As a result, many Home Depot stores required unanticipated "site re-visits," which Datatec began in January 2003. (Compl.¶ 91.) As a result, Datatec allegedly needed to borrow money from IBM Credit in order to complete the project. According to the Plaintiffs, all of this unforeseen work was done without any extra-contractual payment from IBM Global.

In spite of these increases in costs, Plaintiffs allege, Defendants failed to recognize them in the Company's accounting and failed to adjust Datatec's profit projections accordingly. Plaintiffs also claim that although Defendants began adjusting the gross profit margin projections in July 2003, by that time, Defendants knew the Company could not realize a profit on the project at all and should have recognized a loss, which it did not do. Only in December 2003, long after Defendants allegedly knew Datatec could not profit from the project, did Defendants revise the gross profit margin to negative 6-10%. In short, Plaintiffs claim Defendants knew of the rising costs of the project as early as January 2003 and should have adjusted the gross profit margin long before December 2003.

*iii. IBM Credit and IBM Global Interrelationship*

Third, Plaintiffs allege Defendants fraudulently succeeded in obtaining additional loans from IBM Credit beyond what they were contractually entitled to by threatening to default on the Home Depot Project, which was overseen by IBM Global. Defendant then allegedly misrepresented that IBM Credit had authorized the additional loans because of the Company's strong financial performance. In fact, Plaintiffs allege, Defendants needed these cash infusions to stay afloat.

***4** IBM Credit and Datatec had entered into an Inventory and Working Capital Financing Agreement in November 2000 which provided for certain loans, one of which is referred to as the IBM Credit Facility. The IBM Credit Facility permitted Datatec to make borrowings based on a formula of 85% of eligible receivables and 25-35% of eligible inventory. Although Datatec had defaulted on certain financial covenants in the IBM Credit Facility, IBM Credit provided written waivers to Datatec for each of these defaults through July 2003. IBM Credit also repeatedly increased the maximum amount available to Datatec and extended the Credit Facility's expiration date. Thus, when as of January 2003, the initial maximum allowable loan was $16 million, IBM Credit agreed to increase Datatec's maximum amount of borrowing under the IBM Credit Facility to $23 million. Likewise, on or about April 14, 2003, IBM Credit agreed to increase the available borrowings to $29 million and to extend the expiration date on the Credit Facility from August 2003 to August 2004. On or about June 3, 2003, IBM Credit allegedly agreed to increase these limits again.

According to the Complaint, Datatec stated publicly that IBM Credit issued these written waivers and limit increases because the Company had been performing well and because "the Company's accounts receivables and inventory ha[d] increased."(Compl.¶ 68.) Plaintiffs claim, however, that IBM Credit provided these additional funds and waivers to Datatec solely because of Datatec's role as a subcontractor to IBM Global on the Home Depot Project and because Datatec had threatened to default on the project without additional cash. Plaintiffs also claim that Gaon admitted repeatedly at board meetings that he had forced IBM Credit to lend the Company more money by threatening to "close [Datatec's] doors" and default on the Home Depot Project. Gaon further allegedly stated that IBM Credit "would be crazy" to stop lending money due to IBM Global's need to have Datatec finish the Home Depot work. (*Id.* at ¶ 200.)

**C. Alleged Misstatements and Omissions**

The alleged misstatements and omissions at issue in this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

case stem from Datatec's SEC filings (10-Ks, 10-Qs, 8-Ks) and press releases in 2002 and 2003. Although for purposes of these motions to dismiss it is unnecessary for the Court to repeat herein each alleged misstatement and omission, it suffices to say that Defendants allegedly misrepresented in these documents the extent of its indebtedness, its financial health, the nature of and reasons for the loans the Company obtained from IBM Credit, as well as the Company's compliance with Generally Accepted Accounting Standards ("GAAS") and GAAP.

**D. Defendants' Liability**

In their Complaint, Plaintiffs seek to hold Executive and Director Defendants liable for the alleged misstatements because each signed or authorized some or all of the various SEC filings and press releases at issue in this case and "had the power to control, influence, or in fact executed" the fraudulent schemes giving rise to the alleged securities violations. (*Id.* at ¶ 190.)With regard to D & T, Plaintiffs allege D & T recklessly blinded itself to Datatec's improper practices and financial reporting, and falsely issued clean opinions on Datatec's financial statements.

***II. ANALYSIS***

**A. Standard of Review**

*5 To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must set forth sufficient information to outline the elements of its claims or to permit inferences to be drawn that these elements exist. *See*Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A Court may dismiss a Complaint for failure to state a claim only if, after viewing the allegations in the Complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted under any set of facts which could prove consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Zynn v. O'Donnell*, 688 F.2d 940, 941 (3d Cir.1982). In deciding such a motion, a Court must take as true and view in the light most favorable to a plaintiff all allegations in the Complaint. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). A Court need not, however, accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997).

**B. Service of Process**

Defendant Berenblut asks the Court to dismiss the Complaint as against him because Plaintiffs never perfected service of process. Berenblut, who lives in Ontario, Canada, alleges Plaintiffs failed to comply with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"), because instead of leaving a copy of the Summons and Complaint with an adult at his residence, the process server gave the documents to Berenblut's wife on a public sidewalk.

