UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE MBNA CORP.<br>SECURITIES LITIGATION | Case No. 1:05-CV-00272-GMS<br>CONSOLIDATED |

## REDACTED PLAINTIFFS' ANSWERING BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### PUBLIC VERSION

Dated: December 8, 2008

Seth D. Rigrodsky (#3147)
sdr@rigrodskylong.com
Brian D. Long (#4347)
bdl@rigrodskylong.com
**RIGRODSKY & LONG, P.A.**
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310
(302) 654-7530 (fax)

*Plaintiffs' Liaison Counsel*

**MOTLEY RICE LLC**

William H. Narwold (admitted *pro hac vice*)
bnarwold@motleyrice.com
Robert T. Haefele (admitted *pro hac vice*)
rhaefele@motleyrice.com
William E. Applegate, IV (admitted *pro hac vice*)
wapplegate@motleyrice.com
Meghan S.B. Oliver (admitted *pro hac vice*)
moliver@motleyrice.com

28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9450 (fax)

*Plaintiffs' Lead Counsel*

## Table of Contents

NATURE AND STAGE OF THE PROCEEDINGS ........................................................................1

SUMMARY OF ARGUMENT ................................................................................................1

STATEMENT OF FACTS .....................................................................................................1

ARGUMENT ........................................................................................................................7

I.  SUMMARY JUDGMENT IS IMPROPER BECAUSE THERE ARE DISPUTED
    ISSUES OF MATERIAL FACT .................................................................................... 7

    A.  There Is Sufficient Evidence For A Reasonable Jury To Find That Defendants
        Made Material Misrepresentations And Omissions During The Class Period.............. 8

        1.  Defendants' 2004 Year Financial Statements Were False and
            Misleading.................................................................................................... 9

        2.  The January 2005 Earnings Guidance Was Materially False and
            Misleading.................................................................................................. 11

    B.  There Is Sufficient Evidence To Support A Reasonable Inference Of Scienter .......... 12

        1.  Direct Evidence Of Conscious Misbehavior Or Recklessness....................... 13

        2.  Evidence of Motive and Opportunity........................................................... 14

    C.  There Is Sufficient Evidence Of Loss Causation And Damages................................ 15

        1.  The April 21, 2005 Corrective Disclosure Corrected the Defendants'
            Misstatements and Omissions ..................................................................... 16

        2.  Plaintiffs' Expert Has Considered Confounding Information......................... 16

        3.  There is Sufficient Evidence to Preclude Summary Judgment on Loss
            Causation and Damages Resulting From the 2005 Earnings Guidance.......... 20

    D.  Summary Judgment Should Be Denied As To Plaintiffs' Section 20(a) Claims......... 20

CONCLUSION....................................................................................................................20

## Table of Authorities

**Federal Cases**
*Ampex Corp. v. Eastman Kodak Co.*,
   461 F. Supp. 2d 232 (D. Del. 2006) ........................................................................................ 8
*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S. Ct. 2505 (1986) .................................................................................. 12
*Baker v. MBNA Corp.*,
   05-cv-00272 (GMS), slip op. (July 6, 2007) .................................................................. 13, 14
*California Public Employees' Retirement System v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ................................................................................................... 9
*Caremark v. Coram Healthcare Corp.*,
   113 F.3d 645 (7th Cir. 1997) ............................................................................................... 17
*Celotex*, 477 U.S. 317 ......................................................................................................... 8, 17
*Central Laborers' Pension Fund v. Integrated Electrical Services*,
   497 F.3d 546 (5th Cir. 2007) ................................................................................................ 15
*Federal Laboratories, Inc. v. Barringer Research Ltd.*,
   696 F.2d 271 (3d Cir. 1982) ..................................................................................... 8, 16, 19
*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004) ................................................................................................ 13
*In re Advanta Corp. Securities Litigation*,
   180 F.3d 525 (3d Cir. 1999) .......................................................................................... 12, 14
*In re Alpharma Inc. Securities Litigation*,
   372 F.3d 137 (3d Cir. 2004) ................................................................................................ 13
*In re AT&T Corp. Securities Litigation*,
   Civ. No. 01-1883 (GEB), 2004 U.S. Dist. LEXIS 29588 (D.N.J. Sept. 2, 2004) .............................. 8
*In re Bristol-Myers Squibb Securities Litigation*,
   2005 WL 2007004 (D.N.J. Aug. 17,. 2005) ...................................................................... 11, 12
*In re Microstrategy Securities Litigation*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................................... 15
*In re Motorola Securities Litigation*,
   505 F. Supp. 2d 501 (N.D. Ill. 2007) ................................................................................... 17
*In re Omnicom Group, Inc. Securities Litigation*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008) .................................................................................. 18
*In re Pharmaprint, Inc. Securities Litigation*,
   No. 00-CV-00061; 2002 WL 31036813 (D.N.J. Apr. 17, 2002) .......................................... 16
*In re SmarTalk Teleservices, Inc., Securities Litigation*,
   124 F. Supp. 2d 527 (S.D. Ohio 2000) ................................................................................ 15
*In re Suprema Specialties, Inc., Securities Litigation*,
   438 F.3d 256 (3d Cir. 2006) ................................................................................................ 14
*In re Viropharma, Inc.*,
   No. CIV. A. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) ...................................... 12
*In re Westinghouse Securities Litigation*,
   90 F.3d 696 (3d Cir. 1996) ..................................................................................... 8, 10, 12
*In re Worlds of Wonder Securities Litigation*,
   35 F.3d 1407 (9th Cir. 1994) ............................................................................................... 15

