## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE MBNA CORP. SECURITIES LITIGATION | Case No. 05-00272-GMS CONSOLIDATED |

### DEFENDANTS' REPLY BRIEF AND APPENDIX IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

Richard H. Morse (No. 531)
Michele Sherretta Budicak (No. 4651)
rmorse@ycst.com
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Defendants*

*Of Counsel*:

Richard C. Pepperman, II
Stacey R. Friedman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

December 22, 2008

# TABLE OF CONTENTS

ARGUMENT ...........................................................................................................................1

I.     Plaintiffs Have Failed to Establish an Actionable Misstatement
or Omission...............................................................................................................1

        A.     MBNA's Valuation of the 12/31/04 I/O Strip Was Not
False or Misleading.................................................................................1

        B.     MBNA's January 21, 2005 EPS Guidance Was Not Material ................................3

II.    There Is No Evidence That Any Individual Defendant Acted
with Scienter ...........................................................................................................5

III.   Plaintiffs Cannot Establish Loss Causation or Damages.......................................6

        A.     There Was No Corrective Disclosure ....................................................6

        B.     Plaintiffs' Analysis of Damages and Loss Causation
Failed to Exclude the Effect of Non-Corrective Information .................................8

CONCLUSION....................................................................................................................10

APPENDIX

DB01:2665201.1

064261.1001

# TABLE OF AUTHORITIES

## CASES

*Page(s)*

*In re Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999)...................................................................4–5

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)................................................................1–2

*Caremark* v. *Coram Health Care Corp.*,
113 F.3d 645 (7th Cir. 1997) ................................................................10

*Celotex Corp.* v. *Catrett*,
477 U.S. 317 (1986).................................................................................2

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005)...............................................................................10

*McCabe* v. *Ernst & Young, LLP*,
494 F.3d 418 (3d Cir. 2007) ...............................................................6–7

*McKowan Lowe & Co.* v. *Jasmine, Ltd.*,
231 Fed. App'x 216 (3d Cir. 2007)........................................................6

*In re Omnicom Group, Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008).....................................................9

*Provenz* v. *Miller*,
102 F.3d 1478 (9th Cir. 1966) ..............................................................10

*TSE* v. *Ventana Med. Sys.*,
123 F. Supp. 2d 213 (D. Del. 2000) *aff'd*, 297 F.3d 210 (3d Cir. 2002) .............................5–6

*In re Tyson Foods, Inc. Sec. Litig.*,
No. 01-425-SLR, 2004 U.S. Dist. LEXIS 11122 (D. Del. 2004),
*aff'd*, 155 Fed. App'x 53 (3d Cir. 2005)............................................9–10

*In re Viropharma, Inc., Sec. Litig.*,
No. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003).........................5

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3d Cir. 1996)......................................................................5

DB01:2665201.1

064261.1001

**ARGUMENT**

In an attempt to avoid summary judgment, plaintiffs' Answering Brief offers various factual arguments that range from inaccurate to disputed. Even if plaintiffs could prevail on each of these factual issues (they cannot), summary judgment still would be appropriate for the reasons set forth in defendants' Opening Brief. *First*, plaintiffs failed to identify an actionable misstatement or omission. The 12/31/04 I/O Strip[1] valuation was accurate, and plaintiffs' expert has conceded that MBNA's projection of 10% EPS growth in 2005 was immaterial, which precludes any claim based on that guidance. *Second*, plaintiffs do not identify any actions by the individual defendants that support their scienter arguments, without which plaintiffs' claims fail. *Third*, plaintiffs failed to present evidence sufficient to establish loss causation or recoverable damages. Each of these three deficiencies is a ground for the Court to grant summary judgment.[2]

## I.    Plaintiffs Have Failed to Establish an Actionable Misstatement or Omission.

### A.    MBNA's Valuation of the 12/31/04 I/O Strip Was Not False or Misleading.

Defendants' Opening Brief established that plaintiffs failed to prove that the earnings statements at issue in this case—specifically, MBNA's statements on January 20, 2005 and March 15, 2005 regarding the 12/31/04 I/O Strip—were false or misleading. (Defs. Br. 4–5, 7–9.) Plaintiffs' primary response that "accura[cy] is irrelevant" (Pls. Br. 9) is incorrect.

The 12/31/04 I/O Strip valuation estimated the cash MBNA expected to receive over the next six-to-seven months from the credit card loans that made up the I/O strip as of December 31, 2004. Although accuracy alone may not always establish conclusively that a forward-looking prediction was reasonable when made, *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410,

---

[1] Capitalized terms in this brief have the same meaning as in defendants' Opening Brief.

[2] The claims against Charles Krulak fail for the additional reason that plaintiffs have not challenged any statement made by him as false or misleading. (Defs. Br. 10 n.7.) By not addressing this issue in their Answering Brief, plaintiffs essentially abandoned their claims against Charles Krulak.