Under the Hague Convention, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638, individuals located abroad may be served in accordance with applicable laws of that country-here, Canada. Under Canadian law, an individual may be served by leaving a copy of the relevant documents with an adult at the place of residence and mailing a copy of the documents to the residence the same or the following day. Ontario R. of Civ. P. 16, R.R.O.1990, Reg. 194 s. 1b. Although Plaintiffs admit to having served Berenblut by giving the documents to Mrs. Berenblut, they take issue with Berenblut's characterization of Mrs. Berenblut's physical location when she received the documents. They argue, and the process server similarly swears, that Mrs. Berenblut was not standing on a public sidewalk, but rather in the driveway of her house after having put out the trash. Plaintiffs further point out that they used this mode of service only after having made numerous unsuccessful good-faith attempts to serve Berenblut personally at his residence, vacation home, and place of work. Also, in accordance with the applicable rules, Plaintiffs attest to having mailed the documents to the Berenblut residence the following day.

The Court will deny Berenblut's motion to dismiss for failure to effect service. Berenblut does not argue he lacked notice of this action. Instead, he hopes to avoid this litigation based on a technicality by arguing that his wife was standing a few feet beyond the confines of their property when she received the documents. The Court first notes that Berenblut lacks personal knowledge of the facts at issue here since he was not at home at the time of service. More importantly, even if the Court were to believe Berenblut, the process server's only mistake would have been not to wait a few more seconds until Mrs. Berenblut had stepped back onto her property. The Court finds Berenblut's arguments unavailing. The Court

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

finds that Plaintiffs properly served Berenblut in accordance with the Hague Convention and applicable local rules, and denies Berenblut's motion to dismiss as to this ground.

**C. Section 10(b) Claims**

*6 In order to state a valid Section 10(b) claim, Plaintiffs must establish that Defendants "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading" in connection with the purchase or sale of a security.[FN1] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997). Plaintiffs must also establish that Defendants acted with the required scienter, and that Plaintiffs' reliance on the misstatement caused injury. *In re Party City Sec. Litig.*, 147 F.Supp.2d 282, 299 (D.N.J.2001) (*quoting* S.Rep. No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683). Finally, a Section 10(b) claim must satisfy the heightened pleading standards of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995 (hereinafter "PSLRA"). *In re Party City*, 147 F.Supp.2d at 298-99.

FN1. Here, Section 10(b) applies because Plaintiffs received, in connection with their investment, Warrants for the purchase of Datatec stock.

Rule 9(b) requires that all averments of fraud be stated with particularity. Fed.R.Civ.P. 9(b); *see also In re Burlington*, 114 F.3d at 1417. In an attempt "to 'curtail the filing of abusive lawsuits' through the establishment of a 'uniform and stringent pleading requirement,' " *In re Party City*, 147 F.Supp.2d at 299 (*quoting* S.Rep. No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683), the PSLRA also imposes a particularity requirement by demanding that the Complaint set forth "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires Plaintiffs to allege with particularity facts that give rise to a strong inference of scienter with the required state of mind for each act or omission. *See* 15 U.S.C. § 78u-4(b)(2). Although Rule 9(b) allows state of mind to be generally averred, the Third Circuit has concluded that the PSLRA supercedes Rule 9(b) in the event of a conflict. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 n. 5 (3d Cir.1999).

Defendants contend that Plaintiffs have failed to comply with the requirements of both Rule 9(b) and the PSLRA and make a number of arguments in support of their motions to dismiss: (1) failure to plead fraud with particularity; (2) failure to plead misstatements or omissions; (3) failure to plead reliance; (4) failure to plead scienter with particularity; and (5) failure to plead loss causation.

*i. Confidential Witness*

Plaintiffs base many of their allegations on the statements of a confidential witness ("CW"), whom Plaintiffs identify as "a former high-ranking financial officer" of Datatec who has personal knowledge regarding the various filings and press releases at issue, the relevant loans, Datatec's financial results, operational performance, and statements made and actions taken by each Defendant as alleged in the Complaint. (Compl.¶ 6.) As set forth by the Third Circuit in *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir.2004), Plaintiffs may use confidential sources to meet the requirements of the PSLRA, and "there is no requirement that they be named, provided they are described in the Complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 146 (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000), *cert. denied*, 531 U.S. 1012 (2000) (emphasis in original). Defendants do not contend Plaintiffs have failed to meet this requirement.

*ii. Failure to Plead Fraud With Particularity*

*7 All Defendants ask that the Court dismiss the Complaint on the ground that Plaintiffs failed to plead fraud with the requisite particularity required by PSLRA. Specifically, they argue that Plaintiffs base their allegations of fraud impermissibly using "group pleading," and that the Complaint fails to set forth particularized allegations of fraud. Although Defendants are correct that "group pleading" is impermissible after the passage of the PSLRA, *see, e.g., In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896, 2005 WL 2840336 at *15 (D.N.J. October 27, 2005); *Winer Family Trust v. Queen*, 2004 U.S. Dist. Lexis 19244 at *17-18 (E.D.Pa. September 27, 2004), the Court finds Plaintiffs' allegations of fraud sufficiently particularized.

Plaintiffs set forth in great detail the nature of the various alleged fraudulent schemes, outlining in painstaking detail the way in which Defendants allegedly instituted them

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and directed them. Plaintiffs document when the alleged schemes took place, who participated in them, and how they operated to inflate revenue, assets, gross profit, net income, and profitability. Plaintiffs support their allegations with specific conversations that allegedly took place during board meetings as well as during the normal course of Datatec's business.

The Court does agree, however, that while Plaintiffs allege Defendants employed the advance invoicing and advance purchasing schemes with respect to many different contracts, the Complaint only specifically mentions the Lowe's account. Plaintiffs have failed to allege with any degree of particularity the operation of the schemes as to any other contracts or projects. For this reason, while Defendants' motions to dismiss are denied as to the alleged advanced invoicing and purchasing on the Lowe's contract, they are granted as to the other alleged but unidentified contracts.