*Kline v. First West Government Securities, Inc.,*
  24 F.3d 480 (3d Cir. 1994) ................................................................................................. 12
*Lattanzio v. Deloitte & Touche, LLP,*
  476 F.3d 147 (2d Cir. 2007) ............................................................................................... 17
*Lentell v. Merrill Lynch & Co.,*
  396 F.3d 161 (2d Cir. 2005) .......................................................................................... 16, 17
*Marsden v. Select Medical Corp.,*
  No. 04-4020, 2007 U.S. Dist. LEXIS 9893 (E.D. Pa. Feb. 6, 2007) .................................. 19
*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) ............................................................................................... 14
*Pharmacia & Upjohn Co. v. Sicor, Inc.,*
  447 F. Supp. 2d 363 (D. Del. 2006) ..................................................................................... 8
*Philips Electronics, North American Corp. v. Contec Corp.,*
  312 F. Supp. 2d. 632 (D. Del. 2004) .................................................................................... 8
*Provenz v. Miller,*
  102 F.3d 1478 (9th Cir. 1996) ........................................................................................... 17
*SEC v. Infinity Group Co.,*
  212 F.3d 180 (3d Cir. 2000), *cert. denied*, 532 U.S. 905 (2001) .................................. 13, 15
*Semerenko v. Cendant Corp.,*
  223 F.3d 165 (3d Cir. 2000) ............................................................................................... 17
*Strassman v. Fresh Choice, Inc.,*
  No. C-95-20017 RPA, 1995 WL 743728 (N.D. Cal. Dec. 7, 2005) ..................................... 9
*Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Securities Litigation),*
  294 F. Supp. 2d 616 (D. Del. 2003) ................................................................................... 15
*TSE v. Ventana Medical Systems,*
  123 F. Supp. 2d 213 (D. Del. 2000) ................................................................................... 10
*United States v. Bilzerian,*
  926 F.2d 1285 (2d Cir. 1991) ............................................................................................. 11
*Ventana Med. Sys.,*
  123 F. Supp. 2d 213 (D. Del. 2000) (GMS) ................................................................. 10, 15

**Federal Regulations**
17 C.F.R. § 210.4-01(a)(1) ..................................................................................................... 9

## NATURE AND STAGE OF THE PROCEEDINGS

In this class action, Plaintiffs allege that Defendants violated the federal securities laws by materially overstating MBNA's 2004 earnings through the intentional overstatement of MBNA's accounts receivable and by providing materially false earnings guidance for 2005. (D.I. 37.) Plaintiffs' accounting, securitization, and damages experts have opined that MBNA overstated its 2004 earnings by at least $138 million through the overvaluation of an asset known as the IO Strip, and that MBNA provided false earnings guidance when projecting 10% earnings growth for 2005. The evidence shows that the Defendants knew the IO Strip was overvalued and that such growth was not achievable. This Court previously denied Defendants' Motion to Dismiss (D.I. 60), which raised many of the same arguments they now raise on summary judgment (D.I. 40; D.I. 145). Discovery is now complete, Plaintiffs' Motion for Class Certification is pending (D.I. 141), and trial is set for May 4, 2009. For the reasons set forth below, Defendants' Motion for Summary Judgment should be denied.

## SUMMARY OF ARGUMENT

1.     There is sufficient evidence for a reasonable jury to find that: (a) Defendants' challenged statements and omissions were materially false and misleading; (b) Defendants acted with scienter; and (c) Plaintiffs suffered an economic loss as a result of Defendants' fraud. Thus, summary judgment as to Plaintiffs' Section 10(b) and Section 20(a) claims should be denied.

## STATEMENT OF FACTS

In 2004, MBNA Corporation was the world's largest independent credit card issuer, PA01068, with a managed loans portfolio of approximately $121.6 billion, 66% of which was in its U.S. consumer credit card product ("USCC"). PA01112, 01131, 01144. More than 70% of MBNA's new business was financed by selling its credit card loans (accounts receivable) to trusts, which in turn would issue securities backed by these receivables. PA01176. These credit card securitizations were revolving securitizations; as customers paid their credit card balances, the cash proceeds were used to

1

purchase new receivables for the trust. PA01169-70; PA02084-88. MBNA would retain interests in the trusts, including interest-only strip receivables ("IO Strip"), which were, essentially, the rights to the "excess spread," or difference between the interest and fees paid by cardholders and the interest paid to the holders of the securities. PA02085. The IO Strip was recorded on MBNA's balance sheet as part of its accounts receivable from securitization. PA01148. The value of the IO Strip was the present value of the estimated future excess cash flows associated with the securitized loans over the estimated life of those loans, generally six to seven months. PA01169; PA02007; PA02087; PA02409. Two key assumptions used to value the IO Strip were the projected loan payment rate and excess spread. PA01206; PA02021; PA02093-94; PA01966-67.

The IO Strip was recorded on MBNA's books as an asset. Its fair value was affected by the behavior and value of the underlying receivables held by the trust. PA02439. As required by FAS 140,[1] the IO Strip was valued quarterly, taking into account factors such as changes in the credit card payment rate and excess spread, which not only affected the valuation of the IO Strip, but also were key to assessing the strength of MBNA's business. Thus, the valuation of the IO Strip provided "██████████ ████████████████████████████████████████████████████ ████████████████████████████████████." PA01286. Any impairment or write-down of the value of the IO Strip had a direct impact on MBNA's earnings, and was also well-recognized by investors as an indication of the intrinsic value of MBNA's business. PA01285; PA01296.

*2004: "*████████████████████████████████████*"* MBNA faced significant challenges in 2004, including decreasing market share, increasing competition, sluggish

---

[1] Financial Accounting Standards 140 ("FAS 140"), which provides guidance for accounting for securitizations, required MBNA's management to value the IO Strip at its fair value. *See* PA02020.

2

growth in the credit card industry, and increasing prevalence of home equity lines of credit as a substitute for credit card debt. PA01404, PA1429; PA01613; PA00195; PA01580; PA00591. In 2004 MBNA launched an aggressive, "███████" strategy to improve earnings by dramatically reducing 0% promotional rate offers, re-pricing (*i.e.*, increasing interest rates for) existing loans, and shifting its focus to credit card accounts with rewards programs. PA01325-60; PA00095-97; PA00008. But, as its executives recognized, MBNA was "████████████████████████████████ ████████" at the expense of long-term growth. PA01559; *see* PA00111; PA01329; PA01404; PA01605-06; PA00085-86; PA01289. Indeed, these initiatives had an almost immediate negative impact on MBNA's key business metrics (PA00100; PA00014-27; PA00925; PA01954, 01963-64), exacerbating an already slow rate of loan growth, and causing higher account attrition and increased payment rates on promotional and full-rate accounts, which resulted in lower interest income. PA01289-93; PA01331; PA00095-97; PA01949-50, 01963-64; PA00435; PA01363, 01369, 01373-74, 01381; PA00045; PA01308; PA01982-83; PA01928; PA00073.