1429 n.16 (3d Cir. 1997), MBNA's "look-back analysis" demonstrates that summary judgment is appropriate here. That analysis shows that the cash *actually* received by MBNA from the credit card loans that made up the 12/31/04 I/O Strip was $150 million greater than the cash MBNA estimated it would receive in its prior public statements. (Defs. Br. 4–5, 7–8.) Thus, to prevail on their claim, plaintiffs must show that MBNA's estimate of the value of the 12/31/04 I/O Strip was false or misleading, notwithstanding that the estimate turned out to be accurate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Plaintiffs failed to carry that burden. In opposing summary judgment, plaintiffs rely primarily on their accounting expert, Henning, who opined that MBNA overvalued the 12/31/04 I/O Strip by $138.2 million. (Pls. Br. 9.) Henning, however, evaluated only the U.S. Card portion of the I/O strip. (*See* PA 02035–39; Henning Dep. 77.)[3] For plaintiffs to sustain their burden of establishing that defendants fraudulently increased MBNA's reported income by overstating the value of the 12/31/04 I/O Strip, they must provide evidence of a net overvaluation of the *entire* I/O strip. Henning's limited U.S. Card analysis cannot sustain plaintiffs' claim.

Plaintiffs and Henning also do not dispute that when MBNA reiterated its financial results on March 15, 2005, the *actual* cash flow received by that date from the U.S. Card portion of the 12/31/04 I/O Strip was still $50 million more than the amount anticipated by MBNA in its earlier estimate. (*See* Pls. Br. 10–11; Ellingsen Dep. 148:19–149:21, 213:9–25, Ex. 2 at Ex. E.) Plaintiffs instead assert that the $50 million surplus included principal payments that might have reduced U.S. credit card balances and thereby reduced cash flow in later periods. (Pls. Br. 10–11.) The record

---

[3] Plaintiffs challenge the look-back analysis (Pls. Br. 9-10) with an undated declaration from Henning that questions whether the analysis was affected by loans securitized in 2005. (PA 02440-41.) Henning, however, does not rebut the testimony of defendants' accounting expert that those additional loans could not have had any material effect. (Ellingsen Dep. 176-78.)

2

establishes, however, that plaintiffs' argument is incorrect and thus cannot create a factual dispute. The $50 million did not reflect principal payments—it was entirely a measurement of cash received by MBNA from other sources. (*See* PA 01133 (describing types of cash MBNA received, which included interest and fees but not principal payments).)

Finally, plaintiffs' arguments dissolve when considered in practical application. As the record shows, MBNA accurately estimated the value of the 12/31/04 I/O Strip. Despite its ultimate accuracy, plaintiffs argue that the company's estimate was misleading. In other words, if plaintiffs could re-write history, they would have MBNA provide an inaccurate estimate for the 12/31/04 I/O Strip on January 20, 2005, provide another inaccurate estimate on March 15, 2005, and then, only after all the relevant data were received and MBNA's actual valuation proved accurate (or conservative), correct these misstatements. No basis exists in the securities laws for such a counterintuitive result.

B.   <u>MBNA's January 21, 2005 EPS Guidance Was Not Material.</u>

Plaintiffs cannot prove that MBNA's January 21, 2005 estimate of 10% EPS growth for 2005 was material. Plaintiffs' own damages expert, Torchio, testified that this EPS guidance did not materially alter the mix of information about MBNA's earnings growth. (Torchio Dep. 72.) Moreover, he opined that all of the alleged damages in this case (in the form of purported artificial inflation of MBNA's stock price) arose when MBNA announced its 2004 financial results on January 20, 2005, a day before MBNA provided the challenged EPS guidance. (Torchio Dep. 8.) This testimony from plaintiffs' own expert is fatal to their EPS claim.

Recognizing this, plaintiffs offer two new arguments seeking to avoid summary judgment. *First*, they contend that MBNA's announcement of its 2004 financial results on January 20, 2005— which did not mention MBNA's EPS expectations—should have disclosed "that MBNA's [2005] earnings would not meet market expectations of at least 10% growth." (Pls. Br. 20.) This new

3

"omission" theory does not solve plaintiffs' problem.[4]  Whether plaintiffs style their EPS claim as

an alleged misstatement or omission, plaintiffs' expert has conceded that the EPS guidance was

immaterial and thus inactionable.  More fundamentally, no violation of the securities laws arises if

defendants "omit" reporting on future expectations when accurately stating past results, even if the

future looks "less rosy." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).

*Second*, plaintiffs assert that the "materiality of Defendants' statements and omissions is

demonstrated by the decline in share price immediately following the April 21 corrective

disclosure." (Pls. Br. 11.)  Plaintiffs' suggestion that this price decline alone demonstrates that

MBNA's January 21 EPS guidance was material is sheer speculation insufficient to defeat summary

judgment.  Much of the information disclosed on April 21 did not relate to MBNA's earlier-

announced 10% EPS growth target, including important information about changes in MBNA's

business strategy and the difficulties posed by the overall economic environment.  (*See* April 21,

2005 Press Release (PA 1302.04).)  To prevail on their EPS claim, plaintiffs must come forward

with evidence that some or all of the drop of MBNA's stock price after April 21 was caused by

corrective disclosures concerning MBNA's prior EPS guidance.  Because plaintiffs' expert,

Torchio, provided no such analysis, speculation on this point cannot be used to avoid summary

judgment.

Defendants also have demonstrated that MBNA's EPS guidance was immaterial as a matter

of law under the "bespeaks caution" doctrine because the guidance was accompanied by the

requisite cautionary language. (Defs. Br. 9–10.)  Plaintiffs' brief does not address any of the

caselaw or facts cited by defendants.  Rather, plaintiffs rely on two cases (Pls. Br. 12) in which the

---

[4] Plaintiffs rely on two "material omission" decisions that are inapposite. (Pls. Br. 11 (citing cases).)  From the outset of the case, plaintiffs' theory has been that defendants made an affirmative misrepresentation on January 21 concerning EPS growth. (*See* Compl. ¶¶ 83–86.)  That is the only claim asserted in the complaint and the only claim before the Court.