*iii. Failure to Plead Misstatements or Omissions*

Executive Defendants and D & T each argue that the Court should dismiss the Complaint because of a failure to plead misstatements or omissions as required for Section 10(b) liability.

a. *Executive Defendants*

Defendants Gaon and Koch argue that Plaintiffs have failed to plead actionable misstatements as to them and that Plaintiffs impermissibly use group pleading to support their claims.

*1. Impermissible Group Pleading*

The Court agrees with Executive Defendants that, with respect to Koch, Plaintiffs do not allege that Koch actually signed or approved any of the SEC filings at issue in this case. Instead, it appears they seek to hold Koch liable for the filings because of his substantial participation in their preparation. Such allegations, however, amount to little more than allegations that he aided and abetted the other Defendants in perpetuating the fraud. And as the Supreme Court held in Cent. Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), private plaintiffs may not maintain an aiding and abetting suit under Section 10(b).*See also* SEC v. Lucent Techs., Inc., 363 F.Supp.2d 708 (D.N.J.2005) (dismissing case alleging substantial participation in SEC filing because accusation of substantial participation essentially amounted to aiding and abetting).

*8 With regard to the June 26, 2003 press release, on the other hand, Plaintiffs do allege that Koch specifically approved the figures contained therein. As such, while Koch may not be held liable for misstatements contained in other SEC filings, Plaintiffs may pursue this action against him for misstatements contained in the June 26, 2003 press release and the accompanying 8-K of the same date.

With respect to Gaon, the Complaint alleges Gaon signed and/or approved each of the SEC filings at issue in this case. Thus, Plaintiff may seek to hold him liable for any misstatements contained in them. For this reason, the Court will deny Gaon's motion as to this ground.

*2. Misstatements Not Actionable*

Gaon and Koch next collectively argue that the alleged misstatements and omissions are not actionable because they were nothing more than statements of corporate optimism, or "puffery," protected under the law. Certain vague and general statements of optimism have been considered inactionable as a matter of law because they "constitute no more than 'puffery' and are understood by reasonable investors as such."*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 n. 14 (3d Cir.1997)."Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material."*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir.1999).

Although Executive Defendants request dismissal for all alleged misstatements outlined in the Complaint, they only cite to two examples. As such, the Court limits its analysis to these two examples. First, the Executive Defendants identify as inactionable the statement contained in the June 26, 2003 press release: "For fiscal 2004, Datatec expects that sales, excluding potential sales from new government opportunities, will be in the range of $120 to $125 million and earnings per share will be between $0.14 and $0.16."The Court cannot comprehend how Defendants characterize this statement as nothing more than a vague statement of corporate optimism. Here, the announcement provides a very specific range of future sales as well as a specific range of per-share earnings for a specific time period. Statements such as these, articulating specific predictions of future growth and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

earnings can constitute an actionable misstatement. *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 320 (3d Cir.1997) (holding that where an alleged forward-looking misstatement makes a specific prediction regarding "a particular, defined time," such statement is not merely a "vague expression of optimism"). And while such forward-looking statements can be protected under the safe-harbor provision of the PSLRA, forward-looking statements made with actual knowledge that the statement was false or misleading are not. *In re Advanta*, 180 F.3d at 535(*citing*15 U.S.C.A. § 78u-5(c)(1)(B)(I)). Because the Court finds, as further explained in the remainder of this Opinion, that Plaintiffs have sufficiently alleged with respect to the Executive Defendants that these Defendants had actual knowledge of the falsity of the statement, the Court finds it actionable.

*9 Executive Defendants next identify as inactionable puffery the statement contained in the June 26, 2003 press release: "[the] Company expects to achieve improvements to gross margins, profitability and cash flows by taking a more selective approach to project opportunities, adjusting its sales mix and continuing to focus on expense control."The Court agrees that this statement, unlike the previous statement, amounts to little more than a vague prediction of corporate optimism. Plaintiffs argue the statement is nonetheless actionable because it was made without a reasonable basis. They contend that as of the date of the press release, Defendants had begun imploring IBM Credit for cash infusions on almost a daily basis and knew the Company was over-leveraged on the Credit Facility by at least $7 million. Nonetheless, the mere fact that Defendants knew the Company was not performing well does not make unreasonable promises to improve financial health. Indeed, that a company hopes to "do better" is not unreasonable regardless of the financial state it finds itself in at the time. The Court agrees with Executive Defendants that this statement is not actionable.

b. *Deloitte & Touche*

For its part, D & T also alleges the Complaint fails to plead with any degree of particularity misstatements contained in the fiscal 2002 and 2003 audited financial statements. Specifically, D & T claims Plaintiffs have not proffered any allegations identifying which aspects of the financial statements were misstated and by how much. The Court rejects this argument. Plaintiffs' specific allegations of fraud at Datatec, coupled with Datatec's warning in its August 12, 2004 8-K that it had overstated past revenues by up to $18 million and that investors should not rely on any of the previous three years' financial statements suffices to establish that at least aspects of these statements were misstated materially. And because D & T audited the financial statements, the Court denies D & T's motion as to this ground.[FN2]

FN2. See *In re Suprema Specialties Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir.) for the general proposition that auditors may be liable for audit opinions.

*iv. Failure to Plead Reliance*

D & T next argues the Complaint against it should be dismissed because Plaintiffs have not demonstrated reliance on any of D & T's alleged misstatements. Confusingly, D & T once again argues in support of its position that Plaintiffs could not have relied on any misstatements contained in the 2002 financial statements because Plaintiffs have failed to identify any misstatements. As noted above, the Court has already rejected this argument.