Throughout the fall of 2004, senior management, including Bruce L. Hammonds, Kenneth A. Vecchione, Charles C. Krulak, Richard K. Struthers and John R. Cochran[2] (collectively, "Individual Defendants"),[3] received weekly Financial Updates and attended weekly "NIBT" (net income before taxes) meetings at which they discussed key trends and key business metrics. PA01946-47, 01959-61-, 01971-73; PA01989-90; PA01933; PA01996-97; PA02076-77; PA01907-09; PA00052-56; PA00068-80; PA00130-34; PA00198-202; PA00239-43; PA00254-61; PA00328-32; PA00357-59; PA00430; PA00361-64; PA00366-68; PA00370-415; PA00417-23; PA00425-28; PA00205-16; PA0366-68.

---

[2] ████████████████████████████████████████████████████████████ ████████████████████████ PA01971-73.

[3] The complaint was previously dismissed as to John R. Cochran and Richard K. Struthers. (*See* D.I. 60.) Plaintiffs' Motion to Amend the complaint to add Messrs. Cochran and Struthers as Defendants, in light of evidence uncovered during discovery, is pending. (*See* D.I. 128.)

3

The Individual Defendants were thus aware of the negative effects MBNA's new strategies had on the business, including slowing loan growth and increasing payment rates. PA00029; PA00008-12.

By the fall of 2004, MBNA's financial condition had deteriorated so much that many in the company began to worry about meeting the 2004 earnings projections. PA00059-64; PA00052; PA00014-27; PA00032-40; PA00050. If MBNA missed those projections, the Individual Defendants would not earn bonuses for 2004. PA00440-42; PA01938-39. However, if MBNA reached the 13% net income growth it had projected, the Individual Defendants would earn bonuses equal to their salaries, doubling their income. PA00440-42.

In an attempt to meet its financial targets, MBNA " ▉▉▉▉▉▉▉▉▉ " its marketing budget and " ▉▉▉▉▉▉▉▉ " (*i.e.*, increased interest rates on) its credit cards. But the higher interest rates drove away customers, and caused increasing payment rates and decreasing excess spread. MBNA ignored these trends and did not change its assumptions in valuing the IO Strip as of December 31, 2004. It overvalued that asset by at least $138 million, and thus overstated its 2004 net income by six cents a share, which allowed MBNA to meet most of its 2004 internal financial targets, including net income, and even to come out "a penny ahead" of outside analysts' EPS estimates. PA00470; PA00442 . PA01333, 1348; *see* PA01299; PA01363, 1371; PA01944-45. And it allowed Defendants to collect their substantial bonuses for 2004.

*2005:* " ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ " MBNA was aware of the negative trends in the business. In October and November of 2004, concerns surfaced at MBNA about whether the " ▉▉▉ ▉▉▉ " senior management-directed earnings targets for 2005 were achievable. PA00157-59, 00162; PA00228; PA00246; PA00042; PA00345-54; PA01264-65. Defendant Vecchione, MBNA's then-CFO, recognized that a " ▉▉▉▉▉▉ " or " ▉▉▉▉▉▉▉ " was needed for MBNA to achieve its 2005 earnings targets. PA00296; PA01275. In a late November Plan Review, MBNA's two key

4

divisions — the U.S. Card Division and the Corporate and Strategic Planning Division — forecasted, respectively, negative 5% and negative 14% earnings per share ("EPS") growth in 2005. PA00298; PA00336; PA00265; PA00347; PA01911-17. Senior management, including Individual Defendants Hammonds and Vecchione,[4] discussed but completely ignored these grim forecasts, and set a completely unrealistic 10% EPS growth target and a 6% loan growth target for 2005. PA00334.

MBNA's key business metrics continued to deteriorate in early 2005. PA01350; PA0468; PA00885; PA00432; PA00895-97; PA00792. But MBNA continued to ignore the problems, and did not devalue its IO Strip in the amount that was required by GAAP, given the information MBNA had concerning negative business trends, particularly rising payment rates and reduced interest income, and therefore excess spread, from its credit cards portfolio. PA02012, 15, 20, 34. Instead, MBNA painted a rosy picture for investors: In a January 20, 2005 MBNA press release, Defendant Hammonds announced that "[w]e are pleased with the results achieved in 2004" (PA00544); and on January 21, 2005, during an Analyst Call in which all Individual Defendants participated, Defendants Hammonds and Vecchione told investors — and MBNA stated in an 8-K — that MBNA expected 10% earnings growth in 2005 and an average of 12% earnings growth "over the next several years," confirming outside analysts' expectations. PA00557; PA00578-80; PA02355-56; PA02382-83; PA02436-37.

Within days, as soon as trading restrictions were lifted, each of the Individual Defendants sold a large amount of MBNA stock. On January 25, 2005, Defendant Vecchione sold $2,684,399 worth of stock, his only first-quarter sale of stock for the two-year period ending in April 2005. PA01041-53. On January 27, Defendant Hammonds sold $9,315,853 of stock, which constituted over 30% of his total open market sales since January 2003, and Defendant Cochran sold $14,086,345 of stock, equaling about 30% of his open market sales for the previous two years. PA00980-1000; PA00954-78.

---

[4] John Cochran and Richard Struthers were also present at the meeting. PA00334.

On February 3, Defendant Struthers sold $12,278,334 of stock, over 55% of his open market sales from January 1, 2003 through the end of the class period. PA01017-39. Over this same period, Defendant Krulak made over 90% of his open market sales for the previous two years, resulting in proceeds of $7,368,029. PA01002-15.