DB01:2665201.1                                                                                    064261.1001

courts held that the "bespeaks caution" doctrine was inapplicable to statements about events that had already taken place.[5]  Those decisions do not apply to MBNA's statements about its expectations of *future* EPS.  Nor is defendants' reliance on the "bespeaks caution" doctrine undermined by plaintiffs' conclusory assertion that the cautionary language here was "a boilerplate recitation of factors." (Pls. Br. 12.)  As defendants demonstrated (Defs. Br. 10), MBNA's EPS guidance was accompanied by warnings that specifically identified the very risks at issue here.  That is all that is required.

## II.    There Is No Evidence That Any Individual Defendant Acted with Scienter.

Summary judgment is also appropriate because plaintiffs failed to prove motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness by defendants.[6]  Regarding the 12/31/04 I/O Strip, because none of the individual defendants participated in valuing the I/O strip, there is no evidence of opportunity to commit fraud. (Defs. Br. 12–13.)  Likewise, in connection with MBNA's EPS guidance, the evidence shows that MBNA provided guidance *below* market expectations in an effort to reduce those expectations.  This evidence completely contradicts plaintiffs' theory that defendants had a motive to inflate MBNA's stock price improperly.  (Defs. Br. 12–13.)

---

[5] *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 700–01, 709–10 (3d Cir. 1996) (concerning existing reserves); *In re Viropharma, Inc., Sec. Litig.*, No. 02-1627, 2003 WL 1824914, at *6–7 (E.D. Pa. Apr. 7, 2003) (concerning clinical trial that had already happened).

[6] In an effort to establish scienter, plaintiffs make inflammatory statements about defendants' stock sales and bonuses, along with conclusory statements about what defendants knew. (Pls. Br. 4–7, 13–15.)  Stock sales and bonuses do not establish scienter where, as here, there is no proof of motive, opportunity or recklessness.  *See In re Advanta*, 180 F.3d at 540–41 (fraudulent intent cannot be inferred "from the mere fact that some officers sold stock" or bonuses tied to the company's success); *Tse* v. *Ventana Med. Sys.*, 123 F. Supp. 2d 213, 225 (D. Del. 2000) ("it is well-established that the existence of executive compensation dependent upon stock value does not give rise to an inference of scienter"), *aff'd*, 297 F.3d 210 (3d Cir. 2002).

Plaintiffs also fail to counter the facts in defendants' Opening Brief describing the care MBNA employed to value the I/O strip and generate its annual EPS plan. (Defs. Br. 12–15.) Thus, plaintiffs cannot prove an extreme departure from standards of ordinary care required to establish scienter by recklessness, let alone conscious misbehavior.[7]

## III.   Plaintiffs Cannot Establish Loss Causation or Damages.

Plaintiffs wrongly assert that "[i]ssues of loss causation are uniquely unsuited to summary judgment." (Pls. Br. 15.) Case law from this Circuit shows that loss causation can be an appropriate ground for summary judgment. *See, e.g., McKowan Lowe & Co.* v. *Jasmine, Ltd.*, 231 Fed. App'x 216 (3d Cir. 2007) (affirming summary judgment for failure to produce evidence of loss causation); *McCabe* v. *Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007) (same); *Tse*, 123 F. Supp. 2d at 225, 227 (summary judgment for failure to prove loss causation).

Plaintiffs' loss causation and damages theories assume that MBNA's April 21 announcement "corrected" prior misstatements relating to the 12/31/04 I/O Strip and that this correction "caused" MBNA's stock price to drop by $4.14. The undisputed facts establish, however, that the April 21 announcement was not "corrective" and that plaintiffs' analyses of damages and loss causation improperly included confounding information.

### A.   There Was No Corrective Disclosure.

Plaintiffs cannot carry their burden to establish loss causation if the stock drop central to their case was not substantially caused by the release of corrective information. *See McCabe*, 494 F.3d at 426 ("In order to satisfy the loss causation requirement, plaintiff must show that the

---

[7] In declarations and sworn deposition testimony, the so-called "confidential informants" in this case have repudiated the statements attributed to them by plaintiffs in defeating defendants' motion to dismiss. (Defs. Br. 11–12.) In response, plaintiffs contended that they have audio recordings of the confidential informants that supposedly support the statements attributed to them (Pls. Br. 13 n.6) and have come up with a new "confidential informant." (D.I. 158.) Upon learning of the supposed existence of these recordings, defendants immediately asked plaintiffs to produce them. Thus far, plaintiffs have refused.

6

defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss."). Here, MBNA's April 21, 2005 announcement did not "correct" the alleged misstatements regarding the 12/31/04 I/O Strip. (*See* Defs. Br. 16–17.)