D & T next argues that because Plaintiffs made their investments prior to the issuance of the 2003 audited financial statements, they could not have relied on them in making their investment decisions. The Court rejects this argument as well. With regard to the 2003 financial statements, D & T overlooks the fact that Plaintiffs agreed to modify the terms of the original Note Purchase Agreement on July 28, 2003, *after* the 2003 financial statements were released. For this reason, the Court denies D & T's motion as to this ground.

*v. Failure to Plead Scienter With Particularity*

*10 The Court must next determine whether Plaintiffs adequately plead scienter in order to sustain the Section 10(b) claims. The PSLRA requires that a securities fraud complaint, as to each act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."*GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir.2004); *see*15 U.S.C. § 78u-4(b)(2). The "strong inference" requirement under the PSLRA supercedes the more relaxed scienter standard under Rule 9(b).*GSC Partners*, 368 F.3d at 237. A plaintiff may establish a strong inference of scienter by alleging both motive and opportunity to commit fraud or alleging conscious misbehavior or recklessness.*Oran v. Stafford*, 226 F.3d 275, 288-89 (3d Cir.2000).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiffs base their Complaint expressly on a recklessness theory. (Pls.' Br. 2.) "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it .' " In re Advanta, 180 F.3d at 535 (*citing* McLean v. Alexander, 599 F.2d 1190, 1192 (3d Cir.1979)). A plaintiff may establish scienter by pleading contemporaneous facts constituting strong circumstantial evidence of reckless behavior. Wilson v. Bernstock, 195 F.Supp.2d 619, 639-40 (D.N.J.2002). A refusal to acknowledge the obvious or to investigate the doubtful may also give rise to an inference of scienter. In re Nice Sys., Ltd. Sec. Litig ., 135 F.Supp.2d 551, 585 (D.N.J.2001). To this end, Plaintiffs maintain Defendants recklessly made misrepresentations and omitted material information regarding Datatec's financial results and forecasts.

a. *Executive Defendants*

Executives Defendants Gaon and Koch argue that Plaintiffs do not support the allegations in the Complaint with specific, contemporaneous facts showing fraudulently or recklessly made false or misleading statements. The crux of their argument is that Plaintiffs' Complaint contains allegations so general they require the Court to infer knowledge of facts contradicting the statements based simply on Executive Defendants' positions within the Company and on their ability to access information. (Koch's Br. 23.) The Court disagrees.

The Complaint is replete with allegations detailing Executive Defendants' actual knowledge of the fraud and/or knowledge of information concerning the Company that should have alerted them to the fraud. For instance, Plaintiffs claim that Koch generated financial information on, and Gaon regularly reported to the Board operational results of, the Company's major projects. They state that both Gaon and Koch directed the fraudulent advanced purchases of Lowe's materials, particularly at the end of monthly and quarterly periods to meet or beat earnings estimates. Both executives were allegedly the primary contacts with IBM Credit and IBM Global, and, allegedly, Gaon personally directed the financial personnel to threaten IBM Credit with default on the Home Depot Project if the Credit Facility did not provide more cash. The Complaint states that both Executives directed that accounts receivable balances be inflated and ignored the warnings of Datatec's CFO in authorizing the release of aggressive earnings and revenue forecasts for the fourth quarter of fiscal 2003 and for fiscal 2004. Additionally, both were allegedly told the Company had borrowed far more than the IBM Credit's borrowing formula technically permitted.

*11 Further, the Complaint states that, in 2003, Datatec's finance department employee Gretchen Kittel repeatedly approached both Gaon and Koch about discrepancies between the gross margin estimates and costs on the Home Depot contract, but that neither would reduce the estimates. These allegations, among others, provide sufficient backing for Plaintiffs' argument that Executive Defendants were reckless, in light of their knowledge, in issuing the statements involved in this case.

b. *Director Defendants*

Director Defendants also argue that Plaintiffs have failed to allege scienter. In response, Plaintiffs note that they rely on alternative theories for proving recklessness. First, Plaintiffs submit that they have adequately plead Defendants' actual knowledge of facts that directly contradicted their public statements. In the alternative, Plaintiffs allege that where directors are involved in day-to-day operations of a company and the fraud involves the company's core business, knowledge or recklessness can be inferred from Defendants' positions in the company and access to information concerning the fraud. The Court finds that, with regard to the former theory, Plaintiffs have sufficiently alleged actual knowledge on the part of each Director Defendant of the fraud concerning the Home Depot Project and the interrelationship between IBM Credit and IBM Global. With regard to the Lowe's advance purchasing scheme, the Court finds that Plaintiffs have failed to allege either actual knowledge or sufficient facts to allow an inference of scienter for any Director Defendant except Grossman.

*1. Actual Knowledge of Fraud*

To survive dismissal, as previously stated, it is sufficient for Plaintiffs to allege that Defendants had knowledge of facts or access to information contradicting their public statements. In re Party City Sec. Litig., 147 F.Supp.2d 282, 315 (D.N.J., 2001). To this end, Plaintiffs allege that CW informed "each of the Director Defendants during a Board meeting held in or about June or July 2003 [prior to issuance of the 2003 10-K] that the Company was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

indebted in an amount in excess of $25 million against collateral (receivables, for example) that was approximately $18 million."(Compl.¶ 257.) The Complaint further alleges that in the same Board meeting, CW informed each of the Director Defendants "that the Company had 'no cash' and was looking for replacement financing but that, in CW's opinion the Company could not get more favorable lending than it already had received, as it had borrowed far more than the amounts to which it was entitled and which its collateral would support."(Compl.¶ 269.)