On January 26, while Individual Defendants were unloading their shares, an internal email declared that " ████████████████████████████████████████████████████████

████████████████████ " PA00747-48. Nonetheless, MBNA reiterated its 10% EPS growth guidance in a meeting with Citibank Smith Barney the next day. PA00582-83, PA00641-84; PA01975-76. In early February, Robert Lamantia, the Director of MBNA's Corporate & Strategic Planning, expressed to the Individual Defendants his " ████████████ " about MBNA's ability to meet its first quarter EPS target. PA00877. By February 7, " ████████████████████████████████████████

████████████████████████████ " PA00885. Despite these warnings, on February 9, Defendant Vecchione again reiterated the 10% EPS growth guidance in a meeting with Credit Suisse First Boston. PA00582-83, 00701-45.

Only two weeks later, Defendant Vecchione wrote, " ████████████████████████████████

████████████████ " PA00908. By this point, MBNA's 2005 performance confirmed that its problems in 2005 had developed because the " ████████████████████████ " PA00911. MBNA had " ████████████████████ " *Id.* It " ████████████████████████████████

████████████████████████████████ " *Id.* On February 29, 2005, Hammonds warned the Board " ████████████████████████████████████

██████████████████████████ " PA00925.

Concerns at MBNA continued to grow throughout the first quarter of 2005. In late March an internal presentation observed that " ██████████████████████████████████████████



" PA01264. This observation was an

understatement, as evidenced by a handwritten notation penned next to it on a copy of the presentation:

" _Id._ Other notations make clear that the Company ignored key

business and industry trends in planning for 2005: "

" PA01265. In late spring, an MBNA review acknowledged that "

" PA01289.

   _April 21, 2005: MBNA Finally Discloses Its True Financial Condition._ In late March or early

April, Defendants discussed, but decided not to inform the market of, the lower-than-forecasted

earnings and the IO Strip write-down. PA01285; PA01262. Finally, on April 21, 2005, Defendants

disclosed to the public that MBNA's profits would be "significantly below" its 10% growth target for

2005, and that it was taking a $206.6 million write-down of its IO Strip. MBNA also disclosed that its

first-quarter earnings fell 93%, year-over-year, PA01302.01-.19, claiming that it had experienced

"unexpectedly high payment volumes from U.S. credit card customers," which "adversely impacted

the Corporation's yield on managed loans." _Id._ Outside analysts — one of whom titled his report

"Shock and Awe" — were surprised by this disclosure, and immediately reduced their earnings

expectations for MBNA. PA01318-22; PA01310-16; PA02176. MBNA's stock plummeted to a two-

day intraday low of $18.50 before closing at $19.28, down $4.14 per share, or 17.92%. PA02181.

## ARGUMENT

I.   **SUMMARY JUDGMENT IS IMPROPER BECAUSE THERE ARE DISPUTED
     ISSUES OF MATERIAL FACT**

   Plaintiffs have adduced evidence, including expert reports, an expert declaration, and testimony

of Steven Henning and Gary J. Kopff, PA02080-129; PA01999-2071; PA02386-400; PA02402-03;

PA02439-41; PA02405-10, sufficient for a reasonable jury to find that Defendants' statements

concerning the valuation of the IO Strip and projected earnings were false and misleading, as well as

7

sufficient evidence of scienter. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In addition,

Plaintiffs have adduced evidence, including the expert reports and testimony of Frank C. Torchio,

PA02131-344; PA02348-84; PA02412-31, sufficient for a reasonable jury to find that Plaintiffs

suffered an economic loss caused by Defendants' fraud. *Id.* At most, Defendants have demonstrated

that there are disputed issues of material fact as to these elements of Plaintiffs' claims. The Third

Circuit has instructed that courts may not resolve on summary judgment "disputed and relevant factual

issues on conflicting affidavits of qualified experts." *Fed. Labs., Inc. v. Barringer Research Ltd.*, 696

F.2d 271, 274-75 (3d Cir. 1982) (internal citations and annotation marks omitted); *see also In re AT&T

Corp. Sec. Litig.*, Civ. No. 01-1883 (GEB), 2004 U.S. Dist. LEXIS 29588, at *48-49 (D.N.J. Sept. 2,

2004) ("contradictory expert reports provide material disputes of fact that . . . should be determined by

a trier of fact"); *Ampex Corp. v. Eastman Kodak Co.*, 461 F. Supp. 2d 232 (D. Del. 2006) (no summary

judgment where expert opinion raises a factual issue). Nor may the court make determinations as to an

expert's credibility, or the weight of the evidence. *See Pharmacia & Upjohn Co. v. Sicor, Inc.*, 447 F.

Supp. 2d 363, 376 (D. Del. 2006). Thus, summary judgment should be denied. *See also Philips Elecs.,

N. Am. Corp. v. Contec Corp.*, 312 F. Supp. 2d. 632, 633 (D. Del. 2004).

### A.   There Is Sufficient Evidence For A Reasonable Jury To Find That Defendants Made Material Misrepresentations And Omissions During The Class Period

Whether Defendants' challenged statements and omissions were material is determined by

whether "there is a substantial likelihood that the disclosure [of the truth] would have been viewed by

the reasonable investor as having significantly altered the 'total mix' of information' available to that

investor." *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir. 1996) *(citing T.S.C. Indus., Inc. v.

Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132 (1976). "Materiality is a mixed question of

law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from

a given set of facts are peculiarly for the trier of fact." *Id.* (citing *T.S.C. Indus.*, 426 U.S at 450, 96 S.

Ct. at 2132-33).