It is uncontested that the April 21, 2005 statement concerned the value of the forward-looking 3/31/05 I/O Strip, not the historic valuation of the 12/31/04 I/O Strip that plaintiffs challenge. Plaintiffs admit that the value of the 3/31/05 I/O Strip is the estimated "future excess cash flows" that would be paid in the upcoming "six to seven months," describing the I/O strip as "reflective of what management sees coming." (Pls. Br. 2.) Moreover, plaintiffs' own expert acknowledged that the assumptions used by MBNA to value the 3/31/05 I/O Strip do not indicate MBNA's 12/31/04 I/O Strip valuation was incorrect. (*See* Henning Dep. 135.) In short, the April 21, 2005 statements concerning the value of the 3/31/05 I/O Strip were based on future expected cash flows and thus are not corrective of prior statements about the 12/31/04 I/O Strip.

Plaintiffs' response is the unfounded assertion that a statement about the 3/31/05 I/O Strip is "corrective" of the 12/31/04 I/O Strip because the two I/O strips are "simply valuations of the same line item on MBNA's balance sheet at different points in time." (Pls. Br. 16.) This assertion does not carry plaintiffs' burden. It is tantamount to contending that information about a company's accounts receivable as of one date is the same as information about its accounts receivable as of an earlier date because the company put its accounts receivable on the same line of its financial statements. Plaintiffs thus have failed to carry their burden of proving that "corrective" information was the substantial cause of the April 21 stock drop. *See McCabe*, 494 F.3d at 438 (affirming summary judgment because plaintiffs did not prove that the alleged misrepresentations and omissions "were a substantial factor in causing [their] economic loss").

B.    Plaintiffs' Analysis of Damages and Loss Causation
      Failed to Exclude the Effect of Non-Corrective Information.

Plaintiffs' proposed proof of damages and loss causation is limited to an "event study" that

assumes that MBNA's stock price drop on April 21 was caused by the release of "corrective"

information and that the entirety of that drop ($4.14 per share) is the proper measure of damages.

(Torchio Dep. 9–10.) Indeed, Torchio conceded that his analysis is valid only if plaintiffs prove

that the April 21 stock price decline was caused by the release of "corrective information and *only*

*that information.*" (Torchio Dep. 43:13–20 (emphasis added).)  Plaintiffs cannot meet this burden

because Torchio did not exclude the effect of indisputably non-corrective information on the April

21 stock price. (Defs. Br. 18–19.)

For example, Torchio opined that the April 21 stock price decline was caused by the

announcement that the value of the 3/31/05 I/O Strip was $206.6 million less than the value of the

12/31/04 I/O Strip.  (Torchio Dep. 91–93, 102–05.)  However, $84.6 million of the $206.6 million

was indisputably caused by a change in the coupon rate.  (Defs. Br. 19 (citing Henning Dep. Ex. 9

at MBNA 0013221).)  Plaintiffs do not contend that any misstatement related to the coupon rate

occurred.  As a result, Torchio was wrong in assuming that the announcement about the $206.6

million differential was entirely "corrective information."

Plaintiffs argue that expectations about the coupon rate did not affect the April 21 stock

price drop because MBNA did not mention the coupon rate in its announcement.  (Pls. Br. 19.)

This argument makes no sense.  The April 21 announcement disclosed the entire $206.6 million

difference in value between two I/O strips, of which $84.6 million indisputably arises from a change

in the coupon rate assumption.  If plaintiffs want to argue that the $84.6 million coupon rate change

did not affect the stock price, they need to support their argument with an empirical damages

analysis, which Torchio has not undertaken.

8

In addition, there is no basis in the record for the assertion that the $206.6 million announcement is entirely "corrective," given that plaintiffs' accounting expert valued the alleged misstatement related to the I/O strip to be only $138.2 million. (Defs. Br. 19.)  Plaintiffs try to confuse the issue by arguing that MBNA should have announced that the 12/31/04 I/O Strip dropped in value by $233.9 million, which "corresponds closely" to the $206.6 million announcement made in April 2005. (Pls. Br. 18–19.)  Plaintiffs' number ($233.9 million) is comprised of (1) a non-corrective $95.7 million drop in value of the 12/31/04 I/O Strip that MBNA *in fact disclosed* to the market in January (Torchio Dep. 77–79) and (2) the *additional* $138.2 million plaintiffs argue should have disclosed (Torchio Dep. 77–79; *see* Torchio Rebuttal at 13 (PA 02362).)  In short, Torchio's math does not undercut the conclusion the $206.6 million announcement could not be entirely "corrective," given that this case concerns an alleged $138.2 million misstatement.

Plaintiffs attempt to deflect attention from these failures by asserting that the legal standard for loss causation does not require precision in the allocation of damages and that they are not required to show that a misrepresentation was the sole reason for the stock's inflation and subsequent decline in value. (Pls. Br. 17.)  These assertions are beside the point.  Regardless of the imprecision in plaintiffs' analysis, plaintiffs are required to exclude non-fraud factors from their loss causation and damages analyses. *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) ("disaggregating only some of [the confounding factors] cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss").  Torchio's failure to exclude the effect of the non-corrective information from his analysis prevents plaintiffs from establishing loss causation and damages. *See Omnicom*, 541 F. Supp. 2d at 554; *cf. In re Tyson Foods, Inc. Sec. Litig.*, No. 01-425-SLR, 2004 U.S. Dist. LEXIS 11122, at *37 n.3 (D. Del. 2004) (noting that failure to identify what portion of economic loss was attributable to the alleged

9

actionable statement would prevent proof of damages even if it does not bar proof of loss

causation), *aff'd*, 155 Fed. App'x 53 (3d Cir. 2005).