Moreover, according to the Complaint, "[e]ach Director Defendant was told (in CW's presence), during Board meetings in April, June and July 2003 by the CFO that the Company had 'no cash' and had exceeded its borrowing capacity [under the IBM Credit Facility]." (Compl.¶ 249.) In addition, during each of the April, June and July 2003 Board meetings, Gaon allegedly told the Directors that Datatec could not finish the Home Depot job or even keep its doors open without cash from IBM Credit. Plaintiffs also allege that Gaon told the Directors he threatened to default on the Home Depot Project for IBM Global if IBM Credit did not step in to lend more money to Datatec.

*12 Plaintiffs argue the Directors knew the losses Datatec was suffering on the Home Depot contract were substantial and climbing because the problem was specifically discussed at "each Board meeting in the spring, summer and fall of 2003," (Compl.¶ 251). Grossman, Berenblut and Maggard also allegedly discussed the issue during Audit Committee meetings. Further, at Audit Committee and full Board meetings held on or about July 22, 2003, CW allegedly quantified the losses incurred on the Home Depot Project to be up to $1 million. Plaintiffs allege that all of the Directors knew IBM Global had not reimbursed Datatec for these cost overruns and that, because the contract was for a fixed-price, such lack of reimbursement would necessarily reduce or eliminate profits. Under these facts, the Court finds, at least with respect to the Home Depot Project and the IBM Credit and IBM Global interrelationship, Plaintiffs have adequately plead actual knowledge on the part of Defendant Directors that the SEC filings and press releases they approved and/or signed contained material misstatements and omissions.

*2. Inference of Scienter*

On the other hand, with regard to the advance purchasing scheme for Datatec's contract with Lowe's, Plaintiffs failed to plead any facts establishing actual knowledge on the part of any of the Director Defendants. As such, the Court must determine whether Plaintiffs have demonstrated for the purposes of this motion that Defendant Directors were so intimately involved in Datatec's day-to-day operations that the Court may infer knowledge or recklessness.

Where fraud involves a company's core business, knowledge or recklessness can be inferred from a defendant's position in the company and related exposure and access to information revealing the fraud. *E.g.,* Cosmas v. Hassett, 886 F.2d 8, 12-13 (2d Cir.1989) (allegations that sales to China were significant to company's business gave rise to strong inference that directors knew of Chinese import restrictions); *In re* Campbell Soup Co. Litig., 145 F.Supp.2d 574, 599 (D.N.J.2001) (finding defendants' involvement in approval of public disclosures sufficient to impute to them knowledge of falsity of disclosures concerning the company's "core business"). Moreover, "[w]here [ ] accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company."*In re Veeco Instruments, Inc. Sec. Litig.,* No. 05 MD 1695(CM), 2006 WL 759751, at *11 (S.D.N.Y. March 21, 2006) (*citing In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 497 (S.D.N.Y.2004)).

Plaintiffs submit that the Court may infer knowledge of falsity and material omissions in the statements at issue because they involved improper accounting and revenue recognition with respect to Datatec's largest contracts, e.g., Lowe's. To this end, Plaintiffs allege all six outside directors had sufficient involvement in the day-to-day operations of the Company so as to create a strong inference of knowledge of the fraud. In support of this argument, Plaintiffs note that these Directors reviewed and approved Datatec's operating budgets, monitored its performance on its contracts, and reviewed memoranda showing the expected profitability of Datatec's largest clients, including Home Depot and Lowe's. They also allegedly reviewed Datatec's financing, including the level of current borrowings under the Credit Facility and discussed Datatec's need to obtain a replacement for the Credit Facility. Plaintiffs further note, with regard to Grossman, Berenblut and Maggard that their membership

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

on the Audit Committee exposed them to information that would have alerted them to the fraud.

*13 As an initial matter, Plaintiffs' examples of day-to-day involvement as cited above do not amount to anything more than routine tasks of outside directors. Further, mere membership on an audit committee is "insufficient to establish a strong inference of scienter unless plaintiffs could plead that the audit committee was given information that should have alerted [defendant] to the fact that the company's financials were false."*In re Atlas Air Worldwide Holdings Inc. Securities Litigation,* 324 F.Supp.2d 474 (S.D.N.Y.2004); *see also Jacobs v. Coopers & Lybrand, LLP,* No. 97 Civ. 3374(RPP), 1999 WL 101772, at *17 (S.D.N.Y. Feb. 21, 1999) ("[J]ust because a defendant is a director and member of the company's audit committee does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence.") Plaintiffs have not done so.

In addition to the above-mentioned allegations, Plaintiffs have set forth examples of day-to-day involvement specific to Grossman, Milch, Friedman, and Adams. Except as to Grossman, the Court finds these examples still insufficient to allow for an inference of knowledge of the fraud.

With regard to Milch, Plaintiffs point to the fact that he co-founded Datatec, served as a director, and beneficially owned 2.7% of Datatec's stock. Milch's mere status as a co-founder, Director, and shareholder of Datatec is insufficient to demonstrate his involvement in the day-to-day operations of the Company. Further, while Plaintiffs point out that Milch was also employed in Datatec's Chairman's office for a period of two years, they fail to allege any activities he may have engaged in while serving in this position that suffice to show day-to-day operational involvement.