    **1.**    **Defendants' 2004 Year Financial Statements Were False and Misleading**

    After reviewing the relevant evidence, Plaintiffs' accounting expert, Steven Henning,

concluded that MBNA overstated the value of its IO Strip by $138.2 million, contrary to GAAP. The

Court should reject Defendants' argument that a supposed "lookback analysis" shows the valuation

was accurate, and thus cannot have been false or misleading. (*See* Def. Br. at 7-9). Whether

Defendants' valuation (made in violation of GAAP) ultimately proved accurate is irrelevant;

"[f]inancial results reported in violation of GAAP are presumptively misleading." *Cal. Pub. Emps.'*

*Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 153 n.16 (3d Cir. 2004); *see also* 17 C.F.R. § 210.4-01(a)(1).[5]

According to GAAP, MBNA was required to fairly value the IO Strip based on the information

available as of the balance sheet date; not based on information that was not even available until six

months after the fact. PA01133; PA02410.01-02; PA02389; PA02439-40. Defendants knew, or were

reckless in not knowing, that the assumptions they used to value the IO Strip as of December 31, 2004

were false, and that the valuation had not been made in accordance with GAAP. Thus, their

statements as to the value of the IO Strip were false and misleading when made in January 2005.

    In any event, Plaintiffs dispute Defendants' contention that the valuation of the IO Strip as of

December 31, 2004 ultimately proved to be accurate. The "lookback analysis," relied on by

Defendants and their expert, does not prove that the actual value of the IO Strip as of December 31,

2004 was within $5.9 million dollars of MBNA's estimates. As Defendants concede, the December

31, 2004 valuation of the IO Strip was an estimate of "the present value of the cash flow expected to be

received generally over the next six months *from the credit card loans that had been securitized as of*

---

[5] *Strassman v. Fresh Choice, Inc.,* No. C-95-20017 RPA, 1995 WL 743728, at *11 (N.D. Cal. Dec. 7, 2005), on which Defendants rely, is inapposite, as the statements in that case regarded estimates as to the number of future franchises, unlike this case, which involves a valuation that was required, but failed, to comply with GAAP.

*the valuation date.*" (Def. Br. at 3 (emphasis added).)  The securitizations were revolving; as credit card loans were paid off, the trust used the proceeds to purchase other loans from MBNA's managed portfolio. PA01169-70; PA02088.  The "lookback analysis" thus necessarily considers revenues associated with loans that were not securitized as of December 31, 2004, and nothing in the analysis indicates what portion of those revenues was associated with the securitized loans held by the trusts as of that date.  *See* PA02440-41.

Even if the "lookback analysis" did show that revenues from loans securitized as of December 31, 2004 were within $5.9 million of the December 31 valuation — which it does not — it does not follow that Defendants' misrepresentations as to the value of the IO Strip were not material at the time they were made. (*See* Def. Br. at 8.)  The relevant inquiry is whether a reasonable investor would have viewed Defendants' overvaluation of the IO Strip by $138 million, which resulted in an overstatement of approximately 11.4 % of net income, and was made in violation of GAAP (*see* PA02439-40), as "significantly alter[ing] the 'total mix of information available" in January 2005, when the 2004 earnings figures were released to the market.  *Westinghouse*, 90 F.3d at 714.  By this standard, Defendants' misstatements and omissions were material, especially as the overvaluation of the IO Strip allowed MBNA to meet consensus earning estimates for 2004.  At most, Defendants have raised a dispute for the jury: "materiality is a mixed question of law and fact ordinarily decided by the trier of fact."  *TSE v. Ventana Med. Sys.,* 123 F. Supp. 2d 213, 221 (D. Del. 2000).

That cash received from the IO Strip in January and February exceeded MBNA's estimates by nearly $50 million does not, as Defendants contend, validate MBNA's valuation of the IO Strip as of December 31, 2004, and justify including that valuation in its March 2005 10-K filing. (*See* Def. Br. at 8.)  Rather, the temporary spike in cash flow in January and February further demonstrated what Defendants already knew — that the assumptions underlying that valuation were fundamentally

10

flawed. *See* pp. 4-6, *supra.* Increased payment rates in January and February caused a spike in cash

flow as individual card-holders, especially those with the highest interest rates, paid off their accounts

in full. *See* PA01374. The increased payment rates reduced the total number of outstanding accounts,

as well as future excess spread, and thus significantly reduced the expected cash flow in subsequent

periods. *See* PA02441. Indeed, these factors caused MBNA to devalue the IO Strip by $206.6 million

in April 2005, by another $105.5 million after the second quarter of 2005, and by yet another $129.4

million after the third quarter. PA01463; PA01656; PA01794. For the same reasons, Defendants

should have written down the IO Strip as of December 31, 2004. PA02015.

### 2. The January 2005 Earnings Guidance Was Materially False and Misleading

Defendants misconstrue and mischaracterize the testimony of Plaintiffs' damages and loss

causation expert, Mr. Torchio, as a concession that MBNA's 10% earnings guidance is not material.

(*See* Def. Br. at 9.) In both his reports and testimony, Mr. Torchio stated that Defendants' failure to

disclose the truth about MBNA's financial picture on January 20 caused MBNA's share price to

remain artificially inflated, and that because the 10% EPS growth guidance was within the range of

outside analysts' growth expectations, it did not cause a price reaction when announced. PA02138-39;

PA02417-20; PA02354-56. "If a material omission serves to conceal information that would otherwise

cause the stock price to fall, the very fact that the price does not change (until corrective disclosure)

would evince the statement's materiality." *In re Bristol-Myers Squibb Sec. Lit.*, 2005 WL 2007004, at

*17 (D.N.J. Aug. 17, 2005); *see also United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991).

Here, materiality of Defendants' statements and omissions is demonstrated by the precipitous decline in

share price immediately following the April 21 corrective disclosure. *See* PA02182-83.