In apparent realization of this problem, plaintiffs assert that Torchio considered the non-

corrective information (Pls. Br. 17–18), but the pages they cite (PA 02134–35, 02177–79) show no

consideration of the issues raised by defendants (Defs. Br. 18–19).  In sum, it is plaintiffs' burden to

prove that the stock price decline on April 21, 2005 did not result from "non-corrective"

information.  That burden has not been met.[8]

## CONCLUSION

For the reasons set forth above and in defendants' Opening Brief, defendants respectfully

request that their motion for summary judgment be granted.

> YOUNG CONAWAY STARGATT & TAYLOR, LLP

Dated:  December 22, 2008

> */s/ Richard H. Morse*
> _____
> Richard H. Morse (No. 531)
> Michele Sherretta Budicak (No. 4651)
> rmorse@ycst.com
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware  19801
> (302) 571-6600
> *Attorneys for Defendants*

*Of Counsel*:
Richard C. Pepperman, II
Stacey R. Friedman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

---

[8] Relying on the Ninth Circuit's decision in *Provenz v. Miller*, 102 F.3d 1478, 1492 (9th Cir. 1966), plaintiffs claim that *defendants* must prove that the stock price decline on April 21, 2005 resulted solely from factors other than correction of the alleged January 2005 misstatements.  (Pls. Br. 17.)  In *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 343 (2005), however, the Supreme Court rejected the "language the Ninth Circuit used" in cases like *Provenz*.  The other case on which plaintiffs rely, *Caremark* v. *Coram Health Care Corp.*, 113 F.3d 645, 650 (7th Cir. 1997), is distinguishable because it concerned a motion to dismiss making its (pre *Dura*) comment about plaintiffs' burden at the summary judgment stage *dicta*.

## **APPENDIX**

Table of Contents

| **Title** | **Page** |
|---|---|
| Deposition of John E. Ellingsen Exhibit 2 at E | A152 |
| Deposition of John E. Ellingsen (excerpts) | A155 |
| Deposition of Frank C. Torchio (excerpts) | A158 |

064261.1001

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

IN RE:  MBNA CORP.
SECURITIES LITIGATION

)

DEPOSITION OF JOHN E. ELLINGSEN
New York, New York
Tuesday, October 7, 2008

Reported by: CAPRICE LATHE

Job No.:   16900

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE MBNA CORP.<br>SECURITIES LITIGATION | Case No. 1:05-CV-00272-GMS<br>CONSOLIDATED |

# Expert Report of John E. Ellingsen

### August 21, 2008

CONFIDENTIAL



EXHIBIT

Ellingsen 2

10-7-08 CL

## Exhibit E
## Cash Flows from U.S. Card Receivables Securitized at December 31, 2004:
## MBNA's Estimates vs. Actuals for January–February 2005
*(in thousands)*

| Month | 12/31/04<br>Estimated Cash Flows<br>[b] | Percent of Total<br>[b] | Actual Cash Flows<br>[c] | Difference<br>[d] |
|---|---|---|---|---|
| January | $213,911 | 27% | $253,170 | $39,259 |
| February | 180,862 | 23% | 193,398 | 12,536 |
| March | 147,813 | 18% | | |
| April | 114,763 | 14% | | |
| May | 81,714 | 10% | | |
| June | 48,665 | 6% | | |
| July | 15,616 | 2% | | |
| Total | $803,344 | 100% | $446,568 | $51,795 |

Note:
[a] Analytical Review of I/O, MTII & Note Trust [EY4WHS-MBNA-0005083].
[b] = Estimated monthly cash flows / Total estimated cash flows for January through July.
[c] Excess Spread and Payment Rate assumptions have been updated to actual values of 6.03% and 16.65% for January and 4.61% and 15.33%
     for February per Q1 2005 Actual Trust Performance [MBNA 0015270].
[d] = [c] - [a].

CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

IN RE:  MBNA CORP.
SECURITIES LITIGATION

)

DEPOSITION OF JOHN E. ELLINGSEN
New York, New York
Tuesday, October 7, 2008

Reported by: CAPRICE LATHE

Job No.:   16900

**Page 174**

J. ELLINGSEN

1
2     A   Well, it starts large and gets small
3  because the balance is declining each month.  This
4  is only the receivables that have been sold as of
5  12/31/04 and those receivables are paid off.  In
6  this column, it is assumed that they are paid off
7  15.45 percent at the beginning balance per month.
8     Q   And B is -- can you tell me what column B
9  is?
10    A   Column B is a computation using the same
11 model that was used to estimate the cash flow, but
12 putting in the actual payment rates and the actual
13 excess spreads.  So this represents actual cash
14 flows, what the company actually received.
15    Q   Is that a calculation?
16    A   Yes.
17    Q   How did you do that calculation?
18    A   I did it by taking what is called the
19 model, the formula; the same formula that was used
20 to estimate the cash flows in column A.  And
21 instead of using 15.45 as the payment rate, I used
22 the actual payment rate for January.  I used the
23 actual payment rate for each of the months.
24          Instead of using 4.25 as the
25 estimated yield, I used the actual yield, according