Similarly, with regard to Friedman, Plaintiffs simply allege that he served as a Director for over ten years, and that he and his law firm served as outside counsel for "almost every Datatec transaction" throughout most of that time. (Pls. Mem. in Opp'n to Dir. Defs.' Br. 20.) With regard to Adams, Plaintiffs claim that he was familiar with Datatec's operations because Datatec was one of his company's clients and he served as interim CEO of Datatec in 2004 following the bankruptcy. The Court finds these allegations insufficient evidence of day-to-day operational involvement.

With regard to Grossman, on the other hand, Plaintiffs have sufficiently plead enough facts to show that Grossman had day-to-day involvement in the management of the Company. First, Plaintiffs claim he telephoned Gaon "all the time" seeking information about the Company. (Compl.¶ 261.) Plaintiffs also allege he demanded explanations for movements in Datatec's stock price, and demanded that the Company create analyst interest in covering Datatec's stock by issuing aggressive earnings forecasts. He expressed concern about the impact of the Home Depot and Lowe's jobs on Datatec's earnings, and in the fall of 2003, brought in Raul Pupo, a co-executive of Grossman's company Eagle, to conduct a "business review" of Datatec's operations. (Compl.¶ 262.) Later, in December 2003, he installed Pupo as Gaon's successor. Plaintiffs further point out that Grossman and Pupo arranged to have Eagle purchase Datatec's assets in bankruptcy. All of these facts, the Court finds, suggests a significant amount of control by Grossman over Datatec. The Court finds these allegations suffice to create a strong inference of knowledge on the part of Grossman of the misstatements and omissions contained in the various SEC filings. Thus, Plaintiffs have demonstrated scienter regarding the Lowe's advanced purchasing scheme with regard to Grossman. However, they have failed to do so for any other Director Defendant.

c. *Deloitte & Touche*

*14 The Court also finds Plaintiffs have plead scienter on the part of D & T. The Complaint alleges that as early as March 2003, CW told D & T's audit partner Mark Davis that the Company was in "dire financial straits," had no cash, could not meet its payroll obligations, and was overextended on its credit. (Compl.¶ 295.) CW also allegedly told Davis that IBM continued lending Datatec money only so Datatec could finish the Home Depot job. Further, around the same time, CW allegedly questioned D & T about the propriety of the Lowe's advance purchasing scheme, and D & T is said to have received at least two memos written by IBM that found some of Datatec's invoices were not "actual." (Compl.¶ 302-03.) In the summer and fall of 2003, CW allegedly told Davis he was not comfortable with the June 2003 press release announcing positive earnings for the fiscal year and that he was not comfortable with Koch's gross profit margins and percentage of completion calculations. Plaintiffs claim D & T also discussed with Datatec's finance department employee Kittel its observation that Koch's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

gross profit margin estimates did not comport with the finance department's cost information. Davis also allegedly commented he was "not sure" whether Koch was "on top of his numbers." (Compl.¶ 316.)

All told, based on these allegations, the Court finds Plaintiffs have alleged specific facts which could establish scienter under Section 10(b) at least with respect to misstatements made from March 2003 onward. *See, e.g., In re Suprema Specialties,* 438 F.3d at 279 ("[C]ourts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss.") However, as D & T rightly points out, Plaintiffs have failed to allege any knowledge on the part of D & T prior to this date. As such, the Court finds inactionable as against D & T any misstatements pre-dating March 2003.

*vi. Failure to Plead Loss Causation*

Executive Defendants and D & T each submit that Plaintiffs' claims must fail because they failed to plead adequately loss causation. For the reasons cited below, the Court finds these arguments without merit.

a. *Executive Defendants*

Executive Defendants argue the Complaint fails to plead loss causation because it does not show that Datatec's stock price dropped after the alleged fraud was revealed, which Executive Defendants argue is now required under *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336 (2005). Executive Defendants contend that, even though there were two significant drops in stock price following the Company's announcements in December 2003, none of the announcements disclosed the falsity of any of the alleged misrepresentations. However, as Plaintiffs rightly point out, the holding in *Dura* only applies to cases in which a general, as opposed to a private, investor pleads a fraud-on-the-market theory of loss causation. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 949 n. 2 (9th Cir.2005); *McCabe v. Ernst and Young, LLP,* 2006 WL 42371 at *7 (D.N.J. Jan. 6, 2006). In cases such as this, where private investors do not rely on a fraud-on-the-market theory, Plaintiffs need only establish that Defendants' misrepresentations were directly related to the actual economic loss suffered. *See McGonigle v. Combs,* 968 F.2d 810, 821 (9th Cir.1992). The Court finds Plaintiffs have sufficiently met this standard.

b. *Deloitte & Touche*

*15 Next, D & T argues the Complaint fails to plead loss causation because Plaintiffs cannot attribute Datatec's failure to file its quarterly report for the third quarter 2003, which resulted in Datatec's failure to register the Warrants, to any statement made or omission by D & T. D & T also submits that the Complaint fails to state how anything in D & T's October 4, 2002 report or in the 2002 audited year end financial statement caused the loss suffered. Finally, although the Complaint alleges that D & T's July 23, 2003 report and the 2003 audited year-end financial statements contained misstatements, D & T argues Plaintiffs could not have relied on these since they post-dated the Note Purchase Agreement.

Contrary to D & T's characterization, the Court does not read Plaintiffs' Complaint so narrowly. Plaintiffs ground their claims against D & T in the fact that D & T erroneously represented that Datatec's financial statements contained no material misstatements and complied with GAAP. After the Company disclosed the nature of the misstatements in December 2003, the Company lost its credit line, could not file its 2003 third-quarter 10-Q, and soon thereafter went into bankruptcy. All of these, Plaintiffs claim, combined to cause Datatec to default on the Notes and render the Warrants worthless. Under this reading of the Complaint, Plaintiffs have sufficiently plead loss causation against D & T, which issued clean audit opinions on Datatec's financial statements prior to Plaintiffs' initial and subsequent investments.