Defendants also argue that the 2005 EPS guidance is immaterial as a matter of law under the

"bespeaks caution" doctrine because the statements were accompanied by meaningful cautionary

11

statements. (*See* Def. Br. at 9-10.) However, Defendants knew by January 20, 2005 that 10% EPS

growth would be impossible in 2005, that MBNA had already decided to discontinue teaser rates, and

that credit card payment rates had increased dramatically. *See supra* Statement of Facts and Section

I.B. The "bespeaks caution" doctrine, therefore, does not insulate Defendants from liability for their

misleading and false statements about 2005 EPS growth. *See Westinghouse Sec. Litig.*, 90 F.3d at 709-

10 ("bespeaks caution" doctrine not applied where defendants knew reserves were and would remain

inadequate even without future negative events); *see also In re Viropharma, Inc.*, No. CIV. A. 02-1627,

2003 WL 1824914, at *8 (E.D. Pa. Apr. 7, 2003) ("[A] defendant may not use cautionary language to

protect himself when he is already aware that the risks he is cautioning against have come to fruition.").

Further, the purported cautionary statements are a boilerplate recitation of factors that might impact

MBNA's earnings at any given time, and are insufficiently specific to render the misrepresentations

immaterial. *See id.; see also Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d Cir. 1994).

**B.      There Is Sufficient Evidence To Support A Reasonable Inference Of Scienter**

In this Circuit, the PSLRA is not interpreted as altering the well-established standards for

summary judgment, and thus Plaintiff need only show that there is sufficient evidence to support a

*reasonable,* rather than *strong,* inference of scienter in order to defeat summary judgment. *In re*

*Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) ("[A]lthough the [PSLRA] established a

uniform pleading standard, it did not purport to alter the substantive contours of scienter.").   Thus,

neither the "substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106

S. Ct. 2505 (1986), for proving scienter, nor the requirements for defeating summary judgment, were

altered by the PSLRA. *See Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *15 (*citing In re*

*Ikon Office Sol'ns*, 277 F.3d 658, 666 (3d Cir. 2002)).

Even if a heightened standard were applied, the evidence here supports a strong inference of

scienter. Plaintiffs must adduce direct or circumstantial evidence of *either* (a) conscious misbehavior or

12

recklessness, *or* (b) motive and opportunity to commit fraud. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004); *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004). Plaintiffs here have direct evidence of both.

    **1.**    **Direct Evidence Of Conscious Misbehavior Or Recklessness**

MBNA's internal documents[6] are sufficient evidence for a reasonable jury to find that each of the Defendants was either aware that the earnings statements and the IO Strip valuations were false, or was recklessly indifferent to the truth.[7] In deciding the motion to dismiss, this Court already has recognized that the facts alleged satisfied the PSLRA's "strong inference of scienter" pleading standard. *See Baker v. MBNA Corp.*, 05-cv-00272 (GMS), slip op. at 11-12 (July 6, 2007) (D.I. 60). Evidence uncovered in discovery creates an even stronger inference. For example, as discussed in the Statement of Facts, above, discovery has revealed that each of the Individual Defendants received, reviewed, and discussed weekly Financial Updates and participated in "NIBT" meetings where they discussed key trends and business metrics. PA01946-47, PA01959-61, PA01971-73; PA01989-90; PA01933; PA01996-97; PA02076-77; PA01907-09; PA00052-56; PA00068-80; PA00130-34; PA00198-202; PA00239-243; PA00254-261; PA00328-332; PA00357-359; PA00430; PA00361-64; PA00366-68; PA00370-415; PA00417-23; PA00425-428. The evidence shows that the Individual Defendants knew of MBNA's poor and worsening financial condition throughout 2004 and into 2005,

---

[6] Plaintiffs disagree with Defendants' depiction of the confidential informants' ("CIs") testimony and do not concede that the CIs' statements in the Defendant-drafted affidavits contradict statements made by the CIs in audio recordings and cited in the Complaint. Regardless, neither the CIs' statements nor the characterizations of the statements need be considered to determine this motion; Defendants' own documents sufficiently evidence scienter.

[7] Recklessness is "highly unreasonable (conduct), involving … an extreme departure from the standards of ordinary care, … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir. 2000), *cert. denied*, 532 U.S. 905 (2001) (citation omitted).

including the various opinions expressed toward the close of 2004 that MBNA likely would fall short

of its 2004 goals, and that it would have difficulty reaching its goals in 2005 as a result of its 2004

performance and the worsening market. Yet the Individual Defendants signaled to the market not only

that MBNA was doing better than it actually was, but also that 2005 was expected to be even better.[8]

### 2.    Evidence of Motive and Opportunity

*Insider Trading Motive.* Insider trading supports a strong inference of scienter when it is

"unusual in scope or timing." *Advanta*, 180 F.3d at 540. Courts consider whether the sales were

"normal and routine," as well as "the amount of profit made, the amount of stock traded, the portion of

stockholdings sold, or the number of insiders involved." *In re Suprema Specialties, Inc., Sec. Litig.*,

438 F.3d 256, 277 (3d Cir. 2006) (internal citations and quotation marks omitted).

This Court previously found that Defendant Krulak's "sale of nearly two-thirds of his stock

holdings during the Class Period is sufficient to create the requisite inference of scienter." *Baker*, 05-

cv-00272, slip op. at 12, (D.I. 60.) As set out above, the other Individual Defendants also made

substantial, non-routine trades during the class period, which also is sufficient to create an inference of

scienter. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (motive is adequately pled "when

corporate insiders were alleged to have misrepresented . . . material facts about the corporation's

performance or prospects in order to keep the stock price artificially high while they sold their own

shares at a profit"); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546,

---

[8] Scienter is further supported by later acts: (1) LaMantia's "███████████████" about meeting
first quarter EPS targets and Vecchione's projections that loans outstanding would significantly
miss the first quarter plan were shared with the Individual Defendants before the CSFB
reiteration of the earnings statement (PA00877;  PA00885); and (2) in an April 2005 MBNA
board meeting, when it was admittedly clear that MBNA would miss its earning mark for 1Q
2005, "██████████████████████████████████████████████████████████
██████████████████████████████████████████" PA01285. This recommendation
was made even though Defendants knew that investors would be surprised, "██████████████
████████████████████" PA01262.