**Page 175**

J. ELLINGSEN

1
2  to the trust report, for each month.
3     Q   The estimated cash flows, are they done
4  on a managed basis or a trust?
5     A   Trust.  They use the -- the beginning
6  balance that is used in this computation is the
7  balance of receivables that have been securitized
8  and are in trust.  I think they call it M2 -- and
9  there's two different trusts, but they total up the
10 U.S. card securitized receivables.
11    Q   So here, it is a formula.  What is the
12 formula to come up with these actual cash flows;
13 you use the actual payment rate and the actual
14 yield, you said?
15    A   Right.  You take the beginning balance
16 times the -- for January, it is -- the excess
17 spread, whatever that is, 425, or the actual
18 spread, which was more like a higher number.
19 Divide it by 12 times that balance.
20          Then the next month, the balance that
21 you use is reduced by the payment rate.  In the case
22 of the estimated cash flows, that balance is reduced
23 by 15.45 percent.  In the case of my computation, it
24 is reduced by the actual payment rate, which was
25 actually a bit higher.  I think it was 16 point

**Page 176**

J. ELLINGSEN

1
2  something percent.
3          And then that new balance is the
4  balance for February.  You take that times the
5  excess spread divided by 12.  The excess spread is
6  expressed in annual terms, so you divide it by 12 to
7  get the monthly excess spread.  And then the next
8  month you take -- in the case of the estimated cash
9  flows -- 15.45 times the beginning balance and
10 that's the reduction in the balance.  That becomes
11 your new balance.  You multiply that times the
12 excess spread divided by 12.
13    Q   Again, the actual cash flows includes
14 the -- I guess the data used to calculate the
15 actual cash flows includes the experience for loans
16 that were not securitized as of 12/31/04?
17    A   Yes.  And as I explained, I believe that
18 those numbers, within fairly small tolerance,
19 reflect -- that the total numbers in the trust
20 reflect what related to the 12/31/04 balance.
21    Q   What is a fairly small tolerance?
22    A   As I stated earlier, since two million --
23 $2.4 million in total was securitized.  I
24 conservatively estimated that $2 billion of that is
25 new securitizations related to the U.S. card

**Page 177**

J. ELLINGSEN

1
2  receivables.  There were about -- I think it was
3  59 million in total at the end of the second
4  quarter.  So I said, okay.  Let's just say -- I
5  don't believe this, but let's just say that those
6  new accounts had a 20 percent different pre-payment
7  rate -- or payment rate and a 20 percent different
8  yield.  How much would that affect the computation?
9  And it was -- my computation was that it was less
10 than 1 percent.
11    Q   What do you mean 20 percent different?
12    A   Let's say the payment rate instead of
13 being 4 percent was 4.8 percent.  So now you have
14 got -- there's a weighted average of the two.  98
15 percent of the -- I think it was 98 percent.  I
16 forget the exact number, but it was around there.
17          98 percent of the loans are from
18 accounts that were securitized at 12/31/04.  Now,
19 the original 12/31/04 balance has been paid down,
20 but what has been added to the trust pool is
21 receivables from those same accounts.  So there is
22 certainly no reason to believe that the payment rate
23 would be different for receivables in the same
24 accounts.
25          So since 98 percent of them are the

Page 178

J. ELLINGSEN

1         J. ELLINGSEN
2 same, I believe that instead of $818 million, it
3 might be 814 or 800-something million. It is still
4 more than they estimated, so it doesn't change the
5 conclusion at all. That's what I mean by small
6 tolerances, less than 1 percent.
7       (Recess taken from 5:29 p.m. to 5:42
8     p.m.)
9     Q   Did you provide those calculations that
10 we were just discussing as part of your report?
11     A   No.
12     Q   Are those calculations you relied on in
13 forming your opinions?
14     A   I am not sure how to answer that. They
15 were -- I did them to corroborate that my beliefs
16 were correct that the trust results were,
17 overwhelmingly, the results of receivables from
18 accounts that had been secured. So no, I didn't
19 rely on them in that sense.
20     Q   I think before, when you explained the
21 process -- again, looking at Exhibit H -- you
22 explained the process of coming up with column B
23 and you stated that you used the actual payment
24 rates, for example, for each month; is that
25 correct?

Page 179

1         J. ELLINGSEN
2     A   Right.
3     Q   Is that consistent with the process that
4 MBNA used when they did this type of calculation?
5     A   Well, MBNA did routinely a look-back
6 analysis where -- that they compared the actual
7 trust results to the -- to what they had estimated.
8 They didn't do it exactly like this, but yes.
9     Q   Did MBNA use a monthly actual payment
10 rate or did they use averages?
11     A   For what?
12     Q   For the six-month period.
13     A   For what purpose?
14     Q   For calculating cash flows.
15     A   They used an average. For calculating
16 the I/O strip, they used an average.
17     Q   How about for estimating the cash flows?
18     A   Excuse me. Give me that question, again.
19     Q   How about for estimating the cash flows?
20     A   Yes. Yes, they used averages.
21     Q   Why do you use a process that is distinct
22 from the process that management used?
23     A   Because we were doing two different
24 things.
25       That management used to value the I/O