**D. Section 20(a) Claims**

Executive and Director Defendants argue that Plaintiffs have not adequately plead a violation of Section 20(a) of the Exchange Act. Section 20(a) imposes liability on individuals who control any person liable under any provision of the Act. *See* 15 U.S.C. § 78t(a). Section 20(a) is a derivative liability section, requiring evidence of a separate violation under the Act. *In re Advanta,* 180 F.3d at 541. In order to state a claim under Section 20(a), Plaintiffs must plead with particularity: "(1) an underlying violation by a controlled person or entity, (2) that the Defendants are controlling persons, and (3) that they were 'in some meaningful sense culpable participants in the fraud.' " *In re Cendant Corp. Sec. Litig.,* 76 F.Supp.2d 539, 548 (D.N.J.1999) (*quoting Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir.1973).

Plaintiffs' Section 20(a) claim against Executive and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Director Defendants is based on an underlying violation of Section 10(b). A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud. *In re Mobile Media Sec. Litig.*, 28 F.Supp.2d 901, 940 (D.N.J.1998). Executive and Director Defendants initially contend that Plaintiffs' Section 20(a) claim must be dismissed because Plaintiffs' Section 10(b) claim fails. *See In re Cendant Corp.*, 76 F.Supp.2d at 549 (dismissing a Section 20(a) claim because the necessary predicate Section 10(b) claim had been dismissed). Because the Court has sustained the Section 10(b) claims, this argument fails.

***16** Director Defendants next argue that Plaintiffs have failed to plead adequately that any of the Outside Directors were "controlling persons," as required by Section 20(a). To establish that a defendant is a control person, "a plaintiff must demonstrate that 'the defendant had actual power or influence over the allegedly controlled person." ' *In re Mobile Media*, 28 F.Supp.2d at 940. "The pleading of facts that 'support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator' will survive a motion to dismiss ." *In re Loewen Group Inc. Sec. Litig.*, No. 98-6740, 2004 WL 1853137, at *26 (E.D.Pa. Aug. 18, 2004) (citing *In re Health Mgmt. Inc. Sec. Litig.*, 970 F.Supp. 192, 205 (E.D.N.Y.1997)).

Status as directors, standing alone, is insufficient to establish control for purposes of Section 20(a).*See Food & Allied Serv. Trades Dep't, AFL-CIO v. Millfield Trading Co.*, 841 F.Supp. 1386, 1391 (S.D.N.Y.1994). However, the Complaint does not simply allege that Director Defendants served as directors, but that they signed the SEC filings at issue in this case. The Court finds that these two factors suffice to establish control so as to survive a motion to dismiss. *See In re Philip Servs. Corp. Sec. Litig.*, 383 F.Supp.2d 463, 485 (S.D.N.Y.2004) ("it 'comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.'") (*citing Jacobs v. Coopers & Lybrand*, 97 CIV. 3374, 1999 WL 101772, * *17-18, (S.D.N.Y. Feb. 26, 1999)). Director Defendants' motion is thus denied as to this ground.

Director Defendants next argue that Plaintiffs have failed to allege that the individual Directors engaged in "culpable conduct" within the meaning of Section 20(a). However, although Director Defendants are correct that Plaintiffs will have to prove culpable participation at trial, it does not have to be plead in order to survive a motion to dismiss. *See Jones v. IntelliCheck, Inc.*, 274 F.Supp.2d 615, 645 (D.N.J.2003); *In re NUI Sec. Litig.*, 314 F.Supp.2d 388, 400 n.3 (D.N.J.2004).[FN3] Therefore, the Court denies Director Defendants' motion as to this ground as well.

> FN3. The Court recognizes that there is disagreement among the courts as to whether Section 20(a) requires "culpable conduct" to be plead as an element of the offense. Because the plain language of this section does not support a culpable conduct requirement but rather provides for an affirmative defense of good faith and non-inducement, 15 U.S.C. § 78t(a), the Court declines to impose this requirement.

**E. Common Law Claims**

Executive and Director Defendants argue that the Court should dismiss Plaintiffs' common-law claims of breach of fiduciary duty, negligent misrepresentation, and fraudulent conveyance. For the reasons below, the Court finds Plaintiffs' may proceed with the claims.

*i. Martin Act Does Not Bar Claims*

Executive and Director Defendants first argue that New York's Martin Act bars the claims for breach of fiduciary duty and negligent misrepresentation. These Defendants base their argument on the fact that the choice of law clause contained in the Note Purchase Agreement provided for New York law to govern the agreement .[FN4]Although it does appear that the parties intended for New York law to govern the agreement, the Court finds the language of the provision is not so broad as to cover Plaintiffs' common-law tort claims. The provision limits itself to issues relating to the contract itself. For this reason, the Court finds the choice of law clause does not apply to Plaintiffs' tort claims. Further, given that the Company was headquartered and the wrongs took place in New Jersey, the Court holds these claims are governed by New Jersey law. *Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J.1986) (applying a governmental interest analysis to tort claims).

> FN4. The provision reads: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made in New York by persons domiciled in New York and without

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

regard to its principles of conflict of laws. The corporate laws of the State of New York shall govern all issues concerning the relative rights of the Company and its stockholders."(Note Purchase Agreement at 28, § 10.1.)