553 (5th Cir. 2007) (internal citations and quotation marks omitted) (scienter can be inferred where "the sales are out of line with prior trading practices or at times calculated to maximize personal profit"); *In re SmarTalk Teleservices, Inc., Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (insider sales ranging from 11-40% of their holdings raised inference of scienter). Furthermore, courts have recognized that "[a]n insider may not always trade all his shares in the company for which he possesses inside information; the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994); *see also In re Microstrategy Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000). Thus the inference of scienter is not weakened by the fact that Defendants retained a portion of their stock.

*Compensation Plan Motive.* Scienter can also be inferred from evidence that Defendants knew that their bonuses were tied to MBNA's meeting its 2004 earnings projections; *(see supra* at 4), and that a write-down of the IO Strip would have a direct impact on earnings, and thus reduce or eliminate their bonuses. Defendants then caused MBNA to take measures to avoid such a write-down, and to enable MBNA to meet the 2004 earnings projections, at the expense of MBNA's long-term growth and future earnings.[9] *See supra* at 4.

### C.    There Is Sufficient Evidence Of Loss Causation And Damages

Issues of loss causation are uniquely unsuited to summary judgment; "whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact." *Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.)*, 294 F. Supp. 2d 616, 626 (D. Del. 2003) (*citing EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)); *see also In re Pharmaprint, Inc.*

---

[9] Individual Defendants were the senior managers of MBNA and controlled the company. The *Ventana* decision, on which Defendants rely (*see* Def. Br. at 13), is completely inapposite, as the plaintiffs in that case conceded that the defendants there did not control the board or make the relevant decisions. *See Ventana Med. Sys.*, 123 F. Supp. 2d at 226.

*Sec. Lit.*, No. 00-CV-00061, 2002 WL 31036813 at *9-10 (D.N.J. Apr. 17, 2002). *Lentell v. Merrill*

*Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). Summary judgment is particularly inappropriate

where, as here, the loss causation issues boil down to a disagreement between the parties' experts. *See,*

*e.g., Fed. Labs.*, 696 F.2d at 274; *see also supra* at 8.

### 1. The April 21, 2005 Corrective Disclosure Corrected the Defendants' Misstatements and Omissions

Defendants argue that summary judgment must be granted because the April 21, 2005

corrective disclosure did not correspond to the alleged misrepresentations and omissions, as the

corrective disclosure concerned "the value of the 3/31/05 strip," rather than "accounting problems

related to the 12/31/04 IO strip or . . . the value of that asset." (Def. Br. at 17.) This argument rests on

the erroneous premise that the "12/31/04 IO Strip" is a distinct and separate asset from the "3/31/05 IO

Strip" because the specific securitized credit card loans associated with the IO Strip as of December 31,

2004 comprised a "different" – albeit overlapping –"basket of credit card loans" from that associated

with the IO Strip as of March 31, 2005. (Def. Br. at 4-5, 17.) The makeup of the underlying loans in

the trust changed almost daily, as it was a revolving securitization, and the precise composition of those

loans differed each time the IO Strip was valued. But the "12/31/04 IO Strip" or the "3/31/05 IO Strip"

are not separate assets – they are simply valuations of the same line item on MBNA's balance sheet at

different points in time. *See* PA02439. Defendants' misrepresentations and omissions concerned the

fair value of the IO Strip as of 12/31/04, as well as the assumptions underlying that valuation, and the

corrective disclosure four months later corresponded to those misrepresentation and omissions. *See*

PA02134; PA01302.03-.05; PA00564; PA02421-22; PA02368.

### 2. Plaintiffs' Expert Has Considered Confounding Information

This court should reject Defendants' contention that Plaintiffs' expert did not exclude the effect

of "three undisputed non-corrective facts" in his loss causation analysis. (Def. Br. at 18.) Mr. Torchio

did consider whether there was confounding information, but as these purported "facts" did not affect

the stock price on April 21, 2005, there was no need to take them into account. Furthermore, the legal

standard for loss causation does not require an expert's allocation of damages to be "precise." *Lentell*,

396 F. 3d at 177. Plaintiffs are not required to show that a misrepresentation was the sole reason for the

investment's decline in value. "So long as the alleged misrepresentations were a substantial cause of

the inflation in the price of a security and in its subsequent decline in value, other contributing forces

will not bar recovery." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 186 -87 (3d Cir. 2000); *see also*

*Lattanzio v. Deloitte & Touche, LLP*, 476 F.3d 147, 158 (2d Cir. 2007); *In re Motorola Sec. Litig.*, 505

F. Supp. 2d 501, 553 (N.D. Ill. 2007). Thus, to defeat summary judgment, Plaintiffs need only show

that there is sufficient evidence for a reasonable jury to find that the corrective disclosure was a

substantial cause of the decline. Disputes as to "the chain of causation ... [are] a matter of proof at

trial" and not appropriate for summary judgment. *Lentell*, 396 F. 3d at 174.

Defendants therefore bear the heavy burden of proving that no reasonable jury could accept Mr.

Torchio's analysis that the stock price decline was due to the April 21, 2005 corrective disclosure,

which revealed to the market the truth about Defendants' earlier misrepresentations and omissions. *See*

*Celotex*, 477 U.S. at 325. That is, "the defendants must prove, as a matter of law, that the

depreciation . . . resulted from factors other than the alleged false and misleading statements." *Provenz*

*v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1996); *see also Caremark v. Coram Healthcare Corp.*, 113

F.3d 645, 650 (7th Cir. 1997). Defendants have not — and cannot — make such a showing. There can

be no serious question that Mr. Torchio's report, and the evidence on which he relies, is sufficient for a

reasonable jury to find that the April 21 corrective disclosure was a substantial cause of the price

decline that day. And, contrary to Defendants' assertions, Mr. Torchio's analysis did exclude non-

corrective facts, or "confounding information." *See* PA02134-35, 177-79.[10]  The three supposed

"facts" cited by Defendants are not confounding information and Mr. Torchio did not have to treat

them as such.