Page 180

1         J. ELLINGSEN
2 strip?
3     Q   In this case, we are talking about
4 estimating cash flows.
5     A   Well, that's how you value the I/O strip,
6 is you estimate the cash flows.
7     Q   Why are you using a process that is
8 inconsistent with the process that management used
9 for all time?
10     A   Because --
11       MR. MORSE: Objection to form.
12       THE WITNESS: Could I have the question
13 read back?
14       (Record read back.)
15       THE WITNESS: For all time?
16       MR. MORSE: That's why I objected to
17 form.
18       THE WITNESS: I don't understand the
19 question. I don't understand what "all time"
20 means.
21     Q   Why are you using a process that is
22 different than the process that management of MBNA
23 used when valuing the I/O strip?
24     A   Because I am doing something different
25 than they were doing. They were estimating the

Page 181

1         J. ELLINGSEN
2 value of the I/O strip. They were making an
3 estimate based on the assumptions that they
4 developed.
5       What I am doing is comparing their
6 estimate to what actually happened. And what
7 actually happened is based on the particular payment
8 rate and excess spread for that particular month.
9       And I would further point out that
10 the use of averages would not give an accurate
11 portrayal of actual cash flows, because as you can
12 see from Exhibit H and as you pointed out earlier,
13 the cash flows change fairly dramatically over the
14 six months.
15       So it makes a big difference if the
16 rate in January is substantially different than the
17 rate in July, and averages would distort that
18 effect. So that's why I used the actual rate
19 because I am trying to find the actual cash flows.
20     Q   I was trying to look back and see what
21 your opinion is related to the I/O strip. It might
22 be different here today than it is in the report.
23       But your opinion is that the I/O
24 strip as of 12/31/04 was proper, right?
25     A   Right.

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

--------------------------------X

IN RE:  MBNA CORP. SECURITIES        Master Docket

LITIGATION                 No. 05-272 GMS

--------------------------------X


VIDEOTAPED DEPOSITION OF FRANK C. TORCHIO

New York, New York

October 8, 2008


Reported by:
Bonnie Pruszynski, RMR
JOB NO. 18721

Page 74

F. Torchio

1
2     Q     Do you agree that there was no
3  statistically significant movement in the price of
4  MBNA stock on January 21?
5     A     I agree with that.
6     Q     Doesn't that mean there was no
7  material increase in the price on that day?
8     A     That's right.  The lack of a
9  statistically significant price reaction is
10  exactly that.  There is no statistically
11  significant price reaction on that day.
12     Q     So, the price movement on that day
13  might have been random?
14     A     It might have been.
15     Q     Do you have an opinion as to what the
16  price movement of MBNA stock would have been on
17  January 21 if no earnings growth guidance had been
18  given?
19     A     You want me to assume that there was
20  no prior expectation for earnings guidance?
21     Q     I want you to assume that all of the
22  facts which existed, up through and including
23  January 21 existed, except that no earnings growth
24  guidance was given on January 21.
25     A     Okay.  I got the predicate facts.

Page 75

F. Torchio

1
2  And the question, again, is what would have
3  happened?
4     Q     Yes.
5     A     I can't put a magnitude to it, but I
6  would expect that the price would go down.
7     Q     Why would you expect the price would
8  go down?
9     A     My recollection is that the analysts'
10  were appraised that MBNA was going to provide it,
11  provide the market with guidance at the end of the
12  fourth quarter.
13         So, by failing to provide guidance,
14  after you kind of tell the market that you are
15  going to give them guidance, is generally viewed
16  as a negative in my experience.
17     Q     Let me ask another hypothetical
18  question.  If all the facts through January 21 had
19  been the same, except MBNA had not indicated to
20  the analysts' that it would be giving earnings
21  growth guidance, and if you did not give earnings
22  growth guidance, do you have an opinion as to what
23  the stock price would have been on January 21?
24     A     So, let's see.  Management did not
25  tell the market that it was going to give any

Page 76

F. Torchio

1
2  earnings guidance and management did not provide
3  any earnings guidance.  My -- my assessment is
4  that the price would not have reacted in a
5  statistically significant manner.
6     Q     Was a $95.7 million reduction in the
7  IO script as of December 31, 2004, disclosed on
8  January 20?
9     A     You know, I don't remember if it was
10  the 20th or the 21st.  I think it's in my report
11  if you want me to check.
12     Q     Yes.  Check either your report or
13  whatever documents you relied on to --
14     A     Okay.
15     Q     -- to do the report on that issue.
16     A     I think it was the 21st, but I am not
17  100 percent certain.  I don't have specific -- let
18  me just check.
19         My recollection is that that number
20  was disclosed at the analysts' conference call
21  meeting on the 21st.
22     Q     When did MBNA disclose its 2004
23  year-end financials?
24     A     March 15th, I believe, was the date
25  of the 10-K.