*ii. Breach of Fiduciary Duty*

*17 Director Defendants next argue that Plaintiffs lack standing to pursue their breach of fiduciary duty claim because the cause of action belongs to "the corporate debtor's estate" because the debtor, Datatec, filed for bankruptcy. The Court disagrees. While true that all interests that a debtor possesses in property, including causes of action, pass to the estate upon the filing of a bankruptcy petition, *see, e.g.,* Patrick T. Frawley and Assocs. v. City Fed. Sav. Bank, Civ. A. No. 90-2060, 1990 WL 63546, at *3 (E.D.Pa. May 9, 1990), Defendants err in characterizing Plaintiffs' claims as those of Datatec. Here, the common-law claims asserted by Plaintiffs resulted from an agreement executed between Plaintiffs and the debtor corporation Datatec. As such, the claims do not belong to Datatec but rather to Plaintiffs in their capacity as creditors. And where claims such as these belong to creditors qua creditors, it is the bankruptcy trustee who has no standing to sue. *See* Mediators, Inc. v. Manney (In re Mediators, Inc.), 105 F.3d 822, 826 (2d Cir.1997); Shearson Lehman Hutton Inc. v. Wagoner, 944 F.2d 114, 118-19 (2d Cir.1991). The Court finds Plaintiffs have standing to bring a breach of fiduciary duty claim.

Defendant Gaon next argues that the claim for breach of fiduciary duty must fail because Plaintiffs cannot establish the "fiduciary relationship" between themselves and himself. Plaintiffs counter that under Delaware law, officers and directors owe creditors a fiduciary duty when the corporation enters a "zone of insolvency." Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784 (Del. Ch.1992). Plaintiffs submit that Delaware law applies here because the laws of the state of incorporation generally apply to matters concerning "internal affairs" of a corporation. This "internal affairs" doctrine, "is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders-because otherwise a corporation could be faced with conflicting demands."Edgar v. MITE Corp., 457 U.S. 624, 645 (1982).

The Court notes that breach of fiduciary duty claims are typically subject to the internal affairs doctrine. In the instant case, however, the claims are brought by creditors not by officers, directors, or shareholders of Datatec. For this reason, the Court finds that this claim is not subject to the internal affairs doctrine and that New Jersey law applies.

Under New Jersey law, a debtor typically owes no extracontractual duties to a creditor unless the debtor is insolvent. *See* Francis v. United Jersey Bank, 87 N.J. 15, 36 (1981) (stating that, while directors may owe a fiduciary duty to creditors when insolvent, the obligation does not arise absent insolvency). Here, Plaintiffs allege that at all relevant times, Datatec was insolvent and that, therefore, Executive and Director Defendants owed them a fiduciary duty. While Plaintiffs must prove the allegation of insolvency at trial, their claims suffice to survive this motion to dismiss.

*iii. Negligent Misrepresentation*

*18 Executive and Director Defendants also submit that Plaintiffs' negligent misrepresentation claim must fail because Plaintiffs cannot establish any misrepresentation or "special relationship" as required by the claim. The Court first notes that these Defendants are mistaken in grounding their argument in New York case law. As held above, New Jersey rather than New York law governs Plaintiffs' common law claims. Under New Jersey law, a plaintiff need not prove "a special relationship" but may prevail on a negligent misrepresentation claim by showing that "the defendant negligently made an incorrect statement, upon which the plaintiff justifiably relied."Alexander v. CIGNA Corp., 991 F.Supp. 427, 440 (D.N.J.1998). The Court also finds, in keeping with the reasoning set forth in this Opinion, that Plaintiffs have adequately plead misstatements on the part of both Executive and Director Defendants insofar as the Note Purchase Agreement incorporated statements made in the SEC filings, which contained material misstatements made by these Defendants. As such, the Court denies the motions as to this ground.

*iv. Fraudulent Conveyance*

Director Defendants next argue that Plaintiffs have not stated a valid fraudulent conveyance claim. Plaintiffs base their fraudulent conveyance claim on the Board's decision to award annual fees of between $7,000 and $25,000 to various Board and Audit Committee members in July 2003, allegedly when Datatec was already insolvent.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Under New Jersey law, a plaintiff states a claim for fraudulent conveyance upon a showing that "(1) the creditor's claim arises before the transfer; (2) the transfer is made without receiving full value; and (3) at the time of transfer, the debtor is insolvent."*Boardwalk Regency Corp. v. Burd,* 262 N.J.Super. 162, 164 (N.J.Super.App.Div.1993); N.J.S.A. 25: 2-27(a). Director Defendants argue that Plaintiffs have failed to plead either that their claim arose before the transfer or that the transfer was made without receiving full value.

The Court finds that Plaintiffs have appropriately alleged fraudulent conveyance. First, the Complaint makes clear that Plaintiffs' claim arose on July 3, 2003, when they first entered into the Note Purchase Agreement with Datatec. Second, the alleged transfer occurred shortly afterward, in late July 2003, when the Board voted to increase compensation to various members of the Audit and Compensation Committees. At this time, according to the Complaint, the Board knew that the Company had no cash. Finally, Plaintiffs allege that, given these members' neglect of their duties in authorizing unreliable SEC filings, they could not have merited these large increases in compensation. These allegations suffice to state a claim for fraudulent conveyance.

### *III. CONCLUSION*

For the foregoing reasons, Defendants' motions are **GRANTED** in part and **DENIED** in part in accordance with this Opinion. An appropriate Order follows.

D.N.J.,2006.
Palladin Partners v. Gaon
Not Reported in F.Supp.2d, 2006 WL 2460650 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.