     *First,* Defendants are wrong in asserting that the April 21 disclosures concern only the value of

the "3/31/05 IO Strip", while Plaintiffs' case concerns the valuation of the "12/31/04 IO Strip." (*See*

Def. Br. at 16-17.)  As already demonstrated, the "3/31/05 IO Strip" and "12/31/04 IO Strip" are

not separate and distinct assets, but valuations of the same asset as of different dates.  Also, the

challenged statements by Defendants concerned not only the valuation of the IO Strip as of December

31, 2004, but also the assumptions about key business metrics underlying that valuation, and the April

21 disclosure directly corresponds to those statements.

     *Second*, that the IO Strip should have been written down by an additional $138.2 million as of

December 2004 does not mean that only $138.2 million of the $206.6 million write-down as of March

2005 was corrective information when it was disclosed (some three weeks later) on April 21.  The

corrective disclosure concerned not only the amount of the write-down, but also the reasons for that

write-down, and exposed the falsity of MBNA's assumptions regarding key business metrics, as well

as the significant decrease in earnings projections.  Furthermore, as Mr. Torchio points out in his

rebuttal report, "the total hypothetical write-down that Plaintiffs allege should have been disclosed on

January 20, 2005 was $233.9 million, which includes $138.2 million of additional write-down that

Plaintiffs allege MBNA should have disclosed."  Mr. Torchio concludes, "[c]onsequently, it is plainly

evident that the actual write-down in April 2005 corresponds quite closely to what Plaintiffs allege

---

[10] By contrast, in *In re Omnicom Group, Inc. Securities Litigation*, 541 F. Supp. 2d 546, 554
(S.D.N.Y. 2008), on which Defendants rely, the plaintiffs' expert made no attempt to isolate
effects of the fraud from other obvious causes that "dwarfed any shreds of new information."
*Omnicom* at 554.

should have been disclosed in January 2005." PA02361. At most, this is an issue of disagreement among the parties' experts, and a matter for the jury. *See Fed. Labs.*, 696 F.2d at 274.

*Third,* Defendants contend — citing an internal MBNA report — that a portion of the reduction in the valuation of the IO Strip was attributable to a change in the coupon rate (the interest rate paid to the investors in the securitization). *(See* Def. Br. at 19.) Defendants then argue that, because Plaintiffs have not alleged false and misleading statements about the coupon rate, any reduction in the valuation of the IO Strip related to a change in the coupon rate must be excluded from Plaintiffs' damages analysis. *(Id.)* But the internal MBNA report on which Defendants rely was not disclosed to the market. Thus, any information about the coupon rate contained in that report could not have had an impact on the stock price on April 21, and is not confounding information. "The market cannot react to information of which it is unaware." *Marsden v. Select Med. Corp.*, No. 04-4020, 2007 U.S. Dist. LEXIS 9893, at *18-19 (E.D. Pa. Feb. 6, 2007).

The market reacted solely to the corrective disclosure in MBNA's April 21, 2005 press release, which does not even mention the words "coupon rate." Rather, it explains the reasons for the write-down of the IO Strip as "unexpectedly high payment volumes from U.S. credit card customers," particularly on "accounts with higher interest rates," which resulted in "projected lower excess spreads and higher payments" and "a net loss from securitization activity of $206.6 million," as well as predicted 2005 EPS "significantly below [MBNA's] 10% growth objective." PA01302.01-.19. The corrective disclosure corresponds to the misrepresentations and omissions made earlier by Defendants, and caused the $4.14 decline in the price of MBNA's stock. *See* PA02135, 02177; PA02415-16; PA02430-31.

19

**3.      There is Sufficient Evidence to Preclude Summary Judgment on Loss
Causation and Damages Resulting From the 2005 Earnings Guidance**

Defendants argue that Plaintiffs cannot prove that any of their damages were caused by the

misleading 10% earnings guidance issued January 21, 2005, as Mr. Torchio's report states that

MBNA's stock was inflated by $4.14 per share as of January 20, 2005. (*See* Def. Br. at 19-20.) This

argument mischaracterizes both Plaintiffs' argument and Mr. Torchio's analysis. The share price for

MBNA was artificially inflated as of January 20 because Defendants failed to disclose to the market, as

of that day, the over-valuation of the IO Strip, and the reasons for that over-valuation, as well as the fact

that MBNA's earnings would not meet market expectations of at least 10% growth. That management

did not give its earnings guidance until January 21 is insignificant; the market was already (wrongly)

factoring a 10% earnings increase into MBNA's share price by January 20 — which is why the share

price did not move when MBNA gave its earnings guidance the next day. On January 20, Defendants

knew that the value of the IO Strip was overstated and that MBNA would not hit the 10-12% earnings

growth projected by outside analysts. Instead of telling the market the truth on January 21, Defendants

made an affirmative misstatement — that 10% earnings growth was achievable —and failed to disclose

that those expectations were not achievable, and that the assumptions underlying those expectations,

particularly those underlying the valuation of the IO Strip, were false.

**D.      Summary Judgment Should Be Denied As To Plaintiffs' Section 20(a) Claims**

As set forth above, a reasonable jury could find that Defendants violated §10(b). Thus,

summary judgment on Plaintiffs' Section 20(a) claim is not proper.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that summary judgment be denied.

Dated: December 1, 2008                    RIGRODSKY & LONG, P. A.

                                           */s/ Brian D. Long*
                                           Seth D. Rigrodsky (#3147)
                                           Brian D. Long (#4347)

sdr@rigrodskylong.com
bdl@rigrodskylong.com
919 North Market Street, Suite 980
Wilmington, DE 19801
Phone: (302) 295-5310
Fax: 302-654-7530
*Plaintiffs' Liaison Counsel*

MOTLEY RICE LLC
William H. Narwold (admitted pro hac vice)
Robert T. Haefele (admitted pro hace vice)
William E. Applegate, IV (admitted pro hac vice)
Meghan S. B. Oliver (admitted pro hac vice)
28 Bridgeside Boulevard
Mt. Pleasant, SC  29464
Phone: (843) 216-9000
Fax: (843) 216-9450

*Plaintiffs' Lead Counsel*