Page 77

F. Torchio

1
2     Q     Did it make its 2004 financial
3  results available prior to March 15th?
4     A     There were some slides presented at
5  this analysts' conference as I recall, that
6  presented the results, not in a final form but on
7  slides.  So, that is my recollection.
8         MR. MORSE:  Let's go off the record
9  for a second.
10         THE VIDEOGRAPHER:  The time is 11:55.
11  We are going off the record.
12         (Recess taken.)
13         THE VIDEOGRAPHER:  The time is 12:05.
14  We are back on the record.
15         (Torchio Exhibit 4 marked for
16  identification.)
17  BY MR. MORSE:
18     Q     Mr. Torchio, is the document we
19  marked as Exhibit 4 a printout of the slides to
20  which you referred a few moments ago?
21     A     Can I thumb through this?
22     Q     Yes.
23     A     It's been a while since I looked at
24  this.  I think this is it.  It's been a while.
25     Q     Does the fact that that document has

20  (Pages 74 to 77)

## Page 78

F. Torchio

2 the date January 20, 2005, on the first page help
3 you recall that the IO strip reduction of
4 $95.7 million was disclosed on January 20?
5     A    You know, it would seem so. But I am
6 not sure when the presentation was made, if that
7 is just the date of this slide. But it could well
8 have been on the 20th, I just can't recall.
9     Q    Do you know whether or not the IO
10 strip valuation was used in the determination of
11 MBNA's income for 2004?
12     A    The income that was reported in
13 January?
14     Q    Yes.
15     A    I believe it was, but I didn't -- you
16 know, I think the income that was reported was the
17 same as was in the 10-K, which reflected the write
18 down, but as far as going to a specific slide to
19 make that determination, I haven't done that.
20     Q    Was MBNA's 2004 income first
21 disclosed on January 20th in an 8-K?
22     A    Yes, that is correct.
23     So, they disclosed 59 cents per share
24 for the fourth quarter, and $2.05 for the full
25 year, and that was on January 20th.

## Page 79

F. Torchio

2     Q    Now, on the day when the
3 $95.7 million reduction in IO value was disclosed,
4 which I think you said was probably January 20,
5 but maybe was January 21, was there a price
6 change?
7     A    Well, neither day had a statistically
8 significant price reaction, and if I can just -- I
9 might be able to answer your question about when
10 it was disclosed and when one would expect the
11 price reaction. I might have that here somewhere.
12     So, it appears, based upon my
13 chronology, that the meeting did take place, but
14 it took place after the market closed on the 20th.
15 That was my confusion. So, that any price
16 reaction to the meeting would have been reflected
17 in the January 21 price. But, as I said, neither
18 of those two days resulted in a statistically
19 significant price movement.
20     Q    So, regardless of the day, you are
21 saying there was no price reaction when the
22 $95.7 million IO strip reduction was announced;
23 correct?
24     A    Correct.
25     Q    Do you have an opinion as to whether

## Page 80

F. Torchio

2 there would have been a price change if an
3 additional $138 million reduction had been
4 announced on that day?
5     A    No other information?
6     Q    Yes. My hypothetical says the
7 information that was disclosed on January 20 and
8 January 21 was exactly the same, except that
9 instead of there being a number indicating there
10 was a $95.7 million reduction in IO value, there
11 was a number indicating there was a reduction
12 $138 million more than that.
13     A    You know, it's a difficult
14 hypothetical, because it -- you know, it doesn't
15 quite fit together. For a company to announce a
16 233 million IO write down and not say anything
17 else, to me, is an incomplete hypothetical.
18     So, it's difficult for me to respond
19 to that. So, it's difficult to try to understand
20 what would happen if they only announced it.
21     In my effort to be responsive, I can
22 only say that the magnitude of such a write down
23 would have created a great deal of uncertainty and
24 a great deal of questioning about what was going
25 on. So, it's difficult, you know, it's difficult

## Page 81

F. Torchio

2 for me to say what, what would have happened. I,
3 my -- my best expectation is that it would have
4 caused a price decline. But again, it's, in my
5 view it's an incomplete hypothetical.
6     Q    You have no opinion as to how much
7 price decline would have been caused if the amount
8 of write down disclosed was $138 million more and
9 there was no other change in the disclosures?
10     A    Yeah. It's a difficult, it's a
11 difficult hypothetical, as I said. And I can, you
12 know, I can say, with a fair amount of confidence
13 directionally what would happen, but it would be
14 difficult to -- to quantify how much that price
15 reaction would have been. And, as I said here, I
16 do not have a quantification for that.
17     Q    So, you think the price would have
18 gone down, but you have no opinion as to how much?
19     A    Well, yeah. I mean, again, the
20 magnitude of this write down would warrant, you
21 know, even it was hidden in some footnote, I think
22 it would get picked up and would warrant a great
23 deal of uncertainty in the marketplace by analysts
24 about what the heck was going on. And that alone,
25 that, you know, the fact that a company would

21 (Pages 78 to 81)

## CERTIFICATE OF SERVICE

I, Richard H. Morse, hereby certify that on December 22, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of Court using CM/ECF which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jeffrey S. Goddess, Esquire
> Rosenthal Monhait Gross & Goddess, P.A.
> Mellon Bank Center
> 919 Market Street, Suite 1401
> P. O. Box 1070
> Wilmington, DE 19899
>
> Brian D. Long, Esquire
> Rigrodsky & Long, P.A.
> 919 N. Market Street, Suite 980
> Wilmington, DE 19801

I further certify that on December 22, 2008, I also caused copies of the foregoing document to be served by hand on the above-listed counsel of record and on the following in the manner indicated:

### BY EMAIL

> Robert T. Haefele, Esquire
> William E. Applegate, IV, Esquire
> Meghan S. B. Oliver, Esquire
> Motley Rice LLC
> 600 West Peachtree Street NW, Suite 800
> Atlanta, GA 30308

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*Richard H. Morse*

Richard H. Morse (I.D. No. 531)
17th Floor, Brandywine Building
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6651
rmorse@ycst.com

Attorneys for Defendants